**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **PATTY BEALL, MATTHEW MAXWELL, TALINA MCELHANY, KELLY HAMPTON, CASEY BROWN, JASON BONNER, KEVIN TULLOS, ANTHONY DODD, ILENE MEYERS, TOM O'HAVER, JOY BIBLES, DON LOCCHI AND MELISSA PASTOR, individually and on behalf of all other similarly situated;** | § § § § § § § § § § | |
| **Plaintiffs,** | § § § § § | **2:08-cv-422  TJW** |
| **TYLER TECHNOLOGIES, INC. AND EDP ENTERPRISES, INC.** **Defendants.** | § § § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR**
**CERTIFICATION OF COLLECTIVE ACTION AND REQUEST FOR NOTICE TO**
**POTENTIAL PLAINTIFFS PURSUANT TO SECTION 216(b)**

Defendant Tyler Technologies, Inc. ("Tyler"), by and through its attorneys, responds in opposition to Plaintiffs' "Motion for Certification of Collective Action and Request for Notice to Potential Plaintiffs Pursuant to Section 216(b)" on behalf of itself and on behalf of Defendant EDP Enterprises, Inc. ("EDP"), as its successor-in-interest, (collectively, "Defendants"), and shows the Court as follows:

**I.**
**INTRODUCTION AND BACKGROUND FACTS**

Named Plaintiffs Patty Beall, Matthew Maxwell, David Gravley, Talina McElhany, Kelly Hampton, Casey Brown, Jason Bonner, Kevin Tullos, Anthony Dodd, Ilene Meyers, Tom O'Haver, Joy Bibles, Don Locchi and Melissa Pastor (collectively "Plaintiffs") filed this action

alleging they were improperly classified as exempt employees resulting in them not being paid overtime in violation of the Fair Labor Standards Act ("FLSA").   In addition to themselves, Plaintiffs seek to represent a class of Tyler employees spanning at least 11 different job titles, 18 different functional operating divisions and over 35 different geographical locations (the "Putative Class").   Defendants oppose Plaintiffs' Motion because the incredibly expansive Putative Class that Plaintiffs attempt to certify is not similarly situated.

Tyler's business involves selling and servicing software applications primarily to municipal government bodies.  Over the years, Tyler has acquired software companies in its line of business with proven results and strong leadership.[1]  The groups and divisions within Tyler's current corporate structure consist of various software companies that Tyler has acquired.[2]  After their acquisition by Tyler, and as explained more fully herein, the operating groups and divisions continue to exercise a significant degree of autonomy.[3]

Groups and divisions within Tyler manufacture and sell different types of software.  Each division maintains a separate implementation staff, support staff, accounting department and human resources department.[4]  Additionally, each division determines its hiring policies and the structure of its employee job titles and responsibilities.[5]  Further, many divisions maintain multiple office locations, as locations from the original acquisitions generally have stayed in tact.[6]  In addition, many divisions maintain unique pay structures which often include a base

---

[1] *See* Exh. A, Moore Dec. at ¶ 4, APP 0001-0002.
[2] *Id.* at ¶ 7, APP 0003.
[3] *See id.* at ¶¶ 4 & 8, APP 0001-0002, 0004.
[4] *Id.* at ¶ 8, APP 0004.
[5] *Id.*
[6] *Id.*

salary and some sort of incentive plan.[7]

With respect to the exempt/non-exempt classification of employees, Tyler has not changed such classifications upon the acquisition of a particular software company.[8]  To the contrary, the current classification system of Tyler's employees at its various divisions and offices is the product of historical classifications originally made by the entities prior to their acquisition.[9]

The declarations attached to Plaintiffs' Motion do not warrant certification of the expansive class proposed by Plaintiffs.  To the contrary, many of the declarations reveal differences in job function from one Tyler division to another.  For example, within some Tyler groups and divisions, an implementer largely serves a consulting function.[10]  In other divisions, implementers primarily provide training and ongoing support to customers.[11]  Moreover, the declarations are not representative of functionalities across division lines.  For example, while Plaintiffs have assembled three declarations from Tyler's large financial division, all of those declarations are from implementation consultants.  There are no declarations in that division from customer support or the other positions sought to be certified by Plaintiffs as part of the nationwide class.

As a result of Tyler's historical business structure, there are and have been significant differences among the job functions in the Company's various divisions and offices.  Tyler's historical corporate structure and the resulting variations in job functions across Tyler divisions

---

[7] *See* Exh. A, Moore Dec. at ¶ 8, APP 0004; Exh. B, Spence Dec. at ¶ 8, APP 0010; Exh. C, Hepburn Dec. at ¶ 9, 0015; Exh. D, Womble Dec. at ¶¶ 8,11, APP 0018-0019; Exh. E, Volkens Dec. at ¶¶ 4-6, 8-9 APP 0020-0023; Exh. F, Fallon Dec. at ¶¶ 7-8, APP 0025-0026.
[8] Exh. A, Moore Dec. at ¶ 4, APP 0001-0002.
[9] *Id.*
[10] *See, e.g.,* Exh. E, Volkens Dec. at ¶ 4, APP 0020-0021; Plaintiffs' Motion for Certification of Collective Action and Request for Notice to Potential Plaintiffs Pursuant to Section 216(b) (hereinafter "Plaintiffs' Motion"), Exh. I at ¶ 4.
[11] *E.g.*, Plaintiffs' Motion, Exh. F at ¶ 3.

make this case a peculiarly inappropriate candidate for certification under Section 216(b) of the FLSA. Indeed, the expansively broad class sought to be certified by Plaintiffs would not yield any of the judicial efficiencies contemplated by Section 216(b). To the contrary, because of the individualized proof requirements associated with the application of the FLSA's exemptions to the multiple and varied positions identified herein, Plaintiffs' Motion for Class Certification should be denied.

## II.
## ARGUMENT AND AUTHORITIES

A.      **Applicable Law.**

In analyzing requests for certification of a collective action under Section 216(b) of the FLSA, the majority of federal courts, including this one, apply the two-stage approach described in *Lusardi v. Xerox Corp.*[12] Under *Lusardi*, the first determination regarding class certification is made at the notice stage.[13] At the notice stage, the district court makes a decision whether or not court-facilitated notice is proper based on the pleadings and any affidavits which have been submitted.[14] While Plaintiffs at this stage need not marshal all their evidence, they nonetheless must show substantial allegations that the putative class members were victims of a single decision, policy or plan.[15]

If the district court "conditionally certifies" the class, putative class members are given notice of the lawsuit and the opportunity to opt-in.[16] The second determination regarding class

---

[12] 118 F.R.D. 351 (D.N.J. 1987); *see also Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995) *overruled on other grounds*. In *Mooney*, the Fifth Circuit acknowledged the *Lusardi* approach, but did not need to decide which, if any, of the competing methodologies should be employed.
[13] *Mooney*, 54 F.3d at 1213.
[14] *Id.* at 1213-14.
[15] *Id.* at 1214, fn8.
[16] *Id.*

certification is typically precipitated by a motion for "decertification" filed by the defendant(s).[17]

Conditional certification of a collective action under Section 216(b) is a tool of judicial economy and is used to find an "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."[18]  Thus, collective actions are appropriate only when plaintiffs are similarly situated and where common resolution would be appropriate.[19]  The more dissimilar the plaintiffs' job experiences are from one another and the more individualized an employer's defenses are, the less appropriate the case is for collective action.[20]

The analysis in an exemption/misclassification case is a highly fact-intensive inquiry given the multiplicity of factors that a court must consider to determine if an employee is classified properly in light of his or her job duties.[21]  As such, summary certifications of alleged classes in FLSA exemption cases can produce results that diminish the efficient resolution of litigation.  There is perhaps no better example of this than *Johnson v. Big Lots Stores, Inc.*, where the district court conditionally certified a class of Assistant Store Managers ("ASMs") of a nation-wide retail chain.[22]  The ASMs were subject to a uniform job description, required to run individual stores according to corporate policies and each were managed by a Store Manager.[23]  Despite the superficial similarities in essential job functions, <u>after</u> a trial on the merits, the court decertified the class because it determined that it would be forced to analyze each plaintiff's job

---

[17] *Id.*
[18] *Hoffman LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989).
[19] *See Dybach v. State of Fla. Dep't. of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991) (stating that "the district court should satisfy itself that there are other employees of the department-employer who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions").
[20] *Johnson v. Big Lots Stores, Inc.*, 561 F.Supp.2d 567, 574 (E.D. La. June 20, 2008).
[21] *Id.*
[22] *Id* at 569.
[23] *Id.* at 578-579.

duties to determine whether or not he or she properly was classified as an exempt employee and, accordingly, class certification was not appropriate.[24]

At the notice stage, Plaintiffs bear the entire burden to show they are similarly situated to the proposed plaintiffs with respect to job requirements and pay provisions.[25]   Class members must share more than a common allegation that they were denied overtime or paid below the minimum wage.[26]   Plaintiffs must show that the similarities go "beyond the mere facts of job duties and pay provisions."[27]   Plaintiffs must demonstrate that the putative class members were victims of a single decision, policy or plan.[28]

In determining whether Plaintiffs have met their burden to show that they are similarly situated, courts consider not only whether potential plaintiffs were identified and whether affidavits of potential plaintiffs were submitted, but also whether evidence of a coherent, widespread plan has been identified.[29]   If Plaintiffs are able to show that they are similarly situated to the putative class with respect to the alleged unlawful policy or decision, only then should the Court conditionally certify the class and exercise its discretion to approve and order notice to the Putative Class.[30]   Courts have full discretionary authority to deny the sending of notice to potential class members.[31]   When refusing to authorize notice, courts have noted that they have "a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation" when the parties are not similarly situated and cannot efficiently adjudicate their

---

[24] *Id.* at 587-88.
[25] *Allen v. McWane, Inc.*, No. Civ.A.2:06-CV-158, 2006 WL 3246531, at *2 (E.D. Tex. Nov. 7, 2006).
[26] *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. Nov. 8, 2002).
[27] *See Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007), *cert. denied*, 128 S.Ct. 2902 (2008).
[28] *Mooney*, 54 F.3d at 1214, fn8.
[29] *Allen*, 2006 WL 3246531, at *2.
[30] *See Mooney*, 54 F.3d at 1214; *see also Allen*, 2006 WL 3246531, at *2.
[31] *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989) (noting that notice should be allowed only in "appropriate cases").

claims on a representative basis.[32]

**B.      Conditional Certification and Notice are Not Proper in This Case Because Plaintiffs are Not Similarly Situated to the Putative Class.**

Plaintiffs have failed to meet their burden at this notice stage because Plaintiffs' Motion and evidence lack substantial allegations and competent evidence showing: (1) Plaintiffs and the Putative Class were/are victims of a single decision, policy or plan; and (2) that similarities in job requirements and pay policies across the proposed class justify notice.[33]  In fact, the evidence is contrary to Plaintiffs' allegations and supports the conclusion that Plaintiffs and the Putative Class are not similarly situated.  As a result, approving notice to the Putative Class would only result in unwarranted and baseless litigation, which courts have a responsibility to avoid.[34]

1.      **Plaintiffs Have Put Forth No Evidence of a Common Policy or Widespread Unlawful Plan.**

a.      **Historical Divisional Differences.**

Tyler's different business groups and divisions are functionally distinct from one another. The historical differences among the groups and divisions preclude the possibility that the Putative Class members were victims of a common decision, policy or plan.

Beginning in 1997, Tyler began providing integrated software systems and related services for local governments, schools and not-for-profit organizations.[35]  Over the past eleven years, Tyler has acquired more than 25 separate companies across the country.[36]  Until 2005,

---

[32] *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 944 (W.D. Ark. Apr.15, 2003) (quoting *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991)); *H&R Block, Ltd. v. Housden*, 186 F.R.D. 399, 401 (E.D. Tex. June 23, 1999); *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995).
[33] *See H&R Block*, 186 F.R.D. at 400.
[34] *See Allen*, 2006 WL 3246531, at *2 (citing *D'Anna*, 903 F. Supp. at 894); *see also H&R Block*, 186 F.R.D. at 401 (same).
[35] Exh. A, Moore Dec. at ¶ 4, APP 0001-0002.
[36] *Id.*

these entities operated as independent, wholly-owned subsidiaries of Tyler.[37]  Beginning in early 2005, Tyler merged the subsidiaries into Tyler, primarily for tax-related reasons.[38]  Today, most of the former stand-alone subsidiaries maintain operational autonomy, historical management, and organizational structure.[39]  For example, most Tyler divisions have preserved their accounting and human resources staffs.[40]  Moreover, the exempt and nonexempt classifications under the FLSA at the Tyler divisions are the product of historical treatment of employees in job classifications, not the result of any common plan.[41]  Tyler simply inherited and retained the wage and hour classifications of the positions in question previously adopted by the companies which it acquired.[42]

For internal reporting and organizational purposes, the Tyler divisions are  organized into the following four (4) functional groups based primarily on the type of software that each sells: (a) Financial Management (Large Cities) and Education; (b) City Solutions (Small Cities); (c) Courts and Justice; and (d) Property Appraisal and Tax.[43]  Within the Financial Management and Education Group, there are twelve (12) former stand-alone companies.  There are four (4) former stand-alone companies within the City Solutions Group.  Further complicating the analysis of Tyler's structure, many divisions have multiple offices in different cities and states as office locations have generally been maintained post-acquisition by Tyler.[44]  The 18 divisions thus are scattered throughout the United States in different offices.

---

[37] *Id.* at ¶ 5, APP 0002.
[38] *Id.*
[39] *Id.* at ¶ 8, APP 0004.
[40] *Id.*
[41] *Id.* at ¶ 4, APP 0001-0002.
[42] *See id.*
[43] *Id.* at ¶ 7, APP 0003.
[44] *Id.* at ¶ 9, APP 0004.

Most of the divisions offer the same products that they offered prior to their acquisition by Tyler, even if such products are duplicative of products and services offered by other Tyler divisions.[45]  Further, employment decisions, job postings, job descriptions and responsibilities, and compensation plans generally are established at individual divisions by local management – not by a corporate policy or practice.[46]  In addition, the exemption status of employees has been historically determined and maintained by each division and is not subject to a Tyler-wide policy or practice.[47]

Courts have been reluctant to certify classes in analogous cases involving companies with historical structures similar to Tyler's.  For example, in a FLSA "off the clock" case, *Sheffield v. Orius Corp.*, the plaintiffs sought to certify a class of linemen, splicers, crew foremen, and laborers.[48]  The evidence showed that Defendant acquired many smaller companies and was aware of potential wage and hour violations committed by the acquired entities.[49]  The court observed that the putative class members were employed by different affiliates of defendant, held different job titles, enjoyed different payment structures and worked at nine (9) different sites.[50] The court further determined that the plaintiffs had not met their burden to prove that a putative class was similarly situated because of factual differences among the putative class members and the absence of a uniform plan or scheme to deny workers overtime compensation.[51]  The court noted that, "[i]f much of the unlawful conduct was committed by small, individual companies who were later acquired by defendant, then plaintiffs who worked for these separate entities are

---

[45] *Id.* at ¶ 8, APP 0004.
[46] *Id.*
[47] *Id.* at ¶ 4, APP 0001-0002.
[48] 211 F.R.D. 411, 413 (D. Or. 2002).
[49] *Id.*
[50] *Id.*
[51] *Id.*

not related as victims of a uniform, national policy."[52]

The Putative Class here is analogous to that in *Sheffield*.  The Putative Class members were or are employed within various Tyler divisions, holding different job titles and enjoying different compensation structures[53] at locations throughout the United States.   As in *Sheffield*, there simply is no uniform policy or practice that joins the putative class.   Accordingly, conditional certification is improper for this reason alone.

In *Reed v. Mobile County School System*, the plaintiffs sought to certify under Section 216(b) all persons employed by the defendant school system in "non-certified" positions who were not paid overtime compensation during a three-year period.[54]   In its analysis, the court noted that school "…campuses necessarily possess some degree of autonomy from other campuses and even from central administration. . . ."[55]   The court further observed that the plaintiffs sought to represent a class that included persons performing jobs that the named plaintiffs had never held, who had different duties than the named plaintiffs, who worked different schedules than the named plaintiffs under different supervisors, and who worked in locations remote from the plaintiffs and each other.[56]   Accordingly, the court refused to certify the putative class.[57]

Certainly the Tyler divisions, which were historically independent and have maintained their original operational structure, possess a higher degree of autonomy than a school campus that is part of a centralized school system.  Like the *Reed* plaintiffs, Plaintiffs seek to represent a

---

[52] *Id.*
[53] See Section II.B.1.c. herein for a detailed explanation of different compensation structures.
[54] 246 F.Supp.2d 1227, 1230 (S.D. Ala. 2003).
[55] *Id.* at 1232.
[56] *Id.* at 1233.
[57] *Id.* at 1237.

class of workers who performed jobs that some or all of the Putative Class have never held;[58] who performed duties that some or all of the Putative Class have never performed;[59] and who worked different schedules, under different supervisors and at remote locations from one another and from the Putative Class.[60]   Like the plaintiffs in *Reed*, the Plaintiffs have not, and cannot, meet their burden to prove that the Putative Class is similarly situated.

      b.      **Plaintiffs Have Not Provided Proof That They Were Victims Of A Common Decision, Policy Or Plan.**

Plaintiffs also must demonstrate that the putative class members were victims of a single decision, policy or plan.[61]   The classification of a group of employees as exempt or non-exempt is not a "decision, policy or plan."[62]   Accordingly, the mere allegation that various job titles were misclassified as exempt and therefore employees were not paid overtime is not sufficient to satisfy this requirement.[63]   Putative Class members must share more than a common allegation that they were denied overtime or paid below the minimum wage.[64]

Plaintiffs have not and cannot demonstrate that they were victims of a common decision, policy or plan.   Instead, Plaintiffs merely assert that each of their job titles were classified as exempt and that they were not paid overtime.[65]   This is not sufficient for class certification

---

[58] *See id.* at 1233.

[59] *See id.*

[60] *See id.*

[61] *Mooney*, at 54 F.3d at 1214, fn8.

[62] *See Trinh v. JP Morgan Chase & Co.*, No. 07-CV-1666 W(WMC), 2008 WL 1860161, at *4 fn2 (S.D. Cal. Apr. 22, 2008) (noting that "[s]everal courts have found that merely alleging that a class of employees was wrongly designated 'exempt' does not constitute an unlawful, institution-wide policy"); *but see Dreyer v. Baker Hughes Oilfield Operations, Inc.*, H-08-1212, 2008 WL 5204149, *3 (S.D. Tex. Dec. 11, 2008) (finding that failure of a plaintiff to show a common plan or policy among the potential plaintiffs is not necessarily fatal to a motion for certification).

[63] *See Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F.Supp.2d 493, 498 (D.N.J. Aug. 15, 2000) (denying conditional certification because plaintiff's alleged "common scheme" of denying overtime by incorrectly classifying certain employees as exempt, was nothing more than defendants' "determination that they are exempt under the FLSA").

[64] *Sheffield*, 211 F.R.D. at 413.

[65] *See, e.g.*, Plaintiffs' Motion: Exh. A at ¶ 8; Exh. B at ¶ 7; Exh. C at ¶ 7; Exh. D at ¶ 6; Exh. E at ¶ 9; Exh. F at ¶ 7; Exh. G at ¶ 7; Exh. H at ¶ 10; Exh. I at ¶¶ 15-18; Exh. J at ¶¶ 10, 12; Exh. K at ¶¶ 12-13; Exh. L at ¶¶ 9-10; Exh. M

purposes under the FLSA.

        c.    **The Putative Class Is Not Similarly Situated With Respect To Pay Practices.**

Whether or not a putative class is subject to similar pay practices is another factor that courts consider in determining whether certification is appropriate.[66]  Plaintiffs cannot make this showing.  In addition to their base salaries, many of the Plaintiffs and Putative Class members were eligible for different and varying incentive compensation plans or bonuses.[67]  Many of the available incentive compensation plans are unique to certain divisions.  For example, the compensation of various implementation employees varies across Tyler divisions.   In the INCODE division, for example, Implementation Consultants are eligible for bonuses based on a productivity calculation that is specific to INCODE;[68] in the CMS division, Implementation Consultants are eligible for bonuses based on the amount of training time performed.[69]  Customer support employees within Tyler are also subject to varying pay practices.  In the Eden division, Product Support Specialists are eligible for a bonus based on Tyler's annual profitability;[70] in the Courts and Justice group, Support Specialists are eligible for travel bonuses when they are required to travel to a customer's site;[71] in the INCODE division, Client Service Representatives are eligible for bonuses based on productivity;[72] and in the CMS division, Client

---

at ¶¶ 8-9; Exh. N at ¶ 8; Exh. O at ¶ 10; Exh. P at ¶¶ 8-9; Exh. Q at ¶¶ 9-10; Exh. R at ¶ 8; Exh. S at ¶ 8; Exh. T at ¶¶ 9-10.

[66] *Allen*, 2006 WL 3246531, at *2 (stating that the court "should satisfy itself that there are employees of the defendant who are 'similarly situated' with respect to their . . . pay provisions").

[67] *See, e.g.*, Exh. B, Spence Dec. at ¶ 8, APP 0010; Exh. C, Hepburn Dec. at ¶ 9, 0015; Exh. D, Womble Dec. at ¶¶ 8,11, APP 0018-0019; Exh. E, Volkens Dec. at ¶¶ 4-6, 8-9, 0020-0023; Exh. F, Fallon Dec. at ¶¶ 7-8, APP 0025-0026.

[68] Exh. D, Womble Dec. at ¶ 8, APP 0018.

[69] *Id.*

[70] Exh. E, Volkens Dec. at ¶ 5, APP 0021-0022.

[71] Exh. B, Spence Dec. at ¶ 8, APP 0010.

[72] Exh. D, Womble Dec. at ¶ 11, APP 0019.

Service Representatives are not eligible for bonuses.[73]   As another example, within the MUNIS division, implementation and customer support employees who are required to travel are eligible for an "expertise premium," which is a flat dollar amount based on travel and experience level.[74] Finally, within the VersaTrans division, the hourly, nonexempt workers within the Map Production Department handle implementation duties.[75]   Accordingly, the Putative Class was not subject to similar pay practices.

> 2. **Differences Among Putative Plaintiffs' Job Responsibilities Defeat The Purpose Of A Section 216(b) Class.**

The FLSA requires as a general rule that employers must pay overtime wages to their employees.[76]   There are a number of exemptions to this general rule.  Two that may be applicable to some or all of the Putative Class are the Administrative Exemption and the Computer Professional Exemption.[77]   To qualify for either exemption, employees must meet certain tests regarding their primary job duties and compensation.[78]   Job titles are not determinative; rather, an employee's specific job duties and salary must meet all the requirements of the Department of Labor's ("DOL") regulations.[79]

To qualify for the Administrative Exemption,[80] an employee must be paid a minimum salary; the employee's primary duty must be the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and the employee's primary duty must include the exercise of discretion

---

[73] *Id.*
[74] Exh. C, Hepburn Dec. at ¶ 9, APP 0015.
[75] Exh. F, Fallon Dec. at ¶ 6, APP 0025.
[76] 29 U.S.C. § 207 (2007).
[77] 29 U.S.C. § 213 (2007).
[78] 29 C.F.R. §§ 541.200, *et seq.* (2006) (explaining the administrative exemption); 29 C.F.R. § 541.400, *et seq.* (2006) (explaining the computer professionals exemption).
[79] 29 C.F.R. § 541.2 (2006).
[80] 29 C.F.R. § 541.200.

and independent judgment[81] with respect to matters of significance.[82]   To qualify for the Computer Professional Exemption, the employee must be paid a minimum salary or hourly wage; and the employee's primary duty must fall within an enumerated list.[83]

Accordingly, to attempt to prove and/or disprove misclassification, evidence regarding the primary duties of each Putative Class member would be required.  As the *Big Lots* decision cited above suggests, the determination of whether or not a particular employee has been misclassified for FLSA purposes is intensely fact determinative.  As Plaintiffs' own Declarations submitted in connection with their Motion reveal, the benefits of judicial economy typically associated with a class certification under Section 216(b) do not exist.

3.     **Plaintiffs Propose Certifying at Least 11 Different Job Titles in Five Purported Categories Across 18 Different Functional Divisions.**

Plaintiffs have a duty to show that the job responsibilities among the Putative Class are similar.[84]  Plaintiffs' proposed Putative Class represents at least 11 different job titles.  Plaintiffs do not allege that the employees with these job titles all perform similar job duties; instead, they designate five categories of similar job functions into which they allege each of the job titles fit.[85]  However, as demonstrated herein, even within the five broad categories that Plaintiffs identify, the duties of the Putative Class members vary between Tyler groups and divisions.  These differences are the result of Tyler's historical business structure, as discussed herein, and the varying sizes of Tyler's groups and divisions.  Specifically, employees who work at offices

---

[81] 29 C.F.R. § 541.202(a), (c) (noting that generally, the exercise of discretion and independent judgment involves the employee comparing and evaluating possible courses of conduct and acting or making a decision after the various possibilities have been considered.  Additionally, the employee should have the authority to make an independent choice, free from immediate direction or supervision).
[82] 29 C.F.R. § 541.202(a) (stating that the term "'matters of significance' refers to the level of importance or consequence of the work performed").
[83] 29 C.F.R. § 541.400 (2006).
[84] *See Dreyer v. Baker Hughes Oilfield Operations*, No. H-08-1212, 2008 WL 5204149, at *2 (S.D. Tex. Dec. 11, 2008).
[85] *See* Plaintiffs' Motion at ¶ 3.13.

where more Tyler employees work typically perform more specialized job functions.  Employees at smaller offices, on the other hand, typically do not have the luxury of specializing and are required to perform broader, and more varied, tasks in connection with support, implementation, and related functions.

a.      **Telephone And Remote Computer Support.**

Plaintiffs provide five declarations in this category.  These declarations show significant variances in job duties and functions, not a symmetry of duties that would make certification appropriate and class treatment an efficient means to try this case.  First, according to Plaintiff Beall's declaration, she was involved exclusively in remote troubleshooting and answering customer questions about the software that the EDP division sells.[86]  On the other hand, in addition to remote troubleshooting, Plaintiff Tullos spent 25% of his time on-site at customer locations performing the following duties: configuring new hardware; configuring servers; installing backup hardware equipment; and checking confirmed sites ready for installation.[87]  In his role as a Technical Support Specialist/Trainer, Plaintiff Bonner provided client training in addition to performing troubleshooting functions.[88]  Further, Plaintiff Brown testified that he troubleshoots with customers over the phone, and that he also creates and conducts both on-line and on-site trainings.[89]

The evidence submitted by Defendants in support of this brief further reveals the variances in job duties among employees in support roles.  For example, within the Courts & Justice group, prior to 2007, employees who provided implementation services also provided

---

[86] *See* Plaintiffs' Motion, Exh. A at ¶ 3.
[87] Plaintiffs' Motion, Exh. B at ¶ 3.
[88] Plaintiffs' Motion, Exh. C at ¶ 3.
[89] Plaintiffs' Motion, Exh. D at ¶ 3.

customer support services.[90]   Since 2007, most of the subgroups within the Courts & Justice

group have divided these duties among different employees.[91]   Some of the Courts & Justice

employees who provide support services travel on-site to assist implementers.[92]   Two subgroups

within the Courts and Justice group – the Appraisal and Tax Group and the Server and System

Team – did not separate their support and implementation functions.[93]   As a result, these

employees continue to serve support and implementation functions.   Further, within the

Appraisal and Tax subgroup, employees have an additional role in quality assurance (a role filled

within the Quality Assurance department for the remainder of the division).[94]

   The MUNIS division provides another example of how customer support duties vary.  At

MUNIS, the customer support personnel are designated as Support Techs and Support

Analysts.[95]   The Support Techs provide troubleshooting support for customers over the phone,

whereas the Support Analysts handle issues that require more extensive interaction with the

customer and networking into the customer's database to resolve the particular issue.[96]

   b.   **Computer Hardware And Software Set Up And Maintenance.**

   Plaintiffs provide two declarations from this category that are virtually identical and are

both from the Longview EDP division.[97]   This evidence is insufficient to prove that the roles and

responsibilities within this category are sufficiently similar Tyler-wide so as to justify

certification.

---

[90] Exh. B, Spence Dec. at ¶ 3, APP 0008.
[91] *Id.* at ¶ 4, APP 0009.
[92] *Id.* at ¶ 5, APP 0009.
[93] *Id.* at ¶ 4, APP 0009.
[94] *Id.* at ¶ 7, APP 0010.
[95] Exh. C, Hepburn Dec. at ¶ 8, APP 0014.
[96] *Id.* at ¶ 8.
[97] *See* Plaintiffs' Motion, Exhs. G, H.

The Eden division employs one System Engineer who works remotely with clients to install software.[98]  In addition to installing software, he provides technical training on installation software and security software, assists in the technical installation of web-based software and provides minor customizations to customer web pages[99] – functions that are absent from the two declarations in this group submitted by Plaintiffs.

      c.     **Implementation.**

Roles and responsibilities within implementation departments throughout Tyler also vary by group and division.  For example, Plaintiff Huynh testified that he primarily worked on-site with customers during the conversion process performing the following duties: converting customers' data; setting up software modules; training customers' employees to use the new software; and performing hardware installation.[100]  Alternatively, Plaintiff McElhaney performed an off-site consulting role at the Longview EDP office.[101]  Plaintiff McElhaney testified that he was responsible for gathering customer data and relaying it to the software conversion programmers, assisting customers to correct data errors, recommending changes to the basic software package on behalf of customers and continuing to provide post-conversion customer support for a period of six weeks to six months post-conversion.[102]

Plaintiff Hampton held several positions within this category during her tenure.[103]  Initially, according to her declaration, she was a "Trainer" who worked on-site during the process of converting customers to the "EDPRO software"; she conducted on-site, on-line and telephone training for the customers' employees on the software; she assisted the "Client

---

[98] Exh. E, Volkens Dec. at ¶ 6, APP 0022.
[99] *Id.*
[100] Plaintiffs' Motion, Exh. F at ¶ 3.
[101] Plaintiffs' Motion, Exh. I at ¶ 4.
[102] *Id.*
[103] Plaintiffs' Motion, Exh. K at ¶ 1.

Liaisons" in correcting data errors; and she provided customer support regarding the use and operation of EDPRO software.[104]   These job duties are different than those described by Plaintiffs Huyhn and McElhaney.

The additional evidence submitted by Defendants also shows that implementers are not similarly situated across group and division lines.  For example, in the INCODE division, Implementation Consultants perform training and consulting functions.[105]   They travel extensively and meet with customers to determine product needs.[106]  Once the customer's needs are assessed, they set up codes to meet those needs and then train the customers to use the new software.[107]  At the CMS division, Implementation Consultants perform broader duties than the INCODE Implementation Consultants.[108]   In addition to the job duties performed within the INCODE division, the CMS Implementation Consultants provide customer support to troubleshoot software problems, review client data and work with conversion developers in anticipation of installation, and perform quality assurance testing and perform documentation writing for the document in question.[109]

d.     **Sales Support.**

Plaintiffs provide only one declaration from this category.[110]   Plaintiff Locchi's declaration alone is insufficient to show that all of Tyler sales support have similar roles and responsibilities.   Moreover, the evidence establishes that sales support roles among Tyler divisions are not similar.   For example, the VersaTrans division employs a Sales

---

[104] *Id.* at ¶ 2.
[105] Exh. D, Womble Dec. at ¶ 5, APP 0017.
[106] *Id.*
[107] *Id.*
[108] *Id.* at ¶ 6, APP 0018.
[109] *Id.*
[110] *See* Plaintiffs' Motion, Exh. S at ¶ 3.

Engineer/Consultant II who responds to Requests for Proposal (RFPs) and demonstrates the product to prospective customers.[111]  At the Eden division, on the other hand, upper management typically responds to RFPs, but they do employ a sales support employee who spends one to three days at a prospective client's site demonstrating software.[112]

e.      **Quality Assurance.**

Again, Plaintiffs provide only one declaration from this category.[113]  Plaintiff Pastor's declaration alone is insufficient to show that all of Tyler's employees who are tasked with quality assurance functions have similar roles and responsibilities.  Once again, the evidence establishes the contrary.  For example, as noted above, within the Appraisal and Tax subgroup of the Courts and Justice group, the same employees who perform customer support and implementation functions also perform quality assurance testing.[114]  Other subgroups within the Courts and Justice group perform solely quality assurance work.[115]  Alternatively, in the VersaTrans division, quality assurance is handled by the Product Development Department.[116]

f.      **The Declarations Submitted By Plaintiffs Do Not Establish Similarities In Job Functions Across Division Lines.**

While Plaintiffs have accumulated twenty declarations from different Tyler offices, a close examination of these declarations reveals that they are not a representative cross section of job positions and functions across Tyler divisions so as to warrant certification of a class as broad as Plaintiffs propose.  For example, Plaintiffs' Motion attaches three declarations each from former employees of Tyler who worked in the Company's "Munis" and "Eden" divisions.

---

[111] Exh. F, Fallon Dec. at ¶ 10, APP 0027.
[112] Exh. E, Volkens Dec. at ¶ 7, APP 0025-0026.
[113] *See* Plaintiffs' Motion, Exh. S at ¶ 3.
[114] *See* Exh. B, Spence Dec. at ¶ 3, 7, APP 0008, 0010.
[115] *Id.* at ¶ 7, APP 0010.
[116] Exh. F, Fallon Dec. at ¶ 9, APP 0011.

All of these declarations, however, are from employees who performed implementation functions--there are no declarations from employees in any of the other job classifications that would be part of the class Plaintiffs propose be certified.  There are no declarations from telephone service support employees in either the Munis or Eden offices, and Plaintiffs have not established through their declarations that the support functions at these offices are the same or similar to those at other Tyler offices.  Indeed, as the evidence provided herein establishes, there are significant differences that make certification inappropriate.

Seven of the twenty declarations attached to Plaintiffs' motion come from employees who previously worked at Tyler's EDP office in Longview, Texas.  These declarants are the original Plaintiffs in this case prior to the amendment of Plaintiffs' complaint.  While Plaintiffs have assembled declarants from a cross section of employees within the EDP office, the declarations do not establish that the job functions at EDP, which was acquired by Tyler in September 2007, are representative across group and division lines.  Indeed, of the seven declarants from the EDP office, only one worked more than a month after Tyler acquired EDP.  Accordingly, these declarants cannot competently testify that their roles after the Tyler acquisition, or before for that matter, were similar to those performed by employees in other Tyler offices.

Moreover, as to certain job categories, Plaintiffs are able to offer only one or two declarations.  For example, with respect to the Systems Engineers Putative Class, Plaintiffs provide only two declarations, both of which come from employees who worked at EDP in Longview and neither of those employees worked after Tyler's acquisition of EDP.  With respect to the Sales Support Putative Class, Plaintiffs point to only one declaration from an employee who worked at the INCODE division for a six-month period.  Finally, with respect to Quality Assurance employees, Plaintiffs again offer only one declaration from an employee who worked

in the Courts and Justice group for a grand total of four (4) months.   Accordingly, while the Court might be prone to credit Plaintiffs for accumulating as many declarations as they have, they are not enough to justify certification of as broad and expansive a class as Plaintiffs propose and do not establish, in many if not all cases, a representative sample sufficient to justify certification.

g.     **Case Law Does Not Support Certification.**

Plaintiffs have not cited to authority in which a court granted certification in a FLSA exemption/misclassification case with a putative class as broad as that proposed to be certified here.   To the contrary, because of the proposed breadth of the class, the benefits of judicial economy would be completely lost if the court were to grant Plaintiffs' motion.   Indeed, courts have either refused to conditionally certify classes or limited conditional certification in these types of cases.

In *Donihoo v. Dallas Airmotive, Inc.*, the named plaintiff was a customer service representative for the defendant and sought to certify a class of all salaried, nonexempt employees who worked for the defendant over a certain period of time. [117]   The court refused to conditionally certify the class that was proposed by plaintiff and instead conditionally certified a more limited class of customer service representatives.[118]   The court reasoned that, for most of the putative class, the court would need to conduct an inquiry into the employee's specific job duties to determine whether the particular employee is properly classified as exempt and that such an inquiry was not appropriate for a class lawsuit.[119]

[117] 1998 U.S. Dist. LEXIS 2318, at *2 (N.D. Tex. Feb. 20, 1998)
[118] *Id.* at *4
[119] *Id.*

In *Dreyer v. Baker Hughes Oilfield Operations*, the plaintiffs sought to conditionally certify all IT support professionals who worked for the defendant within a 3-year period.[120]  The putative class worked within one department and the plaintiffs alleged that they were subject to common management and policy,[121] but was further divided into four separate groups: (1) the Planning and Design Center, (2) the Customer Services Group, (3) the Network Operations Group, and (4) the Network Services Group.[122]  The two named plaintiffs were in the Network Operations Group which was subdivided into three teams: (1) the Enterprise Server Team, (2) the Tools Team, and (3) the Messaging and Active Directory Team.[123]  Both of the named plaintiffs were on the Enterprise Server Team.[124]  The plaintiffs argued that the job duties among all IT support professionals in the department were similar in that they were all tasked with helping the other Baker Hughes' divisions, "select, use, maintain, troubleshoot, repair, monitor and replace computers called servers."[125]  The plaintiffs sought to certify a class of employees who provided support for both servers and desktops and provided evidence that the job titles and job descriptions for these two groups were the same.[126]  The *Dreyer* court found that the job duties of IT workers who worked outside of the Enterprise Server Team were too dissimilar and ultimately, approved conditional certification only with respect to IT support who worked on the Enterprise Server Team.[127]

---

[120] *See* Case No. 4:08-cv-1212, Plaintiffs' Motion for Conditional Certification of a Collective Action, Motion for Notice to Potential Class Members, and Motion for Expedited Ruling at p. 2.
[121] *Id.* at p. 13.
[122] *Dreyer v. Baker Hughes Oilfield Operations*, No. H-08-1212, 2008 WL 5204149, at *1 (S.D. Tex. Dec. 11, 2008).
[123] *Id.*
[124] *Id.*
[125] *See* Case No. 4:08-cv-1212, Plaintiffs' Motion for Conditional Certification of a Collective Action, Motion for Notice to Potential Class Members, and Motion for Expedited Ruling at p. 14.
[126] *Id.*
[127] *Dreyer,* 2008 WL 5204149, at *2-3 (S.D. Tex. Dec. 11, 2008).

The *Dreyer* court adopted a rule that "if the job duties among potential members of the class vary *significantly*, then class certification should not be granted."[128]   The court found that the job duties of employees who worked outside of the named plaintiffs' team were too dissimilar to the job duties performed by the named plaintiffs.[129]

In the case at bar, the Putative Class members have even more dissimilarities than the proposed putative class in *Dreyer*.   Here the Putative Class members are located across 18 functionally different divisions among a multitude of geographic locations that historically have been treated as distinct operating units with respect to job functions, classifications and other employment related matters.

Plaintiffs argue that their collective action should not be defeated merely because the proposed class members performed a variety of different jobs at different locations; however, the authority upon which they rely is misplaced.   In most of the cases cited by Plaintiffs, the plaintiffs demonstrated evidence of a common policy or practice.[130]   Plaintiffs rely heavily on cases involving allegations of age discrimination under the ADEA.   These cases are different than the one at bar because, in each, a common policy or practice was at issue that, if applied as the plaintiffs theorized, was discriminatory to older workers, regardless of his or her job duties.[131]

---

[128] *Id.* at *2 (citations omitted).

[129] *Id.*

[130] *See* Plaintiffs' Motion at ¶¶ 3.10-3.11.

[131] In *Church v. Consolidated Freightways, Inc.,* plaintiffs produced evidence that planned reductions in workforce were based in part on age.  137 F.R.D. 294, 304 (N.D. Cal. 1991).  In *Austin v. Champion Int'l Corp.*, plaintiffs alleged that their employer induced them to accept severance benefits and early retirement benefits because of their age.  No. H-87-1845, 1990 WL 339487, *2-3 (S.D. Tex. Oct. 16, 1990).  The court noted that differences in jobs did not preclude the putative class from being similarly situated because the alleged course of conduct by the defendants was designed to discriminate based on age, not whether they were salaried or hourly.  *Id.*  In *Heagney v. European Am. Bank*, plaintiffs alleged that the defendant coerced older workers to accept an Early Retirement Incentive Program ("ERIP").  122 F.R.D. 125, 127 (E.D.N.Y. 1988).  The court found a factual nexus to conditionally certify

The few cases cited by Plaintiffs under Section 216(b) of the FLSA, in which violations of the FLSA were alleged, are distinguishable.  In each of those cases, the courts found that the putative class members had similar job duties despite differing job titles.[132]  That is simply not the case here.  Instead, the Putative Class is made up of a large number of job titles and represent at a minimum five functional categories per Plaintiffs' Motion.  Plaintiffs can cite to no exemptions case where the court granted certification under Section 216(b) where there were as many different job titles and job functionalities as exist here.

h. **Important Lessons Can be Learned From Recent *Big Lots* Decision.**

A recent case from a fellow Fifth Circuit District Court reveals the potential perils of granting conditional certification in FLSA exemption/misclassification cases.   In *Big Lots*, a nationwide class of Assistant Store Managers (ASMs) of Big Lots, a retail store, was conditionally certified based on an alleged *de facto* nationwide policy and practice of misclassifying the ASM position as exempt.[133]

After a trial on the merits, the court determined that the ASMs in fact were not similarly situated and it was forced to decertify the class.[134]  The court noted that while the plaintiffs

---

[132] In *Trezvant v. Fidelity Employer Serv. Corp.*, the plaintiffs sought to certify a class that consisted of Technical Analysts, Business Analysts, Configuration Analysts, Project Analysts and Reporting Analysts.  434 F. Supp. 2d 40, 45, 48 (D. Mass. 2006).  The court found that the plaintiffs made a sufficient showing that the Business Analysts, Project Analysts and Reporting Analysts had the same primary duties and granted a more limited collective action certification.  *Id.*  In *Kuperman v. ICF Int'l.*, the court granted conditional certification where despite different job titles, the defendants admitted the plaintiffs' job duties were similar.  No. 8-565, 2008 U.S. Dist. LEXIS 88605, at *19-20 (E.D. La. Oct. 31, 2008).  Further, the plaintiffs provided evidence that there was a program-wide policy of under-recording overtime.  *Id.*  In *Ritzer v. UBS Financial Serv., Inc.*, the court granted conditional certification of all technical support associates despite varying levels because all performed the same general job functions.  No. 2:08-cv-1235, 2008 U.S. Dist. LEXIS 71635, at *6 (D.N.J. Sept. 22, 2008).

the class because the fundamental allegation – that the supposedly voluntary ERIP was a smokescreen for a deliberate campaign of discrimination – was common to all plaintiffs.  *Id.*

[133] 561 F.Supp.2d at 569.

[134] *Id.* at 587.  The court's decision was based on its consideration of the following factors: "(1) the extent to which the opt-in plaintiffs' employment experiences and job duties as Big Lots ASMs are similar or disparate; (2)  the extent to which Big Lots can assert its executive exemption defense on a collective or individual basis; and (3)

pitched their case as involving a uniform policy or practice of misclassifying ASMs, at trial there was no direct evidence of a conscious corporate intention or policy in this regard.[135]   The court found that the plaintiffs' job experiences as Big Lots ASMs varied in relevant ways.[136]   The court also noted that "the dissimilarity of plaintiffs' self-reported job duties makes it exceedingly difficult for Big Lots to assert its statutory exemption defense on a collective basis."[137]   As a result, Big Lots would be forced to prove its defenses on a plaintiff-by-plaintiff basis based on his or her job duties, an "exercise [that] is tantamount to conducting multiple trials on the merits and is an antithesis of a collective action."[138]

The lessons from the ultimate decertification of the *Big Lots* class are important to the case at bar.  First, as *Big Lots* demonstrates, misclassification cases are necessarily fact-intensive. Like the facts in *Big Lots*, because there is no nationwide unlawful discriminatory policy or practice for the Court to consider, Plaintiffs in this case will need to rely on individual proof regarding their respective job duties to prove they were misclassified.   Tyler also will be relying on individual facts to prove-up its defenses.   Second, *Big Lots* involved a single job title in a nation-wide retail chain with common written policies and practices that govern each store. Here, no common written policies and practices exist, Defendants operate fundamentally autonomous divisions across the nation and Plaintiffs are asking the Court to certify at least 11 different job titles nation-wide.  Class certification in this case would create substantially more complexity for the Court and the parties than in  *Big Lots*.

---

fairness and procedural concerns, particularly whether it would be just to collectively and finally adjudicate the claims of 936 opt-in plaintiffs on the evidence before the Court."  *Id.* at 579.
[135] *Id.* at 579.
[136] *Id.* at 579.
[137] *Id.* at 586.
[138] *Id.* at 586.

C.      **Plaintiffs' Discovery Request is Inappropriately Broad.**

In Paragraph 4.3, Plaintiffs request "a computer-readable data file containing the names, job titles, addresses, personal e-mail address (if available), Social Security numbers and home telephone and cell phone telephone numbers" of the potential plaintiffs "so that Court-ordered notice may be implemented."   Although the production of certain contact information may be necessary in the event that this Court approves notice, requiring Defendants to produce the email addresses, the phone numbers, and the social security numbers as requested in this case is simply an unnecessary intrusion into the privacy of the potential plaintiffs.

Defendants also disagree with Plaintiffs' statement in Paragraph 4.5 asserting that all of the requested information "is necessary" to locate the potential plaintiffs.   To the contrary, a computer-readable data file containing the names and last known addresses of the potential plaintiffs provides sufficient information to locate these individuals for the purpose of sending out any court-approved notice.[139]   Plaintiffs have provided no explanation as to why they need the personal email addresses, home phone numbers, and social security numbers of the potential plaintiffs.   In the interest of protecting the privacy rights of the individuals affected, the Court should not order the disclosure of email addresses, telephone numbers, or social security numbers in this case.[140]

---

[139] *See, e.g., Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F.Supp.2d 101, 108 (S.D.N.Y. Sept. 19, 2003) (approving discovery of names and addresses of potential plaintiffs); *Barron v. Henry County Sch. Sys.*, 242 F.Supp.2d 1096, 1106 (Jan. 14, 2003) (ordering production of names and addresses of potential plaintiffs); *Frank v. Capital Cities Commc'ns, Inc.*, 88 F.R.D. 674, 679 (ordering production of names and last known addresses of potential plaintiffs); *Lawrence v. City of Philadelphia, Penn.*, No. 03-CV-4009, 2004 WL 945139, at *3 (E.D. Pa. Apr. 29, 2004) (ordering production of last known names and addresses of potential plaintiffs).

[140] *See Vogt v. Tex. Instruments, Inc.*, No. 3:05-cv-02244, 2006 WL 4660134, at *4 (N.D. Tex. Sept. 19, 2006) (limiting plaintiffs' discovery request to names and last known addresses of potential plaintiffs, citing concern for the privacy of the employees.   Similar to our case, in *Vogt*, the plaintiffs initially requested "a computer-readable data file containing the names, last known addresses, phone numbers and Social Security numbers of all" members of the proposed class.); *see also Francis v. A&E Stores, Inc.*, No. 06 Civ. 1638, 2008 WL 2588851, at *3 (S.D.N.Y. June 26, 2008) (rejecting plaintiff's request for the "name, address, telephone number, social security number, dates

**D.**   **Plaintiffs' Website Must be Neutral.**

To the extent the Court approves Plaintiffs' request for authorization to maintain an internet website in Paragraph 4.6, the information on the website must conform to the same standards as the proposed notice.  The contents of the website should be neutral and should provide the potential plaintiffs with all appropriate disclosures and information necessary to make a decision to consent to join the lawsuit.  Plaintiffs should also be ordered to provide the Court and opposing counsel with notification of any changes or additions made to the website, and Defendants should be afforded the opportunity to object to any substantive changes made to the website.[141]  Defendants reserve their right to make further objections to the proposed website after Plaintiffs submit it to the Court and to Defendants to review.

**E.**   **Plaintiffs' Proposed Notice is Misleading and Inappropriate.**

If the Court conditionally certifies the collective action, then a notice may be sent out to potential plaintiffs to inform them about the lawsuit.  The notice must be timely, accurate, and informative.[142]  Additionally, the Court must review and approve the notice prior to distribution to ensure that it is not misleading.[143]

In the present case, Plaintiffs' proposed notice, which is referenced in Paragraph 4.7 and attached to Plaintiffs' motion as Exhibit V, contains misleading language and is inappropriate for

---

of employment, location of employment, employee number, if any" of each potential plaintiff, and instead ordering production of the names and last known addresses of the potential plaintiffs, noting that plaintiff "provides no justification for her request for additional information"); *see also Russell v. Ill. Bell Tel. Co.*, 575 F.Supp.2d 930, 939-40 (N.D. Ill. Sept. 15, 2008) (explaining that the court was not persuaded by plaintiff's argument that partial security numbers would be necessary or helpful, and therefore did not require disclosure); *compare Garcia v. Elite Labor Serv., Ltd.*, No. 95 C 2341, 1996 WL 33500122, at *5 (N.D. Ill. July 11, 1996) (allowing production of social security numbers, date of birth, and telephone numbers where Defendant "had thousands of temporary workers for short periods of time many of whom had identical or similar names").

[141] *See, e.g., Belt v. EmCare Inc.*, 299 F.Supp.2d 664, 666 (E.D. Tex. Dec. 18, 2003) (explaining that "in response to Defendants' concerns that Plaintiff's website might mislead absent class members, the Court granted Defendants notice and an opportunity to object to any substantive site changes").

[142] *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

[143] *Id.* at 171.

the following seven reasons.  First, the proposed notice does not initially indicate who it is from and ends with the signature of the Judge.  The current form of the proposed notice could mislead potential plaintiffs into believing that the notice is actually an order signed by the Judge. Because the court has an affirmative duty to "avoid even the appearance of judicial endorsement of the merits of the action," a revision to the form of the notice is necessary.[144]  Therefore, Defendants request that the signature line for the Judge at the end of the proposed notice be removed.  Instead, Defendants request that a "From" line be included on the front page of the document stating "FROM: THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, JUDGE T. JOHN WARD."[145]

Second, the "RE: line" of the proposed notice inappropriately implies that there has already been a determination that unpaid wages exist by reading: "RIGHT TO JOIN LAWSUIT TO RECOVER UNPAID WAGES[.]"  As such, Defendants request a slight change, such that the line reads: "RIGHT TO JOIN LAWSUIT SEEKING TO RECOVER ALLEGED UNPAID WAGES[.]"[146]

Third, the proposed notice lacks a description of Defendants' position and response to Plaintiffs' allegations in the lawsuit.  Failure to include such information can be misleading, and therefore notices should include the defendants' denials, if any.[147]  As such, Defendants request

---

[144] *See id.* at 170; *compare Flores v. Lifeway Foods, Inc.*, 289 F.Supp.2d 1042, 1046 (N.D. Ill. Oct. 30, 2003) (noting that in the Seventh Circuit, it is improper for this type of notice to go out "over the signature of the clerk of court or other judicial officer" in order to avoid apparent judicial sponsorship of the notice); *Russell*, 575 F.Supp.2d at 938 (same).

[145] *See, e.g., Belt*, 299 F.Supp.2d at 670 (including similar "from" line in approved version of proposed notice).

[146] *See, e.g., Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 WL 824652, at *4 (N.D. Cal. Mar. 28, 2006) (finding plaintiffs' proposed notice to be one-sided and argumentative and therefore inappropriate); *see also Belt*, 299 F.Supp.2d at 670 (including similar "RE:" line in approved version of proposed notice).

[147] *See Belt*, 299 F.Supp.2d at 671 (containing approved notification which includes defendants' denial of charges); *Gerlach*, 2006 WL 824652, at *4 (finding that the proposed notice was inadequate and one-sided, and noting that the description of the lawsuit "fail[ed] to note that Defendants deny they have violated the law"); *Bailey v. Youth*

that the notice contain the following language summarizing Defendants' response to the allegations:

> Defendants have denied these charges.  Specifically, Defendants assert that Plaintiffs were performing the work of overtime-exempt professionals and that Plaintiffs were paid properly.  Defendants deny a deliberate misclassification and deny that Plaintiffs are entitled to any of the relief sought.  Defendants plan to pursue their defense against Plaintiffs' allegations.

Fourth, the proposed notice should include a provision alerting the potential plaintiffs of their right to obtain their own counsel to represent them in this lawsuit.  Section 216(b) does not require that the entire class be represented by the same counsel.  Rather, each potential plaintiff has the right to secure his or her own counsel in this action and should be notified of this right.[148] Therefore, Defendants request that the Court modify the following language contained on page 2 of the proposed notice, which currently states: "If you believe that you have been penalized, discriminated against . . . you should contact Plaintiffs' counsel immediately."  Defendants request that the following language be inserted in its place: "If you believe that you have been penalized, discriminated against . . . . you should contact Plaintiffs' counsel or another lawyer of your choosing."

Fifth, the description of the due date to return consent forms on the proposed notice is confusing and could be misleading to potential plaintiffs.[149]  Currently, the notice states:

> **The signed Consent Form must be postmarked within 90 days after the date that the motion is granted.  If your signed Consent Form is not postmarked by 90 days after the date on the front page of this letter, you will not participate in any recovery obtained against Defendants in this lawsuit.**

---

*Villages, Inc.*, No. 07-1089, 2008 WL 2987201, at *3 (W.D. Tenn. July 30, 2008) (agreeing that more detail about the basis of defendant's denial should be included in the notice).

[148] *See, e.g., Belt*, 299 F.Supp.2d at 670 (including approved notification which contained such language); *Gjurovich*, 282 F.Supp.2d at 107 (same).

[149] *See Belt*, 299 F.Supp.2d at 670 (including approved notification which contains such language); *Gjurovich*, 282 F.Supp.2d at 107 (same).

In order to reduce confusion, Defendants request that the notice be revised to state:

> **The signed Consent Form must be postmarked by _____ 2009.  If your signed Consent Form is not postmarked by _____ 2009, you will not participate in any recovery obtained against Defendants in this lawsuit.[150]**

Sixth, the proposed notice is misleading because it fails to inform the potential plaintiffs that they could be subject to liability for Defendants' costs and attorneys' fees under certain circumstances.[151]  Therefore, Defendants request that the following language be added to section 7 of the notice: "Those who opt-in may also be held liable for costs associated with this lawsuit, and for potential counterclaims which may be asserted against you by Defendants."

Finally, the proposed notice is misleading to the extent that it gives the appearance of judicial endorsement of the merits of the action.[152]  Currently the notice does not contain a statement clarifying that the Court has not taken a position on the merits of the case.  As such, Defendants request that the following statement be added to the notice:

> **THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE FEDERAL DISTRICT COURT, HON. T. JOHN WARD, DISTRICT JUDGE.   HOWEVER, THE COURT HAS TAKEN NO POSITION REGARDING THE MERITS OF THE PLAINTIFFS' CLAIMS OR OF THE DEFENDANTS' DEFENSES.**

---

[150] Defendants also request that the correct date to be entered into the notice prior to distribution.

[151] *See Hoffman v. Securitas Sec. Servs.*, No. CV07-502-S-EJL, 2008 WL 5054684, at *15 (D. Idaho Aug. 27, 2008) (adding such language to the proposed notice, explaining that the notice should "inform potential plaintiffs that they may share in liability for payment of costs if Defendant prevails in this action"); *Bailey*, 2008 WL 2987201 at *3 (noting that "it is prudent to forewarn potential class members of costs they may be responsible for if the Defendant prevails" and also approving language in the "purpose of notice" section to reflect that "the Notice will inform them of 'potential consequences of making such a claim.'"); *Garcia v. Elite Labor Serv. Ltd.*, No. 95 C 2341, 1996 WL 33500122 (N.D. Ill. July 11, 1996) (approving sentence in proposed order stating "if you do not prevail on your claim, court costs and expenses may possibly be assessed against you").

[152] *See Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (explaining that the court has an affirmative duty to "avoid even the appearance of judicial endorsement of the merits of the action"); *Belt*, 299 F.Supp.2d at 670 (including statement clarifying that the court had not taken a position on the merits of the case in notice); *Gjurovich*, 282 F.Supp.2d at 107 (same); *Securitas Sec. Servs.*, 2008 WL 5054684, at *15 (noting that "reference to the Court's neutrality should be bolded and enhanced"); *see also Bailey*, 2008 WL 2987201, at *3 (including same in "purpose of notice" section).

Additionally, a 90-day opt-in period, as requested by Plaintiffs in Paragraph 4.8, is too long given the facts of this case. Therefore, Defendants request a 60-day opt-in period. A 60-day opt-in period has been used frequently, is reasonable under the circumstances, and provides more than enough time for the potential plaintiffs to respond.[153]

## III.
## <u>CONCLUSION</u>

Plaintiffs' Motion for Certification should be denied. This case simply is not a proper candidate for class certification under Section 216(b) of the FLSA, particularly considering the expansive, nationwide class proposed by Plaintiffs. Because of the different job functionalities across division lines, Plaintiffs and the Putative Class are not similarly situated and the judicial efficiencies associated with certification do not exist here.

---

[153] *Securitas Sec. Servs.*, 2008 WL 5054684, at *16 (implementing 60-day time period from the date of mailing the notice to allow for the filing of opt-in consents) *Francis*, 2008 WL 2588851, at *5-*6 (same); *Gjurovich*, 282 F.Supp.2d at 107 (approving 60-day opt-in period); *compare Dreyer*, 2008 WL 5204149, at *4 (ordering a 45-day response deadline); *but see Garcia*, 1996 WL 33500122, at *5 (N.D. Ill. July 11, 1996) (allowing 90-day opt-in period where "the class is composed of low income workers who are likely to change their addresses more frequently, [and therefore] it may take longer for these potential class members to receive such notices [and] many of these individuals speak Spanish, they may need to consult with others in order to understand the notice").

Respectfully submitted:


/s/ Paulo B. McKeeby
Paulo B. McKeeby
Texas Bar No.: 00784571
paulo.mckeeby@morganlewis.com
Joel S. Allen
Texas Bar No.: 00795069
joel.allen@morganlewis.com
Sharon Fast Fulgham
Texas Bar No.: No. 24045901
sfulgham@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, Texas 75201-7347
phone - 214.466.4000
facsimile - 214.466.4001

Deron R. Dacus
Texas Bar No.:00790553
derond@rameyflock.com

RAMEY & FLOCK P.C.
100 East Ferguson, Suite 500
Tyler, Texas 75702
phone – 903.597.3301
facsimile – 903.597.2413


ATTORNEYS FOR DEFENDANTS
TYLER TECHNOLOGIES, INC. AND
EDP ENTERPRISES, INC.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing has been served via the Court's electronic filing system on this 15th day of May, 2009, as follows:

John D. Sloan, Jr.
Laureen F. Bagley
101 East Whaley Street
P.O. Drawer 2909
Longview, Texas 75606

*/s/ Paulo B. McKeeby*_____