IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | | |
|---|---|---|---|
| PATTY BEALL, MATTHEW MAXWELL, TALINA MCELHANY AND KELLY HAMPTON, individually and on behalf of all others similarly situated, | § § § § § | | |
| *Plaintiffs,* | § § | | |
| *vs.* | § § | NO. | 2:08-CV-422 |
| TYLER TECHNOLOGIES, INC. AND EDP ENTERPRISES, INC., | § § § | | |
| *Defendants.* | § § | | |

## DEFENDANTS' MOTION TO DECERTIFY CLASS AND BRIEF IN SUPPORT

Respectfully submitted,

Paulo B. McKeeby
Texas Bar No.: 00784571
Joel S. Allen
Texas Bar No.: 00795069
Ellen L. Perlioni
Texas Bar No. 00794155
Farin Khosravi
Texas Bar No. 24043753
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, Texas 75201-7347
phone - 214.466.4000
facsimile - 214.466.4001

Deron R. Dacus
Texas Bar No.: 00790553
RAMEY & FLOCK P.C.
100 East Ferguson, Suite 500
Tyler, Texas 75702
phone – 903.597.3301
facsimile – 903.597.2413

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF ARGUMENTS ................................................................................. 1

II. BACKGROUND AND PROCEDURAL HISTORY ........................................................ 2

III. LEGAL ARGUMENTS AND AUTHORITIES ............................................................. 4

    A. The Factual and Employment Settings of Individual Plaintiffs Vary
        Significantly .................................................................................................... 6

        1. The "client liaison" designation and function was unique to two
            Plaintiffs ........................................................................................... 6

        2. Plaintiff Brown functioned as a project manager and led a team of
            implementation consultants/specialists ....................................................... 9

        3. The disparity in testimony of Plaintiffs regarding amount of time
            spent performing various functions is substantial ...................................... 11

        4. Certain job functions were performed by some but not all of the in
            Plaintiffs ......................................................................................... 13

            a. Software configuration ............................................................ 15

            b. Systems analysis .................................................................... 17

            c. Setting agendas and training schedules ...................................... 18

            d. Support functions .................................................................. 19

        5. The testimony of some Plaintiffs further highlights the substantial
            disparity in duties and responsibilities ...................................................... 19

            a. Betty Dupree ......................................................................... 20

            b. Melanie Baird ........................................................................ 20

            c. Joy Flynn .............................................................................. 21

            d. Tony Dodd ............................................................................ 22

    B. Various Defenses Available to Tyler are Individual to Each Plaintiff ................ 23

        1. The White collar exemption defenses are highly individualized ............ 23

         2. Defenses available with respect to the claims of Bonner, Brown,
            and Milburn individually, are not applicable to other Plaintiffs .............. 25

    C. Fairness and Procedural Considerations ............................................................ 26

IV. CONCLUSION ...................................................................................................... 28

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*Aguirre v. SBC Commc'n,*
 No. H-05-3198, 2007 U.S. Dist. LEXIS 17259 (S.D. Tex. March 12, 2007) ........................... 5

*Anderson v. Cagle's, Inc.,*
 488 F.3d 945 (11th Cir. 2007) .................................................................................................. 5

*Bayles v. Am. Med. Response of Colo., Inc.,*
 950 F. Supp. 1053 (D. Colo. 1996)......................................................................................... 23

*Brooks v. Bell South Telecom., Inc.,*
 164 F.R.D. 561 (N.D. Ala. 1995) ........................................................................................... 23

*Carlson v. C.H. Robinson Worldwide, Inc.,*
 No. 02-4261, 2006 U.S. Dist. LEXIS 71483 (D. Minn. Sept. 26, 2006)............................... 4, 5

*Davis v. Lenox Hill Hosp.,*
 No. 03-Civ-3746, 2004 U.S. Dist. LEXIS 17283 (S.D.N.Y. 2004) .......................................... 9

*Diaz v. Elec. Boutique of Am., Inc.,*
 No. 04-CV-0840, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) ................. 5, 9, 25

*Gatewood v. Koch Foods of Miss.,*
 No. 3:07CV82, 2009 U.S. Dist. LEXIS 113896  (S.D. Miss. Oct. 20, 2009) ..................... 5, 23

*Hendricks v. J.P. Morgan Chase Bank,*
 263 F.R.D. 78 (D. Conn. 2009) ................................................................................................ 5

*Hoffmann-La Roche Inc. v. Sperling,*
 493 U.S. 165 (1989)................................................................................................................. 4

*Johnson v. Big Lots Stores, Inc.,*
 561 F. Supp. 2d 567 (E.D. La. 2008)...................................................................... 6, 13, 26, 27

*Johnson v. TGF Precision Haircutters, Inc.,*
 No. H-03-3641, 2005 U.S. Dist. LEXIS 44259 (S.D. Tex. Aug. 17, 2005) ............................. 5

*Keef v. M.A. Mortenson Co.,*
 No. 07-CV-3915, 2009 U.S. Dist. LEXIS 14358 (D. Minn. Feb. 24, 2009) ............................ 5

*King v. CVS/Caremark Corp.,*
 No. 07-21824, 2008 WL 5973490 (S.D. Fla. Sept. 11, 2008)....................................... 5, 25, 28

# TABLE OF AUTHORITIES
## (continued)

Page

*King v. West Corp.*,
   No. 8:04CV318, 2006 U.S. Dist. LEXIS 3926 (D. Neb. Jan. 13, 2006) ................... 4, 5, 24, 25

*Lugo v. Farmer's Pride, Inc.*,
   No. 07-0743, 2010 U.S. Dist. LEXIS 88139 (E.D. Pa. Aug. 25, 2010) ................................... 5

*Mooney v. Aramco Servs. Co.*,
   54 F.3d 1207 (5th Cir. 1995) ............................................................................................... 5, 6

*Morisky v. Pub. Serv. Elec. and Gas Co.*,
   111 F. Supp. 2d 493 (D.N.J. 2000) ................................................................................... 4, 5, 6

*O'Brien v. Ed Donnelly Enter., Inc.*,
   2006 WL 3483956 (S.D. Ohio Nov. 30, 2006).................................................................... 25

*Proctor v. Allsups Convenience Stores, Inc.*,
   250 F.R.D. 278 (N.D. Tex. 2008) ..................................................................................... 5, 26

*Reyes v. Tex. EZPawn*,
   No. v-03-128, 2007 U.S. Dist. LEXIS 1461 (S.D. Tex. Jan. 8, 2007) ....... 4, 5, 6, 23, 24, 25, 27

*Roussell v. Brinker Int'l.*,
   No. H-05-3733, 2009 U.S. Dist. LEXIS 126668 (S.D. Tex. Jan. 26, 2009)............................ 5

*Smith v. Heartland Auto. Serv., Inc.*,
   404 F. Supp. 2d 1144 (D. Minn. 2005)................................................................................ 5

*Stein v. J.C. Penney Co.*,
   557 F. Supp. 398 (W.D. Tenn. 1983) .................................................................................. 24

*Thiessen v. Gen. Elec. Capital Corp.*,
   267 F.3d 1095 (10th Cir. 2001) ....................................................................................... 6, 23

*Wright v. Pulaski County*,
   No. 4:09CV00065, 2010 U.S. Dist. LEXIS 81283 (E.D. Ark. Aug. 24, 2010)......................... 5

## STATUTES

29 C.F.R. § 541.100 ............................................................................................................... 25

29 C.F.R. § 541.2 ................................................................................................................... 13

29 C.F.R. § 541.200(a)(3) ...................................................................................................... 11

## TABLE OF AUTHORITIES
### (continued)

**Page**

29 C.F.R. § 541.400(b)(1).............................................................................................. 24

29 C.F.R. § 541.700 ...................................................................................................... 13

29 C.F.R. § 541.700(a).................................................................................................. 11

29 C.F.R. § 541.700(b) ................................................................................................. 11

29 U.S.C. § 216(b) .......................................................................................................... 4

29 U.S.C. §216(b) ........................................................................................................... 1

## DEFENDANTS' MOTION TO DECERTIFY CLASS AND BRIEF IN SUPPORT

Defendants Tyler Technologies, Inc. and EDP Enterprises, Inc. (collectively "Tyler")[1] respectfully move this Court to decertify this conditional collective action, dismiss the claims of all opt-in Plaintiffs, and sever the named Plaintiffs' claims before proceeding on their individual claims.

## I.
## SUMMARY OF ARGUMENTS

This is a purported collective action under 29 U.S.C. §216(b) of the Fair Labor Standards Act ("FLSA") wherein Plaintiffs allege they were misclassified as overtime exempt employees and denied overtime pay. Under the lenient standard at the preliminary "notice stage," this Court granted conditional certification and allowed the case to proceed initially as a collective action. After a partial settlement of the claims of certain Plaintiffs, and after several months of discovery during which most of the Plaintiffs were deposed, it is clear this case should be decertified.

The fact intensive nature of misclassification cases make them particularly unsuitable for collective action treatment, and the dramatic disparities and variances in the job duties of the named and opt-in Plaintiffs make decertification particularly appropriate here. The record evidence establishes that several of the Plaintiffs performed jobs that were completely unique, while many if not most others performed functions and duties not shared by other Plaintiffs. These variances in job functions go to the heart of Plaintiffs' claims and Defendants' defenses with respect to the application of the white collar exemptions to the overtime requirements of the FLSA. While these differences may result from a variety of factors, such as seniority, the division at which a particular Plaintiff worked or the software in that division that a particular

---

[1] As explained in Defendants' Response in Opposition to Plaintiffs' Original Motion for Certification of Collective Action, EDP Enterprises, Inc. was acquired by Tyler in September 2007 and is no longer a distinct legal entity. *See* Dkt. No. 26, p. 20 of 33.

Plaintiff supported, the reasons for the differences are not controlling.  The bottom line is that Plaintiffs are not similarly situated and the efficiencies usually associated with class certification would be glaringly absent in a trial of this case.  Moreover, and perhaps more significantly, the disparities in Plaintiffs' job functions make it procedurally unfair for this case to proceed as a collective action, as the testimony of one Plaintiff, or even some of the Plaintiffs, simply is not representative of the others as to the critical issue in this case—the jobs they performed and the functions and responsibilities associated therewith.  For these reasons, this case should be decertified as a collective action.

## II.
## BACKGROUND AND PROCEDURAL HISTORY

Tyler's business involves selling and servicing proprietary software applications primarily to municipal government and other public sector entities.[2]  Over the years, Tyler has acquired software companies in its industry with proven results and strong leadership.[3]  The groups and divisions within Tyler's current corporate structure consist of the various software companies that Tyler has acquired.[4]  As a result of these acquisitions, Tyler has offices and divisions throughout the country which sell and support different software applications, each with multiple different modules, to different types of public sector entities.[5]  For example, the TSG, or "Courts and Justice" division in Plano, Texas sells and supports a variety of different software modules within its "justice solutions" application for county and state courts which include:  Case Manager, Prosecutor, Check Manager, Supervision, Jail Manager, Jury Management, Law Enforcement, and Electronic File and Serve.[6]  Other Tyler divisions similarly

---

[2] Exh. 1, Declaration of Chris Hepburn ("Hepburn Decl.") at ¶ 3.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] Exh. 1, Hepburn Decl. at ¶ 4.

support proprietary software applications that contain a wide range of modules that perform different services, and, significantly, different employees with different backgrounds and levels of expertise support these different modules within the broader software applications.[7]

After the Court conditionally certified the case, Plaintiffs' counsel sent notice to approximately 1,104 current and former Tyler employees in four job categories.   At the expiration of the opt-in period, approximately 73 Plaintiffs elected to opt in to this lawsuit joining the fourteen named Plaintiffs for a total of 87 Plaintiffs.   To date, 29 Plaintiffs have elected to opt out of this lawsuit, and 24 Plaintiffs have agreed, pending court approval, to settle their claims against Tyler.[8]   Currently, the lawsuit consists of 34 Plaintiffs[9] – 7 named Plaintiffs and 27 opt-in Plaintiffs.   All of the remaining Plaintiffs perform roles in the "implementation" process in which Tyler's software is integrated into the customer's systems.   Most of the Plaintiffs held titles of "implementation specialists" or "implementation consultants," although, as discussed herein, they performed significantly different jobs.

Of the remaining Plaintiffs, 4 are current Tyler employees and 30 are former employees.[10]   Plaintiffs worked at 5 different divisions of Tyler and worked in offices or their homes all over the country.[11]   The tenures of Plaintiffs at Tyler vary from senior implementation employees who worked for more than twelve years and the most junior who worked for less than

---

[7] Exh. 1, Hepburn Decl. at ¶ 5.

[8] *See* Dkt. No. 129, Joint Motion for Order Approving Partial Settlement and Motion to Present Settlement Papers in Camera, filed on July 2, 2010, for details regarding the settlement.   Specifically, Plaintiffs in the following job categories agreed to resolution of their claims:  telephone customer support, systems engineer, and quality assurance.

[9] This number includes opt-in Plaintiff Mathew New, whom the parties have agreed will withdraw his consent to opt in to this lawsuit.

[10] *See* Exh. 2.

[11] The five (5) divisions or subdivisions at which Plaintiffs were or are employed are, (1) Tyler's "MUNIS" division based in Falmouth, Maine with offices in Westborough, Massachusetts, and Raleigh-Durham, North Carolina; (2) The Software Group ("TSG"), with offices in Plano, Texas; (3) Eagle, which is based in Eagle, Colorado; (4) EDEN, which is based in Renton, outside of Seattle, Washington, and (5) INCODE, based in Lubbock, Texas.   EDP Enterprises, Inc. is now an office within the MUNIS division.   *See*, Exh. 3, Declaration of Lynn Moore ("Moore Decl.") at ¶¶ 7, 13-14; Exh. 4, Declaration of Bruce Volkens ("Volkens Decl.") at ¶ 2.

4 months.[12] The list attached as Exhibit "2" demonstrates the diversity among the remaining Plaintiffs with respect to division and office location and duration of employment for each.[13] With a few exceptions, nearly all of the remaining Plaintiffs have been deposed, and Tyler bases this motion primarily on their deposition testimony.

## III.
## LEGAL ARGUMENTS AND AUTHORITIES

The sole issue before the Court is whether Plaintiffs can meet their burden of proving they are "similarly situated" as required by 29 U.S.C. § 216(b) to proceed as a collective action. The answer is no.  The remaining Plaintiffs simply are not similarly situated because their jobs at Tyler differed in significant and fundamental ways.

Collective actions are vehicles to benefit courts by providing "an efficient resolution in one proceeding of common issues of law and fact."[14]  Because of the fact intensive, individualized nature of assessing job functions in an FLSA misclassification case, "litigating this case as a collective action would be anything but efficient."[15]  As numerous courts have observed, the overtime classification of employees typically must be determined on an employee-by-employee basis, which makes these cases particular unsuitable for collective treatment.[16]  Determining whether an employee falls within the administrative exemption, for example, requires an individualized and fact-intensive inquiry and "a detailed analysis of the

---

[12] *See* Exh. 2.

[13] Exhibit 2 only contains a list of those Plaintiffs that have been deposed to date.

[14] *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

[15] *Morisky v. Pub. Serv. Elec. and Gas Co.,* 111 F. Supp. 2d 493, 499 (D.N.J. 2000) (applying the stricter standard utilized at the "second stage" to deny conditional certification of an action involving the application of the administrative exemption).

[16] *Morisky*, 111 F. Supp. 2d at 499 (denying conditional certification because deciding whether an employee falls within the executive or administrative exemption is highly individualized and fact-intensive and requires a detailed analysis of time spent performing administrative tasks and a factual analysis of the full range of the employee's job duties and responsibilities); *Reyes v. Tex. EZPawn,* No. v-03-128, 2007 U.S. Dist. LEXIS 1461, at *25-27 (S.D. Tex. Jan. 8, 2007); *Carlson v. C.H. Robinson Worldwide, Inc.,* No. 02-4261, 2006 U.S. Dist. LEXIS 71483, at *30 (D. Minn. Sept. 26, 2006); *King v. West Corp.,* No. 8:04CV318, 2006 U.S. Dist. LEXIS 3926, at *43 (D. Neb. Jan. 13, 2006).

time spent performing administrative duties."[17]   Because of the wide divergence of job duties and responsibilities performed by the different Plaintiffs, a "careful factual analysis of the full range of the employee's job duties and responsibilities" cannot be made on representative basis and, accordingly, this action is ill suited for class treatment.[18]

At the decertification stage, Plaintiffs have the burden of showing that they are "similarly situated" based on the evidence gathered during the discovery process.[19]   This inquiry is more stringent and places a much higher burden on Plaintiffs than at the initial notice stage.[20]   The vast majority of district courts have denied certification at this stage in FLSA collective actions.[21]   In fact, at least as of 1995, the Fifth Circuit Court of Appeals in *Mooney v. Aramco* observed that, based on its review of the case law, "no representative class has ever survived the [decertification] stage of review."[22]   Moreover, a review of the case law today suggests there are no cases within the Fifth Circuit where an FLSA class survived the decertification stage in a

---

[17] *Morisky*, 111 F. Supp. 2d at 499.

[18] *Id.*

[19] *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995) (at the decertification stage, courts make a factual determination on the question of "similarly situated" based on the information available to them gathered during the discovery process).

[20] *See Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008); *see also EZPawn*, 2007 U.S. Dist. LEXIS 1461, at *6, 8.

[21] *See, e.g.*, *EZPawn*, 2007 U.S. Dist. LEXIS 101808, at *2; *Aguirre v. SBC Commc'n*, No. H-05-3198, 2007 U.S. Dist. LEXIS 17259, at *7 (S.D. Tex. March 12, 2007); *Proctor*, 250 F.R.D. at 284; *Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 U.S. Dist. LEXIS 44259, at *34 (S.D. Tex. Aug. 17, 2005); *Roussell v. Brinker Int'l.*, No. H-05-3733, 2009 U.S. Dist. LEXIS 126668, at *37 (S.D. Tex. Jan. 26, 2009); *Gatewood v. Koch Foods of Miss.*, No. 3:07CV82, 2009 U.S. Dist. LEXIS 113896, at *73 (S.D. Miss. Oct. 20, 2009); *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 954 (11th Cir. 2007); *Wright v. Pulaski County*, No. 4:09CV00065, 2010 U.S. Dist. LEXIS 81283 (E.D. Ark. Aug. 24, 2010); *Lugo v. Farmer's Pride, Inc.*, No. 07-0743, 2010 U.S. Dist. LEXIS 88139 (E.D. Pa. Aug. 25, 2010); *Hendricks v. J.P. Morgan Chase Bank*, 263 F.R.D. 78, 87 (D. Conn. 2009); *Smith v. Heartland Auto. Serv., Inc.*, 404 F. Supp. 2d 1144 (D. Minn. 2005); *Carlson*, 2006 U.S. Dist. LEXIS 71483; *King v. CVS/Caremark Corp.*, No. 07-21824, 2008 WL 5973490 (S.D. Fla. Sept. 11, 2008); *Diaz v. Elec. Boutique of Am., Inc.*, No. 04-CV-0840, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005); *King v. West Corp.*, 2006 U.S. Dist. LEXIS 3926; *Keef v. M.A. Mortenson Co.*, No. 07-CV-3915, 2009 U.S. Dist. LEXIS 14358 (D. Minn. Feb. 24, 2009).

[22] *Mooney*, 54 F.3d at 1214.   In *Mooney*, the Fifth Circuit Court of Appeals was faced with an appeal form decertification of an action involving claims under the Age Discrimination in Employment Act ("ADEA").   The ADEA, however, explicitly incorporates section 16(b) of the FLSA providing that a person could maintain an action on behalf of himself and other "similarly situated" employees.   *See Mooney*, 54 F.3d at 1212.

---

lawsuit involving misclassification claims and white collar exemption defenses.[23]

To determine whether or not a case should proceed as a collective action under § 216(b) of the FLSA, a court must examine the following factors:  (1) the factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant that may be individual to each plaintiff; and (3) fairness and procedural considerations.[24]  In this case, each of these factors weighs heavily in favor of decertification.

## A.     The Factual and Employment Settings of Individual Plaintiffs Vary Significantly

To determine whether Plaintiffs are similarly situated, courts must assess, "… the opt-in Plaintiffs' job duties, geographic locations, supervision, and salary…."[25]  In a misclassification suit, whether or not Plaintiffs are "similarly situated" must be "analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt."[26]  Based on the factual disparities regarding duties, responsibilities and daily tasks performed by each Plaintiff highlighted below, it is evident that Plaintiffs are not similarly situated.

### 1.     The "client liaison" designation and function was unique to two Plaintiffs

Two of the Plaintiffs who worked for EDP held jobs that were completely unique.  Lisa White ("White"), who resigned before Tyler's acquisition of EDP in September of 2007, and Talena McElhany ("McElhany"), worked for EDP, now a subdivision of Tyler, in Longview,

---

[23] Even where the court denied the employer's motion to decertify a misclassification lawsuit involving Big Lots Stores' assistant store managers, after the trial, the court decertified that action without issuing a verdict and recognized that due to the substantial differences in each employee's job duties and performance of those duties, "the procedural advantages of a collective action evaporate, and the Court's confidence that a just verdict on the merits can be rendered is seriously undermined."  *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 588 (E.D. La. 2008).

[24] *Mooney*, 54 F.3d at 1215; *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001).

[25] *EZPawn*, 2007 U.S. Dist. LEXIS 1461, at *8-9.

[26] *EZPawn*, 2007 U.S. Dist. LEXIS 1461, at *8 (citing *Morisky*, 111 F. Supp. 2d at 498).

<u>**DEFENDANTS' MOTION TO DECERTIFY CLASS AND BRIEF IN SUPPORT**</u> – Page 6

Texas and each held the position of "client liaison."[27]  This position was unique to EDP in Longview, and Tyler is not aware of any other division or office that has utilized that designation.[28]  More significantly, the jobs performed by White and McElhany are completely different from those testified to by the other Plaintiffs.

The client liaison primarily served as an intermediary between the customer and EDP's internal conversion programming team and, more specifically, assisted in the conversion of the customer's data from its previous software system to the new system provided by EDP or Tyler.[29]  Indeed, McElhany estimated that she devoted approximately 85% of her time to data conversion and both McElhany and White agreed that a significant portion of their time was spent working with the customer to convert data.[30]  McElhany described her position as, "… more of a go-between, a collector of information, and a disseminator of information …."[31]  White testified that her job was to be the "point of contact" between the customer and EDP's conversion programming team to identify and resolve data conversion problems.[32]  By contrast, nearly all of the other Plaintiffs testified the conversion of the customers' data was performed by employees in separate departments.[33]

Significantly, while most of the other Plaintiffs testified that they spent at least some portion of their jobs at Tyler's customer sites independently training customers on how to set up

---

[27] Exh. 5, White Dep. pp. 4:17-24, 5:2-7; Exh. 6, McElhany Dep. pp. 4:17-22, 28:19-21.  One other Plaintiff, Kelly Hampton, who worked for EDP may also have held the position of "client liaison" but she has not yet been deposed.
[28] Exh. 1, Hepburn Decl. at ¶ 7.
[29] Exh. 5, White Dep. pp. 89:16-25, 92:15-93:19; Exh. 6, McElhany Dep. pp. 39:6-10, 41:17-44:22, 54:7-10.
[30] Exh. 6, McElhany Dep. pp. 84:13-86:1; Exh. 5, White Dep. p. 57:18-24.  McElhany testified that the remaining approximately 15% of her time was devoted to providing customer support over the telephone for customers after they had installed and were using the new software system.  Exh. 6, McElhany Dep. p. 87:7-13.
[31] Exh. 6, McElhany Dep. p. 106:2-6.
[32] Exh. 5, White Dep. pp. 58:6-59:2, 69:17-71:24.
[33] Exh. 7, Flynn Dep. pp. 47:19-48:20, 76:4-16; Exh. 8, Dupree Dep. pp. 46:5-47:8; Exh. 9, Dunn Dep. pp. 21:24-22:14, 41:6-22; Exh. 10, Void Dep. p. 59:13-21; Exh. 11, Brown Dep. p. 59:8-20; Exh. 12, McLeod Dep. p. 22:4-23:2; Exh. 13, Meyers Dep. p. 59:11-13; Exh. 14, O'Haver Dep. pp. 28:21-29:19.

or use Tyler's software,[34] the client liaison job performed by White and McElhany involved none of the classroom style training at the customer locations as testified to by other Plaintiffs.[35] Indeed, EDP utilized separate employees called "trainers" to train customers.[36]  Moreover, unlike most of the other Plaintiffs who testified that they spent significant amounts of time at customer locations,[37] White and McElhany only rarely traveled to customer sites and spent the bulk of their time communicating with customers by telephone while working in the Longview office.[38] Thus, McElhany and White's experiences during their employment are completely unique and not at all representative of the other Plaintiffs.  One named plaintiff does not allege he was misclassified as an exempt employee, held a different job title, and performed different tasks than the other named and opt-in Plaintiffs.

Jason Bonner ("Bonner"), according to his declaration, was employed as a Technical Support Specialist/Trainer and worked in Tyler's TSG division in Plano, Texas for less than four (4) months.[39]    According to Bonner himself, Bonner's job duties consisted of providing telephone support to customers by answering questions and resolving issues associated with the operation of TSG's appraisal software.[40]  More significantly, unlike all of the other Plaintiffs,

---

[34] *See, e.g.*, Exh. 15, Dodd Dep. pp. 4:13-14, 38:5-39:21 (Tony Dodd, working for the Eagle division, engaged in training end users on Tyler's software); Exh. 16, Wilton Dep. pp. 25:9-12, 26:13-18, 30:13-18, 36:3-25, 91:22-23 (Eyvonne Wilton, an implementation consultant working for the EDEN Division, viewed her primary objective as teaching the client's employees to navigate through Tyler's software on their own).

[35] Exh. 5, White Dep. pp. 90:16-9:23, 94:18-95:19; Exh. 6, McElhany Dep. pp. 70:22-71:5.

[36] Exh. 5, White Dep. pp. 30:3-32:9; Exh. 6, McElhany Dep. p. 60:10-20.  McElhany testified that, after the acquisition of EDP by Tyler in 2007, her job title changed from "client liaison" to "implementer" but that her job duties did not change during the approximately two (2) additional months during which she continued to work.  Exh. 6, McElhany Dep. pp. 60:18-61:13.

[37] *See, e.g.*, Exh. 11, Brown Dep. pp. 45:2-10, 45:14-46:3, 129:4-130:6. (Jill Brown, an implementer working with the TSG division, traveled to various client sites to provide them with training on Tyler's software); Exh. 16, Wilton Dep. p. 132:19-24; Exh. 9, Dunn Dep. pp. 34:25-35:2, 102:13-14.

[38] White testified that she only traveled to a customer location on two different occasions during her three years of employment with EDP.  Exh. 5, White Dep. pp. 30:17-32:16. McElhany testified that she traveled to a customer location on only one or two occasions during introductory planning meetings.  Exh. 6, McElhany Dep. pp. 45:10-47:4.

[39] Exh. 17, Declaration of Jason Hunter Bonner ("Bonner Decl.") at ¶2.

[40] *Id.* at ¶3 (He answered telephone inquiries related to the use of the Legacy Appraisal software).

---

**DEFENDANTS' MOTION TO DECERTIFY CLASS AND BRIEF IN SUPPORT** – Page 8

Bonner was as an hourly, non-exempt employee.[41] Accordingly, Bonner's claims, whatever they might be, are necessarily completely distinct from the other Plaintiffs who contend they were misclassified as exempt employees.   Accordingly, Bonner and the other named and opt-in Plaintiffs "are not similarly situated to one another for no factual nexus exists between their situations."[42]

### 2.   Plaintiff Brown functioned as a project manager and led a team of implementation consultants/specialists

The job of opt-in Plaintiff Jill Brown ("Brown") also was unique.  Brown performed not only as an implementation specialist, she also served as a project manager and oversaw a team of implementers—a function that is unique to Brown and not shared by any of the other named or opt-in Plaintiffs.[43]

Brown worked from her home in Michigan in Tyler's TSG Division.[44]  In her initial role as an implementation specialist, she (1) created training manuals and documentation to assist clients with using Tyler's software;[45] (2) configured Tyler's software to meet the needs of Tyler's clients;[46] (3) reviewed data converted from her clients' pervious software to Tyler's new

---

[41] Exh. 18, Declaration of Paige Cole ("Cole Decl.") at ¶ 5.

[42] *See Diaz v. Electronic Boutique of America, Inc.*, No. 04-CV-0840, 2005 U.S. Dist. LEXIS 30382, at *12 (W.D.N.Y. Oct. 17, 2005) (conditional certification denied where the two named plaintiffs were not similarly situated when one was designated as an exempt employee and the other one non-exempt); *see also, Davis v. Lenox Hill Hosp.*, No. 03-Civ-3746, 2004 U.S. Dist. LEXIS 17283, at *7 (S.D.N.Y. 2004) (held nurse in an exempt program claiming unpaid overtime wages was not similarly situated to non-exempt nurses).

[43] One other Plaintiff, Kevin Mosenthin ("Mosenthin"), was given some additional responsibilities in connection with a training program to become a project manager. Exh. 19, Mosenthin Dep. pp. 17:6-18:25, 79:18-80:6. Specifically, Mosenthin testified that during this period, he was given a "freer hand" to work with his clients to schedule meetings and training agendas. Exh. 19, Mosenthin Dep. pp. 79:22-80:6. Mosenthin also suggested, however, that this greater freedom with respect to setting agendas and schedules may have had as much to do with the management style of his project manager at the time.  Exh. 19, Mosenthin Dep. pp. 81:14-82:12.

[44] Exh. 11, Brown Dep. pp. 23:19-24:15.

[45] Exh. 11, Brown Dep. pp. 50:9-18, 97:15-98:7. Other Plaintiffs testified they did not create customer training materials. *See, e.g.,* Exh. 12, McLeod Dep. pp. 90:11-17, 91:4-6; Exh. 20, Grimwood Dep. pp. 61:22-62:16 (Grimwood testified he created a user manual on only one occasion).

[46] Exh. 11, Brown Dep. pp. 25:7-26:6, 31:6-21, 36:2-9.  Other Plaintiffs testified that they did not do any or much configuration.  *See, e.g.,* Exh. 21, Milburn Dep. pp. 84:7-8, 121:15-16; Exh. 22, Emde Dep. pp. 84:3-85:3; Exh. 23, Dunning Dep. p. 30:1-5.

---

software to ensure the integrity of the data converted;[47] and (4) engaged in "fit analysis" to help clients determine how the software's various functionalities could meet their business needs.[48]

From June 2008 until August 2009, however, Brown took over the additional responsibility of functioning as a project manager on one of her projects, and received an assignment premium of $650 per month for her additional duties.[49]  Brown acknowledges that her role as a project manager was different and distinct from the job she performed as an implementation specialist.[50]  For example, while she was a project manager, she did not train employees of the client on Tyler's software or perform software configuration duties, duties that she performed as an implementation specialist.[51]  As a project manager, Brown testified she had more personal interaction with the customer, had more responsibility for the customer relationship,[52] and was responsible for tracking billing and ensuring that budgets were met.[53]  Moreover, as a project manager, Brown managed and supervised other implementation specialists during the "go live" phase of the project.[54]  Upon learning the customer's need for special enhancements to the software, Brown, as the project manager, met with Tyler's developers to explain the customer's need and prepared budgets for the developers to modify the software.[55]  These project management functions are unique to Brown and not shared by the other Plaintiffs.

---

[47] Exh. 11, Brown Dep. pp. 59:5-60:7.
[48] Exh. 11, Brown Dep. pp. 50:19-52:13, 54:15-56:12. Other Plaintiffs testified they did not do any systems or fit analysis. *See, e.g.,* Exh. 7, Flynn Dep. pp. 51:8-53:17; Exh. 8, Dupree Dep. pp. 31:5-11, 32:7-14; Exh. 22, Emde Dep. pp. 89:11-15, 90:6-12; Exh. 13, Meyers Dep. p. 48:2-7.
[49] Exh. 11, Brown Dep. pp. 61:8-16, 62:10-63:16.
[50] Exh. 11, Brown Dep. p. 63:23-64:15.
[51] Exh. 11, Brown Dep. pp. 65:14-67:2, 68:11-12, 69:7-70:4.
[52] Exh. 11, Brown Dep. p. 64:3-8.
[53] Exh. 11, Brown Dep. pp. 69:1-70:4.
[54] Exh. 11, Brown Dep. pp. 65:17-22, 70:5-71:5.
[55] Exh. 11, Brown Dep. pp. 69:11-70:4.

### 3.    The disparity in testimony of Plaintiffs regarding amount of time spent performing various functions is substantial

The administrative exemption requires that an employee's "primary duty" include "the exercise of discretion and independent judgment with respect to matters of significance."[56]   The FLSA regulations require an individualized inquiry into each employee's job responsibilities to determine an employee's "primary duty" by requiring a consideration of "all the facts in a particular case."[57]   The regulations to the FLSA list the following factors as relevant to the primary duty analysis:  (1) the relative importance of exempt duties as compared to other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees.[58]   Under the regulations, an employee who spends more than 50% of his or her time performing exempt tasks generally will satisfy the "primary duty" requirement.[59]

When Plaintiffs were asked to approximate the percentage of time spent performing particular tasks and functions, some were unable to do so, but the testimony of others is particularly revealing as to the differences in the amount of time spent performing different tasks.  For example, some of the Plaintiffs described the primary function associated with their job as implementers to be training Tyler's customers to use Tyler's software.  Opt-in Plaintiff Betty Dupree ("Dupree"), who worked for Tyler's MUNIS division out of its Westborough, Massachusetts office, agreed that the bulk of her functions involved training employees of Tyler's customers and, specifically, that 80% of her job during the last three (3) years of her

---

[56] 29 C.F.R. § 541.200 (a)(3).
[57] 29 C.F.R. § 541.700 (a).
[58] 29 C.F.R. § 541.700 (a).
[59] 29 C.F.R. § 541.700 (b).

employment involved these functions.[60]  Plaintiff Mosenthin, who worked out of his home in

Florida for Tyler's MUNIS division, also indicated that 80% percent of his job involved

customer training.[61]  Similarly, opt-in Plaintiff Eric Emde ("Emde"), who worked out of his

home for Tyler's INCODE division, testified that his job involved "teaching software" through

"… on-site and remote training to all levels of users …."[62]  Plaintiff Grimwood, a MUNIS

implementer who worked out of his home in Florida, testified that approximately 40% of his

time was spent training end-users how to use Tyler's software.[63]

        Other Plaintiffs, on the other hand, deemphasized the percentage of time spent training

users on utilizing Tyler software.  As noted above, Plaintiffs White and McElhany testified that

they performed no training at a client site in their jobs as "client liaisons."[64]  Opt-in Plaintiff

Amy Dunn ("Dunn"), an implementation specialist who worked out of her home for Tyler's

MUNIS division, estimated she spent approximately 60% of her time meeting with customers to

set up tables within Tyler's software.[65]

        Other Plaintiffs testified that their time spent on particular functions varied from

customer to customer.  For example, Linda Carrington ("Carrington"), an opt-in Plaintiff in

Tyler's TSG Division in Plano, Texas, testified that configuring the software for Tyler's clients

could take 10% of her time during a particular implementation and 40% of her time during a

different implementation depending on a variety of factors.[66]  Laura Milburn ("Milburn"), an

implementation consultant who worked for the MUNIS division in Raleigh, North Carolina, on

---

[60] Exh. 8, Dupree Dep. pp. 14:15-22, 22:13-22, 43:19-44:18.
[61] Exh. 19, Mosenthin Dep. p. 6:25-7:2, 8:9-11, 12:7-9, 77:6-12.
[62] Exh. 22, Emde Dep. pp. 8:14-9:12, 29:16-20, 30:11-20, 47:3-11.
[63] Exh. 20, Grimwood Dep. pp. 7:10-11, 9:25-10:6, 48:24-49:5, 49:17-50:10.
[64] Exh. 5, White Dep. pp. 90:16-91:23, 94:18-95:19; Exh. 6, McElhany Dep. pp. 70:22-71:5.
[65] Exh. 9, Dunn Dep. pp. 7:8-10, 55:16-56:4.
[66] Exh. 24, Carrington Dep. pp. 52:20-53:12, 95:6-15, 128:20-23.

the other hand, testified that she did not do any configuration for clients.[67]  Other Plaintiffs also testified they did not perform software configuration work.[68]  Milburn also testified that during the 16 months that she was employed by Tyler, she seldom traveled to a client site to provide training to clients' employees because the sales in her particular office were low and there was no work.[69]

With respect to data entry and converting the customer's old data into the new software, named Plaintiff Bonner stated in his declaration that he spent an entire week performing "data entry from before sunup to well after sundown."[70]  Other Plaintiffs, on the other hand, testified they did no data entry conversion work and that this process was performed by employees in separate conversion departments.[71]

If the testimony of no one Plaintiff is representative of the entire class as to the primary duties associated with each Plaintiff's job, the case should not proceed as an FLSA collective action.[72]  Each Plaintiff's testimony regarding time spent on various functions shows that, to determine exempt status and primary duty, the fact finder must examine and assess the jobs of literally each Plaintiff.[73]

### 4.    Certain job functions were performed by some but not all of the in Plaintiffs

Tyler produced Chris Hepburn ("Hepburn"), President of Tyler's Schools Division,[74] as its corporate representative regarding the functions generally associated with implementing

---

[67] Exh. 21, Milburn Dep. pp. 9:10-11, 121:5-16.
[68] *See, e.g.*, Exh. 25, Ingram Dep. pp. 70:15-71:12.
[69] Exh. 21, Milburn Dep. pp. 13:14-21, 127:3-130:9.
[70] Exh. 17, Bonner Decl. ¶ 4.
[71] *See, e.g.*, Exh. 7, Flynn Dep. pp. 47:19-48:20, 76:4-16; Exh. 8, Dupree Dep. pp. 46:5-47:8; Exh. 9, Dunn Dep. pp. 21:24-22:14; Exh. 10, Void Dep. p. 59:13-21; Exh. 11, Brown Dep. p. 59:8-20; Exh. 12, McLeod Dep. p. 22:4-23:2; Exh. 13, Meyers Dep. p. 59:11-13; Exh. 14, O'Haver Dep. pp. 28:21-29:19; Exh. 26, Maynard Dep. pp. 35:22-36:3.
[72] *Johnson v. Big Lots*, 561 F. Supp. 2d at 582.
[73] *See* 29 C.F.R. § 541.2 ("A job title alone is insufficient to establish the exempt status of an employee.  The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."); 29 C.F.R. § 541.700 ("Determination of an employee's primary duty must be based on all the facts in a particular case….").
[74] Exh. 27, Hepburn Dep. p. 46:5-7.

Tyler's software and the varying roles employees in the designations of "implementation consultant" and "implementation specialist" perform in this process.  Hepburn testified at length to a variety of factors that may result in differences in job functions and responsibilities from employee to employee.  These factors include differences in levels of seniority, differences in the knowledge and understanding of different software modules,[75] and differences in the actual software being implemented.[76]  For example, an implementer with a high level of experience and product knowledge may perform complicated "systems analysis" work and assist the customer in determining what variables within Tyler's software best meets its needs, while a more junior implementer may not perform these kinds of functions.[77]

Hepburn further testified that implementers at different divisions of Tyler perform different functions based in part on the job performed by the project managers to whom implementation specialists typically report.[78]  Specifically, project managers in the MUNIS divisions of Tyler are "product experts" and typically perform significant analysis and preparatory work with the customer.[79]  Individual project managers decide on an employee-by-employee basis which of these tasks to delegate to the implementer and which to perform herself.[80]  In contrast, project managers at other Tyler divisions, such as INCODE and EDEN typically are not "product experts."[81]  Therefore, implementers at these two divisions perform

---

[75] Exh. 27, Hepburn Dep. pp. 49:1-12, 50:17-51:22, 107:4-108:7 (For example, in the EAGLE division, the implementation consultants working on appraisal and tax products have an average of 15 year experience, in part because of the unique nature of those products.)

[76] Exh. 27, Hepburn Dep. pp. 25:16-23, 26:11-20, 107:4-108:7.

[77] Hepburn testified that whether or not an implementation specialist actually configures the software to meet clients' needs depends on the particular implementer's experience level with respect to the software and the managerial style of the project manager. Exh. 27, Hepburn Dep. pp. 50:4-52:18.  Hepburn further testified that because the applications within courts and public safety are required to be live and running all at the same time, and cannot be staggered, the implementation consultants at INCODE have the added responsibility of multi-tasking more so than their counterparts in the EDEN or MUNIS divisions.  Exh. 27, Hepburn Dep. p. 64:5-19.

[78] Exh. 27, Hepburn Dep. pp. 64:5-65:20.

[79] Exh. 27, Hepburn Dep. pp. 61:3-11, 62:11-18, 65:1-4, 65:16-20.

[80] Exh. 27, Hepburn Dep. p. 68:3-6.

[81] Exh. 27, Hepburn Dep. pp. 63:3-6.

much of the preparatory and analytical work in assessing the customer's needs, how those needs could be met by different alternatives within Tyler's software, and whether or not alternatives such as add-ons or upgrades might need to be considered.[82]

In addition, the functions of implementation employees vary depending on the type of software they support.  For example, implementers who work on a single module, such as building permits or business licenses, may not have the same duties and responsibilities that an employee who supports the entire suite of financial modules within a software application.[83]  Implementation employees in the former category likely will be required to perform initial analysis work as different modules are integrated into the customer's larger software system.[84]

The differences in job functions are not merely theoretical and borne out only by Hepburn's testimony.  The testimony of the Plaintiffs further reveals the variances in distinct job functions.  As discussed below, in many cases, these particular, discrete job functions consisted of significant aspects of the Plaintiffs' overall job duties.

### a.    Software configuration

Some Plaintiffs testified that their jobs involved "configuring" Tyler's software at the customer's location.  This process involves, at a general level, working with the customer to set up tables and parameters within Tyler's system to dictate how information, and what information, is communicated through the software program.  For example, opt-in Plaintiff Titus Britt ("Britt"), who worked in Tyler's Seattle, Washington, EDEN division, described his involvement in the configuration process as meeting with the customer to determine the features

---

[82] Exh. 27, Hepburn Dep. p. 65:16-20, 66:8-17, 67:11-16, 67:21-25, 116:21-117:5.

[83] Exh. 1, Hepburn Decl. ¶ 6.

[84] Exh. 1, Hepburn Decl. ¶ 6.  The testimony of Kevin Mosenthin supports this distinction.  Mosenthin, who towards the end of his employment supported only the business license module, acknowledged that it was a "cookie cutter" software that did not involve as many variables and options for customers as other types of modules that he previously supported during his tenure at Tyler.  Exh. 19, Mosenthin Dep. p. 67:1-16.

associated with the software the customer wanted to activate and then going into the system and activating those features.[85]   Opt-in Plaintiff Carrington, who worked in Tyler's Courts and Justice Division in Plano, Texas, described her role in the configuration process as setting up the system to grant information access rights consistent with customer preferences and policies.[86]

Some, but not all, of the implementers testified that software configuration constituted a significant portion of their jobs at Tyler.[87]   Plaintiff Lorraine Mutch ("Mutch") testified that the configuration process, which took her approximately one week to complete, consisted of setting up the software to permit particular customer personnel to have access to the information the customer told Mutch the personnel need to access.[88]   Opt-in Plaintiff David Hayner ("Hayner"), who worked in Tyler's EDEN division outside Seattle, Washington, testified that, at least as to one of the software modules he supported, the majority of his time at the customer's site was devoted to exploring different software variables to determine how the customer's programs ultimately would be set up.[89]

Other Plaintiffs testified they performed little to no configuration functions.   Opt-In Plaintiff Sandra Dunning ("Dunning") testified that her job did not require configuring Tyler's software at the customer location.[90]   Opt-In Plaintiff Emde testified that only "a very small piece" of his job involved any element of configuration in that he occasionally would be required to adjust forms or change fields in the software and that, at the INCODE division at which he worked, employees called "configuration programmers" performed most of the actual

---

[85] Exh. 28, Britt Dep. pp. 9:17-19, 13:8-12, 103:4-106:5.
[86] Exh. 24, Carrington Dep. pp. 104:22-105:12, 107:4-8, 107:15-23, 108:9-18.
[87] For example, Plaintiff Dunn testified that approximately 60% of her time was spent meeting with the customer and setting up tables within Tyler's software.  Exh. 9, Dunn Dep. pp. 55:25-56:4.
[88] Exh. 29, Mutch Dep. pp. 51:19-53:8, 66:5-67:1.
[89] Exh. 30, Hayner Dep. pp. 10:24-11:9, 34:22-35:25, 41:1-42:12.
[90] Exh. 23, Dunning Dep. p. 30:1-3.

configuration.[91]

     **b.**     <u>**Systems analysis**</u>

     The testimony of Plaintiffs confirms Hepburn's testimony that some but not all implementation specialists perform "systems analysis" functions.  Although Plaintiffs used different terms to describe this process, "systems analysis" generally involves meeting with the customer to learn its internal processes through which data is conveyed in the customer's previous database and explaining how these processes will function, and functional alternatives, in Tyler's software.[92]  Britt testified about meeting with customers during what he called a "consultant review" during which he gathered information about the customer's business processes and the customer's expectations from Tyler's software.[93]  Carrington spoke of a "fit analysis" during which she met with the customer to learn its current system and explained options and alternatives available within Tyler's software.[94]  Hayner testified that his job involved meeting with the customer to go over which variables within Tyler's software it preferred and how its new software would be set up.[95]

     Other implementers testified they did not perform any systems analysis or related

---

[91] Exh. 22, Emde Dep. p. 84:3-22, 87:7-89:3.

[92] *See, e.g.*, Exh. 10, Void Dep. pp. 54:24-55:20.

[93] Exh. 28, Britt Dep. p. 97:12-101:20.

[94] Exh. 24, Carrington Dep. pp. 56:3-57:10.  *See also*, Exh. 11, Brown Dep. pp. 51:3-52:13, 54:21-55:15. Plaintiff Brown testified to performing "fit analysis" in which Brown would conduct business process reviews and make recommendations with respect to different options as to what Tyler's systems could do within the Courts and Justice division in Plano, Texas.  Plaintiff Grimwood testified that, although he did not participate in the introductory "kick-off meeting," he would meet with customers to discuss the MUNIS application and show them alternatives to their current operational systems. Exh. 20, Grimwood Dep. pp. 12:13-13:4, 20:25-21:25. Plaintiff Maynard conducted what she called "analysis sessions" in which she would determine how the client would use the MUNIS.  Exh. 26, Maynard Dep. p. 41:8-22.

[95] Exh. 30, Hayner Dep. pp. 41:1-42:12.  *See also*, Exh. 9, Dunn Dep. p. 18:13-23 (Dunn would meet with Tyler customers to gather "… the information from what they want and need, determining what is best for them, how to use the software, and then helping them set it up to accomplish that."); Exh. 29, Mutch Dep. p. 61:3-18. (Mutch would meet with customers to determine how their software system should be set up, what particular users had access to particular information, and how to set up the customer's data flow processes.); Exh. 31, Baird Dep. pp. 51:15-52:6.  (Prior to performing configuration, Baird would meet with the customer to determine their preferences with respect to the software and storage of information and data.).

functions and they had no need to know the customer's processes in their previous software system.  For example, Plaintiff Dupree was aware of initial consultation meetings called "project kickoffs" which involved determining the customer's software needs but did not participate in any of those meetings.[96]  Other Plaintiffs testified similarly that they had no involvement in systems analysis and related functions.[97]

<strong>c.       Setting agendas and training schedules</strong>

Another area of substantial divergence among Plaintiffs' duties is the degree to which they worked with customers to set training agendas and schedules.   Again, some of the implementers testified that they would confer with customers to explore and identify particular training needs and would create written training schedules to govern the training sessions at the customer's site.[98]  For example, opt-in Plaintiff Emde testified that he would conduct an initial meeting with the customer to identify who needed to be trained and on what modules of the software.[99]  Opt-in Plaintiff Void testified his duties required him to modify an agenda from Tyler's "knowledge" database depending on the particular needs of the customer and that the agenda he created contained the schedule for the training as well as deadlines for the completion of specific tasks.[100]

Other implementers testified that they had no input in establishing training agendas or schedules.  For example, Opt-in Plaintiff Britt testified that his project manager performed these

---

[96] Exh. 8, Dupree Dep. pp. 30:16-31:4.

[97] Exh. 7, Flynn Dep. pp. 52:7-53:17; Exh. 22, Emde Dep. pp. 81:11-82:9, 83:4-23, 89:11-17, 90:6-12; Exh. 13, Meyers Dep. pp. 47:7-49:14, 52:3-7; Exh. 21, Milburn Dep. pp. 117:7-118:2.

[98] *See, e.g.,* Exh. 9, Dunn Dep. pp. 58:6-20, 60:4-6.  Dunn testified that these training schedules would not be submitted to her project manager for approval before submission to the Tyler customer.

[99] Exh. 22, Emde Dep. pp. 95:12-96:1, 96:15-25, 97:6-10.

[100] Exh. 10, Void Dep. pp. 49:9-50:21.  Void testified he only occasionally would submit these agenda to his project manager for approval prior to providing it to the customer.  Exh. 10, Void Dep. pp. 51:23-52:2.  *See also,* Exh. 30, Hayner Dep. p. 53:10-20, 54:2-55:11, 55:17-57:24.  (Hayner customized an agenda based on client needs and was required to adjust and modify the schedule based on the progress of the training). Exh. 24, Carrington Dep. pp. 88:19-89:16 (Carrington testified she would work with the customer to set up a training schedule).

functions.[101]   Other Plaintiffs also testified they had absolutely no input in the training schedule

or agenda and that these matters were predetermined before they arrived at the customer's site.[102]

### d.   Support functions

The responsibilities of some Plaintiffs with the customer ended after Tyler's software was

fully installed, while other Plaintiffs had continued responsibility to provide telephonic support

to resolve customers' day-to-day issues.   For example, opt-in Plaintiff Void, who works in the

Raleigh-Durham office of the MUNIS division, indicated there were particular days on which he

is scheduled to stand by the phone to be ready to answer questions from the customer after the

customer had "gone live" with Tyler's software.[103]   Opt-in Plaintiff Mutch testified she provided

telephone support after the customer had completed the "go live" phase of the implementation

process.[104]   Plaintiff Grimwood, an implementation consultant who worked for the MUNIS

division out of his home in Florida, was actually assigned a support role during the

approximately last three months of his employment in which he assisted the telephone customer

support team in Maine with its backlog of calls.[105]   Other implementers, on the other hand,

indicated that they provided no "post live" support and that they directed customer inquiries after

the implementation phase to Tyler's separate customer support team.[106]

### 5.   The testimony of some Plaintiffs further highlights the substantial disparity in duties and responsibilities

The following section highlights additional testimony by select Plaintiffs that

---

[101] Exh. 28, Britt Dep. pp. 113:17-114:3.
[102] *See* Exh. 13, Meyers Dep. pp. 52:20-54:13; Exh. 7, Flynn Dep. pp. 75:22-76:1; Exh. 8, Dupree Dep. pp. 37:9-22, 38:13-39:21 (project managers prepared the schedule for training and she never engaged in meetings with customers to create agendas or schedules to govern the training she provided).
[103] Exh. 10, Void Dep. pp. 66:22-68:24.
[104] Exh. 29, Mutch Dep. pp. 103:8-104:15.
[105] Exh. 20, Grimwood Dep. pp. 58:18-60:6.
[106] Exh. 8, Dupree Dep. p. 69:1-7 (Dupree did not provide post live support:  "Usually after they went live, they had to call support."); Exh. 22, Emde Dep. p. 111:8-15 (After the customer went live, he would not be in the "support loop" at all); Exh. 28, Britt Dep. pp. 126:4-127:9 ("After they go live, … they're done with us and then somebody else is involved."); Exh. 13, Meyers Dep. pp. 65:4-66:8 (Meyers would refer customer questions after the go live process to a separate support team rather than answering questions on her own).

demonstrates the diversity among Plaintiffs' job functions, duties and responsibilities.

### a.   Betty Dupree

Opt-in Plaintiff Dupree has the longest tenure of the Plaintiffs and worked for Tyler's MUNIS division out of its Westborough, Massachusetts office from 1998 through August 2007.[107]   During the last year of her employment — the longest potentially relevant period of recovery under the FLSA — Dupree worked in a special group called the "Installed Module Team" which serviced implementations for existing Tyler customers who had purchased additional modules of the MUNIS software.[108]   Because the customers she serviced already used Tyler's software, Dupree's job almost exclusively focused on training end-users how to use the new software modules.[109]   Indeed, Dupree estimates that 80% of her time during this final period of her employment was spent purely on training end-users.[110]   During this time, Dupree did not perform functions testified to by other Plaintiffs such as systems analysis work, configuration of software, customer support during the "go live" process, or post-"go live" customer support.[111]

### b.   Melanie Baird

Another opt-in Plaintiff with unique job functions is Melanie Baird ("Baird"), who worked in Tyler's INCODE division[112] in Lubbock, Texas.  Baird specialized in a utility billing software that, unlike Tyler's other software modules, did not replace a customer's existing software, but rather "interfaced" with other software.[113]   This difference meant that the training Baird conducted did not consist of teaching customers how to use Tyler's software, but rather

---

[107] Exh. 8, Dupree Dep. pp. 5:1-3, 11:17-18, 14:15-18, 22:13-22.
[108] Exh. 8, Dupree Dep. pp. 54:3-17, 55:3-23.
[109] Exh. 8, Dupree Dep. p. 54:13-55:2.
[110] Exh. 8, Dupree Dep. p. 44:12-18.
[111] Exh. 8, Dupree Dep. pp. 30:7-31:11, 31:21-32:19, 53:21-54:10, 67:14-18.
[112] Exh. 31, Baird Dep. p. 11:2-4.
[113] Exh. 31, Baird Dep. pp. 30:25-31:14, 43:1-18.

how different softwares communicated.[114]   Indeed, Baird did not consider herself to be an "implementer" because her job was so focused on software interfacing.[115]   As such, she requested that her job title be changed from "implementation specialist" to "interface specialist."[116]   Baird went so far as to call herself an "interface specialist" on her 2008 performance evaluation.[117]

Baird's focus on software interfacing required her to perform tasks different from other Plaintiffs.  For example, Baird had to work closely with the customer prior to training by going onsite, setting up equipment, and installing software.[118]   These are functions that, with the exception of Tony Dodd, who is discussed below, no other Plaintiffs performed.[119]   Moreover, in her 2007 performance review, Baird described her role as "… consistently analyzes problems, recognizes and implements appropriate solutions, finds new and better ways to do things."[120]   Baird also testified that she drafted standard operating procedures, developed protocols for other implementers with respect to training on handheld meter reading devices, and, according to her 2008 performance evaluation, "came up with an install procedure and an implementation procedure that is working well for all parties involved."[121]

      c.    **Joy Flynn**

Joy Flynn ("Flynn") is an example of a Plaintiff who worked for a short time with Tyler and did not perform many of the functions of the other Plaintiffs.[122]   Flynn worked in Tyler's

---

[114] Exh. 31, Baird Dep. p. 45:5-15.
[115] Exh. 31, Baird Dep. pp. 12:20-13:13, 96:9-19.
[116] Exh. 31, Baird Dep. p. 96:9-19.
[117] Exh. 31, Baird Dep. p. 97:7-22.
[118] Exh. 31, Baird Dep. pp. 24:2-25:1, 25:19-22, 26:16-23, 27:8-11.
[119] *See, e.g.,* Exh. 9, Dunn Dep. pp. 47:17-48:13; Exh. 12, McLeod Dep. p. 91:4-6; Exh. 28, Britt Dep. p. 110:3-19.
[120] Exh. 31, Baird Dep. p.48:10-12.
[121] Exh. 31, Baird Dep. pp. 77:8-78:5, 100:2-12.
[122] Although Milburn is another opt-in who worked at the same office as Flynn, and due to Milburn's short tenure, Milburn also did not perform many of the tasks assigned to other Plaintiffs, as further explained below, even Flynn

Raleigh-Durham office in its MUNIS division from March of 2008 through January 2009.[123] She never performed a full implementation on her own and did not train customers how to use the MUNIS software.[124]   Rather, Flynn's "training" involved simply meeting with payroll or human resources employees to explain to them how to perform the initial set up of the system.[125] As a result, Flynn acknowledged that her job did not involve many of the functions mentioned by other Plaintiffs.   For example, Flynn did not, (1) meet with customers to perform systems analysis or assess customer needs within the MUNIS software,[126] (2) set training agendas or schedules,[127] or (3) assist customers during the "go live" process.[128]   Indeed, Flynn acknowledged she never performed any "go live" assistance during her tenure with Tyler and was at the customer location on only one occasion, during her initial training period, when the customer converted to the MUNIS software.[129]   Rather, Flynn's preparatory set up work required that she build employee records by entering data into the new software system: "… and that's where you go in and put the employee benefits type information.  All of that type of information has to be set up."[130]

### d.   Tony Dodd

Dodd, a named Plaintiff who worked out of his home in Lubbock, Texas for Tyler's Eagle division, also performed unique functions.[131]   In particular, much of Dodd's job was completed before he ever went to the customer's premises, and he spent a substantial amount of

---

and Milburn are not similarly situated due to the different defenses available to Defendants with respect to Milburn's claims that are unavailable for Flynn.  Exh. 21, Milburn Dep. 9:7-9.

[123] Exh. 7, Flynn Dep. pp. 10:1-4, 21:22-22:1, 23:6-11.
[124] Exh. 7, Flynn Dep. pp. 35:17-21, 74:21-75:4.
[125] Exh. 7, Flynn Dep. pp. 74:21-75:14.
[126] Exh. 7, Flynn Dep. pp. 51:8-53:1.
[127] Exh. 7, Flynn Dep. p. 51:4-7.
[128] Exh. 7, Flynn Dep. pp. 83:12-85:11.
[129] Exh. 7, Flynn Dep. pp. 84:12-85:11.
[130] Exh. 7, Flynn Dep. pp. 73:1-74:18.
[131] Exh. 15, Dodd Dep. pp. 4:13-14, 14:13-16.

time at his home providing telephone support to customers and converting data from the customer's old system to the new Eagle software.[132]   Nearly all the other Plaintiffs testified they did not convert data and that this function was performed by separate teams within their divisions.[133]   Dodd also performed computer hardware installation, which meant unboxing and setting up computers, monitors, keyboards, running network cables, and installing scanners and printers.[134]   These functions also are unique to Dodd.[135]

## B.   Various Defenses Available to Tyler are Individual to Each Plaintiff

The substantial disparity in the duties performed by the Plaintiffs gives rise to individualized defenses that Tyler may raise in this lawsuit, further making this action improper for proceeding as a collective action.[136]

### 1.   The White collar exemption defenses are highly individualized

Application of the white collar exemptions under the FLSA requires a fact intensive, individualized inquiry as to the duties performed by each Plaintiff.   Because of the overwhelming variances in the duties performed by Plaintiffs, the exemption defenses cannot be adjudicated collectively.   The fact finder might reasonably determine that the degree of discretion and independent judgment exercised by particular Plaintiffs varied depending on whether or not they performed particular job functions, such as systems analysis work, software

---

[132] Exh. 15, Dodd Dep. pp. 29:11-19, 30:7-20, 32:7-33:3, 78:12-14.

[133] Exh. 7, Flynn Dep. pp. 47:19-48:20, 76:4-16; Exh. 8, Dupree Dep. pp. 46:5-47:8; Exh. 9, Dunn Dep. pp. 21:24-22:14, 41:6-22; Exh. 10, Void Dep. p. 59:13-21; Exh. 11, Brown Dep. p. 59:8-20; Exh. 12, McLeod Dep. p. 22:4-23:2; Exh. 13, Meyers Dep. p. 59:11-13; Exh. 14, O'Haver Dep. pp. 28:21-29:19.

[134] Exh. 15, Dodd Dep. pp. 72:14-74:1, 78:25-79:18.

[135] *See, e.g.,* Exh. 9, Dunn Dep. pp. 47:17-48:13; Exh. 28, Britt Dep. pp. 110:3-6; Exh. 20, Grimwood Dep. pp. 44:20-45:2; Exh. 19, Mosenthin Dep. p. 72:18-24.

[136] *See Gatewood v. Koch Foods of Miss.*, 2009 U.S. Dist. LEXIS 113896, at *64; *EZPawn*, 2007 U.S. Dist. LEXIS 1461, at *25; *Bayles v. Am. Med. Response of Colo., Inc.,* 950 F. Supp. 1053, 1067 (D. Colo. 1996) (decertifying because the aciton was "fraught with questions requiring distinct proof as to individual Plaintiffs" and defenses "cannot be addressed on a class-wide basis"); *Brooks v. Bell South Telecom., Inc.,* 164 F.R.D. 561, 569 (N.D. Ala. 1995) (denied certification because court was "faced with numerous individualized defenses"); *Thiessen,* 996 F. Supp. at 1084 (certification may be defeated by evidence of individualized defenses).

configuration, support, and similar duties.[137]   Moreover, the amount of time spent by each Plaintiff on these functions may also determine whether or not the administrative or other professional exemption applies.  As the ultimate issue to be decided in this lawsuit is whether Tyler correctly classified Plaintiffs as exempt employees, "deciding whether members of this proposed class are 'similarly situated' requires analyzing the nature of the job duties performed by each putative plaintiff."[138]

"[W]hile some Plaintiffs may fall squarely within an exemption based on their deposition testimony, [Tyler] may have to use employment records and/or other contradictory witness testimony to rebut some of the Plaintiffs' allegations" that their primary duty did not include the exercise of discretion and independent judgment, or that they did not apply systems analysis techniques and procedures.[139]   Given the diversity of each Plaintiff's experience as a Tyler employee, the evidence related to Tyler's defenses will be highly specific.  For example, for some Plaintiffs, Tyler may have to present their unsatisfactory performance reviews to establish that, although those Plaintiffs had exempt duties and were required to exercise their discretion and independent judgment, they either refused or failed to exercise those duties and, in effect, converted their exempt positions into non-exempt jobs, for which Defendants cannot be held liable.[140]   In addition, there likely will be a need to conduct a case-by-case examination as to

---

[137] *EZPawn*, 2007 U.S. Dist. LEXIS 1461, at *26 (the degree of discretion and authority exercised by each employee varied depending on store management and demographics; therefore, the case was unsuitable for collective treatment in applying the exemption analysis).

[138] *King v. West Corp.*, 2006 U.S. Dist. LEXIS 3926, at *43 ("Opt-in Plaintiffs performing different jobs who are subject to different job actions with various decisions by different supervisors made on a decentralized employee-by-employee or team-by-team basis are not appropriate for class treatment.")

[139] *EZPawn*, 2007 U.S. Dist. LEXIS 1461, at *27. In order for an employee to fall under the computer employee exemption, one of the criteria is that the employee's "primary duty consist of the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specification.  *See* 29 C.F.R. § 541.400(b)(1).

[140] *See Stein v. J.C. Penney Co.*, 557 F. Supp. 398, 405 (W.D. Tenn. 1983) (the plaintiff's own failure to exercise the discretion given to him, did not convert an exempt position to a non-exempt one); *see also, EZPawn,* 2007 U.S. Dist. LEXIS 1461, at *27 (S.D. Tex. Jan. 8, 2007) (discussing certain defenses requiring individualized evidence, making collective treatment of an exemption defense unsuitable.  Such defenses would include the need to use employment

---

whether or not each of the Plaintiffs worked more than forty hours during particular work weeks, which will further require individualized evidence and proof.[141]   Such disparate individual defenses require individualized evidence, making it near impossible for Tyler to defend all of Plaintiffs' claims with generalized proof.[142]

### 2. Defenses available with respect to the claims of Bonner, Brown, and Milburn individually, are not applicable to other Plaintiffs

Tyler's defenses to the claims of Bonner, the lone non-exempt Plaintiff in this action, obviously are unique.  Bonner's particular job duties and responsibilities, as well as the amount of time spent proportionately on those responsibilities, are irrelevant to his claim given that he was paid as a nonexempt, hourly employee.  Rather, Tyler's defense with respect to Bonner's apparent allegation of working off-the-clock will involve an examination of his time sheets and payroll records to determine whether any of the hours he worked were uncompensated.[143]

Tyler's defenses as to Plaintiff Brown, the sole Plaintiff who worked not only as an implementation employee but also as a project manager for over a year, also are unique and may involve the "executive" exemption to the usual overtime requirements under the FLSA.[144]  This defense would be applicable only to Brown as she is the only Plaintiff who held a managerial position during her employment with Tyler.

Tyler's defenses against Milburn also are distinct.  Milburn is the only Plaintiff who filed

---

records, performance evaluations, and witness testimony to refute ach plaintiff's testimony that they did not have exempt tasks).

[141] *King v. CVS/Caremark Corp.*, 2008 WL 5973490, at *5 (the diverse evidence concerning whether each plaintiff worked off-the-clock prevented the FLSA claim from proceeding collectively); *O'Brien v. Ed Donnelly Enter., Inc.*, 2006 WL 3483956, at *7 (S.D. Ohio Nov. 30, 2006) (as each claim required extensive consideration of individual issues of liability and damages, the court granted the defendant's motion for decertification).

[142] *See EZPawn*, 2007 U.S. Dist. LEXIS 1461, at *27; *King v. West Corp.*, 2006 U.S. Dist. LEXIS 3926, at *46-47.

[143] *See Diaz v. Elec. Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382, at *12 (employer's defense with respect to claims of the non-exempt employee was different and distinct than its defense against claims of the exempt employee).

[144] To fall under the executive exemption, in addition to other requirements, an employee's primary duty must be management and the employee must regularly direct the work of two or more other employees.  *See* 29 C.F.R. § 541.100.

for bankruptcy during the relevant period.[145]  Tyler intends to argue that Milburn's claims should be barred by the doctrine of judicial estoppel for failure to disclose her claims against Tyler in the bankruptcy proceedings Milburn commenced during the relevant time.

## C.      Fairness and Procedural Considerations

The final factor—fairness and procedural considerations—in the similarly situated analysis weighs heavily in favor of decertification.  The substantial disparity among Plaintiffs' testimony with respect to daily tasks and duties, and the degree of responsibility of each Plaintiff, makes it unfair and unjust to collectively adjudicate the claims of Plaintiffs.  As the court in *Johnson v. Big Lots Stores* summarized, the fairness and procedural considerations with proceeding as a collective action where Plaintiffs' self-reported job duties are dissimilar can be outcome determinative:

> Using representative proof is problematic if for every instance in which an opt-in plaintiff reported that she [engaged in systems analysis and used her discretion in advising clients on system set up and configuration], there is an alternative response to the contrary.  Thus, [Tyler] cannot prove a common defense to the claims of the class members by calling a handful of witnesses whose testimony strongly suggest that Plaintiffs are properly classified, because there are other witnesses who will testify to the contrary.  [Tyler's] alternative is to pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the Plaintiffs to prove that these [Plaintiffs] are properly classified as exempt.  That exercise is tantamount to conducting multiple individual trials on the merits and is antithesis of a collective action.[146]

Representative testimony will not sufficiently apprise this Court of the alleged claims and damages in this matter, and to allow such testimony by a few Plaintiffs would deprive Tyler of its due process rights to defend against Plaintiffs' claims.[147]  It simply would be unfair to allow one Plaintiff, or even a group of Plaintiffs, to testify as to their job duties and responsibilities and

---

[145] Exh. 32, Schedule of Assets attached to Milburn's Petition for Bankruptcy.
[146] *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 586 (E.D. La. 2008).
[147] *See Proctor*, 250 F.R.D. at 283-84 (ruling against use of representative testimony and granted motion to decertify as the employees' testimony lacked consistency and the time spent working off-the-clock was not alleged to be uniform of a predetermined duration).

have that testimony bind the other Plaintiffs, and Tyler, as to whether or not they were properly classified.   For example, the analysis of whether or not software configuration involves discretion and independent judgment as to one Plaintiff may have no application to another who did not perform, due to his or her experience level or the division at which he or she was employed, any software configuration.

Moreover, the need for individual testimony from and cross examination of each Plaintiff undermines the primary objective of proceeding collectively, which is the "efficient resolution of the claims of multiple Plaintiffs that involve common factual issues on the basis of representative proof."[148]   In light of the individual analysis that each Plaintiff's claims will require, and the disparity among each Plaintiff's testimony, "the judicial inefficiency of having essentially [thirty] plus mini-trials clearly outweighs any potential benefits in proceeding as a collective action.  The Plaintiffs' claims are not amenable to generalized evidence and the Court would not be able to 'coherently manage' the class without potentially prejudicing the parties."[149]

In fact, as the *Big Lots* court observed in decertifying the class after trial involving misclassification claims and exemption defenses, "when there are significant differences in employment experiences," as highlighted in sections above, "the procedural advantages of a collective evaporate…."[150] Due to the individual defenses available to Defendant with respect to claims of each Plaintiff, and the number of witnesses (co-employees and project managers of each plaintiff) that Tyler would need to present to refute each plaintiff's claim, "[t]his collective action would evolve into mini-trials concerning the claims of each plaintiff—contrary to fairness

---

[148] *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 572 (E.D. La. 2008). In fact, most Plaintiffs have acknowledged that, other than having knowledge about their own job duties and responsibilities, they have no knowledge of the other Plaintiff's job duties and day-to-day activities.  *See, e.g.,* Exh. 16, Wilton Dep. p. 131:7-24, Exh. 24, Carrington Dep. pp. 128:20-129:9; Exh. 13, Meyers Dep. p. 79:7-15.
[149] *EZPawn*, 2007 U.S. Dist. LEXIS 1461, at *30.
[150] *Big Lots*, 561 F. Supp. 2d at 588.

and case manageability."[151]

## IV.
## CONCLUSION

For the reasons set forth above, this case simply should not proceed as a collective action under Section 216(b) of the FLSA.  The disparities in job functions testified to and acknowledged by nearly all of the Plaintiffs make it clear they are not "similarly situated" for FLSA collective action purposes.  Relatedly, the adjudication of this case in a collective proceeding raises procedural and due process concerns, as the testimony of one Plaintiff simply would not be representative of the testimony of another, depending, again, on particular duties performed by each.  Invariably, this case would turn into a series of "mini trials" which is precisely what Section 216(b) was designed to avoid.

For these reasons, Defendants respectfully request that the Court enter an order granting its motion to decertify this case as a collective action, and any other relief, at law or in equity, to which the Court finds Tyler justly entitled.

---

[151] *King v. CVS/Caremark,* 2008 WL 5973490, at *5.

Respectfully submitted:


*/s/ Paulo B. McKeeby*
Paulo B. McKeeby
Texas Bar No.: 00784571
paulo.mckeeby@morganlewis.com
Joel S. Allen
Texas Bar No.: 00795069
joel.allen@morganlewis.com
Ellen L. Perlioni
Texas Bar No. 00794155
ellen.perlioni@morganlewis.com
Farin Khosravi
Texas Bar No. 24043753
farin.khosravi@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, Texas 75201-7347
phone - 214.466.4000
facsimile - 214.466.4001

Deron R. Dacus
Texas Bar No.: 00790553
derond@rameyflock.com

RAMEY & FLOCK P.C.
100 East Ferguson, Suite 500
Tyler, Texas 75702
phone – 903.597.3301
facsimile – 903.597.2413

ATTORNEYS FOR DEFENDANTS
TYLER TECHNOLOGIES, INC. AND
EDP ENTERPRISES, INC.

## CERTIFICATE OF CONFERENCE

This is to certify that counsel for Defendants conferred with counsel for Plaintiffs on September 14, 2010, regarding the contents of this Motion.  Plaintiffs are opposed.

*/s/Farin Khosravi*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served via electronic mail on this 24th day of September, 2010, as follows:

John D. Sloan, Jr.
Laureen F. Bagley
SLOAN, BAGLEY, HATCHER &
  PERRY LAW FIRM
101 East Whaley Street
P.O. Drawer 2909
Longview, Texas 75606
jsloan@textrialfirm.com
lbagley@sloanfirm.com

Alexander R. Wheeler
Jason Paul Fowler
R. REX PARRIS LAW FIRM
42220 10th Street West, Suite 109
Lancaster, CA  93534
awheeler@rrexparris.com
jfowler@rrexparris.com

John P. Zelbst
Chandra L. Homes Ray
Zelbst, Holmes & Butler
PO Box 365
Lawton, OK  73502
zelbst@zelbst.com
chandra@zelbst.com

James E. Wren
One Bear Place #97288
Waco, TX  76798
James_Wren@baylor.edu

*/s/ Paulo B. McKeeby*
Paulo B. McKeeby
Ellen L. Perlioni
Farin Khosravi

## LIST OF EXHIBITS TO DEFENDANTS' MOTION TO DECERTIFY CLASS

| Exhibit No. | Description |
|---|---|
| 1. | Declaration of Chris Hepburn |
| 2. | List of each Plaintiff's Employment History with Defendants |
| 3. | Declaration of Lynn Moore |
| 4. | Declaration of Bruce Volkens |
| 5. | Deposition of Plaintiff White, Lisa |
| 6. | Deposition of Plaintiff McElhany, Talena |
| 7. | Deposition of Plaintiff Flynn, Joy |
| 8. | Deposition of Plaintiff Dupree, Betty |
| 9. | Deposition of Plaintiff Dunn, Amy |
| 10. | Deposition of Plaintiff Void, Travis |
| 11. | Deposition of Plaintiff Brown, Jill |
| 12. | Deposition of Plaintiff McLeod, Joy |
| 13. | Deposition of Plaintiff Myers, Illene |
| 14. | Deposition of Plaintiff O'Haver, Thomas |
| 15. | Deposition of Plaintiff Dodd, Tony |
| 16. | Deposition of Plaintiff Wilton, Eyvonne |
| 17. | Declaration of Jason Bonner |
| 18. | Declaration of Paige Cole |
| 19. | Deposition of Mosenthin, Kevin |
| 20. | Deposition of Plaintiff Grimwood, Ronald |
| 21. | Deposition of Plaintiff Millburn, Laura |
| 22. | Deposition of Plaintiff Emde, Edward |
| 23. | Deposition of Plaintiff Dunning, Sandra |
| 24. | Deposition of Plaintiff Carrington, Linda |
| 25. | Deposition of Plaintiff Ingram, Geraldine |
| 26. | Deposition of Plaintiff Maynard, Beth |
| 27. | Deposition of Chris Hepburn |
| 28. | Deposition of Plaintiff Britt, Titus |
| 29. | Deposition of Plaintiff Mutch, Lorraine |
| 30. | Deposition of Plaintiff Hayner, David |
| 31. | Deposition of Plaintiff Baird, Melanie |
| 32. | Schedule of Assets attached to Milburn's Petition for Bankruptcy |
| 33. | Declaration of Kelly Hampton |
| 34. | Declaration of O'Haver, Thomas |