EYVONNE WILTON; May 17, 2010

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

---

PATTY BEALL, MATTHEW MAXWELL,           )
TALINA McELHANY and KELLY               )
HAMPTON, individually and on            )
behalf of all other similarly           )
situated,                               )   2:08-cv-422 TJW
                                        )
    Plaintiff(s),                      )
                                        )
vs.                                     )
                                        )
TYLER TECHNOLOGIES, INC., and           )
EDP ENTERPRISES, INC.,                  )
                                        )
    Defendant(s).                      )

---

DEPOSITION UPON ORAL EXAMINATION OF
EYVONNE WILTON

---

2:00 P.M.

MAY 17, 2010

520 PIKE STREET, 12TH FLOOR

SEATTLE, WASHINGTON

REPORTED BY: MARY L. GREEN, CCR 2981

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

EXHIBIT 0016

EYVONNE WILTON; May 17, 2010

25

1   kind of got sidetracked a little bit.  Anything else
2   from your discussion with the incumbent employee?
3       A.  No.  Except for me trying to remember her
4   name.  No.  She told me basically the same things that
5   Lyn did in terms of what she did for a client kind of
6   vaguely, give me a rough draft.
7       Q.  Like can you explain what you recall from her
8   discussion?
9       A.  That it would be -- some places had set-ups
10  for classroom-like situations.  Other places did not.
11  Sometimes we would have to figure out where we would be
12  teaching the client.
13          Sometimes the client would not be ready as
14  opposed -- like the lead for the project on the client
15  side would be busy with something else and would not
16  necessarily be available, and I would have to start
17  with if there was an assistant with the assistant and
18  then backtrack, things of that nature.
19      Q.  So once you get there, there's always a plan,
20  right?
21      A.  (Nodding head).
22      Q.  Did it ever follow according to the plan?
23      A.  No.  No.  It never actually -- there was
24  always a tweaking here or there, and sometimes it would
25  be just because the client was busy handling something

EYVONNE WILTON; May 17, 2010

26

1  else and we might have to just wait for a minute, which
2  means that we could set up -- figure out where we have
3  to set up.  We would set up and then wait for the
4  client to join.
5      Q.  And how did you decide the best way to
6  rearrange what you were doing depending on whatever the
7  circumstance you encounter when you get there?
8      A.  Depending on the client and what they had
9  available to us.  Like if they didn't have a classroom
10 situation, we would ask them where would it be that we
11 would set up for depending on how many employees that
12 would be learning the software.
13      So we would basically ask them is there a
14 place that, you know, we can use like a conference room
15 or something like that, and if there was a conference
16 room, do you have computers that are available for them
17 to use, because we really are trying to teach them how
18 to use the software.
19     Q.  And what would you do if they didn't?
20     A.  Sat at each individual's desk.
21     Q.  So you came up with an alternative way to
22 provide the training to the employees?
23             MS. BAGLEY:  Object to the form.  Sorry.
24     A.  We had no other choice.
25     Q.  (BY MS. PERLIONI) Can you give me some

30

1  implementation is that when it's a full implementation,
2  the first visit the skeletal model is loaded, and we
3  actually play around in that model, and I teach them
4  how to input the information like their employees'
5  names and addresses, their benefits, things of that
6  nature, so if the skeletal model wasn't available, then
7  there was nothing that we could do.
8     Q.  So when the skeletal model is available, you
9  said you teach them different things and let them play
10 around with it.
11    A.  Uh-huh.
12    Q.  I mean, how do you go about doing that?
13    A.  They provide us with print-outs of their
14 employees, and they basically take that information and
15 they input that into the system, because that's what
16 they have to do, so what they basically are learning
17 how to is to navigate through the system by using their
18 own information.
19    Q.  So the client actually brings their data?
20    A.  Yes.
21    Q.  And is that data you've seen before coming in
22 to meet with them or train them?
23    A.  No.
24    Q.  So they bring their data, show you, and then
25 you help them work through the system utilizing their

EYVONNE WILTON; May 17, 2010

36

1  report to your manager that you decided not to. It's
2  out of my hands.
3           I mean, I'm not there to, you know, force them
4  to do anything. I'm just there because the powers that
5  be said this is the new system and I'm part of the new
6  system, so I'm teaching you how to use your new system.
7  That's all I can do.
8       Q.  And what are the things that might come up in
9  your training where you adjust what you might be doing
10 whether it's to accommodate one, accommodate many, or
11 just because you're viewing the training needed
12 something different?
13      A.  Well, no implementation is the same, so
14 there's always going to be a difference of something,
15 whether it be a person or just issues with the software
16 itself, so you basically adjust to whatever it is
17 that's being thrown at you unfortunately.
18      Q.  Can you give me some examples of what you're
19 talking about?
20      A.  Yes. I had one implementation that it was
21 supposed to be just a simple upgrade and working with a
22 payroll manager, payroll assistant. It was going to
23 take roughly six weeks, which is -- I think I had about
24 in the six weeks -- two months, two months, so I had
25 eight visits scheduled.

EYVONNE WILTON; May 17, 2010

91

1       A.   Yes.

2       Q.   Go to the second page of Deposition Exhibit 6,
3  the one 78906.

4       A.   Yes.

5       Q.   And I'm looking at the sort of in the top
6  third there where it says internal activities.  Do you
7  see that?

8       A.   Uh-huh.

9       Q.   What does that refer to?  It seems to reflect
10 to me that you had paid time off for that.

11      A.   It does.

12      Q.   So it looks like you took a PTO day on August
13 30 of '06?

14      A.   Uh-huh.

15      Q.   And again on September 1 of '06?

16      A.   Uh-huh.

17      Q.   Do you know -- okay.  The two days before -- I
18 don't have a calendar here, but the August 28 of '06,
19 do you know if you were actually present on location
20 with the client for each of these times reflected or
21 would some of them be where you were...

22      A.   That's almost four years ago.  For Coral
23 Gables, I know I was always on-site for the training.
24 I can't recall having any conversations on the phone
25 with them, but then like I said, it's almost four years

EYVONNE WILTON; May 17, 2010

148

REPORTER'S CERTIFICATE

I, MARY L. GREEN, the undersigned Certified Court Reporter and Notary Public, do hereby certify:

That the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability; that the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND, SEAL, AND DIGITAL SIGNATURE this 21st day of May, 2010.

MARY L. GREEN
Certified Court Reporter, #2981
Notary Public in and for the State of Washington,
Residing in Snohomish County. Commission expires 4-4-2013.
mgreen@yomreporting.com

Click Link to Verify Signature:

(Https://digitalid.verisign.com/services/client/index.html)