Freedom Court Reporting, Inc                                          1

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF TEXAS
 2   MARSHALL DIVISION

 3   Case No. 2:08-cv-422 TJW

 4   ─────────────────────────────────────
     DEPOSITION OF ERIC EMDE
 5                                May 4, 2010

 6   ─────────────────────────────────────
     PATTY BEALL, MATTHEW MAXWELL, TALINA McELHANY and
 7   KELLY HAMPTON, individually and on behalf of all
     others similarly situated,
 8
     Plaintiffs,
 9
     vs.
10
     TYLER TECHNOLOGIES, INC. and EDP ENTERPRISES,
11   INC.,

12   Defendants.

13   ─────────────────────────────────────
     APPEARANCES:
14
         ZELBST, HOLMES & BUTLER
15           By Chandra L. Holmes Ray, Esq.
                P.O. Box 365
16              Lawton, Oklahoma 73502
                (580) 248-4844
17                  Appearing on behalf of Plaintiffs.

18       MORGAN, LEWIS & BOCKIUS, LLP
             By Paulo B. McKeeby, Esq.
19              1717 Main Street, Suite 3200
                Dallas, Texas 75201-7347
20              (214) 466-4000
                    Appearing on behalf of Defendants.
21
         Also Present:  H. Lynn Moore, Jr.
22

23

24

25
```

```
 1      Q     And then Mr. Ellison became your
 2   immediate supervisor at some point in December or
 3   November?
 4      A     Somewhere in there, yes.
 5      Q     And then at some point Donna again
 6   became your supervisor?
 7      A     No.
 8      Q     Is Dyke Ellison your supervisor
 9   currently?
10      A     Yes.
11      Q     Is Donna Martindale still employed by
12   Tyler?
13      A     I believe so.
14      Q     And why were you -- what were the
15   circumstances surrounding your transfer from
16   Ms. Martindale to Mr. Ellison?
17      A     Corporate -- or internal INCODE
18   reorganization.
19      Q     Have you -- I take it you currently
20   work out of your home?
21      A     Meaning, do I go into the office
22   otherwise?
23      Q     Yes.
24      A     Yes.
25      Q     You work out of your home?
```

```
 1        A    Yes, I do.
 2        Q    Based on the meaning you just gave?
 3        A    Yes.
 4        Q    And that's always been the case since
 5   you've been employed by Tyler?
 6        A    Yes.
 7        Q    And you report through the INCODE
 8   Lubbock office, correct?
 9        A    That's correct.
10        Q    And that's always been the case
11   throughout your employment at Tyler?
12        A    That's correct.
13        Q    Have you ever been deposed before
14   today?
15        A    No, I have not.
16        Q    Have you ever been a party in any legal
17   proceeding?
18        A    Yes.
19        Q    What was that?
20        A    I was a juror in a civil trial, and I
21   was a juror in a criminal trial and almost got on
22   a murder case.
23        Q    Have you ever filed any claims against
24   an employer, other than Tyler in this case?
25        A    No, I have not.
```

1  But I was more the middleman.
2      Q   So with an implementation, some
3  tasking, to use your term, has already been done
4  before you get the -- before you're on the site?
5      A   Yes.
6      Q   And that would have been done by the
7  conversion programmer?
8      A   Or the project manager or the -- or
9  maybe even some of the other people that were
10 involved on other parts of the program.
11     Q   And the people who do the background
12 work that you mentioned and the formulas and
13 calculations, would that have been conversion
14 programs or some other group of employees?
15     A   I think that -- conversion programmers
16 are only involved when there's data from another
17 piece of software that's being converted into the
18 INCODE software.  The tasking might say that this
19 is conversion, just realizing that there's more to
20 look at.  But that does not mean that I would, in
21 fact, be the conversion person.
22              The person that does the setup,
23 preliminary setup, there would be several
24 different people involved.  One could be setting
25 up forms, another person could be working with the

```
 1   people that do -- for example, on calculations for
 2   electrical permits, how do they -- somebody would
 3   call, work with the building people and say, "How
 4   do you calculate these things? What are the
 5   scales that you would use?" They would write the
 6   formulas for that.
 7        Q     And all that would be done before you
 8   get to the site?
 9        A     Generally, yes.
10        Q     Are you familiar with a term
11   "configuration"?
12        A     Configuration, in a general sense, yes.
13        Q     Is that a term that's used at Tyler
14   with respect -- well, period?
15        A     Yes, but it has a lot of different
16   meanings.
17        Q     The meaning that I attached to
18   configuration relates to taking data from the
19   customer's previous system and setting it up or
20   configuring it into Tyler software. Do you -- is
21   that a definition, if you will, of configuration
22   that you're familiar with at Tyler?
23        A     I'm familiar with the definition, but I
24   would call that conversion.
25        Q     And is conversion a subset of
```

```
 1   conversion?
 2        A    Yes.
 3        Q    And using not my definition of
 4   configuration, but a definition -- and I
 5   understand you testified that it's a broad term.
 6   So if you can answer the question, fine.  Is there
 7   any work that you do that you would describe as
 8   configuration?
 9             MS. HOLMES:  Object to the form.
10        A    Maybe a very small piece of it.
11        Q    (BY MR. McKEEBY)  What piece do you
12   mean?
13        A    I couldn't put a percentage on it, but
14   it would be adjusting a form so it pulls in the
15   right kind of -- maybe changing a field from
16   something that was listed as property to something
17   that belongs in a permit field.  And it would be a
18   matter of working with a Microsoft Word template
19   to change the code.  The code -- and this is not
20   like coding in software.  It's only coding, for
21   example, changing the term from BP to PP, with
22   whatever the attachment was.
23        Q    And that's -- what definition of
24   configuration are you using when you describe that
25   functionality -- or that function, rather?
```

```
 1        A      How about tweaking?  Just minor
 2   adjustments.  Maybe a form needs to have an extra
 3   space in it.  I could go do that.
 4        Q      Otherwise, it would approach
 5   programming, which you don't do?
 6        A      Oh, yeah, definitely.  Even a lot of
 7   that other part, that's why we have specialists
 8   that do nothing but Word templates, for example,
 9   or forms templates.
10        Q      Let me -- I got a little off track,
11   whether you know it or not.  But let me get back
12   to you getting a task document -- tasking document
13   from Ms. -- is it Lynn?
14        A      Phyllis Lynn, yes.
15        Q      Let's -- I want to use an example.  And
16   I know that implementations can be different, but
17   is there -- I've got this Copperas Cove time
18   report in front of me, which is fairly recent.
19   It's in the beginning of 2009.  I think that's the
20   first of the --
21        A      Yes.
22        Q      Do you have that one?  And I'm not sure
23   the document is going to help you, but it might.
24   So go ahead and keep it in front of you, if you
25   like.  But my question relates to, it looks like
```

1   what kind of facilities do they have, what their
2   office hours are, would I have access before or
3   after if I needed to to be able to stay there to
4   work on things, what kind of --
5       Q      Access just to the facilities, you
6   mean?
7       A      Access to the facilities and access to
8   the computers and hardware so I could have
9   passwords and be able to get into the server if I
10  needed to; primarily, because some things you have
11  to set up there.  For example, set up a training
12  environment, which is a macro that essentially
13  runs and just populates everything with live data
14  or what -- a mirror of it.
15             In this case, I may have talked to the
16  configuration programmer beforehand to find out
17  what they had and checked to make sure whatever
18  forms they were going to be using were going to be
19  available.
20      Q      And that's a Tyler employee, the
21  configuration programmer?
22      A      Yes.
23      Q      And that's someone distinct from the
24  conversion programmer?
25      A      Yes.

```
 1      Q      Can you summarize what the
 2  configuration programmer does in this process?
 3      A      Well, she would have set up the
 4  formulas in this case.  This is -- okay, Building
 5  Projects.  So she would have set up the
 6  calculations for permits, as far as how they
 7  calculated the cost of the building permit and
 8  that sort of thing.
 9      Q      Is there someone in particular that
10  you're thinking did this?
11      A      That would have been Mary Beth Moore in
12  this case.
13      Q      And she has the title of configuration
14  programmer, as far as you understand?
15      A      I don't know what her title is, but
16  that function the way -- that configuration, yeah,
17  she would have done that.
18      Q      Is she in Lubbock, or do you know?
19      A      She's in Pasadena, I think; California,
20  not Texas.
21      Q      I guess you get to be good with
22  geography, as much traveling as you do.
23      A      Oh, I've been good with geography all
24  along.
25      Q      So in any event, she would have done
```

```
 1   the configuration work prior to you going to
 2   Copperas Cove, Texas?
 3        A    Yes.
 4             MS. HOLMES:  Object to the form.
 5        Q    (BY MR. McKEEBY)  And you may have
 6   talked to her about that, you're not sure.  But it
 7   would have been typical, or not unusual at least,
 8   for you to have some conversation with her?
 9        A    Well, conversation, no; possibly
10   e-mails, yes.
11        Q    Would you typically have read any
12   reports or documentation about the customer's
13   previous system before you traveled to Copperas
14   Cove?
15        A    No.
16        Q    That would have been unusual?
17        A    Yeah.
18        Q    Can you ever remember a time when you
19   would have done that?
20        A    Only if the -- like in this case, Leah
21   Beth possibly ever said they're converting from
22   this to that, or I guess Max Wiggins, I think is
23   the conversion programmer for this part of the
24   software, if somebody ever said it's going from
25   Black Bear to INCODE, or something like that,
```

1  which really didn't make any difference to me one
2  way or the other.
3      Q    And by that, I mean, you didn't really
4  need to know what the customer --
5      A    From whence it came, no, I don't.
6      Q    And I like the way you put it, but let
7  me make sure I put it in a way others might
8  understand it as well.  You weren't really
9  interested or didn't really need to know about the
10 customer's previous system to do your job as an
11 implementation specialist at Tyler?
12     A    That's correct.
13     Q    Did you, prior to -- again, using this
14 just as an example, but prior to going to Copperas
15 Cove, Texas, would you have prepared any type of
16 training module or PowerPoint for the training
17 that you were to perform?
18     A    For that specific place, no.
19     Q    Would you have training PowerPoints,
20 handouts, or anything like that that you would
21 take with you to Copperas Cove, Texas?
22     A    I'd have the soft copy of it and print
23 it there, if I had anything to bring; in some
24 cases I did, and some cases I didn't.
25     Q    What would it depend on?

```
 1   In the case of Copperas Cove, it was inside of a
 2   little server closet.  But then there would also
 3   be --
 4        Q    You mean physically where you'd be
 5   working?
 6        A    Yeah.  Best one was a bathroom, but
 7   that's another story.  Also, where I would be
 8   working with people when I was actually training.
 9   In that case, they had a City Council chambers, so
10   I would have to set up one of their laptops,
11   projector, that sort of thing.
12        Q    Would there be discussion during this
13   initial meeting as to when training would
14   commence?
15        A    Yes.
16        Q    And the -- I take it the customer would
17   explain its preferences as to --
18        A    Yeah, who they wanted to have trained
19   and in what quantities, I guess, depending on
20   function.  There are some generic things on the
21   CRM, or the customer relationship management
22   software, which is the packages that I was
23   training that are common.  So you could have a
24   larger group orientation and break into hands-on.
25   But who was going to be there just depended on
```

1  schedules for a lot of different things.
2      Q    Is there a title that the person with
3  whom you had this initial meeting typically held?
4      A    No.
5      Q    Varied from county to county?
6      A    City to city, primarily.  It could be a
7  community development director.  It could be the
8  IT manager.  It could be the city clerk.  It just
9  depends on the city, and the size, and how they're
10 laid out.
11     Q    And I guess I also would take it that
12 the length of this initial consultation meeting
13 would vary depending on the variety of factors?
14     A    Yes.
15     Q    So, again, it would be typical that
16 during this initial consultation meaning you would
17 try to -- you would identify who needed to be
18 trained and on what?
19     A    Yes.
20          MS. HOLMES:  Object to the form.
21     Q    (BY MR. McKEEBY)  And that would be
22 based on the input the customer would tell you?
23     A    The customer -- I wouldn't identify it.
24 They would tell me who they wanted trained and how
25 much they needed to know.

```
 1   project is working with the project manager, the
 2   account rep, and support, and giving -- and the
 3   customer saying, "From here on out, support --
 4   here's the number for support.  Here's how you
 5   call them, how you contact them, what to expect
 6   when you do talk to them."  So it's completely
 7   turned over at that point.
 8        Q    Right.  And you wouldn't provide any
 9   customer support after the go-live process?
10             MS. HOLMES:  Object to the form.
11        Q    (BY MR. McKEEBY)  Is that accurate?
12        A    I would not be in the support
13   process -- support loop at all.
14        Q    After they went live?
15        A    Yes.
16        Q    What is your highest level of
17   education?
18        A    Master's degree in education.
19        Q    When did you get that?
20        A    Oh, boy, you would ask.
21        Q    You can look at your resume.
22        A    I'm going to have to look at my resume,
23   because it's been awhile.  '93.
24        Q    From where?
25        A    University of Phoenix.  Terrible
```

Freedom Court Reporting, Inc                                    124

```
 1    STATE OF COLORADO)
 2                     )ss.    REPORTER'S CERTIFICATE
 3    COUNTY OF DENVER )
 4              I, Gail Obermeyer, do hereby certify
 5    that I am a Registered Professional Reporter and
 6    Notary Public within the State of Colorado; that
 7    previous to the commencement of the examination,
 8    the deponent was duly sworn to testify to the
 9    truth.
10              I further certify that this deposition
11    was taken in shorthand by me at the time and place
12    herein set forth, that it was thereafter reduced
13    to typewritten form, and that the foregoing
14    constitutes a true and correct transcript.
15              I further certify that I am not related
16    to, employed by, nor of counsel for any of the
17    parties or attorneys herein, nor otherwise
18    interested in the result of the within action.
19              In witness whereof, I have affixed my
20    signature and seal this 13th day of May, 2010.
21              My commission expires May 10, 2011.
22
23                       Gail Obermeyer, RPR
                         216 - 16th Street, Suite 650
24                       Denver, Colorado  80202
25
```