Linda Estes Carrington - 4/8/10

1

```
IN THE UNITED STATES DISTRICT COURT
   FOR THE EASTERN DISTRICT OF TEXAS
            MARSHALL DIVISION

PATTY BEALL, MATTHEW       )
MAXWELL, TALINA McELHANY,  )
AND KELLY HAMPTON,         )
individually and on behalf )
of all other similarly     )
situated,                  )
        Plaintiffs,        )
                           )  No. 2:08-cv-422
VS                         )
                           )
TYLER TECHNOLOGIES, INC.   )
AND EDP ENTERPRISES, INC., )
        Defendants.        )
```

---

ORAL DEPOSITION OF

LINDA ESTES CARRINGTON

4/8/10

---

ORAL DEPOSITION OF LINDA ESTES CARRINGTON, produced as a witness at the instance of the DEFENDANTS, and duly sworn, was taken in the above-styled and numbered cause on the 8th day of April, 2010, from 9:18 a.m. to 12:23 p.m., before TINA TERRELL BURNEY, CSR in and for the State of Texas, reported by machine shorthand, at the offices of MORGAN, LEWIS & BOCKIUS LLP, 1717 Main Street, Suite 3200, Dallas, Texas 75601, pursuant to the Federal Rules of Civil Procedure.

Osteen Reporting Services  (817) 498-9990

EXHIBIT 0024

Linda Estes Carrington - 4/8/10

52

1   A.  Exactly, yes, sir.
2   Q.  Did you ever have an understanding that it
3   varied from project to project, or did you have any
4   understanding about that?
5   A.  I had no understanding about that.
6   Q.  And with respect to the program that we
7   discussed through which you tracked your time, do you
8   have an understanding of whether or not that was used
9   outside of the software group at Tyler?
10  A.  Repeat that, sir, if you don't mind.
11  Q.  We were talking about the program before we
12  broke, the program that you used to track your time,
13  correct?
14          MS. BAGLEY:  The time sheet program?
15          MR. McKEEBY:  However you want to call it.
16  A.  Right.
17  Q.  That's what we were talking about before we
18  took a break.
19  A.  Right.
20  Q.  And my question is:  Did you have an
21  understanding of whether or not that software program
22  that you used to complete your time sheets was used
23  anywhere other than in Plano?
24  A.  No, sir.  I don't know how else that was used.
25  Q.  And I use the term "the software group."  Do

53

1  you understand that phrase?
2      A.  Yes, sir.
3      Q.  That was something that was used at Tyler,
4  correct?
5      A.  Right.
6      Q.  And that referred to the Plano division of
7  Tyler?
8      A.  Right.  That's the old name.
9      Q.  That's the old name.  Do you understand that
10 the software group was previously a subsidiary of Tyler,
11 or do you know?
12     A.  Yes.
13     Q.  I'm going to hand you a document that's been
14 produced in the case, and I'm going to let you look at it
15 before I mark it as an exhibit.
16     A.  I'm going to get my glasses.
17     Q.  That's fine.  You know what, I am going to go
18 ahead and mark it as an exhibit.
19     A.  Do you want it?
20     Q.  Yes.  This will be marked as Exhibit 3 to your
21 deposition, and I'll represent to you what I'm handing
22 you are documents produced in this case that I believe
23 are printouts of the time sheets that you entered, but
24 we'll go through them, but specifically they are marked
25 Tyler Beall 033059 through Tyler Beall 033177.

56

1  an implementation at Nueces County I take it.
2      A.  It's a fit analysis.
3      Q.  What's a fit analysis?
4      A.  Where we go in, and it's prior to
5  implementation.
6      Q.  What do you do in a fit analysis?
7      A.  That's what Collin County did with us that
8  week.
9      Q.  That introductory --
10     A.  It's an introductory, and you're bringing in
11 all the key users, you know, not every clerk. You're
12 just bringing in what are considered superusers.
13     Q.  And you have this introductory session for
14 them?
15     A.  You try, yeah. And the project manager is --
16 we're all benefiting from it, every aspect of the team.
17     Q.  But this is something you said you didn't
18 specifically attend as an implementation specialist?
19     A.  Implementation people do conduct fit analysis.
20     Q.  Did you conduct this fit analysis at Nueces
21 County?
22     A.  Yes, I did with the project manager as the
23 lead.
24     Q.  What did you do, what was your role in
25 conducting the fit analysis?

1   A.  My role is to drive the computer. I'm the
2   driver, and I go through the system, and what you're
3   doing is you're making the superusers aware of the
4   procedure, the path that Odyssey uses, because the way
5   that they have been working with their old system may not
6   be the way they're going to be able to work with Odyssey.
7   They may have to change some of the procedures.
8           In other words, they begin the same, and
9   the result will be the same, but in between we may need
10  to help them.
11      Q.  How they get there is going to be different?
12      A.  Right.
13      Q.  And that's as a result of the differences in
14  the software?
15      A.  You're just doing a fit analysis to figure out
16  how their organization is set up --
17      Q.  Does the --
18      A.  -- and where the rights and roles are.
19      Q.  So the fit analysis involves some input from
20  the superusers as well?
21      A.  That's what you're doing.
22      Q.  They are giving you information?
23      A.  They are giving you information.
24      Q.  Okay. And you consider this discrete from the
25  implementation process itself?

Linda Estes Carrington - 4/8/10

88

1  clerk, the lead clerk and the court administrator?
2      A.  Like I said, Patrick would come in and check on
3  things.
4      Q.  Come and go?
5      A.  Right, come and go.
6      Q.  This entry on Wednesday says, "also set up
7  user's training schedule." Do you see where I'm reading
8  that?
9      A.  Yes.
10     Q.  I take it the user means the customer.
11     A.  Yes, the clerks and the court admin.
12     Q.  So you were -- when you said the users there,
13 you're not talking about the superusers?
14     A.  Well, they're included in that.
15     Q.  But that includes a larger group of people?
16     A.  Right, exactly.
17     Q.  The clerks as well?
18     A.  Yes, sir.
19     Q.  So there that references you setting up the
20 training schedule?
21     A.  Yes.
22     Q.  How did you do that?
23     A.  With the superusers, you're making sure that
24 the schedule meets everyone's needs, because the problem
25 with training schedules is you can't pull -- especially

89

1   in a small county, you can't pull everybody out of an
2   office at one time.
3   Q.  So you actually created the schedule for
4   training then?
5   A.  Yes, along with input from the -- and the
6   approval of the superusers.
7   Q.  Were you creating an actual document that would
8   govern the training?
9   A.  That would govern the training?
10  Q.  Yes.  As the schedule of training, I'm going to
11  be training these people on this date, these people on
12  this date.
13  A.  Yes.
14  Q.  Is that what you meant by "set up user's
15  training schedule"?
16  A.  Yes.
17  Q.  Look at 73, the next one.  This has an entry
18  for absences and holidays for eight hours on Thursday,
19  correct?
20  A.  Are you on 73?
21  Q.  Yes.
22  A.  Where are you?
23  Q.  I understand it's a little difficult to read.
24  I'm on the entry for Thursday, January 1st, 2009.  It
25  looks like New Year's Day probably.

Linda Estes Carrington - 4/8/10

95

1  Q. Right. No. My question was when did you need
2  to be there at the Bonham courthouse.
3  A. Yes, 7:30.
4  Q. And that was typical?
5  A. Yes.
6  Q. All right. It has not been that long, but
7  remember when we talked about the different elements of
8  the implementation process?
9  A. Yes, sir.
10 Q. And we broke it down into these different
11 elements. If I asked you to assign percentages in terms
12 of how much work an implementation specialist, be it you
13 or someone else --
14 A. Anybody.
15 Q. -- anybody, I'm not talking about you right now
16 specifically -- would spend on each of these elements in
17 a typical conversion, is that something you could break
18 down percentagewise?
19 A. You could, but you've got to realize every one
20 of them is going to be different.
21 Q. Right. Would it be -- for example, in one
22 implementation the configuration process may take 10
23 percent of the time and in a different implementation it
24 might take as much as 40 percent of the time?
25 A. Exactly.

1     Q.   But did you do the code mapping in Dallas
2  County?
3     A.   I went through the reports and looked for --
4  and looked for data that might have been misplaced or
5  incorrectly entered.
6     Q.   Right, which is the process that we just
7  discussed?
8     A.   Uh-huh.
9     Q.   Agree?
10    A.   Yes, sir.
11    Q.   Okay.  How is that different from
12 configuration?  How is the conversion process that you
13 just discussed different from configuration?
14    A.   In conversion you're taking their data, this
15 massive amount of data, and you're converting it into the
16 Odyssey system.  You're taking all these records and
17 reports, all this stuff, and converting it over.
18 Configuration is like taking a suit and altering it.
19    Q.   A suit?
20    A.   Uh-huh.  It's taking a suit and having it
21 altered.
22    Q.   What was the implementation specialist's role
23 in the configuration process?
24    A.   Well, we would configure the system to fit
25 their particular needs.  In other words, you put in all

1   the rights and roles. You put in the names of the users.
2   You put in the types of fees that they've got and the
3   amount of those fees. You put in the types of
4   dispositions they have. You put in the types of hearings
5   they have. You set up their dockets the way they want
6   them set up.
7       Q.  And that's something --
8       A.  I could keep going on and on, but that's
9   configuration.
10      Q.  And that's something the implementation
11  specialist did?
12      A.  Yes.
13      Q.  And that's you?
14      A.  Uh-huh.
15      Q.  Is that yes?
16      A.  Yes, sir. And --
17      Q.  How did you know -- well, go ahead.
18      A.  Depending on the county or the sophistication
19  of the county or how that county wanted to operate, a lot
20  of times they wanted to do their own configuration and
21  for you to teach them how.
22      Q.  So that's --
23      A.  For example, Minnesota, Minnesota is extremely
24  sophisticated, so, you know. And these are all decisions
25  made by a project manager, not by an implementation

1  fee, every part of the system.
2           When you're putting in rights and roles,
3  you're implementing the system to fit that county.
4      Q.  Okay.  So the configuration involves
5  configuring the system such as the rights -- so that the
6  rights and roles are properly input into the system,
7  right?
8      A.  Yes, sir.
9      Q.  So that the clerk has access to the information
10 he or she should have access to?
11     A.  And nothing more and nothing less.
12     Q.  Right.  And similarly with the boss, he or she
13 has access to what he or she needs access to?
14     A.  Right.
15     Q.  And that depends on how the system is
16 configured?
17     A.  Yes -- well, if the rights and roles have been
18 configured in there properly.
19     Q.  Right.  And that's something you do as the
20 implementation specialist?
21     A.  Right.  But you also teach someone at the
22 county or some people at the county how to do it so that
23 they can make those changes.
24     Q.  Right.  But, again, that would depend on the
25 particular county?

Linda Estes Carrington - 4/8/10

108

1  A.  And how that county wants to operate, but those
2  decisions aren't made by an implementation person.
3  They're made by someone else.
4  Q.  When you're actually doing the configuring and
5  determining those rights and roles, you're doing that
6  based on the discussion that you've had with the -- I'll
7  use it broadly -- customer, correct?
8  A.  You mean -- repeat that one more time.
9  Q.  You said there were some instances where you
10 would actually do the configuration yourself as an
11 implementation specialist.
12 A.  Uh-huh.
13 Q.  Which I understand to mean -- and you correct
14 me if I'm wrong -- but I understand to mean that you
15 would actually go into the system and determine -- and
16 program, if you will, the system such that a certain user
17 has the appropriate access rights, correct?
18 A.  Right.
19 Q.  And in those instances, you would get that
20 information through your dialogue with the customer that
21 occurred?
22 A.  The users, and through the instruction of the
23 project manager.  And big projects, not even real big
24 projects, even smaller counties, will also have an
25 equivalent to the Tyler project manager.  They'll have

128

1  didn't have the training?
2      A.  Right.
3      Q.  Just as an example, I understand that there
4  were people at Tyler in Plano that did implementations
5  for -- on real estate systems.
6      A.  Yes.
7      Q.  You couldn't do that, could you?
8      A.  No.
9      Q.  Because you didn't have the experience.
10     A.  And that wasn't part of the courts and justice
11 division.
12     Q.  Right, but they had their own implementers who
13 did that work?
14     A.  Right.
15     Q.  But my point is -- or my question is, is that
16 you, as a courts and justice implementer, didn't have the
17 expertise to do an implementation in the real estate and
18 appraisal division.  That's a correct statement?
19     A.  That's a correct statement.
20     Q.  Do you have -- did you ever work with any
21 implementation specialists in any divisions of Tyler
22 other than the software group in Plano?
23     A.  No, I did not.
24     Q.  Have you talked to any other implementation
25 specialists in connection with this lawsuit about what

Linda Estes Carrington - 4/8/10

129

1   their jobs duties were?
2       A.  I have not.
3       Q.  Let me ask it more broadly.  Have you ever
4   talked to any implementation specialists at all, whether
5   in connection with this lawsuit or otherwise, about their
6   job duties?
7       A.  In other divisions?
8       Q.  Yes.
9       A.  No.
10      Q.  I will mark this as Exhibit Number 6.
11          (Exhibit 6 marked.)
12      Q.  Let me hand you that document.  Is that your
13  signature on the document?
14      A.  Yes.
15      Q.  Would you agree with me that that's the consent
16  form that you completed to participate in this lawsuit?
17      A.  Yes.
18      Q.  And I take it you signed that and sent it to
19  the lawyers in this case.
20      A.  Yes.
21      Q.  Do I understand correctly that your employment
22  was terminated from Tyler?
23      A.  Yes.
24      Q.  And was that because of customers asking you to
25  be taken off of their projects?

Linda Estes Carrington - 4/8/10

142

1        C E R T I F I C A T E

2        I, TINA TERRELL BURNEY, Certified Shorthand Reporter, duly qualified in and for the State of Texas,
3   certify that the foregoing deposition of LINDA ESTES CARRINGTON was reported stenographically by me at the
4   time and place indicated, said witness having been placed under oath by me, and that the transcript is a true
5   record of the testimony given by the witness.

6        Review and signature by the witness were requested at the time of taking this deposition and the
7   changes made by the witness are attached to the transcription of this deposition.

8
        I further certify that the time used by all
9   counsel is as follows:

10        Mr. Paulo B. McKeeby - 2 hours, 44 minutes

11        Ms. Laureen F. Bagley -  4 minutes

12        I further certify that I am neither counsel for nor related to or employed by any party in this cause and
13   am not financially interested in its outcome.

14        Certified to this _____ day of April, 2010.

15

16

17

18        TINA TERRELL BURNEY, CSR No. 2908
         Certified Shorthand Reporter
19       in and for the State of Texas
         Certification expires 12/31/10
20
    Osteen Reporting Services
21  Firm Registration No. 392
    313 Northglen Dr.
22  Hurst, TX 76054
    (817) 498-9990 (telephone)
23  (817) 498-0410 (facsimile)

24

25

Osteen Reporting Services  (817) 498-9990