# FREEDOM COURT REPORTING

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION
 3
    PATTY BEALL; MATTHEW MAXWELL;  )
 4  TALINA MCELHANY; AND KELLY     )
    HAMPTON, individually and on   )
 5  on behalf of all others        )
    similarly situated,            )
 6                                 )
              Plaintiffs,          )  2:08-cv-422 TJW
 7                                 )
    vs.                            )
 8                                 )
    TYLER TECHNOLOGIES, INC.       )
 9  AND EDP ENTERPRISES, INC.,     )
                                   )
10            Defendants.          )
                                   )
11  _____)
12
13
14          Deposition of TITUS J. BRITT
15              (Taken by Defendants)
16           Greensboro, North Carolina
17            Wednesday, July 28, 2010
18
19
20
21
22         Reported in Stenotype by
              Alicia S. Clement, RPR
23  Transcript produced by computer-aided transcription
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

EXHIBIT 0028

FREEDOM COURT REPORTING

Page 9

```
 1        A.   She was -- she was my last supervisor.
 2   Somebody else in -- but she was the last supervisor,
 3   yes.
 4        Q.   Okay.  But there was one before her?
 5        A.   Yes.  But I can't remember.
 6        Q.   Okay.  And do you remember Ms. DeLaney's
 7   title?
 8        A.   I think she was consulting manager, I
 9   think is what it ...
10        Q.   Okay.  And so as a consulting manager, she
11   supervised a group of implementation consultants,
12   one of which was yourself?
13        A.   Correct.
14        Q.   How -- and this -- you were located in the
15   Wash- -- in Washington state?
16        A.   Correct.
17        Q.   And worked out of their Renton,
18   Washington, office?
19        A.   Yes.
20        Q.   Where did you reside at that time?
21        A.   I lived in Parkland, Washington.
22        Q.   How far from Renton was that?
23        A.   About a half hour -- well, hour to half
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**FREEDOM COURT REPORTING**

Page 13

```
 1   Tyler in your capacity as technical services manager
 2   for the City of Auburn?
 3        A.   No.
 4        Q.   Was the Tyler software already in place by
 5   the time you accepted employment with the City of
 6   Auburn?
 7        A.   Yes.
 8        Q.   And just so that we're -- we're clear,
 9   I'm -- I'm using the term "Tyler."  The -- the
10   division of Tyler with which you were employed was
11   called "EDEN"?
12        A.   Yes, it was.
13        Q.   And EDEN is also the name of the software?
14        A.   I didn't use it, but I -- there were --
15   but some of the department did, so I think it may
16   have been.
17        Q.   What -- the software that you focused on
18   was utility billing?
19        A.   When I worked for Tyler, yes.
20        Q.   Yes.  How -- is that what you referred to
21   the software as, utility billing software?
22        A.   Yes.
23        Q.   No other name?
```

## FREEDOM COURT REPORTING

Page 97

```
 1      A.    Correct.
 2      Q.    Okay.  So then typical schedule would be
 3  that you would fly to the location on Monday?
 4      A.    Correct.
 5      Q.    And you would meet with the customer on
 6  Monday?
 7      A.    Yeah, depending on how far.
 8      Q.    Depending on the travel schedule?
 9      A.    Right.
10      Q.    So it might be Tuesday morning?
11      A.    Correct.
12      Q.    Okay.  Be it Tuesday morning or Monday,
13  this -- we call this the -- what did we call this
14  meeting?
15      A.    For us it was the initial -- what --
16  consultant review, consult -- consult --
17      Q.    Some type of consultant review?
18      A.    Right.  With the client.
19      Q.    And this is one-on-one with you and the
20  client or are you -- are there multiple people
21  there?
22      A.    Multiple, whoever they deem part of the
23  project.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

FREEDOM COURT REPORTING

Page 98

1   Q.   But it's -- you're the only representative
2  of Tyler?
3   A.   Sometimes.
4   Q.   Other times who else would be there?
5   A.   A data conversion person.
6   Q.   And would that just depend on the size of
7  the implementation or other factors?
8   A.   We didn't determine that, so I'm not sure.
9   Q.   Okay.
10  A.   But they -- they determined if they needed
11 to come or not.
12  Q.   So during this -- can we call it the
13 initial consultation phase?
14  A.   Yes.
15  Q.   So during this phase of the
16 implementation, you are meeting with, potentially,
17 multiple people whom the client designated to
18 participate?
19  A.   Correct.
20  Q.   Did you know who that was going into the
21 initial consultation phase?
22  A.   Not always.
23  Q.   Sometimes it would be in the business

FREEDOM COURT REPORTING

Page 99

1  process document?
2      A.  Yes.
3      Q.  But you would not have typically spoken
4  with these individuals prior to visiting the client
5  site?
6      A.  There's some occasions where we could
7  have.
8      Q.  For what purpose?
9      A.  If we had more time to review and we have
10 some questions before we got there.
11     Q.  So there might have been times where you
12 would have picked up the phone and asked the client
13 particular questions that would have come to you as
14 a result of review of the business process?
15     A.  Right. We would have to schedule that
16 through the project manager.
17     Q.  Schedule the call with the client?
18     A.  Right.
19     Q.  But you would review the business process
20 document and you might have questions based on that
21 review and you would then schedule a time through
22 the project manager to talk to the client?
23     A.  Correct.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

FREEDOM COURT REPORTING

Page 100

```
 1        Q.   How long typically would the initial
 2   consultancy meeting be?
 3        A.   It's, again, depending.  So it could be
 4   from two to three days, is the, like, initial ...
 5        Q.   So what happens during this phase of the
 6   initial consultancy?  You're -- you're going over
 7   the business processes with the client?
 8        A.   Right.  So I think the document could be
 9   from, like, 50 to 100 pages.
10        Q.   Yeah.
11        A.   So you're going through and ...
12        Q.   And this -- this is a meeting with you and
13   these different individuals with the customer.
14   You're not training at this point, are you?
15        A.   Not at that stage.
16        Q.   Okay.  You're trying to get information
17   from the customer?
18        A.   Correct.
19        Q.   Asking the customer questions about what
20   their expectations are with respect to the software,
21   for example?
22        A.   Well, the -- the goal is to validate.  The
23   assumption is that we already know their
```

FREEDOM COURT REPORTING

Page 101

1  expectation, so we're sort of validating that that
2  information is correct.
3      Q.   And how is it that you go about validating
4  that information?
5      A.   "I understand you do X amount of bills a
6  month"?  And they say, "No, we do quadruple that,"
7  or something.
8      Q.   And then that would be an example where
9  what you were being advised during this initial
10 consultancy phase varied from what was in the
11 business process document?
12     A.   Correct.
13     Q.   So what would you do in that instance?
14     A.   So after we go through that entire
15 process, then that information we would send back
16 to -- I can't think.  There's a -- we would send
17 information back to the appropriate departments
18 within EDEN to make some adjustments to how it
19 affected them, you know, in the software, to make
20 some adjustments.
21     Q.   And how would you -- what form would you
22 use to send it back?
23     A.   Everything -- e-mail was -- was our

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

FREEDOM COURT REPORTING

Page 103

1  at this initial consultancy phase, would you have
2  discussions about their -- their current systems?
3      A.   Yeah.  That's included in part of that.
4      Q.   What else would you do during the
5  consultancy -- initial consultancy phase?
6      A.   That -- we had a form that we would go
7  through.  It's a list of things to cover.  So we
8  would just make sure we cover all that.  And then
9  the goal is to have enough information to go back
10 and start configuring your -- the software to work
11 according to what's been determined in the business
12 process.
13     Q.   What's the form called?
14     A.   Oh, I don't know.  Probably utility
15 billing consult, initial consult.  There's a
16 checklist.
17     Q.   Was this a document that you would have
18 with you at this initial consultancy meeting?
19     A.   Yeah.
20     Q.   And you would use -- I take it you're --
21 what you're saying is that you would use the results
22 of the information acquired during the initial
23 consultancy phase as part of the configuration?

**FREEDOM COURT REPORTING**

Page 104

1  A.  Right.  So --
2      MS. BAGLEY:  Object to the form.
3      THE WITNESS:  So the information
4  would go back to the appropriate
5  department.  And then when it's time to do
6  a configuration, then we would have all
7  this new, you know, combined information
8  to work from.
9  BY MR. MCKEEBY:
10  Q.  And is -- is configuration a phase of the
11  implementation process?
12  A.  A con- -- no.  The -- someone -- someplace
13  somebody else implements the software.  And then
14  once it's implemented, then we just go in and turn
15  on the different features that the -- based on our
16  review.
17  Q.  What do you mean, turn on different
18  features?
19  A.  So the EDEN software had a lot of
20  features.  So based on what we've determined from
21  the -- the initial review, we can go in and say,
22  "yes," to this one; "no," to that; turn -- you know,
23  up, down, you know, just setting up the options to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**FREEDOM COURT REPORTING**

Page 105

1  make it work the way that they anticipated.
2      Q.   And that was -- you saying "yes" or "no"
3  to different options was based on the information
4  that you acquired during the initial phase?
5      A.   Yes.
6           MS. BAGLEY:  Form.
7  BY MR. MCKEEBY:
8      Q.   And is that what is meant by configuring
9  the software --
10     A.   That's my --
11     Q.   -- or is that something else?
12     A.   Yeah, that's my term.  It's probably
13 just -- I don't know what we call it.  But that's my
14 term for configuration, is basically the software's
15 been installed by another department and we're going
16 in to turn on the -- the appropriate options to make
17 it work according to what we have discovered in
18 the -- the review, the initial consult.
19     Q.   Okay.  And is that configuration, again,
20 the way we're using it insofar -- in the context of
21 the deposition, is that some -- that something you
22 did personally then?
23     A.   Yeah.  Some of it we -- yeah.  Some --

1  there's some -- there's a lot of departments
2  involved. So there's some of it we did. There's
3  some that other -- you know, data conversion, they
4  had some things they had to do. So there's, like, a
5  company project.
6      Q.  Okay. And is that done at the client site
7  or is that done remotely?
8      A.  It's -- depend. It can be done both.
9      Q.  And is there a set amount of time that you
10 have to -- to do these -- this configuration?
11     A.  In -- yes. In the project plan. But
12 that -- the project managers kind of determine how
13 long it should take to do certain things. So, yes,
14 I would say we did have it for a certain time.
15     Q.  But you were aware of what that time was?
16     A.  Yes.
17     Q.  And were there instances where you had to
18 get more time?
19     A.  We -- so what I mean is with the project
20 manager, we would let them know that we're probably
21 50 percent done. And then they would let us know,
22 either have to get more help or figure it -- work
23 for --

FREEDOM COURT REPORTING

Page 110

```
 1        A.   When they are actually switching from the
 2   old system to the new system.
 3        Q.   Okay.  So the software's been installed.
 4   And I take it there's someone else that actually
 5   installs the software?
 6        A.   Yeah.
 7        Q.   And that occurs after it's been
 8   configured?
 9        A.   Or could be.
10        Q.   Okay.
11        A.   Yeah.  The --
12        Q.   Who -- who installs the software?
13        A.   I don't know.  Some other department.  I
14   can't -- I don't know if they call it implementation
15   or ...
16        Q.   Conversion?
17        A.   No.  Conversion, they just did data
18   conversion.  So it could have been the IT
19   department, actually, that did the installs.
20        Q.   And by "data conversion," you're meaning
21   taking the information that's in the customer's
22   legacy system, the data, and putting it into
23   Tyler's --
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**FREEDOM COURT REPORTING**

Page 113

1  A. Yes.
2  Q. So in terms of the training that you
3  provided, was there, like, a schedule or agenda set
4  up then between you and the customer?
5  A. Right. So we -- we had standard agendas
6  that we -- everybody used based on the previous
7  information we talked about.
8  Q. Standard agendas based on the types of
9  options that the customer would have selected?
10 A. Correct.
11 Q. Well, didn't you have to modify those
12 agendas based on the customer preferences?
13 A. Some. So the -- the standard -- you know,
14 there are different modules within utility billing.
15 So if they have this module, here's what you should
16 cover. So there were high-level categories.
17 Q. What about with respect to scheduling the
18 actual training? Is that something that you would
19 coordinate with the customer?
20 A. No. That's the PM.
21 Q. Project manager would do that?
22 A. Yes.
23 Q. So before you leave for your trip in which

**FREEDOM COURT REPORTING**

Page 114

1  you're doing training, did you know what -- you
2  know, where you were supposed to be and when?
3     A.  Yes.
4     Q.  And what would tell you that?  What
5  document would tell you that?
6     A.  Just -- I don't know if we had a document.
7  I don't think there ever -- some -- we got the
8  information from the PM.  I'm not sure if it's off
9  the project schedule or if there was something
10 separate that they sent us.  I'm sure there's --
11 there's something -- there's some document that they
12 provided us that told us when the training start --
13 what time we're supposed to be there and -- and the
14 number of days.
15    Q.  But you don't remember any document like
16 that?
17    A.  No.  I'm -- there was a document.  But I
18 can't tell you if it had a name or if it was -- or
19 if it's something that they sent in a Word file and
20 attached to -- in an e-mail to us.  But it -- we did
21 get that information from project management.
22    Q.  Does the term "agenda template" mean
23 anything to you?

FREEDOM COURT REPORTING

Page 126

1    A.    Inglewood was one.

2    Q.    Uh-huh. Park Cities (sic), no, though?

3    A.    Park City, no.

4    Q.    All right. So as an implementation
5  consultant, after this "go live" period, be it --
6  you said it was one to two weeks. After that one to
7  two weeks, whichever one it happened to be, expires,
8  do you have any additional responsibilities with
9  respect to that customer?

10    A.    After they're live, what do we do after
11  that? It's kind of hard for me, you know, because
12  I'm doing customer service now. So I know what we
13  do now which is not the same.

14    Q.    Right.

15    A.    So I -- actually, I don't think we
16  know -- after they "go live," we're -- they're done
17  with us and then somebody else is involved.

18    Q.    Right. So if they have day-to-day
19  questions, they go to the support team?

20    A.    Yeah. They contact some -- someplace
21  else.

22    Q.    I mean, is it true that -- I mean, at that
23  point you would have been onto doing additional

```
 1   implementation work for another customer?
 2       A.   Correct.
 3       Q.   Did you ever get calls from customers
 4   saying, "Hey, you know, you did this implementation
 5   last week or two weeks ago and we've gone live and I
 6   have these kinds of questions"?
 7       A.   Then we send them to the PM.
 8       Q.   To the project manager?
 9       A.   Yes.
10       Q.   Because you were working on a different
11   project at that point?
12       A.   Yeah.  And -- and, plus, we were no
13   longer -- we're --
14            MS. BAGLEY:  Form.
15            THE WITNESS:  -- technically done
16       with them, so ...
17            MR. MCKEEBY:  Okay.
18            THE WITNESS:  Whether we were working
19       on something or not, we're done with them.
20   BY MR. MCKEEBY:
21       Q.   Mentioned the résumé that you submitted at
22   the beginning of your employment with Tyler.  And I
23   didn't mark that as an exhibit.  Does this look like
```

**FREEDOM COURT REPORTING**

Page 139

1  STATE OF NORTH CAROLINA

   COUNTY OF FORSYTH

2

3          REPORTER'S CERTIFICATE

4      I, Alicia S. Clement, a Notary Public in

5  and for the State of North Carolina, do hereby

6  certify that there came before me on Wednesday, the

7  28th day of July, 2010, the person hereinbefore

8  named, who was by me duly sworn to testify to the

9  truth and nothing but the truth of his/her knowledge

10 concerning the matters in controversy in this cause;

11 that the witness was thereupon examined under oath,

12 the examination reduced to typewriting under my

13 direction, and the deposition is a true record of

14 the testimony given by the witness.

15     I further certify that I am neither

16 attorney or counsel for, nor related to or employed

17 by, any attorney or counsel employed by the parties

18 hereto or financially interested in the action.

19     IN WITNESS WHEREOF, I have hereto set my

20 hand, this the 8th day of July, 2010.

21

22                              _____

                         Alicia S. Clement, Notary Public

23                         Notary Number: 19952910041

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**