# EXHIBIT 2

# AMENDED EXPERT REPORT OF BRIAN T. FARRINGTON

**AMENDED EXPERT REPORT OF BRIAN T. FARRINGTON IN *BEALL, et al. v. TYLER TECHNOLOGIES, INC., AND EDP ENTERPRISES, INC.***

I was retained by Sloan, Bagley, Hatcher & Perry Law Firm, to provide a professional opinion on whether the job duties and responsibilities of the plaintiffs and other employees alleged to be similarly situated in this case require the exercise of discretion and independent judgment according to the standards applied by the U.S. Department of Labor, Wage and Hour Division ("USDOL/WH").

**BACKGROUND**

I was employed by the United States Department of Labor, Wage and Hour Division ("Wage and Hour") from 1975 to 1989, with 18 months off for graduate school. From 1975 to 1984, I was a Compliance Officer (an investigator) in Chicago, Illinois and then in Fort Worth, Texas. My primary function was to enforce the laws administered by the Wage and Hour Division, primarily the Fair Labor Standards Act ("FLSA"). I conducted anywhere from 500 to 600 full investigations during this time, as well as 300 to 400 more limited compliance actions. From 1984 to 1989 I was the Assistant District Director in Dallas (the position is now called "Director of Enforcement"). I supervised from 12 to 16 investigators in this position. I assigned them their cases, assisted and advised them during the conduct of their investigations, and reviewed their completed case files. During this review, I evaluated whether the evidence supported the investigators' findings and conclusions and whether the FLSA had been properly applied. I determined whether claimed and/or potentially applicable exemptions had been correctly found to be applicable or not. I also reviewed the interviews conducted by the investigator to see if they supported the investigator's findings adequately. When back wages were computed, I reviewed those computations for both accuracy and proper methodology.

When the investigator was unable to resolve outstanding issues, I met with employers and/or their attorneys in second level conferences to attempt to settle the cases. If no resolution acceptable to the agency could be reached, I made the decision whether a file was suitable to send to the Regional Solicitor of Labor with a recommendation for litigation. If litigation was recommended, I ensured that conclusions were sound and supported by the evidence, and commented on additional factors such as evidence of willfulness. I estimate that I supervised approximately 5,000 investigations while I was Assistant District Director.

I left the Department of Labor in 1989 and went into private consulting on wage and hour and other labor matters with a consulting firm called Harry Weisbrod Associates, which I have since purchased. I also attended law school after leaving the Department of Labor and received my J.D. from the Texas Wesleyan School of Law and was licensed to practice law in 1994. My law practice consists almost exclusively of representing and advising clients in wage and hour and EEOC matters. When appearing

as an expert witness, I have been engaged by both plaintiffs and defendants.  I also do many speeches, seminars and training programs on FLSA and other employment issues.

Since 1989, I have spent a substantial portion of my time in dealing directly with USDOL/WH while representing clients in investigations.  I also maintain professional relationships with a number of agency personnel, and discuss developments in the law and in agency policies, procedures, and interpretations of the law with them.  I am therefore up to date on the agency's policies, procedures, interpretations, and enforcement positions.  In addition, I keep myself informed on developments in the statutes enforced by USDOL/WH, especially the FLSA, and in relevant regulations and opinions.  I also keep up with FLSA case law.  I apply this knowledge continuously in advising employers on wage-hour issues and representing them in USDOL/WH investigations.  I continue to publish on such issues, as noted below.

## DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS

1. Depositions of Talina McElhaney, Lisa White, Linda Carringt0n, Russell Steele, Melanie Baird, Tony Dodd, Eric Emde, Lorraine Mutch, Eyvonne Wilton, Thomas O'Haver, Joy Bibles McLeod, David Hayner, Sandra Dunning, Kelly Hampton, Bethany Maynard, Joy Flynn, Titus Britt, Geraldine Ingram, Travis Void, Ilene Meyers, Christopher Hepburn.

2. Declarations of Kim Huynh, Talina McElhany, Lisa White, Kelly Hampton, Tony Dodd, Ilene Meyers, Tom O'Haver, Joy Bibles.

3. Plaintiffs' First Amended Collective Action Complaint

4. Defendants' Answer to Plaintiffs' First Amended Collective Action Complaint

5. Chart of IS Plaintiffs by Division and job duties

## OTHER CASES IN WHICH I HAVE TESTIFIED AS EXPERT IN AT LEAST THE LAST FOUR YEARS

1. United States District Court for the Northern District of Georgia, Rome Division, Case No.: 4:99-CV-0001-HLM (*McDermott, et al. v. Cracker Barrel Old Country Store, Inc.*). Expert for Plaintiffs on compensability of lock-in time, and payment of minimum wage for side work.  Deposition.

2. United States District Court for the District of Oregon, Case No. MDL Docket No. 1439, (*In re: Farmer's Insurance Exchange Claims Representatives' Overtime Pay Litigation*). Witness for Defendant re:  claims representatives in FLSA case. [Note:  gave no opinion testimony, but reported on results of test sample claims.]  Trial testimony.

3.      District Court, City and County of Denver, Case No. 01CV4773 (*Chase v. Farmer's Insurance Exchange, Inc.*)  Expert for Defendant re:  exercise of discretion and independent judgment by claims representatives in Colorado wage and hour case.  Deposition.

4.      District Court, Fourth Judicial District, State of Minnesota, County of Hennepin, Court File EM 01-015004 (*Milner, et al. v. Farmers Insurance Exchange, et al.*), Expert for Defendant re:  exercise of discretion and independent judgment by claims representatives in Minnesota wage and hour case.  Deposition.

5.      United States District Court for the Western District of Texas, Case No.    EP-02-CA-0564-FM) *(Acosta v. County of El Paso),* Expert for Defendant re:  off clock hours allegedly worked by detention officers, and offset of off-clock hours by paid lunch period.  Deposition.

6.      United States District Court for the Northern District of Alabama, Western Division, Civil Action No. CV-01-C-0303-W, (*Morgan et al. v. Family Dollar Stores, Inc.*)  Expert for the Plaintiffs re:  application of the executive exemption. Deposition.

7.      United States District Court for the District of Arizona, Case No. CIV03 2262 PHX ROS (*Hutton v. Bank of America*), Expert for Defendant re:  administrative exemption, back wage computation, willfulness.  Deposition.

8.      Judicial Court, 49th Judicial District, Webb Co., Texas, Case No. 2003 CV F000553D1, (*The Laredo National Bank and Homeowners Loan Corporation v. Jacob Monty and the Monty Law Firm, P.C.*)  Expert for Defendant re: reasonableness of attorney's opinion on administrative exemption.  Deposition.

9.      United States District Court for the Southern District of Florida, Case No. 04-22640 CIV-JORDAN (*Garcia v. Port Royale Trading Co., Inc., et al.*).  Expert for Defendant re:  back wage calculation.  Deposition.

10.     United States District Court for the Northern District of Alabama, Southern Division, Case No. CV-02-TMF-1174-S (*Chao v. Tyson Foods, Inc.*), Expert for Defendant re:  willfulness.  Deposition.

11.     United States District Court for the Northern District of Alabama, Western Division, Case No. 7:06-CV-01538-LSC (*Womack v. Dolgencorp, Inc., et al.*), Expert for Plaintiffs re:  executive exemption. Deposition.

12.     Long John Silver

**PUBLICATIONS**

1.  <u>Wage-Hour Compliance</u>.  Authored book published 1995 by Warren, Gorham and Lamont, NY, NY.

2.  <u>Wage Hour and EEOC Compliance and Litigation Prevention</u>.  Published 1991 by the Professional Development Institute at the University of North Texas, Denton, TX.  Authored training manual for all day course on the subject.

3.  <u>A CPA's Guide to Workplace Regulation</u>.  Published 2000 by the American Institute of CPA's.  Training manual for an all day course on the subject.

4.  Society for Human Resource Management, "Legal Report" on the 1996 FLSA Amendments.

5.  I wrote several articles for "Payroll Perspectives," a newsletter published by Ernst and Young.

6.  I wrote several articles for "Auto, Inc.," a magazine published by the Automotive Service Association.

7.  I wrote several articles for "Self Storage," a magazine published by the Self Storage Association.

8.  Harry Weisbrod Associates previously published a bi-monthly newsletter in which I wrote regularly.

9.  I have written other articles for industry groups over the years that I have not kept track of.

10. <u>A Wage and Hour Guide for the Self Storage Industry.</u>  Published 2006 by the Self Storage Association, Alexandria, Virginia.  Review of FLSA requirements and of major state wage and hour law considerations as they apply to employers in the self storage industry.

**OPINIONS AND BASIS**

**METHODOLOGY**

The principal method which USDOL/WH enforcement personnel use to make determinations on the application of the administrative exemption (among others) is to conduct interviews with employees in the job or jobs at issue.  USDOL/WH investigative procedure is for the investigator to select employees from among current and former incumbents in the jobs at issue, and to interview them either in person or by telephone

and obtain from them information about their job duties and responsibilities.  There are no hard and fast rules on the number or distribution, geographic or organizational, of employees to be interviewed.  The investigator is to interview enough employees to allow him to feel confident that he has a good understanding of what the employees in the subject jobs do.

In this case I was able to read a number of depositions of opt-in Plaintiffs, which included, among other things, their accounts of their duties and responsibilities.  In addition, I read the deposition of the person deemed by the defendants to be most knowledgeable concerning the duties and responsibilities of the plaintiffs, so that I could get the employer's perspective.

The opinions I express in this report are of the same type that I would have developed in my work for the USDOL/WH, and subsequently in advising clients on wage and hour issues.  I hold all of my opinions to a reasonable degree of certainty in my field. The work I have done and the methods I used in this case are the same type of work that I did while employed at USDOL/WH and use the method I used at the agency when addressing possible overtime violations.  I was as careful in performing the work in this case as I was when at USDOL/WH, and in my normal professional activities.

**DISCRETION AND INDEPENDENT JUDGMENT**

The Fair Labor Standards Act of 1939, as amended (29 U.S.C. §§ 201 et seq.) (hereinafter "FLSA" or the "Act") generally requires that employees be paid overtime when they work in excess of 40 hours in a workweek, unless an exemption applies. There are, however, a number of exemptions from the overtime requirements of the Act. The most important of these exemptions is the exemption from minimum wage and overtime contained in Section 13(a)(1) of the Act (29 U.S.C. 213(a)(1)) for bona fide executive, administrative, and professional employees, and outside salespeople.  The statute itself does not define the terms "executive," "administrative," "professional," or "outside sales," however.  Rather, the statute authorizes the Secretary of Labor to define and delimit those terms by appropriate regulation.  The regulation in which these terms are defined and delimited is 29 CFR 541.

From the materials and information available to me, employees like Plaintiffs did not supervise other employees, nor were they engaged in work requiring knowledge of an advanced type in a field of science or learning, nor were they involved in sales activities.  Therefore, the executive, professional, and outside sales exemptions could not be applicable to them, leaving the administrative exemption.

There are several elements to the administrative exemption in addition to the performance of some work requiring the exercise of discretion and independent judgment, but I have not been asked to opine on those elements. I have been asked to review the duties and responsibilities of employees included in this action and give an opinion as to whether, under the standards applied by the USDOL/WH, the work of the plaintiffs does, in fact, require the exercise of discretion and independent judgment.

The current regulation defines discretion and independent judgment as follows:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.  29 CFR 541.202(a).

The regulation continues:

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

It is true that the exercise of discretion and independent judgment does not require that employees make final decisions.  Rather, employees who make recommendations can meet the regulatory requirement, as long as their recommendations are given particular weight.  However, the recommendations must themselves involve the exercise of discretion and independent judgment.

On the other hand:

> (e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. *See also* § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive,

7

recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

(f) An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly....

This standard is not significantly different from the standard in the previous (i.e., prior to August 23, 3004) version of the regulation, which stated that discretion and independent judgment:

> ...[involving] the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in the regulations in subpart A of this part, more over, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance....

Further, both prior enforcement positions of USDOL/WH and prior court cases on this issue remain relevant—as the Preamble to the current regulation states:

> Accordingly, while retaining this standard from the existing regulations, final section 541.202 clarifies the definition of discretion and independent judgment to reflect existing federal case law and to eliminate outdated and confusing language in the existing interpretive guidelines. The Department intends the final rule to clarify the existing standard and to make the standard easier to understand and apply to the 21st Century workplace.

Final section 541.202(a) thus restates the requirement that the exempt administrative employee's primary duty must "include" the exercise of discretion and independent judgment and includes the general definition of this term, taken word-for-word from the existing interpretive guideline at subsection 541.207(a): "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 69 FR 22142

## CATEGORIES OF EMPLOYEES INVOLVED

I have been asked to look at Implementation Consultants. According to the deposition testimony, these kinds of employees are/have also been referred Implementation Specialists, and Client Liaison at various times and in different divisions of the defendants. In addition, the duties of employees known as Trainers performed duties similar to employees with the other titles mentioned above, although Trainers may

not have done all the functions that the other employees did.  In any event, I will refer to the position(s) in question as Implementation Consultants, or "IC's."

## APPLICABLE STANDARDS

REGULATIONS

      Since this action was filed in May, 2009, and since the maximum statute of limitations under the FLSA is three years, the applicable regulatory standard is the current version of 29 CFR 541, which has been in effect since August 23, 2004.

DUTIES OF IC'S

      According to Christopher Hepburn, who is the person designated by the defendants as most knowledgeable about the duties of the plaintiffs, the primary duties involved in the implementation process would be:

-analyze clients' current business practices
-determine any changes to business practices
-configure software to "adhere to" the changed business practices
-review configuration with clients
-receive client acceptance
-review conversion files
-load conversion files
-educate senior staff and other staff on the particular Tyler Technologies' application in question
-assist with the "go live" transition
-assist with post-go live support

(see Hepburn deposition, p. 20, line 22 – p. 21, l. 7).

      The testimony of the IC's includes most of these duties, although their descriptions or characterizations of the functions often differ from those of Mr. Hepburn. In any event, none of the functions listed by Mr. Hepburn would involve the exercise of discretion and independent judgment as that term is used in the regulations. Rather, they involve product knowledge, and the use of skill in applying well-established techniques, procedures or specific standards. I will examine each in turn.

      The analysis of clients' current business practices was simply the determination of what particular steps, processes, forms, etc., the client was using, so that the defendants could adapt their software to allow the client to carry out its functions.  It primarily involved questioning client employees.  This "analysis" was simply information gathering, in light of the gatherers' knowledge of what the software did. Combined with questions about what the client was currently doing was what changes the

9

client might want to make.  It is important to note, however, that this did not involve advising the client on what they should do.  Rather, it was simply ascertaining what they did do, and what they wanted to do.  As Mr. Hepburn put it:

A.      We'll take accounts payable [as an example].  They have a choice whether they would like to centralize accounts payable functions of decentralize accounts payable functions….

Q.      Okay.  And would you tell the client which on they should do?

A.      No.  my role was to explain the division––the divisions, the pros of one the cons of one, pros of the other , cons of other.  Ultimately, it's their decision.  My role would be to offer—

Q,.     Options?

A.      --options and the detailed analysis of those options backup not a recommend.  (Hepburn deposition, p. 22, ll. 17 –  p. 23, l. 5)

This sort of process in this sort of setting, knowing what questions to ask, how to follow up on those questions to elicit the information needed to implement the defendants' software, has always been treated by USDOL/WH as a skill, not the exercise of discretion and independent judgment.  In addition, in many cases this sort of function is performed by solely or primarily by project managers rather than by IC's:

Q.      Did you as an implementation consultant—I'm sorry— implementation specialist at Tyler ever undertake an analysis of what the client needs and wants—similar to how you described the project manager typically does?

A.      No.  That was the project manager's duties.  (Meyers' deposition, p. 48, ll. 2 – 7).

In addition, in some cases checklists were used:

Q.      All right.  So during this initial call you would gather information about the existing customer's data?

A.      Yes.

Q.      And how would you know what questions to ask?

A.      We had a list, a checklist more or less, of questions that we had to ask and answer and check off as they answered them.  (McElhany deposition, p. 54, ll. 11 – 18)

Thomas Dodd says:

Q.      It is titled Implementation Checklist 1.9, correct?

A.      Correct.

\*         \*         \*         \*

Q.      Okay, what is it?

A.      It looks like just a checklist for what we did to go through for implementation.

Q.      Do you recognize the document?

A.      I do.  There is numerous versions of this, but it is a general outline of how to do…how to stage software and whatnot.

Q.      So you would use that at the configuration staging?

A.      In the staging phase of the implementation.

Q.      Did you ever use this in connection with your job?

A.      Oh, certainly.  This, or a more modern version.

Q.      Is this a document that is tailored to a particular project?

A.      No.  It just happened to be one that I printed out.  I mean, they had a lot of documents similar to this available on line, on the Internet.  (Dodd deposition, p. 44, 1. 17 – p. 46, l. 23

And Mr. Hepburn acknowledges that what an IC offers is not a recommendation, but a set of options (Hepburn deposition, p. 22, ll. 17 – p. 23, l. 5) (and those options, of course, are only those contained in the software, not invented by the project manager or IC).

The point that Mr. Hepburn made, that the IC's don't make recommendations, but rather offer options, was echoed by the IC's.  For example:

Q.      Do you make recommendations based on past experience as an implementation specialist?  (objection omitted)

A.      No, you try not to.

Q.      Not at all?

A.      No.

Q.      Why not?

A.      Because every county is different, and they know what they
        want, and they've got their own culture and their own thing.

Q.      What if they asked you?

A.      You just explain to them that it's—I'll tell you how it works,
        but I'm not going to tell you how to run your office.
        (Carrington deposition, p. 109, ll. 11 – 24)

Next, Mr. Hepburn says, the defendants' software had to be "configured"—that
is, the particular options contained within the software which the client had chosen had to
be activated.  For instance, if a deputy court clerk was supposed to have access to one set
of files, while the clerk himself or herself had to have access to all files, the software had
to be set to allow the appropriate level of access.  The actual technical process of
adjusting the software might be done by a developer/programmer if it was complex, or by
an IC.  In either case, however, this does not entail the exercise of discretion and
independent judgment.  The client has determined who gets what level of access.  The
software has the ability to be set to provide the determined level of access.  It's simply a
matter of skill and product knowledge to set or configure the software to assign the
determined level of access.  Indeed, Mr. Hepburn himself, describing the process (in
terms of financial software), said that once the client's parameters had been determined,
actually configuring the software was "filling out data tables." (p. 28, l. 20 – p. 30, l. 21).

Mr. Hepburn referred to reviewing the configuration with clients.  During both
testing and training, the IC's would review what the software did in any particular
situation with the client to ensure that it was functioning properly and doing what the
client wanted it to do. He described it as building tables and then showing the client an
example (p. 36, l. 4 – 19), a "dry run." Again, this is routine and does not involve
discretion and independent judgment:

Q.      As you work through the different variables or nuances for this
        particular client and you configure it to their system, you said
        you then give them sort of a task list?

A.      Yes, Ma'am.

Q.      How do you come up with that task list?

A.      The task list is already preformed [sic] by the packaging of
        these implementation packages of to do's and the structure of

> things you have.  You give the agenda to the client.  We have
> this list of things that we're supposed to do, and we present
> that to the client.  We have these things that we implement
> from tried and true implementation guide, and that's what—

Q.    Like what kind of thing?  Is it like a recipe where you say I
      need to tell you now that you need to---

A.    Yes, Ma'am.  It's pretty much a recipe.  (Bibles McLeod
      deposition, p. 97, l. 19 – p. 98, l. 11).

Mr. Hepburn mentions client acceptance, which he describes merely as getting a "green light" from the client to move forward, based on the "dry run" examples.

The next duties discussed by Mr. Hepburn are reviewing conversion files and loading conversion files.  This involves the client identifying the files they want to be transferred electronically to the new software, rather than having to enter the data manually, and then actually transferring that data to the new software.  The purely technical aspects of accomplishing this were done by the programmers:

A.    We don't—the implementation person is not really converting
      data as much as they are checking to make sure data has been
      converted properly.

Q.    But that's part of the conversion process?

A.    Yes.

Q.    Who is doing the actual data conversion, the programmer?

A.    Yes.  (Carrington deposition, p. 98, ll. 17 – 24).

Another IC said:

A.    I didn't do the conversion.

Q.    Yeah.  Who would have?

A.    I guess the developers.  (Steele deposition, p. 93, ll. 10 – 12).

The IC's would review the results with the client, identify any problems and notify the programmers so that these problems could be fixed, review again until it appeared that the data had been successfully converted to the new software.

A.    Once you have given that to the programmer he'll run the
      initial conversion   through the conversion process.  And then

he would either come and tell us it completely bombed, and this is what I think is wrong, so gather X, Y, Z information from the customer, or if they had good, clean data, he might could tell you specific areas that needed attention.  So you would go back to your customer and say, I need you to do this, this, and this.  (McElhaney deposition, p. 62, ll. 6 – 14).

Neither the determination of errors nor their correction was discretionary:

Q.      What did you do to verify the customer's data after it was converted?

A.      I would compare—once the conversion programmer had gotten a clean enough run through the conversion that he could actually populate the EDPro database, then we would compare certain areas in the Unix data to areas in the EDPro data.  I believe I mentioned earlier about once you got to the point where you had data in the database, you could actually run error reports in EDPro, and it would tell you there was missing data here and stuff like that, and then  you could go back and look at the Unix data and see why it was missing.

Q.      So were these error reports—you would run error reports?

A.      It was part of the EDPro program.

Q.      Would it happen automatically, our would you have to generate the report?

A.      You'd just click a button.  (McElhaney deposition, p. 76, l. 19 – p. 79, l. 12).

Nothing the IC's do in this process requires the exercise of discretion and independent judgment.  The client identifies the data which must be transferred.  The transfer itself is a technical process.  The results are either right or wrong—the identified data is either successfully transferred or it is not.

At one point Mr. Hepburn tries to argue that discretion and judgment are used in the conversion process because the IC is "recommending" which data should be converted.  After a rather lengthy discussion, though, he ultimately concedes that:

The client would just as soon convert everything because it means less work for them.  It's the implementation consultant's job to give them the pros and cons of their decisions that they choose to make meaning I could—an implementation consultant could tell their client we convert

you will have more work to do than if we don't convert.  Then that implementation consultant articulates with certainty and conviction why converting data means more work for the client when it would clearly simplistically seem to anyone the converting data would mean less work for a client.  It's their—and ultimately the client can still choose hey I want to go down that path and then the implementation consultant lives with that decision and executes.  (p. 117, l. 15 – p. 118,  l. 4)

The next IC duty identified by Mr. Hepburn is training—educating staff about how to use the software.  For most of the IC's, this was the largest or one of the largest components of their duties.  And again, there was nothing about the training that required discretion or independent judgment.  The software operates the way it operates, and the IC's were familiar with it. They would simply show the client's employees how to perform the operations of their departments using the software. Some IC's used training manuals or guidelines, which they themselves did not design or prepare ("Prepare appropriate training materials as new products are developed, didn't have anyting to do with writing training documentation" (Bibles McLeod deposition, p. 90, l. 14 – 16)), which included instructions and screen shots of what the client's employees would see while using the software:

> A.    Well, they each have a computer, and they each have Odyssey on their computer, and we also had—we had training manuals with screen shots. (Carrington deposition, p. 111, l. 15 – 17.

And another IC:

Q.    Was there anything—what were the handouts that you would provide?

A.    They were documents provided by Tyler that were instructions sheets on—it essentially covered what we were covering in the classroom.

Q.    Okay.  Did you determine the agenda for the training in the sense of what particular topics to cover with the employees?

A.    No.  That was pretty predetermined, you know.  It was provided, like I said, in the examples and then I went by the example of the guy that trained me.

Q.    When you say examples, what do you mean?

A.    Shauna would send out a training template and say here is what we did in such and such county, you know, go by this. And I would go by that training schedule.  (Dodd deposition, p. 39, l. 22 – p. 40, l. 12).

Another IC:

A.      The only thing I would receive is what module I was teaching.
        And then I would have the material that was developed by
        MUNIS or Tyler—whoever—the training material I would
        have that training material to use.

Q.      And what—when you say training material, to what do you
        refer?

A.      It's just a manual for each of the modules.  (Meyers, p. 45, l. 6
        – 13).

Other IC's had their teaching material "in their head":

Q.      You didn't prepare anything that prepared you for the actual
        training?  It was all in your head?

A.      Yes.

Q.      And when you got there with the personnel, again, you didn't
        have a document, an agenda, item numbers 1 through 10,
        going across and checking those off, or did you?

A.      I don't recall.

Q.      Now, when you were teaching them as to how to enter the
        citations, did you have a document with you that you would
        flip through and read in order to try to train them?  Or again, it
        was all your knowledge that you were training them on?

A.      Right.  Previous experience with the software.  (Steele
        deposition, p. 52, l. 20 – p. 53, l. 8)

IC's had no authority to deviate from the prescribed training:

A.      Well, I didn't deviate from the Tyler plan.  I had to stay with
        that, because that's duplicatable, so everything was based on
        that.

Q.      What Tyler plan are you talking about?

A.      The Tyler training plan for whatever module we were
        implementing, because the whole idea is if something
        happened to me, somebody else had to pick up right where I

left off, and people couldn't be told something different or be confused by that.

Q.        But the plan, is that like a customer hand-out?  Is that something you're giving to the client?

A.        Yeah.  There's a training guide.  There's an instruction manual.  Everything has to be duplicatable, so whatever it was, it had to stay with that.  So if I was working with a client, that was always the foundation to keep that duplicatable.  (Bibles McLeod deposition, p. 119, l. 5 – 21).


USDOL/WH does not consider this sort of training, which merely involves product knowledge and certain communications skills, as involving discretion and independent judgment.  This would be the case whether the IC taught from training manuals, handouts, PowerPoint presentations, or simply relied on his/her knowledge and experience.

Mr. Hepburn tried to argue that this training involved discretion and judgment because the IC is on his/her own in front of the class and has to assess how the training is going and whether the knowledge is being successfully transferred.  The IC might have to decide to go over some information again.  He also contends that discretion and judgment may be used because some of the employees being taught are opposed to the decision to adopt new software, and may be resistant.

Such issues are common to virtually every training scenario, and do not change the USDOL/WH position that such training is a matter of product knowledge and skill.

In addition, questions can come up which may identify problems which have to be brought to the attention of the developers or project managers, and Mr. Hepburn suggests that the decision as to which of such questions should be forwarded, and when, is discretionary.  Again, however, those decisions are determined by the IC's knowledge of the product and the employer's procedures.

Q.        What if there was a situation where the customer's employees who you were training were not picking up on the training such that the training was not on time?  Would you discuss with the project manager the need to have additional training?

A.        Yes, I would definitely pass that type of information along.

Q.        And then I guess it was up to the project manger to work that out with the client?

A.        And it also always depended on the contract.  Whatever contract the customer had with Tyler they were allowed so many hours of implementation or billable days of implementation.  So if it fell within that parameter—otherwise there would be an additional charge to the customer.  So it all had to be worked around.  I didn't do any of that.  I just passed the information along.  (Meyers deposition, p. 59, l. 14 – p. 60, l. 8)

Another IC:

Q.        So you made a decision whether or not it needed to be brought to the project manager's assistance right then or there or whether it could wait to be done later, after you left for your hotel?

A.        If it didn't interrupt my training, then I continued on with my training, and I contacted them later.

Q.        But you made that decision as to when you were going to contact your project manager?

A.        Depending on the importancy of the—of the—I mean, if we're missing names, obviously I can't train without names.

Q.        Right.

A.        If I'm missing a ZIP code I can train without a ZIP code. (Steele deposition, p. 102, l. 21 – p. 103, l. 10)

The final duties which Mr. Hepburn identifies are assisting with the "go live" transition and with post go live support.  These functions merely involve answering questions about the software as it is configured and adapted to the particular client's procedures.  Often it involves going over while on site during the go live the same material the IC taught to the client's employees earlier during the site visit, which they may not have fully absorbed or which they may simply have forgotten. Post go live support is answering such questions after the IC has left the site.  These duties clearly require general product knowledge and specific knowledge of how the software has been configured to work for that particular client, not discretion and independent judgment.

As noted above, 29 CFR 541.202(b) lists a number of functions which can involve the exercise of discretion and independent judgment.  Now that we have

reviewed the duties of the IC's, it would be useful to compare them to the list in 541.202(b).

-IC's do not have authority to formulate, affect, interpret, or implement management policies or operating practices.  Their work has nothing to do with management policies or practices.

-they do not carry out major assignments in conducting the operations of the business. Rather, they are part of a team providing a product/service to customers.

-their work does not affect business operations to a substantial degree.  Their failures might cost the company money by disappointing or offending a client, but that does not signify that they use discretion and independent judgment (see 541.202 (f)).

-they do not have authority to commit the employer in matters that have significant financial impact.

-they do not have authority to waive or deviate from established policies and procedures without prior approval.

-they do not have authority to negotiate and bind the company on significant matters.

-they do not provide consultation or expert advice to management.

-they are not involved in planning long- or short-term business objectives.

-they do not investigate and resolve matters of significance on behalf of management.

-they do not represent the company in handling complaints, arbitrating disputes or resolving grievances.

Even if the IC's duties could be construed to meet one of these factors, and I contend they cannot, that would not be sufficient.  An October 26, 2006 Opinion Letter reminds us that:

> As the preamble to the final rule explained, federal courts generally conclude that employees who meet at least two or three of the indicators mentioned in 29 C.F.R. § 541.202(b) are exercising discretion and independent judgment, although a case-by-case analysis is required. *See* 69 Fed. Reg. at 22,143.

## OPINION LETTERS

Until quite recently, USDOL/WH would, from time to time, issue Administrator's Opinion Letters in response to questions from the public.   These letters expressed the opinions, interpretations, or enforcement positions of USDOL/WH with regard to specific matters.   There are very few opinion letters which deal with employees performing duties similar to those of the plaintiffs, and those there are do not analyze the specific issue of the exercise of discretion and independent judgment in great depth.

Nevertheless, I am aware of no instance in which the agency has found employees with duties similar to those of the plaintiffs to be exercising discretion and independent judgment, or to be exempt.

An October 26, 2006 Opinion Letter addressed the exempt status of an IT Support Specialist under both the administrative and computer professional exemptions. The letter stated that:

> …testing by various systematic routines to see that a particular…computer application is working properly according to the specifications designed by others are examples of work that lacks the requisite exercise of discretion and independent judgment within the meaning of the administrative exemption. Employees performing such activities are using skills and procedures or techniques acquired by special training or experience. Their duties do not involve, with respect to matters of significance, the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered as required by 29 C.F.R. § 541.202(a).

The letter also points out that a Sixth Circuit case held that (inter alia) configuring hardware and software is not an exempt function:

> See *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 581-84 (6th Cir. 2004) (IT Support Specialist responsible for installing and upgrading hardware and software, configuring desktop computers, and testing and troubleshooting equipment is not exempt as administrative employee under pre-2004 regulations because such work is not directly related to management policies or general business operations and is not of substantial importance to management or operation of the business)….

The October 26 letter also refers to an August 19, 1999 Opinion Letter.  That letter addresses employees with duties very similar to those of the plaintiffs:

> This is in response to your letter requesting an opinion regarding the application of the FLSA to individuals employed as customer training consultants (CTCs). You ask whether the CTCs would qualify as either exempt administrative employees or exempt computer professional employees.

> The CTCs are employed in your client's information management firm. The firm engages in, among other things, the installation of computer systems and customer training on the installed software. CTCs provide training to employees on customers' specialized computer software;

manipulate and modify software settings and specifications (e.g. toolbars and setup) to fit and respond to customer needs (does not include program writing or software developing); install, debug, troubleshoot, and convert data from old systems to the new conversions; test customers' moderns; and conduct customer follow-up visits to ensure customer satisfaction.

You state that CTCs are paid a salary of approximately $ 26,000 to $ 27,000. Some CTCs have bachelors' degrees in a business or technical discipline, and others have a strong industry, technical or business background.

Section 13(a)(1) of the FLSA provides a complete [*2]  minimum wage and overtime exemption for any employee employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in Regulations, 29 CFR Part 541 (copy enclosed). An employee may qualify for exemption if all the pertinent tests relating to duties, responsibilities and salary, as discussed in the appropriate section of the regulations, are met.

An employee who is paid on a salary or fee basis of at least $ 250 per week may qualify for exemption as a bona fide administrative employee if the employee's primary duty is office or nonmanual work directly related to management policies or general business operations of his/her employer or his/her employer's customers, and the employee's work requires the exercise of discretion and independent judgment.

Under section 541.205 of the regulations, activities that are "directly related to management policies or general business operations" of an employer are those relating to the administrative operations of a business. The exemption is limited to employees who perform work of substantial importance to the management or operation of the employer's business. The administrative operations of the business [*3]  include white collar employees engaged in servicing a business. Examples of such activity include advising the management, planning, negotiating, representing the company, and business research. The phrase "directly related to management policies or to general business operations" include those whose work affects policy or whose responsibility it is to carry it out. This includes employees who are advisory specialists and consultants of various kinds.

Based on the information in your letter, it is our opinion that the CTCs would not qualify as bona fide administrative employees. These individuals perform technical tasks, which do not constitute making or implementing policy, or the performance of management functions, necessary for the application of the exemption.

This letter, while it concludes that employees quite similar to plaintiffs are not exempt, bases its conclusion more explicitly on the previous regulations requirement that the primary duty of administrative employees be directly related to management policies or general business operations rather than the requirement for the exercise of discretion and independent judgment.  It is significant, of course, that it does not support the notion that the CTC's under discussion exercise discretion and independent judgment. Moreover, the October 26, 2006 letter cites this August 19, 1999 letter for a conclusion that IT Support Specialists don't exercise discretion and independent judgment:

> Their duties do not involve, with respect to matters of significance, the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered as required by 29 C.F.R. § 541.202(a). *See* Wage and Hour Opinion Letter August 19, 1999 (copy enclosed).

Thus the August 19, 1999 letter does support my opinion that duties such as those of the plaintiffs do not involve the exercise of discretion and independent judgment.

## CONCLUSIONS

Based on my education, training and experience, it is my opinion that the duties of the IC's did not involve the exercise of discretion and independent judgment.  Rather, they involved product knowledge, following prescribed policies, procedures, and guidelines, and the use of skill and experience.  While there were some variations in the duties of the plaintiffs, none of these differences were significant enough to prevent me from reaching the conclusion that all the plaintiffs whose depositions I read did not exercise discretion and independent judgment.  As a USDOL/WH investigator and supervisor, I routinely made decisions about whether the duties of a group of employees were sufficiently similar that I could reach a conclusion about the entire group, and in this case it is my conclusion that the duties of plaintiffs were sufficiently similar that I could conclude that they did not exercise discretion and independent judgment.

I am aware that there will be additional depositions and discovery in this case.  I therefore reserve the right to supplement and/or amend my report accordingly.

## COMPENSATION

I am billing $300 per hour for all work on this case other than testimony, plus reasonable expenses.  Testimony in deposition or in court will be billed at $350 per hour.

Dated:  September 13th, 2010

Brian T. Farrington

22