**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**


| | | |
|---|---|---|
| **PATTY BEALL, MATTHEW MAXWELL,** | § | |
| **DAVID GRAVLEY, TALINA MCELHANY,** | § | |
| **KELLY HAMPTON, CASEY BROWN,** | § | |
| **JASON BONNER, ANTHONY DODD,** | § | |
| **ILENE MEYERS, TOM O'HAVER,** | § | |
| **JOY BIBLES, AND MELISSA PASTOR,** | § | |
| **Individually and on behalf of all others** | § | |
| **similarly situated;** | § | |
| | § | |
| **Plaintiffs,** | § | **2:08-cv-422 TJW** |
| | § | |
| **TYLER TECHNOLOGIES, INC., AND** | § | |
| **EDP ENTERPRISES, INC.** | § | |
| **Defendants.** | § | |


**PLAINTIFFS' RESPONSE IN OPPOSITION TO
<u>DEFENDANT'S MOTION TO DECERTIFY</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................

      **1. INTRODUCTION AND LEGAL ARGUMENT**

    1. The Second Phase of an FLSA Collective Action:        Page 7
       Defendants Motion to Decertify

    2. ......................................................................................................................
  What is the Test at the Decertification Stage ...........................................................

    3. Regardless of the Stage of Litigation, "Similarly Situated"
       Under 29 U.S.C. §216(b) Does Not Mean "Identically Situated"
       and Only Requires Some Common Question of Law or Fact.....................................
      **2.**

    4. Only Relevant, Material Differences Between Plaintiffs
       Should be Considered in Assessing the Propriety of
       Collective Certification under §216(b) ......................................................

    5. ......................................................................................................................
  Members of One Subclass Should Not be Compared to the Members of
  Other Subclasses for the Purpose of Assessing the "Similarly Situated"
  Requirement ...........................................................................................Page 14

**II. PLAINTIFFS INDIVIDUAL CLASSES AND SUBCLASSES**

    1. The First Inquiry: The Employment Setting and Facts are Not Disparate amongst
       these Subclass Members        Page 15
      A. Implementation Class        Page 16
        i. All Plaintiffs Received the Same Training on a Subclass-by-Subclass
          Basis        Page 20
        ii. All Plaintiffs were Subject to Uniform Corporate Performance Evaluations
        iii. The MUNIS Subclass        Page 23
          **(1)** Business Process Review        Page 23
          **(2)** Data Conversion        Page 24
          **(3)** System Configuration        Page 24
          **(4)** Setting Agendas and Training Schedules        Page 25
          **(5)** Client Training        Page 26
          **(6)** Go-live Support & Post Go-live Support        Page 27
        iv. The EDEN Subclass        Page 29
          **(1)** Business Process Review        Page 29
          **(2)** Data Conversion and Review of Conversion Errors        Page 30
          **(3)** System Configuration and Reviewing for Configuration Errors Pg. 31

**(4)** Setting Agendas and Training Schedules      Page 31
**(5)** Client Training      Page 32
**(6)** Go-live Support & Post Go-live Support      Page 33
v.   The INCODE Subclass      Page 33
**(1)** Business Process Review      Page 34
**(2)** Data Conversion      Page 34
**(3)** Software Configuration      Page 34
**(4)** Client Training      Page 35
**(5)** Go-live Support and Post Go-live Support      Page 35
vi.   The ODYSSEY Subclass      Page 35
**(1)** Business Process Review      Page 36
**(2)** Data Conversion      Page 37
**(3)** Software Configuration      Page 37
**(4)** Client Training      Page 37
**(5)** Go-live Support & Post Go-live Support      Page 37
vii. The EAGLE Subclass      Page 37
viii.     The EDP Subclass      Page 38
2.   The Second Inquiry: Defendant's Claims are Uniform as to All Plaintiffs Page 40
A.   Various Defenses form Improper Grounds for Decertification      Page 41
B.   Defendant's Universal Assertion of §13(a)(1) Exemptions Warrant
Collective Treatment      Page 45
3.   The Third Inquiry: Fairness and Procedural Considerations Dictate Against
Decertification      Page 50
**III. ADDITIONAL OR ALTERNATIVE SUBCLASSES**      **Page 52**
**IV. CONCLUSION**      **Page 55**

# <u>TABLE OF AUTHORITIES</u>

## FEDERAL CASES

*Ahle v. Veracity Research Co.*,
    2010 WL 3463513 (D.Minn. 2010)                         Page 23, 46, 47, 51

*Ayers v. SGS Control Servs., Inc.*,
    2007 WL 646326 (S.D.N.Y. 2007)                       Page 11, 51, 55

*Bayles v. Am. Med.Response of Colo., Inc.*,
    950 F.Supp. 1053 (D.Colo. 1996)                       Page 10

*Bradford v. Bed Bath & Beyond, Inc.*,
    184 F.Supp.2d 1342 (N.D.Ga. 2002)                  Page 10, 14

*Chabrier v. Wilmington Fin., Inc.*,
    2008 WL 938872 (E.D.Pa. 2008)                      Page 9

*Church v. Consol. Freightways, Inc.*,
    137 F.R.D. 294 (N.D.Cal. 1991)                      Page 10

*Coan v. Nightingale Home Healthcare, Inc.*,
    2006 WL 1994772  (S.D.Ind. 2006)                   Page 55

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974)                             Page 41

*Crain v. Helmerich & Payne Int'l Drilling Co.*,
    1992 WL 91946 (E.D.La. 1992)                      Page 9, 10

*Damassia v. Duane Reade, Inc.*,
    2006 WL 2853971 (S.D.N.Y. 2006)                  Page 12

*Dolan v. Project Constr. Corp.*,
    725 F.2d. 1263 (10th Cir. 1984)                      Page 10

 *Falcon v. Starbucks Corp.*,
    580 F. Supp. 2d 528, 540 (S.D.Tex.2008)            Page 43

*Flavel v. Svedala Indus., Inc.*,
    875 F.Supp. 550 (E.D.Wis. 1994)                   Page 10

*Gandhi v. Dell Inc.*,
    2009 WL 1940144 (W.D.Tex. 2009)                  Page 9

*Glass v. IDS Fin. Servs., Inc.*,
    778 F.Supp. 1029 (D.Minn. 1991)                    Page 10, 41

*Gonzalez v. Ridgewood Landscaping, Inc.*,
    2010 WL 1903602 (S.D.Tex. 2010)                    Page 9

*Grayson v. K Mart Corp.*,
    79 F.3d 1086 (11th Cir. 1996)                       Page 9, 10

*H&R Block, Ltd. v. Housden*,
    186 F.R.D. 399 (E.D.Tex. 1999)                      Page 11

*Heagney v. European Am. Bank*,
    122 F.R.D. 125 (E.D.N.Y. 1988)                      Page 10

*Hill v. Muscogee County Sch. Dist.*,
    2005 WL 3526669 (M.D.Ga. 2005)                      Page 9, 10, 11, 43

*Hipp v. Liberty Nat'l Life Ins. Co.*,
    252 F.3d 1208 (11th Cir. 2001)                      Page 10, 11

*Hodgson v. The Klages Coal & Ice Co.*,
    435 F.2d. 377 (6th Cir. 1970)                       Page 41

*Hoffman-La Roche Inc. v. Sperling*,
    493 U.S. 165 (1989)                                 Page 14

*Hyman v. First Union Corp.*,
    982 F.Supp. 1 (D.C.D.C. 1997)                       Page 11

*Indergit v. Rite Aid Corp.*
    2010 WL 2465488 (S.D.N.Y. 2010)                     Page 46

*Jackson v. N.Y. Tel. Co.*,
    163 F.R.D. 429 (S.D.N.Y. 1995)                      Page 10

*Johnson v. Big Lots Stores, Inc.*,
    561 F.Supp.2d 567 (E.D.La. 2008)                    Page 9

*Johnson v. TGF Precision Haircutters, Inc.*,
    2005 WL 1994286 (S.D.Tex. 2005)                     Page 51, 53

*Jomokenyatta-Bean v. Hous. Auth.*,
    2006 WL 3193773 (E.D.La. 2006)                      Page 8

*Kreher v. City of Atlanta*,
    2006 WL 739572 (N.D.Ga. 2006)                Page 10

*LaChapelle v. Owens-Illinois, Inc.*,
    513 F.2d 286 (5th Cir. 1975)                Page 10

*Lusardi v. Xerox Corp.*,
    118 F.R.D. 351 (D.N.J. 1987)                Page 11

*Maynor v. DOW Chem. Co.*,
    2008 WL 2220394 (S.D.Tex. 2008)           Page 11, 43

*Mooney v. Aramco Servs. Co.*,
    54 F.3d 1207 (5th Cir. 1995)                Page 11

*Moss v. Crawford &Co.*,
    201 F.R.D. 398 (W.D.Pa. 2000)       Page 5, 11, 14, 40, 45, 51

*Nerland v. Caribou Coffee Co.*,
    564 F.Supp.2d 1010 (D.Minn. 2007)     Page 14, 23, 43, 47, 50, 52

*Prater v. Commerce Equities Mgmt. Co., Inc.*,
    2007 WL 4146714 (S.D.Tex. 2007)          Page 9, 11

*Proctor v. Allsups Convenience Stores, Inc.*,
    250 F.R.D. 278 (N.D.Tex. 2008)            Page 9

*Reyes v. Tex. EZPawn, L.P.*,
    2007 WL 101808 (S.D.Tex. 2007)         Page 9, 45, 53

*Rodolico v. Unisys Corp.*,
    199 F.R.D. 468 (E.D.N.Y. 2001)            Page 10

*Scott v. Aetna Servs., Inc.*,
    210 F.R.D. 261 (D.Conn. 2002)        Page 8, 11, 13, 55

*Smith v. Offshore Specialty Fabricators Inc.*,
    2009 WL 2046159 (E.D.La. 2009)            Page 9

*Stone v. First Union Corp.*,
    203 F.R.D. 532 (S.D.Fla. 2001)            Page 10

*Takacs v. Hans Auto. Corp.*,
    1999 WL 33127976  (S.D.Ohio 1999)          Page 55

*Thiessen v. Gen. Elec. Corp.*,
    267 F.3d 1095 (10th Cir. 2001)            Page 55

*Thiebes v. Wal-Mart Stores, Inc.*,
    1999 WL 1081357 (D.Or. 1999)           Page 55

*Whiteway v. Fedex Kinko's Office & Print Servs., Inc.*,
    2006 WL 2642528 (N.D.Cal. 2006)        Page 16

*Wilks v. Pep Boys*,
    2006 WL 2821700 (M.D.Tenn. 2006)       Page 12, 52

*Wilks v. Pep Boys*,
    2006 U.S. Dist. LEXIS 39537 (M.D.Tenn. 2006)     Page 12, 52

*Williams v. Bally's La., Inc.*,
    2006 WL 1235904 (E.D.La. 2006)        Page 8

*Woods v. N.Y. Life Ins. Co.*,
    686 F.2d 578 (7th Cir. 1982)           Page 10

**I.**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

On June 23, 2009, this Honorable Court conditionally certified this litigation as a collective action pursuant to §216(b) of the Fair Labor Standards Act ("FLSA").[1]  Since then, the parties have engaged in extensive discovery, including the depositions of all named Plaintiffs, almost all of the opt-in plaintiffs and the Defendants' designated corporate representatives.  The parties have sought court approval of a settlement proposal for the Plaintiffs in all other job positions leaving only the plaintiffs that hold/held the implementation consultant/specialist and trainer positions.   Additionally, Plaintiffs amended their complaint to create classes and subclasses including the sub-classing of the implementers by software division, to address any potential issues regarding slight variances in how the various software divisions implemented their software.  The remaining Plaintiffs implemented software from the following divisions of Tyler Technologies: MUNIS; EDEN, INCODE; EAGLE, EDP; ODYSSEY.

Defendants' Motion to Decertify this collective action focuses on the slight job differences between the Tyler divisions and several irrelevant arguments in hope of diverting the court's attention from the inescapable conclusion that the **relevant** employment and factual settings are the same for all the Plaintiffs that hold/held the position of implementation specialist/consultant within their particular class and subclass.  Defendants' allegations of individualized defenses are without merit and fairness and procedural considerations weigh against decertification.  For the reasons that follow, Defendants' sole legal defenses—the applicability of the administrative exemption and computer professional exemption, can be determined in a concise and efficient

---

[1] [1] *See Docket Entry No. 37,*  Mem. Op. and Order of June 23, 2009.

manner through representative testimony on a class by class basis, thus achieving a uniform result and conserving the resources of both the judicial system and the parties.

## 1. THE SECOND PHASE OF AN FLSA COLLECTIVE ACTION: THE DEFENDANTS' MOTION TO DECERTIFY

Generally, after discovery is complete, a defendant may move to decertify a FLSA collective action.[2]  At this second stage of a collective action, the court conducts a more detailed review of the facts produced in discovery to determine if the named plaintiffs and those who actually opted into the case are 'similarly situated' as envisaged by §216(b) of the FLSA.[3]  If the court concludes that the plaintiffs are similarly situated, the motion to decertify must be denied. If the court concludes that the plaintiffs are not similarly situated, the matter is either decertified or broken into subclasses for trial.  In the present case, Plaintiffs have already taken the good faith step of breaking the cause into separate and distinct classes and subclasses of similarly situated individuals in order that the case may proceed as efficiently and as fairly as possible.[4]  It is generally the named plaintiffs' burden to prove "similarly situated" status under the FLSA in response to a motion to decertify.[5]

## 2. THE "SIMILARLY SITUATED" TEST AT THE DECERTIFICATION STAGE

Although the Fifth Circuit Court of Appeals has expressly refrained from defining what "similarly situated" means under 29 U.S.C. §216(b) or articulating what factors should be considered in analyzing certification of a collective action,[6] district courts within the Fifth Circuit have consistently considered three factors at the second stage of certification, these being:

---

[2] *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995); *see also Williams v. Bally's La., Inc.*, 2006 WL 1235904, at *2 (E.D.La. 2006).
[3] *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261 (D.Conn. 2002).
[4] *See Docket Entry No. 143,* Pls.' Second Am. Collective Action Compl.
[5] *Scott v. Aetna Servs., Inc.*, 210 F.R.D. at 264; *but compare JomoKenyatta-Bean v. Hous. Auth.*, 2006 WL 3193773 (E.D.La. 2006) (wherein Judge Lemmon denied a Motion to Decertify, stating "… HANO [the employer] has offered no evidence to indicate that the qualities underlying the conditional certification are no longer present in this action," thus suggesting that the burden of proof at the decertification stage is on movant/employer).
[6] *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995)

(1) the factual and employment settings of the employee plaintiffs; (2) the various defenses available to the defendant that may be individual to each plaintiff; and (3) fairness and procedural considerations.[7]   Although these factors provide guidance as to *what* the court should look at, they shed no light on what level of commonality §216(b) requires for certification to be proper, what weight the court should give to the similarities and differences between plaintiffs revealed during discovery, or how the analysis should be conducted when the plaintiffs' collective action has been delineated into separate subclasses.   These questions warrant some discussion and applying the relevant analysis herein clearly illustrates that the Defendants' Motion to Decertify should be denied.

3.   REGARDLESS OF THE STAGE OF THE LITIGATION, "SIMILARLY SITUATED" UNDER 29 U.S.C. §216(B) DOES NOT MEAN "IDENTICALLY SITUATED" AND ONLY REQUIRES SOME COMMON QUESTIONS OF LAW OR FACT

Courts in Texas and throughout the nation have consistently stated that plaintiffs asserting a claim under the FLSA, regardless of its nature, do not have to show that the named plaintiffs and collective action members are identically situated.[8]   In *Crain v. Helmerich & Payne Int'l Drilling Co.*, Judge Feldman granted a motion to certify a collective action writing, in part:

> Similarly situated does not mean identically situated.   Rather, an FLSA class determination is appropriate where there is a "demonstrated *similarity* among the individual situations [and]… *some* factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged

---

[7] *See id.* at 1215 (quoting district court's analysis); *Gandhi v. Dell, Inc.*, 2009 WL 1940144, at *3 (W.D.Tex. 2009); *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D.Tex. 2008); *Reyes v. Tex.EZPawn, L.P.*, 2007 WL 101808, at *2 (S.D.Tex. 2007).

[8] *Gonzalez v. Ridgewood Landscaping, Inc.*, 2010 WL 1903602,  at *7 (S.D.Tex. 2010); *Gandhi v. Dell Inc.*, 2009 WL 1940144, at *5 (W.D.Tex. 2009); *Prater v. Commerce Equities Mgmt. Co., Inc.*, 2007 WL 4146714, at *6 (S.D.Tex. 2007); *Smith v. Offshore Specialty Fabricators Inc.*, 2009 WL 2046159, at *3 (E.D.La. 2009); *Johnson v. Big Lots Stores, Inc.*, 561 F.Supp.2d 567, 574 (E.D.La 2008); *Crain v. Helmerich & Payne Int'l Drilling Co.*, 1992 WL 91946, at *2 (E.D.La. 1992); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996); *Chabrier v. Wilmington Fin., Inc.*, 2008 WL 938872, at *3 (E.D.Pa. 2008); *Hill v. Muscogee County Sch. Dist.*, 2005 WL 3526669, at *2 (M.D.Ga. 2005).

[policy or practice]."  Thus a court can foreclose a plaintiff's right to proceed collectively only if "the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice."[9]

Although the plaintiffs have the burden of proving that they are similarly situated in response to a motion to decertify, the "burden is not heavy."[10]  Indeed, as the court noted in *Grayson v. K-Mart Corp.*, "the similarly situated requirement of §216(b) [at the decertification stage], is more elastic and less stringent than the requirements found in Rule 20 [joinder] and Rule 42 [severance]."[11]  Furthermore, most courts have determined that the burden under §216(b), regardless of the claim brought, is either inapposite to or less severe than the requirements for class certification under Rule 23(a).[12]  As the court noted in *Stone v. First Union Corp.*, the "'similarly situated' requirement [of §216(b)]… does not require that all questions of law or fact be common; it is enough if *some* questions of law or fact are common to all parties, even if those questions do not predominate."[13]

The same conclusion, that "similarly situated" does not mean "identically situated," is also applicable at the second stage of review, wherein the defendant files their motion to

---

[9] *Crain*, 1992 WL 91946, at *2 (E.D.La. 1992)(emphasis added).

[10] *Hill v. Muscogee County Sch. Dist.*, 2005 WL 3526669, at *2 (M.D.Ga. 2005)

[11] *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996); *see also Kreher v. City of Atlanta*, 2006 WL 739572, n. 11 (N.D.Ga. 2006); *Hill v. Muscogee County*, 2005 WL 3526669, at *2; *Bradford v. Bed Bath & Beyond, Inc.*, 184 F.Supp.2d 1342, 1345 (N.D.Ga. 2002).

[12] *See generally Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1216-17 (11th Cir. 2001)(describing the fundamental difference between Rule 23 and §216(b) in the context of an ADEA claim); *see also Dolan v. Project Constr. Corp.*, 725 F.2d 1263, 1266 (10th Cir. 1984); *see also Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 580 (7th Cir. 1982); *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 481 (D.C.N.Y. 2001); *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F.Supp. 1053, 1059 (D.Colo. 1996); *Jackson v. N.Y. Tel. Co.*, 163 F.R.D. 429, 431-32 (D.C.N.Y. 1995); *Flavel v. Svedala Indus., Inc.*, 875 F.Supp. 550, 553 (D.C.Wis. 1994); *Glass v. IDS Fin. Servs., Inc.*, 778 F.Supp. 1029, 1042 (D.Minn. 1991); *Church v. Consol. Freightways, Inc.*, 137 F.R.D. 294, 306 (N.D.Cal. 1991); Fed. R. Civ. P. 23(a) (requiring that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.).

[13] *Stone v. First Union Corp.*, 203 F.R.D. 532, 541 (S.D.Fla. 2001); *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127, n.2 (E.D.N.Y. 1988) ("the 'similarly situated' requirement of 29 U.S.C. §216(b) is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate'"); these cases conform with the Fifth Circuit's language that Fed. R. Civ. P. 23 class actions and §216(b) collective actions are "mutually exclusive and irreconcilable."  *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 289 (5th Cir. 1975).

decertify.[14]   While the second stage of review is "more stringent," this is only in regards to the

plaintiff's burden of production; the level of commonality required for conditional certification is

the same as that required for surviving a defendant's decertification motion.  At the notice stage

of certification, courts only require plaintiffs to make "substantial allegations" based on the

pleadings or affidavits that they are "similarly situated" to the potential members of the putative

collective action.[15]   The reason for this fairly lenient burden of production arises from the fact

that there is minimal evidence at the preliminary stage of review; not all of the potential plaintiffs

have been identified, those potential plaintiffs have not been sent notice, it is unclear which

potential plaintiffs will opt in and which will not, and little or no discovery has generally taken

place.[16]   The second stage typically occurs when discovery is largely complete and there is

sufficient evidence for the court to make a factual determination as to whether there are similarly

situated employees.[17]   At the end of the day, the question posed at both stages is the same: have

the plaintiffs established that they are "similarly situated" by showing some common questions

of law or fact.

4.   ONLY RELEVANT, MATERIAL DIFFERENCES BETWEEN PLAINTIFFS SHOULD BE
     CONSIDERED IN ASSESSING THE PROPRIETY OF COLLECTIVE CERTIFICATION UNDER
     §216(B)

    Requiring plaintiffs to show that they are identically situated would effectively write the

collective action provision of §216(b) out of existence.  This very scenario was addressed by the

_____

[14] *Hill v. Muscogee County Sch. Dist.*, 2005 WL 3526669, at *2 (M.D.Ga. 2005); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1217, 1219 (11th Cir. 2001); *Moss v. Crawford & Co.*, 201 F.R.D. 398 (W.D.Pa. 2000); *Ayers v. SGS Control Servs.*, 2007 WL 646326, at *5 (S.D.N.Y. 2007); *Hyman v. First Union Corp.*, 982 F.Supp. 1, 7 (D.C.D.C. 1997); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261 (D.Conn. 2002).
[15] *H & R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D.Tex. 1999).
[16] *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1998); *Maynor v. Dow Chem. Co.*, 2008 WL 2220394, at *5 (S.D.Tex. 2008).
[17] *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J. 1987); *Prater v. Commerce Equities Mgmt. Co., Inc.*, 2007 WL 4146714, at *3 (S.D.Tex. 2007).

court in *Damassia v. Duane Reade* in the context of a claim that a particular job position was misclassified as exempt, like the Plaintiffs' claims herein.  In that case, the court stated:

> Defendant also points to evidence in plaintiffs' deposition testimony that trucks made deliveries during some of plaintiffs' shifts but not during other plaintiffs' shifts; that some plaintiffs took breaks more often than others; that some plaintiffs had the authority to arrange store displays, while others did not; and that there was variation among the stores at which plaintiffs worked with respect to the stores' location, their layout, their hours of operation, the amount of customer traffic, the amount of office space, the number of "RF guns" used for inventory, the amount of money in the safe, the location of cigarette cartons, and the frequency with which outside cleaning crews visited the store. Such differences are hardly relevant to whether plaintiffs and potential opt-in plaintiffs were common victims of an illegal application of the "bona fide executive" exemption to overtime compensation requirements.  ***On defendant's logic, no group of opt-in plaintiffs would ever be "similarly situated" unless they were clones of one another working in completely identical stores, in identical neighborhoods, with identical clientele.*** [18]

The *Damassia* court properly points out that an inquiry into the propriety of §216(b) certification cannot demand universal commonality and that the analysis must turn solely on relevant, material differences.[19]  Under the "similarly situated" analysis, therefore, the Court is posited with only three questions.  First, what are the differences between the representative plaintiffs and the opt-in plaintiffs (and, undoubtedly, some exist as must be the case where any two or more people are compared against one another).  Second, is the nature of the differences such that they relate to the merits of the plaintiffs' or defendant's case.  If any divergence between the representative Plaintiffs and opt-in Plaintiffs does not relate to the merits of the parties' claims, that divergence must be ignored.  Third, are the relevant differences of such great

---

[18] *Damassia v. Duane Reade*, 2006 WL 2853971, at *6 (S.D.N.Y. 2006)(emphasis added).
[19] *See also Wilks v. Pep Boys*, 2006 U.S. Dist. LEXIS 39537, at *19 (M.D.Tenn. 2006) ("defendants cannot defeat a §216(b) [collective action] simply by pointing out all the ways in which plaintiff's exact day-to-day tasks differ from those of the opt-in plaintiffs; instead, defendants must show that plaintiffs are not similarly situated *in ways relevant* to their entitlement to overtime compensation under FLSA….") (emphasis in original).

magnitude that there exist no common questions of law or fact which may be adjudicated collectively.[20]

Defendants argue, however, that collective adjudication of Plaintiffs' claims must be denied because "the fact intensive nature of misclassification cases make them particularly unsuitable for collective action treatment"[21] and because of the "fact intensive, individualized nature of assessing job functions in an FLSA misclassification case…."[22]   In summarizing the case law on this point, the court in *Scott v. Aetna Servs., Inc.* wrote:

> …several courts have held that it is appropriate to bring an FLSA exemption claim[23] as a class action with regard to employees who perform similar, but not identical duties, notwithstanding the highly fact-specific nature of the exemption inquiry.[24]

In *Scott v. Aetna Servs.*, the court denied decertification in a substantially similar case involving a group of Systems Engineers whose job duties included implementation.[25]

> …[T]he "plaintiffs have established that their claims may be supported by generalized proof. The record evidence suggests that the actual job duties of the plaintiffs are quite similar. Each "Systems Engineer" with the 504* 14 and 504* 16 job codes, "installs, implements, and supports large scale and mid-range technologies (hardware/software) that enables Aetna to meet its internal computer service requirements." ...Several potential class members have testified that the work performed by Aetna's Systems Engineers concerned, in general terms, "specific computer platforms that support the electronic services provided to its customers." …As well, Aetna classifies the employment of the plaintiffs in a single job category, i.e., "Systems Engineer," lists the job duties of the Systems Engineers in one document – the "Matrix" – and applies a blanket overtime exemption policy to such engineers. Accordingly, the job duties of the Systems Engineers may be established by generalized proof for purposes of the FLSA and CMWA analyses.  As well, Aetna correctly notes

---

[20] *See supra* Part I.3.
[21] Def's Mot. to Decertify, at 1.
[22] *Id.* at 4.
[23] This is precisely what Plaintiffs herein are doing; challenging the legitimacy of the uniform application of the administrative exemption to their respective positions.
[24] *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 265 (D.Conn. 2002).
[25] *Scott*, 210 F.R.D. at 265.

> that the deposition testimony of the named plaintiffs and proposed class members indicates that each Systems Engineer spends his or her time on somewhat different specific assignments, this does not refute the conclusion that job duties of the plaintiffs and "opt-in" plaintiffs are the same type. The "exemption" analysis does not require a more narrow inquiry into the job duties of an employee.[26]

Similar to Aetna the plaintiffs herein perform the same job duties.[27]

While Defendant would have the court believe that certification of a collective action involving misclassification or the application of the administrative exemption is legally impossible, that is incorrect.   In addition to *Scott v. Aetna*, multiple courts have denied decertification in similar cases.[28]

Indeed, crediting Defendants' argument defeats the purpose of the FLSA.  The FLSA envisions a collective action process in which claims of similarly situated workers are adjudicated collectively rather than individually.[29]   Under Defendants' logic, no FLSA action that is premised upon an alleged misclassification under any exemption could be resolved through the collective action process, thereby destroying the collective action provision of the FLSA and wasting judicial resources by requiring courts to consider each individual plaintiff's claims in a separate lawsuit in any and every case involving a misclassification claim.

5. **MEMBERS OF ONE SUBCLASS SHOULD NOT BE COMPARED TO THE MEMBERS OF OTHER SUBCLASSES FOR THE PURPOSE OF ASSESSING THE "SIMILARLY SITUATED" REQUIREMENT**

---

[26] *Id.* at 265.

[27] *See infra* Part II.1.A.

[28] See, *Nerland v. Caribou Coffee Co.*, 564 F.Supp.2d 1010, 1025-26 (D.Minn.2007)(denying defendant's motion to decertify a collective action at the second stage of review in a misclassification case).  *Bradford v. Bed, Bath & Beyond,* 184 F. Supp. 2d 1342, 1347 (N.D. Ga. 2002) (refusing to decertify Section 216(b) class because "plaintiffs' job duties, while not identical, were very similar" and defendant's "store within a store" approach did not "result[ ] in many practical differences among the stores"); *Moss v. Crawford*, 201 F.R.D. 398, 409 (W.D. PA 2000) (refusing to decertify Section 216(b) class of monitors, insurance adjusters and invoice reviewers despite defendant's arguments concerning differences in potential plaintiff's job duties, geographic assignments and hourly billing rates); *Pendlebury v. Starbuck's Coffee Co*., 518 F. Supp. 2d 1345 (S.D Fla. 2007)

[29] *See, e.g., Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (noting that the purpose of a collective action is to "allow…plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources").

Defendants hope to convince the court that the class members are not 'similarly situated' under §216(b) by comparing the named and opt-in plaintiffs from different divisions within the company.[30]  Defendants assert that there are dissimilarities that exist between plaintiffs because they worked at different divisions or because they supported different software while maintaining that "the reasons for the differences are not controlling."[31]  To avoid any potential unfairness that might result from differences in job duties between the five divisions of Tyler Technologies and EDP employees Plaintiffs have amended their Complaint seeking to subclass the Implementation Plaintiffs by software division.

Plaintiffs will demonstrate in this Response that the class members within each of the discrete subclasses are similarly situated thus making it appropriate to continue this collective action.

## II.

## PLAINTIFFS' INDIVIDUAL CLASSES AND SUBCLASSES

### 1. THE FIRST INQUIRY: THE EMPLOYMENT SETTINGS AND FACTS ARE NOT DISPARATE AMONGST SUBCLASS MEMBERS

In assessing the employment settings of the individual plaintiffs, the court "…assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary."    No one factor, however, is dispositive and differences in geographic locations, certain job duties or even billing

---

[30] *See* Def's Mot. to Decertify, at 6-7 (comparing the members of the 'client liaison' subclass to all members of every other subclass); *see also id.* at 11-13 (comparing the amount of time members of the MUNIS, INCODE, EDP, and ODYSSEY subclasses spent performing particular); *see also id.* at 13-15 (comparing MUNIS, INCODE, EDEN, and the other software subclasses with each other in regards to their job functions); *see also id.* at 15-16 (comparing the software configuration functions of implementation employees within the EDEN, ODYSSEY, MUNIS, and INCODE subclasses); *see also id.* at 17-18 (comparing the systems analysis functions of implementation employees within the EDEN, ODYSSEY, INCODE, and MUNIS subclasses); *see also id.* at 18-19 (comparing the agenda and scheduling functions of implementation employees within the MUNIS, INCODE, EDEN, ODYSSEY subclasses); *see also id.* at 19 (comparing the support functions of implementation employees within the MUNIS, INCODE, and EDEN subclasses); *see also id.* at 20-23 (asserting that the testimony of two MUNIS subclass members, an INCODE subclass member, and the *only* EAGLE subclass member justifies decertification of the entire action).
[31] *Id.* at 1-2.

rates will not support decertification.[32]   The ultimate inquiry is whether the plaintiffs are "similarly situated" enough to justify collective treatment in light of the remedial nature of the FLSA.

As the court noted in *Whiteway v. Fedex Kinko's Off. & Print Servs., Inc.*:

> The court agrees that CM's share similar job duties and responsibilities regardless of center type.  Even assuming there are some variations among the daily tasks performed by CM's, as defendant alleges, ***the similarities create common questions as to whether CMs are properly classified as executive exempt***.[33]

In the present case, the employment and factual settings are the same as to each respective subclass because only one job is at issue in each subclass, only two exemptions are at issue in the entire case, and because the Plaintiffs in their respective subclasses all have the same (1) training; (2) are subject to uniform performance evaluations; (3) job duties; (4) are paid in the same manner; and (5) are subject to the same corporate and division policies.  A review of the relevant elements of the employment and factual settings reflect that Defendant's Motion to Decertify should be denied.

### A.  THE IMPLEMENTATION CLASS

The implementation class consists of individuals who are or were employed by Defendants as an "implementation specialist" or "implementation consultant" at any time since July 13, 2006, and is broken down into six subclasses.[34]   Every implementation specialist and consultant in each of the respective subclasses shared the same training, was subject to uniform evaluations, possessed the same job duties, and undertook the same tasks.

---

[32] *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D.Pa. 2000)(noting that "variations in the plaintiffs' duties, job locations, and hourly billing rates do not differentiate the collective basis of the class to the extent that it defeats the primary objectives of a 216(b) class action.").

[33] *Whiteway v. Fedex Kinko's Office & Print Servs., Inc.*, 2006 WL 2642528, at *5 (N.D.Cal. 2006).

[34] There is no functional difference between individuals based on their title as an "implementation specialist" or as "implementation consultant," as they perform essentially the same job functions.  *See* Exhibit No. "1", Sansone Dep. pp. 28:2-24.

### 1. THE GENERAL PROCESS OF IMPLEMENTATION IS UNDISPUTED

In order to properly evaluate the similar nature of Plaintiffs' factual and employment settings a basic understanding of the implementation process is essential.  It is undisputed that no matter what Division's software is being implemented the basic implementation process is identical for all divisions of Tyler Technologies.   Indeed, even Defendant's corporate representative, Chris Hepburn, President of Tyler's Schools Division,[35] testified to six primary duties implementation employees working for Tyler would perform: (1) a review of customer's current business processes; (2) data conversion and reviewing converted data; (3) software configuration and reviewing the configuration for errors; (4) training; (5) go-live assistance; and (6) post go-live support.[36]  These duties are typically performed in this order, save that reviewing the software configuration and converted data could take place throughout the implementation process.   Additionally, it is also important to understand that each implementation is overseen by a project manager who dictates when, where and how the implementer is to perform his/her job.[37]  Although the implementer is often at the client site alone, the parameters of what the implementer is supposed to do have been pre-determined by the project manager.[38]   The following brief description of each of the essential elements of an implementation is instructive:

### (1) Review of Customer's Current Business Processes

Business process review is the process of meeting with the client and reviewing their current business processes in order to determine how Tyler's software will need to be set up/configured or customized to fit the customer's processes.[39]  Mr. Hepburn described this

---

[35] *See* Exhibit No. "2", Hepburn Dep. 46:5-7
[36] *See* Exhibit No. "2", Hepburn Dep. 20:11-21:5.
[37] *See infra* Part II.1.A.iii.(4); *see also infra* Part II.1.A.iv.(4).
[38] *See supra* note 37.
[39] *See infra* Part II.1.A.iii.(1) (business process review as testified to by the Munis subclass members); *see also infra* Part II.1.A.iv.(1) (business process review as testified to by the EDEN subclass members), *see also infra* Part

process as consultation with the client wherein one of Defendants' employees would ask questions to determine what the client's current software did and what the client would like the new software to do.[40]

It is important to understand that the Tyler Technologies software programs are "canned" "out of the box" programs with various options built into the programs which can be turned on or off as needed to suit the client's preferences.[41]  In other words the MUNIS payroll software is the same whether it is being implemented by Ilene Meyers in the Virgin Islands or Travis Void in Raleigh, North Carolina.   The client in the Virgin Islands may want to set up payroll checks on a weekly basis and the client in Raleigh may want to select the option of bi-weekly payroll checks.  The **process** is identical for each implementer, i.e. turning on the options chosen by the client within the software modules.[42]

### (2)   Conversion

Conversion is the process where the client's existing data (i.e. employee names, social security numbers, client names etc.) is converted to a format that can be read by the Tyler software.[43]   The process involves the loading of conversion software by the conversion department or programmers and the software converts the client's existing data into a new format.  The **only** role that some implementers are involved with in the conversion process is the review of conversion reports that are generated once the conversion software has attempted to convert all the data.[44]   The reports identify data that has not properly converted.   The

---

II.1.A.v.(1) (business process review as testified to by the INCODE subclass members); *see also infra* Part II.1.A.vi.(1) (business process review as testified to by the ODYSSEY subclass members).
[40] *See* Exhibit No. "2", Hepburn Dep. 21:8-28:19.
[41] *See supra* note 39.
[42] When there are occasions that the software cannot perform what the client wants the implementer simply communicates the request to their project manager or  the software programmers so they can determine whether a custom software program can be written for the client's particular need.
[43] *See infra* Part II.1.A.iii.(2).
[44] *See id.*; *see also infra* Part II.1.A.iv.(2); *see also infra* Part II.1.A.v.(2); *see also infra* Part II.1.A.vi.(2).

implementer identifies these errors and notifies the programmers and/or assists the client in correcting the way their existing data is entered so that the conversion software can read and convert it.[45]   The implementers do not write conversion software, they do not load conversion software and they do not determine how the conversion is to be performed.[46]

### (3)   Configuration

Configuration is the process in which the implementer sets up the software according to the client's preferences as determined in the business process review.[47]   (See payroll example above).  Footnote *Supra* Part II.1.A.(1).

### (4)   Training

The training process is identical for all implementers.[48]   It is simply instructing the client's employees how to use the software.[49]   The implementers primarily use the screen shots from the software and simply walk the employees through each step in the process.[50]

### (5)   Go Live

Go Live is the process where the client begins using the software in its operations.[51]   The role of all implementers in this process is identical.[52]   The implementer is on site to answer questions, re-train if necessary and address glitches if they occur.[53]

### (6)   Post go live support

---

[45] *See supra* note 44.
[46] *See supra* note 44.
[47] *See infra* Part II.1.A.iii.(3); *see also infra* Part II.1.A.iv.(3); *see also infra* Part II.1.A.v.(3); *see also infra* Part II.1.A.vi.(3).
[48] *See infra* Part II.1.A.iii.(5); *see also infra* Part II.1.A.iv.(5); *see also infra* Part II.1.A.v.(4); *see also infra* Part II.1.A.vi.(4).
[49] *See supra* note 48.
[50] *See supra* note 48.
[51] *See infra* Part II.1.A.iii.(6); *see also infra* Part II.1.A.iv.(6); *see also infra* Part II.1.A.v.(5); *see also infra* Part II.1.A.vi.(5).
[52] *See supra* note 51.
[53] *See supra* note 51.

Post go live support is simply answering questions, in other words more training.[54]   The client may have forgotten the sequence of entering information in order to print checks and the implementer merely goes over the steps of the process and walks the client through it, usually over the phone.[55]   While the Defendant attempts to create a difference in job duties by pointing to the fact that some implementers perform follow up support and others do not,[56] it is simply irrelevant.[57]   Post live support is nothing more than continued training that all implementers perform, it is simply occurring after go live instead of before go live.[58]   Additionally, post live support is usually very limited amounting to a de minimis job duty at best.[59] Thus it can hardly be a basis for creating dissimilarities between the class members.[60]

     As Defendant points out, there is some slight variance between divisions regarding which of these duties implementation employees would engage in.  These differences, contrary to Defendant's assertion, however, are immaterial.  Even if the court were to determine that differences exist between Tyler's different divisions, sub classing by division addresses any such concerns.  As set forth in detail below the employment and factual settings within each of the six subclasses are nearly identical.   Thus, differences based on division or software applications, which form the lion's share of Defendant's Motion to Decertify, are completely irrelevant.

> **ii.  ALL PLAINTIFFS RECEIVED THE SAME TRAINING ON A SUBCLASS-BY-SUBCLASS BASIS**

Mr. Hepburn testified regarding the training implementation employees received from Defendant.[61]   As Mr. Hepburn admitted, all Plaintiffs classified by Defendant as implementation

---

[54] *See supra* note 51.
[55] *See supra* note 51.
[56] *See* Def's Mot. to Decertify, at 19, n. 106.
[57] *See infra* Part II.1.A.iii.(6).
[58] *See supra* note 51.
[59] *See infra* note 110.
[60] *See infra* Part II.1.A.iii.(6).
[61] *See* Exhibit No. "2", Hepburn Dep. 141:20-146:11.

specialists and implementation consultants were subject to the same training undertaken in the same fashion.[62]   Indeed, the only consistent difference between the training received by an implementation employee in one class and those of any other class is the length of time that training occurred and the level of formality.[63]   This training, regardless of division or software serviced, consisted of three components: (1) self-led instruction; (2) peer-led instruction; and (3) shadowing other implementation employees as they conducted their day-to-day duties.[64]

For self-led instruction, all Plaintiffs would be provided with manuals and information prepared by the company containing information on how the respective software serviced by any particular division worked; Plaintiffs would thereafter read through these manuals to acquaint themselves with the software and practiced with the programs on the computer.[65]   Shadowing, as aforementioned, consisted of following other implementation specialists or consultants to client sites in order to observe the day-to-day activities they would be expected to perform.[66]

The level of formality with which training would be given was uniform within each division, and, therefore, within each subclass.[67]   For the EDEN division, for example, the training process was informal, with greater emphasis on self-led instruction and on the shadowing of other employees.[68]   Training at MUNIS was "semi-formal," similar to INCODE and EDP.[69]  At the most formal was Courts and Justice, which serviced the ODYSSEY software package, where implementation specialists and implementation consultants were trained by a training coordinator with classes and examinations.[70]   The time over which implementation

---

[62] *See id.*
[63] *See id.*
[64] *See id.* at 142:7-10; *See* Exhibit No. "3", Ingram Dep. 30:21-31:7; *See* Exhibit No. "4", Maynard Dep. 88:1-12;
[65] *See* Exhibit No. "3", Ingram Dep. 30:21-31:2.
[66] *See* Exhibit No. "3", Ingram Dep. 31:3-7.
[67] *See* Exhibit No. "2", Hepburn Dep. 141:20-146:11.
[68] *See* Exhibit No. "2", Hepburn Dep. 142:16-19.
[69] *See* Exhibit No. "2", Hepburn Dep. 141:25, 142:24, 145:11.
[70] *See* Exhibit No. "2", Hepburn Dep. 143:17-144:6.

employees would be trained was also set on a division-by-division basis, ranging from the low

end at 60 days at EDEN and INCODE and up to six months for ODYSSEY.[71]

The only Plaintiffs to which this overarching corporate or division training model does

not apply are the members of the EDP subclass because they were employed by EDP prior to it

becoming a subsidiary of Tyler Technology.  All the members of this subclass, however, are

similarly situated in regards to their subclass; they all worked out of the same office in

Longview, Texas,[72] and received similar training relating to their pertinent employment.[73]

Thus, the training undergone by all Plaintiffs is subject to uniform determination on a

subclass-by-subclass basis and is one factor weighing in favor of continued collective treatment.

### iii.   ALL PLAINTIFFS ARE SUBJECT TO UNIFORM CORPORATE PERFORMANCE EVALUATIONS

Mr. Hepburn testified that all implementation specialists and implementation consultants

employed by Defendants are evaluated using uniform standards and criteria established by

Defendants' corporate human resources department.[74]   This further illustrates the precarious

position that Defendants have adopted in regards to their Motion to Decertify.  On the one hand,

Defendants asserts that Plaintiffs are not similarly situated while at the same time treating all

implementation specialists and implementation consultants the same by reviewing their

performance using the exact same standards and criteria.[75]

---

[71] *See* Exhibit No. "2", Hepburn Dep. 142:11-15, 142:16-21, 142:23-143:16, 143:17-24, 145:25-146:7; *see also See* Exhibit No. "3", Ingram Dep. 30:18-20 (MUNIS employee receiving 60 days of training); *see also* Exhibit No. "5", Meyers Dep. 32:15-18 (MUNIS employee receiving two months, or approximately 60 days of training);

[72] *See* Exhibit No. "6", White Dep. 29:22-30:2.  *See* Exhibit No. "7", Hampton Dep. 11:9-14.

[73] Two of the three subclass members, Lisa White and Talina McElhaney, sat in on the same WebEx training seminars.  *See* Exhibit No. "6", White Dep. 29:10-40:7, 47:12-48:3.  Although Kelly Hampton started working for EDP as a trainer, her job as such was so similar to the client liaison position that the other two subclass members filled that she did not require any additional training to make the transition.  *See* Exhibit No. "7", Hampton Dep. 34:21-35:5.

[74] *See* Exhibit No. "2", Hepburn Dep. 147:6-22.

[75] The courts in *Ahle v. Veracity Research Co.*, 2010 WL 3463513, at *23 (D.Minn. 2010) and *Nerland v. Caribou Coffee Co.*, F.Supp.2d 1010, 1024 (D.Minn. 2007) found this kind of uniform treatment by employers strongly favors collective treatment.

###### iv.   THE MUNIS SUBCLASS

The MUNIS subclass, which is the largest of all Plaintiffs' subclasses, consists of thirteen individuals, all classified as an implementation specialist or implementation consultant during all times relevant to this lawsuit, save Jill Brown who for a short time was asked to take on the roll of project manager for one client.

###### (1) BUSINESS PROCESS REVIEW

The implementation consultants within the MUNIS  division did not perform business process reviews and are thus similarly situated with regard to this job duty.  As Defendants point out in their own Motion to Decertify, "project managers in the MUNIS divisions of Tyler are 'product experts' and *typically* perform significant analysis and preparatory work with the customer."[76]   By exclusion, implementation specialists and consultants within the MUNIS subclass did not and do not typically perform this review, which fact is borne out by Plaintiffs' deposition testimony.[77]   The vast majority of MUNIS Plaintiffs did not engage in any formal consultation with the client in order to reveal elements of the pre-existing system or what the client wanted the new software to do[78] and, at most, had such information explained to them from end-users during training.[79]   Therefore, the MUNIS Plaintiffs are similarly situated in this regard, supporting continued collective certification.

---

[76] *See* Docket Entry No. 145, Def.'s Mot. to Decertify, at 14 (emphasis added), *citing* Exhibit No. "2", Hepburn Dep. 64:5-65:20.

[77] *See* Exhibit No. "3", Ingram Dep. 42:16-20 (project manager set up the client training database with the features that had been agreed upon in consultation with the client).

[78] Only one Plaintiff in the MUNIS subclass testified to performing an initial consultation meeting with a client to determine system functionality.  *See* Exhibit No. "8", Dunn 18:13-23.  Another Plaintiff, Travis Void, testified to performing some review, but it's unclear from his testimony whether this process was more similar to Dunn's or the other Plaintiffs.  *See* Exhibit No. "9", Void Dep. 54:24-55:20.

[79] Bethany Maynard testified that she would know how particular clients wanted to use software by, first, looking at the project plan, and, second, through information that was conveyed to her during training.  *See* Exhibit No. "4", Maynard Dep. 39:16-19, 41:19-42:1.

Joy Flynn stated that she never took part in the initial consultation regarding the software's functionality, but "when I came into the situation [to perform training]…it was more or less the day-to-day functionality that the employees would be doing…." *See* Exhibit No. "10", Flynn Dep. 52:12-53:17.

### (2) DATA CONVERSION

Data conversion consists of taking the data contained within the customer's old system and electronically converting it over to the new software.[80]  The MUNIS division had a separate department to perform this task for clients, and, therefore, none of the implementation specialists or consultants within the MUNIS subclass performed data conversion for customers, and are thus similarly situated in this regard.[81]

### (3) SYSTEM CONFIGURATION

The configuration process is another area within which members of the MUNIS subclass are similarly situated.  The software applications provided by the Tyler divisions were basically an "out of the box" program with certain formatting options built into the software.[82]  The configuration process generally consisted of setting up these options based on the customer preferences or walking the customer through those options that were indicated during the course of performing the business process review.[83]

---

Betty Dupree stated that she never talked to the customer about whether or not they wanted to purchase particular modules or application, that having been done "long before [she] got there," but information about the everyday functionality of the system would come up during training.[79] *See* Exhibit No. "11",  Dupree Dep. 51:10-52:21. Similarly, Ilene Meyers stated that she never engaged in any formal consultation with the client to determine what it needed or wanted in terms of software, although she did receive that kind of information during training sessions. *See* Exhibit No. "5", Meyers Dep. 47:7-49:14, 52:3-19.

Likewise, Laura Milburn testified that she never actually "sat" down with the client to discuss what their needs were with respect to the software in order to design that software, such a role being filled by the project manager. *See* Exhibit No. "12", Milburn Dep. 117:7-118:2; *see also* Exhibit No. "13",  Mosenthin Dep. 64:11-20.

[80] *See* Exhibit No. "8", Dunn Dep. 21:24-22:2.

[81] *See* Exhibit No. "4", Maynard Dep. 35:22-36:3; *See* Exhibit No. "9", Void Dep. 59:13-21; *See* Exhibit No. "5", Meyers Dep. 59:6-13; *See* Exhibit No. "12", Milburn Dep. 101:20-22; *See* Exhibit No. "10", Flynn Dep. 47:20-48:20; *See* Exhibit No. "13", Mosenthin Dep. 51:18-52:8; *See* Exhibit No. "11", Dupree Dep. 46:5-11; *See* Exhibit No. "8", Dunn Dep. 21:20-22:8.

[82] *See* Exhibit No. "9", Void Dep. 60:11-17; *See* Exhibit No. "5", Meyers Dep. 37:4-13.

[83] *See* Exhibit No. "9", Void Dep. 60:11-22 (implementation specialist position included setting up parameters for the customer based on how they were going to use the software); *See* Exhibit No. "4", Maynard Dep. 37:4-38:8 (implementation position included setting up parameters for the customer based on how they going to use it); *See* Exhibit No. "12", Milburn Dep. 83:15-19 (if the customer needed the software configured to their needs, Milburn would do that as part of the implementation); *See* Exhibit No. "13", Mosenthin Dep. 72:3-11 (helped customers set up the parameters in their system); *See* Exhibit No. "11", Dupree Dep. 47:6-7 (implementation specialists would help the customers build the tables that were going to be used in the MUNIS software); *See* Exhibit No. "8", Dunn Dep. 22:9-21 (implementation consultants would help the customer define where their data went within the MUNIS

(4) Setting Agendas and Training Schedules

Agendas utilized by implementation specialists and consultants within Defendant's MUNIS division are essentially schedules for when an implementation specialist or consultant would be providing training to customers and what that training would comprise.

> Basically all [creating an agenda] was is just taking the training manual and just dividing it up…. In other words, obviously as trainers, we always had to train…Page 1 through 4 on Day 1, Page 5 through 6, [etc.].… Basically going through the manual and [saying] which topic are you covering today and which one are you covering tomorrow.[84]

The "substantial divergence" amongst implementation specialists and consultants that Defendant claims exists[85] disappears under even the most minimal scrutiny.  The actual scheduling of customer training was preordained by the project manager for all members of the MUNIS subclass.[86]  The agendas themselves were derived from the training manual and were substantially or entirely created by the project manager for all but one of the Plaintiffs within the MUNIS subclass.[87]  Defendant's own job descriptions for implementation specialists and consultants illustrate the uniformity within the MUNIS subclass, stating: "[Implementation Specialists][Implementation Consultants] are *given* training assignments and *have minimal authority to deviate from these assignments*."[88]

This minimal authority is common amongst MUNIS Plaintiffs and gives rise to no relevant distinctions.  Kevin Mosenthin (Mosenthin), an implementation specialist working for

---

software); *See* Exhibit No. "14", Grimwood Dep. 24:20-25:4; 27:4-7; 29:10-18 (implementers configured the client's software according to their preferences).

[84] *See* Exhibit No. "13", Mosenthin Dep. 36:11-37:4; *see, e.g.,* Exhibit No. "8", Dunn Dep. 59:13-19.

[85] *See Docket Entry No. 145,* Def's Mot. to Decertify, at 18.

[86] *See* Exhibit No. "3", Ingram Dep. 47:2-11; *See* Exhibit No. "4", Maynard Dep. 27:5-16, 29:22-25, 31:14-23; *See* Exhibit No. "13", Mosenthin Dep.38:7-39:12; *See* Exhibit No. "5", Meyers Dep. 52:20-54:13; *See* Exhibit No. "10", Flynn Dep. 75:22-76:1; *See* Exhibit No. "11", Dupree Dep. 37:9-22, 38:13-39:21; *See* Exhibit No. "12", Milburn Dep. 85:9-10; *See* Exhibit No. "8", Dunn Dep. 8:10-13; *See* Exhibit No. "9", Void Dep. 49:2-6.

[87] *See supra* n. 86

[88] Exhibit No. "15", pg. 2; Exhibit No. "16", pg. 2.

MUNIS from 2002 to 2007, might have to "change the name of a particular client to meet a form."[89]  Travis Void (Void), whom Defendant claims performed "modification" and "creation" of agendas,[90] would cut and paste information from an existing template based on the training his project manager told him to perform.[91]  In other words, if Client X doesn't need page 6, Void would remove that page from the template he had been provided and teach pages 1 through 5 and page 7.  This is the same, in effect, as other Plaintiffs, who would not teach information not proscribed in the agenda; whether they physically removed such information from their manual makes no relevant difference.  Furthermore, the specific timing within which Void would have to convey specific information was set by his project manager, which is also the same as the aforementioned Plaintiffs.[92]

### (5) CLIENT TRAINING

All members of the MUNIS subclass provided training to customers on how to use MUNIS software.[93]  This training consisted of "how to utilize the software screen by screen, table by table… how to enter data, the data that they need to put into the Tyler system from an existing system."[94]  More importantly, implementation specialists and consultants working within MUNIS provided training both on-site and remotely,[95] but although "training was given in different formats... [implementation specialists or consultants] use[d] canned reports from the

---

[89] *See* Exhibit No. "13", Mosenthin Dep. 39:3-5.
[90] *See Docket Entry No. 145,* Def's Mot. to Decertify, at 18.
[91] *See* Exhibit No. "9", Void Dep. 49:2-51:22.
[92] *Id.* at 51:15-19.
[93] *See* Exhibit No. "3", Ingram Dep. 50:8-51:10; *See* Exhibit No. "4", Maynard Dep. 14:8-10; *See* Exhibit No. "9", Void Dep. 62:3-63:13; *See* Exhibit No. "5", Meyers Dep. 40:4-6; *See* Exhibit No. "12", Milburn Dep. 87:25-90:7; *See* Exhibit No. "10", Flynn Dep. 78:18-79:18; *See* Exhibit No. "13", Mosenthin Dep. 69:7-10; *See* Exhibit No. "11", Dupree Dep. 41:19-42:6; *See* Exhibit No. "17", Dunning Dep. 72:25-73:1; *See* Exhibit No. "8", Dunn Dep. 16:6-15; *See* Exhibit No. "14", Grimwood Dep. 29:21-23, 32:2-11.
[94] *See* Exhibit No. "3", Ingram Dep. 50:8-51:0.
[95]*See* Exhibit No. "4", Maynard Dep. 26:23-27:2; *see* Exhibit No. "9", Void Dep. 46:1-3; *see* Exhibit No. "13", Mosenthin Dep. 102:12-15; *see* Exhibit No. "11", Dupree Dep. 42:1-3; *see* Exhibit No. "17", Dunning Dep. 78:15-19; *see* Exhibit No. "8", Dunn Dep. 17:13-18:4 (content of Webex and on-site training is the same).

Tyler site to show up on the screen… [which] was the main focus."[96]   Therefore, because training was administered according to standardized methods and procedures,[97] all training given by members of the MUNIS subclass adhered to a uniform process, thus creating common questions of law and fact subject to collective adjudication.

### (6) GO-LIVE SUPPORT & POST GO-LIVE SUPPORT

At the end of the implementation of MUNIS software, customers would proceed through a "go-live" process.  During this phase of the implementation, customers would move from using their old software system to using the MUNIS software for their day-to-day business activities.[98] All members of the MUNIS subclass who testified regarding the go-live process stated that they participated in customer's going live with MUNIS software during the course of their employment with Defendant.[99]   The role of implementation specialists and consultants within MUNIS during the go-live phase was the same: to provide support to the customers and to ensure that errors in the system were worked out.[100]

Post go-live support within the MUNIS subclass can be broken down into two functions. The first function involves returning to the customer's site directly after the go-live to answer any additional questions the customer may have and to provide additional retraining as

---

[96] *See* Exhibit No. "3", Ingram Dep. 50:19-22.

[97] *See* Exhibit No. "4",  Maynard Dep. 31:14-32:10; *see* Exhibit No. "5", Meyers Dep. 82:20-83:4; *See* Exhibit No. "12", Milburn Dep. 87:25-90:7; *see also* Milburn Dep. 91:18-19 ("I was instructed on how to train and that's how I trained"); *see* Exhibit No. "10", Flynn Dep. 80:14-18 (project manager would go into detail regarding what the implementation specialist would be providing as far as the training to customers).

[98] *See* Exhibit No. "10", Flynn Dep. 84:3-8.

[99] *See* Exhibit No. "4", Maynard Dep. 54:15-17; *see* Exhibit No. "9", Void Dep. 44:24-45:4; *see* Exhibit No. "5", Meyers Dep. 60:18-21; *see* Exhibit No. "12", Milburn Dep. 114:4-6; *see* Exhibit No. "10", Flynn Dep. 84:12-14; *see* Exhibit No. "13", Mosenthin Dep. 76:8-18; *see* Exhibit No. "11", Dupree Dep. 69:21-70:8; *see* Exhibit No. "17", Dunning Dep. 82:9-13; *see* Exhibit No. "8", Dunn Dep. 69:5-7; *See* Exhibit No. "14", Grimwood Dep. 43:4-14.

[100] *See* Exhibit No. "4", Maynard Dep. 55:23-56:2 (purpose was to "provide support to users, any further retraining that was necessary, working with our internal support if something went wrong or wasn't right); *See* Exhibit No. "5", Meyers Dep. 61:21-62:17 (the purpose was to provide support, handle system issues that arose, answer questions, coordinate with technicians); *See* Exhibit No. "12", Milburn Dep. 115:11-13 (during the go-live phase, the implementation specialist is there to provide support); *See* Exhibit No. "11", Dupree Dep. 70:9-10 (present during the go-live phase to provide assistance "on an as-needed basis"); *See* Exhibit No. "8", Dunn Dep. 69:13-17 (purpose was to answer the customer's questions); *See* Exhibit No. "14", Grimwood Dep. 43:10-14, 43:22-44:2.

determined by the customer and project manager.[101]   The second function involves answering the customer's questions via telephone or email for a period of time after the go-live had occurred.[102]

All MUNIS Plaintiffs provided post live support by fulfilling one or both of these functions.  Maynard testified that during the formal transition to support, she would answer questions from the customer.[103]  Void testified that he would sometimes go to the client site to answer questions and perform additional retraining if required of him and that during the transition to support he would answer the customer's questions.[104]  Meyers testified that she would take calls from customers she had trained and answer their questions if she knew the answer.[105]  Mosenthin testified to returning to the client's site a day or two after the go-live to answer questions and provide additional retraining if the customer contracted for it.[106]  Dupree testified that if she received a call from a customer with a question, she would try to answer it.[107]  Dunn testified that during post live support, she would answer questions sent by the customers on an as-needed basis until the customer was fully transitioned to the support department.[108]

Defendant argues, however, that divergences between Plaintiffs from different divisions in providing post go-live support warrants decertification because some Plaintiffs provided this support on a formal basis (Void, for example, had one day scheduled per customer to be available to answer questions) whereas other Plaintiffs provided this support on an informal basis

---

[101] *See* Exhibit No. "9", Void Dep. 66:15-20, 66:22-67:4.
[102] *Id.* at 68:4-8.
[103] *See* Exhibit No. "4", Maynard Dep. 51:25-52:8.
[104] *See* Exhibit No. "9", Void Dep. 66:15-21; 68:4-8; *see also* Exhibit No. "14", Grimwood Dep. 45:18-47:14 (Grimwood similarly testified that he would sometimes be present at the client's site after the go-live to handle any issues and would answer questions via telephone to the extent that he was able).
[105] *See* Exhibit No. "5", Meyers Dep. 65:14-17.
[106] *See* Exhibit No. "13", Mosenthin Dep. 74:25-75:5, 75:15-20, 75:21-76:7.
[107] *See* Exhibit No. "11", Dupree Dep. 69:11-20.
[108] *See* Exhibit No. "8", Dunn Dep. 74:23-75:3.

(answering questions as they came up, as in the case of Meyers and Dupree).[109]   This is a distinction without much difference as it relates to whether Plaintiffs were misclassified as exempt.   Dunn's testimony reflects, moreover, that an implementation specialist or consultant may spend 1-2% of their time providing post live support to a customer.[110]   The minute differences existing between Plaintiffs as to a job duty that constituted such a small aspect of their employment with Defendant does not warrant decertification.   The fact that Plaintiffs are similarly situated in regards to providing go-live and post go-live support, even though they may not be identically situated as to the latter, is sufficient to establish common questions of law or fact.

### v.   THE EDEN SUBCLASS

The EDEN subclass consists of only five individuals classified as implementation specialists or implementation consultants for periods relevant to this lawsuit.   The substantial similarity in their overall job duties and functions establishes the propriety of adjudicating their claims on a collective basis.

### (1) BUSINESS PROCESS REVIEW

All plaintiffs within the EDEN subclass testified to having conversations with the client regarding the client's legacy system and the implementation of EDEN software in the course of their employment.   Joy McLeod (McLeod) testified to sitting down with the client to figure out how they manage their project in order to translate their previous needs into the new system.[111]   Tom O'Haver (O'Haver) had telephone conversations or online sessions with clients to gather information to set up the "different parameters within the [purchased] software."[112]   Eyvonne

---

[109] *See Docket Entry No.145*, Def's Mot. to Decertify, at 19, n. 106.
[110] *See* Exhibit No. "8", Dunn Dep. 75:14-23.
[111]*See* Exhibit No. "18",  McLeod Dep. 93:16-94:1.
[112] *See* Exhibit No. "19", O'Haver Dep. 40:4-8, 32:13-22, 34:9-16, 38:8-18.

Wilton (Wilton) also testified that one of her job functions was to go over site fit documentation and questionnaires to "understand how we could process it and put it into the system."[113]  Even the Defendant inadvertently recognizes the similarity of the EDEN subclass by comparing the deposition testimony of the other two members of the subclass, Titus Britt (Britt) and David Hayner (Hayner), in an attempt to distinguish them from members of other subclasses. Specifically, Defendant points out that "Britt testified about meeting with customers during what he called a 'consultant review' during which he gathered information about the customer's business processes and the customer's expectations from Tyler's software" and that, likewise, "Hayner testified that his job involved meeting with the customer to go over which variables within Tyler's software it preferred and its new software would be set up."[114]

### (2) DATA CONVERSION AND REVIEW OF CONVERSION ERRORS

None of the Plaintiffs in the EDEN subclass performed data conversion, that function being performed by a separate department,[115] although Plaintiffs within the EDEN subclass testified to reviewing converted data for errors in the conversion process.  O'Haver, for example, testified that part of his job would be to "identify any inconsistencies in the data and relay that to the data conversion group.[116]  McLeod also testified that if there were errors in the converted data she would call the conversion team to notify them and have the error resolved.[117]

### (3) SYSTEM CONFIGURATION AND REVIEWING FOR CONFIGURATION ERRORS

Members of the EDEN subclass also share substantial uniformity in configuring the software purchased by clients and reviewing those configurations for errors during the course of

---

[113] *See* Exhibit No. "20", Wilton Dep. 138:9-139:4.
[114] *See Docket Entry No.145*, Def's Mot. to Decertify, at 17.
[115] *See* Exhibit No. "18", McLeod Dep.  22:16-23; *See* Exhibit No. "19", O'Hayner Dep. 28:21-29:19; *See* Exhibit No. "22", Britt Dep. 110:17-111:6.
[116] *See* Exhibit No. "19", O'Haver Dep. 69:18-24, 72:7-12
[117] *See* Exhibit No. "18", McLeod Dep. 117:15-118:18.

an implementation.  As to this job function as well, Defendant once again make Plaintiffs' case

for the propriety of collective treatment for them.  In an attempt to establish that Plaintiffs

working for Tyler Technology, in general, are dissimilar in performing these configurations,

Defendant argues:

> [O]pt-in Plaintiff Titus Britt ("Britt")… described his involvement
> in the configuration process as meeting with the customer to
> determine the features associated with the software the customer
> wanted to activate and then going into the system and activating
> those features….   Opt-in Plaintiff David Hayner ("Hayner")…
> testified that, at least as to one of the software modules he
> supported, the majority of his time at the customer's site was
> devoted to exploring different software variables to determine how
> the customer's programs ultimately would be set up.[118]

Bibles and O'Haver also testified to setting up configurations and reviewing those

configurations for errors throughout the implementation.[119]

### (4) SETTING AGENDAS AND TRAINING SCHEDULES

McLeod's testimony illustrates the role that all implementation specialists and

consultants had in developing the training agendas for particular clients.  Specifically, McLeod

testified as follows:

> Q:  How do you come up with that task list?
>
> A:   The task list is already preformed by the packaging of these
> implementation packages of to do's and the structure of things you
> have.   You give the agenda to the client….   It's pretty much a
> recipe.
>
> Q:  And these agendas, they don't have those client nuances listed,
> correct?
>
> A:  No, Ma'am, they don't.[120]

---

[118] *See Docket Entry No. 145*, Def's Mot. to Decertify, at 15-16; *see also* Exhibit No. "21", Hayner Dep. 46:14-18, 47:8-16, 89:9-11.

[119] *See* Exhibit No. "18", McLeod Dep. 93:16-94:1, 98:21-24; *See* Exhibit No. "19", O'Havner Dep. 27:6-15, 42:1-45:4; *see also* Exhibit No. "20", Wilton 48:21-49:15, 52:2-53:2, 66:16-67:12 (although Wilton did not testify that she performed configuration, she did testify to reviewing configurations for errors similar to other Plaintiffs).

This exact same approach is reflected in the testimony of every other member of this subclass.  Hayner stated that he "would develop… a canned agenda… simply filling it out for the dates of the trip as it would apply to that specific client."[121]  Likewise, O'Haver testified that he would "send out an agenda based upon what was accomplished the first time and what needs to be accomplished the next time *as specified in our standard implementation plan*."[122]  This testimony is echoed also by Britt and Wilton, the other two members of the EDEN subclass.[123]

### (5) CLIENT TRAINING

After the training agenda and schedule has been set up for members of the EDEN subclass, Plaintiffs provided training to the client end-users following a set training manual using the same general procedures.  O'Haver testified to the typical process, stating:

> [A]ll [training] follows the planned curriculum that we have that has been provided to me by the company…. [A]ny deviation would be not totally my decision.  It would be based upon what the project manager and my manager and myself agreed would be best….  We have [presentations] and curriculum that are standard for the module training session…written print-outs that we print out for them to follow along while I lecture….  I'm trained on the standard way of conducting the session…[which is] with the…presentation that incorporates – that follows the curriculum and incorporates screen shots [based on the particular client's configuration].[124]

The only deviation from this model that can be seen from Plaintiffs' testimony is based on whether or not the persons receiving training had access to a computer during the training session.  If the clients being trained had access to a computer, whether a personal laptop or a company desktop in a training room, they would also input data into the software and be able to

---

[120] *See* Exhibit No. "18", McLeod Dep. 97:24-98:20.
[121] *See* Exhibit No. "21", Hayner Dep. 32:6-9.
[122] *See* Exhibit No. "19", O'Haver Dep. 50:18-21.
[123] *See* Exhibit No. "22", Britt Dep. 113:2-16; *See* Exhibit No. "20", Wilton Dep. 23:3-5, 23:19-24:24.
[124] *See* Exhibit No. "19", O'Haver Dep. 56:12-58:19; *see also* Exhibit No. "22", Britt Dep. 117:19-118:10.

see the results themselves, in which case Plaintiffs would also observe the users in inputting that data and answer questions.[125]

### (6) GO-LIVE SUPPORT & POST GO-LIVE SUPPORT

All Plaintiffs within the EDEN subclass testified to being on-site during the go-live transition, during which they would observe the client in the use of the software, field any questions that the client may have, and observe for any configuration or conversion errors.[126] Furthermore, Plaintiffs testified that after the client had undergone a successful go-live, their role with the client was, in effect, over.[127]

### vi. THE INCODE SUBCLASS

The INCODE subclass consists of seven individuals classified as implementation specialists or implementation consultants during all periods relevant to this lawsuit. The deposition testimony which has been taken of these individuals reveals that they were all essentially performing the same tasks during their employment with Defendant. For this reason, it is clear that the INCODE implementation specialists were similarly situated. The questions of fact regarding their job duties are common amongst all of them. Moreover, the application of law as it pertains to any alleged exemption will be common to all of them as well.

### (1) BUSINESS PROCESS REVIEW

The testimony of the INCODE subclass members demonstrates that at the beginning of an implementation they would initially meet with the customer to provide options on how the

---

[125] *See* Exhibit No. "19", O'Haver Dep. 59:2-61:2; *see also* Exhibit No. "22", Britt Dep. 118:11-15; *see also* Exhibit No. "20", Wilton Dep. 29:24-30:18; *see also* Exhibit No. "18", McLeod Dep. 101:3-101:20; *see also* Exhibit No. "21", Hayner Dep. 44:9-46:9.

[126] *See* Exhibit No. "18", McLeod Dep. 111:17-112:3; *see also* Exhibit No. "21", Hayner Dep. 49:5-19; *see also See* Exhibit No. "20", Wilton Dep. 70:4-14; *see also* Exhibit No. "22", Britt Dep. 121:10-125:13 (although Britt testified to having an agenda during the go-live transition, his job duties were essentially the same as all other Plaintiffs: to check for configuration and conversion errors and convey those errors to other departments for their resolution).

[127] *See* Exhibit No. "18", McLeod Dep. 112:12-22; *see also* Exhibit No. "20", Wilton Dep. 72:1-17; *see also* Exhibit No. "22", Britt Dep. 126:10-127:19.

customer wanted the system set up.   For example, Gayla Duke (Duke) testified that when she arrived at the client site she would have meetings with the customer discussing different options within the software that they may or may not want to use.[128]   Similarly, Melanie Baird (Baird) spoke of conversations that she had with the customer for the purpose of proffering different ways to set up the software.[129]   This similarity is evinced in the testimony of the other Plaintiffs.[130]   Furthermore, although all Plaintiffs presented system options to the customer, they were not allowed to advise the customers on which options they should select in setting up their system.[131]

### (2) DATA CONVERSION

The INCODE implementation specialists did not participate in conversions of customers' data.[132]

### (3) SOFTWARE CONFIGURATION

After meeting with the client, the INCODE implementation specialists would make sure the fields looked the way the client wanted them to look and, if not, they would configure the software to do so by setting up the system parameters in accordance with the client's preferences.[133]

### (4) CLIENT TRAINING

---

[128] *See* Exhibit No. "23", Duke Dep. 83:11-18.
[129] *See* Exhibit No. "24", Baird Dep. 47:1-25.
[130] *See* Exhibit No. "25", Mutch Dep. 48:22-49:12; *see also* Exhibit No. "26", Steele Dep. 48:3-7; *see also* Exhibit No. "27", Emde Dep. 94:22-25.
[131] *See* Exhibit No. "23", Duke Dep. 89:17-22, 92:1-93:6; *See* Exhibit No. "25", Mutch Dep. 55:12-19; *See* Exhibit No. "24", Baird Dep. 47:9-10, 47:24-25, 49:2-10; *See* Exhibit No. "26", Steele Dep. 53:15-19.
[132] *See* Exhibit No. "23", Duke Dep. 86:6-8; *See* Exhibit No. "25", Mutch Dep. 49:18; *See* Exhibit No. "27", Emde Dep. 80:17-19; *See* Exhibit No. "24", Baird Dep. 18:20-21, 20:3-5; *See* Exhibit No. "26", Steele Dep. 93:10.
[133] *See* Exhibit No. "23", Duke Dep. 113:24-25, 114:1-15; *See* Exhibit No. "25", Mutch Dep. 52:10-24, 53:4-8; *See* Exhibit No. "27", Emde Dep. 83:7-25, 84:1-22 ; *See* Exhibit No. "24", Baird Dep. 18:16-17, 73:17; *See* Exhibit No. "26", Steele Dep. 93:12-18, 94:1-3, 96:6-18.

After the configuration process is completed, INCODE implementation specialists proceeded to train the customer on the Tyler software.[134]  Similar to other divisions, this training could be done in a small group, one-on-one, or over the phone, but regardless of the medium, the training itself was conducted substantially the same way, that is, by walking the end user through the software while illustrating how the software worked.[135]

### (5) GO-LIVE SUPPORT AND POST GO-LIVE SUPPORT

After the training was completed, the implementation specialists at INCODE would assist with the "go-live" process.[136]  After the "go-live" process was completed the implementation specialists would provide some follow up support for the customer.[137]

### vii.   THE ODYSSEY SUBCLASS

The ODYSSEY subclass consists of only three Plaintiffs, Jill Brown (Brown), Kim Huynh (Huynh), and Linda Carrington (Carrington).   As the testimony from the deposed Plaintiffs illustrates, the members of the ODYSSEY subclass are similarly situated in their employment with Defendant and share common questions of law and fact which justify collective adjudication of their claims against Defendant.

### (1) BUSINESS PROCESS REVIEW

Each of the deposed Plaintiffs testified to playing the exact same role in the review of the customer's use of ODYSSEY software.  Brown described this process as follows:

> You basically sit there and listen to the project manager talk with
> the client and client's telling them what their business process is,

---

[134] *See* Exhibit No. "23", Duke Dep. 114:16-18; *See* Exhibit No. "25", Mutch Dep. 72:19-74:3; *See* Exhibit No. "27", Emde Dep. 95:12-23, 96:15-25; *See* Exhibit No. "24", Baird Dep. 45:5-10; *See* Exhibit No. "26", Steele Dep. 45:14-17.
[135] *See* Exhibit No. "23", Duke Dep. 75:23-77:1, 80:19-24; *See* Exhibit No. "25", Mutch Dep. 58:20-59:7, 72:22-73:4; *See* Exhibit No. "27", Emde Dep. 100:23-101:2; *See* Exhibit No. "24", Baird Dep. 33:14-18.
[136] *See* Exhibit No. "23", Duke Dep. 99:10-17; *See* Exhibit No. "25", Mutch Dep. 84:19-22, 85:1-7; *See* Exhibit No. "27", Emde Dep. 106:2-5, 106:21-23, 107:1-8.
[137] *See* Exhibit No. "23", Duke Dep. 100:9-20; *See* Exhibit No. "24", Mutch Dep. 103:12-23; *See* Exhibit No. "24", Baird Dep. 115:19-25; *See* Exhibit No. "26", Steele Dep. 118:12-20, 121:11-16.

and you enter in a code to show them and – so that the project
manager can show them if that will work to meet their business
process….   The project manager is in charge and directs the
process, and the client is telling the project manager, "This is how
we do this business process."   And the project manager says,
"Okay.  You know, Jill, enter the code to show them how that
would be done."  So you would enter the code and the client would
see how – how that would work for their business process.[138]

A comparison of this testimony with the testimony of Carrington clearly indicates the

substantial similarity amongst implementation consultants in this process.  Carrington testified:

Q:  What did you do, what was your role in conducting the fit
analysis?

A:  My role is to drive the computer.  I'm the driver, and I go
through the system, and what you're doing is you're making the
superusers aware of the procedure, the path that ODYSSEY uses,
because the way that they have been working with their old system
may not be the way they're going to be able to work with
ODYSSEY….

Q:  And in this case, you did it with the project manager?

A: Yes.

Q:  And that would be typical?

A:  Yes….

Q:  What is the project manager's role during the fit analysis?

A:  The project manager is leading the whole thing….

Q:  So the project manager would say, "Okay, let's talk about
this?"

A: Right, exactly. [139]

This is the first example of the substantial uniformity between members of the

ODYSSEY subclass indicating the propriety of collective adjudication.

---

[138] *See* Exhibit No. "28", Brown Dep. 51:4-8, 51:14-20.
[139] *See* Exhibit No. "29", Carrington Dep. 56:25-57:7, 58:5-9, 63:21-23, 64:12-14.

### (2) CONVERSION

None of the implementation specialists in the ODYSSEY subclass had a hand in the actual conversion of any customer's data, but all were responsible for checking to make sure that data had been converted properly.[140]

### (3) CONFIGURATION

After the fit analysis had been performed for a particular implementation, members of the ODYSSEY subclass would configure the software to meet the customer's needs and preferences.[141]

### (4) CLIENT TRAINING

Throughout the course of any given implementation, ODYSSEY implementation specialists would provide training to the customer's employees on how to use the ODYSSEY software, which was provided in the exact same fashion either on-site or through Webex.[142]

### (5) GO-LIVE SUPPORT

At the end of an implementation, Plaintiffs would be present during the transition to the new software going live for the purpose of providing support to the customer.[143]

### viii.   THE EAGLE SUBCLASS

The EAGLE subclass consists of only one plaintiff, class representative, Tony Dodd. Defendant has made numerous comparisons between Mr. Dodd or EAGLE and other Plaintiffs belonging to other subclasses in an attempt to defeat collective treatment of the present action. Because of the present procedural position of other Plaintiffs, however, there exist no relevant distinctions between Mr. Dodd ,EAGLE and to other Plaintiffs, if any existed to begin with, and

---

[140] *See* Exhibit No. "28", Brown Dep. 59:5-60:7; *See* Exhibit No. "29", Carrington Dep. 98:9-19.
[141] *See* Exhibit No. "28", Brown Dep. 25:18-26:6; *See* Exhibit No. "29", Carrington Dep. 104:22-105:12.
[142] *See* Exhibit No. "28", Brown Dep. 58:22-24, 28:13-19, 34:23-35:9; *See* Exhibit No. "29", Carrington Dep. 110:18-112:3, 91:5-16.
[143] *See* Exhibit No. "28", Brown Dep. 43:8-19; *See* Exhibit No. "29",  Carrington Dep. 114:6-18.

such comparisons have become inapposite to collective treatment.   Indeed, Defendants'
particular emphasis on Mr. Dodd in their Motion to Decertify and the fact that none of the
differences they cite, assuming they are valid, are relevant goes to confirm and establish the
similarity of Plaintiffs as they relate to their particular subclasses.[144]

### i.   THE EDP CLIENT LIAISON CLASS AND THE EDP IMPLEMENTATION SUBCLASS

The EDP client liaison class consists of three individuals, Talina McElhany (McElhany),
Lisa White (White), and Kelly Hampton (Hampton).  McElhany, White, and Hampton all began
working for EDP prior to its acquisition by Tyler Technology in September 2007.  All of these
individuals held the same position, worked out of the same office, had the same managers,
serviced the same software, and performed the same duties.  Prior to EDP becoming a subsidiary
of Tyler in 2007, McElhany, White, and Hampton held the job title of "client liaison."[145]
Although this title changed to "implementation specialist" after the acquisition in order to
coincide with other Tyler divisions, the functions of the position remained the same. [146]   All
three plaintiffs worked out of the same office in Longview, Texas[147] and reported to the same

---

[144] Defendant uses Tony Dodd as one of only four Plaintiffs that they claim gives rise to dichotomies warranting decertification.  *See Docket Entry No. 145*, Def's Mot. to Decertify, at 22-23.

[145] McElhaney Dep. 4:17-22, 28:19-21; *See* Exhibit No. "6", White Dep. 4:17-24, 5:2-7; Hampton began her employment with EDP as a trainer, but had been employed as a client liaison for approximately a year before the acquisition took place.  *See* Exhibit No. "7", Hampton Dep. 9:25-10:3, 33:4-8.  Hampton is undoubtedly similarly situated to the other members of the subclass with respect to her role as a client liaison for the reasons that follow.  Moreover, Hampton's role as a trainer was so similar to that of a client liaison that she required no additional training in making the transition and Hampton therefore shares common questions of law and fact with the other subclass members in regards to her role as a trainer as well.  *See id.* at 34:21-35:2.  Moreover, Plaintiffs' have requested that a separate training class be allowed to include Hampton and those similarly situated to her in the event the Court determines that this aspect of her employment shares no common questions of law or fact with the other members of the EDP subclass.  *See Docket Entry No. 146*,  Pl.'s Second Am. Collective Action Compl., at 9.

[146] *See* Exhibit No. "30", McElhaney Dep. 61:2-10; *See* Exhibit No. "7", Hampton Dep. 9:23-24; Although Lisa White ceased employment with Defendants prior to Tyler's acquisition of EDP, and, therefore, she never held the implementation specialist title, her inclusion is this subclass is proper because the aforementioned did not change any of the duties within the EDP subclass.  *Id.*

[147] *See* Exhibit No. "6", White Dep. 29:22-30:2.

manager, Chandra Robbins.[148]   Furthermore, they all provided support for the ED Pro software.[149]

The EDP implementation subclass consists of Talina McElhany and Kelly Hampton, the only client liaisons that continued their employment with the EDP division after Tyler Technologies acquired EDP Enterprises, Inc.

These Plaintiffs share numerous common questions of law and fact.  Indeed, Plaintiffs agree with the substantial similarity that existed within the "client liaison" position at EDP portrayed in Defendant's Motion to Decertify.  Namely, Plaintiffs agree that:

> (1)   "The client liaison *primarily* served as an intermediary between the customer and EDP's internal conversion programming team and… assisted in the conversion of the customer's data from its previous software system to the new system provided by EDP or Tyler."
>
> (2)   "*Both* [McElhaney and White]… spent a significant portion of their time working with the customer to convert data."
>
> (3)   That the client liaison served as a "go-between" or "point of contact" in the conversion process.
>
> (4)   That the client liaison "*rarely* traveled to customer sites and spent the bulk of their time communicating with customers by telephone while working in the Longview office."[150]

If anything, Defendants' position establishes the propriety of collective treatment of the EDP client liaison class and EDP implementation subclass.  The untenable nature of Defendants' decertification argument position lies in the conundrum that the Defendants are attempting to defeat the collective action in total by establishing the uniformity of the individual subclasses.

## 2.   THE SECOND INQUIRY: DEFENDANT'S CLAIMS ARE UNIFORM AS TO ALL PLAINTIFFS

---

[148] *See* Exhibit No. "30", McElhaney Dep. 14:16-20; *See* Exhibit No. "6", White Dep. 5:8-9, 5:20-21; *See* Exhibit No. "7", Hampton Dep. 10:14-19.
[149] *See* Exhibit No. "30", McElhaney Dep. 31:17-21; *See* Exhibit No. "7", Hampton Dep. 12:12-13.
[150] *Docket Entry No. 145*, Def's Mot. to Decertify, at 7-8.

The courts look to individualized defenses because they "prevent an efficient proceeding with a representative class."[151]  A simple reading of Defendant's Motion to Decertify or even its Second Amended Answer demonstrates that it is not asserting *any* individualized defenses except as to Brown, Bonner and Milburn, which are addressed infra.  Rather Defendant is arguing that all of the class members were properly classified as exempt under the administrative or computer professional exemption.[152]  Because these defenses (despite the fact that they are without merit), are asserted against the entire class as a whole (rather than against individual plaintiffs), they should not be considered in the decertification analysis.[153]

Defendant asserts specifically that alleged factual variances will result in individualized defenses to the claims herein.  In particular, Defendant claims there will be individualized defenses because of the exemptions claimed, the amount of time spent on job duties, the ability to contradict witnesses, damage calculation variations, and the amount of hours worked.[154]  As a result, Defendant claims that Plaintiffs should not be allowed to proceed collectively.  But the principal legal defense asserted by Defendant to the Plaintiffs' claims herein is identical, and that is that each Plaintiff is covered by the administrative exemption or computer professional exemption.[155]  It is Defendant's burden to prove that these exemptions are applicable under the FLSA.[156]

Here, there are only two legal defenses, the administrative exemption and computer programmer exemption, claimed against all thirty-three Plaintiffs.  The other alleged variations

---

[151] *See Moss v. Crawford & Co.,*, 201 F.R.D. 398, 410-11 (W.D. Penn. 2000) (finding this factor weighed against decertification because the defense was not "a particular defense raised against a specific plaintiff, rather it will be asserted against every member of the class.").

[152] *See Docket Entry Nos. 145, Def's Mot. to Decertify  and Docket Entry No. 150, Def's Second Am. Compl.*

[153] *Moss*, 201 F.R.D. at 410-11.

[154] *See Docket Entry No. 145,* Def's Mot. to Decertify, at 23-25.

[155] 29 C.F.R. §541.100, *et seq.*

[156] *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974); *Hodgson v. The Klages Coal & Ice Co.*, 435 F.2d 377, 382 (6th Cir. 1970).

urged by Defendant, discussed infra, as a basis for decertification have been cited and rejected by other courts or are inappropriate grounds for denying certification at the present time.

### A.  VARIOUS DEFENSES FORM IMPROPER GROUNDS FOR DECERTIFICATION

The weakness of the Defendants' arguments becomes patently obvious when one looks at their leading arguments, to which they devote five pages of their Motion.[157]   First, the Defendants attempt to compare the job position of client liaison, a position that was unique to EDP Enterprises, Inc. in Longview Texas with the implementation specialist and implementation consultant positions in the other Tyler divisions.  Defendant is well aware that the claims of the EDP client liasions are two separate claims; one against Tyler Technologies, Inc., as the successor in interest to EDP Enterprises, Inc., and one against Tyler Technologies, Inc.  In fact, the claims of Lisa White and Kelly Hampton are essentially limited to Tyler Technology as successor toEDP Enterprises, Inc. To attempt to compare the job duties of client liaisons that worked for a different company prior to Tyler's acquisition is misleading and disingenuous. After Tyler acquired EDP Enterprises, Kelly Hampton remained only a few weeks and class representative Talina McElhany remained employed as an implementation consultant for another eleven months.[158]   Any differences in their position as compared to implementers in other divisions are easily addressed through subclassing as was indicated in Plaintiffs Second Amended Complaint.[159]

Second, the Defendants argue that Jason Bonner, a non-exempt hourly employee who held the position of Technical Support Specialist/Trainer is dissimilar to the class members. Again, Defendant is well aware that Mr. Bonner is not an exempt employee.  This fact was

---

[157] *See Docket Entry No. 145,* Def's Mot. to Decertify, at 6-10.
[158] *See* Exhibit No. "7", Hampton Dep.  9:13-16;*See* Exhibit No. "30", McElhaney Dep. 14:10-11. (these cites art to the draft transcript)
[159] *See Docket Entry No. 143,* Pl.'s Second Am.  Compl.

discovered in Mr. Bonner's deposition.  Since that time Plaintiffs' counsel has made a good faith effort to resolve Mr. Bonner's individual claim for unpaid overtime wages to no avail.  It is Mr. Bonner's intent to seek the court's permission to withdraw from this suit and request a reasonable time in which to file his individual claim.  Any individualized defense which may have been applicable to him is no longer relevant.

Third, the Defendants seek to diversify the class by comparing the job duties of a "project manager," a job duty that Jill Brown accepted for a year while she continued to perform as an implementation consultant for other clients. Clearly, during the time that Jill Brown held the job position of project manager she would not qualify for this collective action, as that job position is not included in this action. However, Mrs. Brown was employed as an implementation specialist from February 2007 to June 2008, and during that period of time was similarly situated to the other ODYSSEY Plaintiffs, Carrington and Huyhn.  Defendants' argument that Ms. Brown is dissimilar from the other class members because she performed project manager duties is meritless and should be ignored.

Defendants also claim that this case demands a "case-by-case examination as to whether or not each of the Plaintiffs worked more than forty hours during particular work weeks."[160] This exact same argument was rejected by the court in *Nerland v. Caribou Coffee Co.* on the grounds that the majority of opt-in plaintiffs deposed in that case testified to working more than 40 hours per week,[161] just as the Plaintiffs herein have done. [162]  In fact, the court found that the

---

[160] *See Docket Entry No. 145*, Def's Mot. to Decertify, at 24-25.

[161] *Nerland v. Caribou Coffee Co.*, 564 F.Supp.2d 1010, 1021-22 (D.Minn. 2007).

[162] *See* Exhibit No. "31", Dodd Decl., pg. 1; *see* Exhibit No. "18", McLeod Dep. pp. 31:15-23; *see* Exhibit No. "21", Hayner Dep. pp. 95:25-96:4; *see* Exhibit No. "19", O'Haver Dep. pp. 103:17-105:6; *see* Exhibit No. "22", Britt Dep. pp. 51:7-12; *see* Exhibit No. "20", Wilton Dep. pp. 137:6-22; *see* Exhibit No. "32", McElhany Decl. pgs. 1-2; *see* Exhibit No. "33", White Decl. pg. 1; *see* Exhibit No. "34", Hampton Decl. pg. 2; *see generally See* Exhibit No. "23", Duke Dep. 50:9-53:24, 56:12-19 (Duke had a running balance of overtime hours which she worked as a customer service employee, which was still fewer hours than she had worked as an implementation consultant); *See* Exhibit No. "25", Mutch Dep. 33:3-34:2 (averaged 55-60 hours per week throughout the course of her employment);

commonality with which plaintiffs testified to working in excess of 40 hours each week, as well as the common deprivation of overtime compensation due to the uniform application of an exemption, presented common evidence of possible eligibility for overtime compensation that weighed in *favor* of collective treatment of plaintiffs' misclassification claims.[163]

To the extent a claim of an individualized defense relates to damages, the *Nerland* court held that "these damages issues do not preclude the collective adjudication of the exemption issue at the center of this action."[164]  This holding is mirrored in *Hill*, where the court wrote:

> These defenses appear to relate chiefly to the issue of damages…
> how much uncompensated overtime is actually due to each
> plaintiff.  This issue should not preclude collective adjudication.[165]

The Defendants also claim that they have individualized defenses against the claims of Jason Bonner, Jill Brown, and Laura Milburn which require the Court to decertify this collective action.[166]   Again, Defendants' claims are meritless.  Defendants' claims against Bonner are easily disposed of because Bonner isn't even a proper member of this collective action. Defendants' inclusion of Jason Bonner, a non-exempt technical support employee, is misleading and disingenuous.

Equally disingenuous is the Defendants' contention that it has an individualized defense as to Jill Brown because she agreed, for a limited time, to take over as a project manager for one

---

*see* Exhibit No. "27", Emde Dep. 117:12-21; *see* Exhibit No. "24", Baird Dep. 112:15-19; *see* Exhibit No. "3", Ingram 32:3-9, 64:1-4; *see* Exhibit No. "4", Maynard Dep. 89:17; *see* Exhibit No. "9", Void 89:6-11; *see* Exhibit No. "35", Meyers Decl. pgs. 1-2; s*ee* Exhibit No. "12", Milburn Dep. 25:23-26:2, 133:3-6; *see generally* Exhibit No. "10", Flynn Dep. 54:19-55:7 (Flynn worked 50-60 hours per week even when she was just shadowing other implementers); *see generally* Exhibit No. "13", Mosenthin Dep. 109:10-110:11 (Mosenthin worked on average more than 40 hours per week when making mostly day trips; thereafter his hours further increased because the travel time increased); *see* Exhibit No. "11", Dupree Dep. 75:17-22; *see* Exhibit No. "17", Dunning Dep. 15:21-16:3; *see* Exhibit No. "8", Dunn Dep. 68:15-23; *see* Exhibit No. "28", Brown Dep. 100:2-8; s*ee* Exhibit No. "36", Huyn Decl. pg. 1; *see* Exhibit No. "29", Carrington Dep. 133:13-17.
[163] *Nerland*, 564 F.Supp.2d at 1022.
[164] *Id.* at 1025.
[165] *Hill v. Muscogee County Sch. Dist.*, 2005 WL 3526669, at *4 (emphasis added). See also, Maynor v. Dow Chem. Co. No. G-07-0504 V.5. Dist. Lexis 424 88 at 9 (S.D. Tex 2008); Falcon v. Starbucks Corp. 580 F. Supp. 2d 528, 540 (S.D. Tex 2008); Plewinski v. Luby's Inc. 2010 U.S. Dist Lexis 39179 (S.D. Tex 2010)
[166] *See Docket Entry No. 145*, Def's Mot. to Decertify, at 25-26.

client.  As previously stated, during the time that Jill Brown held the job position of project manager she would not qualify for this collective action, as that job position is not included in this action.  Consequently, Defendants have no individualized defense as to Jill Brown.

Defendants additionally contend that they allegedly have an individualized defense of judicial estoppel against Laura Milburn based on the fact that she filed bankruptcy two months after she became employed at Tyler Technology and failed to list a claim against Tyler for overtime in her bankruptcy that was discharged/terminated three months after it was filed. Defendants state that they intend to argue that Milburn's claims should be barred by the doctrine of judicial estoppel for Milburn's failure to disclose her claims against Tyler in the bankruptcy proceedings even though her deposition testimony clearly states that she was not working more than 40 hours per week during her first three months of employment because she was self training for her position.[167]  First, Defendants' argument regarding judicial estoppel has no merit, and second, it is not a basis for decertifying this collective action as the issue, if actually asserted by Defendants, can be resolved by the court prior to trial upon proper Motion by the Defendant.

Defendant further appears to claim that the fact that some implementers work from their home and others work out of a division office has some bearing on the issues in this case. However, the fact that Defendants fail to explain how that distinction is relevant to the issues in this case is not surprising consideringTyler's corporate representative, Bob Sansone, testified that the fact that some implementation consultants/specialists worked from their homes made no difference in their jobs.

Mrs. Bagley:

> Q.    …-does the fact that an employee works out of - - an implementor works out their home versus an office, does that affect the employee's employment in any way?

---

[167] *See* Exhibit No. "12", Milburn Dep. 53:12-24.

A.    No.

Q.    Does that affect how the employee is supervised?

A.    No.

Q.    Does that affect how the implementor does their job?

A.    No.[168]

## B. DEFENDANTS' UNIVERSAL ASSERTION OF §13(A)(1) EXEMPTIONS DOES NOT WARRANT DECERTIFICATION

The Court's analysis of the second factor addresses "whether the potential defenses pertain to the opt-in class *as a whole* or whether *many different* defenses will be raised with respect to *each individual* plaintiff."[169]   Standing opposed to this proposition, the sole defense asserted by Defendants herein as to the merits of all Plaintiffs' claims, except Jill Brown,[170] is that each was covered by the administrative exemption or computer professional exemption.[171] Defendants maintain, however, that the application of §13(a)(1) exemptions under the FLSA "*requires* a fact intensive, *individualized* inquiry as to the duties performed by *each* Plaintiff."[172]

This argument, while not novel, is inapplicable; it is the same to say that Congress provided a special provision for plaintiffs to pursue their FLSA claims collectively, without *any* reference to the nature of the claim, while simultaneously furnishing exemptions which deprive that provision of all applicability, *depending* on the claim.  Such an argument defies the canons of construction, not to mention logic.  Lending credence to the assertion would furthermore mean

---

[168] *See* Exhibit No. "1", Sansone Dep. 283:22–284:7.
[169] *Reyes v. Tex. EZPawn, L.P.*, 2007 WL 101808 (S.D.Tex. 2007) (emphasis added), *citing Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D.Pa. 2000).
[170] Defendant erroneously asserts that it may have a basis to assert the executive exemption as to Jill Brown in her job as project manager.  See *supra* Part II.2.A.
[171] Tyler's assertion of the computer professional exemption is belated and without any factual or legal basis.  Bob Sansome, Defendants' corporate representative with the most knowledge regarding the exempt status of the Plaintiffs, testified that the only exemption that Tyler Tecnhologies applied to the Plaintiffs was the administrative exemption.  Sansone Dep. 102:1–103:13.
[172] *See Docket Entry No. 145*, Def.'s Mot. to Decertify, at 23.

that no FLSA action asserting misclassification claims could be resolved through collective adjudication, despoiling the stated purpose of the FLSA and wasting judicial resources by requiring courts to consider each individual plaintiff's claims in separate lawsuits without regard to how similarly situated they may be to other offended employees.[173]

Perhaps more arrant is the fact that this contention is the Defendant's attempt to have their cake and eat it too.  Deciding the application of the administrative exemption to all implementation specialists and consultants, without any fact intensive, individualized inquiry as to the duties performed by each Plaintiff, is precisely what the Defendants have done.  As the court noted in *Ahle v. Veracity Research Co.*:

> Plaintiffs also are similarly situated in the sense that Veracity's decision to classify them as exempt was not the result of a fact-intensive analysis of the specific duties performed by each individual [plaintiff] or of the specific duties performed by [plaintiffs] at the various titles and levels.  Rather it was the result of a single decision by Veracity's founders that exemption was an industry standard, and that decision was applied uniformly to all levels of [plaintiffs] regardless of their actual duties.  The uniformity of treatment strongly suggests that Plaintiffs are indeed similarly situated.[174]

Putting aside that uniformity, however, the numerous similarities amongst Plaintiffs in individual subclasses as they relate to the §13(a)(1) exemptions, along with other reasons, actually support collective treatment.  The test for exempt status as an administrative employee is as follows:

> (a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

---

[173] *See Ahle v. Veracity Research Corp.*, 2010 WL 3463513, at *23 (D.Minn. 2010), *citing to Indergit v. Rite Aid Corp.*, 2010 WL 2465488, at *9 (S.D.N.Y. 2010) (collecting cases that have expressly rejected this argument).
[174] *Ahle*, 2010 WL 3463513, at *23 (D.Minn. 2010); *see also Nerland*, 564 F.Supp.2d at 1024 (observing that an employer's argument that employees could not proceed collectively to challenge the classification as exempt was "disingenuous" given that the employer's classification decision was done collectively and generally).

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.[175]

Also, the test for exempt status under the computer professional exemption provides, in relevant part, that:

(b) The section 13(a)(1) exemption applies to any computer employee compensated on a salary or fee basis at a rate of not less than $455 per week…. In addition, under either section 13(a)(1) or section 13(a)(17) of the Act, the exemptions apply only to computer employees whose primary duty consists of:

(1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;

(2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

(4) A combination of the aforementioned duties, the performance of which requires the same level of skills.[176]

In the present case, there can be no dispute that Plaintiffs were paid by Defendant on a "salary basis" or that they were paid the minimum amount necessary under section (1) of these provisions.  As such, all Plaintiffs are similarly situated as to the first element of the tests.

---

[175] 29 C.F.R. §541.200.
[176] 29 C.F.R. §541.400.

The second and third elements of these exemptions likewise do not dictate that decertification is proper.  In assessing the second element, whether Plaintiffs' employment directly related to management or general business operations, the court will look to the "type of work performed" by Plaintiffs.[177]  The third element, determining the exercise of discretion and independent judgment, requires the court to look at whether the position involves the "comparison and evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered" as to matters of significance.[178]  The elements of the computer professional exemption merely look to the job duties of the employee plaintiffs.[179]

The factors of these tests do, clearly, relate to the factual employment settings of plaintiffs alleging misclassification of their employment status as exempt.  Where Defendant misses the mark is in the fact that just because individual Plaintiffs' job duties are important does not, ipso facto, mean that the judicial system must bear the burden of enduring thirty-three separate and individual trials to litigate the same factual issues.  That is why there is a "similarly situated" requirement built into §216(b) and why there is a second level of review of certification after discovery is largely complete.  Where plaintiffs engage in similar types of work, in similar fashions, and thereby share common questions of law or fact, certification is proper.  That is the situation this Honorable Court is faced with here.

Plaintiffs in the present cause, with respect to their individual subclass, are not subject to wide factual disparities.[180]  Defendant's claim against them is the matter of a single defense, whether Defendant properly applied the administrative exemption or computer professional

---

[177] 29 C.F.R. §541.201.
[178] 29 C.F.R. §541.202(a).
[179] *See* C.F.R. §541.400(b).
[180] *See supra* Part II.1.

exemption.[181]   With respect to that defense, and with respect to their own claims, Plaintiffs'
performed substantially the same type of work, in similar fashion imbuing them with similar
levels of discretion and judgment.[182]

Defendant asserts, however, that it "'may have to use employment records and/or other
contradictory witness testimony to rebut some of the Plaintiffs' allegations' that their primary
duty did not include the exercise of discretion and independent judgment, or that they did not
apply systems analysis techniques and procedures."[183]   Similarly, Defendant claims that it "may
have to present [Plaintiffs'] unsatisfactory performance reviews to establish that… [they]
converted exempt positions into non-exempt jobs."[184]   These objections to collective treatment
do not prop up Defendant's position on decertification.   The first reason is that the members of
Plaintiffs' subclasses bear out substantial uniformity to one another, thus making this a virtual
non-issue.[185]   Second, assuming some relevant distinction exists between a representative and
opt-in plaintiff in this regard, Defendant's objection is addressed by collective treatment itself.

If, for example, Ilene Meyers, a representative plaintiff, performed a job function which
Joy Flynn, an opt-in plaintiff, did not perform but should have, the finder of fact is all-the-same
presented the testimony of the independent discretion and judgment to be exercised by
implementation specialists and consultants within the subclass through Ilene Meyers and
Defendant's own witnesses.   If the converse was true, and Ilene Meyers, the named
representative, failed to perform a task which she should have performed (or if she failed to
perform that task in some proscribed way), she is present and subject to Defendant's cross-
examination, impeachment, and rebuttal.   In either instance, the Plaintiffs' activities and the

---

[181] *See supra* Part II.2.A.
[182] *See supra* Part II.1.
[183] *See Docket Entry No. 145*, Def's Mot. to Decertify at 24.
[184] *See id.*
[185] *See supra* Part II.1.

mental processes attached thereto which were or should have constituted the sum total of their responsibilities with Defendant are brought to light and Defendant's due process concerns are placed at naught.[186]

Because Plaintiffs share substantial uniformity in the first instance, and because all of Defendants' defenses are asserted against all Plaintiffs, the questions of fact or law that resolve those defenses are common as to all Plaintiffs, thereby weighing in favor of collective treatment.

### 3. THE THIRD INQUIRY: FAIRNESS AND PROCEDURAL CONSIDERATIONS DICTATE AGAINST DECERTIFICATION

In analyzing the relevant fairness and procedural considerations, the court looks at the primary objectives of a collective action which are:

> (1) To lower the costs to plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity.[187]

In general terms, the courts have said they must "… balance the benefits of a reduction in the cost to individual plaintiffs and any increased judicial utility that may result from the resolution of claims in one proceeding with the cost of any potential detriment to the defendant and the potential for judicial efficiency that could stem from collective treatment." This analysis, however, must be conducted with the remedial nature of the FLSA in mind. As the court noted in *Ahle v. Veracity Research Co.*:

> [While] ensuring that the remedial nature of the FLSA is realized are not, by themselves, an adequate reason for allowing a

---

[186] *See generally Nerland v. Caribou Coffee Co.*, 564 F.Supp.2d 1010 (D.Minn. 2007)(finding that Defendant's ability to cross examine a witness purporting to testify to issues relevant to all of the plaintiffs' misclassification claims at a collective trial on the merits was sufficient). Here, the representative Plaintiffs' testimony is relevant to all members of their respective subclasses because they are similarly situated; if Defendant wishes to cross examine them on Plaintiffs' misclassification claims and in support of their defense, they, likewise, will be fully able to do so at a collective trial on the merits.

[187] *Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286, at *7 (S.D.Tex. 2005); *see also Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D.Pa. 2000); *see also Ayers v. SGS Control Servs., Inc.*, 2007 WL 646326, at *6 (S.D.N.Y. 2007).

> collective action to proceed as a collective action,… they do
> suggest that 'a close call as to whether the plaintiffs are similarly
> situated should be resolved in favor of certification.[188]

It cannot seriously be disputed that a collective action with representative testimony will

lower the costs to the parties.  Similarly, this collective action is capable of resolving the legal

issue as to all named Plaintiffs and opt-in Plaintiffs.

Moreover, granting a motion to decertify often runs afoul of the fairness and procedural

considerations.

> The effect of a court order directing the decertification of
> plaintiffs' conditional collective action would be a dismissal of all
> of the opt-in plaintiffs without prejudice, placing each opt-in
> plaintiff back at square-one, without the benefit of pooled
> resources, and presenting the Court with [thirty-three] separate
> lawsuits to resolve the same question of whether Defendants
> exemption    classification    of    all    its    implementation
> specialists/consultants was proper.
>
> This result contravenes the policy behind collective actions under
> section 216(b) of the FLSA of allowing plaintiffs to vindicate their
> rights with lower individual costs by pooling resources and
> benefitting the judicial system  through 'efficient resolution in one
> proceeding of common issues of fact and law arising from the
> same alleged…activity.[189]

Defendants attempt to circumvent this policy by arguing that representative testimony

would rob them of their due process rights and that it would be "unfair" to assess collectively

whether Plaintiffs should have been classified as exempt.  These arguments can be, and often are,

leveled against all FLSA claims which proceed collectively, and, once again, the effect of

crediting such blanket assertions is to write §216(b) out of existence.  Such considerations must

be balanced against the rights of the Plaintiffs, many of whom may be unable to bear or justify

---

[188] *Ahle v. Veracity Research Co.*, 2010 WL 3463513, at *29 (D.Minn. 2010) (denying defendants' motion to decertify a collective action in a misclassification case).

[189] *Nerland v. Caribou Coffee Co.*, 564 F.Supp. 2d 1010, 1025-26 (D.Minn. 2007) (denying defendant's Motion to Decertify in a misclassification case), *citing Wilks v. Pep Boys*, 2006 WL 2821700, at *8 (M.D.Tenn. 2006) (discounting defendant's due process argument similar to the one made by the present defendants in this case).

the costs of an individualized trial, to have their claims heard.   Moreover, the individualized

evidence problems Defendant asserts are ameliorated by Plaintiffs' effort to subclass plaintiffs by

division and software group so that the case may proceed as efficiently and as fairly as possible.

        If this Honorable Court grants Defendant's Motion to Decertify, all opt-in Plaintiffs

would then be required to file separate lawsuits.   The overarching common issue of the

applicability of the administrative exemption and/or computer professional exemption will

remain unresolved but will be common to all plaintiffs in their respective lawsuits.   As such, the

fairness and procedural considerations weigh in favor of aggregating plaintiffs' claims and

denying Defendants' Motion to Decertify.

## III.

### DEFENDANTS' CASES ARE DISTINGUISHABLE

        Plaintiffs acknowledge that there are cases decertifying FLSA collective actions, as

would be proper where there are no common questions of law or fact making the resolution of

such claims collectively efficient.   That is not the situation before this Honorable Court and

Defendants' cases asserted to the contrary are both factually and legally distinguishable.[190]

Many of Defendants' cases involve either multiple job categories or multiple individual

defenses.[191]   Several of these cases were decertified or conditional certification denied due to

unique circumstances not present here.[192]   In *Morisky v. Pub. Serv. Elec. & Gas Co.*, the

---

[190] Half of Defendants' cases are not even cited under the auspice of being factually or legally similar, but for the
sole proposition that collective treatment, out of the universe of possible reasons, was denied.  *See Docekt Entry No.
145*, Def's Mot. to Decertify, at 5, n. 21; Furthermore *Stein v. J.C. Penney Co.*, 557 F.Supp. 398 (W.D.Tenn. 1983)
is not even a collective action case.

[191] *Reyes v. Tex. EZPawn, L.P.*, 2007 WL 101808, at *2 (S.D.Tex. 2007) (involving multiple individual exemptions
not applicable to the class as a whole); *Johnson v. TGF Haircutters, Inc.*, 2005 WL 1994286, at *1 (S.D.Tex. 2005)
(involving multiple job categories); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F.Supp.2d 493, 495—96 (D.N.J.
2000).

[192] *See generally Reyes*,  2007 WL 101808 (involving multiple individual exemptions not applicable to the class as a
whole); *See generally TGF Haircutters*, 2005 WL 1994286 (involving multiple job categories); *See generally
Morisky* 111 F.Supp.2d 493 (plaintiffs failed to produce any evidence of the opt-in plaintiffs' job duties); *see*

plaintiffs sought to collectively adjudicate the exemption claims of *six* different job categories.[193]

Central to the court's holding in that case was that the:

> Plaintiffs have made *no showing* that the job responsibilities of the named plaintiffs are the same or similar to those of the remaining members of the proposed class, or that the opt-in plaintiffs could properly be classified as non-exempt employees.  *In fact, plaintiffs do not even discuss the job responsibilities of the opt-in plaintiffs.* Instead, plaintiffs reference an extremely broad 'general connection' all plaintiffs have to the production of electricity.[194]

Similarly, in *Carlson v. C.H. Robinson Worldwide, Inc.*:

> A substantial number of the Named Plaintiffs and the Opt-in Plaintiffs either did not attempt to demonstrate that they performed duties similar to those performed by other plaintiffs or conceded that their job duties differ from those of other plaintiffs.[195]

The plaintiffs in *Carlson* could not even claim that there was some common treatment of defendant's employees in classifying them as exempt because they were subject to individualized and frequent reviews of their exempt status.[196]

In *King v. West Corp.*, a single named representative, employed as a (VSM) (voice services manager), sought to represent a collective action of 177 other employees who were either VSM's or DSM's (data services managers).[197]  These VSM's and DSM's were included in highly specialized teams[198] and many of them performed niche functions within that team not undertaken by other members, such that a team might have one person as a facilitator, one person as a quality control expert, one person as a subject matter expert and performing distinct and

---

*generally Smith v. Heartland Auto. Servs., Inc.*, 404 F.Supp.2d 1144 (D.Minn. 2005) (plaintiffs failed to produce evidence of being similarly situated).

[193] *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F.Supp.2d 493,  495—96 (D.N.J. 2000) (this amalgamation of completely unrelated job titles included Procedure Writers, Quality Verification Inspectors, Designers, Technical Specialist/Senior Engineers, Senior Staff Engineers, and Installation and Test Engineers).

[194] *Id.* at 498 (emphasis added).

[195] *Carlson v. C.H. Robinson Worldwide, Inc.*, 2006 WL 2830015, at *6 (D.Minn. 2006).

[196] *Id.* at 1.

[197] *King v. West Corp.*, 2006 WL 118577, at *1, 2, 3 (D.Neb. 2006).

[198] *Id.* at 5-10.

individualized tasks as a result.[199] The question before the court was whether King, individually, was similarly situated to these 177 other opt-in plaintiffs,[200] which could not possibly be the case.

Conversely, Plaintiffs' herein have produced overwhelming evidence that they are similarly situated, that they are subject to common defenses globally asserted against the entire class, and that the present action should be allowed to proceed collectively.

## IV.

### ADDITIONAL OR ALTERNATIVE SUBCLASSES

In the event this Honorable Court determines that the subclasses that Plaintiffs have already endeavored to create are insufficient, additional or alternative subclasses, and not decertification, is appropriate.  In *Wilkes v. Pep Boys*, the court determined that factually disparate plaintiffs are often divided into subclasses for purposes of judicial efficiency at trial.[201] In *Thiessen v. Gen. Electric Corp.*, the court reversed a decertification order, instead remanding the case with the holding that bifurcation could have addressed variances in issues of damages or liability.[202]  Numerous other cases have followed this same tack and have acknowledged the creation of subclasses as an alternative to decertification.[203]

## V.

### CONCLUSION

Defendant's Motion to Decertify should be denied.  The crux of Defendant's argument is dissimilarity between all Plaintiffs working for Tyler Technologies, generally, regarding their job

---

[199] *Id.* at 10-11.
[200] *Id.* at 1.
[201] *Wilkes v. Pep Boys*, 2006 WL 2821700, at *6 (M.D.Tenn. 2006).
[202] *Thiessen v. Gen. Elec. Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001).
[203] *See Thiebes v. Wal-Mart Stores, Inc.*, 1999 WL 1081357, at *3 (D.Ore. 1999); *see also Takacs v. Hahn Auto. Corp.*, 1999 WL 33127976, at *1-3 (S.D.Oh. 1999); *see also Coan v. Nightingale Home Health Care, Inc.*, 2006 WL 1994772, at *2 (S.D.Ind. 2006); *see also Ayers v. SGS Control Servs., Inc.*, 2007 WL 646326, at n.7 (S.D.N.Y. 2007).

functions.   The question before this Honorable Court is narrower than that; that question is whether the Plaintiffs representing each division or product line are "similarly situated" such that they share common questions of law or fact more efficiently and fairly resolved collectively than in thirty-three separate trials.   As the court held in *Scott v. Aetna Servs., Inc.*, refusing to decertify a collective action on the defendant's motion:

> However, several courts have held that it is appropriate to bring an FLSA exemption claim as a class action with regard to employees who perform similar, but not identical duties, notwithstanding the highly fact specific nature of the exemption inquiry.   Here, the plaintiffs have established that their claims may be supported by generalized proof.[204] (citations omitted).

The Plaintiffs in the present case have done likewise.   Generalized proof will determine the applicability of the administrative exemption to the job of implementation specialists and consultants as they were employed by Defendant in each of divisions or with respect to the particular software program they serviced.   The overwhelming evidence in the record, after almost every Plaintiff has been deposed and extensive discovery, establishes that Plaintiffs underwent the same types of training, were subject to uniform evaluation by Defendant, and had substantially similar job functions and roles as they related to performing or not performing fit analyses, software configuration and review of configuration errors, converting data and reviewing conversion errors, in training Defendant's customers subject to the canned agendas and training manuals propagated through the corporation, and in providing go-live support and post go-live support to those same customers.   All of this reflects that Plaintiffs are similarly situated, that they do share common questions of law or fact, and that it is just and proper to continue this litigation as a collective action.   Defendant's motion should be denied.

---

[204] *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 265 (D.Conn. 2002).

Respectfully submitted,

SLOAN, BAGLEY, HATCHER & PERRY
LAW FIRM

/s/ Laureen F. Bagley
John D. Sloan, Jr.
State Bar No. 18505100
jsloan@textrialfirm.com
Laureen F. Bagley
State Bar No. 24010522
lbagley@textrialfirm.com
101 East Whaley Street
P.O. Drawer 2909
Longview, Texas 75606
(903) 757-7000
(903) 757-7574 (Fax)

Alexander R. Wheeler
awheeler@rrexparris.com
Jason Paul Fowler
jfowler@rrexparris.com
R. REX PARRIS LAW FIRM
42220 10TH Street West, Suite 109
Lancaster, CA 93534-3428
(661) 949-2595
(661) 949-7524 (Fax)

John P. Zelbst
zelbst@zelbst.com
Chandra L. Holmes Ray
chandra@zelbst.com
ZELBST, HOLMES & BUTLER
P.O. Box 365
Lawton, OK 73502-0365
(580) 248-4844
(580) 248-6916 (Fax)

James E. Wren
Texas State Bar No. 22018200
James_Wren@baylor.edu
One Bear Place #97288
Waco, Texas 76798-7288
 (254) 710-7670
(254) 710-2817 (Fax)

**ATTORNEYS FOR PLAINTIFFS**


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing instrument has been served on all counsel of record via electronic mail on this 8th day of November, 2010, as follows:

Paulo B. McKeeby
Joel S. Allen
Sharon Fast Fulgham
*MORGAN, LEWIS & BOCKIUS, LLP*
1717 Main Street, Suite 3200
Dallas, Texas 75201-7347

Deron R. Dacus
*RAMEY & FLOCK, P.C.*
100 East Ferguson, Suite 500
Tyler, Texas 75702


 s/Laureen F. Bagley
LAUREEN F. BAGLEY

**LIST OF EXHIBITS TO PLAINTIFFS' RESPONSE**

**IN OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY**

| EXHIBIT NUMBER | DESCRIPTION |
|:---:|---|
| 1 | Deposition excerpts of Robert Sansone |
| 2 | Deposition excerpts of Chris Hepburn |
| 3 | Deposition excerpts of Geraldine Ingram |
| 4 | Deposition excerpts of Bethany Maynard |
| 5 | Deposition excerpts of Ilene Meyers |
| 6 | Deposition excerpts of Lisa White |
| 7 | Deposition excerpts of Kelly Hampton |
| 8 | Deposition excerpts of Amy Dunn |
| 9 | Deposition excerpts of Travis Void |
| 10 | Deposition excerpts of Joy Flynn |
| 11 | Deposition excerpts of Betty Dupree |
| 12 | Deposition excerpts of Laura Milburn |
| 13 | Deposition excerpts of Kevin Mosenthin |
| 14 | Deposition excerpts of Ronald Grimwood |
| 15 | Position Description MUNIS Implementation Consultant dated December 4, 1997 |
| 16 | Position Description MUNIS Implementation Specialist dated May 6, 1999 |
| 17 | Deposition excerpts of Sandra Dunning |
| 18 | Deposition excerpts of Joy Bibles McLeod |

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 19 | Deposition excerpts of Thomas O'Haver |
| 20 | Deposition excerpts of Yvonne Wilton |
| 21 | Deposition excerpts of David Hayner |
| 22 | Deposition excerpts of Titus Britt |
| 23 | Deposition excerpts of Gayla Duke |
| 24 | Deposition excerpts of Melanie Baird |
| 25 | Deposition excerpts of Lorraine Mutch |
| 26 | Deposition excerpts of Russell Steele |
| 27 | Deposition excerpts of Eric Emde |
| 28 | Deposition excerpts of Jill Brown |
| 29 | Deposition excerpts of Linda Carrington |
| 30 | Deposition excerpts of Talina McElhaney |
| 31 | Declaration of Anthony Dodd |
| 32 | Declaration of Talina McElhaney |
| 33 | Declaration of Lisa White |
| 34 | Declaration of Kelly Hampton |
| 35 | Declaration of Ilene Meyers |
| 36 | Declaration of Kim Huynh |