# FREEDOM COURT REPORTING

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                   MARSHALL DIVISION
 3
    PATTY BEALL; MATTHEW MAXWELL;  )
 4  TALINA MCELHANY; AND KELLY     )
    HAMPTON, individually and on   )
 5  on behalf of all others        )
    similarly situated,            )
 6                                 )
            Plaintiffs,            )  2:08-cv-422 TJW
 7                                 )
    vs.                            )
 8                                 )
    TYLER TECHNOLOGIES, INC.       )
 9  AND EDP ENTERPRISES, INC.,     )
                                   )
10          Defendants.            )
    _____)
11
12
13
14          Deposition of GERALDINE C. INGRAM
15                (Taken by Defendants)
16              Greensboro, North Carolina
17               Thursday, July 29, 2010
18
19
20
21
22              Reported in Stenotype by
                Alicia S. Clement, RPR
23  Transcript produced by computer-aided transcription
```

**EXHIBIT 3**

# FREEDOM COURT REPORTING

Page 2

```
 1                    APPEARANCES
 2   ON BEHALF OF PLAINTIFFS:
 3        LAUREEN F. BAGLEY, Esquire
          Sloan, Bagley, Hatcher & Perry Law Firm
 4        101 East Whaley Street
          Longview, Texas  75601
 5        (903) 757-7000
 6   ON BEHALF OF DEFENDANTS:
 7        PAULO B. MCKEEBY, Esquire
          Morgan, Lewis & Bockius LLP
 8        1717 Main Street, Suite 3200
          Dallas, Texas  75201
 9        (214) 466-4000
10
11
12
13
14
15
16        DEPOSITION OF GERALDINE C. INGRAM, a
17   witness called on behalf of Defendants, before
18   Alicia S. Clement, Registered Professional Reporter
19   and Notary Public, in and for the State of North
20   Carolina, at the Offices of Ogletree, Deakins, Nash,
21   Smoak & Stewart, PC, 2725 Horse Pen Creek Road,
22   Suite 101, Greensboro, North Carolina, on Thursday,
23   July 29, 2010, commencing at 9:44 a.m.
```

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 3

```
 1              INDEX OF EXAMINATIONS

 2   BY MR. MCKEEBY . . . . . . . . . . . . . .   PAGE 4

 3

 4              INDEX OF EXHIBITS

 5   NUMBER          EXHIBIT                    MARKED

 6   1- Résumé. . . . . . . . . . . . . . .       7

 7   2- Work Schedule Spreadsheet,

         September-November '06. . . . . . . .   36

 8

     3- Itinerary . . . . . . . . . . . . .      49

 9

     4- Consent to Opt In . . . . . . . . . .    77

10

     5- Letter from Mr. Sansone to

11       Ms. Ingram, 12/15/05. . . . . . . . .   67

12   6- Munis Vacation Request Form . . . . . .  74

13   7- Job Posting . . . . . . . . . . . . .    75

14

15

16

17

18

19

20

21

22

23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 29

1          Q.    Or to Ms. -- I'm sorry.

2          A.    -- to Carrie Lynn Ware.

3          Q.    And is that -- is that who you would make

4     the request -- the -- the request to always, was

5     Ms. Ware?

6          A.    I would not say, "always."  I would say

7     that it would be Carrie Lynn Ware or both Carrie

8     Lynn and Penny Parsons by e-mail.

9          Q.    Okay.  So is your testimony that it was

10    Ms. Ware that approved on occasion you taking

11    Fridays off to attend to personal matters when you

12    had traveled?

13         A.    It's one particular Friday that I'm

14    referencing.

15         Q.    What particular Friday is that?

16         A.    The one I -- where I say that I had gotten

17    in at 1 o'clock on a Friday morning.  I actually had

18    to spend the night in a hotel because of my flight

19    delay.

20         Q.    I see.  So you came back to Raleigh on

21    Friday morning?

22         A.    Right.

23         Q.    And you made a request on that occasion to

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 30

1   Ms. Ware to not have -- to not come into the office?

2        A.   Right.

3        Q.   And Ms. Ware approved that?

4        A.   She did.

5        Q.   Where had you been?

6        A.   I had been to Missouri.  But I got stuck

7   in Chicago.

8        Q.   Were there occasions other than that where

9   you made a request of either Ms. Ware or Ms. Parsons

10  to take a Friday off after you had been traveling

11  during the week?

12       A.   I don't recall.

13       Q.   Now, when you were hired by Tyler and

14  started working in January of 2006, did you go

15  through a training period?

16       A.   I did, yes.

17       Q.   Let's talk a little bit about that.  What

18  did you do -- first of all, how long was the

19  training period?

20       A.   It was approximately 60 days.

21       Q.   And would you agree with me that during

22  that training period, you spent some of the time in

23  the Raleigh-Durham offices going over the Tyler

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**

# FREEDOM COURT REPORTING

Page 31

1   manuals about the different software applications?

2        A.   Yes.

3        Q.   And is it also true that during that

4   approximately 60-day training period, you also went

5   on trips with other employees to customer sites to

6   observe what they did?

7        A.   Yes.

8        Q.   And if I use the term "shadow" the

9   employees, is that a term that was used at Tyler to

10  describe that process?

11       A.   Yes, it was.

12       Q.   Do you remember the names of the employees

13  who you shadowed?

14       A.   I shadowed my project manager and one

15  other associate on that site who I don't remember

16  their name.

17       Q.   Was there any other type of training that

18  you received that we have not discussed during this

19  approximately 60-day period?

20       A.   No.

21            MS. BAGLEY:   Object to the form.

22  BY MR. MCKEEBY:

23       Q.   Now, just focusing on this 60-day

**EXHIBIT 3**

# FREEDOM COURT REPORTING

Page 32

1    period --

2         A.    Uh-huh.

3         Q.    -- did you work more than 40 hours during

4    any week during the first 60 days, this training

5    period?

6              MS. BAGLEY:  Object to the form.

7              THE WITNESS:  The period of time that

8         I worked over 40 hours was when I

9         shadowed.

10   BY MR. MCKEEBY:

11        Q.    Did you -- let me scratch that.

12             If can we break down the training period,

13   then, into periods of time in which you shadowed and

14   periods in time in which you were in the office

15   reviewing manuals.

16        A.    Yes.

17        Q.    I mean, did the -- did the period of time

18   when you were in the office reviewing the manuals

19   occur before you started shadowing the other

20   employees?

21        A.    Yes.

22        Q.    So -- okay.  How long were you in the

23   office reviewing manuals as part of this training

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 33

1    period?

2        A.    Ninety-nine percent of that time.  I only

3    shadowed one client.

4        Q.    Okay.  So most of the 60 days of the

5    training period was spent at the office reviewing

6    manuals?

7        A.    Yes.

8        Q.    And while -- and during those weeks in

9    which you didn't shadow, you worked 40 hours or

10   less?

11       A.    Correct.

12       Q.    But the time when you did shadow during

13   this training period -- and, again, I'm just talking

14   about the 60 days.

15       A.    Yes.

16       Q.    We'll talk about the rest of the time at

17   Tyler in a minute.

18             But during that time when you shadowed the

19   one client, you did work more than 40 hours?

20       A.    Yes.

21       Q.    And was -- what was the client, the

22   location, if that helps?

23       A.    Radford, Virginia.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**

# FREEDOM COURT REPORTING

Page 41

1      Q.   I'm looking at the 14th of September.

2      A.   Yes.  Williamson, Tennessee.  Williamson

3 County, Tennessee.

4      Q.   Okay.  Where is that in Tennessee?

5      A.   Franklin -- Franklin --

6      Q.   So --

7      A.   I think it was near Franklin, Tennessee.

8      Q.   Okay.  So you flew from Raleigh to what?

9 Nashville probably? and --

10     A.   Yes.

11     Q.   Okay.

12     A.   And drove from Nashville to --

13     Q.   Williamson?

14     A.   -- right, Williamson County.

15     Q.   Okay.  And then on Friday you returned to

16 Raleigh, correct?

17     A.   Yes.

18     Q.   And then went back to Williamson County on

19 the following Monday?

20     A.   Yes.

21     Q.   And then, if you'll follow me,

22 went -- flew back from Williamson -- or from

23 Tennessee back to Raleigh on the following Thursday,

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 42

```
 1   the 21st?

 2        A.   Yes.

 3        Q.   Was that the -- the -- that wouldn't have

 4   been the time when you got held up, because you told

 5   me you were held up in Missouri and Chicago.  It

 6   looks like you got to take that Friday, the 22nd,

 7   off, correct?

 8        A.   No.

 9        Q.   That was a day that you spent at work in

10   the office?

11        A.   Right.

12        Q.   Okay.  So let's focus a little bit on

13   the -- the trip to Williamson, Tennessee.

14   What -- what does -- first of all, looking at that

15   14th designation, what does "mini-parallel" mean?

16        A.   That's where the project -- project

17   manager has set up the client training database to

18   run a sample payroll to see if all of the features

19   that their project manager had pulled out from the

20   consultation were in place.

21        Q.   Okay.  So does that mini-parallel refer to

22   some type of training that you were to administer?

23        A.   It was just to assist the client in
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 43

1    processing a sample payroll out of the client

2    training base to get the outcome.

3         Q.    So that doesn't refer to training that you

4    engaged in?

5         A.    No.

6         Q.    No, it does not?

7         A.    No, it does not.

8         Q.    What -- this refers to working with a

9    client, though, correct?

10        A.    It is working with a client and just

11   assisting.

12        Q.    Assisting with a sample payroll?

13        A.    Correct.

14        Q.    And so what type of assistance did you

15   provide?

16        A.    If they had questions on what was a

17   particular -- the meaning of a field or how to enter

18   particular types of hours, you would assist.

19        Q.    So on that date, the 14th, you would

20   have been observing representatives of the client

21   working within the Tyler payroll system?

22        A.    Correct.

23        Q.    Would this be in, like, a classroom

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 46

1   after the County had gone live with the software?

2       A.    This was in preparation for them going

3   live with the -- the application.

4       Q.    And using this as an example - and we'll

5   broaden it out if we need to - prior to visiting

6   Williamson County -- let me ask you this:  Had

7   you -- prior to this visit in September, had you met

8   with that client before?

9       A.    Not to my knowledge, but I -- I cannot

10  accurately say that.

11      Q.    Okay.  For sure?

12      A.    Right.

13      Q.    Okay.  Prior to -- to the visit to

14  Williamson County on the 14th to do this

15  mini-parallel observation and assistance work, did

16  you need to know anything about their legacy system,

17  or previous system?

18      A.    No.

19      Q.    Did you do anything in preparation for

20  your work in Williamson County at the office in the

21  sense of reading any reports or talking to anyone

22  about what you would be doing or did you know pretty

23  well from the calendar designation what it is you

## FREEDOM COURT REPORTING

Page 47

1    needed to be doing?

2        A.   I had an agenda that my project manager

3    completed when I went out on site and that is where

4    I would know what to -- what schedule to follow,

5    what task to complete.

6        Q.   And when you use the term "agenda," you're

7    talking about a particular document --

8        A.   Yes.

9        Q.   -- that was sent to you by the project

10   manager?

11       A.   Correct.

12       Q.   And it was the form of a schedule?

13       A.   Yes.  It was just basically an outline.

14       Q.   What additional details did -- did it

15   provide beyond what's in Exhibit 2 with respect to

16   what you were to be doing in Williamson County?

17       A.   It may have a heading on it in- --

18   indicating the dates and mini-payroll as the task,

19   main task.  Then it would have, for example,

20   Thursday, the 14th, from this time to this time,

21   entering data, client enters hours.  That was the

22   type of format and basically stepped you through the

23   process and the time frames.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**

# FREEDOM COURT REPORTING

Page 48

1    Q.   Would it be typical for you prior to going

2    on the customer location to provide the assistance,

3    observation, or training to have any phone

4    conversations with the customer?

5    A.   No.

6    Q.   That would not be -- that would be

7    unusual?

8    A.   It was only to confirm the -- the arrival

9    time or that you were still on schedule and

10   expected.

11   Q.   Okay.

12   A.   As far as particulars of the setup, no.

13   Q.   Did you have any -- in the context of this

14   assignment to Williamson County, did you have any

15   reporting obligations?

16   A.   No.

17   Q.   Did you have any reporting obligations

18   generally with respect to visits to customer

19   locations?

20   A.   Are you -- creating reports?

21   Q.   Or -- that could be one example.  I'm

22   saying, you know, in terms of telling your project

23   manager or whomever at Tyler what you had done, how

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 3**

# FREEDOM COURT REPORTING

Page 49

1  well it had gone?

2        A.    Yes.

3        Q.    Okay.   What -- what form did you submit

4  that type of information?

5        A.    There -- it was multiple ways.   During

6  the -- the -- the day with the client, our customer,

7  you would be in contact by voice mail or e-mail.   I

8  was in contact through voice mail or e-mail with my

9  project manager.   After -- at the end of the day, I

10  was in contact again with my project manager as to

11  how things had gone.   And we had what we referred to

12  as "trip notes" that were completed at the end of a

13  week that indicated concerns, issues, and how

14  the -- how the training or the assistance-giving

15  went -- given went during that particular period of

16  time.   So there was multiple ways to give that

17  input.

18        Q.    Is -- I'm going to hand you another

19  document that you produced in the lawsuit which I'll

20  go ahead and mark as Exhibit 3.

21        A.    Okay.

22     (EXHIBIT NUMBER 3 WAS MARKED FOR IDENTIFICATION)

23  ///

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 50

1    BY MR. MCKEEBY:

2         Q.    And ask you is -- are these examples of

3    trip notes?

4         A.    These are examples of trip notes.

5         Q.    And this is for a trip to Richmond County?

6         A.    Yes.

7         Q.    Looking back at these -- the schedule,

8    Exhibit 2, would you agree with me that part of your

9    job at Tyler as an implementation specialist

10   involved providing training to customers?

11        A.    Training was involved on occasion as

12   to -- again, how to utilize the software screen by

13   screen, table by table, just entering this data,

14   data entry, data entry, how to enter data, the data

15   that they need to put into the Tyler system from an

16   existing system.

17        Q.    Is that the only type of training that you

18   provided while you were at Tyler?

19        A.    Well, the training was given in different

20   formats.  We would use canned reports from the Tyler

21   site to show up on the screen, to show them output

22   of the data.  That was the main focus.

23        Q.    Okay.  But in terms of the type of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 51

1  training you were providing, it was how to enter the

2  Tyler data from -- or utilizing the Tyler software?

3      A.   Right.  How to enter their unique data

4  into the Tyler software.

5      Q.   Okay.  And apart from the method by which

6  you trained, was there any other training that you

7  provided to customers beyond training them as to how

8  to enter their unique information into Tyler's

9  software?

10      A.   Not that I can recall, no.

11      Q.   And can you -- looking at

12  this -- the -- this calendar, can you tell me from

13  the descriptions of the work examples of when you

14  were training customers as to how to enter their

15  information into Tyler's software?

16      A.   You want examples of when I was doing

17  that?

18      Q.   Yeah, if you can tell it from the -- from

19  the calendar.

20      A.   Of course, on the 18th with payroll

21  processing, again, I was sitting there and just

22  making sure that they were entering their hours.

23  They would ask questions, if they had them.  Again,

## FREEDOM COURT REPORTING

Page 52

1    it was more data processing.

2              On the 19th that was another module of

3    the system.  And, again, I do recall that one being

4    showing them how to utilize the system to -- to

5    basically cover the workflow procedures.

6         Q.   Okay.  But let me ask you this -- let

7    me -- let me ask you it in a different way.  Looking

8    not just at the Williamson County work but the

9    entire document, are there days -- you -- you've

10   just described the type of training that -- that you

11   provided while you were at Tyler training customers

12   as to how to enter their unique information into

13   Tyler's system.  And my question for you is:  Just

14   looking at this whole document, you know, all the

15   different, I guess -- what are there?  Two -- two

16   pages, really, for September and -- through

17   November? -- are there designations in these

18   calendars that you can point to and say, "Yeah, that

19   was a date in which I provided training to a

20   customer as to how -- how to enter their unique

21   information into Tyler's system"?

22        A.   I still don't know if I'm understanding,

23   because all of these procedures would include that.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 3**

# FREEDOM COURT REPORTING

Page 63

1    Q.  And, also, at -- the time of phone calls

2  with your project manager?

3    A.  And e-mails, yes.

4    Q.  Now, how are the e-mails going to appear

5  in the expense reports, though?

6    A.  No.  I'm saying that that is another part

7  to look at when you're looking at hours worked, is

8  time that would have been spent with the project

9  manager --

10    Q.  But my question is --

11    A.  -- after hours.

12    Q.  But my question is:  If I just had the

13  expense report - let's just say the expense report

14  for that week of -- of September 18th - could

15  you -- could I hand that to you and you tell me, "I

16  worked 44 hours this week," for example?

17    A.  In my opinion, all of that time would have

18  been considered worked.

19    Q.  Okay.  But -- and could you do it just on

20  the basis of the expense report, of what was in the

21  expense report?

22    A.  In my opinion, yes.

23    Q.  What -- since I don't have those documents

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 64

1   with me, what is your claim as to how many hours you

2   typically worked on average at Tyler after the

3   60-day training period?

4        A.   I typically worked about 55 hours a week.

5        Q.   Are there documents other than the expense

6   reports that we've discussed that would -- you could

7   point to that would show us the number of hours that

8   you worked?

9        A.   There are the forms that the client had to

10  sign off on on each trip.

11       Q.   What are those forms called?

12       A.   I don't remember.

13       Q.   And what are in those forms?

14       A.   That was the hours at the -- the -- those

15  were billable hours that the customer was signing

16  off to verify.

17       Q.   And you completed that document?

18       A.   Yes, I completed the document.  And the

19  customer would sign off in agreement.

20       Q.   And those documents contained a number of

21  hours as opposed to, like, a half day or a full day?

22       A.   It -- it had actual hours spent with the

23  client that they were being billed for.  Now, in

**EXHIBIT 3**

## FREEDOM COURT REPORTING

Page 65

1    addition to that, there are hours that were spent,

2    again, working with my project manager or working on

3    the client's data separate from the client that were

4    not ultimately billed to the client.

5         Q.   And so those hours would not appear on the

6    form that you provided to the client?

7         A.   Correct.

8         Q.   All right.  Other than the form that you

9    just described that the client signed and the

10   expense reports, are there other documents that you

11   can recall that would have shown the number of hours

12   that you worked in particular workweeks?

13        A.   Other than at that point I may have had

14   some personal documents, but nothing that was

15   specific, I would say.

16        Q.   What personal documents do you mean?

17        A.   I mean, at that time I probably had a

18   Day-Timer or a calendar that showed me that.  But

19   I -- I could not say that I still have that

20   information.

21        Q.   So was it a -- a -- you maintained a

22   Day-Timer that showed the number of hours that you

23   worked?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 3**