# FREEDOM COURT REPORTING

Page 1

```
1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF TEXAS

3                        MARSHALL DIVISION

4    _____

5    _____

6    PATTY BEALL, MATTHEW

7    MAXWELL, TALINA McELHANY and

8    KELLY HAMPTON, Individually

9    and on behalf of all other

10   similarly situated,

11           Plaintiffs,           2:08-cv-422  TJW

12      v.

13   TYLER TECHNOLOGIES, INC., and

14   EDP ENTERPRISES, INC.,

15           Defendants.

16   _____

17   _____

18                     DEPOSITION OF

19                      ILENE MEYERS

20

21   At Raleigh, North Carolina

22   Friday, July 30, 2010; 9:14 a.m.

23   Reported by: Lindsey D. Cline, CVR
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 2

```
 1                      A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4         LAUREEN F. BAGLEY, ESQ.

 5         Sloan, Bagley, Hatcher & Perry Law Firm

 6         101 East Whaley Street

 7         Longview, Texas 75606

 8

 9    For the Defendants:

10         PAULO B. McKEEBY, ESQ.

11         Morgan, Lewis & Bockius, LLP

12         1717 Main Street, Suite 3200

13         Dallas, Texas 75201-7347

14

15

16

17

18

19

20

21

22

23
```

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 3

1                    T A B L E O F C O N T E N T S

2                      E X A M I N A T I O N S

3         EXAMINATION                              PAGE

4           Direct Examination by Mr. McKeeby        6

5           Cross Examination by Ms. Bagley         89

6

7                    T A B L E O F C O N T E N T S

8                        E X H I B I T S

9         EXHIBITS        DESCRIPTION           MARKED/REFERENCED

10        Number 1      Expense Reports           15/23

11        Number 2      Customer Services Report  22/23,24,26

12        Number 3      Offer Letter              75/77

13        Number 4      Resume                    80/

14        Number 5      Updated Resume            82/

15        Number 6      Declaration of Ilene      84/

16                      Anne Meyers

17        Number 7      Opt In Notice             89/

18

19

20

21

22

23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 31

```
1    Q.    She got married?

2    A.    Uh-huh.

3    Q.    Is that yes?

4    A.    Yes, sorry.

5    Q.    That's all right.  Who was the next project

6          manager to whom you reported?

7    A.    Karen Lowe, and it's an "E" at the end, L-O-W-E.

8    Q.    How long did you report to Ms. Shumaker-Jackson as

9          a project manager?

10   A.    I'd say approximately three months.

11   Q.    What were the circumstances surrounding your

12         transition from Ms. Jackson's team to Ms. Lowe's

13         team?

14   A.    Just growth.  Projects -- she was a more

15         experienced project manager.  I would get more

16         growth working with Karen Lowe.

17   Q.    So did you make a request to move to her team?

18   A.    No.

19   Q.    You were just advised that you were moving to her

20         team?

21   A.    Yes.

22   Q.    And do I understand your testimony correctly to

23         mean that you were advised that the reason for
```

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 32

```
 1        this shift was to allow you to grow more under a

 2        more experienced project manager?

 3   A.   Yes.

 4   Q.   Is that something Ms. Parsons told you?

 5   A.   Yes.

 6   Q.   Well, let me break it down a little bit.  Did you

 7        -- when you were first employed by Tyler, did you

 8        go through a period of training?

 9   A.   Yes.

10   Q.   Without getting into the effectiveness of the

11        training, was there a period that we could

12        identify that you were training to be an

13        implementation specialist?

14   A.   Yes.

15   Q.   Again, if you could give me an estimate, how long

16        was that training period?

17   A.   I was probably in training for approximately two

18        months.

19   Q.   And did part of that training consist of reviewing

20        the Tyler manuals to better acquaint yourself with

21        Tyler software?

22   A.   Yes.

23   Q.   And was that done in the office?
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 33

1  A.  Yes.

2  Q.  And was part of the training shadowing or

3     observing other implementation specialists as they

4     did their job?

5  A.  Yes.

6  Q.  During this two-month training period that you

7     referenced -- approximately two-month training

8     period that you referenced -- did your training

9     consist of anything other than reviewing the

10    manuals and shadowing or observing other

11    implementation specialists?

12 A.  That was it.

13 Q.  Had you ever done software training or support

14    before coming to Tyler?

15 A.  No.

16 Q.  Was there something -- Well, I'll ask it a very

17    direct way.  Why did you seek employment with

18    Tyler?

19 A.  I was laid off from Southwest Airlines.  I was

20    unemployed.

21 Q.  Did you -- How did you find out about employment

22    opportunities at Tyler?

23 A.  Networking, through friends.

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 36

1       weeks in which you did work more than 40?

2   A.  When I was shadowing.

3   Q.  And I take it that includes travel time?

4   A.  No, it does not include travel time.

5   Q.  What does -- what did you do when you were

6       shadowing?

7   A.  I was assisting the -- whoever was implementing

8       the training, and then there was sometimes follow-

9       up work in the hotel.

10  Q.  What kind of follow-up work?

11  A.  Setting up parameters, possibly, you know, just --

12      and even in the learning phases, learning what was

13      taught that day or implemented that day for that

14      client.

15  Q.  And how would you go about learning what was

16      implemented that day?

17  A.  I would have my computer with me and would have

18      taken appropriate documentation.

19  Q.  So would this be kind of refreshing your

20      recollection and knowledge about what had been

21      trained during that day?

22  A.  Yes.

23  Q.  And when you were setting up parameters, would

**FREEDOM COURT REPORTING**

Page 37

1      that be something you would assist the implementer

2      with?

3   A.   Yes.

4   Q.   And when you say parameters, what does that mean?

5   A.   There are tables within the software that need to

6      be set up that the software behaves in a certain

7      capacity based on their business needs -- whatever

8      their business needs are.

9   Q.   Does -- Is what you just described referred to at

10      Tyler during your employment as configuration or

11      is that something different?

12   A.   Parameters and configuration could probably be

13      interchanged, possibly, as words.  There are some

14      more -- I would say more -- it's more basic

15      setting of parameters or tables that are within

16      the software for that client, in particular.

17   Q.   What does configuration mean?

18   A.   Sometimes I think of it more on a heavier

19      technical side configuration, if it's something

20      that, you know, really starts with the software

21      development of the configuration for the

22      particular client.  It goes with, you know,

23      whatever analysis has been done for that

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 38

1           particular client.

2    Q.    Moving aside just for a moment now from the

3           training time, during your employment with Tyler

4           as an implementation specialist, I take it that --

5           and this is when you were on your own after the

6           training period.  You would do this work yourself

7           in terms of setting up the parameters?

8    A.    Yes.

9    Q.    Would you also do the type of configuration that

10          you just mentioned while you were an

11          implementation specialist?

12   A.    No.

13   Q.    Someone else at Tyler did that?

14   A.    Uh-huh, I believe so.

15   Q.    Do you know who?

16   A.    Well --

17   Q.    Or what department?

18   A.    I think it's the technology department.  Whatever

19          the technical people -- more of the inner workings

20          of the computer and the software.

21   Q.    Okay.  The -- and you didn't personally develop

22          the software?

23   A.    Do you think -- no, I didn't.  I'm sorry.

**EXHIBIT 5**

## FREEDOM COURT REPORTING

1   Q.   That's okay.  Who -- can you name the implementers

2        who you shadowed?

3   A.   Sarah Shumaker-Jackson was one.  And I'm really --

4        I see her face and I don't know.

5   Q.   Let's see if I have it in these expense reports.

6        It says that you did some shadowing in Richmond.

7        Was that with Sharon?

8   A.   With Sarah --

9   Q.   I mean with Sarah?

10  A.   I think -- yes, Sarah Shumaker.  And there was

11       some done in Halifax County.

12  Q.   With?

13  A.   I just can't place her name.

14  Q.   Can't place the person's name?

15  A.   (Witness shakes head from side to side.)

16  Q.   Okay.

17  A.   I think she might even still be with them.

18  Q.   Okay.  Was the -- I understand MUNIS's software to

19       be broken down between financial software and

20       human resources software.  Does -- do you -- is

21       that accurate?

22  A.   The only thing I ever worked on were the

23       financials.  I didn't do the -- I think you're

## FREEDOM COURT REPORTING

Page 40

1           talking payroll?

2     Q.    I am.

3     A.    Yes.  I didn't work on payroll.

4     Q.    So you worked on supporting and training on the

5           financial software that Tyler provided?

6     A.    Yes.

7     Q.    And I guess you would agree that there are a

8           variety of different -- what do you call it --

9           applications within the software?

10    A.    Yes.

11    Q.    Like a general ledger.

12    A.    Accounts payable.

13    Q.    Accounts payable.  What are some other examples?

14    A.    Project management, accounts receivable,

15          general --

16    Q.    Billing?

17    A.    Billing.

18    Q.    Okay.  Well, I don't understand that to be an

19          exhaustive list of the applications within Tyler's

20          financial software, but they are representative

21          examples.

22    A.    Yes.

23    Q.    Did you have a particular specialty during your

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 41

```
1        employment with Tyler as implementation specialist

2        with respect to any of these different modules?

3   A.   I wouldn't say I was a specialist in any of them.

4   Q.   Did you train in all of them?

5   A.   Yes.

6   Q.   Was the two-month training period that you

7        discussed established with you at the time of your

8        hire?  In other words, did someone tell you, "We

9        have a two-month period in which you're going to

10       be training before you go out on your own," or did

11       it just kind of develop that way?

12  A.   Actually, it was told I had a three-month training

13       period.

14  Q.   And was that by Ms. Parsons?

15  A.   Yes.

16  Q.   Why was your training period, in fact, cut, if you

17       will, to two months?

18  A.   I guess it was need -- need for an implementer.

19  Q.   Was anything ever expressed to you as to the

20       reason that you were trained for two instead of

21       three months?

22  A.   I think they just said a client's need.

23  Q.   Was there a particular client that you're
```

# FREEDOM COURT REPORTING

Page 46

1       all part of the same larger document?

2   A.  It was separate documents for each module.

3   Q.  Were they -- how would you -- would you describe

4       these documents as -- I think you used the term

5       manuals.  Are they -- how long would they

6       typically be?

7   A.  It fluctuated.

8   Q.  Depending on the application?

9   A.  Yeah, depending on the application.

10  Q.  Would these be the same manuals that you mentioned

11      that you reviewed in connection with your

12      training?

13  A.  Yes.

14  Q.  So did the manuals explain how the software worked

15      or did they explain how you were supposed to train

16      others to learn the software?

17  A.  It just gave you screen shots and how the software

18      worked.

19  Q.  Okay.  Other than these manuals and the e-mail,

20      would there be anything else you would review

21      document-wise before embarking on the trip to the

22      customer site?

23  A.  I'm not recalling.

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 47

```
 1   Q.   Okay.  Like a project report or anything specific

 2        to the project?  Anything you can recall along

 3        those lines?

 4   A.   You know, I don't want to be very specific because

 5        I'm not recalling.

 6   Q.   Okay.

 7   A.   But I just know that the project manager always

 8        did the analysis of what the client needs and

 9        wants.  And so I know that had to have been

10        communicated to me.  And I'm not positive that

11        there was an actual form or if it actually was

12        just through e-mail saying this is exactly what

13        the client is going to be using.

14   Q.   Okay.  And when you say the analysis of what the

15        client needs and wants, you're talking something

16        more than just what module you're training on,

17        correct?

18   A.   Yes.

19   Q.   This is something more specific as to what the

20        client wants to do within the particular module as

21        to routing of data, for example?

22   A.   What they're using and what they're not.

23   Q.   Within the module?
```

## FREEDOM COURT REPORTING

Page.48

1    A.    Yes.

2    Q.    Did you as an implementation consultant -- I'm

3          sorry -- implementation specialist at Tyler ever

4          undertake an analysis of what the client needs and

5          wants -- similar to what you described the project

6          manager typically does?

7    A.    No.  That was the project manager's duties.

8    Q.    Okay.  And so your recollection, as best you can

9          recall, is that that would have been communicated

10         to you by the project manager in some form,

11         perhaps in a document, but perhaps through an e-

12         mail or a phone conversation?

13   A.    Yes.

14   Q.    Is there a name for that analysis of what the

15         client needs and wants that was used at Tyler?

16   A.    I don't know if there was a set name, but I would

17         call it the project plan.

18   Q.    If I use the term systems analysis, is that

19         something you're familiar with as a term used at

20         Tyler?

21   A.    I think that's a common usage for most technology,

22         system analysis.  But I don't know if that's

23         particularly what they called it as a project

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 49

```
1        manager doing it.

2    Q.  Okay.  But just using that sort of generic

3        understanding of what a systems analysis means, is

4        that a description of what we've discussed in

5        terms of analyzing what the client wants and needs

6        with respect to the software and what it intends

7        to use and what it doesn't intend to use?

8    A.  I don't know, because I don't know what the real

9        definition of that term is.  And I hate to --

10   Q.  Okay.

11   A.  -- say anything.

12   Q.  But you're more comfortable with the phrase

13       project plan to describe that?

14   A.  Uh-huh, yes.

15   Q.  Okay.  Would it have been typical for you to be on

16       the phone with the customer prior to visiting the

17       customer site?

18   A.  It could be, possibly.

19   Q.  And what types of -- what reason would you have to

20       communicate with the client before the trip?

21   A.  I would just tell them I was to be expected in at

22       this time.  "I'm staying here.  Is there anything

23       I need to bring, or is there anything you need
```

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 50

```
 1        before I leave for my trip there?"  Customer

 2        service.

 3   Q.   Did you do that on every occasion?

 4   A.   I was pretty much customer service oriented.

 5   Q.   Okay.  So that's something you tried to do?

 6   A.   Yes.

 7   Q.   Would it be -- have been typical for you to do

 8        training on multiple modules for the same client?

 9   A.   Yes.

10   Q.   When you embarked on a trip to do training, would

11        it have been typical for you to train on two

12        different models during one trip?

13   A.   Yes.

14   Q.   I will tell you that based on depositions of

15        others in your position at Tyler, they've talked

16        about different phases of training.  Is that a

17        concept with which you're comfortable with, if I

18        talk about phases?

19   A.   Again, I refer back to project plan.  There are

20        different steps to the project.  And maybe you

21        want to put it into the words of phases.  You do

22        -- you know, first you come in and you might train

23        one piece.  And then you might come back and train
```

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 51

1  another piece.  But it's all aligned on a project.

2  That's what the project manager did is outline

3  the project of each step to get the client to

4  where it needs to go to get to that final point.

5  Q.  Okay.  When you say piece, are you -- what does

6  that mean?

7  A.  When I talk about pieces, there's different things

8  that the client's responsible to do to get to a

9  point where I come in and do the training.  So for

10  example, if it is to put in certain data --

11  information into the parameters that we just set

12  up, then --

13  Q.  To set up the system?

14  A.  Well, yeah.  Pretty much set up the system, get

15  ready to be able to be trained on it.

16  Q.  Did you ever provide training to customers about

17  how to set up the system?

18  A.  I showed them the different parameters when we set

19  up parameters.  But most of that discussion is

20  done ahead of time through that analysis that's

21  done or the project set-up, what they're going to

22  be using, what they're not going to be using.  So

23  I just assist them in setting up the parameter

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 52

```
 1        tables for it to work for their business

 2        processes.

 3   Q.   Was -- in your job as implementation specialist,

 4        was it important at all for you to know about the

 5        customer's legacy or previous system?

 6   A.   No.  I never got involved in their old system,

 7        even though I heard about it.

 8   Q.   You'd hear about it from the --

 9   A.   From the client.

10   Q.   From the representatives who you were training?

11   A.   Yes.

12   Q.   When they would say, "We used to do it like this"?

13   A.   Yes.

14   Q.   Okay.

15   A.   Constant.

16   Q.   Okay.  But it's not something that you would have

17        reviewed or talked to the customer about in any

18        depth?

19   A.   No.

20   Q.   Now, you described the process by which you were

21        informed of what modules you would be training,

22        who your contact person was.  And again, I

23        understand you weren't exactly sure how -- in what
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 53

```
 1        form that was communicated to you by your project

 2        manager on every instance.  But how would you know

 3        how to set up the particular schedule of training

 4        with the customer?  And by that I mean, what times

 5        of the day that you're training, you know,

 6        particular representatives?  Is that something

 7        that you would have to work out with the customer

 8        once you got to the site, or was that something

 9        that was done ahead of time?

10   A.   That was done ahead of time.

11   Q.   And was that -- did Tyler use the term agenda to

12        describe that?

13   A.   I don't know if they used the word agenda.  But

14        the project manager was the one who would set up

15        with the client the days that I would be there to

16        train and the times.

17   Q.   Were you, as an implementation specialist, ever

18        involved in that process in setting up the agenda

19        for the training?

20   A.   Generally not.  If -- you use the word agenda as

21        what?  What is agenda?  The days, the time, the

22        place?

23   Q.   Yeah, I'll -- let me give you a definition.
```

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 54

```
 1    A.    Okay.

 2    Q.    By agenda, I meant the day -- the schedule.  Like,

 3          "Tuesday at 9:00 we want you to be training these

 4          people on, you know, this aspect of the module.

 5          And then at 1:00 you're going to go into this room

 6          and train this group on, you know, this particular

 7          aspect of the software."  Basically, the schedule

 8          in the sense of where you're supposed to be and

 9          what you're supposed to be doing.

10    A.    Right.

11    Q.    That's what I mean by agenda.

12    A.    Okay.  My project manager would set that up ahead

13          of time for me.

14    Q.    Okay.  And would there be a document that you

15          would have at the commencement of the

16          implementation that would tell you that, or would

17          you just be at the, kind of, customer's direction?

18    A.    I would know ahead of time that this -- and again,

19          that's the same thing that I don't recall if that

20          was given to me in an actual schedule or if it was

21          e-mailed to me or called to me.  But there was

22          some formal way of telling me that before I left

23          for my trip.
```

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 55

1   Q.   Of telling you when and where you were supposed to

2        be at particular times during the week?

3   A.   And contact person.  That's very important.

4   Q.   Right.  But it told you more detail than just, you

5        know, "At 9:00 show up, you know, in the Virgin

6        Islands and talk to this person."

7   A.   Go to the beach.

8   Q.   Yeah.  That too.

9   A.   That was exactly correct.  Usually it would say

10       to, "Meet this person.  You're supposed to be

11       training for three days."  That was more of the

12       generalization, more than exactness.  Like, "At

13       9:00 you're going to be here and training this."

14       It says, "Okay.  Meet with -- you will train" --

15       it usually tells me how many days I'm going to be

16       training and what modules I was training more

17       than, you know -- "But you're meeting Joe Smith at

18       9:00."  And then we'd go to the training room and

19       go from there.

20  Q.   Okay.

21  A.   So there was some -- I'm sorry.  Go ahead.

22  Q.   No, go ahead.  No.  I was just going to ask:  So

23       there wasn't necessarily a specific detailed

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 58

```
 1    Q.   And what kinds of things would you tell your

 2         project manager during these calls, just how the

 3         training was going, that kind of thing?

 4    A.   I would give her a -- if the training was going

 5         well, was it running on time, was anything that

 6         came up possibly that might need to be handled, if

 7         the system was working well, if there's something

 8         that maybe the system wasn't doing, if, you know,

 9         she could look into it.

10    Q.   When you say "if the training was going on time,"

11         on time relative to what, a schedule, I take it?

12    A.   Just that I knew I was there for three days, three

13         billable days.  Was the three billable days going

14         to cover what I needed to cover?

15    Q.   And what would that depend on?

16    A.   It would depend on how quickly your client was

17         picking up what you were training or how well you

18         trained.

19    Q.   And when you said one of the things you would

20         report was whether or not the training was going

21         well, is that the same kind of thing in terms of

22         how -- when you say "going well," did you mean how

23         quickly the client was picking up the material?
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 59

1  A.  It's just that there was no glitches in the

2      system.  The client seems to understand what's

3      going on and the data information came -- through

4      conversation, they convert their information into

5      the system.  Everything seems to be working well.

6  Q.  And converting the data into the system, that was

7      something done by Tyler's conversion department?

8  A.  Yes, if that's the name of that.  But I don't know

9      if it's called Tyler's conversion department.  But

10     there were technology folks that did that.

11 Q.  How about this?  It wasn't -- you were not the one

12     that converted the data?

13 A.  I did not.  And they're lucky I didn't.

14 Q.  Fair enough.  What if there was a situation where

15     the customer's employees who you were training

16     were not picking up on the training such that the

17     training was not on time?  Would you discuss with

18     the project manager the need to have additional

19     training?

20 A.  Yes, I would definitely pass that type of

21     information along.

22 Q.  And then I guess it was up to the project manager

23     to work that out with the client?

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 60

```
 1    A.    And it also always depended on the contract.

 2          Whatever contract the customer had with Tyler,

 3          they were allowed so many hours of implementation

 4          -- or billable days of implementation.  So if it

 5          fell within that parameter -- otherwise there

 6          would be an additional charge to the customer.  So

 7          that all had to be worked around.  I didn't do any

 8          of that.  I just passed information along.

 9    Q.    So were you aware of what the number of hours were

10          on the contract?

11    A.    I didn't -- I never saw contracts.

12    Q.    Okay.  When you did complete a trip report, what

13          would you do with it?

14    A.    It actually went in -- I would send it to -- if I

15          recall correctly, I would do my trip report and

16          send it to my project manager via e-mail.  It was

17          a report within the system.

18    Q.    Did you have responsibilities when the customer

19          went live with Tyler's software?

20    A.    If I had implemented the full time for one client,

21          I would be there for the go-live.

22    Q.    Well, let's make sure we're on the same page about

23          what go-live means.  Tell me what your -- how
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 61

```
1         you're using that.

2    A.   Go-live is the -- now have actually -- are in

3         production, meaning it is an active system within

4         their business and their folks will be actually

5         using the system.  So it is actually generating

6         information.  It's actually having people put

7         input into their system.  So everything is

8         supposedly worked out prior to that for them to go

9         live.  And we would be there for support.

10   Q.   When you say we, would there be others with you?

11   A.   Generally, the project manager is there for go-

12        live.

13   Q.   But the project manager wouldn't be there when you

14        were doing the other training that you discussed?

15   A.   Generally not.  There had been times that she

16        would be there.

17   Q.   But the --

18   A.   But on a general basis, no, she was not there.

19   Q.   You would do that by yourself?

20   A.   Yes.

21   Q.   So in terms of the support that you provided

22        during the go-live process, was more -- I mean,

23        that's not something that the manual necessarily
```

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 62

1     assisted you with, correct?

2   A.   That's correct.  It would be more of they're

3        trying to do something and suddenly something's

4        not right with the system.

5   Q.   So sort of handling questions that came up during

6        the process of going live?

7   A.   And sometimes we'd have to get our own technical

8        people involved in it.

9   Q.   Would you use the term training to describe the

10       functions that you were performing during the go-

11       live process?

12  A.   I would call -- yeah -- training support.

13  Q.   And what do you mean by the term training support?

14  A.   Just there because the people -- it's new.  The

15       system's new to them.  Just to know that I'm

16       there.  If they have a question, I can assist them

17       with it.

18            MS. BAGLEY:  Paulo, just a heads up.  I've

19       got an expert calling me on another case.  I may

20       have to take a quick break if he calls.  I've been

21       trying to reach him all week.

22            MR. MCKEEBY:  Sure.

23            MS. BAGLEY:  And the deadline's today.

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 63

```
 1           MR. MCKEEBY:  Yeah, I understand.

 2           MS. BAGLEY:  He's in court.

 3           MR. MCKEEBY:  Just let me know.

 4           MS. BAGLEY:  Okay.  When the phone -- if it's

 5      a --

 6           THE WITNESS:  If it starts dancing around --

 7           MS. BAGLEY:  Yeah.

 8           THE WITNESS:  -- we know.

 9           MR. MCKEEBY:  Okay.

10  Q.  (Mr. McKeeby)  All right.  Moving on.  After -- I

11      take it the amount of support that you provided

12      during the go-live process was something that was

13      scheduled?

14  A.  The go-live was scheduled.  I don't know if you

15      would consider the support scheduled.  The go-live

16      was just called go-live.

17  Q.  Right.

18  A.  And under the understanding of go-live, you were

19      there to help with training -- support --

20  Q.  But --

21  A.  -- during that period of time.  But it wasn't like

22      a schedule -- okay.  Scheduled training support.

23      It just was called go-live.
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 64

1    Q.    Right.  But what about the duration of the go-live

2          support that you provided?  That was scheduled,

3          correct?

4    A.    Oh, yes.  It was billable days.

5    Q.    Right.  And so just as the training that you

6          described before, which was scheduled -- you know,

7          again, either pursuant to some informal e-mail or

8          telephone call or some more formal document that

9          you may or may not be able to remember -- the go-

10         live support also was scheduled?

11   A.    Yes.

12   Q.    So you knew when you were providing go-live

13         support for a particular customer?

14   A.    Yes.

15   Q.    Would it have been unusual for you to provide go-

16         live support to a customer who you had not

17         previously visited?

18   A.    Possibly, yes.  Possibly, yes.

19   Q.    So wait.  There were occasions where you did

20         provide go-live support to a customer that you had

21         not visited before?

22   A.    Possibly, yes.

23   Q.    But that didn't happen very often?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 65

```
 1   A.   No.

 2   Q.   No, it did not?

 3   A.   No, it did not.  Sorry.

 4   Q.   That's all right.  That's my question that

 5        elicited the double negative, so I have to fix it.

 6        All right.  Once that set amount of go-live

 7        support ended, did you have any additional

 8        responsibilities with respect to that customer?

 9   A.   Personal -- no.

10   Q.   Did you have any responsibilities with respect to

11        fielding questions from customers on the telephone

12        when you were at the office?

13   A.   I didn't, per se, have responsibility to where it

14        says, "You need to take these."  I would take

15        calls if they were customers I had implemented if

16        they had a question.  Absolutely I'd take their

17        call.

18   Q.   Was there any period of time in which you were

19        supposed to transition those kinds of calls to

20        Tyler's telephone support team?

21   A.   Well, anything technical went to Tyler's support

22        team.  If it was a simple training question I

23        could answer, I would answer it.  But anything
```

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 66

```
 1        technical always went to technical support.

 2   Q.   And -- but let's say a client called you because

 3        you had been their implementer and they had a

 4        technical question, would it have been your

 5        practice to try to answer that question or to send

 6        that to support?

 7   A.   I would send it to support.  I wouldn't be any

 8        help to them.

 9   Q.   I see, okay.  Because you wouldn't know how to

10        answer the question perhaps?

11   A.   That's correct.

12   Q.   Was it the practice at the Raleigh office at Tyler

13        to allow you some flexibility to take all or part

14        of Fridays off if you had engaged in travel during

15        that week?

16   A.   No.  I was required to come in on Friday.

17   Q.   Have you -- before I just stated it in my

18        question, had you ever heard of such a practice at

19        the Raleigh office?

20   A.   It didn't happen with me, so I don't know.

21   Q.   Did it happen with others?

22   A.   I can't talk for them.  I don't know.  I don't

23        know what --
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 81

1   A.   No.

2   Q.   And if I asked you to provide that resume --

3   A.   May I step back?

4   Q.   You can step back.

5   A.   I'm sorry.  Has what information I've put in for

6        the Tyler description changed?  No.  Have I

7        updated since?  Yes, because I've had other

8        employment.

9   Q.   Okay.

10  A.   Okay.  I just wanted to --

11  Q.   No.  That's a helpful clarification --

12  A.   Okay.

13  Q.   -- and probably saved us some time.  All right.

14       So that updated resume with the description of

15       your position at Tyler is something that you could

16       provide to our attorney?

17  A.   Yes.

18           MS. BAGLEY:  I gave it to you yesterday.

19  Q.   (Mr. McKeeby)  It's something you did provide to

20       your attorney?

21  A.   Yes, that too.

22  Q.   What do you know?

23  A.   Magic.  Do you want to take this back?

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 82

```
 1    Q.    No, we'll leave that one.  I've already entered it

 2          as an exhibit.  I want to mark as Defendant's

 3          Exhibit 5 what I understand to be your updated

 4          resume that your counsel reminded me that she

 5          provided to me yesterday.

 6    A.    Thank you.

 7              (THEREUPON, DEFENDANT'S EXHIBIT 5 WAS

 8              MARKED FOR IDENTIFICATION.)

 9    Q.    (Mr. McKeeby)  Is -- take a look at that and make

10          sure I'm right.

11    A.    Uh-huh, yes.

12    Q.    Okay.  Let me take a look at it if you could

13          because --

14    A.    Sure.  Tyler's right on that page you're looking

15          at.

16    Q.    Let me ask you what you meant by that first phrase

17          under the second bullet of your description of

18          your job with Tyler.  "Create lessons and training

19          plans."  What do you mean by lessons there?

20    A.    I just meant I bring out the manual that I'm going

21          to be using for the client and know what the

22          client -- who I'm going to be giving training to.

23          And so I didn't write anything down.  I didn't
```

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 5**

### FREEDOM COURT REPORTING

Page 83

1      have like a written lesson plan or anything like

2      that.  All I just did was just kind of organize

3      myself to where I knew exactly what I was going to

4      be training that day for that client.

5   Q.   That's what you meant by creating lessons?

6   A.   Uh-huh, yes.

7   Q.   And what about training plans, is that something

8        distinct from lessons?

9   A.   No.  It was just my plans for training.

10  Q.   And that, I take it, also doesn't refer to any

11       written document?

12  A.   No.  Because I couldn't read my own handwriting.

13  Q.   Okay.  But the training plan that you referenced

14       in that bullet means the type of training that you

15       were to be providing to the customers?

16  A.   Uh-huh, yes.

17  Q.   And it's probably on your resume.  What's your

18       highest level of education?

19  A.   I have an associates degree, but I'm enrolled

20       right now in school.

21  Q.   What's your course of study currently?

22  A.   Information security systems.

23  Q.   Where are you in school currently?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 84

1   A.   I'm at Wake Tech.

2   Q.   And when did you get your associates degree?

3   A.   Back in 1985.

4   Q.   From what school?

5   A.   I think it was 1986 -- '85.  Phoenix College.

6   Q.   Is it in Phoenix?

7   A.   Yes.

8        MR. MCKEEBY:  Let me mark this as Defendant's

9   Exhibit 6.  Thank you.

10       (THEREUPON, DEFENDANT'S EXHIBIT 6 WAS

11       MARKED FOR IDENTIFICATION.)

12   Q.  (Mr. McKeeby)  This looks like a statement that

13       you provided in connection with this lawsuit to

14       your attorneys.  Would you agree with that

15       characterization?

16   A.   Yes.

17   Q.   That your signature on the second page of the

18       document?

19   A.   Yes.

20   Q.   Look at Paragraph 4 of the second sentence that

21       says, "You never worked less than 40 hours per

22       week unless I was on vacation or took time off for

23       illness."  Was there a particular vacation that

**EXHIBIT 5**