1

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
 2                  MARSHALL DIVISION

 3  PATTY BEALL, MATTHEW        )
    MAXWELL, TALINA MCELHANY    )
 4  AND KELLY HAMPTON,          )
    INDIVIDUALLY AND ON BEHALF  )
 5  OF ALL OTHER SIMILARLY      )
    SITUATED,                   )
 6                              )
            Plaintiffs,  ) 2:08-CV-422 TJW
 7                              )
    VS.                         )
 8                              )
    TYLER TECHNOLOGIES, INC.    )
 9  AND EDP ENTERPRISES, INC.,  )
                                )
10          Defendants.  )

11      ------------------------------------

12            ORAL DEPOSITION OF

13             KELLY HAMPTON

14              JUNE 3, 2010

15      ------------------------------------

16

17     ORAL DEPOSITION OF KELLY HAMPTON, produced as a

18  witness at the instance of the DEFENDANTS, and duly

19  sworn, was taken in the above-styled and -numbered cause

20  on June 3, 2010, from 10:54 a.m. to 1:36 p.m., before

21  Crystal Greer, CSR in and for the State of Texas,

22  reported by machine shorthand, at the law offices of

23  Sloan, Bagley, Hatcher & Perry Law Firm, 101 East Whaley

24  Street, Longview, Texas, 75601, pursuant to the Federal

25  Rules of Civil Procedure.
```

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 7**

1           A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS:
4     MS. LAUREEN F. BAGLEY
      SLOAN, BAGLEY, HATCHER & PERRY LAW FIRM
5     101 EAST WHALEY STREET
      LONGVIEW, TEXAS 75601
6     (903) 757-7000
7
8  FOR THE DEFENDANTS:
9     MR. PAULO B. MCKEEBY
      MORGAN LEWIS
10    1717 MAIN STREET
      SUITE 3200
11    DALLAS, TEXAS 75201
      (214) 466-4000
12
13
14
15
16
17
18
19
20          REPORTER'S NOTE
21     Uh-huh = Yes - Affirmative response
22     Huh-uh = No - Negative response
23  Quotation marks are used for clarity and do not
       necessarily indicate a direct quote.
24
25

Case 2:08-cv-00422-TJW   Document 161-2   Filed 11/09/10   Page 3 of 14 PageID #: 2011

Kelly Hampton - 6/3/10

3

1                           INDEX

2                                          PAGE

3    Appearances.............................................. 02

4    KELLY HAMPTON
        Examination by Mr. McKeeby...................... 04
5       Examination by Ms. Bagley....................... 117
        Examination by Mr. McKeeby...................... 119
6
     Signature and Changes................................ 121
7
     Reporter's Certificate............................... 123
8

9

10                        EXHIBITS

11   NO.  DESCRIPTION                              PAGE

12   1    Kelly Hampton's resume......................... 06
     2    Kelly Hampton's time sheets from EDP........... 19
13   3    Kelly Hampton's Declaration.................... 24
     4    Company job description for client liaison..... 111
14   5    Kelly Hampton's letter of resignation.......... 115

15

16

17              REQUESTED DOCUMENTS/INFORMATION

18   NO.  DESCRIPTION                              PAGE

19   1    Name of EDP's administrative secretary when
          Ms. Hampton was employed....................... 20
20

21

22

23

24

25

**EXHIBIT 7**

1    A. Salary.
2    Q. And has that always been the case since you've
3  been employed by the West Rusk County School District?
4    A. Yes, sir.
5    Q. To whom do you report at your current employer?
6    A. The superintendent.
7    Q. Who is that person?
8    A. Tommy Alexander.
9    Q. And has he been your supervisor throughout the
10 tenure of your employment at the West Rusk County School
11 District?
12   A. No, sir.
13   Q. There have been different superintendents?
14   A. Yes, sir.
15   Q. How long has Mr. Alexander been the
16 superintendent?
17   A. Since November.
18   Q. Who was it before Mr. Alexander?
19   A. Mike King.
20   Q. And your tenure of employment with the West
21 Rusk County School District is what? You started in
22 2007?
23   A. Yes, sir, October of 2007.
24   Q. And prior to that time, you were employed by
25 Tyler Technologies?

Kelly Hampton - 6/3/10

9

1   A. Yes, sir.
2   Q. And just for purposes of the deposition and
3 that we're on the same page, Tyler Technologies, do you
4 understand, took -- acquired a company called EDP
5 Enterprises?
6   A. Correct.
7   Q. And so previous to that corporate acquisition,
8 you were employed by EDP Enterprises, correct?
9   A. Yes, sir.
10   Q. And you were employed by EDP Enterprises from
11 -- beginning in 2004?
12   A. Yes, sir, March of 2004.
13   Q. Okay. How -- and I understand that you
14 would've only been employed after the Tyler acquisition
15 for a month or so?
16   A. Right.
17   Q. Did your job change at all during that month
18 after the Tyler acquisition in the fall of 2007?
19       MS. BAGLEY: Object to the form.
20       You can go ahead and answer. I'm just
21 preserving the objection for the record.
22       THE WITNESS: Okay.
23   A. The job title changed, but the job duties did
24 not.
25   Q. (By Mr. McKeeby) The job title -- let me make

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 7**

1  sure I understand correctly -- changed from client
2  liaison to implementation specialist?
3      A. Yes, sir.
4      Q. And how were you made aware of the change in
5  the job title?
6      A. The implementation manager informed us that our
7  title would change --
8      Q. And --
9      A. -- to be consistent with the other Tyler
10 Technology divisions.
11     Q. Okay. Consistent with the way they called that
12 position?
13     A. Yes, sir.
14     Q. And who was the implementation manager that you
15 mentioned?
16     A. Chandra Robins. C-H-A-N-D-R-A; Robins,
17 R-O-B-I-N-S.
18     Q. And was Ms. Robins your supervisor at the time?
19     A. Yes, sir.
20     Q. And was she always your supervisor during the
21 tenure of your employment with EDP and then Tyler?
22     A. We actually started on the same day. When I --
23 she became my supervisor within the first year.
24     Q. I understand that you have produced time
25 records in this case?

Kelly Hampton - 6/3/10

11

1   A. Yes, sir.
2   Q. Was there anything about how you completed
3 those time records that changed after the Tyler
4 acquisition in the fall of 2007?
5   A. It was my understanding that they didn't
6 require time sheets.
7   Q. Okay. So "they" being Tyler?
8   A. Tyler, yes. I'm sorry.
9   Q. So do I understand from that that you,
10 specifically in your job for that month or so while you
11 were in Longview working for, now, at that point, Tyler
12 Technologies -- did you no longer keep time sheets
13 during that, roughly, month period?
14   A. I believe that's correct.
15   Q. We have them here. And so we'll go over
16 them in a second --
17   A. Okay.
18   Q. -- to confirm that, if we need to.
19   A. It's been a long time.
20   Q. Yeah. I understand that.
21       Do you recall any -- now, you said your
22 understanding was that Tyler didn't require time sheets.
23 Are you recalling some specific instruction that you
24 received or a memorandum or something like that that
25 would lead you to make that statement?

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 7**

12

1    A. I recall that being a question in a staff
2  meeting because time accounting wasn't something that
3  anyone enjoyed doing.  I recall someone asking if we had
4  to continue with the time accounting, and we were told
5  no.
6    Q. Okay.  And this was in a staff meeting?
7    A. Correct.
8    Q. And when you say a "staff meeting," who
9  would've been at that staff meeting?
10    A. That would've been the EDPRO implementation
11  department.
12    Q. And "EDPRO" is the name of the software?
13    A. Correct.
14    Q. And that's -- the "ED" part of that stands for
15  "education"?
16    A. Correct.
17    Q. And that's distinct from like financial
18  software?
19    A. At that -- when I went to work for EDP, it was
20  all school financial software.  But they had a COBOL
21  based software, and then they had a Windows based
22  software.  And we were more or less segregated.
23    Q. Okay.
24    A. The EDPRO department worked downtown.  The
25  other software departments worked on Collins Circle.

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 7**

1  Q. Okay. So was the EDPRO software, was that
2  Windows based or --
3  A. Correct.
4  Q. Okay. So who were the other EDPRO implementers
5  that were in this -- would've been in this staff meeting
6  at that time?
7  A. Richard Fritz, Chandra Robins, Talina McElhany,
8  Delana Offord. Now I've got to really rack my brain.
9  There would've been support personnel. And at this
10 time, I don't remember which ones were still working
11 there at that time.
12 Q. Okay. Was this just a regular staff meeting
13 that occurred?
14 A. Yes, sir. We had one weekly.
15 Q. And was it Ms. Robins that told the group that
16 they would no longer have to keep their time?
17 A. I believe it was Mr. Fritz.
18 Q. What was his position?
19 A. He was actually considered a vice president.
20 Q. Would he have been above or below Ms. Robins in
21 terms --
22 A. Above.
23 Q. -- of the company hierarchy? Above?
24 A. Yes, sir, above.
25 Q. Did Ms. Robins report to Mr. Fritz?

Kelly Hampton - 6/3/10

32

1  A. Correct, some of that time would've been
2  reflected.
3  Q. Okay. Now, you're slipping up a little bit in
4  terms of talking over me. So if you'd please wait until
5  I'm finished, if you would. Thank you. And I'll try to
6  do the same.
7       All right. Okay. The travel that you did,
8  did that change from the time that you were a trainer to
9  a client liaison?
10 A. Yes, sir. It was less.
11 Q. You did less travel as a client liaison?
12 A. Yes, sir.
13 Q. Let me make sure I understand the dates. What
14 were the dates that you were a trainer? If you need to
15 look at your declaration, that's fine. I'm not sure it
16 says.
17 A. (Witness peruses documents).
18 Q. I'll tell you that it doesn't. So I'm going to
19 have to ask you based on your memory.
20 A. Oh, my.
21 Q. And if you started work -- if you started work
22 in -- what did we agree -- March of 2004 and you left in
23 September of 2007 -- did we say September or October?
24 A. October.
25 Q. -- October of 2007 --

Kelly Hampton - 6/3/10

33

1   MS. BAGLEY: If you can remember when you
2   switched to client liaison, that's probably really the
3   only -- and we can figure out the rest from there.
4   Q. (By Mr. McKeeby) Yeah. When did you switch to
5   client liaison? That's --
6   MR. MCKEEBY: Thank you, Laureen.
7   A. I'm going to say approximately a year before I
8   left.
9   Q. (By Mr. McKeeby) Okay. So let's say probably
10  around the fall of 2006?
11  A. Correct.
12  Q. Okay. And was that a promotion?
13  A. No, sir.
14  Q. What was the occasion for you being moved from
15  a trainer to a client liaison? Do you want me to ask a
16  better question?
17  A. Correct, please.
18  Q. How were you informed that you were moving to
19  that position or were -- well, let me ask you that that
20  way. Maybe that will help.
21  A. There was a position available.
22  Q. Did you apply for the position?
23  A. I don't think I had to actually fill out an
24  application. But I expressed an interest --
25  Q. Expressed an interest.

1   A. -- in the open position as client liaison. I
2   was very interested in being involved in verifying the
3   data, the number crunching of it.
4   Q. And to whom did you express that interest?
5   A. Chandra Robins and Richard Fritz.
6   Q. Did someone leave the client liaison position,
7   then it became opened?
8   A. Correct.
9   Q. Do you remember who that was?
10  A. Lisa White.
11  Q. Okay.
12  A. That might help with determining when I became
13  a client liaison.
14  Q. Okay. Well, Laureen and I can go back and
15  figure that out.
16      All right. So you told Chandra and Richard
17  that you were interested in moving into that role?
18  A. Correct.
19  Q. And they moved you into that role?
20  A. Yes, sir.
21  Q. Did you have to go through any training before
22  you did that?
23  A. No, sir.
24  Q. I mean did you go into any -- did you do -- did
25  you have to be retrained to do the client liaison

1  position?

2     A. No, sir.

3     Q. Were some of the duties of the client liaison

4  position the same as the trainer duties?

5     A. Yes, sir.

6     Q. But there were some duties that were different?

7     A. Correct.

8     Q. And that required less travel?

9     A. Yes, sir.

10    Q. Did it require any travel?

11    A. Yes, sir, to additional -- I meant -- I'm sorry

12 -- to the planning meeting as far as the initial

13 planning with the school district.

14    Q. Okay. But is it fair to say as a client

15 liaison, you did not do any of the customer training

16 that I assume that you did as a trainer?

17    A. I did a little bit.

18    Q. But less?

19    A. But -- yes, definitely less.

20    Q. And as a client liaison, you were not at the

21 customer's facility when they transitioned and went live

22 with EDP software?

23    A. Correct.

24    Q. But as a trainer, you were there?

25    A. Yes, sir.

Kelly Hampton - 6/3/10

36

1   Q.  What was it about the client liaison position
2   that made you interested enough to express the interest
3   that you did to Ms. Robins and Mr. Fritz?
4   A.  I have accounting experience, and I'm very
5   interested in numbers and data verification.  And that
6   interested me, making sure that all of the data was
7   accurate.
8   Q.  And when you talk about the "data," you're
9   still talking about the data that's part of the
10  conversion from the customer's previous systems to the
11  EDPRO system?
12  A.  Yes, sir.
13  Q.  And only the EDPRO system?  That's the only one
14  you worked with?
15  A.  Yes, sir.
16  Q.  The work that you did at home that you
17  described where you would study updates to the software
18  or updates to the manual, how often would you estimate
19  that occurred; once a month, once every two months, more
20  than that?
21  A.  Is the question how often would I take work
22  home?
23  Q.  Yes.
24  A.  I would say three to four times a month.
25  Q.  And when would you do it; on the weekends?

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 7**