# FREEDOM COURT REPORTING

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                  MARSHALL DIVISION

4    _____

5    _____

6    PATTY BEALL, MATTHEW

7    MAXWELL, TALINA McELHANY and

8    KELLY HAMPTON, Individually

9    and on behalf of all other

10   similarly situated,

11          Plaintiffs,

12       v.                    2:08-cv-422  TJW

13   TYLER TECHNOLOGIES, INC., and

14   EDP ENTERPRISES, INC.,

15          Defendants.

16   _____

17   _____

18                  DEPOSITION OF

19                   JOY FLYNN

20

21   At Raleigh, North Carolina

22   Tuesday, July 27, 2010; 9:17 a.m.

23   Reported by: Lindsey D. Cline, CVR

**EXHIBIT 10**

## FREEDOM COURT REPORTING

```
1                    A P P E A R A N C E S

2

3    For the Plaintiffs:

4         LAUREEN F. BAGLEY, ESQ.

5         Sloan, Bagley, Hatcher & Perry Law Firm

6         101 East Whaley Street

7         Longview, Texas 75606

8

9    For the Defendants:

10        PAULO B. McKEEBY, ESQ.

11        Morgan, Lewis & Bockius, LLP

12        1717 Main Street, Suite 3200

13        Dallas, Texas 75201-7347

14

15

16

17

18

19

20

21

22

23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 10**

# FREEDOM COURT REPORTING

1                    T A B L E  O F  C O N T E N T S

2                      E X A M I N A T I O N S

3     EXAMINATION                                    PAGE

4        Direct Examination by Mr. McKeeby              6

5        Cross Examination by Ms. Bagley               --

6


7                    T A B L E  O F  C O N T E N T S

8                         E X H I B I T S

9     EXHIBITS        DESCRIPTION          MARKED/REFERENCED

10    Number 1        Letter                     17/18

11    Number 2        Consent to Opt In           89/

12

13

14

15

16

17

18

19

20

21

22

23

**EXHIBIT 10**

# FREEDOM COURT REPORTING

Page 46

1      of try to get a list if I can.  The reporting

2      functions --

3   A.  Uh-huh.  Run reports, yes.

4   Q.  Okay.  What other functions would -- and again,

5      I'm just talking about this three- to four-month

6      period while you were --

7   A.  Yes.

8   Q.  -- shadowing these other folks.  What type of

9      other work would you do after the training?  Run

10     reports.  What are other examples?

11  A.  Okay.  Run reports.  For example, at some work

12     sites, employee information had to be entered into

13     the system.

14  Q.  Is that something you did during this --

15  A.  Yes.

16  Q.  -- three- to four-month period?

17  A.  Yes.  Also, when you go through the payroll

18     process, there's different steps that you have to

19     take.  And there's certain processes that have to

20     be built on the screen.  For example, state

21     reporting -- tax reporting.  All of that type of

22     information has to be input into the system.  So

23     that is like behind-the-scenes work that has to be

**EXHIBIT 10**

## FREEDOM COURT REPORTING

Page 47

1     done.

2         When the implementer would be doing the

3     training, they would set up maybe two or three

4     fictitious employees into the training system.

5     But if a work site, for example, has three, four,

6     five hundred employees, well, all those employee

7     records have to be built into the system.  So

8     that's what I would assist with doing.

9   Q.   But this is different than conversion, correct?

10       MS. BAGLEY:  Object to the form.

11       THE WITNESS:  I'm sorry?

12       MS. BAGLEY:  I'm objecting to the form of the

13     question.

14       MR. MCKEEBY:  You can answer though.

15       MS. BAGLEY:  You can answer if you understand

16     the question.

17       THE WITNESS:  Okay.  When you say conversion,

18     explain what you mean by conversion.

19   Q.   (Mr. McKeeby)  Okay.  Does conversion -- let me

20     ask you this.  While you were at Tyler, did the

21     term conversion have a particular meaning to you?

22   A.   Yes.

23   Q.   And what was that meaning?  I want to use yours if

## FREEDOM COURT REPORTING

Page 48

```
1        we can.

2    A.  Okay.  My understanding was the clients were

3        running their payroll processes on a older type

4        system, so they were being converted over to the

5        MUNIS-Tyler software that they would now be using.

6        So some of the information -- employee data

7        information would transfer over into the new

8        system.  But all of it would not convert over into

9        the new system.  So that gap of information is

10       what had to be manually input into the system.

11   Q.  And that gap of information, as you described it,

12       was done by a separate department at MUNIS,

13       correct?  They had a conversion department?

14   A.  Yes, they did have a conversion --

15           MS. BAGLEY:  Object to the form.

16   Q.  (Mr. McKeeby)  They did have a conversion

17       department?

18   A.  I believe they did have a conversion department.

19       Those were the programmers that did the

20       conversion.

21   Q.  So what you described a moment ago as building

22       employee records into the system is something

23       different than what the conversion department
```

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 10**

## FREEDOM COURT REPORTING

Page 49

```
 1        programmers did, correct?

 2             MS. BAGLEY:  Objection.  Misstates testimony.

 3   Q.   (Mr. McKeeby)  You can answer.

 4   A.   Okay.  Let me make sure I'm stating it correctly,

 5        okay?

 6   Q.   Okay.

 7   A.   At Tyler they have a group of programmers, and

 8        those programmers would take what was on the old

 9        system of the client's and upload it into the new

10        software package that was going to be used.

11   Q.   The Tyler software package?

12   A.   The Tyler software package, correct.  But some

13        information still had to be manually built into

14        the system.  And so myself, as well as some of the

15        employees at the client's site, would manually

16        input that type of information.

17   Q.   Okay.  I think I understand.  So this gap that you

18        described of information that wasn't converted

19        over needed to be manually put into the system?

20   A.   That is correct.

21   Q.   And that's something that you did as an

22        implementation specialist?

23   A.   That is correct.
```

**EXHIBIT 10**

# FREEDOM COURT REPORTING

Page 51

1    A.    Let's see.  Other than setting up, like I said,

2          the missing information for reports, various data

3          elements, that is all that I can recall.

4    Q.    And when you were shadowing the more senior

5          implementers, you didn't have anything to do with

6          setting up the agenda for the training, did you?

7    A.    No, I did not.

8    Q.    Are you familiar, based on your employment with

9          the Tyler -- based on your employment with Tyler

10         -- of a concept called systems analysis?

11   A.    No.

12   Q.    Let me give you my understanding of what systems

13         analysis means --

14   A.    Okay.

15   Q.    -- and maybe that will help; maybe not.  But my

16         understanding is that systems analysis means

17         looking at the client's old software system and

18         setup and discussing with the client different

19         options of how that information can be utilized

20         and flow through the Tyler systems.  Sort of an

21         initial meeting with the customer to have a dialog

22         about how the Tyler system would work compared to

23         their old system and getting input from the client

**EXHIBIT 10**

FREEDOM COURT REPORTING

Page 52

1        about how to set up the Tyler software.  Is that

2        -- as I described that, does that refresh your

3        recollection at all about --

4    A.  Yes.

5    Q.  -- that function?

6    A.  Yes.

7    Q.  Is that -- what do you call that?  I am using the

8        term systems analysis, and I don't know why.

9        That's just my recollection.  Is there something

10       you used, or a phrase you used to describe that

11       that's different from systems analysis?

12   A.  Well, what would happen -- in the beginning when

13       you first meet with a client, that's when they

14       have the meetings to discuss what their system

15       functionality currently is and where they want to

16       see their system function in the future.  So at

17       the very initial meetings, that would be more

18       senior persons that had those type of

19       conversations.  Like Penny or Rob or -- you know,

20       higher level persons than myself.  When I came

21       into the situation, those conversations had

22       already taken place.  So it was more or less the

23       day-to-day functionality that the employees would

**EXHIBIT 10**

# FREEDOM COURT REPORTING

Page 53

1        be doing, not the higher level conversations.

2    Q.   Okay.  So first of all, let me see if there's a

3        way to describe that.  Was there any term that you

4        used during your employment with Tyler to describe

5        that process that we both discussed, which is the

6        high level, sitting down with the client,

7        discussing where they want to go with Tyler

8        systems?

9    A.   Well, that would be their initial consultation.

10   Q.   Okay.

11   A.   Client consultation conversations.  And like I

12       said, those were handled with more senior type

13       persons.

14   Q.   Okay.  So throughout your employment with Tyler,

15       you never participated in those initial

16       consultation conversations?

17   A.   No, I did not.

18   Q.   Okay.  During your three- to four-month shadow

19       period, what would be your estimate of your weekly

20       hours worked on average?

21   A.   I would say it would be about 45 to 50 hours.

22       That's at the client's site.  I'm not talking

23       about travel time or anything like that.

# FREEDOM COURT REPORTING

Page 54

1   Q.   Okay.  So during the three- to four-month period

2        when you were shadowing more senior implementers,

3        you estimate that you would work 45 to 50 hours

4        per week, but that that does not include the

5        travel time?

6   A.   That is correct.

7   Q.   And let me ask you:  Does that estimate change

8        after you started doing the implementations on

9        your own after this shadow period?

10  A.   Yes.

11  Q.   What is the change?

12  A.   I would say work days would end -- would start as

13       early as maybe 7:30 if there had to be a

14       conference call with our project manager.  And

15       once leaving the client's site, if documentation

16       needed to be reviewed, I would work sometimes

17       until 8:00, 9:00, 10:00 in the evening getting

18       prepared for the next day.

19  Q.   Okay.  So if I asked you what your average hours

20       were during the time after this shadow period,

21       what would your estimate be for that period of

22       time on a weekly basis?

23  A.   I'm trying to do the math in my head.  So if you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 10**

# FREEDOM COURT REPORTING

Page 55

1    say on an average about 10, 12 hours a day.  So

2    that calculates to times five days a week.  How

3    much is that?

4    Q.    So 50 --

5    A.    Fifty --

6    Q.    -- to 60 hours?

7    A.    Yes, I'm sorry, 50 to 60.

8    Q.    And again, is it your testimony that we could

9          discern the exact number of hours that you worked

10         on a weekly basis if we looked at these expense

11         reports that you mentioned?

12   A.    Yes, you could.  However, those little expense

13         half-sheet reports that I was referencing earlier,

14         that will only -- that only shows just the hours

15         we were physically at the client's site, not

16         additional work before arriving at the client's

17         site or once you leave the client's site, back at

18         the hotel room.

19   Q.    Okay.  So if I understand your testimony

20         correctly, those expense report sheets would not,

21         in fact, show every hour that you worked at Tyler?

22   A.    Right.  And you're saying expense report sheets.

23         But in my mind, those are not expense report

**EXHIBIT 10**

## FREEDOM COURT REPORTING

Page 56

```
 1        sheets.

 2   Q.   What do you call them?

 3   A.   I can't remember.  I'm sorry.  I can't remember

 4        the name.  But the expense report sheets, those

 5        were actually the ones that showed like your

 6        travel time, your airline reservation, your hotel

 7        reservation.  But there was -- it was some type of

 8        client reporting, and it was a three-part sheet.

 9        And if I remember correctly, there was a white,

10        yellow, and pink copy.  And the client signed the

11        sheet where you had every day listed from the

12        first day you came to the last day you left.  And

13        each day you would indicate what you covered at

14        the client's site.  And then at the end on Friday

15        or Thursday afternoon, whenever the assignment was

16        over for that week, the client would sign off.

17        And I think it was the yellow copy of the sheet

18        was attached with our expense report.  I'm sorry.

19        I don't remember the name of the sheet.  But the

20        client always had to sign off on that particular

21        sheet.

22   Q.   Okay.  So as I understand your testimony just now,

23        you described two different types of documents.
```

# FREEDOM COURT REPORTING

Page 74

```
 1        So first you have to build those employee

 2        records.  So when you're looking at this Excel

 3        spreadsheet, even though it may say payroll under

 4        there, it would say, "Employee record setup" --

 5   Q.   Okay.

 6   A.   -- or something of that nature.

 7   Q.   Okay.  So the actual calendar would indicate not

 8        only payroll but the type of payroll training that

 9        you would be performing?

10   A.   The type of processes, yes.

11   Q.   Got it.  And what you just described, the building

12        the employee records, setting up the

13        beneficiaries, the deductions from payroll, that's

14        the type of -- that's what you mean when you say,

15        "Getting the group started on the process" --

16   A.   That is --

17   Q.   -- the initial steps?

18   A.   That is correct, yes.

19   Q.   And so that's the type of training you performed?

20   A.   That is correct.

21   Q.   Okay.  So I take it that you would be -- for the

22        training you would be doing, you wouldn't

23        necessarily be training end users with respect to
```

**EXHIBIT 10**

## FREEDOM COURT REPORTING

```
 1        functionality; but you would be training people

 2        who would be setting up the system at the

 3        customer?

 4   A.   That is correct.

 5   Q.   Did these people have some particular designation

 6        or title?

 7   A.   The people that I generally worked with were

 8        people that actually worked in payroll processes,

 9        actually worked in HR.  So they were familiar with

10        their old processing system.  And now we're

11        plugging this information into the new system, so

12        -- and verifying that everything from their old

13        system has moved over correctly to the new

14        software system.

15   Q.   Okay.  I take it the calendar would tell you how

16        long you were supposed to be at a particular

17        location?

18   A.   Yes.

19   Q.   Did you ever have any role in -- and again, we're

20        now talking about the three to four months --

21   A.   Yes.

22   Q.   -- while you were on your own.  Did you ever have

23        any role in setting up the calendar or the agenda?
```

**EXHIBIT 10**

# FREEDOM COURT REPORTING

Page 76

1   A.   No.

2   Q.   That was done by Jodi?

3   A.   Yes.

4   Q.   When you were doing the initial training, had the

5        customer already been converted -- as we defined

6        that term earlier -- to the Tyler system?

7   A.   Sometimes.

8   Q.   Was there anything it depended on or was it just

9        -- did it vary?

10  A.   There was various reasons.  Sometimes when they

11       did the initial conversion, there may have been

12       problems with the conversion processes so the

13       programmers had to figure out what -- kind of

14       troubleshoot the software to see what the

15       situation was.  But normally it was mostly all

16       converted.

17  Q.   Okay.  Okay.  When you went to Iowa -- I think you

18       said you took two trips to Iowa?

19  A.   I believe so, two.

20  Q.   Was that for the same customer?

21  A.   Yes, yes, it was.

22  Q.   Why did you only have to make two trips to Iowa

23       versus the many weeks that you went back to

**EXHIBIT 10**

## FREEDOM COURT REPORTING

Page 77

```
 1        Newport News?  Was that a function of the number

 2        of people that had to be trained or something

 3        else?

 4   A.   The number of people.  I believe in Iowa it was

 5        only about 200 employees.  And I was just doing

 6        the initial piece, setting up employee benefit

 7        information.

 8   Q.   And what about in Newport News?  Was it more

 9        employees that had to be trained then?

10   A.   Yeah.  They had whole departments of persons.  And

11        their employee database was as much as between

12        7,000 and 10,000 employees.  So the various

13        different departments that go along with that.

14   Q.   Was there any type of recordkeeping that you were

15        required to do that summarized your work?

16             MS. BAGLEY:  Object to the form.

17   Q.   (Mr. McKeeby)  Did you have -- does the term trip

18        reports mean anything to you?

19   A.   Yeah.  Those trip reports again -- and I think

20        that's what these little half sheets of paper

21        might -- I'm sorry.  The trip reports, yes.  The

22        trip reports was like a summary once the week was

23        complete that you wrote up what you did every day
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 10**

# FREEDOM COURT REPORTING

Page 78

1       with the client, what was accomplished, any

2       questions that the client may have had, any

3       unresolved issues that may need to be addressed by

4       a person more senior than myself, which was Jodi.

5   Q.  But you were the person that drafted the trip

6       report?

7   A.  Yes, I was.

8   Q.  And was that done, you said, on a weekly basis?

9   A.  Yes, it was.

10  Q.  But it summarized daily activities?

11  A.  Yes, it did.

12  Q.  What did you do with the trip reports, just give

13      them to Jodi?

14  A.  They were e-mailed to Jodi, yes.  Jodi, and I

15      think a copy also went to Penny.

16  Q.  You copied Penny on the e-mail?

17  A.  I believe so, yes.

18  Q.  In terms of the training that you conducted as an

19      implementation specialist, was it classroom style

20      training typically?

21  A.  Yes.

22  Q.  So there would be multiple people in the class?

23  A.  Yes, there would be.

# FREEDOM COURT REPORTING

Page 79

1    Q.    And they would all have laptop computers?

2    A.    No.

3    Q.    You would have a projection of a laptop?

4    A.    A projection of the laptop.  Some of them did have

5          their own laptop.  And some people just worked off

6          the screen.  But generally, most times there was a

7          laptop available in the training room.

8    Q.    For each person who was attending the training?

9    A.    Yes.  Most times there was.

10   Q.    And how did you know how to conduct the training

11         at a particular location in terms of what to show

12         the people in the classroom?

13   A.    That was based on the experience I had from

14         shadowing the more senior persons.  And then

15         before going to a particular location, Jodi would

16         -- we would have a conversation and discuss what

17         the needs of the clients were and what I would be

18         training the client on.

19   Q.    Was that documented, the kinds of training that

20         the client would need, or was that just something

21         conveyed to you in communications orally with

22         Jodi?

23   A.    Orally with Jodi.  And it would also be shown on

## FREEDOM COURT REPORTING

Page 80

```
 1        those Excel spreadsheets I was referencing

 2        earlier.

 3   Q.   The calendar?

 4   A.   The calendar, yes.

 5   Q.   Was there anything like a project report or

 6        anything like that that you reviewed in connection

 7        with deciding what type of -- how to conduct the

 8        training?

 9   A.   No.

10   Q.   Give me an example of the kind of information you

11        received from Jodi regarding what type of needs

12        the client had?  What type of things would she

13        tell you in those conversations?

14   A.   In those conversations she would tell me, of

15        course, where I was going, who the senior

16        management person was that I would be reporting

17        to, and then go into detailing what I would be

18        providing to the users as far as their training.

19        For example, if we were going to be setting up

20        employees' accounts into the system, that is what

21        she would reference, "You will be building or

22        setting up employee records into the database."

23        If we were running a payroll, she would say, you
```

## FREEDOM COURT REPORTING

Page 81

```
 1        know, "You're going to teach them the steps of how

 2        to process or run a payroll."  And so you walk the

 3        users through each step of the process.

 4    Q.  And you would know how to do that based on the

 5        training and studies that you did prior to that

 6        time?

 7    A.  That is correct.

 8    Q.  And when she would indicate the senior management

 9        person to whom you would be reporting, you're

10        talking about someone at the customer site?

11    A.  That is correct.

12    Q.  Not another Tyler employee?

13    A.  No.  At the customer site.

14    Q.  Was Jodi typically at the customer site with you

15        while you were doing implementations?

16    A.  No.

17    Q.  It was -- you did this on your own?

18    A.  I was there on my own except at Newport News.

19        There was -- and I think her name was Patricia.

20        She would be like on the same equal level as Jodi

21        but assigned permanently there at the Newport News

22        site.

23    Q.  Would she be with you in the room while you were
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 10**

## FREEDOM COURT REPORTING

Page 83

1      requirements from you an assessment of how well

2      the trainees were doing?

3  A.  Yes, that is correct.

4  Q.  And again, the document -- no, this is the trip

5      report that you're talking about?

6  A.  Yes, the trip report, yes.

7  Q.  Okay.

8  A.  Because when you're doing an implementation, you

9      know, it's set up by time periods how long it's

10     going to take from the initial startup to the

11     client being on their own.

12  Q.  Are you familiar with the concept of going live?

13  A.  Yes.

14  Q.  And let me give you the description that I

15     understand so that you can --

16  A.  Okay.

17  Q.  -- then tell me if we're on the same page.

18  A.  Okay.

19  Q.  And I'm going to speak at a fairly general level.

20     I understand that going live means the process by

21     which a client moves from its old systems to Tyler

22     systems and starts inputting information into the

23     system about its employees in the context of the

# FREEDOM COURT REPORTING

Page 84

1        payroll.  Is that a fair characterization?  And if

2        not, why not?

3   A.   Okay.  What you just described is part of the

4        implementation process.  When you speak of the go-

5        live, that is when, actually, Tyler turns over the

6        processing to the client and they're processing on

7        their own and just contacting Tyler for questions

8        through their call center.

9   Q.   Okay.  Were you -- and that actually has to happen

10       at a particular time?

11  A.   That is correct.

12  Q.   And my question for you is, were you at the client

13       site when the client went live?

14  A.   In Newport News, yes.

15  Q.   But not in the other location that you mentioned?

16  A.   No.

17  Q.   How long -- well, let me ask you this:  What were

18       your functions at Newport News when the client

19       went live?

20  A.   I was with -- again, that was during my shadowing

21       time period.  And what I was doing was

22       specifically reviewing the reports that came out

23       to make sure that the employee record information

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 10**

## FREEDOM COURT REPORTING

Page 85

```
1         was all entered into the system correctly so when

2         they began their new payroll processing all the

3         payrolls would come out correctly.

4    Q.   Okay.  Let me ask you this in connection with the

5         period of time when you were on your own, that

6         three- to four-month period.

7    A.   Uh-huh.

8    Q.   Were you ever at the customer facility during that

9         three- to four-month period when the customer went

10        live?

11   A.   No.

12   Q.   The functions that you described that occurred

13        while you were in the shadowing period, running

14        reports, entering employee information, the

15        behind-the-scenes work involving building

16        processes as well as troubleshooting, did you

17        perform those same functions during the three- to

18        four-month period that you were on your own?

19   A.   Yes.

20   Q.   Were there any other functions that were different

21        from those functions that were performed while you

22        were in the shadowing period?

23   A.   No.
```