# FREEDOM COURT REPORTING

Page 1

1                                                    Volume: I

2         UNITED STATES DISTRICT COURT      Pages: 1-94

3           EASTERN DISTRICT OF TEXAS       Exhibits: 1-3

4               MARSHALL DIVISION

5    ---------------------------------

6    PATTY BEALL, MATTHEW MAXWELL,

7    TALINA MCELHANY and KELLY

8    HAMPTON, individually and on

9    behalf of all other similarly

10   situated,

11              Plaintiffs        Docket No.

12          vs.                   2:08-cv-422 TJW

13   TYLER TECHNOLOGIES, INC. and

14   EDP ENTERPRISES, INC.,

15              Defendants

16   ---------------------------------

17          DEPOSITION of BETTY J. DUPREE

18          Friday, August 20, 2010

19          9:40 a.m. to 11:41 a.m.

20          Jones Reporting Company

21            Two Oliver Street

22       Boston, Massachusetts 02109

23       Reporter:  Heidi B. Stutz, CSR

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 11**

# FREEDOM COURT REPORTING

Page 2

```
 1    APPEARANCES:

 2

 3         CHANDRA L. HOLMES RAY, ESQ.

 4         Zelbst, Holmes & Butler

 5         P.O. Box 365

 6         411 Southwest 6th Street

 7         Lawton, Oklahoma 73502-0385

 8         580-248-4844 chandra@zelbst.com

 9             on behalf of the Plaintiffs

10

11         PAULO B. MCKEEBY, ESQ.

12         Morgan, Lewis & Bockius LLP

13         1717 Main Street, Suite 3200

14         Dallas, Texas 75201-7347

15         214-466-4000 paulo.mckeeby@morganlewis.com

16             on behalf of the Defendants

17

18    ALSO PRESENT:  H. Lynn Moore, Jr., Esq.

19                   Executive VP & General Counsel

20                   Tyler Technologies, Inc.

21

22

23
```

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 3

```
1                    I N D E X

2   WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS

3   BETTY J. DUPREE     4        87      89,92       91

4

5

6

7

8   EXHIBITS:              DESCRIPTION              PAGE

9     1         Resume                              4

10    2         Offer Letter 11/17/98              20

11    3         Resume                             57

12

13

14

15

16

17

18

19

20

21

22

23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 11**

# FREEDOM COURT REPORTING

Page 36

1      Q.    That's a true statement?

2      A.    Right.

3      Q.    Okay.  So again speaking generally here,

4  you would know the location and you would know the

5  module or modules that would be involved.  What

6  other information would you have prior to going,

7  let's say going on to the customer location?

8      A.    Usually the customer contact.

9      Q.    Customer contact information?

10     A.    Yes.

11     Q.    Would it be typical for you to speak with

12 the customer prior to going on the location of the

13 customer?

14     A.    No.

15     Q.    Were there any agenda or schedules with

16 respect to the particular implementation at the

17 customer location that you would have been able to

18 review prior to going on location?  And let me ask

19 you a more clear question, because you've used

20 "schedule" in a different context and I don't want

21 to confuse that.  You told me about the schedule

22 that you would sometimes get that was specific to

23 you that would basically tell you where to go, and I

# FREEDOM COURT REPORTING

Page 37

1    understood that to include the location and in some

2    cases at least the module or modules on which you

3    would be training.

4         A.    Right, or the part of the module.

5         Q.    Right, the part of the module.

6         A.    Right.

7         Q.    Or if it was fixed assets, the module?

8         A.    Right.

9         Q.    And my question is was there a more

10   detailed or specific document related to the

11   particular training or particular implementation,

12   rather, that told you what you were going to be

13   doing at particular times, i.e., consulting with the

14   customer representative at 12 o'clock on Monday,

15   having a training class at 2 o'clock on Tuesday,

16   again speaking hypothetically?  Was there something

17   like that that you would have been able to review

18   prior to going into the customer location?

19        A.    Sometimes.

20        Q.    And who, on those occasions when you would

21   have a document like that who would prepare it?

22        A.    The project manager.

23        Q.    And would it, would the existence of that

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 38

1  kind of document depend on any factor that you could

2  identify?

3      A.   It would depend on what they had already

4  done.  You know, if they had done requisitions,

5  would it be a requisition review, would it be going

6  to the purchase orders.  If it was payroll, have

7  they done X number of tables for payroll, you know,

8  I would do the next set of tables.

9      Q.   So I take it these documents that you're

10  referring to would be in different forms and

11  formats?

12      A.   Sometimes.

13      Q.   Did you call them anything, like a -- I

14  used the term "schedule," but was that document

15  called anything?

16      A.   We usually called it a schedule.

17      Q.   So the schedule, it sounds like from your

18  testimony, would apprise you of work that had

19  already been done in connection with the servicing

20  of that customer?

21      A.   Yes.

22      Q.   Would the schedule also provide you with

23  an agenda of what you would be doing?

**EXHIBIT 11**

# FREEDOM COURT REPORTING

Page 39

1        A.    Usually.

2        Q.    Were you ever charged with the

3    responsibility to sit down with the customer and

4    create an agenda or schedule that would govern the

5    services that you would provide during the

6    implementation phase with the customer?

7        A.    No.

8        Q.    In those instances in which a schedule

9    that outlined the function you were to perform at

10   the customer was not prepared, how would you know

11   what those functions were?

12       A.    Sometimes I call the project manager and

13   sometimes I would ask the customer what stage they

14   were at.

15       Q.    And when you say "what stage," do you mean

16   what stage of the implementation?

17       A.    Uh-huh.

18       Q.    Is that "yes"?

19       A.    Yes.  Did they cover, you know, XYZ and

20   did they understand that?  And if they did, we would

21   go on to the next step.

22       Q.    So from that answer I'm going to assume,

23   and you can tell me if that's incorrect, that you

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 40

1  worked on components of broader implementations in

2  the sense that parts of the implementation would

3  have been completed before you stepped in?

4       A.   Yes.  It depended.  Sometimes we did the

5  whole implementation, sometimes I only did a part of

6  it.

7       Q.   Okay.  You were talking about, in that

8  last bid of testimony about occasions on which you

9  only did a part of the testimony where you would

10  have the opportunity to either ask the customer or

11  discern from one of these schedules what work had

12  already been done?

13       A.   Right.

14       Q.   But even on those occasions in which you

15  were involved, I'll say, in the implementation from

16  the beginning to the end, you wouldn't prepare an

17  agenda or schedule to govern the terms?

18       A.   No.

19       Q.   That's a correct statement?

20       A.   That's correct.

21       Q.   So when you -- and the answer to this may

22  depend as well.  Describe, if you can, your initial

23  meeting with the customer at the customer's

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 41

1    location.  Again, you've been told what modules,

2    you've been told where to go, you've been given

3    customer contact information.  I take it you're

4    arriving at the city location and asking for the

5    contact person and then you meet with that contact

6    person?

7         A.    You meet with them, you introduce

8    yourself, you might ask them a few basic questions,

9    and then you start the implementation, you start

10   training.

11        Q.    So it would be typical for you to commence

12   training soon after your arrival at the customer

13   location?

14        A.    Yes.

15        Q.    This introductory meeting, based on what

16   you've told me, I take it, typically, again

17   typically did not take more than a few hours?

18        A.    Probably not more than a half hour.

19        Q.    Now, we'll talk more about the training,

20   but I take it this is, the training at a general

21   level involves explaining to employees of the

22   customer how to use Tyler's software?

23        A.    Yes.

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 42

1        Q.    And this might be in a classroom-type

2    setting?

3        A.    Sometimes.

4        Q.    Sometimes it might be one on one with

5    particular users?

6        A.    Yes.

7        Q.    And that would be determined by factors

8    such as the size of the implementation?

9        A.    Sometimes.

10       Q.    What other factors would that depend on?

11       A.    How many employees need to be trained on

12    it.

13       Q.    On the particular part of the module?

14       A.    Exactly.

15       Q.    And how would you know how many employees

16    need to be trained on a particular part of the

17    module?

18       A.    The site would determine that.

19       Q.    Did you, would it be typical for you to

20    have kind of a central location where you would be

21    providing the training such that people were coming

22    into a conference room or training center or office

23    on a scheduled basis?

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 43

1      A.    Sometimes.

2      Q.    Okay.  When it wasn't like that, how would

3   you describe the training?  That would be a case

4   where you would train individuals more one on one?

5      A.    Exactly.  We did the individual training

6   for a few people and we did the large classrooms.

7      Q.    But the process of which, by which the

8   customer would determine what employees needed to be

9   trained on what modules wasn't something in which

10  you were involved?

11     A.    No.

12     Q.    Was that something in which the project

13  manager was involved or do you know?

14     A.    I don't know.

15     Q.    Of the -- it sounds like that the bulk of

16  your functions at Tyler involved training employees

17  of the customer.  Is that a fair statement?

18     A.    Yes.

19     Q.    What percentage of your time at Tyler did

20  you spend training customers of the employees?  And

21  I know you're not going to be able to give me a

22  precise amount that I'm sure varied from time to

23  time.  But I understand there may have been some

# FREEDOM COURT REPORTING

Page 45

1    you've at least touched upon so far in your

2    deposition would you, you would actually be training

3    customers on the software system?

4         A.    Yes.

5         Q.    Would the data from their previous system

6    already have been converted to Tyler's system at the

7    time you were conducting the training?

8         A.    Not usually.  Because I was teaching how

9    to use the system, you know, I would encourage them

10   to use data that they would normally put in, but we

11   practiced on a test system so they didn't have to

12   use actual data.  But I encouraged them to use the

13   actual data that they would use.

14        Q.    Okay.  You're going to have to maybe

15   explain that a little bit to me.  They would not use

16   actual data?

17        A.    They would use what they would normally,

18   data that they would use, but we would put it into a

19   test system.

20        Q.    I see.

21        A.    So that it didn't become a permanent

22   record.

23        Q.    Were you involved in creating that test

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 46

1    system?

2        A.    No.

3        Q.    Or was that a programming function?

4        A.    That was a programming function.

5        Q.    Did you have any role in converting data

6    from the customer's previous system into the MUNIS

7    system?

8        A.    I didn't usually get involved in that.

9    There was a conversion team that did that.  I

10   sometimes helped the customer check and verify the

11   information after.

12       Q.    Okay.  And in terms of entering data into

13   the customer's system, that's something that was

14   done by the conversion department?

15       A.    Depends.

16       Q.    Was it something that was done by you?

17       A.    Depends what module it is and what

18   information you're talking about.  We built the

19   payroll tables or the customer built the payroll

20   tables.  The conversion data was records that they

21   had from the previous system that they could put

22   into the MUNIS data using the tables.

23       Q.    And who did that function?  Was that the

## FREEDOM COURT REPORTING

Page 47

1   customer or was that the converse department or was

2   that you?

3       A.   The conversion department did that.

4       Q.   Okay.  You as an implementation specialist

5   typically wouldn't do that?

6       A.   No.  We usually helped them build the

7   tables, but I didn't normally put the data in, put

8   the conversion data into it.

9       Q.   And let me make sure I understand.  When

10  you assisted a customer in building the tables were

11  you counting that in the approximately 80 percent

12  range that you used or would that building, table

13  building --

14      A.   That's part of the training.

15      Q.   Okay.  And tell me what's involved in

16  building a table.

17      A.   Depends what module it is.  If it's

18  payroll, you have to put in whether they're hourly,

19  salary, how often they get paid, weekly, biweekly,

20  monthly, the tax tables for the federal and whatever

21  state they're in, what benefits they have.

22      Q.   So for payroll this table basically is

23  different information that would be input into the

**EXHIBIT 11**

**FREEDOM COURT REPORTING**

Page 48

1  system with respect to each of the employees?

2      A.    You build the tables and then you tie the

3  employee to that table.

4      Q.    I see.  So the table in that sense is

5  generic?

6      A.    Right.

7      Q.    Once the particular employee information

8  is input, then it becomes specific to that employee?

9      A.    Right.

10     Q.    And you're not involved in inputting that

11  specific information about the particular employees,

12  you're involved in building the table, is that a

13  correct statement?

14     A.    Well, we would help them put, you know,

15  enter employees and tie the employees to the tables,

16  too.  That's part of the training.

17     Q.    Okay.  Did you use any Power Points or

18  overhead presentations when conducting training?

19     A.    I didn't, no.

20     Q.    You were actually on the system with the

21  customer?

22     A.    Yes.

23     Q.    And the customer typically would have a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 50

1    that something that had already been determined

2    through discussions with the project manager?

3         A.   Ask that a different way.

4         Q.   Yeah, let me try to do that and maybe lay

5    a little better predicate for the question.

6                   I understand that these different

7    modules or parts of these modules may have different

8    features that the client or that a particular client

9    may elect to utilize or not utilize.  Is that

10   correct generally?

11        A.   Yes.

12        Q.   My question is were you involved in

13   discussions with the client to arrive at a

14   collective decision or, I guess -- let me scratch

15   that.

16                   Were you involved in discussions

17   with the client whereby the client chose which of

18   these features to elect or was that something that

19   was done at some earlier stage typically?

20        A.   That was done at an earlier stage because

21   each module had, was priced differently.  So if they

22   used requisitions, they paid for that.  If they

23   didn't use requisitions, they used purchase orders,

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 51

1    they paid for that, but they couldn't use

2    requisitions.

3         Q.   But were there different features within

4    the requisition software that the customer could

5    elect to utilize or not utilize?

6         A.   They could elect to utilize it or not

7    utilize it.  But if they bought the requisition

8    software, they could use all of it.  Whether they

9    decided to or not was their choice.

10        Q.   And my question to you is were you

11   involved in any dialogue with the customer whereby

12   you were explaining those different features to

13   enable them to make those decisions or was that

14   something done at a previous stage, if at all?

15        A.   Well, if we were talking requisitions, I

16   would talk to them about what they wanted to use on

17   it.  But I didn't talk to them as to whether they

18   wanted to purchase it or not.  That was done long

19   before I got there.

20        Q.   Okay.  When I'm talking about features,

21   and I may be wrong, but I'm understanding that there

22   are certain things that you can do with the

23   requisition software options that you could use

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 52

1    within the software that the customer might elect to

2    use or not, say, well, no, for my system that's too

3    complicated or I don't really need that and not use

4    it.

5         A.    Right.

6         Q.    That's what I'm thinking of when I'm

7    saying "features."

8         A.    Exactly.  And that would come out when we

9    were training.  I would show them what it had and

10   they would say yes or no.  Usually if they bought

11   it, they did want to use it usually.

12        Q.    So you would explain the software to them,

13   explain the different features, and they would tell

14   you whether or not they were interested in utilizing

15   particular features in their setup?  Is that not

16   quite right?

17        A.    Not quite right.

18        Q.    Why not?

19        A.    I would show them what the features were

20   and they would decide whether they wanted to use it

21   or not, but that was part of the training.

22        Q.    And would that decision be communicated to

23   you, the decision as to whether or not, yeah, that

## FREEDOM COURT REPORTING

1   sounds like an interesting feature that we would use

2   or, no, that's probably too complicated for us?

3        A.   I think those decisions would probably be

4   made more in the sales representative or in the

5   project kickoff rather than when I start the

6   training.  Because when I start the training they

7   know what they want.

8        Q.   Okay.  So in the course of training and

9   setting up these tables would customers ever ask you

10  for input or advice as to what they should do with

11  the software?

12       A.   Well, they usually tried and I'd say it's

13  up to you, it's your system.  You have to use it.

14  It has to fit the way you want it to.  It's not my

15  decision to make for you.

16       Q.   What kind of questions, give me an example

17  of a question that they would ask you about what

18  they should do in terms of, I guess, how to set up

19  the table or how to use the software or what feature

20  to use.

21       A.   In specific terms I really don't remember

22  because it's been, the last three years I didn't do

23  startup implementations.  I worked on systems that

## FREEDOM COURT REPORTING

Page 68

1    page.

2        A.    When they're using that module on the

3    production system on a daily basis.

4        Q.    It's true that even on a system that's

5    part of this installed module team that there would

6    be a time when the customer went live?

7        A.    For that module, yes.

8        Q.    Was there anything that you could identify

9    that was a factor or that otherwise determined

10   whether or not you were on site when the customer

11   went live with that particular module?  You said

12   there might have been occasions where you were

13   there.  It wouldn't be typical.  My question is

14   whether some particular set of facts or

15   circumstances that warranted your presence at the

16   customer location when they went live or did it just

17   kind of depend on --

18       A.    It depended on if the customer wanted

19   somebody there or not.

20       Q.    So that would have been something that

21   would have been prearranged with the customer and

22   the --

23       A.    And Jim Mundy.

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 69

1        Q.   And Jim.  And what about the provision of

2    post live support?  Is that something you did during

3    these final three years of your employment in terms

4    of answering the customer's questions after they

5    went live as to operational questions?

6        A.   Usually after they went live they had to

7    call support.

8        Q.   Were there times when they called you or

9    would that be unusual?

10       A.   It would be unusual.

11       Q.   Did you have a practice of referring

12   customers to support if they did call you after they

13   had gone live with the system during this three-year

14   period in which you were on the installed module

15   team?

16       A.   Me being me, I would probably try to

17   answer their question.

18       Q.   Was that contrary to any Tyler policy or

19   practice of which you were aware?

20       A.   Not that I'm aware of.

21       Q.   The presence at the customer site during

22   the go-live process, in particular in your presence,

23   was that something that occurred more often prior to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 11**

1    you being part of this installed module team?

2         A.    Yes.

3         Q.    Would it have been routine that you would

4    have been at the customer location prior to the --

5    I'm sorry, during the go-live process during that

6    time prior to the creation of this installed module

7    team?

8         A.    Yes.

9         Q.    And you would be providing assistance on

10   an as needed basis?

11        A.    Yes.

12        Q.    Additional training as was required?

13        A.    Yes.

14        Q.    Did you have an understanding at Tyler

15   that your being placed on the installed module team

16   had something to do with your experience level?

17        A.    Yes.

18        Q.    What was the basis of that understanding?

19        A.    Because I'd been there so long.

20        Q.    Right.  I think you misunderstand my

21   question.  That could be because I didn't ask a

22   precise enough question.  But what was it about your

23   experience level that made it preferable to Tyler

## FREEDOM COURT REPORTING

Page 71

1    that you be on this installed module team?

2         A.   Because I knew so many modules and I was

3    so familiar with so many modules and new people

4    coming in didn't have that experience.

5         Q.   I see.  So you could kind of jump back and

6    forth to different modules more readily than someone

7    who was more junior?

8         A.   Yes.

9         Q.   That's what you meant?

10        A.   Yes.

11        Q.   Got it.

12             Let me ask a question, first of all,

13   with respect to this three-year period of your

14   employment during which you were on this installed

15   module team.  Did you track your hours?

16        A.   I did not.

17        Q.   Did you complete expense reports?

18        A.   Yes, I did.

19        Q.   Did those expense reports indicate whether

20   or not your time was billable to the client?

21        A.   It did record the billable time to the

22   client.  It recorded the time I left the house, the

23   time I got back, how many miles I went.  It did not

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 74

1    like Mr. Sansone or Mr. Hepburn or anyone else about

2    the issue of overtime pay for implementation

3    consultants?

4         A.   No.

5         Q.   Okay.  So understanding that the claim in

6    the case is that you weren't paid for hours worked

7    over 40, are there any documents that we or anyone

8    else could look at to determine the number of hours

9    that you worked in a particular week at Tyler

10   Technologies?  Let's start, first of all, focus the

11   answer on that final three years of your employment

12   when you were on the installed module team.

13        A.   The only thing that's on record are the

14   travel reports.

15        Q.   And we've already established that we

16   could not necessarily -- well, that we could not use

17   those to assess with precision or specificity

18   precise number of hours worked during a week?

19        A.   I suppose it depends on whether you want

20   to include the travel as work hours.

21        Q.   Let's say we did not include the travel as

22   work hours.  Could you then use the expense reports

23   to determine the precise number of hours that you

**EXHIBIT 11**

## FREEDOM COURT REPORTING

Page 75

1    worked in a particular week?

2         A.    I'm not sure.  I don't think so.

3         Q.    Are there any other documents of which

4    you're aware that we could look at to determine the

5    hours that you worked during a particular week or

6    did you already tell me it would just be the expense

7    reports?

8         A.    Just the expense report, that's it.

9         Q.    All right.  Did you keep any personal

10   documents such as a daytimer --

11        A.    No.

12        Q.    -- or journal or diary or anything like

13   that?

14        A.    No.

15        Q.    No, you did not?

16        A.    No.

17        Q.    If you were asked to provide an estimate

18   of the number of hours that you worked during that

19   three-year period in which you were on the installed

20   module team on a weekly basis that would be your

21   best estimate?

22        A.    Minimum between 60 and 70.

23        Q.    Does that include your travel time?

**EXHIBIT 11**

# FREEDOM COURT REPORTING

Page 76

1       A.    Yes.

2       Q.    When you were doing implementation work

3    during the approximately three-year period you were

4    on the installed module team were you ever required

5    to perform work that required you to interface with

6    third-party software?

7       A.    From somebody else?

8       Q.    What's that?

9       A.    Software from somebody else?

10      Q.    Right.  Did you ever have to look at how

11   Tyler's software functioned in conjunction with a

12   software that a third party had provided to the

13   customer either prior to or during the

14   implementation that you were working on?

15      A.    I don't recall doing that.

16      Q.    Did you work with a software called

17   Crystal?

18      A.    Sorry, yes, I did work with Crystal.

19      Q.    Okay.  That's an example of a third-party

20   software?

21      A.    So I did with Crystal, yes.

22      Q.    What is Crystal?

23      A.    It's a reporting, report record.

**EXHIBIT 11**