## FREEDOM COURT REPORTING

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

 4

 5    PATTY BEALL, MATTHEW MAXWELL,

 6    TALINA MCELHANY AND KELLY

 7    HAMPTON, individually and on

 8    behalf of all other similarly

 9    situated;

10            Plaintiffs,

11    vs.                    Civil Action

12                          No. 2:08-CV-422 TJW

13    TYLER TECHNOLOGIES, INC.

14    AND EDP ENTERPRISES, INC.,

15            Defendants.

16    _____/

17    PAGE 1 TO 139

18

19    The Deposition of LAURA MILBURN,

20    Taken at 400 Renaissance Center, Suite 2160,

21    Detroit, Michigan,

22    Commencing at 10:01 a.m.,

23    Wednesday, September 1, 2010,

24    Before Jacquelyn S. Fleck, CSR 1352, RPR, CRR, RMR,

25
```

**EXHIBIT 12**

# FREEDOM COURT REPORTING

```
 1    APPEARANCES:
 2    LAUREEN F. BAGLEY
 3    Sloan, Bagley, Hatcher & Perry Law Firm
 4    101 East Whaley Street
 5    Longview, Texas 75606
 6    (903) 757-7000
 7    Appearing on behalf of the Plaintiffs.
 8
 9    FARIN KHOSRAVI
10    Morgan, Lewis & Bockius, LLP
11    1717 Main Street
12    Suite 3200
13    Dallas, Texas  75201-7347
14    (214) 466-4000
15    Appearing on behalf of the Defendants.
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT 12**

# FREEDOM COURT REPORTING

```
 1                          TABLE OF CONTENTS

 2     Witness                                        Page

 3     LAURA MILBURN

 4     EXAMINATION BY MS. KHOSRAVI:                      4

 5

 6

 7                          INDEX TO EXHIBITS

 8

 9     Exhibit                                        Page

10     DEPOSITION EXHIBIT 1                            26

11     DEPOSITION EXHIBIT 2                            37

12     DEPOSITION EXHIBIT 3                            54

13     DEPOSITION EXHIBIT 4                            93

14

15

16

17

18

19

20

21

22

23

24

25
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 12**

## FREEDOM COURT REPORTING

1           would that have been?

2    A.    I don't.  I can't recall exactly when it was.  We were

3          in St. Louis more than one -- on one occasion together.

4    Q.    Were you in St. Louis --

5    A.    It was cold.

6    Q.    If it was cold -- okay.

7                So you think it might have been September --

8          was it towards the end of your employment?  Your

9          employment, again, ended around November 2009.

10   A.    No.  I'd say it was -- I would say it was earlier in

11         2009, when it was winter, or spring.

12   Q.    So January, February, March time period --

13   A.    Yes.

14   Q.    -- of 2009?

15               Sitting here today, Ms. Milburn, you believe

16         that Tyler Technologies owed you overtime pay for any

17         hours worked over 40; is that correct?

18   A.    Correct.

19               MS. BAGLEY:  Object to form.

20   BY MS. KHOSRAVI:

21   Q.    And when did you form this belief?  When did you learn

22         that the company should have paid you overtime pay for

23         any hours that you worked over 40?

24   A.    When did I learn that?

25   Q.    When did you realize that the company should have paid

**EXHIBIT 12**

## FREEDOM COURT REPORTING

```
 1              you overtime pay for any hours worked over 40?
 2    A.    I can't -- I can't recall when I realized that.
 3    Q.    When you worked with Lisa Seymour in St. Louis did you
 4          believe that the company owed you overtime pay at that
 5          point?
 6    A.    Yes.
 7    Q.    What about before you went to St. Louis; did you
 8          believe that the company owed you overtime pay?
 9    A.    I don't know.  I think -- I'm not sure when I started
10          traveling.  St. Louis was one of my first sites, and it
11          was around that time.
12    Q.    And what prompted you to form a belief that the company
13          should be paying you overtime pay?
14    A.    The schedule, the overtime hours.
15    Q.    So once you started working more than 40 hours per week
16          you thought, wait a minute, I'm working more than 40
17          hours per week, the company should pay me overtime?
18              MS. BAGLEY:  Form.
19    A.    Correct.
20    BY MS. KHOSRAVI:
21    Q.    When did you start working overtime for Tyler
22          Technologies?  And let me put this in some perspective.
23          You started working for the company around June 9,
24          2008, so that was the beginning of your employment.  So
25          think back and tell me, during what month was it that
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 12**

## FREEDOM COURT REPORTING

1    you started working more than 40 hours per week?

2    A.    It started with my first site visit.

3    Q.    Do you remember when your first client visit was?

4    A.    I could not say for certain.

5    Q.    How many months was it that you were working for Tyler

6          Technologies before they sent you to a client site?

7                  And let me help you through -- well, no, I

8          want you to help me through this.  I'm imagining if you

9          started working at Tyler Technologies in June 2008, on

10         June 9, 2008, the next week they wouldn't just send you

11         to a client site because --

12   A.    I would say two months.  You know, it was two months.

13   Q.    So by August 2008 you had started to go to a client

14         site?

15   A.    Correct.

16   Q.    And by then you believe that you were owed overtime for

17         any hours that you were working over 40 per week?

18   A.    I phrased it as extra compensation, yes.

19   Q.    But in this lawsuit you're not saying extra

20         compensation.  You're asking for overtime pay; is that

21         not right?

22   A.    Yes.  Correct.

23   Q.    So you believe that the company owed you overtime pay;

24         correct?

25   A.    Correct.

# FREEDOM COURT REPORTING

Page 27

```
 1                    DEPOSITION EXHIBIT 1

 2                   MARKED BY THE REPORTER

 3                   FOR IDENTIFICATION

 4     BY MS. KHOSRAVI:

 5     Q.    Ms. Milburn, I'm going to hand you what's been marked

 6           as Exhibit Number 1.  Tell me if you recognize this

 7           document.

 8     A.    Correct.

 9     Q.    This -- the document I handed you is -- Exhibit 1 is

10           the consent to opt into this lawsuit that you signed on

11           September 14, 2009; is that correct?

12     A.    Yes.

13     Q.    And is this the first time, September 14, 2009, is that

14           the first time that you consented to opt into this

15           lawsuit?

16     A.    Yes.

17     Q.    Ms. Milburn, have you ever been involved in any other

18           lawsuits besides this one?

19     A.    No.

20     Q.    Have you filed any complaints with the Department of

21           Labor or the Equal Employment Opportunity Commission

22           against Tyler Technologies?

23     A.    No.

24     Q.    What about against any other employers?

25     A.    No.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 12**

# FREEDOM COURT REPORTING

1    Q.    How many days would you say you did that?  Meaning you

2          got into the office in the morning, Good morning

3          everybody, you walk into your office, you sit down and

4          you start working with the software and reviewing

5          documents.  How many days would you do that?

6    A.    Every day that I wasn't at a client site.

7    Q.    Right.  Okay.  So then that's what I would like to

8          know.  I would like to know how many -- starting June

9          9th, 2008, when you first went to work, how many weeks

10         did you continue to do that, go to your office, sit

11         there and train yourself on how to use the software?

12   A.    Until my first client visit.  And then --

13   Q.    Which was when?

14   A.    I don't remember.

15   Q.    This one I want you to estimate.

16               MS. BAGLEY:  Form.

17   A.    August, September.  It was my -- probably my first

18         client visit, somewhere around after two months of

19         employment.

20   BY MS. KHOSRAVI:

21   Q.    So you think, you think June, the whole month of June,

22         starting from June 9 until the end of June, you were

23         training yourself on the system?

24   A.    Correct.

25   Q.    Do you -- do you remember whether or not you were sent

**EXHIBIT 12**

# FREEDOM COURT REPORTING

Page 53

```
 1              to a client site in June 2008?

 2      A.     I don't think I was.

 3      Q.     So the first month of June we're done with.  You were

 4              training yourself.  Next comes July 2008.  You were

 5              coming to the office, you were training yourself.  Were

 6              you sent to a client site in July 2008?

 7      A.     I don't know.

 8      Q.     That first month that you were working for Tyler

 9              Technologies training yourself --

10                     MS. BAGLEY:   The expense reports I --

11      BY MS. KHOSRAVI:

12      Q.     That first month that you were training yourself on

13              Tyler Technologies software, what time did you get to

14              the office in the morning?

15      A.     I typically got to the office around 8:00.

16      Q.     And I'm not talking about later on, once you actually

17              learned what you were supposed to do.  I'm only talking

18              about initially, when you were still trying to figure

19              out the software and teach yourself and do

20              self-studies.  You still got to the office at 8:00 --

21      A.     Correct.

22      Q.     -- during that time period?

23              And when did you leave the office?

24      A.     Between 4:30 and 5.

25      Q.     Okay.
```

EXHIBIT 12

# FREEDOM COURT REPORTING

```
1     A.    Typically.

2     Q.    Why do you say typically?

3     A.    I -- I wouldn't say -- I mean that was the time frame,

4           8 to 5.

5     Q.    8 to 5 is when you were expected to be at the office

6           during that time period; correct?

7     A.    Correct.  Correct.

8     Q.    Was there any reason to stay at the office beyond 5:00

9           during that initial period when you were training

10          yourself?

11    A.    No.

12                MS. KHOSRAVI:  Good point, Laureen.

13    BY MS. KHOSRAVI:

14    Q.    Ms. Milburn, if you were ever sent to a client site,

15          did you typically fill out an expense report for the

16          expenses that you incurred during your trip to a client

17          site?

18    A.    Yes.

19    Q.    Was there ever a time that you went to a client site

20          and you did not incur any expenses that Tyler

21          Technologies needed to reimburse you for?

22    A.    No.

23                MS. KHOSRAVI:  Okay.  Let's mark this.

24                DEPOSITION EXHIBIT 3

25                MARKED BY THE REPORTER
```

EXHIBIT 12

# FREEDOM COURT REPORTING

Page 82

1    A.    To go on-site.  I'm looking at the notes.  It says

2          there was travel to St. Louis and St. Thomas.  And when

3          that -- when there was travel coming up, I would be

4          potentially working later than 40 hours by preparing

5          whatever it was.

6    Q.    Now, I notice on this document it says potentially --

7          travel coming up September 15th and September 24th.

8    A.    Mm-hmm.

9    Q.    You would be traveling -- you would be preparing for

10         the travel a month in advance of the upcoming travel?

11   A.    Well, you have to realize I was a new employee, so I

12         was learning everything.

13   Q.    Right.  So that's my question, how long in advance of a

14         trip you started preparing for the trip.

15   A.    As soon as I heard about it I would start preparing for

16         it.

17   Q.    And what did you do to prepare for the trip?

18   A.    I would print out whatever documentation, training

19         documentation that pertained to the session, and I

20         would practice on the -- in the demonstration software

21         on my laptop so I could be well-versed in front of the

22         client.

23                And Lisa Seymour and I did a lot of

24         self-study activities together.

25   Q.    I want to talk about when you actually went to a client

## FREEDOM COURT REPORTING

Page 83

```
 1            site by yourself.  Was there ever an occasion where you
 2            did not have another implementation consultant with you
 3            at a client site?
 4       A.   Yes.
 5       Q.   What location was that?  Was it several times or just
 6            one time?
 7       A.   It was more than once.
 8       Q.   When you went to a client site was it to go there and
 9            train them on Tyler software?
10       A.   Yes.
11       Q.   Did you do anything else while you were at the client
12            site other than training them on the software?  Did you
13            help them convert their data?
14       A.   No.
15       Q.   Did you help them configure the system?
16       A.   If they wanted -- I mean if they needed to add a pay
17            code or something like that, I would help them do that,
18            yes.  So it wasn't -- it wasn't always planned.  I mean
19            it was very random if it came up.
20       Q.   So you might not have known that once you go out there
21            you have to help them put in a pay code, for example?
22       A.   You wouldn't know.
23       Q.   You would not know?
24       A.   Right.
25       Q.   So once you got to a client site --
```

**EXHIBIT 12**

## FREEDOM COURT REPORTING

Page 84

1    A.    I went there to train.

2    Q.    You went there to train.  But if they said, Oh, we need

3          this information to present itself in a different way,

4          then you would need to actually configure the system

5          for them as to how to do that?

6    A.    I would be with them while they called the call center.

7    Q.    So you would not actually help them configure it?

8    A.    In general, no.

9    Q.    You said in general, no.  Did you ever?

10   A.    I probably did.

11   Q.    But typically speaking, you actually refer them to the

12         call center?

13   A.    Customer service.

14   Q.    Customer service.

15         Okay.  So before you went out there to train

16         them, you were starting to tell me what you would do in

17         preparation for traveling to a client site to train

18         them.

19         First of all, how would you know that you

20         need to go to a client site to train?  Who would tell

21         you that information?

22   A.    Penny or my project manager.

23   Q.    They would tell you the date that you needed to be

24         there; correct?

25   A.    Correct.

**EXHIBIT 12**

# FREEDOM COURT REPORTING

Page 85

```
 1    Q.    They would tell you who you needed to meet up with when

 2          you got there; correct?

 3    A.    Correct.

 4    Q.    Would they also tell you which modules or which

 5          software in particular that needed to be trained?

 6    A.    Specifically what was going to be covered, yes.

 7    Q.    Okay.  Tell me then, what did you do?  Did you prepare

 8          an agenda for your training?

 9    A.    The project manager usually prepared the agenda and

10          gave it to the implementation consultants.

11    Q.    You told me earlier that, yes, sometimes as soon as you

12          found out there was a trip, even the trip that was --

13          you found out about a month before it was to take place

14          you started preparing, so I want to know what it is

15          that you did to prepare.  If the agenda was prepared

16          for you by the project manager, I want to know in the

17          meanwhile, what were you doing to prepare for the

18          training session?  Walk me through that.

19                MS. BAGLEY:  Form; asked and answered.  You

20          can answer.

21    A.    I would, again, become as versed as possible --

22          well-versed as possible on the software.  I would just

23          practice whatever it was we were training on.

24    BY MS. KHOSRAVI:

25    Q.    For you to learn the software; correct?
```

**EXHIBIT 12**

# FREEDOM COURT REPORTING

Page 86

```
1      A.    Always.
2      Q.    Okay.  So what did you do specifically to prepare for
3            the training session?  Did that have to do -- you had
4            to be well-versed on the software in order to be able
5            to train the employees?
6      A.    Correct.
7      Q.    What else did you do besides learning the software to
8            be prepared for the training session?
9      A.    A lot of -- a lot of reading and a lot of -- again, I
10           told you I did a lot of my self-studying with another
11           co-worker, Lisa Seymour specifically.  And we would
12           just -- it was repetition.  It was repetition,
13           understanding all the intricacies --
14                    MS. BAGLEY:  Intricacies.
15     A.    -- intricacies of the software.
16     BY MS. KHOSRAVI:
17     Q.    When you got to a client site how did you know how to
18           train them?  Because so far you've told me the only
19           preparation you did was learn the software yourself.
20           So you know the software.  You learned the software.
21           You get to a client site.  How were you then prepared
22           or what did you do to train them?
23     A.    I learned that through shadowing.  That was what
24           shad- -- the purpose of shadowing was about, was to
25           watch other Tyler trainers train and copy that.
```

**EXHIBIT 12**

# FREEDOM COURT REPORTING

```
1    Q.    And you -- but you didn't go to the same client that
2          you watched another implementation consultant train;
3          correct?  You went to a new client?
4    A.    Sometimes I went to the same.
5    Q.    Okay.
6    A.    I mean I did training in St. Louis.  I also shadowed in
7          St. Louis.
8    Q.    So the client, Tyler's clients would receive multiple
9          training on the same software and the same module?
10   A.    Not --
11   Q.    They would be different modules; correct?
12   A.    You could -- you could go train on time entry.  You
13         could then go train on reporting.
14   Q.    But you wouldn't train them twice on the reporting
15         module?
16   A.    Correct.  You didn't go back and train the same thing
17         every time.
18   Q.    So even though you shadowed and you watched another
19         implementation consultant train that same group of
20         people on one module, when you went back to train them
21         you were training them on a completely different set of
22         modules?
23   A.    It's all under the HR/payroll module, but, yes, time
24         and attendance like would be a subcategory.
25   Q.    So what did you do then to prepare for that?  I know
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 12**

# FREEDOM COURT REPORTING

Page 88

```
 1              you studied and you prepared yourself.  Did you prepare
 2              a PowerPoint presentation?  Did you prepare --
 3      A.      No.
 4      Q.      So you went to the client site unprepared to train
 5              them?
 6      A.      No, I went --
 7                      MS. BAGLEY:  Object to the form.
 8      BY MS. KHOSRAVI:
 9      Q.      Answer that question.  I want to know what -- how
10              you --
11      A.      I was very prepared.
12      Q.      Prepared in the sense that you knew how the software
13              worked.
14      A.      Yes.
15      Q.      I am very prepared with respect to knowing how to take
16              a deposition, but I can't just walk into any room and
17              just start talking.  I have to know about that
18              particular client and -- and design my deposition for
19              that particular client.
20      A.      All given by the project manager.
21      Q.      Okay.  So the project manager would give you what?
22      A.      She would tell you what you needed to do.  She would --
23              she would just tell you what she -- what her
24              expectations, what the client expectations were; and if
25              you had any questions or concerns, she would address
```

**EXHIBIT 12**

## FREEDOM COURT REPORTING

```
1              them as well.
2      Q.     So the project manager would tell you what the client's
3              expectations were, you said, meaning which sections of
4              the program they wanted to get training on?  I'm trying
5              to understand that.
6      A.     Yes.
7      Q.     So was she --
8      A.     The project manager knew what the client was to receive
9              out of this training session, so she would prepare us
10             by making sure that all the points were covered.
11     Q.     And how did she prepare you?
12     A.     Typically through a conversation on the phone,
13             sometimes Web Ex.
14     Q.     And she would tell you these are the specific not
15             modules, but you said subcategories that they need to
16             be trained on?
17     A.     She would -- she would definitely tell you what you
18             needed to train on.
19     Q.     So when you went to a client site did you take a laptop
20             with you?
21     A.     Yes.
22     Q.     How did you then start training them?  Did you prepare
23             a PowerPoint presentation?
24     A.     No.  We typically used the client's software.  So even
25             though I had a laptop, we were using the client's
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 12**

# FREEDOM COURT REPORTING

```
1          software.  And I'm sure through my training I've had --
2          I had agendas.  I don't know that they were agendas I
3          created or my project manager created for me.  I do not
4          recall.  But that basically gave the flow of the
5          training session.
6     Q.   Based on the agendas that were prepared?
7     A.   Correct.
8     Q.   Did you ever have to deviate from those agendas?
9     A.   Probably.
10    Q.   Did you ever have an occasion where somebody, clients
11         you were training were not getting it and you had to go
12         back or figure out how else to teach it to them to get
13         it?
14    A.   Probably.
15    Q.   You just don't remember?
16    A.   I can't recall specifically.  I will say that typically
17         on -- at client sites there was a lead person on the
18         client side as well, and that person was typically
19         responsible for ensuring that the client was doing
20         their part.
21    Q.   When you say client was doing their part, what is it
22         that the client was supposed to be doing?
23    A.   If it was trained, if I had trained it, then that
24         person would not expect me to train it again.  So if
25         the client -- if the -- there were people in the class
```

**EXHIBIT 12**

# FREEDOM COURT REPORTING

```
 1              that weren't paying attention or were talking or were

 2              going in and out, that wouldn't be something that I

 3              would have to address.

 4      Q.      That would not be something that you would have to

 5              address?

 6      A.      No.  If I trained what I was supposed to train, that

 7              was my only goal, was to train what I was supposed to

 8              train.  And typically the person who's signing off on

 9              the trip report is agreeing with that.  So I don't

10              recall ever really doing any repetitive retraining.

11      Q.      If you had a group of difficult students, I don't want

12              to say -- students who were having a hard time

13              understanding the new software, did you come up with

14              different ways of how to teach it to them, or you just

15              said, well, you know what, tough luck, they don't get

16              it, I'm just going to continue teaching?

17                   MS. BAGLEY:  Form.

18      A.      I certainly would try to be as helpful as possible, but

19              I was instructed how to train and that's how I trained.

20      BY MS. KHOSRAVI:

21      Q.      Why did your employment with Tyler Technologies end?

22      A.      Why did it?

23      Q.      Yeah.

24      A.      I guess that's subjective.  They terminated me.

25      Q.      They terminated.  Okay.  Do you know why they
```

**EXHIBIT 12**

# FREEDOM COURT REPORTING

Page 92

```
 1              terminated your employment?
 2      A.      They said that I was not doing a satisfactory job.
 3      Q.      Previous to them telling you that when they terminated
 4              your employment, did you have any conversations with
 5              them, was there ongoing coaching, ongoing --
 6      A.      Yes.  And I took a test, and I supposedly was the only
 7              person at Tyler Technologies that actually passed this
 8              sort of test, and everything was on track.
 9      Q.      You said:  I was supposedly the only person who passed
10              that test.
11      A.      That's what I was told by Penny.
12      Q.      Penny told you you passed this test?
13      A.      Yes.
14      Q.      And after she told you you passed this test, she told
15              you, but you're not --
16      A.      No.  That was probably a month or two before I was
17              terminated.
18      Q.      A month or two before you were terminated you took a
19              test and Penny told you you were the only person who
20              passed it.  Did everybody else take this test with you?
21      A.      I don't know.  Nobody else took this test as far as I
22              know.  It was -- it was some sort of assessment as to
23              where I was with the training at Tyler Technologies.
24      Q.      Was that test given to you because you were having
25              issues with the software or you were not up to par --
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660
### EXHIBIT 12

# FREEDOM COURT REPORTING

1          previously, would you agree that you did not work

2          anymore than 40 hours during that week?

3     A.   Yes.

4     Q.   Let's move on to the next one.  Are you looking at

5          expense report for the week of 8-31-2008?

6     A.   Yes.

7     Q.   And based on the reflection on this expense report that

8          you spent the entire week in the Raleigh office --

9     A.   Correct.

10    Q.   -- is it correct that you did not spend anymore than 40

11         hours at work during that week?

12    A.   Correct.

13    Q.   Is the next expense report you're looking at 9-7-08?

14    A.   Yes.

15    Q.   And again, based on the reflection of that expense

16         report, is it an accurate statement that you did not

17         spend anymore than 40 hours working during that week?

18    A.   Correct.

19    Q.   Is the next one you're looking at 9-14-2008?

20    A.   Correct.

21    Q.   Now, this one reflects that you spent Monday, Tuesday,

22         Wednesday and Thursday in St. Louis County; is that

23         correct?

24    A.   Correct.

25    Q.   Do you remember whether you were there still shadowing

# FREEDOM COURT REPORTING

```
 1            or whether this was your first assignment?
 2    A.      It was my first assignment, because I can tell from the
 3            summary of activity that the client was being billed.
 4            And there was a client form attached to this one.
 5    Q.      Tell me what you're looking at under Summary of
 6            Activity.  Where it says:  Billable one or zero --
 7    A.      Zero or one, yes.
 8    Q.      When you put one, that means that you were training
 9            them; that's why that time was being billed to the
10            client?
11    A.      It is being billed to the client.  Whatever I was doing
12            there was being billed to the client.
13    Q.      Does this document reflect any number of hours that you
14            spent at the client site?
15    A.      It does not.
16    Q.      During this training session in St. Louis County do you
17            recall whether or not you did any conversion for them
18            while you were there?
19    A.      What do you mean conversion?
20    Q.      Converting their old data to their new software.  Is
21            that something that you ever dealt with?
22    A.      No.
23    Q.      So when you were training these folks, you had no
24            knowledge of the previous software that they were
25            using, other than the fact that you were there to train
```

## FREEDOM COURT REPORTING

Page 102

```
 1              them on the new Tyler Technologies software?
 2     A.       Correct.
 3     Q.       Did you do any data entry?  You started to tell me at
 4              some trip you thought you might have done data entry.
 5              This trip right here, the week of 9-14-2008 in
 6              St. Louis, do you remember whether you were training
 7              them or not?
 8     A.       I remember that I trained them on time and attendance.
 9              I just don't remember when.
10     Q.       So you don't -- looking at this document, this is not
11              refreshing your memory as to what you were doing in
12              St. Louis County on this particular occasion?
13     A.       No, it does not reflect -- I mean it does not state
14              what I was doing specifically.
15     Q.       So we've established that the one trip to St. Louis
16              before this one was when you went there and you
17              shadowed another implementation consultant.  Do you
18              remember that?
19     A.       Correct.
20     Q.       And then you went back to St. Louis County during this
21              week; correct?
22     A.       Correct.
23     Q.       But sitting here today, you do not remember at all what
24              it is that you were doing, whether you were shadowing
25              or you were training them?
```

**EXHIBIT 12**

## FREEDOM COURT REPORTING

```
 1                    What caused you to have to stay there till
 2          10:00, at least on one occasion?
 3    A.    The work wasn't done.  What the objective, what I was
 4          sent there to do was not completed.
 5    Q.    And the objective for you was what; to train their
 6          employees on the software?
 7    A.    That was typically the objective.  The one that I
 8          stayed 10, 11:00 at night was more for -- I think it
 9          was more data entry, perhaps.
10    Q.    You think on one occasion you were sent to the client
11          site to actually do data entry?
12    A.    Yes.
13    Q.    Do you remember who the client was?
14    A.    I would know if you said it, but --
15    Q.    I don't know who all your clients were.  Maybe we'll
16          find out once we go through your time sheets.
17                    I want to understand this data entry.  When
18          you talk about data entry, what data were you entering,
19          what were you doing?  What does that mean?
20    A.    I can think of on one occasion just doing a parallel
21          payroll.
22    Q.    What does that mean?
23    A.    That means you're just -- they've got their payroll on
24          their Legacy system, their old system, they're not yet
25          live on the MUNIS system, and we're going to run the
```

**EXHIBIT 12**

# FREEDOM COURT REPORTING

```
1              two systems together to make sure that anything that

2              needs to be addressed is addressed before they go

3              actually switch to just the MUNIS system.

4      Q.      Were you ever at a client site when they were at the

5              go-live phase of the project?

6      A.      Yes.

7      Q.      And what would you -- what was your role then, during

8              the go-live phase?

9      A.      It would be going through the process, the payroll

10             process.

11     Q.      At the go-live phase?

12     A.      Correct.  You know, you would -- from the opening up

13             the pay period to doing all the entry, training,

14             whatever, to running the reports, to printing the

15             checks, to sending out any fees, check reconciliations

16             to the banks, and just the whole process.

17     Q.      When you're there at a client site for the go live,

18             you're not training them anymore during that week, are

19             you?

20     A.      Typically, no.  You're there to -- in case they need

21             training, though.

22     Q.      I see.  So -- and tell me what go-live phase is so the

23             record is clear.  What is a go live?

24     A.      That's the -- the go live is the date they're actually

25             going to start using the system.
```

| | | |
|---|---|---|
| 1 | Q. | The new software that Tyler has sold to them? |
| 2 | A. | Yes. |
| 3 | Q. | So you are there on-site at the client site so that in |
| 4 | | case they have any issues, you can troubleshoot for |
| 5 | | them? |
| 6 | A. | That was -- that had -- |
| 7 | | MS. BAGLEY: Form. |
| 8 | A. | On one occasion at least I was there at the go live, |
| 9 | | but it wasn't always the go live. I mean -- |
| 10 | BY MS. KHOSRAVI: | |
| 11 | Q. | No. No. I'm only talking about your role on the |
| 12 | | client side during a go-live phase. |
| 13 | A. | Yes, you're there for support. |
| 14 | Q. | But you're not actually sitting there doing payroll for |
| 15 | | them? |
| 16 | A. | No. No. |
| 17 | Q. | Okay. So before we got to this go-live phase, you were |
| 18 | | telling me about at least one occasion where you were |
| 19 | | at the client site and you had to stay till about |
| 20 | | 10:00, and you recall you were doing data entry. Do |
| 21 | | you remember what we were talking about then? |
| 22 | | I'm not asking -- I'm just asking whether you |
| 23 | | remember that conversation. |
| 24 | A. | Yes. |
| 25 | Q. | So let's go back to that conversation. Think back |

**EXHIBIT 12**

# FREEDOM COURT REPORTING

```
 1              about what you were doing.
 2                      You said you were doing data entry.  You were
 3              doing -- you were doing parallel payroll; is that the
 4              term you used?
 5    A.    I did use the term parallel payroll.
 6    Q.    I want to -- I want to understand what it is that you
 7              were doing.  Were you looking at their old system,
 8              seeing a name with how much they were making and then
 9              typing in that information into the new software or no?
10              You actually had reports printed out, compared the two
11              reports to make sure the correct information from the
12              Legacy system made its way over to the new system?  I
13              want to know which one of those two you were doing.
14                      MS. BAGLEY:  Form.
15    A.    In St. Louis they had purchased billable time for
16              parallels, and so they would have their old reports,
17              and we would use those reports to put into -- the
18              information into the new system to see how the outcome
19              would be.
20    BY MS. KHOSRAVI:
21    Q.    So you were actually entering the old data into the new
22              software?
23    A.    That was -- no.  You --
24    Q.    No?
25    A.    Entering time.  It was a -- it was just time.  Not --
```

# FREEDOM COURT REPORTING

```
 1          you know, not employee demographics or anything.  It

 2          was just time.

 3     Q.   So you were actually entering the data regarding how

 4          many hours their employees had worked into the new

 5          software?

 6     A.   In St. Louis on one occasion, yes.

 7     Q.   Did you ever sit down with any of your clients to

 8          discuss what their needs were with respect to the

 9          software in order to design the software?

10     A.   No.  That was done through the project manager.

11     Q.   Did you ever sit down with a client to discuss

12          configuring the software for the client?

13     A.   Project manager.

14     Q.   Project manager did that?

15     A.   Yes.

16     Q.   Yes.  And you never had an occasion to do that;

17          correct?

18     A.   I wasn't allowed, really, to do that.

19     Q.   Okay.  So you never actually sat down with the

20          project -- with the client to do configuration or

21          discuss configuration; correct?

22     A.   Correct.

23     Q.   Did you ever sit down with the client and discuss

24          business processes or do fit analyses?

25     A.   Done by the project manager.
```

**EXHIBIT 12**

# FREEDOM COURT REPORTING

```
 1      Q.    So you never did?

 2      A.    No.

 3      Q.    So other than you converting some of the client's data

 4            from the old system to the new system, that's one, and

 5            then training the client's employees on how to use the

 6            new Tyler software, that's two, perform any other

 7            functions?

 8                  MS. BAGLEY:   Form.   Other than what she's

 9            already testified to?

10   BY MS. KHOSRAVI:

11      Q.    Other than these two.

12      A.    No.   It all falls under the genre of training.   And in

13            the -- in the example of St. Louis, there was -- they

14            had purchased data entry services.

15      Q.    Tell me if I'm wrong.   What I'm categorizing are

16            functions.   I'm categorizing it into two categories.

17            One function you had at a client site was to train

18            their employees actually in the classroom setting,

19            teaching them how to use the software; is that correct?

20      A.    That is correct.

21      Q.    So that's one.

22                  And then the other one I'm hearing is you

23            actually inputting the data from their old system into

24            their new system.   That's the second one that you've

25            testified to; correct?
```

**EXHIBIT 12**

## FREEDOM COURT REPORTING

Page 132

```
1              understood your salary to be 50,000; is that right?

2     A.       Correct.

3     Q.       And the paychecks that you were getting were consistent

4              every week?  You were getting a set amount of salary

5              every -- every two weeks, was it?

6     A.       No.

7     Q.       Why were --

8     A.       Every two weeks I was paid, yes.  The amounts were

9              different, because if you were traveling you got

10             premiums.  You got travel premiums, $30 a day.

11    Q.       But depending -- if you worked 40 hours a week, like we

12             discussed going through expense reports, the weeks you

13             worked 40 hours per week your salary was still the same

14             as the week where you actually might have traveled

15             somewhere else, your base salary, which was --

16    A.       Correct.

17    Q.       -- at 50,000.

18                      And when you -- you were first employed by

19             Tyler, you understood that the number of hours you were

20             going to be working each week was going to be

21             different?

22                      MS. BAGLEY:  Form.

23    BY MS. KHOSRAVI:

24    Q.       Some weeks you may work 40 hours --

25    A.       No.
```

EXHIBIT 12

# FREEDOM COURT REPORTING

Page 133

```
 1    Q.    You thought you were going to work the same amount of

 2          hours every week?

 3    A.    I had -- I wasn't told otherwise.  I wasn't told that

 4          this -- sometimes I'd be working 80 hours and sometimes

 5          I'd be working 40 hours.  My schedule was the typical 8

 6          to 5.

 7    Q.    So when you were interviewed and when you were

 8          employed, you were told you're going to be working 8 to

 9          5 only?

10    A.    I don't recall being told what my -- you know.

11    Q.    Based on your previous work experience --

12                MS. BAGLEY:  Wait.  Were you finished?

13    BY MS. KHOSRAVI:

14    Q.    Are you finished?

15    A.    Yes.

16                MS. KHOSRAVI:  Read that back, the question I

17          asked her.

18                (Record repeated as requested)

19    BY MS. KHOSRAVI:

20    Q.    So let me --

21    A.    The "only" thing is what I had a concern with.  I

22          wasn't told that I would be working 8 to 5 only.  I

23          knew that the business office in Raleigh was open from

24          8 to 5.

25    Q.    Did anyone stay in the office after 5:00?
```

# FREEDOM COURT REPORTING

```
 1    A.    I -- I'm sure -- I have no idea.

 2    Q.    You don't know.  Because you never stayed after 5:00 to

 3          know whether anyone else stayed or not; correct?

 4                MS. BAGLEY:  Form.

 5    BY MS. KHOSRAVI:

 6    Q.    We went over that earlier, that when --

 7                MS. BAGLEY:  Form.

 8    A.    In general, no, I did not stay after 5.  Saying never

 9          is a little bit -- you know, that has me concerned,

10          because it may have happened.

11    BY MS. KHOSRAVI:

12    Q.    Based on your previous experience at Ceridian, where

13          you told me you were an exempt employee and you were

14          not paid overtime, at Ceridian were you always working

15          8 to 5 only?

16    A.    At Ceridian I was working out of my house, and my hours

17          were 8 to 5.

18    Q.    Was there ever an occasion that you were working more

19          than 40 hours a week at Ceridian?

20    A.    I'm sure there was.

21    Q.    Did you get overtime pay for that job?

22    A.    I got stock options and other --

23    Q.    Those are benefits.  I'm talking about --

24    A.    -- forms of compensation.

25    Q.    You got other benefits.  Did you receive overtime pay?
```

EXHIBIT 12