# FREEDOM COURT REPORTING

Page 1

```
 1                          IN THE UNITED STATES DISTRICT COURT
                            FOR THE EASTERN DISTRICT OF TEXAS
 2                          MARSHALL DIVISION

 3                          CASE NO. 2:08-cv-422 TJW

 4
 5
         PATTY BEALL, MATTHEW MAXWELL, TALINA McELHANY
 6       and KELLY HAMPTON, individually and on
         behalf of all others similarly situated,
 7
 8              Plaintiffs,
         vs.
 9
         TYLER TECHNOLOGIES, INC., and EDP ENTERPRISES, INC.,
10
                Defendants.
11
12       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
13
14       DEPOSITION OF:       KEVIN MOSENTHIN
15       DATE TAKEN:          Thursday, September 9, 2010
16       TIME:               9:45 a.m. - 12:30 p.m.
17       PLACE:               500 S. Australian Avenue
                              Suite 600
18                            West Palm Beach, Florida  33401
19       TAKEN BY:            The Defendants
20       REPORTED BY:         DENISE T. MEDINA, RMR
                              Court Reporter and Notary
21                            Public
22
23
24
25
```

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
1    A P P E A R A N C E S:

2    LAUREEN F. BAGLEY, ESQUIRE

3    OF:  SLOAN, BAGLEY, HATCHER & PERRY LAW FIRM
            101 East Whaley Street
4           Longview, Texas  75606

5

6            APPEARING ON BEHALF OF THE PLAINTIFFS

7

8    PAULO B. McKEEBY, ESQUIRE

9    OF:  MORGAN , LEWIS & BOCKIUS LLP
            1717 Main Street
10          Suite 3200
            Dallas, Texas  75201

11

12           APPEARING ON BEHALF OF THE DEFENDANTS

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
1                    C O N T E N T S
2    TESTIMONY OF KEVIN MOSENTHIN
          Direct Examination by Mr. McKeeby.................5
3
4    CERTIFICATE OF OATH................................115
5    CERTIFICATE OF REPORTER...........................116
6    ERRATA PAGE.......................................117
7    NOTIFICATION LETTER...............................118
8                    E X H I B I T S
9    Defendants' Exhibit 1..............................26
          (Letter to Mr. Mosenthin from Ms. Hain dated
10          February 7, 2007)
11
     Defendants' Exhibit 2..............................59
12          (Performance evaluation)
13   Defendants' Exhibit 3..............................83
          (Letter to Mr. Mosenthin from Ms. Hain dated
14          July 11, 2007)
15   Defendants' Exhibit 4..............................89
          (MUNIS Time and Expense Report)
16
     Defendants' Exhibit 5..............................89
17          (MUNIS Time and Expense Report)
18   Defendants' Exhibit 6.............................105
          (Resume)
19
20   Defendants' Exhibit 7.............................107
          (Letter to Mr. Mosenthin from Mr. Sansone dated
21          January 10, 2002)
22   Defendants' Exhibit 8.............................107
          (Letter to Mr. Mosenthin from Mr. Sansone dated
23          January 11, 2002)
24   Defendants' Exhibit 9.............................113
          (Consent to Opt In)
25
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 13**

## FREEDOM COURT REPORTING

1    you need to do."  And simply, you know, most of, most of

2    the goal dates were just very unrealistic based on the

3    fact that I was still trying to work a full-time

4    schedule.

5         Q.    Okay.  And so --

6         A.    Another way of saying it is I was not given

7    less duties to explore, and being given more duties on

8    the project manager side.  My duties, my normal duties

9    were not lessened, but my additional duties with trying

10   to even do anything with the project manager was still,

11   therefore, an expectation, which, of course, just could

12   not happen.

13        Q.    Got it.  And these goals that are listed in

14   this document that I've provided to you as Deposition

15   Exhibit Number 1, I don't know if you ever had a chance

16   to look through them.

17        A.    Not past the first page.

18        Q.    Take a look at them.  And I'll tell you my

19   question as you go through it is that were these goals

20   that are identified and listed in this document

21   associated with your transition or possible transition

22   to project manager or were these things that you were

23   expected to do as an implementation specialist or

24   neither.

25        A.    I would say they would probably be, some of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 13**

**FREEDOM COURT REPORTING**

1    them would be my normal duties but on a lesser role.

2         Q.   Okay.  All right.  Let's maybe take a few

3    examples.  And I'm looking at the first page here.  With

4    respect to documentation, it lists a goal of creating a

5    business license or multiple business license agendas.

6    Do you see where I'm reading?

7         A.   Yes.

8         Q.   Is that, is creation of business license

9    agendas something that you did as an implementation

10   specialist?

11        A.   Basically all that was is just taking the

12   training manual and just dividing up.  Again, because of

13   this project management course that all the project

14   managers had gone through, it was kind of calling

15   something, which it had always been one way, just a

16   different name.  In other words, obviously as trainers,

17   we always had to train, you know, Page 1 through 4 on

18   Day 1, Page 5 through 6, you know.  We would always

19   break it up.  Simply that was no more than doing the

20   same thing following the manual and saying how you're

21   breaking it up among the days but making it sound,

22   making it adapt to what the project manager is asking

23   where it kind of gets fancier names.

24        Q.   Okay.  So do you understand the term business

25   license agenda to be the schedule of training on the

```
 1   business license, on the business license module?
 2        A.   Yeah.   Basically going through the manual and
 3   just, you know, which topic are you covering today and
 4   which one are you covering tomorrow.
 5        Q.   And would that be something you would do as an
 6   implementation specialist?
 7        A.   Ask the question again.  I'm not sure I
 8   understand what you're asking.
 9        Q.   Okay.  Right.  The creation of a business
10   license agenda, as I understand your testimony, meant
11   simply --
12        A.   Which pages are you covering today and which
13   ones are you covering tomorrow.
14        Q.   Right.  Let me articulate, if you would.  It
15   means establishing the schedule for the training on
16   business licenses in the sense of determining which
17   parts of the program you would train on at particular
18   times?
19        A.   I would say among, of that week.
20        Q.   Okay.  And is that something that you did as
21   an implementation specialist?
22        A.   On a normal basis, no.  Because a lot of
23   agendas were kind of set out for us already.
24        Q.   By the project manager?
25        A.   Yes.
```

## FREEDOM COURT REPORTING

```
1          Q.    And then I understand that what she's asking
2     you to do in kind of this transition phase is to start
3     assuming that responsibility; i.e., you would develop
4     the agendas as opposed to the project managers?  Is that
5     your understanding?
6          A.    I believe that's probably a fair statement.
7          Q.    Okay.  And did you during this transition
8     period ever take on that responsibility of creating the
9     business license agenda?
10         A.    Not, not, not in that aspect where we're
11    scheduling out the days and, in that aspect of
12    scheduling what we're going to cover for those days.
13         Q.    Okay.  Did you do it in some other aspect?
14         A.    No.
15         Q.    Okay.
16         A.    Other than, again, other than following the
17    preordained agendas that were given to us.
18         Q.    And those were preordained by the project
19    manager?
20         A.    Yes.
21         Q.    So then by that, I take it it's a correct
22    statement that you as an implementation specialist never
23    created a business license agenda?
24         A.    Not from scratch.  I believe we have used
25    other ones to adapt to that particular client by putting
```

# FREEDOM COURT REPORTING

1    their name on it and basically, but it was not, it was

2    not generated from scratch by me.

3        Q.   Right.  But you were just changing the names

4    of a particular client to meet a form?

5        A.   More or less, yes.

6        Q.   What you're saying you didn't necessarily do

7    is develop the schedule and put it in a document?

8        A.   Correct.

9        Q.   Did you ever have to deviate from the agendas

10   as an implementation specialist?

11       A.   Not a whole lot.  If we ran out of time, it

12   would simply roll over to the next day.

13       Q.   What would cause you to run out of time?

14       A.   Them asking a lot of questions.

15       Q.   When you did that, did you have to advise your

16   project manager, or what did you do to change the

17   schedule?

18       A.   Yes.  We would usually have to advise the

19   project manager we're just not having enough time for

20   these days.  And so then they would either have to book

21   more days or reschedule out future visits.

22       Q.   And how would you know to advise the project

23   manager of that?  Because they just weren't getting done

24   with the module, because they were asking so many

25   questions or that they weren't getting it?

# FREEDOM COURT REPORTING

Page 40

```
 1        A.    How would I know what?
 2        Q.    Well, you said at some time you would have to
 3   contact the project manager and say they're going to
 4   have to book more time for the training because, I take
 5   it because they're not picking it up quickly enough?
 6        A.    That would be in our trip reports.
 7        Q.    Okay.  But am I right that what would cause
 8   you to put that in a trip report and say they need to
 9   book more training would be their inability to grasp the
10   training in the time allotted?
11        A.    Correct.
12        Q.    And the time allotted was something that had
13   been part of the preordained agenda?
14        A.    Correct.
15        Q.    What about, what's a conversion crosswalk?
16        A.    Basically saying okay.  This is what it was in
17   their database.  This is what it is in the new database.
18        Q.    Does that suggest a document?  And let me help
19   you.  In the first bullet, she's suggesting that you
20   develop a generic conversion document for business
21   license.
22        A.    Well, what she's alluding to based on Ray
23   Arbour's tax conversion document -- I'm just reading
24   here -- Ray Arbour's tax conversion document, his tax
25   conversion documented what fields should map to what
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 13**

## FREEDOM COURT REPORTING

1    change.  You did a generic agenda.  Fine.  Use the

2    generic agenda, but now customize it where, you know,

3    you're simply putting the client's name and a few other

4    things that, you know, make it look more specific to

5    that client.

6        Q.   How were you advised of these customized

7    changes that were to be made to the agenda?

8        A.   Through the project manager.

9        Q.   Just orally?

10       A.   Or a document E-mailed to us.

11       Q.   What document or E-mail are you thinking of?

12       A.   Like the agenda form to use.  I believe that

13   was another form that was changed and handed to us of

14   how it should look.

15       Q.   But then you were to customize that agenda

16   form to address the particular client?

17       A.   Just plugging in the generic agenda into that

18   form.

19       Q.   Look at the next page.  It talks about

20   business license conversion documentation, and it

21   references a Hartford site report.  What is a site

22   report?

23       A.   That would be a report that we were always

24   required at the end of our session to report to our

25   project manager of how things went.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
 1          Q.    Is that the same as a trip report?

 2          A.    Not exactly the same.

 3          Q.    What's different?

 4          A.    The trip report documents your hours and

 5     billable.  And basically think of it this way.

 6     Accounting cares what the trip report says.  The site

 7     report is what the project manager cares about.  So the

 8     site report would simply be who you met with, what

 9     client, what got covered, what didn't get covered, any

10     concerns, any problems.  Again, it was a report that was

11     more formally done I would say after the whole project

12     management training and stuff.

13          Q.    Okay.  And she's saying you included more

14     detailed conversion specifications.  Correct?  It's the

15     second sentence.

16          A.    Yeah.  I think she was just looking for more

17     detail.

18          Q.    What does conversion specification mean?

19          A.    It's simply saying what, looking at the

20     conversion and what might be incorrect about it.

21          Q.    Did you do the actual conversion?

22          A.    Be specific on that.

23          Q.    I understand conversion to mean a process by

24     which the customer's data from its previous system is

25     transferred or moved on to Tyler's system.
```

**EXHIBIT 13**

## FREEDOM COURT REPORTING

```
1        A.    Uh-huh.

2        Q.    That I understand involves some type of

3   programming component.

4        A.    Right.  I did not do any programming.

5        Q.    What part of the conversion did you perform?

6        A.    Well, typically we would look at it and note

7   any errors when it came up in MUNIS to see where it

8   might be inconsistent.

9        Q.    And when she talks about detailed conversion

10  specifications, is that what she's referencing, as you

11  understand it, the notification of errors and the

12  comparison?

13       A.    I believe that's what she's alluding to.

14       Q.    And it looks like she is transitioning a

15  little bit here in ii where she says, "Using this

16  report, create generic crosswalk/report that can be used

17  by other implementation staff."

18       A.    I believe that's where she's referring back to

19  the previous page where, where you're referring to Ray

20  Arbour's tax conversion document.

21       Q.    All right.  And you told me you at some point

22  during your employment did that?

23       A.    Uh-huh.

24       Q.    Is that a yes?

25       A.    Yes.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 13**

## FREEDOM COURT REPORTING

1      Q.    Okay.  Let's move to the third page of the

2   document where it looks like the final section of the

3   document relates to goals for February through April.

4      A.    Uh-huh.

5      Q.    Is that a yes?

6      A.    Yes.

7      Q.    And did you discuss these roles with Ms. Hain?

8      A.    Discussed or read this report.

9      Q.    Okay.  And she's copying Bob Sansone and --

10   this is the person that I mentioned earlier -- Shawn

11   Gaudreau.  Who is that?

12      A.    In the last transition, that would have been

13   her, that would have been her boss.

14      Q.    Ginger Hain's boss?

15      A.    Yes.  Who worked out of the Falmouth office.

16      Q.    Is that Falmouth, Maine?

17      A.    Yes.

18      Q.    And Mr. Sansone was the human resources person

19   out of Falmouth?

20      A.    That's correct.

21      Q.    Okay.  She is providing you with different

22   goals it looks like in this last section.  And then let

23   me go through each one of them.  The first one is

24   project status reports where she's saying "Provide

25   monthly summary to manager for each project assigned."

# FREEDOM COURT REPORTING

```
1    what you did in connection with the year-long project
2    involving the business license --
3         A.   Uh-huh.
4         Q.   -- module.  They had already purchased that
5    module before you had come on as an implementation
6    specialist?
7         A.   Correct.
8         Q.   And I take it you would have been assigned to
9    cover that client?
10        A.   Correct.
11        Q.   That assignment would have come from your
12   project manager?
13        A.   Correct.
14        Q.   And were you, was this an existing customer of
15   Tyler in the sense that they had other modules
16   purchased, or was this a particular --
17        A.   I believe they had other modules.
18        Q.   Was that important for your role?
19        A.   No.  Not really.
20        Q.   Okay.  So the first time you visited
21   Tuscaloosa -- we're talking about the City of
22   Tuscaloosa?
23        A.   Uh-huh.
24        Q.   Is that a yes?
25        A.   Yes.
```

**EXHIBIT 13**

## FREEDOM COURT REPORTING

Page 64

```
 1          Q.   Would you have done anything in preparation
 2     for that initial visit?
 3          A.   You mean for them or on my own?
 4          Q.   Either.
 5          A.   Such as?
 6          Q.   I mean such as reviewing a documentation that
 7     some other employee may have prepared or --
 8          A.   Yes.
 9          Q.   Discussing their processes or talking with a
10     customer.
11          A.   Very typical prior to arriving at a project,
12     there would have been somebody else that would have done
13     some analysis that I would go over so I would at least
14     be familiar with what I was looking at when I got there.
15          Q.   And what form would that analysis be in?
16          A.   Usually paperwork.
17          Q.   And would that typically be prepared by the
18     project manager?
19          A.   Either the project manager or an analysis.
20     Somebody doing a specific analysis for the client.
21          Q.   And when you say "a specific analysis," what
22     is it that was being analyzed?
23          A.   Depending on what their needs are.  If they
24     are more of a cookie-cutter client or a unique
25     situation.
```

## FREEDOM COURT REPORTING

Page 65

1     Q.    And typically these clients would have had

2  some type of business licensing software already in

3  place?

4     A.    Correct.  Of some form.

5     Q.    Okay.  So you would typically review this

6  paperwork.  Would you have talked to anyone at the

7  client?

8     A.    Not prior to my visit.

9     Q.    So would there, for a business license

10  software, would there be a particular person that you

11  would coordinate with upon your arrival?

12     A.    Yes.

13     Q.    And who would that be?

14     A.    I don't recall.  It would have been the

15  manager of that division.

16     Q.    What division?

17     A.    Of basically who handles the business

18  licenses.

19     Q.    Okay.  And would you have a meeting with that

20  person?

21     A.    Usually not independently.  Usually they would

22  act as a project manager.  So I would meet with them

23  some of the time, but then others of the time I would

24  just directly be dealing with their staff since their

25  staff is the one that does that.

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
 1    probably a year after that or maybe even six months -- I
 2    can't remember date specific -- it was pretty much all I
 3    did.
 4         Q.   Okay.  So business licenses was pretty much
 5    all you did after what period of time?
 6         A.   I can't recall specifically.  But I would
 7    say --
 8         Q.   Generally.
 9         A.   -- probably within twelve months of July of
10    '04.
11         Q.   Let me time frame it a different way.  Let's
12    say during the last two years of your employment.
13         A.   Definitely all I did.
14         Q.   Was business licenses?
15         A.   Yes.
16         Q.   Okay.  You said during the last two years of
17    your employment that you focused on business licensing
18    and that it was more of a cookie-cutter module and that
19    I think I understood you to say that you would meet with
20    the end users almost immediately upon your arrival?
21         A.   Correct.
22         Q.   And you would train them?
23         A.   Yes.
24         Q.   Just looking at the last two -- let me back
25    up.  Going back to your comments in your review, you
```

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
1     talk about the year-long project -- and I know that was

2     an approximation -- at Tuscaloosa, and you have already

3     told us that you had to go there on multiple occasions.

4     I take it on each of these occasions you're providing

5     training to just different people?

6          A.    It was pretty much the same core of users.

7          Q.    Would you train them all at once?

8          A.    Yes.

9          Q.    In like a classroom type setting?

10         A.    Yes.

11         Q.    So on each trip, you would be training on a

12    different aspect of the module, or would it just be

13    refreshers?

14         A.    Tuscaloosa was more of a unique situation in

15    the fact that development was writing a lot of code for

16    them.  And so many of the training would be that they

17    wrote a new module that will do X, Y and Z.  "Now,

18    Kevin, go to the site and train them on X, Y and Z."

19         Q.    Was some of this training that you're talking

20    about in connection with Tuscaloosa, did that occur

21    after they had already gone live with the software?

22         A.    No.  Pretty much when a site goes live, within

23    a month or two, I'm out of there.

24         Q.    Okay.  So it wasn't unique in that sense?

25         A.    No.  No.  It was unique in the fact that
```

**EXHIBIT 13**

## FREEDOM COURT REPORTING

1    development was writing a lot of new code for them.

2        Q.    I see.

3        A.    And so I would train them on that code after

4    it was developed.

5        Q.    So what was somewhat unique about

6    Tuscaloosa --

7        A.    That they had a lot of code that was specific

8    to them that I would train them on.

9        Q.    Did that require you to -- sorry.  Did the

10   fact that the code was being written or a lot of code

11   was being written for Tuscaloosa in connection with the

12   software result in the implementation lasting longer

13   than typical?

14       A.    Yes.

15       Q.    So these trips to Tuscaloosa where you would

16   train the users would just be as new code was written?

17       A.    Not exclusively.  But that's why the project

18   dragged on for a long time.

19       Q.    So when you were dispatched during, some point

20   during the year to Tuscaloosa to train, obviously or I

21   take it you were given the subject matter of the

22   training?

23       A.    Uh-huh.

24       Q.    Yes?

25       A.    Yes.

# FREEDOM COURT REPORTING

1    Q.    And that came from the new code or some other

2    source?

3    A.    It would usually come from the developer.

4    Q.    And so your trips to Tuscaloosa were based on

5    when new code was developed?

6    A.    A lot of the time it seemed that way.

7    Q.    Okay.  During the last two years of your

8    employment at Tyler when you were supporting the

9    business licensing module, did you have any role in

10   configuration of the software?

11   A.    Only, I mean --

12   MS. BAGLEY:  I'm going to object to the form.

13   I'm not sure I'm understanding what configuration

14   is.

15   MR. McKEEBY:  I don't care if you're

16   understanding it.  He has to.

17   THE WITNESS:  Following the manual, we would

18   have to, you know, put in like their name, and, you

19   know, there would be some things to fill in as the

20   module was trained on.  But that would, again, be

21   referenced back to how the developer coded it.

22   BY MR. McKEEBY:

23   Q.    What do you understand configuration to be?

24   A.    Well, it depends on if you are a technical

25   person or a non-technical person asking, I guess.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 13**

## FREEDOM COURT REPORTING

```
 1         Q.   Let's assume that it's the latter.  I'm a
 2    non-technical person.
 3         A.   Then configuration could be as simple as
 4    putting in, you know, the client's name in their
 5    software.
 6         Q.   Other implementers I'll tell you have used the
 7    term setting up parameters.
 8         A.   Yeah.  That's probably a good way of
 9    describing it.
10         Q.   Did you do that type of work?
11         A.   Right.
12         Q.   Okay.
13         A.   The setting up -- let's clarify parameters.
14    You know, setting up their names, setting up the initial
15    software based on what the parameters call for that.
16         Q.   That's something you did?
17         A.   Yes.
18         Q.   You didn't have any role in installing
19    software or hardware?
20         A.   No.  No.
21         Q.   I got a double negative there.  It is a true
22    statement that you did not have any role in installing
23    either hardware or software?
24         A.   True, I did not install hardware or software.
25         Q.   Thank you.  You can use Tuscaloosa if you'd
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 13**

# FREEDOM COURT REPORTING

1    like.  But I'm really asking more of a generic question

2    here.  The process of configuration in the non-technical

3    sense that we've discussed involving putting in the

4    information, is that something that typically occurred

5    like a set period of time while you're spending, you

6    know, half a day or some discrete period of time setting

7    up the software in a non-technical sense, or was that

8    kind of an ongoing --

9         A.    No.  Typically a very short period of time.

10        Q.    Okay.  Would you agree with me that -- let me

11   start over.  When you were in business licensing for the

12   last two years of your employment, I want to at a very

13   high level break down --

14        A.    Can I clarify your question?  Again, I was in

15   business license more than two years.

16        Q.    Okay.  That's fine.  I was just focusing on

17   that discrete period of time.  But let's broaden it.

18   And if we need to change it, we can.  But while you were

19   supporting the business license software, I want to kind

20   of break down what an implementation looked like with

21   respect to what you did.

22        A.    Okay.

23        Q.    And let me kind of list, first of all, some of

24   the duties that we've already discussed so we don't have

25   to rehash it.  One of the things that you would do

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
 1        typically in connection with an implementation of the

 2        business license software would be to review materials

 3        that either the project manager or someone else had

 4        prepared?

 5             A.   Correct.

 6             Q.   And then you would perform -- and I say

 7        "then."  I should say and you would perform these

 8        non-technical configuration steps that we've discussed

 9        in terms of inputting parameters and general

10        information?

11             A.   Correct.

12             Q.   Would that be done before or after the

13        training, or would it depend?

14             A.   It would probably be part of it.

15             Q.   And then by training, based on in part your

16        previous testimony, I understand that to mean you're

17        teaching end users how to use software?

18             A.   Correct.

19             Q.   Okay.  I think that's kind of -- you would

20        have to do a site report and a trip report?

21             A.   Correct.  For my project manager.

22             Q.   Were you on the premises when the customer

23        went live with the business license software?

24             A.   Typically, yes.

25             Q.   And would you provide any post-live support to
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
 1    the customer after they went live?

 2         A.    Depending on the client.  But typically I

 3    would be there on the day they would go live and like

 4    one or two days afterwards just to make sure there's no

 5    bumps.  And then usually after that point they're good.

 6         Q.    There wasn't any period of time in which you

 7    were taking phone calls typically from the customer?

 8         A.    I would never take a phone call from a client.

 9         Q.    Okay.  So by post-live support, you were there

10    a few days?

11         A.    Just being on-site to hold their hand.

12         MS. BAGLEY:   Let him finish asking the

13         question.

14    BY MR. McKEEBY:

15         Q.    And that would depend on what?

16         A.    Their level of knowledge and whether they want

17    to pay for the billable time.

18         Q.    Of you being there and assist them after the

19    go live process?

20         A.    Correct.

21         Q.    And would that be something done under the

22    contract?

23         A.    Yes.

24         Q.    Would you have input in that in terms of

25    saying to the project manager, you know, "Hey, it might
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 13**

# FREEDOM COURT REPORTING

Page 76

1    be a good idea to have these folks pay for an extra day.

2    I think they need it?"

3         A.    Not typically.

4         Q.    Would that happen occasionally?

5         A.    Only, I would only express a concern, and then

6    at that point, the project manager would call them and

7    say, "I think we need another day or two," yeah.

8         Q.    Okay.  So I've identified six, different

9    components of an implementation in the context of the

10   business licensing software module, review materials,

11   the configuration steps that we've talked about, the

12   training of the end users, the reports, the go live

13   assistance and the post-live support that occurred a day

14   or two after the customer went live.  Are there any

15   other discrete job functions that you can identify that

16   occurred during the implementation process other than

17   those six that I've --

18        A.    No.  That's pretty much the typical.

19        Q.    Okay.

20             MR. McKEEBY:  Can we take a short break?

21             MS. BAGLEY:  Uh-huh.

22             (A recess was held.)

23   BY MR. McKEEBY:

24        Q.    Okay.  Before we took a break, we broke down

25   the components of the implementation function in the

**EXHIBIT 13**

## FREEDOM COURT REPORTING

1   business licensing module to six, different components.

2   And I understand there was some overlap I think based on

3   your previous testimony.  For example, you said that

4   configuration had sometimes overlapped with the

5   training.  So I want to be fair to your previous

6   testimony.  Would it be, I think I understood from your

7   previous testimony that the bulk of the time that you

8   spent while you were supporting the business licensing

9   module was in the actual training?

10      A.    Correct.

11      Q.    If we had to put a percentage on that, would

12   you say 80 percent?

13      A.    I would say that's probably fair.

14      Q.    Going back to your performance review where

15   you talk about the success with Tuscaloosa, what about

16   it, that particular project made it in your mind a

17   successful one?

18      A.    They were a very difficult client.  And I

19   believe I had alluded to it that three times they had

20   specifically requested that I be back at their site.  So

21   they worked well with me.  Though they were difficult

22   and a very particular client, that in itself was

23   noteworthy.  The other thing is with that long of a

24   project, obviously it's, things can, you know, get out

25   of hand and get them upset.  I mean, they had been upset

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 13**

## FREEDOM COURT REPORTING

```
1    say on that travel day on Friday, if I had gotten back
2    home at say 5 o'clock, I would not get compensated for a
3    supper meal.  If I got back at 7:30 -- in this case, I
4    did -- I am, I believe.
5         Q.   You used the term compensated and I used it
6    too.  But really you mean reimbursable expenses?
7         A.   Per diem.  It's a per diem.
8         Q.   Okay.
9         A.   So you would not trigger the per diem unless
10   you were out past a certain hour.  So they always wanted
11   to document what time did you leave the house and what
12   time did you get back.  If I left at 11 a.m. that
13   morning, I would get compensated for lunch.  If I left
14   at 1 o'clock, I would not get compensated for lunch.
15        Q.   Okay.  There are no other Tyler documents that
16   we would need to look at to be able to more easily tell
17   your time?
18        A.   No, sir.  I would say that's probably the most
19   accurate time sheet of ours, if you will.
20        Q.   In the expense reports?
21        A.   Yes.
22        Q.   And you didn't keep any personal documents, a
23   calendar, a journal or anything like that where you
24   wrote down the number of hours that you worked?
25        A.   No.
```

# FREEDOM COURT REPORTING

```
1          Q.   Do you have any estimate of what the typical
2    hours that you worked in the work week would be?
3          A.   I would say a very typical week where I was
4    traveling -- and that was very, very typical -- I would
5    say probably about 50 hours to 55.
6          Q.   When you say it was typical that you would
7    travel, let's focus on the last two years of your
8    employment.
9          A.   Sure.
10         Q.   What percentage does that mean?  How many
11   weeks in a year would you have been on the road?
12         A.   I would say it's an anomaly to get a whole
13   week of WebEx.  And that would happen maybe once every
14   month and a half to two months.  So day in and day out
15   pretty consistent fly out, fly back.  Again, a few rare
16   occasions where I would have some Florida clients where
17   I would drive there, and it would take three hours to
18   get there.  Very atypical.
19         Q.   That was atypical.  Okay.  And in terms of if
20   you weren't doing -- were there any weeks where you
21   weren't doing either WebEx training or traveling?  You
22   were kind of doing paperwork at home?
23         A.   Extremely rare and very frowned upon.  So ...
24         Q.   Frowned upon in the sense that, not that you
25   were doing something wrong, but because you didn't have
```

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
1    control of when you were meeting with clients?
2         A.   You would think so.  But we would still feel
3    the heat.
4         Q.   How would you feel the heat?
5         A.   "You need to get more billable days," even
6    though we weren't responsible for going out and booking
7    out those billable days.
8         Q.   Who would give you those directives?
9         A.   The project manager.  But they in turn would
10   be getting the flak from their manager looking at
11   billable days.
12        Q.   What would they tell you to do?  I mean, to
13   get more billable days, what direction would you be --
14        A.   They wouldn't.  It wouldn't be, it wouldn't be
15   a solution based direction.  It wouldn't be like, "You
16   need more billable days.  So, therefore, do this."  It
17   was more of a, "You've only got ten days.  We've got to
18   get you a couple of more."
19        Q.   Somewhat of a collaborative?
20        A.   Kind of.  Even though there was nothing that
21   we would do for it.
22        Q.   Are you employed currently?
23        A.   Yes.
24        Q.   Where do you work?
25        A.   I'm self-employed.
```

**EXHIBIT 13**

## FREEDOM COURT REPORTING

1   negotiate a higher salary?

2       A.   I negotiated a higher salary.

3       Q.   With whom did you have those negotiations?

4       A.   Bob Sansone.

5       Q.   Was that done over the telephone?

6       A.   Yes.

7       Q.   And you also understood that you would be

8   eligible for the travel and expertise premiums?

9       A.   Yes.

10       Q.   You got those during your employment at Tyler?

11       A.   Yes.

12       Q.   And would it be fair to say that you

13   understood when you accepted the offer of employment

14   that you knew that it was a salaried position?

15       A.   I understood that there was a variety of

16   compensation methods.

17       Q.   Right.  You understood you wouldn't be paid

18   overtime for the hours that you worked over 40?

19       MS. BAGLEY:  Form.

20       THE WITNESS:  I understood that there was a

21     base salary with additional.

22   BY MR. McKEEBY:

23       Q.   And you understood you wouldn't be paid

24   overtime for hours if you worked over 40?

25       MS. BAGLEY:  Form.

**EXHIBIT 13**

# FREEDOM COURT REPORTING

```
 1            THE WITNESS:  I'm not sure that was
 2       specifically discussed.
 3   BY MR. McKEEBY:
 4       Q.   Okay.  I didn't ask if it was discussed.  I
 5   asked if it was your understanding.  And you knew when
 6   you started employment that when you worked over 40
 7   hours you weren't going to get paid time and a half for
 8   that; correct?
 9            MS. BAGLEY:  Form.
10            THE WITNESS:  It was not, it was not
11       understood necessarily that there would be working
12       a great deal over 40 hours I would say would be
13       more so the assumption.  The other thing, I guess
14       to elaborate on that, when I was hired, I was also
15       working out of the Maine office with the majority
16       of the travel being local day trips.
17   BY MR. McKEEBY:
18       Q.   So during the initial period of time, you
19   weren't working overtime?
20       A.   No.  What I'm saying I was basically, it was
21   pretty close to the number of hours because the travel
22   would be maybe one hour away.
23       Q.   So you were working 40 hours a week, then?
24       A.   Closer.
25       Q.   And when did that change, if it did?  I'm
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 13**

# FREEDOM COURT REPORTING

1   going to assume that it did.

2       A.   I would say probably for the first one year

3   of, maybe year and a half of my employment it was pretty

4   much mostly day travel.  Again, when I say "day travel,"

5   I mean go to a client that is a half an hour away and

6   drive home at night.  So I would get home at, you know,

7   maybe 6 o'clock.

8       Q.   So during that first year and a half, you were

9   working roughly 40 hours a week?

10      A.   I'd say real close, yeah.  I mean, not

11  exactly.  You know, maybe 45.  But very close to that.

12      Q.   Did you ever in your employment with Tyler

13  raise the issue of not receiving overtime?

14      A.   We had raised the issue as far as traveling so

15  much.  But it was kind of passed down to us.  This would

16  be later when I was living down here.  And all the

17  travel was flight and stuff like that.  I had raised it

18  before to my manager as far as, you know, if I'm working

19  on Sunday o,r if I have to be at the site on Monday, I

20  have to leave on Sunday.  And basically the response

21  was, "It's up to you on where you want to live.  If it

22  takes you leaving on Sunday to get there on Monday,

23  so be it."

24      Q.   Who were those discussions with?

25      A.   I believe I had, I'm pretty sure I had had

## FREEDOM COURT REPORTING

1   that conversation with Ginger.

2        Q.   Anyone else?

3        A.   Possibly the former manager.

4        Q.   Is that the one that you still can't name?

5        A.   If I saw the name, I'd remember it.

6        Q.   But that's who you meant?

7        A.   Yes.

8        Q.   Do you understand that the allegation in this

9   lawsuit is that you were misclassified as an overtime

10  exempt employee?

11       A.   Yes.

12       Q.   Did you have that understanding while you were

13  employed at Tyler Technologies?

14       A.   Did I have which understanding?

15            MS. BAGLEY:  Object to form.

16  BY MR. McKEEBY:

17       Q.   Did you have an understanding while you were

18  employed at Tyler Technologies that you should been

19  classified as a non-exempt employee?

20       A.   I didn't understand the difference on that.

21       Q.   Okay.  So from that -- your complaints that

22  you made or the issues that you raised with Ginger and

23  the other didn't involve, "Hey, I'm a non-exempt

24  employee.  You should pay me overtime?"

25       A.   That is correct.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660
**EXHIBIT 13**