# FREEDOM COURT REPORTING

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION
 3   PATTY BEALL, MATTHEW          )
     MAXWELL, DAVID GRAVLEY,       )
 4   TALINA MCELHANY, KELLY        )
     HAMPTON, KEVIN TULLOS,        )
 5   CASEY BROWN, JASON BONNER,    )
     ANTHONY DODD, ILENE           )
 6   MEYERS, TOM O'HAVER, JOY      )
     BIBLES, DON LOCCHI AND        )
 7   MELISSA PASTOR,               )
     Individually and on behalf    ) CIVIL ACTION
 8   of all others similarly       )
     situated,                     ) NO.: 2:08-CV-422 TJW
 9                                 )
                   PLAINTIFFS,     )
10                                 )
     VS.                           )
11                                 )
                                   )
12   TYLER TECHNOLOGIES, INC.      )
     AND EDP ENTERPRISES, INC.,    )
13                                 )
                   DEFENDANTS.     )
14
15          ------------------------------------
16                 ORAL DEPOSITION OF
17                  MELANIE BAIRD
18                  APRIL 26, 2010
19          ------------------------------------
20
21       ORAL DEPOSITION OF MELANIE BAIRD, produced as a
     witness at the instance of the DEFENDANTS, and duly
22   sworn, was taken in the above-styled and numbered cause
     on the 26th day of April, 2010, from 1:22 p.m. to
23   4:30 p.m., before Elaine Fowler, CSR in and for the
     State of Texas, reported by machine shorthand, at the
24   offices of Cathy Sosebee & Associates, 901 Mac Davis
     Lane, Lubbock, Texas, pursuant to the Federal Rules of
25   Civil Procedure and the provisions stated on the record
```

**EXHIBIT 24**

# FREEDOM COURT REPORTING

Page 2

```
1              A P P E A R A N C E S
2

   FOR THE PLAINTIFFS PATTY BEALL, MATTHEW MAXWELL, DAVID
3  GRAVLEY, TALINA MCELHANY, KELLY HAMPTON, KEVIN TULLOS,
   CASEY BROWN, JASON BONNER, ANTHONY DODD, ILENE MEYERS,
4  TOM O'HAVER, JOY BIBLES, DON LOCCHI AND MELISSA PASTOR,
   Individually and on behalf of all others similarly
5  situated:
6      MS. CHANDRA L. HOLMES RAY
       Zelbst, Holmes & Butler
7      P.O. Box 365
       Lawton, Oklahoma 73502-0365
8      (580) 248-4844
9  FOR THE DEFENDANTS TYLER TECHNOLOGIES, INC. AND EDP
   ENTERPRISES, INC.:
10
       MS. FARIN KHOSRAVI
11     Morgan, Lewis & Bockius, L.L.P.
       1717 Main Street
12     Suite 3200
       Dallas, Texas 75201-7347
13     (214) 466-4146
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 24

# FREEDOM COURT REPORTING

```
 1                       INDEX

                                                  PAGE
 2   Appearances........................................  2
 3   MELANIE BAIRD
 4        EXAMINATION BY MS. KHOSRAVI....................  4
          EXAMINATION BY MS. HOLMES RAY:.................141
 5        EXAMINATION BY MS. KHOSRAVI....................147
 6

     Reporter's Certificate............................ 159
 7

                       EXHIBITS
 8

     NO.   DESCRIPTION                                 PAGE
 9

     1     3-9-06 Performance Review..................... 41
10   2     Performance Review from 2006 to 2007.......... 74
     3     Performance Review 2007 to 2008............... 97
11   4     Answers to interrogatories...................117
     5     Resume.......................................128
12   6     Consent to Opt In............................136
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 17

1    support?  What is the business of Tyler?

2        A.  They design software for governments so they

3    can operate.

4        Q.  But the time you were employed as software

5    support, the software that Tyler sold to the municipal

6    government, those clients would then call you if they

7    had questions about the software?

8        A.  Questions or problems.

9        Q.  And did I understand you that those problems or

10   concerns would be communicated to you by the customer or

11   the client making a telephone call to you?

12       A.  They would call into a phone queue.

13       Q.  And when you say phone queue, tell the jury

14   what you mean by that.

15       A.  Where they call in and their call is taken in

16   the order it was received.

17       Q.  So you never knew what call you were going to

18   receive when you answered a telephone call?

19       A.  That is correct.

20       Q.  How long did you remain in the software support

21   specialist position?

22       A.  Approximately four years.

23       Q.  When you first became employed by Tyler your

24   starting salary was around $28,000; is that right?

25       A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 18

1    Q.   But by the time you resigned in 2008 you had

2    received several raises; is that right?

3    A.   Yes.

4    Q.   And your ending salary was about $34,984 per

5    year?

6    A.   Something like that.

7    Q.   As an implementation specialist, what was your

8    job duty and responsibility?

9    A.   As an implementation specialist I worked with

10   the project managers to implement contracts.

11   Q.   Tell me what that means, implementing

12   contracts.

13   A.   Okay.  Marketing would sell the applications to

14   the customer and then implementation, we -- project

15   managers would, you know, work out the details with the

16   customers and then we would configure the software into

17   a conversion and then train them on the application.

18   Q.   So as an implementation specialist, one of your

19   jobs was to convert and configure; is that right?

20   A.   I didn't work on the conversions as much as the

21   trainers did.

22   Q.   Did you ever work on conversions?

23   A.   I would help them -- in a conversion, I would

24   help them figure out what information needed to go in

25   which field in the software.  So, yes, I did work on

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 19

1    conversions.

2         Q.   Good.   You were starting to explain to me what

3    conversions meant.   That was my next question.

4         A.   Yes.   A conversion is where you take them from

5    a software package they were using with another company

6    and bring that information into our software.

7         Q.   Give me an example, because I am trying to

8    envision and understand what it is that you were doing.

9    And I do not have a technical background.

10        A.   Okay.   Let's say that -- I am trying to think

11   of what you might use.

12        Q.   Give me an example of one of the projects you

13   worked on.

14        A.   Okay.   Say you were using -- say you were using

15   Lotus Notes for your email and you went to Outlook.

16        Q.   Okay.

17        A.   So it would be bringing those emails into the

18   new program.

19        Q.   And with you being involved in the conversion

20   process, what specifically would be involved in taking

21   my email in Lotus Notes over to Outlook?

22        A.   That was where the programmers would come in.

23   They would have to write programs to bring that

24   information over.   We just had to tell them where to put

25   it.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 20

1        Q.   So your role in the conversion process was

2    where to put what?

3        A.   Like we would have to, say, find the customer's

4    name in this software and put it in this field in our

5    software.

6        Q.   And who would you give those directions to?

7        A.   The project managers, and then they would

8    communicate that with development.

9        Q.   So if the subject of the mail was depositions,

10   you would tell the project manager in Lotus Notes the

11   subject field says depositions, in Outlook there is also

12   a field called subject matter, so make sure that the

13   name deposition is incorporated into this field.  Am I

14   understanding that correctly?

15       A.   Yes.

16       Q.   So you were involved in the conversion process

17   in that way.  And I think you also said configuration?

18       A.   Yes.

19       Q.   Help me understand what configuration means.

20       A.   Say in like a utility billing software, when --

21   before the customer can bill you how much water or gas

22   or electric you use they have to send a meter reader out

23   to read your meter to get readings.

24       Q.   You mean the utility services to the customer?

25       A.   Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

# FREEDOM COURT REPORTING

1          Q.   Okay.

2          A.   And so the meter reader will have to go out and

3     get a reading.  And then they have a device that they

4     type the reading in.  And then we would have to

5     configure based off of the software they used for that

6     how to get that information into the INCODE software.

7     So we have to say the meter number is here, the reading

8     is here, the address is here.

9          Q.   And when you say "here", you don't mean a hard

10    copy document, you mean --

11         A.   Right.

12         Q.   -- a different software application?

13         A.   Yes.

14         Q.   Okay.  Go on.

15         A.   We would tell it, you know, the address is in

16    field one, you know, for 10 characters, the name is in

17    field 11 for five characters.  We would have to, you

18    know, configure our software to know how to recognize

19    that information.

20         Q.   And what steps did you take to configure?  I am

21    trying to understand that.

22         A.   It would depend on which company they used for

23    their meter reading, because they were all different.

24         Q.   Give me an example of one that you can think

25    of.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

# FREEDOM COURT REPORTING

Page 32

```
 1       Q.   They continued to use the old software and the

 2   new one that they purchased from Tyler?

 3       A.   No.   The old software would be -- we would

 4   replace that software.   This is other software they used

 5   in addition to.

 6       Q.   So, for example, if your client was switching

 7   from -- the example you gave earlier, switching from

 8   Lotus Notes to Outlook, it didn't mean that they were

 9   also switching from Microsoft Word to Word Perfect, you

10   had to make sure that Microsoft Word was communicating

11   with the new software, Outlook?

12       A.   Yes.

13       Q.   Am I following you?

14       A.   Yes.

15       Q.   So you trained them over the phone on

16   interface (sic)?

17       A.   Yes.

18       Q.   How was your training in person that you did on

19   clients' sites different from doing the training by

20   phone?

21       A.   You were hands-on with the customer.   When you

22   are on-site you could actually say, okay, you need to do

23   this, this and this.   When you are on the phone it is

24   very hard to, you know, actually show them what they

25   need to do.
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 33

1    Q.   So when you are on-site training a client you

2    are actually sitting beside or near the user on their

3    computer screen showing them?

4    A.   Yes.

5    Q.   And when you are doing it by phone, are you

6    logged onto the client's computer to show them this?  I

7    am trying to envision how you actually trained when you

8    are remote.

9    A.   When we had the opportunity to do it, we would

10   connect to their computers.  Sometimes they would have

11   IT stuff that would not let us do that.

12   Q.   So when you were not able to remote in, how did

13   you train them by phone?

14   A.   I would actually have their screen pulled up on

15   my screen and just say, you know, in the upper

16   right-hand corner you see this, you know, if you look

17   below that you see this and if you look to the left you

18   see that, just guide them the best you could.

19   Q.   What training did Tyler Technologies provide

20   for you in the beginning when you first became an

21   implementation specialist?

22   A.   None.

23   Q.   How did you know how to do your job as an

24   implementation specialist when you first became one?

25   A.   I learned as I went.  They would give me a task

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 34

1  and I would just have to learn how to do it.

2      Q.  So day one when you first became an

3  implementation specialist, did somebody send you to a

4  client site and say, Ms. Baird, go and train them on --

5  name a software, I don't know, INCODE -- is that how it

6  happened?

7      A.  No.

8      Q.  Okay.  So what was done by Tyler to prepare you

9  for your first trip out to a client's site to be able to

10  train them?

11      A.  I waited -- I didn't have any formal training.

12      Q.  And I am not limiting my question to any formal

13  training.  Me, Farin Khosravi, sitting here today, I am

14  trying to understand how you did your job as an

15  implementation specialist with not having any

16  background.  So when you went in as an implementation

17  specialist, did you already have an understanding of how

18  INCODE functioned?

19      A.  Functioned in which way?

20      Q.  Functioned in any way.  Were you familiar with

21  INCODE from previous jobs, from previous training, from

22  previous positions you had with the company?

23      A.  I mean, I knew how the software worked from

24  working in support.

25      Q.  Let's go back to that then.  Before you became

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 44

1      A.  Exceptional knowledge of all aspects of the

2  job.

3      Q.  And then the next sentence is?

4      A.  Considered an expert in the field.

5      Q.  Why did you consider yourself to be an expert

6  in the field?

7      A.  I was trying to get a good raise.

8      Q.  Any other reasons?  Were you being truthful

9  when you marked that?

10     A.  Yes.

11     Q.  Any other reasons besides trying to get a raise

12  that you believed you were an expert in your field?

13     A.  Well, I just always did a good job.

14     Q.  And what did you consider doing a good job?

15  You have said that several times, you did a good job.

16  But what is it specifically that you did that you

17  considered yourself doing a good job?

18     A.  Well, I just always took care of the customer

19  to the best of my abilities.

20     Q.  Lets turn the page together to the second page

21  of the performance review.  Now, look with me under Item

22  Number 3, which is problem solving, and under employee

23  comments.  Read me what you put down for problem solving

24  under employee comment.

25     A.  This one is difficult because this is done on a

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 45

1    customer by customer basis and is usually handled

2    between the trainer and I.  It usually pertains to the

3    way routes are set up for customers and what the best

4    way to set them up for them is.

5         Q.  When you say it is usually handled between the

6    trainer and I, help me understand.  I thought you were

7    the trainer who trained the customers.  What did you

8    mean by that sentence?

9         A.  Well, I trained them on the interfaces.  We had

10   trainers that went on-site to train them on the modules.

11        Q.  So you didn't train them on how to use Tyler's

12   software, you only trained them on how to make two

13   softwares communicate, correct?

14                MS. HOLMES RAY:  Object to the form.

15        A.  Correct.

16        Q.  (BY MS. KHOSRAVI)  And what do you mean by the

17   second sentence, it usually pertains to the way routes

18   are set up for customers?

19        A.  Well, every customer was different.

20        Q.  The routes are set up, what does that phrase

21   mean?

22        A.  Routes are like the order the meter readers

23   would read the meters.  Like every city is set up

24   differently and they have different ways of doing

25   things.

**EXHIBIT 24**

# FREEDOM COURT REPORTING

Page 46

1      Q.   So you had to actually communicate with the

2    client and find out how they set those up, correct?

3      A.   Yes.

4            MS. HOLMES RAY:   Objection, form.

5      Q.   (BY MS. KHOSRAVI)   And you would have to

6    understand that from the client to then know how to

7    assist them with their problems; is that right?

8            MS. HOLMES RAY:   Object to the form.

9      Q.   (BY MS. KHOSRAVI)   You may answer the question.

10     A.   Can you repeat that, please.

11           MS. KHOSRAVI:   Would you read that back,

12   please.

13           (The reporter read the last question.)

14     A.   Correct.   Can I ask what time it is?

15           MS. HOLMES RAY:   10 minutes after 2.

16           THE WITNESS:   I have to notify my daughter

17   if she has to ride the bus home or not.   She gets out at

18   3:15.

19           MS. HOLMES RAY:   Off the record.

20           (Break taken from 2:11 p.m. to 2:14 p.m.)

21     Q.   (BY MS. KHOSRAVI)   Ms. Baird, before we took a

22   quick break we were discussing your employee comments on

23   your performance review with respect to problem solving.

24   Do you remember that?

25     A.   Yes.

# FREEDOM COURT REPORTING

1      Q.  And we were discussing your comment where it

2   says it usually pertains to the way routes are set up

3   for customers and what the best way to set them up for

4   them is.  Do you remember having put that down on your

5   performance evaluation?

6      A.  Yes.

7      Q.  And was it you then that decided what the best

8   way was to set up the routes for your customers?

9      A.  I would make suggestions to the customers, but

10   it was ultimately their decision how it was set up.

11      Q.  And how do you decide what suggestions to make

12   to your customers?

13      A.  Just -- after doing it for so long you just

14   learn it, you --

15      Q.  So you determine what the best route would be

16   provided under the comment?

17

18          MS. HOLMES RAY:  Objection, form.  You can

19   answer.

20      A.  Okay.  I would just -- pretty much what I would

21   do, I would say -- you know, I never knew how their old

22   software worked, so I would say this is how our software

23   works and this would be the easiest way for you to do

24   it.  But ultimately it was up to them how we set it up,

25   the way they did their day-to-day work.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 48

1      Q.   Now, I want you to go up two lines, again I am

2    on problem solving, and tell me how you rated yourself.

3    Do you see your own ranking under box that has got a

4    capital E on top?

5      A.   Yes.  There is two of them marked there.  I do

6    not know why there is two of them marked there, so I

7    don't know which one I actually picked.

8      Q.   Why don't you read me the first one that has an

9    employee checkmark next to it.

10      A.   Consistently analyzes problems, recognizes and

11    implements appropriate solutions, finds new and better

12    ways to do things.

13      Q.   Tell me what you meant by saying that you

14    recommended and implemented appropriate solutions.  Do

15    you remember an example?

16           MS. HOLMES RAY:  I am going to object to

17    the form.  You can answer.

18      A.   Like an example would be -- like, say, they

19    would tell me that they have like 10 routes and we -- I

20    don't know what orders their meter readers would read

21    in, but I would need to find out from them like what

22    account numbers they wanted in each route.  And then we

23    would have different configurations that we could set up

24    for them so they could make sure the right account

25    numbers and right meters came up for the meter reader on

# FREEDOM COURT REPORTING

Page 49

```
 1    their devices.
 2        Q.  Did you suggest to the city what configurations
 3    to use?
 4        A.  I would give them options because they -- you
 5    know, it is the type of situation where you can't say
 6    you have to do it this way, because they had multiple
 7    options they could do.  I would just tell them like what
 8    is the easiest way to do it versus the hardest way to do
 9    it.  Then they could make a more informed decision that
10    way.
11        Q.  And how did you know of these options that you
12    were telling the clients they could use?
13        A.  What do you mean?
14        Q.  You said you would give them different options.
15    I am trying to figure out how did you know what options
16    were available.
17        A.  I would try to find out from them what --
18        Q.  From the client?
19        A.  Yes, from the client, what they needed.  What
20    do you need and then I would say, okay, here is your
21    option based on their needs.
22        Q.  Now back to that same sentence.  Did you
23    consider yourself consistently analyzing problems?
24
25              MS. HOLMES RAY:  Object to the form.  You
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1   can answer.

2       A.  Yes.

3       Q.  (BY MS. KHOSRAVI)  And tell me why it is that

4   you considered yourself consistently analyzing problems.

5       A.  Well, I mean, the job that I did was the same

6   all the time.  So I was -- you know, for every customer

7   I would talk to, I would -- it would be consistently

8   doing the same thing with them just based off of their

9   different needs.

10      Q.  And when you say doing the same thing, you mean

11  analyzing their problems?

12      A.  Yes.

13      Q.  That is what you were referring to?

14      A.  Yes.

15      Q.  But as you said before, every customer was

16  different, you had to tailor your suggestions to their

17  needs, correct?

18      A.  Right, but it was still the same process.

19      Q.  The same process of what?

20      A.  You know, you would still ask them the same

21  questions; you would just have to figure out, you know,

22  what -- how they did things differently than the other

23  customers, then make the suggestions based on that.

24      Q.  Let's turn the page, Ms. Baird.  On the top of

25  the third page of your performance review under employee

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 72

1      Q.   So who became the contact for the trainers?

2      A.   They continued to contact their project

3  managers.

4      Q.   I see.  And you are testifying that the project

5  managers did not have the knowledge and expertise that

6  you did?

7      A.   Yes.

8           MS. HOLMES RAY:  Object to the form.

9      Q.   (BY MS. KHOSRAVI)  Would you read the next

10  sentence for me, please.

11      A.   "I would also like to take a class on Microsoft

12  Front Page to learn it better."

13      Q.   Tell me what Microsoft Front Page is.

14      A.   That is a program for designing web pages.

15      Q.   Why did you want to attend that class?

16      A.   Because the InSite program, that would have

17  been a way for me take more control of it, to do the

18  set-up so I didn't have to wait on other people to do

19  it.

20      Q.   Did you make that suggestion to Dyke Ellison?

21      A.   Yes.

22      Q.   What did he think?

23      A.   He said no.

24      Q.   Did he tell you why?

25      A.   No.

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 73

1      Q.   Would you read the next sentence for me,

2   please.

3      A.   "I would also like to be the person to build

4   the site and purchase the SSL certificates and install

5   them."

6      Q.   These SSL certificates were the security bar

7   codes you were telling me about?

8      A.   No.  That was the security software that

9   encrypts your credit card when you make a purchase

10   on-line.

11      Q.   And remind me why you were suggesting that you

12   would be the person who builds the site and purchases

13   the certificate.

14      A.   Because we had -- I had to wait on other

15   departments to do all of that.

16      Q.   In order to --

17      A.   In order to do my configuration and my

18   training.

19      Q.   Did you make that suggestion to Dyke Ellison?

20      A.   Yes.

21      Q.   And that was declined, correct?

22      A.   Yes.

23      Q.   Did he explain to you why that was being

24   declined?

25      A.   No.

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 74

1     Q.  Did you ever ask or follow up?

2     A.  Yes.

3     Q.  And the result was?

4     A.  He would just not respond.

5     Q.  Look at the very last sentence in that

6  paragraph starting with "Joe and Michael".  Read that

7  for me.

8     A.  "Joe and are much better, but I would be able

9  to do my job more efficiently if I could do these other

10  parts."

11     Q.  Who were you referring to when you said Joe and

12  Michael?

13     A.  Joe was the programmer and Michael was the IT

14  person that -- they were the two people that I had to

15  wait on in the other department to do their job before I

16  could do mine.

17     Q.  So they were Tyler employees?

18     A.  Yes.

19     Q.  Okay.  If you will go ahead and put that aside

20  for me.  Now I am going to hand you another one.

21            (Exhibit 2 marked.)

22     Q.  Ms. Baird, I am going to hand you what has been

23  marked as Deposition Exhibit Number 2.  Take a look at

24  that and tell me if you recognize that document, please.

25     A.  Yes.

## FREEDOM COURT REPORTING

Page 111

1  accounting functions for our regional office, but I also

2  handled the billing and the payments when they came in.

3      Q.  When you were being interviewed for a position

4  with Tyler, during the interview process were you told

5  that you were going to be receiving a salary and not

6  overtime pay?

7      A.  No.

8      Q.  So when did you first become aware that you

9  were not getting paid overtime pay for the hours worked

10 over 40?

11     A.  When I started working at Tyler and I asked if

12 we got overtime pay and I was told no.

13     Q.  And you realized that even if you worked 45

14 hours you were still getting the same salary as if you

15 worked 40 hours per week, right?

16     A.  That was the way it was explained to me.

17     Q.  But, in fact, was it reflected in your paycheck

18 that the pay didn't change no matter how many hours you

19 worked?

20     A.  That is correct.

21     Q.  And did your hours change as well?  Were you

22 working a set number of hours per week or were they

23 different?

24     A.  The hours that we were, you know, required to

25 work was 8 to 5.  But if you didn't complete something,

## FREEDOM COURT REPORTING

Page 112

1    they would ask, you know, why didn't you stay over and

2    do that.

3        Q.  So your hours, depending on your work load,

4    would change week to week, right?

5        A.  Yes.

6        Q.  It was possible one week you worked 40 and one

7    week you worked 45, for example, correct?

8        A.  Yes.

9        Q.  And did you ever work less than 40 hours per

10   week?

11       A.  Only if I took like a day off in the middle of

12   the week.  But not when I worked five days, no.

13       Q.  Did you ever make any complaints to anybody at

14   Tyler about overtime pay?

15       A.  I expressed my concerns to Dane Womble.

16       Q.  Tell me what you told Dane Womble.

17       A.  I just told him that, you know, I worked well

18   over 40 hours a week and I felt I should have been

19   compensated for that, and he said we don't do that.

20       Q.  So when you said you felt like you should be

21   compensated, you were referring to overtime pay?

22       A.  Yes.

23       Q.  What were the maximum number of hours that you

24   worked in a given week?

25       A.  Like any week?

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 113

1      Q.  Yeah, on average I want to know the maximum

2   number of hours that you worked.

3      A.  Do you want a maximum or do you want an

4   average?

5      Q.  No.  Give me a maximum that you ever worked in

6   a given work, that you can remember.

7      A.  The maximum that I can ever remember, I worked

8   90 hours one week.

9      Q.  What was the situation?  Talk to me about that.

10      A.  I was travelling and still doing all of my

11   normal work.  And it was a very -- we had a very large

12   load that week -- or I had a very large load that week.

13   And that is just what it took me to get the job done.

14      Q.  When you say I was travelling and my normal

15   work, why are you distinguishing between the normal -- I

16   don't understand by normal work and then travelling.

17      A.  That probably wasn't the best way to word that.

18   Like I had all the interfacing and everything and then

19   they added the Audiotel onto that.  So I was not always

20   in the office; I was also travelling and I was away from

21   my desk.  So I could not do the remainder of my work

22   while I traveled because I would be at the customer

23   site, you know -- I was giving them my attention and

24   not --

25      Q.  Instead of --

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1      A.  Right.  Instead of everything else.  I couldn't

2  do all of it at once where I would be able to put more

3  attention on more things while I was at my desk.

4      Q.  So you mean while you were at a client's site

5  you couldn't then assist other clients who were calling

6  you on the phone asking you about another software?

7      A.  Yes.

8      Q.  Okay.  So once you finished with the client's

9  site that you were visiting, once you returned back to

10  your desk you would contact that client, or how did that

11  work?  How did you then attend to that client who was

12  trying to reach you?

13      A.  I would call them back -- I would return all of

14  my messages and emails and everything.  I would just get

15  to them, you know, in the order I received them or if

16  there was something more pressing I would have to

17  prioritize them.

18      Q.  I am trying to figure out how it is that you

19  were working 90 hours that week.  What were the hours of

20  your clients usually, their office hours?  They were

21  municipalities, correct?

22      A.  They were usually 8 to 5.

23      Q.  So then you were pretty much working 8 to 5?

24      A.  I would work 8 to 5, but then I would also work

25  in my hotel room afterwards.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 115

1     Q.   Okay.   And what type of work were you doing at

2    your hotel room afterwards?

3     A.   I would answer emails.   I would call in and get

4    my voice mails.   You can't call the customers back at

5    that point, but I would send them emails.   I would

6    answer emails.   I would contact project managers.   We

7    were in constant contact with project managers.   So they

8    were the ones that you had to go to for any project.

9    Even if someone bought a software package after they had

10   already gone live on the main system, the project

11   manager was still in charge of that project.   So I was

12   always in contact with the project managers.

13    Q.   When you say that you were constantly in

14   contact with the project managers, tell me in what way.

15   Because I am envisioning you being in constant contact

16   with the clients who were calling you regarding issues

17   and problems that they were having.   Help me understand

18   that.

19    A.   Well, I was in contact -- the clients would

20   call in with issues they were having when I was in

21   support.   When I was in implementation we were actually

22   implementing programs.   We were setting them up,

23   training them how to use them and making them work.   I

24   didn't do as much support once I was in implementation.

25   I still did some support.   But the project managers are

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

# FREEDOM COURT REPORTING

Page 116

1   the ones who we were in contact with when there would be

2   -- arise a problem with a customer, because that was

3   their customer.

4        Q.   Okay.  So you would be in contact with a

5   project manager once a problem arose?

6        A.   Yes.

7        Q.   After you had set it up?

8        A.   Right.  And when I was travelling, you know, I

9   didn't have access to my computer, to my physical

10  computer at the office.  So I would have to contact

11  them, you know, we need to do this for this customer or

12  we need to do that for that.  And they would have to go

13  over to my desk or get on my computer or something to

14  try to find some of that information.  So I had a lot of

15  back and forth communication with the project managers.

16       Q.   How many weeks during your employment with

17  Tyler as an implementation specialist do you remember

18  working 90 hours, the maximum that you testified?

19       A.   90 hours, I only remember working one, you

20  know.

21       Q.   Okay.  Now, on average how many hours a week

22  were you working?

23       A.   An average -- I came up with about 60 hours

24  average.

25       Q.   And how did you come up with that number?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**