```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
                         MARSHALL DIVISION

PATTY BEALL, MATTHEW         )
MAXWELL, TALINA McELHANY,    )
AND KELLY HAMPTON,           )
individually and on behalf   )
of all other similarly       )
situated,                    )
              Plaintiffs,    )
                             )   No. 2:08-cv-422VS
                             )
                             )
TYLER TECHNOLOGIES, INC.     )
AND EDP ENTERPRISES, INC.,   )
              Defendants.    )
```

---

ORAL DEPOSITION OF

TALINA REANN McELHANY

3/29/10

---

ORAL DEPOSITION OF TALINA REANN McELHANY, produced as a witness at the instance of the DEFENDANTS, and duly sworn, was taken in the above-styled and numbered cause on the 29th day of March, 2010, from 9:14 a.m. to 12:35 p.m., before TINA TERRELL BURNEY, CSR in and for the State of Texas, reported by machine shorthand, at the offices of SLOAN, BAGLEY, HATCHER & PERRY, 101 East Whaley Street, Longview, Texas 75601, pursuant to the Federal Rules of Civil Procedure.

COPY

```
 1                A P P E A R A N C E S

 2  FOR THE PLAINTIFFS:

 3      Ms. Laureen F. Bagley
        SLOAN, BAGLEY, HATCHER & PERRY
 4      101 East Whaley Street
        Longview, Texas 75601
 5
        (903) 757-7000 (telephone)
 6      (903) 757-7574 (facsimile)

 7      Ms. Chandra Holmes Ray
        ZELBST HOLMES & BUTLER
 8      P.O. Box 365
        Lawton, Oklahoma  73502
 9
        (580) 248-4844
10

11  FOR THE DEFENDANTS:

12      Mr. Paulo B. McKeeby
        MORGAN, LEWIS & BOCKIUS LLP
13      1717 Main Street
        Suite 3200
14      Dallas, Texas 75201

15      (214) 466-4000 (telephone)
        (214) 466-4001 (facsimile)
16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX
 2                                                    PAGE
 3   Appearances.......................................  2
 4   TALINA REANN MCELHANY
 5   Examination by Mr. McKeeby........................  4
 6   Signature and Changes............................ 124
 7   Reporter's Certificate........................... 126
 8
 9                       EXHIBITS
10   NO.    DESCRIPTION                                PAGE
11   1  -   Declaration of Talina McElhany              50
12   2  -   Ms. McElhany's weekly time sheets           90
13   3  -   Job Description Form                       105
14   4  -   Performance Evaluation Form                111
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                TALINA REANN MCELHANY,
 2   having been first duly sworn, testified as follows:
 3                      EXAMINATION
 4   BY MR. MCKEEBY:
 5        Q.   Ms. McElhany, will you state your full name for
 6   the record, please?
 7        A.   Talina Reann McElhany.
 8        Q.   Ms. McElhany, I usually introduce myself before
 9   we get on the record, but in this case I didn't.  My name
10   is Paulo McKeeby.  You understand I represent Tyler
11   Technologies?
12        A.   Yes.
13        Q.   And I represent Tyler in connection with a
14   lawsuit in which you are a party.  Do you understand
15   that?
16        A.   Yes.
17        Q.   And you were formerly employed by Tyler?
18        A.   Yes.
19        Q.   And you understand that Tyler acquired at some
20   point a company with which you were previously employed
21   called EDP?
22        A.   Yes.
23        Q.   And that acquisition took place in September of
24   2007?
25        A.   Yes.
```

|   |   |   |
|---|---|---|
| 1 | Q. | What is your current address? |
| 2 | A. | 1301 Creek Bend Street, White Oak, Texas 75693. |
| 4 | Q. | How long have you lived there? |
| 5 | A. | Seven and a half years. |
| 6 | Q. | What is your highest level of education? |
| 7 | A. | I have a bachelor's degree. |
| 8 | Q. | From where? |
| 9 | A. | Baylor University. |
| 10 | Q. | When did you get that? |
| 11 | A. | December of 1982. |
| 12 | Q. | And what was your specialty? |
| 13 | A. | I have a business degree. |
| 14 | Q. | Is it anything more specific than business? |
| 15 | A. | I had a concentration in computer information systems. |
| 17 | Q. | Was that like a major? |
| 18 | A. | No, it's not considered a major, just a concentration. |
| 20 | Q. | Did you have a separate major? |
| 21 | A. | No. |
| 22 | Q. | Is that just how Baylor designates? |
| 23 | A. | It was at that time. I don't know if they still do. |
| 25 | Q. | Have you had any education beyond your |

1 you?
2   A. Yes.
3   Q. We'll talk about these (indicating), and I'll
4 show them to you during the course of the deposition.
09:23AM 5 Was that the kind of time sheets that you thought you
6 might have at your home?
7   A. Yes.
8   Q. Was it your practice to take those types of
9 records to your home while you were working at EDP or
09:24AM 10 Tyler?
11   A. Time sheets?
12   Q. Yes.
13   A. No.
14   Q. You weren't violating any policy, as you
09:24AM 15 understood it, taking those to your home?
16   A. No.
17   Q. Was there a reason that you did on a couple of
18 occasions take time sheets to your home?
19   A. Well, I didn't think that I had, but when you
09:24AM 20 leave a place of employment, you know, you have personal
21 belongings, a file of personal stuff that you kept. I
22 thought it was possible that there might have been a
23 time sheet stuck in that file, but I didn't find any.
24   Q. But what you're telling me is that you don't
09:24AM 25 have any particular recollection of there being an

```
 1  occasion in which you took one or more time sheets from
 2  the company to your home?
 3       A.   No, I don't.
 4       Q.   Okay.  Was there a time that you stopped
 5  completing time sheets while you were employed with EDP
 6  in Tyler?
 7       A.   Tyler, yes.
 8       Q.   When was that?
 9       A.   It was after Tyler bought EDP.  I'm not
10  positive of the time.  I would say -- I would estimate
11  that it was in the fall of 2007.
12       Q.   And you left Tyler in August of 2008, correct?
13       A.   Yes.
14       Q.   How did you become aware that you were no
15  longer having to keep a time sheet?
16       A.   We were told not to keep time sheets any
17  longer by our manager.  I'm not sure what her title was
18  at that point.
19       Q.   Who are you referring to?
20       A.   Chandra Robins.
21       Q.   Did she give you that instruction orally?
22       A.   Yes.
23       Q.   Did she give you that instruction personally,
24  or was it in a meeting?
25       A.   I believe she just walked into our office.
```

```
 1  There were three of us in that office, and she said,
 2  y'all don't have to keep time sheets anymore.
 3      Q.   Did she say why?
 4      A.   No.
 5      Q.   Did you ask?
 6      A.   Yes, and she said, that's what they told us.
 7      Q.   Where was your office located at that time?
 8      A.   It was at the downtown building in what used
 9  to be a bank building.  I can't even tell you the
10  address.  I could drive you to it, but I don't know the
11  address.
12      Q.   Okay.  Were you on the second or third floor?
13      A.   On the third floor.
14      Q.   Did you have your own office, or were you in a
15  cubicle?
16      A.   I shared an office with two other ladies.
17      Q.   Right now you're talking about around the fall
18  of 2007?
19      A.   That's correct.
20      Q.   What two other ladies did you share it with?
21      A.   At that time I believe it was -- well,
22  actually at that time it was just one lady, Kelly
23  Hampton.
24      Q.   Did you have your own desk at the office?
25      A.   Yes.
```

1   Q.   That was something they explained to you?
2   A.   They didn't say those words.
3   Q.   But that was your understanding?
4   A.   They said, you'll work these -- during those
5   two weeks, you'll have to work until 6:00, and that
6   you'll have to work one Saturday during that time
7   period. There was not any discussion of the money
8   related to that.
9   Q.   But it was your understanding based on the fact
10  they were telling you that you were going to have to work
11  more during these periods of time and you would be making
12  a salary is that you were going to make your weekly
13  salary no matter how many hours you worked?
14          MS. BAGLEY: Object to the form.
15  A.   I don't think I thought about it at that
16  point.
17  Q.   But they certainly didn't mention any extra pay
18  for these times where you might have to stay over a
19  little late or this two-week period at the end of the
20  school year where you would have to work additional
21  hours?
22  A.   No, I don't think they did.
23  Q.   Did you report to Ms. McBride during the entire
24  time that you were a customer support representative?
25  A.   No.

```
 1           Q.   Who else did you report to?
 2           A.   Ms. McBride left probably a month or a month
 3   and a half after I came to work there, and there was an
 4   interim customer support manager for a period of time.
 5           Q.   Who was that?
 6           A.   Her name was Lisa Payne.
 7           Q.   Was she someone that was already working there?
 8           A.   Yes.
 9           Q.   And then what happened to her, did she leave as
10   well?
11           A.   Eventually she did, but...
12           Q.   Someone else became your manager?
13           A.   Yes.
14           Q.   Who became your manager?
15           A.   Chandra Rash.
16           Q.   So was Ms. Rash your manager for the remaining
17   time in which you were a customer support representative?
18           A.   Yes.
19           Q.   And then in September of '05, you became a
20   client liaison, correct?
21           A.   Yes.
22           Q.   Was that a promotion in your eyes?
23           A.   Yes.
24           Q.   Did you get more money?
25           A.   I don't remember if I got a raise at that
```

```
 1  time.
 2       Q.   Why did you regard it as a promotion?
 3       A.   It was a different software, a newer software.
 4       Q.   What was the newer software, EDPro?
 5       A.   EDPro.
 6       Q.   They called it EDPro?
 7       A.   Uh-huh.
 8       Q.   Did the position of client liaison become open
 9  that you applied for internally, or how did you get that
10  role?
11       A.   There was an opening, and I did express
12  interest in that opening to Chandra Rash and to Kelly
13  Ainsworth, who was over the side of the business that I
14  was in at that time.  He was over Chandra.
15       Q.   And when you say there was an opening, is that
16  because someone left?
17       A.   Yes.
18       Q.   Who left?
19       A.   I believe Susie Briscoe.
20       Q.   Did you interview for the client liaison
21  position?
22       A.   I did.
23       Q.   With whom?
24       A.   Well, initially -- because it was open for a
25  long time, and I don't remember when it became open -- I
```

```
 1  interviewed with Cathy Mount at one point because she
 2  was over the client liaisons.  Then I interviewed with
 3  Chandra Robins before I took the job -- before I was
 4  offered the job.
 5      Q.   So that would have been -- that interview with
 6  Chandra Robins would have been close to September of '05?
 7      A.   I don't really remember when it was.  I was
 8  told that I had the job several months before they moved
 9  me over.
10      Q.   So this interview that you're thinking about
11  with Chandra Robins occurred several months before you
12  actually became a client liaison?
13      A.   I believe so.
14      Q.   And the interview with Cathy Mount occurred
15  prior to that time?
16      A.   Yes.
17      Q.   Prior to your interview with Chandra Robins?
18      A.   Yes.
19      Q.   How much prior?
20      A.   I don't remember.
21      Q.   A couple of weeks, a couple of months?
22      A.   More than two weeks.  I really don't remember.
23  I don't have a time reference.  I'm sorry.
24      Q.   That's okay.  Did you have a sense of what the
25  client liaison job was based on your experience to that
```

```
 1  point at EDP?
 2      A.   Not based on my experience, based on the fact
 3  that I was friends with Lisa White.
 4      Q.   Who was a client liaison?
 5      A.   Who was a client liaison.
 6      Q.   So she had told you what her job involved?
 7      A.   Yes.
 8      Q.   Did you -- as a customer support
 9  representative, did you work closely with the client
10  liaisons?
11      A.   No.
12      Q.   Did you work at all with the client liaisons?
13      A.   No.
14      Q.   So your information about what the client
15  liaison job involved was a product of your discussions
16  with your friend, Lisa White?
17      A.   Yes, that and knowing that the client liaisons
18  were involved with taking customers from the classic
19  software that I worked with at that time as a support
20  representative and converting their data and taking them
21  to the new EDPro software.
22      Q.   And how did you have that information?
23      A.   Occasionally there would be a question arise
24  about the software that I was supporting that Lisa or
25  Cathy Mount might call and ask me about a certain run
```

```
 1  number in the software or where to find a piece of
 2  information in the software when they were trying to
 3  convert to EDPro.
 4       Q.   What was the classic software?  What's the best
 5  way to describe it or call it?
 6       A.   Well, we called it Unix when I worked there.
 7       Q.   U-N-I-X?
 8       A.   U-N-I-X.
 9       Q.   So that's what you mean when you are talking
10  about the classic software that you supported --
11       A.   Yes.
12       Q.   -- as a customer support representative?
13       A.   Yes.
14       Q.   And then EDPro was a new software that EDP had
15  developed, correct?
16       A.   Yes.
17       Q.   So what was going on in the school district was
18  that EDP was selling the EDPro software as a replacement
19  to Unix?
20       A.   It was sold as a replacement to Unix.  It was
21  sold as a stand-alone if there was a district that
22  wasn't a Unix customer.
23       Q.   So they were marketing EDPro either to existing
24  customers who had used Unix or to new customers?
25       A.   Yes.
```

|  |  |  |
|---|---|---|
| 1 | Q. | Were there other -- other than yourself and |
| 2 | Lisa White, who were the other client liaisons? | |
| 3 | A. | For a time it was just me and Lisa, but Kelly |
| 4 | Hampton was also a liaison, and then before I left -- I | |
| 10:44AM 5 | actually don't remember if DeLana was in that position | |
| 6 | before I left or after I left. | |
| 7 | Q. | Who was the person you're thinking of? |
| 8 | A. | DeLana Alford. And Janet Copeland was also a |
| 9 | liaison for a short time. | |
| 10:44AM 10 | Q. | So the departmental meetings would be between |
| 11 | Chandra Robins and the client liaisons at the time? | |
| 12 | A. | And the trainers. |
| 13 | Q. | The trainers also reported to Chandra Robins? |
| 14 | A. | Yes. |
| 10:45AM 15 | Q. | Now, did these trainers also go by the |
| 16 | designation "implementers"? | |
| 17 | A. | Once Tyler took over, yes. |
| 18 | Q. | The term "implementer" wasn't used as a job |
| 19 | designation while you were at EDP? | |
| 10:45AM 20 | A. | No. |
| 21 | Q. | That statement I made was a correct statement? |
| 22 | A. | I'm sorry, that is a correct statement. |
| 23 | Q. | That's not your fault. I asked you a bad |
| 24 | question. Okay. That's a designation that started being | |
| 10:45AM 25 | used when Tyler took over in September of 2007? | |

1   A.   Yes.
2   Q.   I think I have this, but your job didn't change
3 after Tyler took over, did it?
4        MS. BAGLEY:   Object to form.
10:46AM 5   A.   No, it did not.
6   Q.   It did not change?
7   A.   My duties didn't change.  My title changed.
8   Q.   Right.  Your title changed from client liaison
9 to implementer?
10:46AM 10  A.   I believe it was implementation specialist.
11  Q.   But in terms of what you were doing on a
12 day-to-day basis, it stayed the same?
13  A.   Yes.
14  Q.   So the description of your job that I
10:46AM 15 referenced in Paragraph 4 of your declaration is accurate
16 as to while you were a client liaison at EDP and at
17 Tyler?
18  A.   Yes.
19  Q.   So how often were these departmental meetings?
10:46AM 20  A.   I don't really know.
21  Q.   Were they more than once a month?
22  A.   No.
23  Q.   Okay.  So you have this initial call.  What do
24 you do with the form that you completed?  Did you give
10:47AM 25 that to the programmer?

```
 1      A.   Yes, and keep a copy for yourself also.
 2      Q.   So what do you do next in the conversion
 3 process?  Do you wait for the programmer to give you
 4 information, or how do you know if you're supposed to do
 5 something else in connection with the conversion process?
 6      A.   Once you have given that to the programmer,
 7 he'll run the initial conversion through the conversion
 8 process.  And then he would either come and tell us it
 9 completely bombed, and this is what I think is wrong, so
10 gather X, Y, Z information from the customer, or if they
11 had good, clean data, he might could tell you specific
12 areas that needed attention.
13           So you would go back to your customer and
14 say, I need you to do this, this and this.
15      Q.   And how did he communicate the status of the
16 initial conversion to you, by e-mail, orally?
17      A.   Both.  We would have conversations about it,
18 and he might send me an e-mail and say, these are the
19 things that I see wrong.  If I needed clarification, I
20 would just go to him, and we would talk about it.  I
21 would take notes.
22      Q.   How long would it typically take him to do the
23 initial conversion?
24      A.   I wouldn't say there was a typical time.
25      Q.   What would it depend on?
```