```
 1               IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   PATTY BEALL, ET AL.      )(

 5                            )(   CIVIL DOCKET NO.

 6                            )(   2:08-CV-422-TJW

 7   VS.                      )(   MARSHALL, TEXAS

 8                            )(

 9   TYLER TECHNOLOGIES, INC.,)(   JUNE 19, 2009

10   ET AL.                   )(   9:30 A.M.

11               CLASS CERTIFICATION HEARING

12          BEFORE THE HONORABLE JUDGE T. JOHN WARD

13               UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16

17   FOR THE PLAINTIFFS:  (See Attorney Sign-In Sheet)

18

19   FOR THE DEFENDANTS:  (See Attorney Sign-In Sheet)

20

21   COURT REPORTER:      MS. SHELLY HOLMES, CSR
                          Deputy Official Court Reporter
22                        2593 Myrtle Road
                          Diana, Texas  75640
23                        (903) 663-5082

24

25   (Proceedings recorded by mechanical stenography,
```

transcript produced on a CAT system.)

2

```
 1                          I N D E X

 2

 3

 4   June 19, 2009

 5                                                Page

 6        Appearances                            1

 7        Hearing                                3

 8        Court Reporter's Certificate           30

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                  COURT SECURITY OFFICER:  All rise.

2                  THE COURT:  Please be seated.

3                  All right.  Class cert hearing in this

4     collective action -- collective action, Beall versus

5     Tyler Technologies, 2:08-CV-422.

6                  What says the plaintiff?

7                  MR. WREN:  Your Honor, Jim Wren on behalf of

8     plaintiffs, and we're ready to proceed.

9                  THE COURT:  All right.  How long do you

10    need, Mr. Wren?

11                 MR. WREN:  I think about 10 and at the very

12    most 15 minutes, but probably closer to 10, Your Honor.

13                 THE COURT:  Okay.  Defendant?

14                 MR. DACUS:  Your Honor, Darren Dacus on

15    behalf of the defendants, Paulo McKeeby from the Morgan,

16    Lewis & Bockius firm in Dallas, Your Honor, and we're

17    ready to proceed.

18                 THE COURT:  How long you think you need?

19                 MR. MCKEEBY:  I -- sorry, I'm going to be

20    doing the argument, Your Honor.  15 to 20 minutes should

21    be fine.

22                 THE COURT:  Okay.  We'll proceed.  Hear from

23    the plaintiff first.

24                 MR. WREN:  Thank you, Your Honor.

25                 THE COURT:  Why don't you do it from the

1   podium, if you would, please, sir?

2              MR. WREN:  Yes, sir.

3              THE COURT:  That screen should -- small

4   screen should have the same thing that's on the big

5   screen.

6              MR. WREN:  Great.  Good morning, as I said,

7   I will be brief, Your Honor.  As you know, and I know

8   you are certainly aware, I've reviewed your opinion in

9   the Allen versus McWane case and others.

10             As you know, Congress has stated its intent

11  that employees who have been properly denied overtime

12  should have the opportunity to proceed collectively.

13  And as you have noted in Allen versus McWane, the Court

14  should foreclose that right to proceed collectively only

15  if the action relates to specific circumstances that are

16  personal to the plaintiff rather than to generally

17  applicable policy or practice.  And as the Supreme Court

18  has said, the collective benefit depends on the

19  employees receiving accurate and timely notice.

20             So, Your Honor, I want to focus very briefly

21  on what we know here at this preliminary notice stage.

22  First of all, turning to Tyler Technologies' own

23  handbook, Tyler Technologies personnel handbook.

24             On Page 1, the handbook -- Tyler

25  Technologies states that an individual Tyler company --

1    and Tyler is made up of a number of subsidiary

2    components now, all merged into one company with

3    divisions, but as the handbook says, an individual Tyler

4    company may have additional policies that supplement

5    this handbook, but if there is a difference between this

6    handbook and individual company policies, the handbook

7    shall control unless a policy specific to an individual

8    company has been approved by Tyler.  In other words,

9    Tyler corporate officer retains control, as you would

10   expect.

11            Turning to Page 9 of the handbook, there

12   is -- getting into the discussion of personnel.  The

13   human resources department at Tyler's corporate office

14   is responsible for handling employee records,

15   interpretation of policies, employee relations,

16   benefits, and related personnel administration functions

17   at Tyler.  This is important, Your Honor, because the

18   argument that has been made by the defendants is that

19   they are in my -- I'm using my words, not theirs, but

20   that they are a conglomeration of different companies,

21   subsidiaries operating autonomously, independently, and

22   that is, as I'm going to be walking through, is simply

23   not the case from everything that we have had made

24   available to us and have proceeded to the Court at this

25   point in time.

6

1               Going to the -- to Page 24 of the handbook,

2     specific to the question of review of personnel policies

3     including personnel compensation, we have this

4     statement:  "Tyler conducts" -- talking about Tyler

5     corporation -- "conducts individual compensation reviews

6     annually on or about each anniversary date following the

7     annual performance review.  Wage or salary increases are

8     not guaranteed; rather, they are based on individual

9     performance.  Wage or salary increases typically are

10    effective in the pay period ending after the dates they

11    are granted; however, increases may be retroactive at

12    the discretion of the manager."

13              In other words, Your Honor, all of the

14    policy or all of the personnel decisions pursuant to

15    Tyler's policy are centralized in the sense that the

16    ultimate review and responsibility for the payment of

17    these employees rest with Tyler corporate headquarters,

18    as would be expected.

19              We have seen from Mr. Lynn Moore, who's here

20    today, executive vice president of Tyler Technologies,

21    his own declaration speaks to the fact that Tyler, for a

22    period of time prior to 2005, after acquiring other

23    companies, would allow them to operate and did allow

24    them to operate autonomously as wholly owned

25    subsidiaries, but that that changed in 2005.

7

1              In 2005, there was a merger of all of these

2     subsidiary companies into Tyler Technologies into the

3     one single corporation and that from that point forward

4     as additional companies have been acquired.  They have

5     all continued then to be merged into Tyler Technologies

6     as one single company.

7              The declarations -- and, Your Honor, we have

8     provided as part of our pleadings in this preliminary --

9     for this preliminary certification and notice, we have

10    provided 20 declarations.  They come from nine different

11    locations, across five different states, from each of

12    the five categories of technical support personnel that

13    are -- for which we are seeking the right to proceed

14    collectively because they are all similarly situated.

15             These 20 different employees' declarations

16    all show that the -- there is a uniform practice, as

17    would be expected, where there is the ultimate direction

18    of personnel policies by corporate headquarters, that

19    there is no indication from those 20 declarations -- and

20    I'll speak in a moment to some of the managerial

21    declarations -- there is no indication of any sort of

22    individualized review to determine on an individualized

23    basis whether there is some basis to make them either

24    exempt or nonexempt as an individual separate and apart

25    from how they are being handled as a group.

1         These positions are all being handled

2    together, being addressed together for exemption or

3    nonexemption purposes, which points to the very fact

4    that they are similarly situated.  There is no payment

5    of overtime of any of these people, despite working, as

6    we've shown through these 20 declarations, in many cases

7    working 60, 70, 80, sometimes 90-hour weeks, no overtime

8    compensation.

9         Furthermore, as I've said, not only is there

10   no individualized analysis to see whether on an

11   individual as opposed to a group basis these employees

12   should be treated any differently from the group.  In

13   fact, Your Honor, the declarations have shown that there

14   are no time sheets kept.  There used to be, but those

15   have been discontinued at the direction Tyler corporate.

16        Across the board, there -- the

17   discontinuance of time sheets has, in fact, taken away

18   the potential for any sort of individualized

19   determination where it could be done on a record-kept

20   basis.  This is, as the affidavit of Kelly Ainsworth

21   points out, done -- this discontinuation of keeping any

22   sort of time sheets that would allow individualized

23   determination has been directed by Tyler corporate.

24        We further know from Mr. Ainsworth's

25   declaration who -- and Mr. Ainsworth, former management

1    with Tyler Technologies, that Tyler Technologies, at

2    least within -- after acquiring EDP in Longview and

3    substituting in its management in place of the EDP

4    management, has been treating all of the employees, with

5    exception of receptionist, as exempt, that the

6    compensation issues are handled by Tyler Technologies

7    out of their Maine corporate headquarters in Maine, not

8    on any sort of individualized or autonomous basis, that

9    from his knowledge, all the companies are brought into

10   Tyler divisions and do not work -- do work on any sort

11   of autonomous basis.

12           Your Honor, all this points to the fact that

13   these technical support personnel in these five

14   categories, implementation employees, customer support

15   employees, engineers, quality assurance employees, and

16   sales employees, all of these in -- in these five

17   varieties of technical support, these folks are all

18   being treated on a uniform basis, despite whatever

19   differences there may be in individual titles, in

20   individual job duties.

21           The basic -- as I understand the essential

22   arguments of Tyler Technologies, they've really pointed

23   to about three primary defenses.  One being that these

24   are multiple jobs with different duties and different

25   pay, but in digging into those declarations, both the

```
 1    employee declarations and the declarations of the
 2    management folks from Tyler Technologies, and by the
 3    way, they have provided no employee declarations, only
 4    management declarations, they can -- have not pointed to
 5    any difference in duties that is material to the
 6    question of whether we have FSLA violations, FSLA
 7    violations, and the differences are simply not material
 8    to determination for purposes of overtime -- entitlement
 9    to overtime pay.  Whether there is a violation, mostly
10    it goes to issues of damages.
11            They've raised the question of exemption,
12    whether there should be some sort of determination of
13    exemption here and whether that makes this appropriate
14    for a collective action.  Your Honor, as -- first of
15    all, as I've pointed out, in the declarations, there is
16    no indication of any sort of individualized
17    determination.  The very time sheets that we look to
18    have been discontinued by Tyler specifically so that
19    they would not have to account for the time that was
20    being spent.  And, furthermore, in their response, in
21    their briefing, they point to a case, Big Lots, out of
22    the Eastern District of Louisiana, talking about how
23    exemptions could potentially make it an inappropriate
24    case for collective determination.
25            And I want to be sure that the Court is
```

1   aware that as the Eastern District of Louisiana in a

2   subsequent opinion, in the Cooperman versus ECU -- the

3   ICF opinion which came out in November of 2008, of last

4   year, and it's cited in our materials, as they

5   acknowledge, the determination of exemptions is not

6   appropriate for this stage.  The reason it's not

7   appropriate is because the burden of proof is on the

8   defendant, that is, in essence, a merits determination,

9   and to proceed to it now, particularly where there has

10  been no showing of any event of any sort of indi --

11  individualized determination of exemptions, is

12  inappropriate to be determined as this preliminary

13  stage.  The only question at this stage is giving notice

14  so that the employees may properly come forward.

15          Finally, Your Honor, the third argument that

16  they basically raised is that these Tyler companies were

17  required to operate autonomously, therefore, these

18  employees should not be treated together, and that just

19  simply doesn't track with the handbook, it does not

20  track with the declaration of Mr. Lynn Moore or with the

21  management declaration of Kelly Ainsworth.  It does not

22  appear to be a -- an appropriate, accurate argument,

23  Your Honor.

24          For all of these reasons, we ask that at

25  this preliminary stage, the employees set forth in our

1   request, in our definition be provided with notice of

2   this so that we can go forward with the discovery of the

3   case.

4            And, Your Honor, thank you for the

5   opportunity to address this.

6            THE COURT:  Okay.

7            MR. MCKEEBY:  Thank you, Your Honor.

8            THE COURT:  Yes, sir.

9            MR. MCKEEBY:  I want to make it clear that

10   we're not asking the Court to decide the exemption issue

11   here today or at this preliminary stage, but the

12   exemption issue is relevant, and we have raised it in

13   our answer and otherwise in our -- in our briefing on

14   this issue because the issue is as to how this case is

15   going to be decided.

16            And how this case is going to be decided on

17   the exemption issue is that the Court and/or the jury is

18   going to have to determine whether or not the

19   representative testimony of a particular plaintiff can

20   bind the other members of the -- of the class if the

21   Court were to certify the class.

22            And essentially the argument would have to

23   be, Your Honor, that they could take, for example, an

24   implementation consultant out of Lubbock, Texas, have

25   that person testify or pick any imple -- implementation

1    consultant randomly from one of Tyler's office and have

2    that employee's testimony bind the rest of the people in

3    the class.  That testimony would be about what the

4    employees's functions were, whether or not the

5    employee's job was predominantly administrative, whether

6    or not the employee's job involved discretion and

7    judgment, all of the factors that the Courts and that

8    regulations tell us to apply in determining whether or

9    not in that case the administration -- the

10   administrative exemption applies.

11           And, Your Honor, the reasons set forth in

12   our brief, and I'll go over them more today, the

13   evidence here demonstrates that the divergences in jobs

14   are dramatic enough in this context so as to warrant a

15   finding that the employees here that would sought to be

16   certified are not, in fact, similarly situated.

17           Your Honor, we're familiar, as well, with

18   the -- with the other cases from this Court that have

19   involved requests to certify classes under Section 216,

20   the McWane case, also the Nelson case and the Mimms

21   case.  And in the latter two, Your Honor is, I'm sure,

22   aware, the Court did not certify a nationwide or as

23   broad a class as the plaintiffs had sought in those two

24   latter cases but rather certified a -- a more modest

25   class.

1            And those -- all of those cases are

2    critical, Your Honor, because they're distinct in this

3    situation because of the type of cases that were

4    involved.  None of those cases were exemption cases

5    where the Court and the jury is going to have to assess

6    the particular duties of individual employees.  Those

7    cases were all donning and doffing cases or similar

8    cases in which preliminary and post employment shift

9    activities were -- were not paid for, and it was fairly

10   easy in those cases for the Court to view, look, the

11   testimony of one person as to what donning and doffing

12   activities were to be engaged in prior to work would be

13   sufficient, would be -- would bind the other

14   representatives of the case because that testimony was

15   indicative of a common practice for policy.

16            And here, we don't have that.  We don't have

17   that in -- you don't have that in the exemption case

18   generally, and you particularly don't have that in this

19   case where the testimony is going to have to be by

20   nature anecdotal and not representative of a broad

21   policy or practice.

22            Your Honor, I think the history of Tyler and

23   its organization is absolutely relevant in this -- in

24   this case.  This is not a situation where you've got,

25   for example, a large retail establishment that opens

1    offices throughout the country when they see a need.

2              Tyler began operating in the software

3    systems and services to governments, schools, and

4    not-for-profit organizations in the mid-'90s and since

5    that time has acquired entities across the country that

6    have fit within that -- within that product niche, and

7    it essentially has inherited the designations of those

8    entities as to employment classifications, and they've

9    allowed those -- those offices -- those 37 offices

10   within Tyler to operate autonomously.

11             And the handbook that was -- that was

12   introduced by the plaintiffs in this case refers

13   generally to policies but doesn't talk about employment

14   classifications generally and doesn't talk about

15   employment duties specifically of -- of the various

16   employees that were sought to be certified.

17             And essentially the argument, Your Honor,

18   is -- is that because they were all treated as exempt,

19   they're similarly situated and therefore they should

20   be -- the class should be certified.  But that is not

21   the law.  The law is very clear that you have to show

22   more than simple -- the simple uniformity in how

23   employees are treated to determine certification even at

24   this stage.  You have to look at the similarities of the

25   job duties to determine whether or not class treatment

1    is fair, whether or not it's fair to allow one

2    implementation consultant, for example, to testify and

3    bind the rest of the group who fall into only that

4    category.  And, Your Honor, as plaintiffs acknowledge,

5    that's only one of the five job classifications that the

6    plaintiffs would seek to -- to have certified in this

7    case.

8            If this were simply -- when this case was

9    originally filed, Your Honor, there were seven employees

10   from the Longview office, which previously was EDP

11   Enterprises, the other defendant in this case, and if

12   they were the only -- if those were the only plaintiffs

13   in this case and that was the extent of the

14   certification that was sought, then we probably wouldn't

15   oppose class certification, but when they've attempted

16   to extend that beyond that single office to go

17   nationwide to cover five different classifications of

18   employees, technical support employees, implementation

19   consultants, systems engineers, quality assurance

20   employees, and now sales technicians, they go well

21   beyond the four corners of their office here in

22   Longview.  And, moreover, Your Honor, we're talking

23   about 37 different offices, we're talking about four

24   functional work groups.  Financial Management, which has

25   20 different offices, we're talking about City

1   Solutions, which has eight offices, Courts and Justices,

2   which has an office in Plano, and then the Property

3   Appraisal and Tax Division, which has eight separate

4   offices.  So a total of 37 different offices across the

5   country from Falmouth, Maine, to Renton, Washington,

6   they would seek so certify based primarily on the

7   declarations of the -- that they've submitted on behalf

8   of their -- of their motion.

9           And, Your Honor, if you look at those

10  declarations a little bit more closely than -- than the

11  plaintiffs would suggest, you see why they're not

12  representative or why they're not sufficient at least at

13  this stage to be representative of a -- of a class as

14  broad as they would seek to certify.

15          For example, one of the -- one of the

16  subgroups of employees that -- that has been designated

17  as quality assurance, they've got one declaration from a

18  quality assurance employee, Your Honor, and that's from

19  Plaintiff Pastor who was employed for a grand total of

20  four months in -- in -- out of the software group in --

21  in Plano.  She says in her -- in her testimony, in her

22  declaration that, again, she's a four-month employee,

23  but nonetheless can testify that from my experience, the

24  job title of Quality Assurance Analyst 2 was used by

25  Tyler Technologies, Inc., to refer to a group of Tyler

1   Technologies, Inc., employees that share the same job

2   position and the same job duties as I did.  No -- no

3   basis for how she knows that, no indication of what

4   employees she's talking to.  Has she traveled to other

5   offices?  You know, none of that is in the -- is in the

6   declaration, Your Honor, and that's the exact same type

7   of conclusory testimony that Courts have refused to

8   accept, and even in this preliminary context when

9   deciding certification.

10          Similarly, Your Honor, this sales support

11  position that's been referenced is supported by the lone

12  declaration of a Plaintiff Locchi, that's at Exhibit S

13  to plaintiff's motion, out of -- out of Lubbock, Texas,

14  so, again, a single employee that has no knowledge or

15  now foundation to testify that he can speak to the

16  duties and responsibilities of other employees in

17  different offices.

18          Similar with respect to systems engineers,

19  there's two declarations, both of whom come from

20  employees who worked at EDP here in -- or rather in

21  Longview, one of which, Your Honor, Plaintiff Maxwell,

22  who was not even employed by the company as of September

23  of 2007 when Tyler acquired the company, he was employed

24  by EDP prior to the acquisition and yet his declaration

25  is being offered to support certification of a

1   Tyler-wide class of, in that case, systems engineers.

2            With respect to implementation consultants,

3   Your Honor, they do have additional declarations, but,

4   Your Honor, I direct the Court respectfully to the -- to

5   the declaration of Chris Hepburn, who's in the company's

6   financial management group, also known as large cities,

7   and he talks about what -- what I think is going to be

8   critical to this case, is that implementation

9   consultants do different things depending on their

10  levels of experience, primarily depending on what office

11  they're working in, depending on the type of product

12  that they -- that they provide, and that's the case both

13  with implementation consultants and also with respect to

14  customer support employees.

15           For example, the support employees that work

16  in Lubbock, Texas, and this comes from the declaration

17  of Dane Womble, fall into different categories.

18  Frontline support employees who deal primarily with the

19  customers on a direct level over the telephone, advisors

20  who deal with more complicated issues and assist and --

21  and not so much -- not so important that it's just more

22  complicated, but the way they do their job is different.

23  They do their job differently as they're not doing as

24  much interaction with customers.  They're advising these

25  more -- more junior typically frontline supervisors in

1    handling particular problems.  And then you have also a

2    group of team leaders that fall within the customer

3    support category, at least in the Lubbock office, who

4    actually have input on -- in personnel decisions and

5    lead these groups of other employees.  And so all --

6    even within the particular office these employees are

7    doing different things.  To suggest that you can

8    randomly pick one of these employees to testify, "Here's

9    my job," and have that testimony bind the other

10   employees even within this office is -- is not fair and

11   not consistent with the jurisprudence on -- on this

12   issue.

13           Moreover, Your Honor, as you move from

14   office to office, you're going to find significant

15   differences based primarily on the size of the office.

16   For example, again, back to Mr. Womble's declaration, he

17   talks about the Lubbock office where there's a large

18   number of employees in, for example, the implementation

19   consultant position where they're highly specialized,

20   and they can afford to be because of the size of the

21   office.  Whereas, in other offices in Ames and Sioux

22   Falls over which he has supervisory responsibility,

23   which involve much smaller operations, less employees,

24   the implementation consultants in those positions have

25   to pretty much do everything.  They're not as highly

```
 1    specialized.  And so, again, the job duties are
 2    significantly different.
 3              And even looking -- as we set forth in our
 4    brief, even looking at the declarations of the
 5    plaintiffs themselves, there are significant differences
 6    that emanate.  For example, in the context of the -- of
 7    the customer support employees, Plaintiff Beall says
 8    that she worked exclusively doing remote troubleshooting
 9    and answered customer questions over the telephone,
10    whereas the other employees, for example, Plaintiff
11    Tullos, again, only worked for the company for a few
12    months, says that she performed all of those functions
13    plus spent 25 percent of her time doing configuration
14    work.  Whereas another customer support employment,
15    Plaintiff Bonner, says she also assisted in client
16    training activities.
17              And, again, the point is not to say that,
18    "Well, that makes some of these employees and some of
19    these -- exempt and others nonexempt."  The point is
20    that they're doing different things, and so it would be
21    fundamentally unfair and not what a 216(b) collective
22    action is supposed to be, to have one employee sit up on
23    the stand and tell the jury, "Here's what I do.  Decide
24    whether or not I'm exempt or nonexempt," and that --
25    that testimony bind to the remainder of the people
```

1   within that group because the jobs are so -- are so

2   different in this context.

3            And, Your Honor, we're not asking the Court

4   to traverse new legal ground here.  There are many cases

5   cited on our brief and otherwise in which Courts have

6   recognized the inherent difficulty in certifying a

7   class, again, even at the preliminary stage when an

8   exemption -- when the exemption issue is central to the

9   case as opposed to, again, donning and doffing or

10  tip-pooling or an age discrimination reduction in force

11  where you have a centralized decisionmaking process

12  where there is one policy that the Court can -- can

13  assess and the jury can assess to determine liability.

14           Here that can't be done because of the

15  individualized inquiry nec -- necessitated by the -- the

16  exemption analysis in determining whether or not these

17  folks are -- are properly classified.

18           Just a few examples, Your Honor.  The -- the

19  Safeco -- Mike v. Safeco case out of the district in

20  Connecticut where the Court denied, again at the

21  preliminary stage, that's 274 F. Supp. 216, denied

22  certification of the class because the Court determined

23  that the administrative exemption requires examination

24  of individual day-to-day tasks and would be inconsistent

25  with collective action.

1            Similarly, Your Honor, Holt v. Rite-Aid out

2    of the Northern District of Alabama, 333 F. Supp. 2d

3    1265, where the Court, again, denied certification

4    because it was clear that the, quote, Court would have

5    to inquire at the second stage as to the daily tasks of

6    each putative collective action member to determine

7    whether they are similarly situated to the persons

8    identified by the plaintiffs.

9            Also, the Morisky case and others that we've

10   cited in our brief, Sheffield, that talk about in the

11   context of an exemption analysis, you've got to be very

12   careful, and the very nature of the analysis dictates --

13   or mitigates against collective action where there's

14   some evidence, as there is here, that the job duties are

15   disparate from plaintiff to plaintiff and from

16   collective member to collective member.

17           THE COURT:  Is there any suggestion that

18   y'all have more than one employee handbook that

19   controls -- asserts an ultimate control of the policies?

20           MR. MCKEEBY:  We have one employee handbook,

21   Your Honor, but if you look at the policies that -- that

22   are contained in the handbook are very general and

23   ultimately they're not particularly relevant to what's

24   to be determined in this case.  They don't deal with job

25   duties.  I mean, not for example, I mean, that is the

1    issue.

2              What are these -- what are these employees

3    doing on a day-to-day basis?  And the handbook -- the

4    fact that there might be a centralized human resources

5    department and the fact that the handbook might apply to

6    all employees with respect to, for example, a sexual

7    harassment policy or when performance reviews are to be

8    given is of no relevance of what's to be determined in

9    this case.

10             What's to be determined in this case are

11   what do the employees do and whether or not it's fair

12   and consistent with 216(b) to allow an employee randomly

13   selected in one of these particular job classifications

14   to testify about his or her duties and functions and

15   have that bind the other -- the other members of the --

16   of what would be the class if -- if what we think would

17   be the incorrect certification of it.

18             So, no, there's no other handbook, but the

19   handbook I think respectfully is a red herring in the

20   sense that it doesn't relate to what's ultimately at

21   issue in this -- in this case.  This case is going to be

22   decided not by the handbook but by what the employees

23   testify and what we can show as to what their duties are

24   and whether or not those duties are sufficient that they

25   be classified as -- as exempt employees based on their

1   exercise of judgment and discretion, based on their

2   exercise of administrative as opposed to production

3   roles, and you're going to find none of that in the

4   handbook, and the plaintiffs haven't directed the Court

5   to anything in the handbook that relates -- that relates

6   to those -- to those issues.

7        Your Honor, in closing, we recognize that

8   the easy approach in this case might be to certify the

9   class based on -- based on the standard and the

10  discretion that's yielded in the Court, but -- but it's

11  a discretion that should be used cautiously.  And, you

12  know, the Big Lots case is -- is representative because

13  it shows what can happen in these kinds of cases when

14  this -- the analysis at this stage is not as thorough as

15  it -- as it maybe could be, quite frankly, in that you

16  certify the class continually and then later on

17  decertify it.  And, Your Honor, our office has -- has a

18  case for Dollar General, which we drove by on the -- on

19  the way here, where -- out of -- out of Alabama where

20  the Court conditionally certified a class and then later

21  decertified it.  And I don't think any of those cases

22  are in the Eastern District, but after the

23  decertification, there are literally 1,600 different

24  cases floating around the federal district courts, 60 of

25  them in the Northern -- I think 60 of them in the

1    Northern District of Dallas, and that's what happens

2    when you certify a case at this preliminary stage, allow

3    notice to go out to a volume of parties who currently

4    don't have any idea or any thought that they're going to

5    be in federal court, and then say later on when there is

6    more evidence in front of the -- in front of the Court,

7    "No, certification is improper."

8             That's the -- that's the ramification of

9    that type of analysis, and that's why -- that's why the

10   cases that I've cited to the Courts today, the Courts

11   have looked at this situation in the exemption context

12   in particular, and, again, I want to emphasize how

13   different the proof in this type of case is to the

14   donning -- in the donning and doffing cases, age

15   discrimination cases, other types of cases where

16   collective actions may be appropriate because there is a

17   policy.

18            What is going to be in front of the jury is

19   whether or not it was a violation of the Fair Labor

20   Standards Act to require employees to don whatever

21   particular protective year is at issue in a particular

22   donning and doffing case.  And that type of testimony is

23   going to be much more likely in general here, but much

24   more likely to be representative than this type of

25   exemption case where each employee is going to have to

1    testify about his or her job duties.

2           And Tyler, in its defense of the case, is

3    going to have to elicit testimony about individual job

4    responsibilities from different -- different plaintiffs.

5    The testimony and the evidence is going to be by its

6    very nature anecdotal, not policy or practice-wide as

7    you see in the cases in which certification is granted.

8           Thank you, Your Honor.

9           THE COURT:  Well, you may be right,

10   Counselor, you know, but that -- there may be defenses

11   that I may change my mind, but I'm going to

12   conditionally certify the purpose of giving notice.

13          Now, where are y'all on the notice?  What --

14   what problems do you have with the notice?

15          MR. MCKEEBY:  Well, we've raised some

16   problems in our briefing.  We haven't really had any

17   conference about it, but I might suggest that we -- we

18   do so.  It's --

19          THE COURT:  Well --

20          MR. MCKEEBY:  You know, I can delineate the

21   problems that I have with the proposal.

22          THE COURT:  Well, I notice some of them.  I

23   think you ought to try to work it out.  Now, here the

24   thing about it, if you've got e-mail addresses, I mean,

25   I don't see why to the extent you've got them they ought

1    to be included in what you furnish to the plaintiffs.

2              As to the wording of the notice, I don't

3    want my signature on the notice, and I never have had my

4    signature on the notice, and it shouldn't be from me.

5    It -- if you follow what I've done previously, I think

6    you ought to be able to work it out, but I want to give

7    you a time frame to either -- how long do y'all think

8    you need to either -- to submit to me what you will

9    agree upon, and if you can't agree upon it, submit what

10   you can't agree upon so I can get one done.

11              MR. MCKEEBY:  10 days.

12              MS. BAGLEY:  That sounds fair.

13              THE COURT:  Okay.  If y'all do that, then

14   we'll get it done, and I think the defendant is -- you

15   object to the way it's worded about the date of the

16   order, or do you want to -- how do you want to -- what's

17   the problem there?  Do y'all think y'all can work that

18   out?

19              MR. MCKEEBY:  I think -- I suspect we can

20   work it out, but I think it should be as to the -- as to

21   the date as opposed to saying 90 days from an

22   unspecified date.

23              THE COURT:  I don't have any problem with

24   that.

25              MS. BAGLEY:  I don't either.

```
 1              THE COURT:  Y'all can work that out.

 2              MR. MCKEEBY:  Yeah, I -- I suspect that --

 3              THE COURT:  If y'all can get that to me

 4   within 10 days, then we'll get it done.

 5              MS. BAGLEY:  Thank you, Your Honor.

 6              MR. MCKEEBY:  Thank you, Your Honor.

 7              MR. WREN:  Thank you, Your Honor.

 8              COURT SECURITY OFFICER:  All rise.

 9              (Hearing concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         CERTIFICATION

 2

 3              I HEREBY CERTIFY that the foregoing is a

 4     true and correct transcript from the stenographic notes

 5     of the proceedings in the above-entitled matter to the

 6     best of my ability.

 7

 8

 9
       SHELLY HOLMES                          Date
10     Deputy Official Reporter
       State of Texas No.: 7804
11     Expiration Date:    12/31/10

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```