IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PATTY BEALL, MATTHEW MAXWELL, TALINA MCELHANY AND KELLY HAMPTON, individually and on behalf of all other similarly situated; | § § § § § | |
| Plaintiffs, | § § | 2:08-cv-422   TJW |
| | § § | |
| TYLER TECHNOLOGIES, INC. AND EDP ENTERPRISES, INC. Defendants. | § § § § | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF THEIR MOTION FOR DECERTIFICATION**

## TABLE OF CONTENTS

                                                                                                                          **Page**

I.      INTRODUCTION ................................................................................................................ 1

II.     ARGUMENTS AND AUTHORITIES............................................................................... 3

        A.      Plaintiffs' proposed subclasses contravene the purposes of an FLSA collective action ................................................................................................... 3

        B.      Tyler has not argued that Plaintiffs must be "identically" situated and the cases cited by Plaintiffs are distinguishable............................................................ 5

        C.      The subclasses proposed by Plaintiffs do not cure the procedural defects associated with collective treatment ..................................................................... 7

                1.       The Proposed MUNIS Subclass.................................................................. 7

                2.       The Proposed Incode Subclass.................................................................... 9

                3.       The Proposed Eden Subclass ...................................................................... 9

        D.      The application of the overtime exemptions renders collective treatment inappropriate and are procedurally unfair............................................................ 10

        E.      Chris Hepburn's testimony does not assist Plaintiffs in meeting their burden to show that they are similarly situated ..................................................... 12

III.    CONCLUSION................................................................................................................ 13

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Carlson v. Leprino Foods*,
  1006 U.S. Dist. LEXIS 48589 (W.D. Mich.  June 30, 2006) ....................................................... 4

*Damassia v. Duane Reade, Inc.*,
  2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006)............................................................................... 6

*Hoffman-LaRoche, Inc. v. Sperling*,
  493 U.S. 165 (1989).................................................................................................................. 4

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009) .................................................................................................... 7

*Nerland v. Caribou Coffee Co.*,
  564 F. Supp. 2d 1010 (D. Minn. 2007)..................................................................................... 7

*Reed v. County of Orange*,
  266 F.R.D. 446 (C.D.Ca. Jan. 8, 2010)..................................................................................... 4

*Reyes v. Texas EZPawn*,
  2007 WL 101808 (S.D. Tex. Jan. 8, 2007)............................................................................... 4

*Scott v. Aetna Servs*,
  2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006).......................................................................... 6, 7

*Thiessen v. General Electric Capital Corp.*,
  267 F/3d 1095 (10th Cir. 2001) ................................................................................................ 4

*Vinole v. Countrywide Home Loans*,
  571 F.3d 935 (9th Cir. 2009) .................................................................................................... 7

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF THEIR MOTION FOR DECERTIFICATION**

Defendants Tyler Technologies, Inc. and EDP Enterprises, Inc. (collectively, "Tyler") file this Reply to Plaintiffs' Response to Tyler's Motion to Decertify the conditionally certified class ("Response") and, in support thereof, respectfully show as follows:

**I.
INTRODUCTION**

At the conditional certification stage, Plaintiffs urged that all Tyler employees in the prospective class were "similarly situated" based in part on common policies contained in Tyler's human resources manual.  Plaintiffs' motion for conditional certification was supported by declarations from Plaintiffs and others announcing there were no material differences in the job functions among the then five different groups of employees before the Court.  Plaintiffs now acknowledge that their position, and the basis on which this case was conditionally certified, was erroneous.

After the parties' partial settlement currently pending approval by the Court, there remain only 31 Plaintiffs, all in implementation related positions.  Plaintiffs now contend, through their Second Amended Complaint—filed literally on the eve of Tyler's deadline to file its motion to decertify—that, for this case to be efficiently tried as a Section 216 collective action under the Fair Labor Standards Act ("FLSA"), the remaining Plaintiffs must be divided into eight separate subclasses.  While Plaintiffs' decertification briefing mentions subclasses based on six Tyler divisions, Plaintiffs' Second Amended Complaint identifies three subclasses—"client liaisons," "trainers," and "implementation employees"—the latter of which Plaintiffs propose to further divide into six different subclasses.[1]

---

[1]   *See* Plaintiffs' Second Amended Collective Action Complaint at p. 8-9. Dkt. No. 143.  It is not at all clear which Plaintiffs would fall into each proposed subclass.  For example, neither Plaintiffs' Second Amended

Plaintiffs' eleventh hour effort to replead their case contradicts not only the arguments they originally made to the Court to justify conditional certification, but also the position they continue to advance. For example, Plaintiffs, in both their First and Second Amended Complaints, assert that, "Tyler Technologies, Inc. sells a wide variety of software products for use by public entities. Although the software packages are designed for different applications, the **job duties of the implementation specialist/consultants are essentially the same.**" (emphasis added).[2] The declarations submitted by Plaintiffs in support of conditional certification also were replete with assertions that the job duties of implementation employees were identical across Tyler divisions.[3] Finally, while Plaintiffs' Second Amended Complaint seeks to create separate subclasses of trainers and implementation employees, it also states "[T]rainers, implementation consultants, and/or implementation specialists are job titles that involve the same or similar duties."[4]

Plaintiffs thus have come full circle and now, at least implicitly, concede what Tyler has argued all along that the distinctions in job functions make collective treatment under the FLSA improper and unfair. Notwithstanding Plaintiffs' dramatic change of position as to how this case should be litigated, Plaintiffs still cannot meet their burden to establish they are similarly situated

---

Complaint nor their decertification briefing indicate whether or not the three EDP Plaintiffs, who held the title of "client liaison," would be covered both by the "client liaison" subclass and the "EDP subclass," which itself falls within the proposed "implementation class." Similarly unclear is whether the four individuals, who also apparently worked for EDP, referenced as comprising the "trainer" class are the same subclass members who also would comprise the "client liaison" class or the "EDP subclass."

[2]     *See*, fn. 2 ¶ 6.9 in Plaintiffs' First Amended and Second Amended Complaints.

[3]     *See*, *e.g.,* Declaration of Tony Dodd: "From my experience, the job title 'implementation specialist' was used by Tyler Technologies, Inc. to refer to a group of Tyler Technologies, Inc.'s employees that share the same job position and same job duties as I did." (Emphasis added). Dkt. No. 18:13. Declaration of T. McElhany: "From my experience, the job title 'implementation specialist' was used by Tyler Technologies, Inc. to refer to a group of Tyler Technologies, Inc. employees that share the same position and same job duties as I did." (Emphasis added). Dkt. No. 18:10.  *See also* the following Declarations which contain identical language for implementers of other types of software:  Declarations of Kim Huynh (implementation specialist, Odyssey software) Dkt. No. 18:7, Ilene Meyers (implementation specialist, MUNIS software) Dkt. No. 18:14, Tom O'Haver (implementation consultant, Eden software) Dkt. No. 18:14, Joy Bibles (implementation consultant, Eden software) Dkt. No. 18:16, Wayne Todd Davis (implementation specialist, MUNIS software) Dkt. No. 18:17.

[4]     *See* Plaintiffs' Second Amended Complaint, ¶ 6.9.  Dkt. No. 143.

and that this case should be tried as a Section 216(b) collective action.

First, the tangled web of subclasses proposed by Plaintiffs, particularly relative to the few remaining Plaintiffs in the case, completely eviscerates the goal of judicial efficiency associated with a FLSA collective action. It makes no sense whatsoever, from the prospective of judicial efficiency or otherwise, to split a case of 31 plaintiffs into eight different subclasses, three of which consist of three or less plaintiffs. This case should be decertified and tried separately in the forums where the witnesses reside and can be subpoenaed and such that each Plaintiff be required to prove his or her own cases on an individual basis.

Moreover, the subclasses proposed by Plaintiffs do not address the fundamental differences in job functions explained in Tyler's decertification motion. Even within the proposed subclasses, there remain significant and material differences in job duties among class members. Many of these differences go to the heart of Plaintiffs' claims and Tyler's defenses concerning the application of the administrative and computer professional exemptions under the FLSA. For these reasons, this case cannot be efficiently or fairly adjudicated as a collective under Section 216(b), and Tyler's motion for decertification should be granted.

## II.
## ARGUMENTS AND AUTHORITIES

**A.     Plaintiffs' proposed subclasses contravene the purposes of an FLSA collective action.**

After the Court conditionally certified this case in June of 2009, Tyler sent notices to more than 1,100 current and former employees in the applicable job titles originally identified by Plaintiffs. After the parties agreed to a partial settlement, and after months of discovery, only 31 Plaintiffs remain in the case. (That number is generously high given that Plaintiffs have been unable to produce four opt-ins for deposition and apparently concede that one opt-in Plaintiff, Bonner, should not be part of the class.)

Despite the already small size of their class, Plaintiffs now would have the Court divide the class into eight separate subclasses.  As Plaintiffs concede in their Response, one of these classes consists of one member, while two others consist of only three members.  As the cases cited below demonstrate, this is not how an FLSA collective action should be litigated.  Conducting eight separate "mini-trials" to assess the exempt status of the subclasses does not further the goal of judicial efficiency, while the due process fairness concerns associated with representative proof remain.

A Section 216(b) collective action is designed to afford "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact."[5]  In light of this objective, the court must "… consider whether it can coherently manage the class in a manner that will not prejudice any party or be particularly burdensome on a jury."[6]  In *Reyes*, the court held that "in light of the individual analysis each plaintiff's claim will require, the judicial inefficiency of having essentially forty plus mini-trials clearly outweighs any potential benefits in proceeding as a collective action."[7]  Similarly, in *Reed v. County of Orange,* the court decertified part of the plaintiffs' claims despite the plaintiffs' "last-ditch effort to ask the Court to divide the claimants into three sub-classes."[8]  The court disagreed with the plaintiffs that such subclasses "would avoid the level of chaos and confusion that will result from hearing these claims together,"[9] and held instead that having "a single trial will not merely result in confusion and inefficiency, it will inject chaos into the fact-finding process."[10]

---

[5] *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989).
[6] *Reyes v. Texas EZPawn*, 2007 WL 101808, at *6 (S.D. Tex. Jan. 8, 2007), citing *Thiessen v. General Electric Capital Corp.*, 267 F/3d 1095, 1105 (10th Cir. 2001) (finding that maintaining the collective action "impose[d] extraordinary burdens on the jury, both in terms of quantity of evidence and the length of trial.").
[7] *Id.* at *6.
[8] 266 F.R.D. 446, 456 (C.D.Ca. Jan. 8, 2010).
[9] *Id.*
[10] *Id. See also, Carlson v. Leprino Foods*, 1006 U.S. Dist. LEXIS 48589, at *18 (W.D. Mich. June 30, 2006) ("The Court has considered the possibility of employing separate classes and subclasses as to a national action, but

At a trial of this case, the factfinder would be required to listen to the testimony of at least one representative member of each of the eight proposed subclasses and sort through the differences in testimony regarding job functions and application of the FLSA exemptions. The relatively few number of remaining Plaintiffs in this case, coupled with the acknowledged need to divide those Plaintiffs into eight different subclasses, renders this case peculiarly improper for collective treatment under the FLSA.

**B.     Tyler has not argued that Plaintiffs must be "identically" situated and the cases cited by Plaintiffs are distinguishable.**

Plaintiffs suggest throughout their Response that Tyler's motion for decertification requires them to meet some elevated burden of proof. Tyler has not argued that Plaintiffs must establish that they are identically situated. To the contrary, the issue is whether there are differences in job functions significant enough to render the case improper for representative proof. Plaintiffs may be correct that the contours as to the degree of differences necessary to defeat certification may not have been fully established by any judicial test and therefore must be decided on a case-by-case basis. Nonetheless, when one Plaintiff testifies she spent 80% of her time conducting class room training of Tyler's customers on how to use software, and another Plaintiff, who worked in the *same* division, testifies she did not spend any time performing class room style training, but rather simply explained to select groups of employees how to perform the initial set up the system, that surely is sufficiently "material" to render collective treatment improper.[11]

---

has determined that such a suit would be entirely unwieldy in terms of the number of distinct classes and the distinctiveness of the factual scenarios involved—which would make such an approach a blue print for jury confusion.").

[11]     *See* Deposition of Betty Dupree, a MUNIS implementation consultant, who testified she spent 80% of her time during the relevant time period engaged in class room style training end uses how to utilize Tyler's software. Tyler Exh. 8, Dupree Dep. p. 44:12-18. Joy Flynn, also a MUNIS implementation consultant, testified that she did not train employees but rather simply met with payroll and human resources employees to explain how to perform the initial set up of the system. Tyler Exh. 7, Flynn Dep. p. 74:21, 75:14.

The cases cited by Plaintiffs are distinguishable. First, the majority of the cases referenced in Plaintiffs' Response concern whether conditional certification was proper at the notice stage, which involves the application of a more lenient standard than the one applied at the decertification stage.[12] For example, Plaintiffs cite *Damassia v. Duane Reade*,[13] an unpublished decision from the Southern District of New York. The *Damassia* court, applying the "fairly lenient standard" at the preliminary notice stage, conditionally certified the case. The court observed, however, that, "defendant's attacks on plaintiffs' affidavits and other evidence raise questions as to whether plaintiffs could prevail under a more stringent standard and whether the opt-in plaintiffs will survive a decertification motion at the close of discovery."[14]

Plaintiffs also cite a district court decision from Connecticut, *Scott v. Aetna Servs*,[15] and make the naked assertion that *Scott* is "a substantially similar case" and that Plaintiffs in this case and the Systems Engineers in *Scott* "perform the same job duties."[16] In fact, the Scott opinion does not address in any detail the job duties of the Systems Engineers and only vaguely mentions that each Systems Engineer "installs, implements, and supports large scale and mid-range technologies (hardware/software,)"[17] and that the work performed by the Systems Engineers generally concerned "specific computer platforms that support the electronic services provided to its customers."[18] From these general statements, Plaintiffs leap to the unwarranted conclusion that the "System Engineer" position is similar to varied roles of Plaintiffs.

Other courts also have squarely rejected the *Scott* court's implication that, because the

---

[12] *See, e.g., Damassia v. Duane Reade, Inc.*, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006) (courts "use a fairly lenient standard in deciding whether notice is proper," the notice stage normally requires a "modest factual showing" and the plaintiff's "burden at this preliminary stage is 'minimal.'")
[13] 2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006).
[14] *Id.* at *5.
[15] 210 F.R.D. 261 (D. Conn. 2002).
[16] Plaintiffs' Response, pp. 13-14.
[17] *Scott*, 210 F.R.D. at 263.
[18] *Id.* at 265.

company "applied a blanket overtime exemption policy" to the Systems Engineers, their job duties "may be established by generalized proof."[19] For example, in *Vinole v. Countrywide Home Loans*, the plaintiffs urged the court to "adopt a rule that class certification is warranted…whenever an employer uniformly classifies a group of employees as exempt, notwithstanding the requirement that the district court conduct an individualized analysis of each employee's actual work activity."[20] The Ninth Circuit rejected this approach.[21]

C. **The subclasses proposed by Plaintiffs do not cure the procedural defects associated with collective treatment.**

Even if the Court were inclined to allow a group of 31 Plaintiffs to divide themselves into eight different subclasses, there remain significant differences in job functions within the proposed subclasses. Despite Plaintiffs' best efforts to contort the evidence, the Plaintiffs within the proposed subclasses are not similarly situated.

1. **The Proposed MUNIS Subclass.**

For example, Plaintiffs' assertion that none of the employees within the proposed MUNIS subclass performed "systems analysis" or "business process reviews" is inaccurate. While some MUNIS Plaintiffs testified that their project managers performed these functions, others testified that they regularly met with clients to review and analyze their processes and systems to determine how Tyler's software could be implemented consistent with those processes and systems. Ronald Grimwood, a MUNIS implementation consultant who worked out of his home in Florida, testified that part of his job involved meeting with customers to show alternatives within the customer's operational plan, and that meeting with customers to

---

[19] *Id. See, also, Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1014 (D. Minn. 2007) ("just as defendant was able to determine on a collective basis that all of its store managers were employed 'in a bona fide executive … capacity,' so, too, this Court can determine on a collective basis whether defendant's decision was correct."). Although Plaintiffs also rely on *Nerland* in their Response, the Ninth Circuit, in *Vinole* and *Wells Fargo*, explicitly rejected this approach.
[20] 571 F.3d 935, 346 (9th Cir. 2009).
[21] *Id.*; *see also, In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009).

understand their current software and information processes was a function performed at times by the project manager and at other times by him, depending on the particular project.[22] Similarly, Plaintiff Amy Dunn, a MUNIS implementation consultant who worked out of her home in Maine, met with customers to learn their business processes in connection with the implementation component of her job.[23] Finally, Plaintiff Travis Void, a current MUNIS implementer who works in the Raleigh-Durham, North Carolina office, testified extensively about his involvement in "systems analysis" functions in which he learned the customer's legacy systems and processes to assess how those processes would work within Tyler's software.[24]

Other significant functions in the implementation process were performed by some, but not all, Plaintiffs within the proposed MUNIS subclass. For example, while most of the members of the proposed MUNIS subclass testified that they performed software "configuration" work, Geraldine Ingram, a MUNIS implementation consultant who worked out of the Raleigh-Durham office, testified she performed no configuration functions.[25] In addition, it simply is not true that the "actual scheduling of customer training was preordained by the project manager for all members of the MUNIS subclass."[26] Several members of the proposed MUNIS subclass testified that they in fact did meet with customers to determine who should be trained and when such training should be scheduled. For example, Bethany Maynard, a MUNIS implementer who worked out of both her home and the Falmouth, Maine office, acknowledged she would suggest changes and recommendations to how project plans were drafted and had the "freedom to develop [her] own training procedures for Office and Chrystal modules where

---

[22] Ex. 35, Grimwood Dep. p 15:12-16:23; 20:2-21:22.
[23] Ex. 36, Dunn Dep. p. 41:23-44:17.
[24] Ex. 37, Void Dep. p. 54:3-56:17. During this process, Void indicated he would provide the customer with different features and options within the software and assist the customer if they requested modifications that might involve some enhancement to the software at an additional expense. Ex. 37, Void Dep. p. 57:1-24.
[25] Ex. 25, Ingram Dep. p. 70:15-71:12.
[26] *See*, Plaintiffs' Response at p. 25.

procedures were not as well defined."[27] Maynard also acknowledged that she assisted her project manager in planning the training schedule for a particular client.[28]

### 2. The Proposed Incode Subclass.

The disparities in job functions within subclasses are not limited to the proposed MUNIS subclass. In the proposed Incode subclass, which has only three members, Plaintiff Eric Emde testified that "only a very small piece" of his job involved software configuration and that a separate configuration programmer performed these functions on the projects to which he was assigned.[29] Plaintiff Loraine Mutch, also an Incode implementer, on the other hand, indicated that she spent a significant amount of time on configuration related functions and that at times it would take a full week to perform these functions at the customer location.[30] Mutch testified that she performed no training with the customer during this first week of work in which she configured the software.[31] As pointed out in Tyler's Motion, Melanie Baird, also within the proposed Incode subclass, did not even consider herself an "implementation specialist" in part because she did not train customers how to use Tyler's software.[32] Moreover, as explained in Tyler's Motion, Baird performed job functions that were unique to her role and not shared by other members of the proposed Incode subclass.[33]

### 3. The Proposed Eden Subclass.

The job functions of the implementation employees in the Eden division also varied

---

[27] Ex. 38, Maynard Dep. p. 81:17-82:22.
[28] Ex. 38, Maynard Dep. p. 87:7-22. *See also*, Ex. 37, Void Dep. p. 51:20-52:15 (Void would create an agenda from a company template which he would coordinate on and obtain approval from the client but which he only occasionally would submit for approval to his project manager); Ex. 36, Dunn Dep. p. 58:6-60:11 (Dunn would meet with the customer to discuss who needed to be trained to set up an agenda and schedule that she reduced to writing to govern the training schedule for the customer. This document would not be submitted to the project manager for approval.)
[29] Ex. 22, Emde Dep. p. 87:7-88:17.
[30] Ex. 39, Mutch Dep. p. 53:4-54:21.
[31] Ex. 39, Mutch Dep. p. 57:10-25.
[32] Ex. 31 and Ex. 40, Baird Dep. p. 45:5-15; 96:1-19.
[33] *See* Tyler's Motion to Decertify at p. 20-21. Dkt. No. 145.

significantly depending on the type of software being implemented and the seniority of the employee. For example, Eyvonne Wilton implemented the Eden payroll module but testified that she did no configuration work and could not fix errors because she was too "green."[34] On the other hand, David Hayner spent a significant amount of his time configuring the financial software which he implemented: "Most of what I do is questions, asking them questions. Is this what you mean? Well, if it is not what you mean, how exactly do you want this? … A real basic example is there are 600 to 700 system preferences within Tyler and how you set one of those system preferences can make a huge difference."[35] Hayner further testified that differences exist in the financial software, with certain modules being much more "intricate" and requiring the implementer to talk to the client to "… get them to come up with how they want the software to work and show them how they can set it up for that as opposed to GASB words either here or it's there."[36] To further illustrate these differences, Hayner testified that he struggled when he started implementing payroll software: "Learning the functioning of the payroll module, piece of cake. Learning all of the detail behind payroll and all the possibilities that exist is mind boggling."[37]

D.  **The application of the overtime exemptions renders collective treatment inappropriate and are procedurally unfair.**

Plaintiffs' dismissal of the individual defenses applicable to certain Plaintiffs is not compelling. For example, while Plaintiffs seem to concede that Jason Bonner, a nonexempt employee who was paid by the hour, is not properly part of the conditionally certified class, he remains an opt-in Plaintiff and, unless and until he is dismissed, could be called to testify on behalf of the other Plaintiffs in a representative action. Similarly, Plaintiffs wrongly suggest that

---

[34] Ex. 41, Wilton Dep. p. 53:3-54:23.
[35] Ex. 30, Hayner Dep. p. 41:10-23.
[36] Ex. 42, Hayner Dep. p. 39:17-40:19.
[37] Ex. 42, Hayner Dep. p. 58:8-13.

Jill Brown's services as project manager occupied only a minor part of her time. In fact, Brown testified that from June 2008 until August 2009 she functioned in a project manager role.[38]

Moreover, and perhaps more importantly, the issue is not simply that certain individual defenses may apply to some but not all Plaintiffs. Rather, the key is that the proof relevant to the application of the FLSA exemptions as to each Plaintiff will necessarily vary based on the particular job duties performed. Plaintiffs' argument that they must be similarly situated simply because Tyler has pled affirmative defenses based on the administrative and computer professional exemptions is superficial and misunderstands the nature of the defenses. That all of the Plaintiffs may be exempt does not mean that they are similarly situated.

For example, Plaintiffs such as Travis Void, Bethany Maynard, Sandra Dunning, Ronald Grimwood and Linda Carrington performed significant and sophisticated system analysis work in which they met with customers to discuss and map out different software features and alternatives. Plaintiffs acknowledge that other class members did not perform these functions. The evidence as to exempt status will vary significantly depending on these kinds of differences, as the factfinder will be required to assess, in the context of the administrative exemption for example, whether these types of functions involve sufficiently significant levels of independent judgment and discretion to warrant application of the exemption. The representative proof associated with an FLSA collective action is improper, and procedurally unfair, because there is the potential that the testimony of Plaintiffs who never performed these types of functions will bind the Plaintiffs who did. This is precisely why Plaintiffs cannot meet their burden to show that this case should proceed to trial as a collective action.

---

[38]  Ex. 11, Brown Dep. p. 61:8-16, 62:10-63:16.

**DEFENDANTS' REPLY BRIEF IN SUPPORT**
**OF THEIR MOTION FOR DECERTIFICATION – PAGE 11**
DB1/66062185.1

> **E.     Chris Hepburn's testimony does not assist Plaintiffs in meeting their burden to show that they are similarly situated.**

Plaintiffs cite the testimony of Tyler's corporate representative, Chris Hepburn ("Hepburn"), as to the steps and processes generally associated with installation and implementation of software. But, simply because processes, at a very general level, may be similar, does not mean that the employees who perform functions within those processes do the same jobs. In fact, Hepburn testified to the contrary—that the job duties of implementation consultants and specialists, even within the same Tyler division, are "different at every client and every implementation."[39] The reasons for these differences include varying levels of seniority, differences in knowledge and understanding of different software modules, and differences in the actual type of software being implemented.[40] When asked by Plaintiffs' counsel whether Hepburn had "discussed everything that [he] would have done when [he] analyze[d] the current business practice of a customer," Hepburn clarified:

> Every single client is different. Every single implementation is different. There is no – there is no cookie cutter approach. So it's hard for me to answer that because at Client A, I may have dealt with the banking items. At Client B I may not have. So it's – I think the example is just that. It's an example but not meant to imply that that's – that there was a set – a set model that was repeatable.[41]

Hepburn emphasized throughout his deposition that the job duties and functions of the implementation specialists and consultants varied greatly based on factors such as the project managers' supervision styles and delegation preferences.[42] For example, when asked whether implementation specialists within the school division configure software, Hepburn replied: "not every implementor."[43] Moreover, in his deposition, Hepburn emphasized that Tyler software

---

[39]     Ex. 43, Hepburn Dep. p. 55:12-15, 19-23.
[40]     Ex. 27, Hepburn Dep. p. 49:1-12; 50:17-51:22; 107:4-108:7
[41]     Ex. 43, Hepburn Dep. p. 24:20-25:23.
[42]     Ex. 43, Hepburn Dep. p. 47:3-7, 23-49:12; 67:21-69:8.
[43]     Ex. 27, Hepburn Dep. p. 50:17-22.

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF THEIR MOTION FOR DECERTIFICATION – PAGE 12**
DB1/66062185.1

implementations can vary dramatically in terms of length and complexity.[44]  Accordingly, the implication that, because software installation and implementation involve similar steps, employees who perform implementation functions must do the same work within those processes is unwarranted and contrary to the evidence.

Of similarly limited relevance is Plaintiffs' reliance on Hepburn's testimony concerning training and job evaluations.  That implementation employees generally received training by reading software manuals and "shadowing" more senior employees does not mean that each employee receives the same amount or kind of training and, moreover, does not mean that employees perform the same job functions once they complete training.  Indeed, the Plaintiffs themselves testified to different experiences with respect to the training they received.[45]  Moreover, Tyler's utilization of form performance evaluations, which are applicable to employees in a variety of jobs, and which measure general performance criteria—such as judgment, teamwork, and attitude—as opposed to performance of discrete job functions, does not support the conclusion that implementation employees perform the same job functions and are similarly situated.

### III.
### CONCLUSION

The depositions of the Plaintiffs have confirmed what Tyler has been arguing to this Court since this case was filed—that there is not a sufficient degree of commonality in the jobs performed by Plaintiffs to warrant collective treatment of Plaintiffs' overtime claims.  Even among the eight subclasses belatedly proposed by Plaintiffs, there remain significant disparities

---

[44] Ex. 43, Hepburn Dep. p. 55:7-23; 56:17-57:5; 63:7-64:19.

[45] *See, e.g.* the deposition of Amy Dunn, a MUNIS implementer, who indicated she read no manuals and reviewed the actual software on her lap top to train herself to do her job. Ex. 36, Dunn Dep. p. 24:25-25:11.  Sandra Dunning, on the other hand, testified that she traveled to the MUNIS home office in Falmouth, Maine for a week long, formal training program.  Ex. 44, Dunning Dep. p. 36:9-37:16.  Finally, Melanie Baird, an Incode employee, testified that she received no formal training and never shadowed other implementation employees.  Ex. 40, Baird Dep. p. 33:19-34:11, 38:3-11.

and significant job functions that go to the heart of the Plaintiffs' claims and the potential application of the FLSA exemptions. It therefore would be procedurally unfair to try this case as a representative action. Moreover, the relatively few remaining Plaintiffs, and the acknowledged need to divide those Plaintiffs into eight separate subclasses, eliminates the judicial efficiencies typically associated with a collective action. For these reasons, and those set forth in Defendants' original motion, Defendants Tyler Technologies, Inc. and EDP Enterprises, Inc. respectfully request the Court grant its motion for decertification.

Respectfully submitted:

*/s/ Paulo B. McKeeby*
Paulo B. McKeeby
Texas Bar No.: 00784571
paulo.mckeeby@morganlewis.com
Joel S. Allen
Texas Bar No.: 00795069
joel.allen@morganlewis.com
Ellen L. Perlioni
Texas Bar No. 00794155
ellen.perlioni@morganlewis.com
Farin Khosravi
Texas Bar No. 24043753
farin.khosravi@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, Texas 75201-7347
phone - 214.466.4000
facsimile - 214.466.4001

Deron R. Dacus
Texas Bar No.: 00790553
derond@rameyflock.com

RAMEY & FLOCK P.C.
100 East Ferguson, Suite 500
Tyler, Texas 75702
phone – 903.597.3301
facsimile – 903.597.2413

ATTORNEYS FOR DEFENDANTS
TYLER TECHNOLOGIES, INC. AND
EDP ENTERPRISES, INC.

## CERTIFICATE OF SERVICE

      This is to certify that a true and correct copy of the above and foregoing has been served via electronic mail on this 19th day of November, 2010, as follows:

| | |
|---|---|
| John D. Sloan, Jr. <br> Laureen F. Bagley <br> SLOAN, BAGLEY, HATCHER & <br>  PERRY LAW FIRM <br> 101 East Whaley Street <br> P.O. Drawer 2909 <br> Longview, Texas 75606 <br> jsloan@textrialfirm.com <br> lbagley@sloanfirm.com | Alexander R. Wheeler <br> Jason Paul Fowler <br> R. REX PARRIS LAW FIRM <br> 42220 10th Street West, Suite 109 <br> Lancaster, CA 93534 <br> awheeler@rrexparris.com <br> jfowler@rrexparris.com |
| John P. Zelbst <br> Chandra L. Homes Ray <br> Zelbst, Holmes & Butler <br> PO Box 365 <br> Lawton, OK 73502 <br> zelbst@zelbst.com <br> chandra@zelbst.com | James E. Wren <br> One Bear Place #97288 <br> Waco, TX 76798 <br> James_Wren@baylor.edu |

                                                  */s/ Paulo B. McKeeby*
                                                  Paulo B. McKeeby
                                                  Ellen L. Perlioni
                                                  Farin Khosravi