Freedom Court Reporting, Inc                                                        1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                       MARSHALL DIVISION

 3   PATTY BEALL, MATTHEW         )  2:08-cv-422 TJW
     MAXWELL, TALINA MCELHANY and )
 4   KELLY HAMPTON, individually  )
     and on behalf of all other   )
 5   similarly situated,          )
                       Plaintiffs )
 6                                )
          v.                      )
 7                                )
     TYLER TECHNOLOGIES, INC.,    )
 8   and EDP ENTERPRISES, INC.    )
                       Defendants )
 9

10

11

12

13           DEPOSITION OF AMY R. DUNN, taken before Colleen

14   A. DiPierro, RMR, CRR, pursuant to notice dated July

15   13, 2010, at Executive Office Centers, 477 Congress

16   Street, Portland, Maine, on August 19, 2010, commencing

17   at 8:51 A.M.

18

19
     APPEARANCES:
20                              PAULO B. McKEEBY, ESQ.
                                CHANDRA L. HOLMES RAY, ESQ.
21

22

23

24

25
```

**367 Valley Avenue Birmingham, Alabama (877) 373-3660**

EXHIBIT 36

```
 1        Tyler?
 2   A.   I -- I only actually did that once with one customer.
 3   Q.   Which customer was that?
 4   A.   Amherst, Mass.
 5   Q.   The City of Amherst?
 6   A.   I guess, yeah. I don't know if it's a city or town.
 7   Q.   So that was the only occasion in which you had that
 8        kind of meeting with a client to discuss where their
 9        data would fit within Tyler's system. First of all,
10        that's correct?
11   A.   Yes.
12   Q.   Were there any duties that you had with respect to
13        converting data while you were at Tyler that was
14        different from what you've described?
15   A.   No.
16   Q.   Did part of your training, and I'm now focusing on the
17        initial training that we've discussed where you
18        mentioned you're shadowing in your sessions with your
19        supervisor, did you have to do any training on your own
20        in the sense of reading and studying materials to learn
21        the different -- well, in this case the business
22        license module?
23   A.   Yes. After we have a session with her, we would be
24        expected to go through and try it on our own.
25   Q.   Was there a period in which you were studying these is
```

```
 1        it -- if I called them manuals with respect to the
 2        modules, is that something you're comfortable with?
 3   A.   There were no manuals.
 4   Q.   What was it that you would be reviewing?
 5   A.   It would be a copy of the software on the laptop.
 6   Q.   So you were actually in the software working?
 7   A.   Yes.  And if there were random documents.  Sometimes
 8        there were help sheets or something to that effect.  We
 9        would review those as well.
10   Q.   But no manuals that you studied?
11   A.   No, no books.
12   Q.   Was there a period of time which you were conducting
13        the Webex training and going into the system which you
14        just described and then the shadowing occurred or was
15        it all kind of intermingled?
16   A.   It was all intermingled.
17   Q.   During this intermingled training period, did you at
18        any point go to your supervisor and say something along
19        the lines of I think I'm ready to initiate
20        implementation functions on my own or anything like
21        that?
22   A.   No.
23   Q.   How were you advised that your initial training period
24        was over such that you could conduct an implementation
25        on your own?
```

```
 1                MR. McKEEBY:  Let's take a five-minute break.
 2        Is that okay with you?
 3                MS. HOLMES RAY:  Yes.
 4                (A short break was taken.)
 5     BY MR. McKEEBY:
 6   Q. We're returning from a short break.  One of the things
 7        you told me about prior to going on break was the work
 8        that you did with the one customer in which you met
 9        with the customer to discuss where their data would fit
10        in the Tyler software, and then you communicated that
11        information to the conversion department via the
12        electronic form.
13                Do you recall that?
14   A. Yes.
15   Q. That was with the City of Amherst or with Amherst?
16   A. Yes.
17   Q. Be it a town or city?
18                Okay.  Is that called, that process that
19        you -- did it have a name at Tyler?
20   A. The conversion in itself did.  I guess it was part of
21        that larger process, but I was not the person actually
22        changing -- doing the conversion.
23   Q. Did you -- okay.  I understand when we talk about your
24        resume that you indicated that there was some at least
25        type of distinction between implementing and training,
```

```
 1      at least how your resume was worded, that you defined
 2      implementation as at least involving some discussions
 3      with the customer to learn about how their business
 4      processes operated.
 5              Did you do that type of work with Tyler's
 6      customers?
 7   A. Yes.
 8              MS. HOLMES RAY:  Object to the form of the
 9      question.  You can answer.
10   A. Yes.
11   BY MR. McKEEBY:
12   Q. And if I use the term, systems analysis, is that a term
13      or phrase, rather, that you have heard before during
14      your employment with Tyler?
15   A. I've heard the term before, but I would consider what I
16      did gathering information.
17   Q. Is -- are the functions that you performed distinct
18      from what you understand to be involved in systems
19      analysis?
20   A. My understanding of systems analysis would be in a
21      programmer's world, not something doing what I was
22      doing.
23   Q. Is it accurate to say that the information gathering
24      that you would be -- would have done as an
25      implementation consultant at Tyler occurred at the
```

```
 1        beginning stages of the implementation?
 2   A.   Yes.
 3   Q.   So how would you go about gathering the information?
 4   A.   In some cases they would send us information in advance
 5        to give us an idea, and then on-site we would also ask
 6        questions and talk with the customer.
 7   Q.   What type of information were you gathering?
 8   A.   Do you want an example or --
 9   Q.   Sure.
10   A.   Code permits and code enforcement, one of the things we
11        did was issue permits, so I would ask them about their
12        permits.
13   Q.   And what would you ask them about their permits?
14   A.   What permits do they issue and what do they look like.
15   Q.   And would you ask questions and gather information when
16        you were supporting the business license module as
17        well?
18   A.   Yes.
19   Q.   And I take it those questions related to that software
20        application?
21   A.   Yes.
22   Q.   And what was the purpose in gathering the information?
23        How would you as an implementation consultant use the
24        information that you were gathering or did you simply
25        send that information to some other source?
```

```
 1   A.   I would take that information and we would use it to
 2        set up the software.
 3   Q.   And you used the term 'we' would use it to set up the
 4        software.  What 'we' do you mean?
 5   A.   The customer and I.
 6   Q.   And when you're gathering this information in the
 7        context when you were asking questions with the
 8        customer, would you do this just you and the customer
 9        or would there be other Tyler employees involved?
10   A.   No other Tyler employees involved.
11   Q.   And would this be typically you one on one with a
12        representative of the customer or would it be multiple
13        representatives of the customer or both?
14   A.   It could be one or more of the customer.
15   Q.   And would that depend, again, on the size of the
16        customer and the size of the implementation?
17   A.   Yes.
18   Q.   Did you -- when information was sent to you in advance,
19        I take it it would have been sent to you in advance by
20        the customer?
21   A.   Yes.
22   Q.   And what -- was there a particular form that it would
23        come in?
24   A.   I don't recall.  It came through the project manager.
25   Q.   When you -- when you say you used the information to
```

```
 1   Q.   And when you say that would depend on the site, you
 2        mean that would depend on the customer site?
 3   A.   Yes.
 4   Q.   Does that go back to the size of implementation?
 5   A.   Yes.
 6   Q.   As an implementation consultant, would you meet with
 7        the customer to discuss who at the customer needed to
 8        be trained and on what and when in terms of setting up
 9        the agenda or schedule for the training?
10   A.   Yes.
11   Q.   And, again, this is a one-on-one meeting between you
12        and either -- this is a meeting between you and either
13        one or more representatives of the customer?
14   A.   Yes.
15   Q.   Would this agenda be created at the same time as the
16        initial meeting that you discussed in which you would
17        gather information about the customer's processes?
18   A.   No.
19   Q.   This would be a separate meeting?
20   A.   Yes.
21   Q.   Is there -- would there be a person at the customer who
22        would be typical for you to meet with in terms of a
23        title like a, I don't know, a planner, or would that
24        just depend on the particular staffing of the customer?
25   A.   It would depend on the staffing.
```

```
 1    Q.   Okay. When you were meeting with the customer to set
 2         up these agendas and schedule, would you come away with
 3         something in writing out of that process?
 4    A.   I tried to.
 5    Q.   What was the ultimate writing that you would try to
 6         create as a result of that meeting, the schedule?
 7    A.   Yes.
 8    Q.   And you would provide that schedule to the customer for
 9         approval?
10    A.   The customer would usually take the schedule and be
11         sure that everybody was available when we had
12         determined.
13    Q.   What would the schedule contain? Would it be just
14         times and the identification of whatever aspect of the
15         module that the training would be on at that time
16         or --
17    A.   With the person who would be there, yes.
18    Q.   Any other information?
19    A.   Not typically.
20    Q.   Are those schedules one of the types of documents that
21         you retained that you mentioned earlier?
22    A.   No.
23    Q.   What would you do with those schedules after they were
24         completed?
25    A.   I kept them on file just in the claim file.
```

| | | |
|---|---|---|
| 1 | Q. | Would that be part of the trip report or attached to |
| 2 | | the trip report or anything like that? |
| 3 | A. | Not usually. |
| 4 | Q. | Would they be submitted to the project manager for |
| 5 | | approval? |
| 6 | A. | Not typically. |
| 7 | Q. | So if I understood your testimony correctly, you would |
| 8 | | come up with the schedule with the customer and then |
| 9 | | the customer would confirm that the people were |
| 10 | | available at the designated times? |
| 11 | A. | Yes. |
| 12 | Q. | Would the schedule actually have employees of the |
| 13 | | customer on it? |
| 14 | A. | Typically, yes, and it would be distributed to them. |
| 15 | Q. | And then obviously you would have a copy so you would |
| 16 | | know who you were training and when? |
| 17 | A. | Yes. |
| 18 | Q. | When you were training employees of the customer about |
| 19 | | the functionality of the Tyler software, would you have |
| 20 | | any obligation typically to report back to the customer |
| 21 | | to advise the customer at a general level how the |
| 22 | | training was going? |
| 23 | A. | In very general terms I'm sure I just told them that |
| 24 | | they went well or -- |
| 25 | Q. | Did you ever have to tell them that they didn't go |

Freedom Court Reporting, Inc                                    110

```
 1                    STATE OF MAINE

 2            I, Colleen A. DiPierro, RMR, CRR, a Notary

 3      Public in and for the State of Maine, do hereby certify

 4      that pursuant to notice there came before me on August

 5      19, 2010 the following-named person to wit:  AMY R.

 6      DUNN, was duly sworn to testify to the truth and

 7      nothing but the truth; that she was thereupon carefully

 8      examined upon her oath and her examination reduced to

 9      writing under my supervision; that this deposition is a

10      true record of the testimony given by the witness.

11            I further certify that I am neither attorney

12      nor counsel for, nor employed by any of the parties to

13      the action in which this deposition is taken, and

14      further, that I am not a relative or employee of any

15      attorney or counsel employed by the parties hereto, or

16      financially interested in this action.

17            IN WITNESS WHEREOF I have hereunto set my hand

18      this      day of                        , 2010.

19

20

21

22

23                      Colleen A. DiPierro, RMR, CRR

24
        My Commission Expires
25      May 1, 2011
```

367 Valley Avenue Birmingham, Alabama (877) 373-3660

EXHIBIT 36