IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PATTY BEALL, MATTHEW MAXWELL, | § | |
| DAVID GRAVLEY, TALINA MCELHANY, | § | |
| KELLY HAMPTON, CASEY BROWN, | § | |
| JASON BONNER, KEVIN TULLOS, | § | |
| ANTHONY DODD, ILENE MEYERS, | § | |
| TOM O'HAVER, JOY BIBLES, DON | § | |
| LOCCHI AND MELISSA PASTOR , | § | |
| Individually and on behalf of all others | § | |
| similarly situated; | § | |
| | § | |
| Plaintiffs, | § | 2:08-cv-422 TJW |
| | § | |
| TYLER TECHNOLOGIES, INC. AND | § | |
| EDP ENTERPRISES, INC. | § | |
| Defendants. | § | |

**PLAINTIFFS' SUR-REPLY TO DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR DECERTIFICATION**

Plaintiffs, on behalf of themselves and all others similarly situated, current and former employees of Defendants, Tyler Technologies, Inc. and/or EDP Enterprises, Inc., file this Sur-Reply to Defendants' Brief in Support of Their Motion for Decertification, and would show the Court as follows:

### I. INTRODUCTION

1.1  Defendants' Reply brief is devoid of any meaningful reason why this action cannot be maintained as a collective action under 216(b), through Plaintiffs' proposed sub-classes. Defendants' attempts to create differences within the proposed sub-classes are misleading and do not warrant decertification. Finally, Defendants' argument that proceeding as a collective action would eviscerate judicial efficiency is without logic or judicial support.

## II. ARGUMENTS AND AUTHORITIES

A. **Plaintiffs' Proposed Subclasses Uphold the Purpose of § 216(b) Collective Actions**

2.1  The sub-classes proposed by Plaintiffs are tailored to address the very issues Defendants complained about in their Motion to Decertify, and yet Defendants still contend that it is not enough. Instead, Defendants suggest that each of the 30 remaining Plaintiffs should be required to file individual lawsuits to pursue the same claims against Defendants.

2.2  In an effort to create an impression that sub-classing would "completely eviscerate the goal of judicial efficiency associated with a FLSA collective action" Defendants misstate the true nature of litigating this case through Plaintiffs' proposed subclasses by overinflating the number of subclasses and the manageability of the case.[1]  First, there are only six (6) division subclasses for implementation consultants/specialists MUNIS; EDEN; INCODE; ODYSSEY; EAGLE; and EDP[2] and one EDP trainer with only 6 months of employment within the third year of the class period.  Thus, Plaintiffs' class representative testimony can be presented through seven class representatives, at most.

2.3  Defendant also implies that proceeding by subclasses will be confusing to the jury, however, Defendant does not discuss how it would be confusing.[3]  In reality, the facts of this case

---

[1] *See* Docket Entry No. 175, Defendants' Reply Pages 3-5

[2] The EDP class representative's testimony regarding the job duties of client liaison (during the time they worked for EDP) and implementation consultant, (during the time they worked for Tyler) will be identical.  Thus one class representative's testimony is representative of both "client liaisons" and "implementation consultants" for EDP.

[3] *See* Docket Entry No. 175, Defendants' Reply Pages 3-5

present a very clearly defined set of job duties that must be performed in **every** implementation.[4] The jury will simply hear the same testimony as to how those six job duties are performed. The only differences that Tyler has alleged with regard to these clearly defined job duties is that some implementation consultants do not perform all of the job duties and/or they may spend different amounts of time performing the job duties.[5] Both of these arguments go to the issue of the "primary duty" of implementation consultants, an issue that the jury should not have difficulty understanding and separating among subclasses.

2.4 Defendants' contention that somehow the number of Plaintiffs remaining in this suit prevents this court from subclassing is unsupported and is simply wrong. Numerosity is only a requirement for certification of a Federal Rule of Civil Procedure 23 class action; it is not a prerequisite for a § 216(b) collective action.[6] Despite Defendants' desire to impose the higher standards Rule 23, it does not change the fact that those standards do not apply here. This conforms to the purposes behind these two very different rules. Unlike Rule 23 class actions, § 216(b) collective actions are the preferred procedural vehicle to bringing multiple claims by similarly

---

[4] *See Exhibit No. 37,* Deposition Excerpts of Chris Hepburn. 62:6-18, 63:4, 69:9-15, 75:8-12, 78:2-8.

[5] *See* Docket Entry No. 145, Motion for Decertification, Page 11-15.

[6] *See generally Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1216-17 (11th Cir. 2001)(describing the fundamental difference between Rule 23 and §216(b) in the context of an ADEA claim); *see also Dolan v. Project Constr. Corp.*, 725 F.2d 1263, 1266 (10th Cir. 1984); *see also Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 580 (7th Cir. 1982); *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 481 (D.C.N.Y. 2001); *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F.Supp. 1053, 1059 (D.Colo. 1996); *Jackson v. N.Y. Tel. Co.*, 163 F.R.D. 429, 431-32 (D.C.N.Y. 1995); *Flavel v. Svedala Indus., Inc.*, 875 F.Supp. 550, 553 (D.C.Wis. 1994); *Glass v. IDS Fin. Servs., Inc.*, 778 F.Supp. 1029, 1042 (D.Minn. 1991); *Church v. Consol. Freightways, Inc.*, 137 F.R.D. 294, 306 (N.D.Cal. 1991); Fed. R. Civ. P. 23(a) (requiring that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.).

situated plaintiffs so that employees, who have fewer resources and stand in a position subject and subordinate to their employers, may have their claims heard.

2.5     Defendants' reliance on *Reyes v. Texas EZPawn* is misplaced as the issue of subclassing was never addressed by the *Reyes* court.   Likewise, Defendants' reliance on *Reed v. County of Orange Reed* is misplaced.  A close look at the *Reed* decision clearly shows the facts in *Reed* are very different from the present action.  The *Reed* plaintiffs consisted of deputies within the Orange County Sheriff's Department (OCSD). Orange County comprises a geographical area of 798.2 square miles, with 34 incorporated cities, and has an estimated current population of over 3,100,000.[7]  In relation to Orange County's size and population, a deputy within OCSD might be "assigned to any number of job assignments, all with differing responsibilities.[8]  OCSD comprised three overarching commands; the Custody and Court Services Command, the Field and Operations Command, and the Administrative Services Command.[9]  Each of these commands was further subdivided.[10]  The Administrative Services Command comprised three other divisions.[11]  All of the commands were also additionally sub-sub-divided into different facilities, bureaus, and units.[12]  The Custody and Court Services alone had 5 correctional facilities.[13]  Each deputy plaintiff within each

---

[7] http://www.orangecounty.net/pdf/statistics.pdf

[8] *Reed v. County of Orange*, 266 F.R.D.  446, 450 (C.D.Ca. 2010).

[9] *Id.* at 450.

[10] *Id.* at 450–51.

[11] *Id.* at 451.

[12] *Id.*

[13] *Id.*

facility performed different jobs within and amongst each facility.[14] Some deputies were "prowlers" keeping track of inmates, others were assigned to guard stations, others were assigned to monitor inmates outside of prisons, still others would not monitor inmates at all, but would "classify inmates, screen visitors, work in Main Control, Immigration Customs, or the Enforcement unit."[15] These are just the variations within one of these commands within its facilities, not counting differences in that one commands bureaus and units. In response to these almost countless divisions, the *Reed* plaintiffs proposed that the action be broken down into *only three* subclasses, which could not possibly rectify the disparate employment situations of those plaintiffs.[16] As such, *Reed* is not instructive as to what this court should do in the instant case. [17]

    2.6    The more common approach is for courts to divide alleged factually disparate

---

[14]*Id.*

[15]*Id.*

[16]*Id.* at 456, n. 11.

[17]Defendants also cite to *Carlson v. Leprino Foods, Co.*, for the proposition that a court has declined to utilize the subclass procedure available in a collective certification case. The plaintiffs in *Leprino* sought certification of a class involving nine different plants with nine different and distinct policies regarding the plaintiffs' donning and doffing claims. *Carlson v. Leprino Foods, Co.*, 2006 WL 1851245, at *1—3 (W.D.Mich. 2006). One plant compensated for 10 minutes for donning and doffing, some did not compensate at all, three were unionized and covered collective bargaining agreements that applied to some, but not putative plaintiffs, one was governed by a Dept. of Labor investigation, and yet another one had entered into a settlement that covered certain putative plaintiffs but not others. *Id.* at 2—4. The *Leprino* plaintiffs, unlike here, all worked in a single plant and had no knowledge of whether they were similarly situated to other putative plaintiffs in other plants or if those putative plaintiffs were even similarly situated to each other. *Id.* at 1—2. Moreover, the plaintiffs proposed definition was extremely broad, covering "all hourly employees of Leprino who, as part of their duties for Leprino, required by Leprino to put on and take off protective clothing." With no named plaintiffs at any of these other plants and without knowing who the plaintiffs at other plants potentially were, whether they were similarly situated amongst each other, how they were affected by the various policies, procedures, settlements, and collective bargaining agreements in place, the court understandably declined to divide an overarching class into subclasses. *See id.* at *4—6; *see also id.* at 6, n. 7.

Plaintiffs into subclasses.[18] *See e.g. Maynor v. Dow Chemical Company,* 671 F.Supp. 2d 902 (S.D. Tex. 2009)( denying decertification for alleged off the clock training when employees trained in different ways and for different amounts of time and stating that "subclassing provides a mechanism for addressing differences amongst groups"); *Aquilar v. Complete Landsculpture, Inc.,* 2004 U.S. Dist. LEXIS 20265, *11 (N.D. Tex. 2004)("Of course, if discovery shows that certain plaintiffs are not similarly situated…the Court can decertify the class <u>or can create subclasses</u>."); *Rodolico v. Unisys Corporation,* 199 F.R.D. 468, 484 (E.D. N.Y. 2001)(if, after a collective action is conditionally certified, "the court has the discretion to create subclasses."). In fact, subclassing amongst company divisions has been recognized to be viable and permissible. *See Ayers v. SGS Control Services, Inc.,* 2007 U.S. Dist. LEXIS 19634, *20, fn. 7 ( D.C.N.Y. 2007)(denying decertification and stating that "if need be, the Court can create subclasses by, for example separating OGC and ASI employees, or by creating subclasses by claim or subclaim.").

Subclassing by individual Applebee's restaurants was addressed in *Fast v. Applebee's International, Inc.,* 2009 U.S. Dist. LEXIS 66854, 15 Wage & Hour Cas. 2d (BNA) 1714 (W.D. Mo. 2009), wherein the defendant tried to decertify a class by focusing on the differences in the plaintiff's situations in each of its different restaurants. The Court denied decertification stating that "[a]ny challenges which might be posed by these differences will be addressed through dividing the class into subclasses by restaurant. *Id*. at * 24.

    **B.**    **Plaintiffs' Proposed Subclasses Illustrate Substantial Uniformity Both Within and Amongst Tyler Divisions.**

        **(1)**    **The Munis Subclass**

---

[18]

2.7     Defendants' assert, in the first instance, that the Munis subclass should be decertified because of supposed differences between Plaintiff Betty Dupree and Joy Flynn.[19] Defendants argue that Plaintiff Betty Dupree spent significant time "conducting class room training of Tyler's customers on how to use software."[20]  Joy Flynn, on the other hand, Defendants contend, "*did not spend any time performing class room style training*, but rather simply *explained* to select groups of employees how to perform the initial set up the system."[21]  Again, in footnote 11 of Defendants' Reply, Defendants' assert that "Joy Flynn, also a MUNIS implementation consultant, *testified she did **not** train employees* but rather simply *met* with payroll and human resources employees to *explain* how to perform the initial set up of the system."[22]  Compare Defendants' recitation of the evidence to the actual testimony of Joy Flynn:

> Q: And what you just described, the building the employee records, settin up the beneficiaries, the deductions from payroll, that's the type of – that's what you mean when you say, "Getting the group started on the process" --
>
> A: That is –
>
> Q: – the initial steps?
>
> A: That is correct, yes.
>
> Q: And so that's the type of *training* you performed?
>
> A: That is correct.

---

[19] *See* Docket Entry No. 175, *Def's Reply Brief*, pg. 5.

[20] *Id.* (emphasis added).

[21] *Id.*

[22] *Id.,* n. 11 (emphasis added).

*Plaintiffs' Sur-Reply to Defendants' Brief*
*in Support of Their Motion for Decertification*                                                                      Page 7

> Q: Okay. So I take it that you would be – for the *training* you would be doing, you wouldn't necessarily be training end users with respect to functionality; *but you would be training people who would be setting up the system at the customer?*
>
> A: *That is correct....*
>
> Q: *In terms of the training that you conducted as an implementation specialist, was it classroom style training typically?*
>
> A: *Yes.*[23]

Defendants' contention is not just a gross mischaracterization, it is almost 100% false. The only distinction between Joy Flynn and Betty Dupree that can possibly be gleaned from the actual testimony presented is that Joy Flynn had a different audience and trained from a different manual. But in a misclassification case, such as this one, who the audience is and what skill is being taught is completely irrelevant. As the Code of Federal Regulations makes clear "the exercise of discretion and independent judgment must be more than the use of a skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."[24]

    2.8    Defendants' second alleged issue with the MUNIS subclass is their contention that some implementers performed business processes reviews and other did not.[25] Plaintiffs have set forth the substantial similarity amongst the MUNIS subclass members in this regard, in Plaintiffs' Response to Defendants' Motion to Decertify.[26] Defendants allege, however, that three people

---

[23] *See* Exhibit No. 38, Flynn Dep. 74:21–75:4, 78:18–21.

[24] 29 C.F.R. §541.202(e).

[25] *See* Docket Entry No. 175, *Def's Reply Brief*, pg. 7–8.

[26] *See* Docket Entry No. 159, *See Pls' Resp. to Def's Mot. to Decertify*, pg. 23-24.

within the entire subclass engaged in a business process review and therefore decertification is appropriate.[27]

2.9     Initially, Defendants assert that Ronald Grimwood had "meetings with customers to show alternatives within the customer's operational plan, and that meeting to understand their current software and information processes" was sometimes conducted by Mr. Grimwood and sometimes by the project manager.[28] Notably absent from Defendants' argument, however, is what this "review" actually consisted of.  Mr. Grimwood clearly describes that all he did was  print off a list of  questions that had already been prepared by Tyler Technologies, sit down with the customer, and record their answers in the pre-prepared Word document containing those questions.[29] Walking through a canned checklist of questions is not a task that involves any "independent discretion and judgment" under the administrative exemption nor is it a task that involves the kind of specialized computer knowledge pertinent to the computer professional exemption.

2.10    Additionally, the aspect of Grimwood's job that involved him making recommendations on how to set the system up is not a business process information gathering function, as Defendants suggest, but part of the configuration process for setting up the system performed by virtually all implementation specialists and consultants in MUNIS.

2.11    Likewise Defendants mischaracterize Travis Void's involvement with "business process reviews" by confusing "business process reviews" with "configuration."  Void testified that

---

[27] *See* Docket Entry No. 175, *Def's Reply Brief*, pg. 7–8.

[28] *Id.*

[29] *See* Exhibit No. 39, Grimwood Dep. 17:24–18:14, 19:20–23.

the process of being given information about the customer's business processes occurred during setup training (i.e.configuration) .[30] "Void indicated he would provide the customer with different features and options within the software and assist the customer if they requested modification... to the software."[31] Defendants suggest this task is information gathering, however Void's testimony clearly demonstrates that this information exchange occurred in the context of the configuration process which virtually every single Plaintiff in the MUNIS class performed. This exact process was pointed out in Plaintiffs' Response to the Defendants' Motion to Decertify.[32]

    2.12    Defendants' last ditch effort to justify decertification of the present action is that there is some purported divergence in setting up schedules and agendas.[33] The fact that Bethany Maynard could make a recommendation, which may or may not be followed by the project manager who had ultimate authority over agendas and scheduling, that she could possibly develop an agenda in the rare instance where Tyler did not have an extensive and thorough canned one somewhere, and that on one occasion, during her five years of employment with Defendants, she *once* helped a project manager put together a schedule for *one* particular client that very well may have taken all of a couple hours is simply unconvincing. Plaintiffs' have provided extensive citation to the depositions of every single Plaintiff in the MUNIS subclass, along with citations to the Defendants' very own

---

[30] *See* Exhibit No. 40, Void Dep. 53:21–54:23.

[31] Defendant's Reply Brief page 8 n. 24.

[32] *See* Docket Entry No. 159, *Pl's Response to Def's Mot. to Decertify*, pg 23–24 and corresponding footnotes.

[33] *See* Docket Entry No. 175, *Def's Reply Brief*, pg. 8–9.

job descriptions.[34]  There is no doubt that Plaintiffs' are similarly situated in this regard.

### (2)    The INCODE Subclass

2.13   In the first instance, the INCODE subclass consists of seven individuals, not three as Defendants' claim.  First, Defendants' claim that Melanie Baird "did not train customers how to use Tyler's software" and that she is not similarly situated to other Plaintiffs.[35]   Contrary to Defendants assertion,  Baird did train customer's employees on Tyler's software; the only difference is that she trained them on how that software interacted with the existing software.[36]

2.14   Defendants claim, however, gives rise to a whole host of distinctions.  The first is that Baird went on-site to set-up equipment and install software that Defendants claim constituted a function so phenomenal that the entire subclass must be decertified.[37]  But this function was for only one software application that Baird implemented.[38]

2.15   Likewise, when asked why she wanted a different title, Baird testified "there was not anything really specific.  I just wanted a different title."  This desire to set herself apart from her peers is further illustrated by Baird putting down on her own performance evaluation that she was "considered a product expert in the field," that "I am constantly referred to as the guru," that she considered herself "an expert in the field." The reason for all this puffery, according to Baird herself,

---

[34] *See* Docket Entry No. 159, *Pls' Res. to Def's Mot. to Decertify*, pgs 25-26 and corresponding footnotes.

[35]*See* Docket Entry No. 175, *Def's Reply Brief*, pg. 9.

[36]*See* Exhibit No. 41, Baird Dep. 45:5-15.

[37]*See* Docket Entry No. 145, *Def's Mot. to Decertify*, pg. 20-21.

[38]*See* Exhibit No. 41, Baird Dep. 24:14–25:1.

was that she "was trying to get a good raise" and thought "she always did a good job."  The Defendants are asking the court to elevate form over substance because the evidence clearly shows that Baird performed substantially the same job as other implementers.  Baird's primary job duties, just like other INCODE Plaintiffs, were to meet with customers at the beginning of an implementation to propose different options on how to set up the software,[39] not to participate in any data conversion,[40] configure the customer's software according to their preferences,[41] train customers on the software they had purchased,[42] and provide go-live and post go-live support to customers.[43]

2.16   Defendants second objection to this subclass is that Plaintiff, Eric Emde, spent less time than another Plaintiff, Loraine Mutch, performing configuration.[44]  But this difference in time is based on the definition that Emde used for configuration.[45]  Lorraine Mutch's definition was more inclusive, even incorporating business process review functions, and thus, by necessity would constitute a greater proportion of her time.[46]  Regardless, these minute differences, if any, they do

---

[39] *See* Exhibit No. 41, Baird Dep. 47:1-25.

[40] *See* Exhibit No. 41, Baird Dep. 18:20-21, 20:3-5.

[41] *See* Exhibit No. 41, Baird Dep. 18:16-17, 73:17.

[42] *See* Exhibit No. 41, Baird Dep. 45:5-10, 33:15-18.

[43] *See* Exhibit No. 41, Baird Dep. 55:21–56:8; 115:19–116:3.

[44] *See* Docket Entry No. 175, *Def's Reply Brief*, pg. 9.

[45] Emde testified that configuration is used in different ways at Tyler.  *See* Exhibit No. 42*, Emde Dep. 82:10–16.  His definition only included adjusting forms and changing a field from one thing to something else.  *See id.* 84:6–22.  That definition did not include discussing options which is a configuration function that Emde also performed.  *See id.* 94:19-25.

[46] *See* Exhibit No. 43, Mutch Dep. 51:19–54:8, 57:10–25 (Mutch testifying that configuration, for her, involved having discussions with the client to learn the customer's preferences with respect to system setup, all the time spent with the client to get them involved in the setup, training the client on setting up the system, and actually setting up the parameters for the software).

not rise to the level such that there are no common questions of law or fact to adjudicate on a collective basis. Accordingly, decertification is not warranted.

### (3) The EDEN Subclass

2.17 Defendants only contention regarding the EDEN subclass is that one implementer out of five did not perform one job duty out of six and therefore the parties should be forced to have five individual and separate trials. Such an argument runs afoul of the purposes behind collective actions under 216(b) and strips it of any usefulness. As the court explained in *Whiteway v. Fedex Kinko's Office & Print Servs., Inc.*, no one factor in the similarly situated requirement is dispositive, and differences in geographic locations, certain job duties or even billing rates will not support decertification.[47] However, to assuage Defendants' concerns, Plaintiffs agree not to call Evyonne Wilton as the class representative for the EDEN subclass and agrees that Wilton's claims may be decided on the basis of the other EDEN class representatives' testimony.

### C. The Universal Claims and Defenses in the Present Case Favor Collective Treatment

2.18 Defendants allege that representative proof is "improper, and procedurally unfair, because there is the potential that the testimony of Plaintiffs who never performed these types of functions will bind Plaintiffs who did." This argument was made in Defendants' original Motion to Decertify and was expressly addressed by Plaintiffs in their Response. If there is a representative Plaintiff who performed a job duty that an opt-in Plaintiff did not, the representative Plaintiff's testimony is subject to Defendants' cross examination, impeachment, and subject to rebuttal evidence. As such, the Plaintiffs activities and mental processes attached thereto which were or

---

[47] *Whiteway v. Fedex Kinko's Office & Print Servs., Inc.*, 2006 WL 2642528, at *5 (N.D.Ca. 2006).

should have constituted the sum total of their employment responsibilities will be made known to the fact finder and Plaintiffs' claims will be decided *en masse* on the basis of all the evidence. If anything, this places the Plaintiffs at a procedural disadvantage because the testimony of those who performed certain job functions will bind the claims of those who did not. Moreover, Plaintiffs will agree that Joy Flynn and Eyvonne Wilton, who are more junior employees that did not perform all of the job duties of the Plaintiffs within their respective subclasses will not be called at trial to testify as the representative Plaintiff for their respective subclass.

### D. Chris Hepburn's Deposition Testimony

2.19    As a last ditch effort to break this collective action apart, Defendants argue that Plaintiffs cannot rely on the deposition testimony of their own designated corporate representative to support collective treatment because it is at a "very general level."[48] On the very same page, Defendants purport to use that "very general" testimony to assert that the collective action should be decertified.[49] The value of Hepburn's testimony is that he clearly describes the six basic job functions that must be performed for every implementation. It is these functions which lay the ground work for establishing the similar nature of the job for all Plaintiffs. However, Plaintiffs have painstakingly produced to the Court a 60 page Response that details the Plaintiffs' deposition testimony regarding how their job functions, and the specific duties are substantially similar. It is this similarity, based on the entirety of the evidence, that supports collective treatment in this case. And it is on the basis of this evidence that Plaintiffs ask this Honorable Court to deny the

---

[48]*See* Docket Entry 175, *Def's Reply Brief*, pg. 12.

[49]*See id.*

*Plaintiffs' Sur-Reply to Defendants' Brief*
*in Support of Their Motion for Decertification*                                                        Page 14

Defendants' Motion to Decertify.

### III. CONCLUSION

For the reasons set forth, Plaintiffs respectfully request that Defendants' Motion to Decertify the class be denied.

Respectfully submitted,

SLOAN, BAGLEY, HATCHER & PERRY LAW FIRM

 /s/ Laureen F. Bagley
John D. Sloan, Jr.
State Bar No. 18505100
jsloan@textrialfirm.com
Laureen F. Bagley
State Bar No. 24010522
lbagley@textrialfirm.com
101 East Whaley Street
P.O. Drawer 2909
Longview, Texas 75606
(903) 757-7000
(903) 757-7574 (Fax)

Alexander R. Wheeler
awheeler@rrexparris.com
Jason Paul Fowler
jfowler@rrexparris.com
R. REX PARRIS LAW FIRM
42220 10TH Street West, Suite 109
Lancaster, CA 93534-3428
(661) 949-2595
(661) 949-7524 (Fax)

John P. Zelbst
zelbst@zelbst.com
Chandra L. Holmes Ray
chandra@zelbst.com

ZELBST, HOLMES & BUTLER
P.O. Box 365
Lawton, OK 73502-0365
(580) 248-4844
(580) 248-6916 (Fax)

James E. Wren
Texas State Bar No. 22018200
James_Wren@baylor.edu
One Bear Place #97288
Waco, Texas 76798-7288
(254) 710-7670
(254) 710-2817 (Fax)

**ATTORNEYS FOR PLAINTIFFS**

By: /s/ Laureen F. Bagley
LAUREEN F. BAGLEY

### CERTIFICATE OF SERVICE

I hereby certify that on this the 29th day of November, 2010, a true and correct copy of this document was sent via electronic mail to the following:

Paulo B. McKeeby
Joe S. Allen
Sharon Fast Fulgham
*Morgan, Lewis & Bockius LLP*
1717 Main Street, Suite 3200
Dallas, TX 75201-7347

Deron R. Dacus
*Ramey & Flock P.C.*
100 East Ferguson, Suite 500
Tyler, TX 75702

By: /s/ Laureen F. Bagley
LAUREEN F. BAGLEY