# FREEDOM COURT REPORTING

Page 1

```
1    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF TEXAS
2    MARSHALL DIVISION
     Case No. 2:08-cv-422 TJW
3
     ------------------------------------------
4
     DEPOSITION OF BETHANY J. MAYNARD
5            July 16, 2010
6    ------------------------------------------
7    PATTY BEALL, MATTHEW MAXWELL, TALINA McELHANY and
     KELLY HAMPTON, individually and on behalf of all others
8    similarly situated,
9    Plaintiffs,
10   vs.
11   TYLER TECHNOLOGIES, INC., and EDP ENTERPRISES, INC.,
12   Defendants.
13   ------------------------------------------
14
     APPEARANCES:
15
       ZELBST, HOLMES & BUTLER, by
16     Ms. Chandra L. Holmes Ray
       P.O. Box 365
17     411 Southwest Sixth Street
       Lawton, Oklahoma  73502
18     Appeared on behalf of the Plaintiffs.
19     MORGAN, LEWIS & BOCKIUS, LLP, by
       Mr. Paulo B. McKeeby
20     1717 Main Street, Suite 3200
       Dallas, Texas  75201
21     Appeared on behalf of the Defendants.
22
23
24
25
```

**EXHIBIT 4**

# FREEDOM COURT REPORTING

Page 2

1            Pursuant to Notice and the Federal Rules of

2    Civil Procedure, the deposition of BETHANY J. MAYNARD, called

3    by Defendants, was taken on Friday, July 16th, 2010,

4    commencing at 9:45 a.m., at 710 North Plankinton Avenue,

5    Milwaukee, Wisconsin, before Elaine A. Thies, Registered

6    Professional Reporter and Notary Public within and for the

7    State of Wisconsin.

8

9                         I N D E X

10   Examination by:                                    Page

11   Mr. McKeeby                                            3

     Ms. Holmes Ray                                        92

12

13

14                      E X H I B I T S

15   Exhibit No.          Description                   Page

16   No. 1  -   An e-mail and resume                      11

     No. 2  -   Offer letter received from Mr. Sansone    17

17   No. 3  -   Most current resume                       21

     No. 4  -   Performance review document               70

18   No. 5  -   Self-assessment form                      70

     No. 6  -   Opt-in form                               83

19   No. 7  -   Performance evaluation dated March of 2006   85

20               (Original exhibits attached to original

21        transcript.  Copies attached to copy transcripts.)

22

23

24

25

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 4**

FREEDOM COURT REPORTING

Page 13

```
 1   Q   Okay.  But you do believe based on your e-mail I

 2       take it that it referred to an opening in an

 3       implementation specialist position?

 4   A   That's what I'm saying in this e-mail so-.

 5   Q   Okay.  And then in the third paragraph you

 6       summarize your experience with ATX in the capacity

 7       of implementation specialist?

 8   A   Yes.

 9   Q   Were the job duties at ATX as an implementation

10       specialist the same as your job duties at Tyler as

11       an implementation specialist?

12   A   Yes.

13   Q   So these different duties that you list here --

14       let's just go over each one of them.  You say in

15       representing your job duties at ATX, the first one

16       is to gather data requirements from clients.  Is

17       that something you did at Tyler as an

18       implementation specialist?

19   A   Yes.

20   Q   Analyzing their business needs, that's again your

21       description of a function that you performed at

22       ATX.  Is it your testimony that you also performed

23       that function as an implementation specialist at

24       Tyler?

25   A   Yes.
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 4**

## FREEDOM COURT REPORTING

```
 1   Q   And what about installation of software; that again
 2       is one of the items you've used to describe your
 3       job duties at ATX.  And is that something that you
 4       did as an implementation specialist at Tyler?
 5   A   Yes.
 6   Q   I take it the same is with respect to the next
 7       entry which is train users and provide -- Well, let
 8       me just start with train users.  You trained users
 9       while you were at Tyler as well; correct?
10   A   Yes.
11   Q   And then providing support during the
12       implementation phases; is that something that you
13       did at Tyler as well as ATX?
14   A   Yes.
15   Q   To whom did you -- While you were an implementation
16       specialist, to whom did you report at ATX?
17   A   Kevin Hogan.
18   Q   And then the next sentence says in describing again
19       your position at ATX, this was to include traveling
20       to various sites and working with end users in
21       person while documenting and meeting project
22       milestones.
23               I take it that's also a description
24       of functions you performed as an implementation
25       specialist at Tyler?
```

**FREEDOM COURT REPORTING**

Page 15

```
1   A   Traveling to various sites, yes.  Working with end
2       users in person, yes.  Documenting and meeting
3       project milestones, yes.
4   Q   Okay.  What was -- I see there looks like a
5       description here, but just in your own words today
6       what was your reason for leaving ATX?
7   A   Uncertainty about the company after the -- it was
8       bought out.
9   Q   Who bought it out?
10  A   I can't remember.
11  Q   Was that at the time when there was this split that
12      you mentioned between --
13  A   Correct.
14  Q   -- between ATX and Tax Solver?
15  A   Correct.
16  Q   Were you -- How were you paid as an implementation
17      specialist at ATX?
18  A   Hourly.
19  Q   Was that the case the entire time?
20  A   Yes.
21  Q   So you were paid overtime for hours that you worked
22      in excess of 40 while you were at ATX?
23  A   Yes.
24  Q   Did you receive any compensation other than your
25      hourly wage while you were employed at ATX as an
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

## FREEDOM COURT REPORTING

```
 1   A     Sixteen -- I think there was a 16 billable day goal.
 2         There -- and 16 may not be accurate, but there was a
 3         billable day goal so--.
 4   Q     If I said it was 13, does that ring a bell?
 5   A     Thirteen maybe.
 6              MS. HOLMES RAY:  Object to the form.
 7              THE WITNESS:  It could be.  I'm not sure.
 8   BY MR. MCKEEBY:
 9   Q     Okay, you're just not sure.
10   A     I'm not sure.
11   Q     You know there were certain requirements --
12   A     There was a billable day goal.
13   Q     And what constituted a -- what made a day billable
14         as opposed to non-billable?
15   A     Going to a client site and providing services.
16   Q     Okay.  So in other words, when you were at the
17         office in Falmouth, it was not a billable day?
18   A     Unless you were providing training via the phone.
19   Q     Okay.  So you said you would have to back out the
20         number of days that you would have spent on average
21         approximately at the office at Falmouth, and I
22         think I kind of interrupted you while you were
23         maybe making that calculation and got off on a
24         tangent, but can you do that now?
25   A     I would say on average per month five days.
```

# FREEDOM COURT REPORTING

Page 26

1  Q   And then the rest of the days were spent on the

2      road remotely at customer sites; correct?

3  A   On the road at customer sites or remotely at customer

4      sites.

5  Q   And when you say remotely at customer sites, that

6      means you would be in the office at Falmouth doing

7      remote training?

8  A   Correct.

9  Q   Whenever you did remote training, it would have

10     been from your office at Falmouth?

11 A   Yes, for -- until I moved to Wisconsin.

12 Q   Okay.  Then you did remote training from your home?

13 A   From my home office, correct.

14 Q   What determined, if you know, whether or not you

15     did remote training versus live training at the

16     customer's site?

17 A   I don't know.  Those days were told to me.

18 Q   They were told to you in the sense that you were

19     told that either you needed to be at the customer's

20     location or you were going to be doing training

21     remotely?

22 A   Correct.

23 Q   When you did the training remotely, was it WebEx

24     type training where you were using the internet?

25 A   Yes.

**EXHIBIT 4**

FREEDOM COURT REPORTING

```
 1   Q   And the telephone I take it as well?

 2   A   Correct.

 3   Q   It wasn't videoed?

 4   A   No.

 5   Q   And who would tell you whether or not the training

 6       was remote or at the actual customer site?

 7   A   Jane.

 8   Q   And how would she communicate that to you, and by

 9       that I mean, to be a little more specific, was this

10       something that she would tell you on a day-to-day

11       basis, did you have like a monthly calendar, or

12       some other method to tell you essentially where you

13       were supposed to be on a particular day?

14   A   We had a monthly schedule.

15   Q   And Jane prepared that I take it?

16   A   Yes.

17   Q   And so I take it that that monthly schedule might

18       have -- Can you think of a customer that you did --

19       an example of a customer that you did training on

20       site?

21   A   Yes.

22   Q   Okay, give it to me.

23   A   Indianapolis Public Schools.

24   Q   Okay.  So on this schedule there would be periods

25       of time in which you were to be at the Indianapolis
```

# FREEDOM COURT REPORTING

```
1         Public School customer site?

2    A    Correct.

3    Q    And just for ease of discussion, when -- Was that

4         at the school actually or somewhere else?

5    A    At the business office.

6    Q    Business office, okay.  And what would be typical

7         as to the amount of days you were scheduled to be

8         at the business office?  Again, if it's helpful

9         using this example of the Indianapolis Public

10        Schools.

11   A    Days per week?  Days per month?

12   Q    Let's start with days per week.

13   A    Three and a half, four.

14   Q    Now, when you did this work for the Indianapolis

15        Public Schools, was that while you were living in

16        Wisconsin or in Maine or both?

17   A    That is not the reason I left either place.

18   Q    No, no, not the reason, but while you were doing

19        that work at Indianapolis Public Schools and

20        visiting their business office -- I take it you

21        visited their business office more than once?

22   A    Yes.

23   Q    Okay.  And so my question is was that while you

24        were working in Maine or while you were working out

25        of your office in Wisconsin --
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 4**

FREEDOM COURT REPORTING

Page 29

```
1    A    Both.

2    Q    -- or both?  Okay.

3              So the monthly schedule comes out.

4         It says, let's say for example, that you're to

5         spend Tuesday through Friday of a particular week

6         in the business office of the Indianapolis Public

7         Schools.  Do you -- Does it tell you anything else

8         on the schedule as to what you're going to be doing

9         on those days?

10   A    What subjects, whether it's GL training or fixed

11        asset training, accounts payable training.

12   Q    GL, general ledger?

13   A    Yes.

14   Q    And so these are just the different applications of

15        the Munis Financial software package that you would

16        be providing training on?

17   A    Correct.

18   Q    So the monthly schedule would tell you which of

19        those applications would be trained on at

20        particular times?

21   A    Correct.

22   Q    Would you have to have telephone communications

23        with anyone at the business office to set any of

24        this up, or had that already been done?

25   A    Jane scheduled that.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

# FREEDOM COURT REPORTING

1   Q   So you would just show up?

2   A   Yes.

3   Q   You would know who to ask for?

4   A   Based on the contact list and the project plan, yes.

5   Q   So the project plan is a separate document that you

6       would have been provided?

7   A   Yes.

8   Q   And that would have your contact information?

9   A   Correct.

10  Q   So was it simply a matter of when you would arrive

11      at the business office, you would ask for that

12      contact person?

13  A   Yes.

14  Q   You wouldn't have any telephone communications

15      talking about the type of training or --

16  A   No.

17  Q   -- the scheduling or anything like that?

18  A   No.

19  Q   If that was done it would have been done by Jane?

20  A   Correct.

21  Q   Did you have to engage in any -- again, kind of

22      returning to this not hypothetical but this example

23      that you provided of visiting the business office

24      of the Indianapolis Public Schools, and if it's not

25      a good example for some particular reason we can

## FREEDOM COURT REPORTING

```
 1        talk about that, but my question was going to be

 2        prior to going on that trip, was there any type of

 3        preparatory work that you would have to do specific

 4        to that project?

 5   A    Reviewing what subjects were going to be covered,

 6        making sure I was prepared to train on those, that I

 7        had the knowledge in those subjects and on those

 8        modules, and also phoning in making travel

 9        arrangements.

10   Q    You used the term modules.  Is that the same as an

11        application?

12   A    Correct.

13   Q    Okay.  And that's fine.  I just want to make sure

14        I'm on the same page.  So by reviewing the

15        subjects, you would -- you mean you would review

16        what was on the monthly schedule as to what

17        subjects were being trained?

18   A    Correct, and then further, the steps that needed to

19        be trained upon.

20   Q    And when you say the steps that needed to be

21        trained upon, was that something that was in the

22        monthly schedule?

23   A    It's in the project plan.

24   Q    Okay.  And when you say the steps that need to be

25        trained on, what does that mean?  Is that
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 4**

# FREEDOM COURT REPORTING

```
1      particular aspects of the module that need to be
2      focused on, or do you mean something other than
3      that?
4   A  Correct, features, makeup of -- if you're talking
5      about I'm going to go train on journal entries, then
6      I need to, you know, make sure that I talk about and
7      train on general ledger accounts and dates and
8      debits, credits and dollar amounts.  I mean there's
9      certain training items, bullet points, that go with
10     every subject.
11  Q  Okay.  And that would have been on the project
12     plan?
13  A  Yes.
14  Q  How -- I've never seen a project plan.  Is it like
15     a notebook or a couple of pages?
16  A  It's an Excel document.  Jane's project plans are
17     Excel documents.
18  Q  Okay.  How long a document?
19  A  How many pages?
20  Q  Yeah.
21  A  It depends on how big the client is --
22  Q  Fair.
23  A  -- how many subjects they have, modules.
24  Q  Okay.  But you would review it to ascertain which
25     particular features were being covered on each of
```

## FREEDOM COURT REPORTING

1      the modules on which you were training?

2   A   Correct.

3   Q   And you also said that if you -- you wanted to make

4      sure that you had knowledge of the particular

5      modules on which you were training; is that right?

6   A   Correct.

7   Q   And were there instances where you did not have

8      knowledge of a particular module?

9   A   Yes.

10   Q   What would you do in that situation?

11   A   Read documentation.

12   Q   What kind of documentation do you mean?

13   A   Software documentation.  If it was particularly after

14      an upgrade or a new release, maybe going back to

15      release notes and reviewing.

16   Q   And this type of work you would perform during your

17      office days?

18   A   If I had office days.  If I didn't it was at home.

19   Q   Now, when you would go to the customer's site,

20      would you bring anything with you in terms of --

21      well, what would you bring with you?  If you're

22      arriving at the customer site -- and again, I'll

23      use the Indianapolis Public Schools as an example.

24      You've -- you know your contact, you've read the

25      project plan, to the extent that you've needed to

**EXHIBIT 4**

FREEDOM COURT REPORTING

Page 34

1    brush up on any of the particular modules you've

2    done so, and you're arriving on the Tuesday, let's

3    say hypothetically, that you're scheduled to be at

4    the business office of the Indianapolis Public

5    School System, and you ask for your contact person.

6    Do you have anything with you related to the

7    project?

8  A  My laptop which has the project plan, the documents.

9  Q  So it has the project plan on it, and when you say

10    the documents --

11  A  Documentation, user documentation that Munis has for

12    their modules.  You know, often times you have an

13    internet connection so if you need to get to a

14    website.

15  Q  Okay.  Now, at this point in the process of selling

16    the software by Tyler to the customer, the

17    customer's already entered into a contract to

18    purchase the software; correct?

19  A  Yes.

20  Q  And the customer's data that was in its previous

21    software has already been converted to Tyler's

22    systems, to Munis system?

23  A  That depends on what type of training day I'm there

24    for, at what point in the implementation I'm there.

25  Q  And tell me a little bit more about that and let me

# FREEDOM COURT REPORTING

Page 35

```
 1        ask you a specific question.  What would it depend

 2        on as to whether or not -- what different types of

 3        training would you provide that would differ

 4        depending on whether or not a conversion had

 5        already taken place?

 6    A   If I'm there to set up user security, that's

 7        happening very early on and is not -- doesn't require

 8        data to be in the system.

 9    Q   Okay.

10    A   However, if you're doing general ledger training,

11        there may need to be the chart of accounts converted

12        into the system.

13    Q   User security training, that would simply be

14        training as to maintaining the passwords and other

15        security devices associated with the software?

16    A   And permissions.

17    Q   But the data from the company's -- the client's old

18        system need not be converted at that point?

19    A   No.

20    Q   That's a true statement?

21    A   Yes.

22    Q   Do I understand correctly that Munis while you were

23        employed with Tyler had a separate department that

24        did the actual conversion of the information?

25    A   Yes.
```

# FREEDOM COURT REPORTING

1    Q    You didn't convert the information as an

2        implementation specialist at Munis?

3    A    No.

4    Q    What was that?  Was it called the conversion

5        department?

6    A    I can't remember what they were called.

7    Q    But it was a particular department?

8    A    It wasn't me.  I don't know.  I don't know.

9    Q    That's fine.  Okay.  Not employees that you would

10       have interacted with on a regular basis?

11    A    Define on a regular basis.  I mean during -- during a

12       conversion?

13    Q    Yeah.

14    A    Yes.

15    Q    On what -- What was the context of the interaction?

16       What would you guys -- would you be -- would they

17       have questions for you?

18    A    On the phone.  I would be asking them why data didn't

19       come in, wasn't there, was missing, was wrong.

20    Q    And that would be something that you would have

21       detected during the course of your training?

22    A    Yes.

23    Q    And when you're doing the actual training, I take

24       it -- let's put security training to one side, but

25       when you're doing the general ledger training or

## FREEDOM COURT REPORTING

Page 37

```
 1         any of the other type of training on the Munis
 2         Financial software modules, you are actually
 3         providing in the -- at least when you're on site
 4         live training to the users?
 5    A    Yes.
 6    Q    Are you comfortable with me calling it a
 7         classroom-type setting?
 8    A    In some cases it's a classroom and if there's enough
 9         users to qualify as a classroom.
10    Q    Right.
11    A    In some it may be one on one --
12    Q    And that --
13    A    -- with --
14    Q    Sorry, go ahead.  I didn't mean to interrupt.
15    A    -- with a user.
16    Q    And that would depend on the size of the customer?
17    A    It could be the size of the customer.  It could also
18         be the subject on which you're training.
19    Q    Because in the latter example, the subject on which
20         you were training might have been -- had
21         application only to a limited number of users?
22    A    Correct.
23    Q    And so if it differs from whether it's a classroom
24         or more individualized-type training, you can let
25         me know, but you would be training on the actual --
```

# FREEDOM COURT REPORTING

```
 1        again, putting the user security training to one

 2        side and talking now about the Munis Financial

 3        modules, the training would be done on the system

 4        as opposed to like on a PowerPoint in which you're

 5        teaching.  You have your laptop, the user has the

 6        laptop, and you're training on the modules while

 7        the user is on the system?

 8   A    Yes.

 9   Q    So each person in the training, whether or not it

10        be one or two or 12, just using hypothetical

11        numbers, would have a laptop?

12   A    Not always, depending on resources at the client

13        site.

14   Q    But they would be looking at a laptop maybe that

15        was being operated by someone else?

16   A    Correct, on a screen.

17   Q    Okay.  So you would -- Would -- Your laptop would

18        be projected on a screen typically?

19   A    Sometimes mine; sometimes the client's.

20   Q    Okay.  When you did training on a particular

21        module, and maybe we can take general ledger as an

22        example -- if it's not a good example, you can let

23        me know -- but how would you go about conducting

24        the training, how would you know what to do?

25   A    General ledger training probably not the best because
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

FREEDOM COURT REPORTING

Page 39

```
1          it's broad.

2    Q     Okay, so give me a better example.

3    A     A more concise version would be requisition training,

4          decentralized requisition training.

5    Q     Just for my benefit, what does requisition mean in

6          that context?

7    A     Purchase requisition.

8    Q     Okay.  So that's a better example.  What would

9          you -- How did you know how to train on that

10         software, the purchasing -- or rather the

11         requisition trainings -- I'm sorry -- the

12         requisition software is a better way to call it I

13         think.

14   A     Read the documentation surrounding the module, know

15         how the client's using it.

16   Q     And knowing how the client is using it would come

17         from the project plan?

18   A     Project notes in the project plan, yes.  Also from

19         walking through the configuration options for them:

20         Security, things like that.

21   Q     What does the term configuration option mean?

22   A     Chart of accounts.  I mean general ledger accounts

23         that they have in the system; how many levels of

24         approvers they have, approval chains, that have been

25         set up previously.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

# FREEDOM COURT REPORTING

Page 40

1   Q   So that levels of approval means who gets what

2       information and who has to approve --

3   A   Well, specific to requisitions.  Requisitions went

4       through the system electronically for approval.  In a

5       day previous to a decentralized training class, we

6       would have had a training class with the purchasing

7       department on how to enter an approver and how to set

8       up an approval chain.

9   Q   Okay.

10  A   Wherein, we would have learned from them how they

11      were going to set it up.

12  Q   So that wouldn't have been something that you would

13      have learned in the project plan.  That would have

14      been something you would have gathered from the

15      client in this sort of initial training?

16  A   If I didn't do the training on the approval chain, it

17      would be documented so that I would have that

18      information.

19  Q   But sometimes you would do the training on the

20      approval chain?

21  A   Yes.

22  Q   So in that case I mean you might document it, but

23      you would also know it based on the training that

24      you had performed?

25  A   Correct.

**EXHIBIT 4**

## FREEDOM COURT REPORTING

Page 41

1   Q   And in the context of requisition software, levels

2       of approval means what particular individuals have

3       approval rights as to particular purchases?

4   A   Correct.

5   Q   And obviously you need to know that from the

6       customer to be able to train the users?

7   A   Yes.

8   Q   Are you familiar with the term systems analysis?

9   A   Yes.

10  Q   I'm sorry.  There's a different term that I'm going

11      to ask you about.  Something called analysis

12      sessions?

13  A   Yes.

14  Q   Does an analysis session as it was used at Tyler

15      Munis refer to this initial type of training that

16      you just testified to concerning in this example

17      the approval chain with respect to requisition

18      software?

19  A   What analysis session means to me is that each client

20      is different but the software remains the same, so

21      it's determining how the client's going to use the

22      software of the prescribed ways you can use it.

23  Q   Is an analysis session something that you performed

24      as an implementation specialist?

25  A   I conducted training sessions where we decided which

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

# FREEDOM COURT REPORTING

Page 42

1         way the software was going to be used.

2    Q    And would one example have been in the training

3         that you just mentioned about the requisition

4         software?

5    A    Training users on how to enter an approver would lead

6         itself to finding out how many approval levels

7         they're going to have and who those are going to be,

8         yes.

9    Q    So that involves a dialogue with the client?

10   A    There's a training aspect to show them how to set

11        that up because they set up their data, and, yes,

12        information being shared with them on instructions I

13        guess on how that could be set up.

14   Q    So was that an example then of an analysis session?

15   A    That's an example of an analysis session.

16   Q    There's a training component but there's also an

17        analysis component?

18                  MS. HOLMES RAY:  I object to the form.

19                  THE WITNESS:  I -- Define analysis I

20        guess.  I explained that there's a training

21        component saying this is how you enter an approver,

22        this is how it's going to show up, this is how it's

23        going to govern a requisition.

24   BY MR. MCKEEBY:

25   Q    Right, right.  That's what I understand to be

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 4**

# FREEDOM COURT REPORTING

Page 43

1        training.  And I'll tell you what I understand to

2        be analysis.  Analysis, as I understand it, and I

3        need you to tell me if you agree, but the analysis

4        component of that process if you will is

5        determining what the chart of accounts is and

6        what -- who has particular levels of approval.

7    A   No.  Any -- When you walk into a municipality, their

8        purchasing departments already have prescribed

9        approval levels, dollar amounts, department heads.

10       They have an approval structure for purchasing

11       already in place.  I guess in an analysis session

12       it's translating what may be in a piece of paper

13       somewhere so that it works in the system

14       electronically.

15   Q   Okay.  So the analysis session as we've been

16       describing it doesn't necessarily relate to levels

17       of approval.  It relates to how particular

18       information is going to be used in the Tyler

19       software?

20   A   How the levels of approval are going to get into the

21       Tyler software.

22   Q   Okay.  So that type of training and analysis would

23       have been performed either by you or someone else

24       prior to the training of the users on how to

25       operate the general ledger software or application?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 4**

## FREEDOM COURT REPORTING

1        more than one implementation specialist dispatched

2        to a particular customer location to do training on

3        a particular module?

4  A   That would depend on the size of the client and the

5        breadth of the services that they purchased from us.

6  Q   So -- and I guess that would also be your answer if

7        I asked you how long a particular implementation

8        took?

9  A   Correct.

10  Q   What could it vary from?

11  A   Two months to two years.

12  Q   Depending on the size of the client and the number

13        of applications that were purchased?

14  A   Among other things, yes.

15  Q   What other things?

16  A   Conversion issues, client issues, budget issues.

17  Q   Sure.  And am I right that a client purchasing the

18        Munis Financial software could purchase particular

19        applications, that is, they might purchase the

20        general ledger software but they might not purchase

21        the decentralized requisition software for example?

22  A   Correct.

23  Q   And you weren't involved in that aspect of the

24        sales process.  That would have been done prior to

25        you being on the scene as an implementation

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

## FREEDOM COURT REPORTING

1      specialist?

2    A   Correct.

3    Q   Were you -- Did you have any responsibilities with

4        respect to supporting the software once it -- once

5        your training had been completed and the customer

6        had gone live?  Did they call you and say, hey, you

7        know, I'm not -- I have questions about this, or

8        was there a separate department for that?

9    A   After their formal transition to support, there was a

10       support department.

11   Q   And by that response it makes me think that there

12       was some period where there was -- prior to there

13       being a formal transition to support.  Is that what

14       you meant to convey?

15   A   Correct, formal transition to support happens after a

16       period of time after the client has gone live.

17   Q   Okay.  What period of time was it or did that

18       depend too?

19   A   It depends.

20   Q   Okay.  So there's a transition period then before

21       they are transferred to support?

22   A   Yes.

23   Q   They being the client?

24   A   Yes.

25   Q   And that -- and during that transition period, if

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

```
1        the client has questions about particular aspects
2        of the software do they call you or someone else or
3        how did that work?
4    A   They would.
5    Q   They would call you?
6    A   They would call me.  They might call the
7        implementation specialist.  They might call the
8        project manager.
9    Q   So would you typically -- Who from the client would
10       give -- would call you in these instances during
11       this transition period where they would have
12       questions about the software?  Would that be one of
13       the users that you had trained, or would it be
14       someone at a different level or an IT person?
15   A   It could be anyone.  It depends on the size of the
16       client again.
17   Q   But it could be if it's a smaller client the actual
18       user asking a day-to-day type question?
19   A   In any case it's going to be --
20   Q   True.
21   A   -- a user or a member of the project team on their
22       side.
23   Q   And did you -- When you would get those calls would
24       you document them?
25   A   That depends on the nature of the call.
```

# FREEDOM COURT REPORTING

1   Q   What type of calls would you document, and again,

2       I'm talking about these calls that you would

3       receive during this transitionary period before --

4       or this transition period before the customer was

5       moved to support?

6   A   Sometimes these were e-mails so I guess by way of

7       responding to them I was documenting them and perhaps

8       cc my project manager on that.

9   Q   Okay.  So you're saying that there were --

10      sometimes the questions from the client would come

11      in e-mail form?

12  A   More often than not e-mail form.

13  Q   But you didn't have any type of responsibilities

14      sort of akin maybe to the trip report where you

15      were having to enter in some summary of the call

16      and what the resolution is or anything like that?

17  A   No.

18  Q   So let's say for example the client didn't send you

19      an e-mail but called you on the telephone and said

20      I'm having trouble with this application of the

21      software, can you walk me through this, and let's

22      assume for the purposes of my hypothetical that you

23      were able to do it and address the client's

24      concern; that would be the end of it and you

25      wouldn't have to write that down somewhere?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 4**

## FREEDOM COURT REPORTING

Page 54

```
 1    A    Correct.
 2    Q    And how did you know what the transition period
 3         was?  Is that something that was in like a contract
 4         or in the project notes?
 5    A    In the project plan, when the --
 6    Q    In the project plan?
 7    A    The date of the formal support transition was in the
 8         project plan.
 9    Q    So that's something that the client knew as well
10         presumably?
11    A    If they looked at their project plan.
12    Q    And the project plan was something that was shared
13         with the client?
14    A    Yes.
15    Q    Were you as an implementation specialist at Tyler
16         on location when the customer went live?
17    A    In most cases, yes.
18    Q    Was there -- Would there be a particular reason why
19         you weren't there in certain instances?
20    A    Size of the client, breadth of services.
21    Q    Can you think of an example of a customer where you
22         were at the customer's site when they went live?
23    A    At Clover Park School District outside of Seattle,
24         Washington.
25    Q    So had you traveled to Seattle for this?
```

**EXHIBIT 4**

# FREEDOM COURT REPORTING

Page 55

1   A   Yes.

2   Q   And so you were at the school district's business

3       office when they went live?

4   A   Yes.

5   Q   How did it go?

6   A   New Year's Day.

7   Q   That's why you remember it.  Did the go live go

8       smoothly?

9   A   Actually I think I traveled on New Year's Day, but

10      yeah, as smoothly as a go live goes.

11  Q   And just so that we're on the same page, go live

12      means when the customer is actually using the Tyler

13      software to perform day-to-day functions --

14  A   Correct.

15  Q   -- and has converted from its previous system?

16  A   Correct.

17  Q   Did you -- Were you dispatched to the Clover Park

18      School District business office particularly for

19      the purpose of overseeing the go live process, or

20      were you there already on other implementation

21      work?

22  A   No, specifically for the client's go live.

23  Q   What were your functions -- what did you do during

24      that period?

25  A   Provided support to users, any further retraining

# FREEDOM COURT REPORTING

Page 56

1       that was necessary, working with our internal support

2       if something went wrong or wasn't right.

3   Q   Was there any other Tyler employee at the business

4       office of the Clover Park School District during

5       that time?  Was the project manager --

6   A   Yes, Jane was there for that -- that particular go

7       live, and I'm not a hundred percent sure of the name

8       of that school district.  That was a long time ago

9       but I think it's Clover Park.  Clover Valley,

10      something like that.

11  Q   Something outside of Seattle?

12  A   Yes.  Outside of Tacoma.

13  Q   Tacoma.  And were there other times when you

14      assisted with the go live process that Jane was not

15      there?

16  A   Yes.

17  Q   And then in those instances you would have been the

18      only Tyler employee at the premises?

19  A   Yes.

20              MR. MCKEEBY:  Can we take a short break?

21              MS. HOLMES RAY:  Uh-huh.

22              (Recess taken.)

23  BY MR. MCKEEBY:

24  Q   While you were employed at Tyler, Ms. Maynard, did

25      you keep track of the number of hours that you

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 4**

## FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | | worked? |
| 2 | A | No. |
| 3 | Q | There was no Tyler reporting system or anything |
| 4 | | like that that you had to complete? |
| 5 | A | No. |
| 6 | Q | And did you do anything informally in a journal or |
| 7 | | diary or otherwise to indicate the number of hours |
| 8 | | that you worked during a week? |
| 9 | A | No. |
| 10 | Q | Did you ever work weekends while you were at Tyler? |
| 11 | A | I traveled on weekends. |
| 12 | Q | Any work other than travel? |
| 13 | A | If it was preparatory on a weekend for the upcoming |
| 14 | | week, yes. |
| 15 | Q | That happened on occasion? |
| 16 | A | Yes. |
| 17 | Q | Do you have any estimates of the number of hours |
| 18 | | that you averaged during a week at Tyler? |
| 19 | A | Averaged for the five years, 50. |
| 20 | Q | Did it change at any particular periods of time, |
| 21 | | that is, I understand that the nature of an average |
| 22 | | is that you're averaging different times, but were |
| 23 | | there any particular let's say years where it was |
| 24 | | higher or lower than 50 based on your recollection? |
| 25 | A | Yes. |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

## FREEDOM COURT REPORTING

Page 87

1  A   Yes, but not out of -- it wasn't -- there was no

2      exclusivity.  It was just the size of the client and

3      their requirements at the time so-.

4  Q   How long a period of time would that have been?

5  A   I'd say probably the last year of my employment with

6      Munis.

7  Q   And do you agree with her statement at the end of

8      that section where she says that Beth has worked

9      with me to develop new plans and schedules for this

10     client and is willing to provide suggestions for

11     making this project a success?

12  A   I'm not sure what she means by plans and schedules

13     anymore than just relaying information, X number of

14     people need to be trained, this many people need to

15     be trained on this module, so that would assist her

16     in planning a training schedule.

17  Q   And she says you were willing to provide

18     suggestions for making this project a success.  Do

19     you agree with that?

20  A   Yes, I signed it so-.  I can't speak to what she

21     means there, but I wanted the project to be a

22     success, certainly.

23  Q   Did you -- When you were first hired by Tyler, did

24     you go through any type of formal training?

25  A   No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 4**

# FREEDOM COURT REPORTING

Page 88

1   Q   Did you do kind of on-the-job training where you

2       were shadowing different implementation

3       specialists?

4   A   I shadowed Jo Lamontagne for a handful of days.

5   Q   Any other implementation specialists that you

6       shadowed?

7   A   Not that I recall.

8   Q   Is that how you were trained?

9   A   In addition to self-train.

10  Q   And by self-training you mean reading the manuals

11      that we've discussed to better learn the software?

12  A   Yes.

13  Q   Why did you leave Tyler?

14  A   Didn't feel that there was a lot of opportunity there

15      for me.

16  Q   Opportunity for advancement?

17  A   Correct.

18  Q   I think you've answered a slightly different

19      question but if you'll indulge me I'm almost done,

20      but is it a true statement that during the tenure

21      of your employment, you did not complain to anyone

22      at Tyler about not being paid overtime?

23  A   I did not complain to anyone formally about being

24      paid overtime.

25  Q   Informally or formally?

FREEDOM COURT REPORTING

1   A    About -- Specifically about being paid overtime?  I

2        can't recall ever complaining to someone, no.

3   Q    Was that something during your employment with

4        Tyler that you were -- that you had a problem with

5        necessarily?

6   A    I guess I don't understand the question.

7   Q    I mean at the time.  I mean obviously you've chosen

8        to participate in this lawsuit --

9   A    Correct.

10  Q    -- and so you're asserting claims for overtime

11       payment --

12  A    Correct.

13  Q    -- which contemplate a legal claim, and I guess my

14       question is did you have -- while you were employed

15       at Tyler, did you have a feeling that, you know,

16       hey, I should be paid overtime?

17  A    I knew I was working more than 40 hours a week.

18       Whether or not I was entitled to overtime, I was not

19       aware of that.

20            MR. MCKEEBY:  Let me take a quick break

21       and see if I have anything else.

22            MS. HOLMES RAY:  Okay.

23            (Recess taken.)

24  BY MR. MCKEEBY:

25  Q    I have a couple more questions.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**
**EXHIBIT 4**

## FREEDOM COURT REPORTING

Page 90

```
1    A    Okay.

2    Q    What's your highest level of education?

3    A    Associates degree.

4    Q    From where?

5    A    Northern Maine Technical College.

6    Q    Is that a four-year degree?

7    A    Two-year degree.

8    Q    When you were conducting the training that we've

9         spent a lot of time talking about at the customer

10        sites, am I correct that that was typically done by

11        yourself as opposed to side by side with another

12        Tyler employee?

13   A    Yes.

14   Q    And if you look at Exhibit 3 in front of you which

15        is your current resume, the resume at the second

16        page describes your job at Tyler; correct?

17   A    Yes.

18   Q    And it refers to it as Munis but we've discussed

19        already that that's -- we're talking about the same

20        thing for the purposes of the deposition; correct?

21   A    Yes.

22   Q    One of the things that it references as a duty

23        is -- or excuse me -- was aiding clients' IT staff

24        in determining system requirements.  That's about

25        midway through the description.  Do you see that?
```

**EXHIBIT 4**

| | | |
|---|---|---|
| 1 | | be projects that are a little bit different from |
| 2 | | one to the other -- |
| 3 | A | Right. |
| 4 | Q | -- but I'm going to talk to you at some length, as |
| 5 | | you imagine, about what your job involved, and what |
| 6 | | I want to know is do we need to break it up into |
| 7 | | segments, you know, kind of similar to what you |
| 8 | | mentioned at ATX where, you know, there was a part |
| 9 | | of your employment where you were doing programming |
| 10 | | duties and then you switched over to implementation |
| 11 | | duties, and I know there wasn't anything that |
| 12 | | dramatic at Tyler but was there -- if we talk about |
| 13 | | your job duties, do we need to break it up like by |
| 14 | | year or during other time periods, or can we just |
| 15 | | talk about it generally? |
| 16 | A | Generally. |
| 17 | Q | All right.  So there were no significant changes -- |
| 18 | A | No. |
| 19 | Q | -- in your job duties; is that true? |
| 20 | A | Correct. |
| 21 | Q | Okay.  Let me start by asking how many days let's |
| 22 | | say during an average month at Tyler would you have |
| 23 | | spent at the office at Falmouth? |
| 24 | A | I'll have to back into that.  We were -- |
| 25 | Q | Yeah. |

```
 1   A    Sixteen -- I think there was a 16 billable day goal.

 2        There -- and 16 may not be accurate, but there was a

 3        billable day goal so-.

 4   Q    If I said it was 13, does that ring a bell?

 5   A    Thirteen maybe.

 6             MS. HOLMES RAY:  Object to the form.

 7             THE WITNESS:  It could be.  I'm not sure.

 8   BY MR. MCKEEBY:

 9   Q    Okay, you're just not sure.

10   A    I'm not sure.

11   Q    You know there were certain requirements --

12   A    There was a billable day goal.

13   Q    And what constituted a -- what made a day billable

14        as opposed to non-billable?

15   A    Going to a client site and providing services.

16   Q    Okay.  So in other words, when you were at the

17        office in Falmouth, it was not a billable day?

18   A    Unless you were providing training via the phone.

19   Q    Okay.  So you said you would have to back out the

20        number of days that you would have spent on average

21        approximately at the office at Falmouth, and I

22        think I kind of interrupted you while you were

23        maybe making that calculation and got off on a

24        tangent, but can you do that now?

25   A    I would say on average per month five days.
```

**EXHIBIT 4**

```
 1   Q    And then the rest of the days were spent on the

 2        road remotely at customer sites; correct?

 3   A    On the road at customer sites or remotely at customer

 4        sites.

 5   Q    And when you say remotely at customer sites, that

 6        means you would be in the office at Falmouth doing

 7        remote training?

 8   A    Correct.

 9   Q    Whenever you did remote training, it would have

10        been from your office at Falmouth?

11   A    Yes, for -- until I moved to Wisconsin.

12   Q    Okay.  Then you did remote training from your home?

13   A    From my home office, correct.

14   Q    What determined, if you know, whether or not you

15        did remote training versus live training at the

16        customer's site?

17   A    I don't know.  Those days were told to me.

18   Q    They were told to you in the sense that you were

19        told that either you needed to be at the customer's

20        location or you were going to be doing training

21        remotely?

22   A    Correct.

23   Q    When you did the training remotely, was it WebEx

24        type training where you were using the internet?

25   A    Yes.
```

**EXHIBIT 4**

| 1 | Q | And the telephone I take it as well? |
|---|---|---|
| 2 | A | Correct. |
| 3 | Q | It wasn't videoed? |
| 4 | A | No. |
| 5 | Q | And who would tell you whether or not the training |
| 6 | | was remote or at the actual customer site? |
| 7 | A | Jane. |
| 8 | Q | And how would she communicate that to you, and by |
| 9 | | that I mean, to be a little more specific, was this |
| 10 | | something that she would tell you on a day-to-day |
| 11 | | basis, did you have like a monthly calendar, or |
| 12 | | some other method to tell you essentially where you |
| 13 | | were supposed to be on a particular day? |
| 14 | A | We had a monthly schedule. |
| 15 | Q | And Jane prepared that I take it? |
| 16 | A | Yes. |
| 17 | Q | And so I take it that that monthly schedule might |
| 18 | | have -- Can you think of a customer that you did -- |
| 19 | | an example of a customer that you did training on |
| 20 | | site? |
| 21 | A | Yes. |
| 22 | Q | Okay, give it to me. |
| 23 | A | Indianapolis Public Schools. |
| 24 | Q | Okay.  So on this schedule there would be periods |
| 25 | | of time in which you were to be at the Indianapolis |

**EXHIBIT 4**