## FREEDOM COURT REPORTING

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4      _____

 5      _____

 6      PATTY BEALL, MATTHEW

 7      MAXWELL, TALINA McELHANY and

 8      KELLY HAMPTON, Individually

 9      and on behalf of all other

10      similarly situated,

11              Plaintiffs,         2:08-cv-422  TJW

12          v.

13      TYLER TECHNOLOGIES, INC., and

14      EDP ENTERPRISES, INC.,

15              Defendants.

16      _____

17      _____

18                      DEPOSITION OF

19                      ILENE MEYERS

20

21      At Raleigh, North Carolina

22      Friday, July 30, 2010; 9:14 a.m.

23      Reported by: Lindsey D. Cline, CVR
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4         LAUREEN F. BAGLEY, ESQ.

 5         Sloan, Bagley, Hatcher & Perry Law Firm

 6         101 East Whaley Street

 7         Longview, Texas 75606

 8

 9    For the Defendants:

10         PAULO B. McKEEBY, ESQ.

11         Morgan, Lewis & Bockius, LLP

12         1717 Main Street, Suite 3200

13         Dallas, Texas 75201-7347

14

15

16

17

18

19

20

21

22

23
```

**EXHIBIT 5**

# FREEDOM COURT REPORTING

1              T A B L E O F C O N T E N T S

2                E X A M I N A T I O N S

3     EXAMINATION                                PAGE

4        Direct Examination by Mr. McKeeby          6

5        Cross Examination by Ms. Bagley           89

6

7              T A B L E O F C O N T E N T S

8                   E X H I B I T S

9     EXHIBITS        DESCRIPTION        MARKED/REFERENCED

10    Number 1       Expense Reports          15/23

11    Number 2       Customer Services Report  22/23,24,26

12    Number 3       Offer Letter             75/77

13    Number 4       Resume                   80/

14    Number 5       Updated Resume           82/

15    Number 6       Declaration of Ilene     84/

16                   Anne Meyers

17    Number 7       Opt In Notice            89/

18

19

20

21

22

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

```
 1   Q.   She got married?

 2   A.   Uh-huh.

 3   Q.   Is that yes?

 4   A.   Yes, sorry.

 5   Q.   That's all right.  Who was the next project

 6        manager to whom you reported?

 7   A.   Karen Lowe, and it's an "E" at the end, L-O-W-E.

 8   Q.   How long did you report to Ms. Shumaker-Jackson as

 9        a project manager?

10   A.   I'd say approximately three months.

11   Q.   What were the circumstances surrounding your

12        transition from Ms. Jackson's team to Ms. Lowe's

13        team?

14   A.   Just growth.  Projects -- she was a more

15        experienced project manager.  I would get more

16        growth working with Karen Lowe.

17   Q.   So did you make a request to move to her team?

18   A.   No.

19   Q.   You were just advised that you were moving to her

20        team?

21   A.   Yes.

22   Q.   And do I understand your testimony correctly to

23        mean that you were advised that the reason for
```

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 32

```
 1         this shift was to allow you to grow more under a

 2         more experienced project manager?

 3    A.   Yes.

 4    Q.   Is that something Ms. Parsons told you?

 5    A.   Yes.

 6    Q.   Well, let me break it down a little bit.  Did you

 7         -- when you were first employed by Tyler, did you

 8         go through a period of training?

 9    A.   Yes.

10    Q.   Without getting into the effectiveness of the

11         training, was there a period that we could

12         identify that you were training to be an

13         implementation specialist?

14    A.   Yes.

15    Q.   Again, if you could give me an estimate, how long

16         was that training period?

17    A.   I was probably in training for approximately two

18         months.

19    Q.   And did part of that training consist of reviewing

20         the Tyler manuals to better acquaint yourself with

21         Tyler software?

22    A.   Yes.

23    Q.   And was that done in the office?
```

**EXHIBIT 5**

FREEDOM COURT REPORTING

1   A.   Yes.

2   Q.   And was part of the training shadowing or

3        observing other implementation specialists as they

4        did their job?

5   A.   Yes.

6   Q.   During this two-month training period that you

7        referenced -- approximately two-month training

8        period that you referenced -- did your training

9        consist of anything other than reviewing the

10       manuals and shadowing or observing other

11       implementation specialists?

12  A.   That was it.

13  Q.   Had you ever done software training or support

14       before coming to Tyler?

15  A.   No.

16  Q.   Was there something -- Well, I'll ask it a very

17       direct way.  Why did you seek employment with

18       Tyler?

19  A.   I was laid off from Southwest Airlines.  I was

20       unemployed.

21  Q.   Did you -- How did you find out about employment

22       opportunities at Tyler?

23  A.   Networking, through friends.

**EXHIBIT 5**

FREEDOM COURT REPORTING

```
 1        weeks in which you did work more than 40?
 2   A.   When I was shadowing.
 3   Q.   And I take it that includes travel time?
 4   A.   No, it does not include travel time.
 5   Q.   What does -- what did you do when you were
 6        shadowing?
 7   A.   I was assisting the -- whoever was implementing
 8        the training, and then there was sometimes follow-
 9        up work in the hotel.
10   Q.   What kind of follow-up work?
11   A.   Setting up parameters, possibly, you know, just --
12        and even in the learning phases, learning what was
13        taught that day or implemented that day for that
14        client.
15   Q.   And how would you go about learning what was
16        implemented that day?
17   A.   I would have my computer with me and would have
18        taken appropriate documentation.
19   Q.   So would this be kind of refreshing your
20        recollection and knowledge about what had been
21        trained during that day?
22   A.   Yes.
23   Q.   And when you were setting up parameters, would
```

**EXHIBIT 5**

FREEDOM COURT REPORTING

1       that be something you would assist the implementer

2       with?

3  A.   Yes.

4  Q.   And when you say parameters, what does that mean?

5  A.   There are tables within the software that need to

6      be set up that the software behaves in a certain

7      capacity based on their business needs -- whatever

8      their business needs are.

9  Q.   Does -- Is what you just described referred to at

10     Tyler during your employment as configuration or

11     is that something different?

12  A.   Parameters and configuration could probably be

13     interchanged, possibly, as words.  There are some

14     more -- I would say more -- it's more basic

15     setting of parameters or tables that are within

16     the software for that client, in particular.

17  Q.   What does configuration mean?

18  A.   Sometimes I think of it more on a heavier

19     technical side configuration, if it's something

20     that, you know, really starts with the software

21     development of the configuration for the

22     particular client.  It goes with, you know,

23     whatever analysis has been done for that

EXHIBIT 5

FREEDOM COURT REPORTING

Page 38

1         particular client.

2    Q.   Moving aside just for a moment now from the

3         training time, during your employment with Tyler

4         as an implementation specialist, I take it that --

5         and this is when you were on your own after the

6         training period.  You would do this work yourself

7         in terms of setting up the parameters?

8    A.   Yes.

9    Q.   Would you also do the type of configuration that

10        you just mentioned while you were an

11        implementation specialist?

12   A.   No.

13   Q.   Someone else at Tyler did that?

14   A.   Uh-huh, I believe so.

15   Q.   Do you know who?

16   A.   Well --

17   Q.   Or what department?

18   A.   I think it's the technology department.  Whatever

19        the technical people -- more of the inner workings

20        of the computer and the software.

21   Q.   Okay.  The -- and you didn't personally develop

22        the software?

23   A.   Do you think -- no, I didn't.  I'm sorry.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

1   Q.   That's okay.  Who -- can you name the implementers

2        who you shadowed?

3   A.   Sarah Shumaker-Jackson was one.  And I'm really --

4        I see her face and I don't know.

5   Q.   Let's see if I have it in these expense reports.

6        It says that you did some shadowing in Richmond.

7        Was that with Sharon?

8   A.   With Sarah --

9   Q.   I mean with Sarah?

10  A.   I think -- yes, Sarah Shumaker.  And there was

11       some done in Halifax County.

12  Q.   With?

13  A.   I just can't place her name.

14  Q.   Can't place the person's name?

15  A.   (Witness shakes head from side to side.)

16  Q.   Okay.

17  A.   I think she might even still be with them.

18  Q.   Okay.  Was the -- I understand MUNIS's software to

19       be broken down between financial software and

20       human resources software.  Does -- do you -- is

21       that accurate?

22  A.   The only thing I ever worked on were the

23       financials.  I didn't do the -- I think you're

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 5**

## FREEDOM COURT REPORTING

1        talking payroll?

2   Q.   I am.

3   A.   Yes.  I didn't work on payroll.

4   Q.   So you worked on supporting and training on the

5        financial software that Tyler provided?

6   A.   Yes.

7   Q.   And I guess you would agree that there are a

8        variety of different -- what do you call it --

9        applications within the software?

10   A.   Yes.

11   Q.   Like a general ledger.

12   A.   Accounts payable.

13   Q.   Accounts payable.  What are some other examples?

14   A.   Project management, accounts receivable,

15        general --

16   Q.   Billing?

17   A.   Billing.

18   Q.   Okay.  Well, I don't understand that to be an

19        exhaustive list of the applications within Tyler's

20        financial software, but they are representative

21        examples.

22   A.   Yes.

23   Q.   Did you have a particular specialty during your

## FREEDOM COURT REPORTING

Page 41

1      employment with Tyler as implementation specialist

2      with respect to any of these different modules?

3   A.   I wouldn't say I was a specialist in any of them.

4   Q.   Did you train in all of them?

5   A.   Yes.

6   Q.   Was the two-month training period that you

7       discussed established with you at the time of your

8       hire?  In other words, did someone tell you, "We

9       have a two-month period in which you're going to

10      be training before you go out on your own," or did

11      it just kind of develop that way?

12  A.   Actually, it was told I had a three-month training

13      period.

14  Q.   And was that by Ms. Parsons?

15  A.   Yes.

16  Q.   Why was your training period, in fact, cut, if you

17      will, to two months?

18  A.   I guess it was need -- need for an implementer.

19  Q.   Was anything ever expressed to you as to the

20      reason that you were trained for two instead of

21      three months?

22  A.   I think they just said a client's need.

23  Q.   Was there a particular client that you're

**EXHIBIT 5**

## FREEDOM COURT REPORTING

1      all part of the same larger document?

2  A.  It was separate documents for each module.

3  Q.  Were they -- how would you -- would you describe

4      these documents as -- I think you used the term

5      manuals.  Are they -- how long would they

6      typically be?

7  A.  It fluctuated.

8  Q.  Depending on the application?

9  A.  Yeah, depending on the application.

10  Q.  Would these be the same manuals that you mentioned

11      that you reviewed in connection with your

12      training?

13  A.  Yes.

14  Q.  So did the manuals explain how the software worked

15      or did they explain how you were supposed to train

16      others to learn the software?

17  A.  It just gave you screen shots and how the software

18      worked.

19  Q.  Okay.  Other than these manuals and the e-mail,

20      would there be anything else you would review

21      document-wise before embarking on the trip to the

22      customer site?

23  A.  I'm not recalling.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | Q. | Okay.  Like a project report or anything specific |
| 2 | | to the project?  Anything you can recall along |
| 3 | | those lines? |
| 4 | A. | You know, I don't want to be very specific because |
| 5 | | I'm not recalling. |
| 6 | Q. | Okay. |
| 7 | A. | But I just know that the project manager always |
| 8 | | did the analysis of what the client needs and |
| 9 | | wants.  And so I know that had to have been |
| 10 | | communicated to me.  And I'm not positive that |
| 11 | | there was an actual form or if it actually was |
| 12 | | just through e-mail saying this is exactly what |
| 13 | | the client is going to be using. |
| 14 | Q. | Okay.  And when you say the analysis of what the |
| 15 | | client needs and wants, you're talking something |
| 16 | | more than just what module you're training on, |
| 17 | | correct? |
| 18 | A. | Yes. |
| 19 | Q. | This is something more specific as to what the |
| 20 | | client wants to do within the particular module as |
| 21 | | to routing of data, for example? |
| 22 | A. | What they're using and what they're not. |
| 23 | Q. | Within the module? |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page.48

1   A.   Yes.

2   Q.   Did you as an implementation consultant -- I'm

3        sorry -- implementation specialist at Tyler ever

4        undertake an analysis of what the client needs and

5        wants -- similar to what you described the project

6        manager typically does?

7   A.   No.  That was the project manager's duties.

8   Q.   Okay.  And so your recollection, as best you can

9        recall, is that that would have been communicated

10       to you by the project manager in some form,

11       perhaps in a document, but perhaps through an e-

12       mail or a phone conversation?

13  A.   Yes.

14  Q.   Is there a name for that analysis of what the

15       client needs and wants that was used at Tyler?

16  A.   I don't know if there was a set name, but I would

17       call it the project plan.

18  Q.   If I use the term systems analysis, is that

19       something you're familiar with as a term used at

20       Tyler?

21  A.   I think that's a common usage for most technology,

22       system analysis.  But I don't know if that's

23       particularly what they called it as a project

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

```
 1        manager doing it.

 2   Q.   Okay.  But just using that sort of generic

 3        understanding of what a systems analysis means, is

 4        that a description of what we've discussed in

 5        terms of analyzing what the client wants and needs

 6        with respect to the software and what it intends

 7        to use and what it doesn't intend to use?

 8   A.   I don't know, because I don't know what the real

 9        definition of that term is.  And I hate to --

10   Q.   Okay.

11   A.   -- say anything.

12   Q.   But you're more comfortable with the phrase

13        project plan to describe that?

14   A.   Uh-huh, yes.

15   Q.   Okay.  Would it have been typical for you to be on

16        the phone with the customer prior to visiting the

17        customer site?

18   A.   It could be, possibly.

19   Q.   And what types of -- what reason would you have to

20        communicate with the client before the trip?

21   A.   I would just tell them I was to be expected in at

22        this time.  "I'm staying here.  Is there anything

23        I need to bring, or is there anything you need
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

FREEDOM COURT REPORTING

1       before I leave for my trip there?"  Customer

2       service.

3   Q.  Did you do that on every occasion?

4   A.  I was pretty much customer service oriented.

5   Q.  Okay.  So that's something you tried to do?

6   A.  Yes.

7   Q.  Would it be -- have been typical for you to do

8       training on multiple modules for the same client?

9   A.  Yes.

10  Q.  When you embarked on a trip to do training, would

11      it have been typical for you to train on two

12      different models during one trip?

13  A.  Yes.

14  Q.  I will tell you that based on depositions of

15      others in your position at Tyler, they've talked

16      about different phases of training.  Is that a

17      concept with which you're comfortable with, if I

18      talk about phases?

19  A.  Again, I refer back to project plan.  There are

20      different steps to the project.  And maybe you

21      want to put it into the words of phases.  You do

22      -- you know, first you come in and you might train

23      one piece.  And then you might come back and train

FREEDOM COURT REPORTING

Page 51

1    another piece.  But it's all aligned on a project.

2    That's what the project manager did is outline

3    the project of each step to get the client to

4    where it needs to go to get to that final point.

5  Q.  Okay.  When you say piece, are you -- what does

6    that mean?

7  A.  When I talk about pieces, there's different things

8    that the client's responsible to do to get to a

9    point where I come in and do the training.  So for

10   example, if it is to put in certain data --

11   information into the parameters that we just set

12   up, then --

13 Q.  To set up the system?

14 A.  Well, yeah.  Pretty much set up the system, get

15   ready to be able to be trained on it.

16 Q.  Did you ever provide training to customers about

17   how to set up the system?

18 A.  I showed them the different parameters when we set

19   up parameters.  But most of that discussion is

20   done ahead of time through that analysis that's

21   done or the project set-up, what they're going to

22   be using, what they're not going to be using.  So

23   I just assist them in setting up the parameter

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 52

1     tables for it to work for their business

2     processes.

3   Q.   Was -- in your job as implementation specialist,

4        was it important at all for you to know about the

5        customer's legacy or previous system?

6   A.   No.  I never got involved in their old system,

7        even though I heard about it.

8   Q.   You'd hear about it from the --

9   A.   From the client.

10  Q.   From the representatives who you were training?

11  A.   Yes.

12  Q.   When they would say, "We used to do it like this"?

13  A.   Yes.

14  Q.   Okay.

15  A.   Constant.

16  Q.   Okay.  But it's not something that you would have

17       reviewed or talked to the customer about in any

18       depth?

19  A.   No.

20  Q.   Now, you described the process by which you were

21       informed of what modules you would be training,

22       who your contact person was.  And again, I

23       understand you weren't exactly sure how -- in what

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 53

```
 1        form that was communicated to you by your project

 2        manager on every instance.  But how would you know

 3        how to set up the particular schedule of training

 4        with the customer?  And by that I mean, what times

 5        of the day that you're training, you know,

 6        particular representatives?  Is that something

 7        that you would have to work out with the customer

 8        once you got to the site, or was that something

 9        that was done ahead of time?

10   A.   That was done ahead of time.

11   Q.   And was that -- did Tyler use the term agenda to

12        describe that?

13   A.   I don't know if they used the word agenda.  But

14        the project manager was the one who would set up

15        with the client the days that I would be there to

16        train and the times.

17   Q.   Were you, as an implementation specialist, ever

18        involved in that process in setting up the agenda

19        for the training?

20   A.   Generally not.  If -- you use the word agenda as

21        what?  What is agenda?  The days, the time, the

22        place?

23   Q.   Yeah, I'll -- let me give you a definition.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 54

1   A.   Okay.

2   Q.   By agenda, I meant the day -- the schedule.  Like,

3        "Tuesday at 9:00 we want you to be training these

4        people on, you know, this aspect of the module.

5        And then at 1:00 you're going to go into this room

6        and train this group on, you know, this particular

7        aspect of the software."  Basically, the schedule

8        in the sense of where you're supposed to be and

9        what you're supposed to be doing.

10  A.   Right.

11  Q.   That's what I mean by agenda.

12  A.   Okay.  My project manager would set that up ahead

13       of time for me.

14  Q.   Okay.  And would there be a document that you

15       would have at the commencement of the

16       implementation that would tell you that, or would

17       you just be at the, kind of, customer's direction?

18  A.   I would know ahead of time that this -- and again,

19       that's the same thing that I don't recall if that

20       was given to me in an actual schedule or if it was

21       e-mailed to me or called to me.  But there was

22       some formal way of telling me that before I left

23       for my trip.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 55

| | | |
|---|---|---|
| 1 | Q. | Of telling you when and where you were supposed to |
| 2 | | be at particular times during the week? |
| 3 | A. | And contact person.  That's very important. |
| 4 | Q. | Right.  But it told you more detail than just, you |
| 5 | | know, "At 9:00 show up, you know, in the Virgin |
| 6 | | Islands and talk to this person." |
| 7 | A. | Go to the beach. |
| 8 | Q. | Yeah.  That too. |
| 9 | A. | That was exactly correct.  Usually it would say |
| 10 | | to, "Meet this person.  You're supposed to be |
| 11 | | training for three days."  That was more of the |
| 12 | | generalization, more than exactness.  Like, "At |
| 13 | | 9:00 you're going to be here and training this." |
| 14 | | It says, "Okay.  Meet with -- you will train" -- |
| 15 | | it usually tells me how many days I'm going to be |
| 16 | | training and what modules I was training more |
| 17 | | than, you know -- "But you're meeting Joe Smith at |
| 18 | | 9:00."  And then we'd go to the training room and |
| 19 | | go from there. |
| 20 | Q. | Okay. |
| 21 | A. | So there was some -- I'm sorry.  Go ahead. |
| 22 | Q. | No, go ahead.  No.  I was just going to ask:  So |
| 23 | | there wasn't necessarily a specific detailed |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

1    Q.    And what kinds of things would you tell your

2          project manager during these calls, just how the

3          training was going, that kind of thing?

4    A.    I would give her a -- if the training was going

5          well, was it running on time, was anything that

6          came up possibly that might need to be handled, if

7          the system was working well, if there's something

8          that maybe the system wasn't doing, if, you know,

9          she could look into it.

10   Q.    When you say "if the training was going on time,"

11         on time relative to what, a schedule, I take it?

12   A.    Just that I knew I was there for three days, three

13         billable days.  Was the three billable days going

14         to cover what I needed to cover?

15   Q.    And what would that depend on?

16   A.    It would depend on how quickly your client was

17         picking up what you were training or how well you

18         trained.

19   Q.    And when you said one of the things you would

20         report was whether or not the training was going

21         well, is that the same kind of thing in terms of

22         how -- when you say "going well," did you mean how

23         quickly the client was picking up the material?

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 59

```
 1   A.   It's just that there was no glitches in the
 2        system.  The client seems to understand what's
 3        going on and the data information came -- through
 4        conversation, they convert their information into
 5        the system.  Everything seems to be working well.
 6   Q.   And converting the data into the system, that was
 7        something done by Tyler's conversion department?
 8   A.   Yes, if that's the name of that.  But I don't know
 9        if it's called Tyler's conversion department.  But
10        there were technology folks that did that.
11   Q.   How about this?  It wasn't -- you were not the one
12        that converted the data?
13   A.   I did not.  And they're lucky I didn't.
14   Q.   Fair enough.  What if there was a situation where
15        the customer's employees who you were training
16        were not picking up on the training such that the
17        training was not on time?  Would you discuss with
18        the project manager the need to have additional
19        training?
20   A.   Yes, I would definitely pass that type of
21        information along.
22   Q.   And then I guess it was up to the project manager
23        to work that out with the client?
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

1   A.   And it also always depended on the contract.

2        Whatever contract the customer had with Tyler,

3        they were allowed so many hours of implementation

4        -- or billable days of implementation.  So if it

5        fell within that parameter -- otherwise there

6        would be an additional charge to the customer.  So

7        that all had to be worked around.  I didn't do any

8        of that.  I just passed information along.

9   Q.   So were you aware of what the number of hours were

10       on the contract?

11  A.   I didn't -- I never saw contracts.

12  Q.   Okay.  When you did complete a trip report, what

13       would you do with it?

14  A.   It actually went in -- I would send it to -- if I

15       recall correctly, I would do my trip report and

16       send it to my project manager via e-mail.  It was

17       a report within the system.

18  Q.   Did you have responsibilities when the customer

19       went live with Tyler's software?

20  A.   If I had implemented the full time for one client,

21       I would be there for the go-live.

22  Q.   Well, let's make sure we're on the same page about

23       what go-live means.  Tell me what your -- how

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 61

1      you're using that.

2   A.  Go-live is the -- now have actually -- are in

3       production, meaning it is an active system within

4       their business and their folks will be actually

5       using the system.  So it is actually generating

6       information.  It's actually having people put

7       input into their system.  So everything is

8       supposedly worked out prior to that for them to go

9       live.  And we would be there for support.

10  Q.  When you say we, would there be others with you?

11  A.  Generally, the project manager is there for go-

12      live.

13  Q.  But the project manager wouldn't be there when you

14      were doing the other training that you discussed?

15  A.  Generally not.  There had been times that she

16      would be there.

17  Q.  But the --

18  A.  But on a general basis, no, she was not there.

19  Q.  You would do that by yourself?

20  A.  Yes.

21  Q.  So in terms of the support that you provided

22      during the go-live process, was more -- I mean,

23      that's not something that the manual necessarily

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

FREEDOM COURT REPORTING

Page 62

1      assisted you with, correct?

2   A.   That's correct.  It would be more of they're

3        trying to do something and suddenly something's

4        not right with the system.

5   Q.   So sort of handling questions that came up during

6        the process of going live?

7   A.   And sometimes we'd have to get our own technical

8        people involved in it.

9   Q.   Would you use the term training to describe the

10       functions that you were performing during the go-

11       live process?

12  A.   I would call -- yeah -- training support.

13  Q.   And what do you mean by the term training support?

14  A.   Just there because the people -- it's new.  The

15       system's new to them.  Just to know that I'm

16       there.  If they have a question, I can assist them

17       with it.

18       MS. BAGLEY:  Paulo, just a heads up.  I've

19       got an expert calling me on another case.  I may

20       have to take a quick break if he calls.  I've been

21       trying to reach him all week.

22       MR. MCKEEBY:  Sure.

23       MS. BAGLEY:  And the deadline's today.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

```
 1              MR. MCKEEBY:  Yeah, I understand.

 2              MS. BAGLEY:  He's in court.

 3              MR. MCKEEBY:  Just let me know.

 4              MS. BAGLEY:  Okay.  When the phone -- if it's

 5    a --

 6              THE WITNESS:  If it starts dancing around --

 7              MS. BAGLEY:  Yeah.

 8              THE WITNESS:  -- we know.

 9              MR. MCKEEBY:  Okay.

10    Q.   (Mr. McKeeby)  All right.  Moving on.  After -- I

11         take it the amount of support that you provided

12         during the go-live process was something that was

13         scheduled?

14    A.   The go-live was scheduled.  I don't know if you

15         would consider the support scheduled.  The go-live

16         was just called go-live.

17    Q.   Right.

18    A.   And under the understanding of go-live, you were

19         there to help with training -- support --

20    Q.   But --

21    A.   -- during that period of time.  But it wasn't like

22         a schedule -- okay.  Scheduled training support.

23         It just was called go-live.
```

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 64

1    Q.    Right.  But what about the duration of the go-live

2          support that you provided?  That was scheduled,

3          correct?

4    A.    Oh, yes.  It was billable days.

5    Q.    Right.  And so just as the training that you

6          described before, which was scheduled -- you know,

7          again, either pursuant to some informal e-mail or

8          telephone call or some more formal document that

9          you may or may not be able to remember -- the go-

10         live support also was scheduled?

11   A.    Yes.

12   Q.    So you knew when you were providing go-live

13         support for a particular customer?

14   A.    Yes.

15   Q.    Would it have been unusual for you to provide go-

16         live support to a customer who you had not

17         previously visited?

18   A.    Possibly, yes.  Possibly, yes.

19   Q.    So wait.  There were occasions where you did

20         provide go-live support to a customer that you had

21         not visited before?

22   A.    Possibly, yes.

23   Q.    But that didn't happen very often?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

1   A.   No.

2   Q.   No, it did not?

3   A.   No, it did not.   Sorry.

4   Q.   That's all right.   That's my question that

5        elicited the double negative, so I have to fix it.

6        All right.   Once that set amount of go-live

7        support ended, did you have any additional

8        responsibilities with respect to that customer?

9   A.   Personal -- no.

10  Q.   Did you have any responsibilities with respect to

11       fielding questions from customers on the telephone

12       when you were at the office?

13  A.   I didn't, per se, have responsibility to where it

14       says, "You need to take these."   I would take

15       calls if they were customers I had implemented if

16       they had a question.   Absolutely I'd take their

17       call.

18  Q.   Was there any period of time in which you were

19       supposed to transition those kinds of calls to

20       Tyler's telephone support team?

21  A.   Well, anything technical went to Tyler's support

22       team.   If it was a simple training question I

23       could answer, I would answer it.   But anything

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

FREEDOM COURT REPORTING

Page 66

1       technical always went to technical support.

2   Q.  And -- but let's say a client called you because

3       you had been their implementer and they had a

4       technical question, would it have been your

5       practice to try to answer that question or to send

6       that to support?

7   A.  I would send it to support.  I wouldn't be any

8       help to them.

9   Q.  I see, okay.  Because you wouldn't know how to

10      answer the question perhaps?

11  A.  That's correct.

12  Q.  Was it the practice at the Raleigh office at Tyler

13      to allow you some flexibility to take all or part

14      of Fridays off if you had engaged in travel during

15      that week?

16  A.  No.  I was required to come in on Friday.

17  Q.  Have you -- before I just stated it in my

18      question, had you ever heard of such a practice at

19      the Raleigh office?

20  A.  It didn't happen with me, so I don't know.

21  Q.  Did it happen with others?

22  A.  I can't talk for them.  I don't know.  I don't

23      know what --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

1    A.    No.

2    Q.    And if I asked you to provide that resume --

3    A.    May I step back?

4    Q.    You can step back.

5    A.    I'm sorry.  Has what information I've put in for

6          the Tyler description changed?  No.  Have I

7          updated since?  Yes, because I've had other

8          employment.

9    Q.    Okay.

10   A.    Okay.  I just wanted to --

11   Q.    No.  That's a helpful clarification --

12   A.    Okay.

13   Q.    -- and probably saved us some time.  All right.

14         So that updated resume with the description of

15         your position at Tyler is something that you could

16         provide to our attorney?

17   A.    Yes.

18             MS. BAGLEY:  I gave it to you yesterday.

19   Q.    (Mr. McKeeby)  It's something you did provide to

20         your attorney?

21   A.    Yes, that too.

22   Q.    What do you know?

23   A.    Magic.  Do you want to take this back?

## FREEDOM COURT REPORTING

Page 82

1    Q.   No, we'll leave that one.  I've already entered it

2         as an exhibit.  I want to mark as Defendant's

3         Exhibit 5 what I understand to be your updated

4         resume that your counsel reminded me that she

5         provided to me yesterday.

6    A.   Thank you.

7              (THEREUPON, DEFENDANT'S EXHIBIT 5 WAS

8              MARKED FOR IDENTIFICATION.)

9    Q.   (Mr. McKeeby)  Is -- take a look at that and make

10        sure I'm right.

11   A.   Uh-huh, yes.

12   Q.   Okay.  Let me take a look at it if you could

13        because --

14   A.   Sure.  Tyler's right on that page you're looking

15        at.

16   Q.   Let me ask you what you meant by that first phrase

17        under the second bullet of your description of

18        your job with Tyler.  "Create lessons and training

19        plans."  What do you mean by lessons there?

20   A.   I just meant I bring out the manual that I'm going

21        to be using for the client and know what the

22        client -- who I'm going to be giving training to.

23        And so I didn't write anything down.  I didn't

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

## FREEDOM COURT REPORTING

Page 83

```
1       have like a written lesson plan or anything like

2       that.  All I just did was just kind of organize

3       myself to where I knew exactly what I was going to

4       be training that day for that client.

5   Q.  That's what you meant by creating lessons?

6   A.  Uh-huh, yes.

7   Q.  And what about training plans, is that something

8       distinct from lessons?

9   A.  No.  It was just my plans for training.

10  Q.  And that, I take it, also doesn't refer to any

11      written document?

12  A.  No.  Because I couldn't read my own handwriting.

13  Q.  Okay.  But the training plan that you referenced

14      in that bullet means the type of training that you

15      were to be providing to the customers?

16  A.  Uh-huh, yes.

17  Q.  And it's probably on your resume.  What's your

18      highest level of education?

19  A.  I have an associates degree, but I'm enrolled

20      right now in school.

21  Q.  What's your course of study currently?

22  A.  Information security systems.

23  Q.  Where are you in school currently?
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 84

1    A.    I'm at Wake Tech.

2    Q.    And when did you get your associates degree?

3    A.    Back in 1985.

4    Q.    From what school?

5    A.    I think it was 1986 -- '85.  Phoenix College.

6    Q.    Is it in Phoenix?

7    A.    Yes.

8          MR. MCKEEBY:  Let me mark this as Defendant's

9    Exhibit 6.  Thank you.

10         (THEREUPON, DEFENDANT'S EXHIBIT 6 WAS

11         MARKED FOR IDENTIFICATION.)

12   Q.    (Mr. McKeeby)  This looks like a statement that

13         you provided in connection with this lawsuit to

14         your attorneys.  Would you agree with that

15         characterization?

16   A.    Yes.

17   Q.    That your signature on the second page of the

18         document?

19   A.    Yes.

20   Q.    Look at Paragraph 4 of the second sentence that

21         says, "You never worked less than 40 hours per

22         week unless I was on vacation or took time off for

23         illness."  Was there a particular vacation that

1   A.   It's just that there was no glitches in the

2         system. The client seems to understand what's

3         going on and the data information came -- through

4         conversation, they convert their information into

5         the system. Everything seems to be working well.

6   Q.   And converting the data into the system, that was

7         something done by Tyler's conversion department?

8   A.   Yes, if that's the name of that. But I don't know

9         if it's called Tyler's conversion department. But

10        there were technology folks that did that.

11  Q.   How about this? It wasn't -- you were not the one

12       that converted the data?

13  A.   I did not. And they're lucky I didn't.

14  Q.   Fair enough. What if there was a situation where

15       the customer's employees who you were training

16       were not picking up on the training such that the

17       training was not on time? Would you discuss with

18       the project manager the need to have additional

19       training?

20  A.   Yes, I would definitely pass that type of

21       information along.

22  Q.   And then I guess it was up to the project manager

23       to work that out with the client?

1    A.    And it also always depended on the contract.

2          Whatever contract the customer had with Tyler,

3          they were allowed so many hours of implementation

4          -- or billable days of implementation.  So if it

5          fell within that parameter -- otherwise there

6          would be an additional charge to the customer.  So

7          that all had to be worked around.  I didn't do any

8          of that.  I just passed information along.

9    Q.    So were you aware of what the number of hours were

10         on the contract?

11   A.    I didn't -- I never saw contracts.

12   Q.    Okay.  When you did complete a trip report, what

13         would you do with it?

14   A.    It actually went in -- I would send it to -- if I

15         recall correctly, I would do my trip report and

16         send it to my project manager via e-mail.  It was

17         a report within the system.

18   Q.    Did you have responsibilities when the customer

19         went live with Tyler's software?

20   A.    If I had implemented the full time for one client,

21         I would be there for the go-live.

22   Q.    Well, let's make sure we're on the same page about

23         what go-live means.  Tell me what your -- how

```
 1        you're using that.

 2   A.   Go-live is the -- now have actually -- are in

 3        production, meaning it is an active system within

 4        their business and their folks will be actually

 5        using the system.  So it is actually generating

 6        information.  It's actually having people put

 7        input into their system.  So everything is

 8        supposedly worked out prior to that for them to go

 9        live.  And we would be there for support.

10   Q.   When you say we, would there be others with you?

11   A.   Generally, the project manager is there for go-

12        live.

13   Q.   But the project manager wouldn't be there when you

14        were doing the other training that you discussed?

15   A.   Generally not.  There had been times that she

16        would be there.

17   Q.   But the --

18   A.   But on a general basis, no, she was not there.

19   Q.   You would do that by yourself?

20   A.   Yes.

21   Q.   So in terms of the support that you provided

22        during the go-live process, was more -- I mean,

23        that's not something that the manual necessarily
```

EXHIBIT 5

```
 1              MR. MCKEEBY:  Yeah, I understand.

 2              MS. BAGLEY:  He's in court.

 3              MR. MCKEEBY:  Just let me know.

 4              MS. BAGLEY:  Okay.  When the phone -- if it's

 5        a --

 6              THE WITNESS:  If it starts dancing around --

 7              MS. BAGLEY:  Yeah.

 8              THE WITNESS:  -- we know.

 9              MR. MCKEEBY:  Okay.

10    Q.  (Mr. McKeeby)  All right.  Moving on.  After -- I

11        take it the amount of support that you provided

12        during the go-live process was something that was

13        scheduled?

14    A.  The go-live was scheduled.  I don't know if you

15        would consider the support scheduled.  The go-live

16        was just called go-live.

17    Q.  Right.

18    A.  And under the understanding of go-live, you were

19        there to help with training -- support --

20    Q.  But --

21    A.  -- during that period of time.  But it wasn't like

22        a schedule -- okay.  Scheduled training support.

23        It just was called go-live.
```

**EXHIBIT 5**

1   Q.   Right.  But what about the duration of the go-live

2        support that you provided?  That was scheduled,

3        correct?

4   A.   Oh, yes.  It was billable days.

5   Q.   Right.  And so just as the training that you

6        described before, which was scheduled -- you know,

7        again, either pursuant to some informal e-mail or

8        telephone call or some more formal document that

9        you may or may not be able to remember -- the go-

10       live support also was scheduled?

11  A.   Yes.

12  Q.   So you knew when you were providing go-live

13       support for a particular customer?

14  A.   Yes.

15  Q.   Would it have been unusual for you to provide go-

16       live support to a customer who you had not

17       previously visited?

18  A.   Possibly, yes.  Possibly, yes.

19  Q.   So wait.  There were occasions where you did

20       provide go-live support to a customer that you had

21       not visited before?

22  A.   Possibly, yes.

23  Q.   But that didn't happen very often?

```
 1    A.    No.

 2    Q.    No, it did not?

 3    A.    No, it did not.  Sorry.

 4    Q.    That's all right.  That's my question that

 5          elicited the double negative, so I have to fix it.

 6          All right.  Once that set amount of go-live

 7          support ended, did you have any additional

 8          responsibilities with respect to that customer?

 9    A.    Personal -- no.

10    Q.    Did you have any responsibilities with respect to

11          fielding questions from customers on the telephone

12          when you were at the office?

13    A.    I didn't, per se, have responsibility to where it

14          says, "You need to take these."  I would take

15          calls if they were customers I had implemented if

16          they had a question.  Absolutely I'd take their

17          call.

18    Q.    Was there any period of time in which you were

19          supposed to transition those kinds of calls to

20          Tyler's telephone support team?

21    A.    Well, anything technical went to Tyler's support

22          team.  If it was a simple training question I

23          could answer, I would answer it.  But anything
```

```
 1         you were thinking of when you wrote that

 2         statement?

 3    A.   I would take some -- I had to take time off.  I

 4         don't remember particulars of -- I could have been

 5         gone to the beach.  I don't know -- recall the

 6         actual vacation.

 7    Q.   How much vacation time were you permitted during

 8         your employment with Tyler?

 9    A.   I don't know how many hours I had and how many

10         hours I took.  I don't know how much time.

11    Q.   But you did take vacation from time to time?

12    A.   Yes.

13    Q.   And it also says, "Taking time off for illness."

14         Was there a particular illness or period that you

15         were referring to?

16    A.   Yeah.  I got very sick in Louisiana and I went to

17         the hospital so -- I was there.

18    Q.   Was that during a implementation?

19    A.   Yes, it was.

20    Q.   How long were you in the hospital?

21    A.   It was a 24-hour thing, and then I flew home.

22    Q.   Any other times that you can think of that you

23         missed work at Tyler because of illness?
```

**EXHIBIT 5**

1    A.    No.

2    Q.    And Paragraph 5 also discussed other forms of

3          compensation that you received during your

4          employment with Tyler, a travel premium of $25 per

5          day; is that correct?

6    A.    Yeah.  Any night I didn't sleep in my own bed, I

7          got $25.

8    Q.    And then after six months of employment you were

9          paid an expertise bonus of $30 per day?

10   A.    For every billable day, I would get $30.

11   Q.    Did you have to be out of town to get the

12         expertise premium?

13   A.    No.  It was just -- it was reflecting to billable.

14   Q.    So it says here, "Each day that I was out of town

15         performing billable work."  So that's not

16         accurate?

17   A.    I guess it isn't.  I believe that if -- well, the

18         only -- I'll step back again.  Because the only

19         time I actually had billable days was when I was

20         out of town.  And out of town could be, you know,

21         five hours up the road in a car.

22   Q.    So your testimony is that anytime you were at the

23         office you would not have been performing billable

1          work?

2     A.   That's -- no.  I take that back.  Yes, I would.

3     Q.   Because sometimes you'd be doing remote work?

4     A.   Right.  I would be doing data entry or something

5          that would be considered billable days -- billable

6          work.  Excuse me.

7     Q.   And you would get at least a portion of your

8          expertise bonus for that work, correct?

9     A.   Yes.

10    Q.   And Paragraph 5 mentions the salary, the travel

11         premium, and the expertise bonus.  Was there any

12         other type of compensation that you received from

13         Tyler in terms of a bonus or anything else like

14         that?  I understand you had per diems.  I

15         understand you had health and those types of

16         benefits.  But in terms of money compensation, was

17         there anything beyond what's specified in

18         Paragraph 5?

19    A.   No.

20    Q.   Paragraph 6 says that you -- that's on the next

21         page.  It talks about other implementation

22         specialists at Tyler.  Who did you mean by that?

23    A.   Other folks -- do you want particular names?

1        You're asking me for names?

2    Q.   Yes.

3    A.   Remmy -- and if you can try to pronounce her last

4         name.  She's no longer with Technology.  Michelle

5         Bryant.  You know, these are other folks that

6         might be on an implementation job with me.

7    Q.   So was Michelle Bryant one person or two persons?

8    A.   Michelle Bryant's one person.  I believe she's

9         still with the company.

10   Q.   And then the first person you named was

11        somebody --

12   A.   Remmy.

13   Q.   Remmy?

14   A.   Her first name is Abajaba (phonetic).  She's --

15        it's just really.  I can't pronounce her last

16        name.  She's African and has a very --

17   Q.   Okay.  We'll let the court reporter work on that

18        one.

19   A.   Remmy Bajajaja (phonetic).  That's it.

20   Q.   Okay.  Anybody else in particular that you had in

21        mind when you wrote that sentence?

22   A.   No one else in mind.  I worked pretty close with

23        those two.  Remmy and I were hired the same day,