# FREEDOM COURT REPORTING

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                   MARSHALL DIVISION
 3   PATTY BEALL, MATTHEW      )  2:08-cv-422 TJW
     MAXWELL, TALINA MCELHANY and  )
 4   KELLY HAMPTON, individually )
     and on behalf of all other )
 5   similarly situated,        )
                     Plaintiffs )
 6                              )
     v.                         )
 7                              )
     TYLER TECHNOLOGIES, INC.,  )
 8   and EDP ENTERPRISES, INC.  )
                     Defendants )
 9
10
11
12
13        DEPOSITION OF AMY R. DUNN, taken before Colleen
14   A. DiPierro, RMR, CRR, pursuant to notice dated July
15   13, 2010, at Executive Office Centers, 477 Congress
16   Street, Portland, Maine, on August 19, 2010, commencing
17   at 8:51 A.M.
18
19
     APPEARANCES:
20                        PAULO B. McKEEBY, ESQ.
                          CHANDRA L. HOLMES RAY, ESQ.
21
22
23
24
25
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

# FREEDOM COURT REPORTING

Page 2

1                          INDEX
    Deponent:  AMY R. DUNN
2        Examination by:                        Page
             ATTY. McKEEBY                         3

3

                           EXHIBITS
4    Number          Description                  Page
       1             Resume                        14
5      2             Tyler Expense Report, 11/9/08  31
       3             Performance Evaluation Form    76
6      4             Performance Evaluation Form dated  90
                     3/5/09
7      5             Email to MUNIS Jobs from Dunn,  98
                     5/14/07
8      6             Letter to Amy from Sansone, 6/7/07  103
       7             Consent To Opt In, 7/21/09    107
9
       (Exhibits included in original and copies.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

# FREEDOM COURT REPORTING

1   A.   I go on-site to clients and I go to the office when I'm

2        not on-site.

3   Q.   Have you -- who is your supervisor at Harris Computers?

4   A.   Jennifer Cyrus, C-Y-R-U-S.

5   Q.   What is her title?

6   A.   I honestly couldn't tell you.  I just know she manages

7        the office.  I don't know her official title.

8   Q.   Am I correct that your title at Tyler Technologies was

9        implementation consultant?

10  A.   Yes.

11  Q.   Is your understanding of your -- well, let me lay the

12       predicate first.

13            Have you started performing the job of

14       application consultant at Harris Computers?

15  A.   I'm in training.

16  Q.   What has that training consisted of generally?

17  A.   Learning the software and shadowing another application

18       consultant to learn the software.

19  Q.   Is it your understanding based on that training that

20       you have received that the job of application

21       consultant at Harris Computer is similar to the

22       implementation consultant position that you performed

23       at Tyler?

24  A.   I believe it will be similar.  However, I'll have more

25       responsibility in setting up the appointments and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

## FREEDOM COURT REPORTING

Page 8

```
 1       handling my own schedule.

 2   Q.  And what responsibilities specifically in terms of

 3       setting up your appointments do you expect to have at

 4       Harris Computers that you didn't have at Tyler

 5       Technologies?

 6   A.  Once the contract is signed, I believe I'd be notified

 7       and then I would schedule the client to make sure they

 8       get it in a timely manner and make sure it fits into my

 9       schedule as well.

10   Q.  And how did it work at Tyler Technologies with respect

11       to scheduling?

12   A.  Project managers did that.  I was told where I would be

13       and when I would be there.

14   Q.  So your understanding of your job at Harris Computers

15       is that you would work directly with the client to

16       schedule the appointment within whatever the

17       contractual time designations are?

18   A.  Yes.

19   Q.  And is that -- you mentioned setting up an appointment

20       and handling your schedule.  Are those distinct

21       concepts in your mind?

22   A.  No, I was just trying to elaborate.

23   Q.  Okay.  But you would agree with me that there would be

24       some obviously limits in terms of your ability to set

25       up your schedule and your appointments in the sense of
```

**EXHIBIT 8**

## FREEDOM COURT REPORTING

```
 1        you would be governed by whatever the contractual

 2        arrangement between Harris Computers and its client

 3        would be?

 4             MS. HOLMES RAY:  Objection, form of the

 5        question.  You can answer.

 6   A.   Can you repeat it now.

 7   BY MR. McKEEBY:

 8   Q.   Probably not, but I'll try to ask in maybe a more

 9        discernible fashion.

10             Would you agree with me that even though you

11        may have some autonomy to set up your schedule at

12        Harris Computers, that there would be some structure

13        dictated by the terms of the contract and any deadlines

14        that are set forth in the contract between Harris

15        Computers and its customer?

16             MS. HOLMES RAY:  Same objection.  You can

17        answer.

18   BY MR. McKEEBY:

19   A.   Yes.

20   Q.   Based on what you've learned about your job at Harris

21        Computers, are there any other differences in terms of

22        the responsibilities between what you expect at your

23        current position compared to your position of

24        implementation consultant at Tyler Technologies?

25   A.   The only difference that I've been told is that I will
```

**EXHIBIT 8**

## FREEDOM COURT REPORTING

Page 15

```
1       of the website?

2   A.  It is J-O-B-S I-N M-E.

3   Q.  Okay.  So it stands for Jobs in Maine; is that right?

4   A.  Yes.

5   Q.  Okay.  Do you have a copy of that posting?

6   A.  I would have a copy at home, yes.

7   Q.  Where would that be located?  Is it just like a file or

8       something related to your employment through --

9   A.  Yes.

10  Q.  Returning to your resume, I forgot, did you agree with

11      me that this is indeed the updated resume, Exhibit 1?

12  A.  Yes, it is.

13  Q.  I notice that you have structured the resume such that

14      it describes your professional experience generally and

15      then lists the different places where you've been

16      employed.

17          First of all, are you okay with that

18      characterization?

19  A.  Yes.

20  Q.  And that there's a heading called professional

21      experience that starts here on page 2?

22  A.  Yes.

23  Q.  And I think it goes to page -- yeah, it finishes up on

24      page 3 of the resume, correct?

25  A.  Uhm-uhm, yes.
```

**EXHIBIT 8**

## FREEDOM COURT REPORTING

1  Q.  Which, if any of these summaries, describe your job

2       responsibilities and experience at Tyler Technologies?

3  A.  May I?

4  Q.  Yes.  And let me -- let me maybe break it down a little

5       bit.

6            The first heading is called software training.

7       Do you see that?

8  A.  Yes.

9  Q.  Does that entry describe, or portions of that entry I

10      guess would be a better way to phrase the question, do

11      portions of that entry describe your job

12      responsibilities at Tyler?

13  A.  The first bullet would.

14  Q.  But only the first bullet?

15  A.  Yes.

16  Q.  I'm just going to put a little checkmark by that if

17      that's okay with you?

18  A.  Fine.

19  Q.  What about the second heading which is software and

20      hardware technical support, did I read that right?

21  A.  Yes.

22  Q.  Do any of those bullets describe your job duties while

23      you were at Tyler Technologies?

24  A.  If any, it wasn't intended to, but the provided

25      technical support on part of the software, I did in

**EXHIBIT 8**

# FREEDOM COURT REPORTING

1      some cases provide technical support for.

2   Q.   But it wasn't your --

3   A.   Primary duty.

4   Q.   -- primary duty or your intent when you drafted that

5        portion of your resume to describe your functions at

6        Tyler?

7   A.   That's correct.

8   Q.   And, I take it -- the last section is called accounting

9        and bookkeeping.  Any of those bullets describe your

10       performance or rather your job responsibilities at

11       Tyler?

12  A.   They do not.

13  Q.   This bullet that you mentioned under software training

14       starts with implemented and provided training and it

15       mentions on-site and online.

16            First of all, I take it, on-site means at the

17       customer location?

18  A.   Yes.

19  Q.   And online means via the web in sort of a Webinar

20       context?

21  A.   Webex, yes.

22  Q.   Webex, okay.  That's where you're providing remote

23       training?

24  A.   Yes.

25  Q.   While you were at Tyler was the substance of the

**EXHIBIT 8**

1   training that you provided on-site compared to through

2   the Webex the same in terms of what you were training

3   on?

4   A.   The content would have been the same, yes.

5   Q.   Okay.  That was my question.

6           What determined whether the training was

7   on-site versus online?

8   A.   My supervisor.

9   Q.   Your supervisor's direction?

10  A.   Made those decisions.

11  Q.   The -- again, the first bullet talks about it says

12  implemented and provided training.

13          Is there a distinction in your mind between

14  implemented and training?

15  A.   In my mind I think of the implementation as getting

16  them set up, gathering the information from what they

17  want and need, determining what's best with them, how

18  to use the software, and then helping them set it up to

19  accomplish that.

20  Q.   So implementation describes functions that we'll go

21  into more in detail but occurred prior to doing user

22  training?

23  A.   Yes.

24  Q.   When you were hired at Tyler, what type of training did

25  you go through?

## FREEDOM COURT REPORTING

Page 19

1   A.   I had sessions with my supervisor for training and I

2        also shadowed my supervisor and other implementation

3        consultants.

4   Q.   Was there a discreet period of time which you were in

5        training?

6   A.   I couldn't define that, no.

7   Q.   Meaning you can't remember what it was or you're not

8        sure if there necessarily was a specific period of

9        time?

10   A.   There was no specific deadline that I can recall.  It's

11        been a long time.

12   Q.   I understand.  How long were you in training

13        approximately if you don't have a precise number?

14   A.   I couldn't guess.  It seemed like the first at least

15        two or three months it was definitely training, but I

16        also learned a second module, so I started training

17        again.  It was all sort of intermingled.

18   Q.   When did you learn the second module?

19   A.   I have no idea.

20   Q.   At some point after the initial two to three months,

21        though?

22   A.   Yeah.  I don't recall a specific time frame.

23   Q.   Okay.  So at some point during your employment you

24        learned a second module, and so there was some element

25        of training that occurred during that process?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 8**

## FREEDOM COURT REPORTING

```
1    A.    Yes.

2    Q.    Did that also involve shadowing?

3    A.    Yes.

4    Q.    Just so that we're all on the same page, what was the

5          second module that you learned?

6    A.    Permits and code enforcement.

7    Q.    And what was the initial module that you learned?

8    A.    Business license.

9    Q.    How did it come about that you learned this second

10         module of permits and code enforcement?

11   A.    That was determined by the project managers.  I don't

12         know.

13   Q.    How were you advised of the need to learn this second

14         module?

15   A.    Again, by my supervisor.

16   Q.    Which one?

17   A.    I don't remember.

18   Q.    But one of these project managers that we mentioned?

19   A.    It would be Hope or David, but I don't know which one.

20   Q.    And during your tenure of your employment, did you

21         conduct implementations both with respect to business

22         licenses and permits and code enforcement?

23   A.    Yes, I did.

24   Q.    And is it a correct statement to say that those were

25         the only two modules that you had or that you supported
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

# FREEDOM COURT REPORTING

Page 21

1     while you were an implementation consultant to Tyler?

2  A.  Yes.

3  Q.  When you say that you had sessions with your supervisor

4     in connection with your initial training, to what are

5     you referring?

6  A.  Webex training sessions, listening in on Webexes.

7  Q.  So these would be training sessions that you would be

8     viewing on the web along with other participants?

9  A.  At the time I started with another implementation

10     consultant who was also learning business license, so

11     the two of us in the early stages.

12  Q.  Who was that?

13  A.  Nicole something.  I don't remember her last name.

14  Q.  Was she at Tyler at the time you left employment there?

15  A.  I believe she was but in a different department.

16  Q.  What department was she in?

17  A.  I believe she had joined conversions but I can't

18     confirm that.  I -- that was my last contact with her,

19     that that was where she was.

20  Q.  And so you're identifying a department of conversions

21     that is distinct from is it the implementation

22     department that you were in?

23  A.  Yes.

24  Q.  What does conversion mean in the vernacular at Tyler?

25  A.  It was a department who was responsible for taking data

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

# FREEDOM COURT REPORTING

Page 22

1    from existing systems from clients and electronically

2    converting it and loading it on the client's software.

3    Q.   So then that's not something you did as an

4    implementation consultant?

5    A.   In some cases we would assist them in defining where

6    their data went in our system from their old data, but

7    I did not actually do the physical or electronic

8    conversion.

9    Q.   Would you -- I'm sorry.  You would assist the

10   conversion department at times?

11   A.   We would assist the customer in defining where their

12   data went in our system and that would be submitted to

13   the conversion department, and they would do the actual

14   conversion.

15   Q.   Okay.  So you would meet with the client to explain to

16   the client where the data from their system would go in

17   Tyler's system?

18            MS. HOLMES RAY:  Object to the form of the

19   question.  You can answer.

20   A.   I didn't dictate where it went, I helped them define

21   where they wanted it to go.

22   BY MR. McKEEBY:

23   Q.   And you would do that in a meeting with the client?

24   A.   Yes, in one of our on-site visits.

25   Q.   And how would you communicate where the client directed

**EXHIBIT 8**

## FREEDOM COURT REPORTING

Page 23

1     the data to go in Tyler's system to the conversion

2     department?

3  A.  There's a worksheet to be filled out.

4  Q.  And is that a worksheet that you filled out as an

5     implementation consultant?

6  A.  With the customer.

7  Q.  What does that mean, you filled it out with the

8     customer?

9  A.  We discussed with -- their data and where it should go

10    and then we completed the form together.

11  Q.  Was this a form that was completed online?

12  A.  No, it was a spreadsheet.

13  Q.  So was it done manually then?

14  A.  It was electronic but it was not --

15  Q.  Okay.

16  A.  -- on the net.  When you say online, I assume it would

17    mean the Internet.

18  Q.  Probably is a fair assumption.

19       But you completed it electronically on the

20    system with the customer?

21  A.  Yes.

22  Q.  And then you took whatever action to submit that to the

23    conversion department?

24  A.  Yes.

25  Q.  And was that the case throughout your employment with

# FREEDOM COURT REPORTING

1    Q.   And when you say that would depend on the site, you

2         mean that would depend on the customer site?

3    A.   Yes.

4    Q.   Does that go back to the size of implementation?

5    A.   Yes.

6    Q.   As an implementation consultant, would you meet with

7         the customer to discuss who at the customer needed to

8         be trained and on what and when in terms of setting up

9         the agenda or schedule for the training?

10   A.   Yes.

11   Q.   And, again, this is a one-on-one meeting between you

12        and either -- this is a meeting between you and either

13        one or more representatives of the customer?

14   A.   Yes.

15   Q.   Would this agenda be created at the same time as the

16        initial meeting that you discussed in which you would

17        gather information about the customer's processes?

18   A.   No.

19   Q.   This would be a separate meeting?

20   A.   Yes.

21   Q.   Is there -- would there be a person at the customer who

22        would be typical for you to meet with in terms of a

23        title like a, I don't know, a planner, or would that

24        just depend on the particular staffing of the customer?

25   A.   It would depend on the staffing.

## FREEDOM COURT REPORTING

Page 59

1   Q.   Okay.  When you were meeting with the customer to set

2        up these agendas and schedule, would you come away with

3        something in writing out of that process?

4   A.   I tried to.

5   Q.   What was the ultimate writing that you would try to

6        create as a result of that meeting, the schedule?

7   A.   Yes.

8   Q.   And you would provide that schedule to the customer for

9        approval?

10  A.   The customer would usually take the schedule and be

11       sure that everybody was available when we had

12       determined.

13  Q.   What would the schedule contain?  Would it be just

14       times and the identification of whatever aspect of the

15       module that the training would be on at that time

16       or --

17  A.   With the person who would be there, yes.

18  Q.   Any other information?

19  A.   Not typically.

20  Q.   Are those schedules one of the types of documents that

21       you retained that you mentioned earlier?

22  A.   No.

23  Q.   What would you do with those schedules after they were

24       completed?

25  A.   I kept them on file just in the claim file.

**EXHIBIT 8**

## FREEDOM COURT REPORTING

1   Q.   Would that be part of the trip report or attached to

2        the trip report or anything like that?

3   A.   Not usually.

4   Q.   Would they be submitted to the project manager for

5        approval?

6   A.   Not typically.

7   Q.   So if I understood your testimony correctly, you would

8        come up with the schedule with the customer and then

9        the customer would confirm that the people were

10       available at the designated times?

11  A.   Yes.

12  Q.   Would the schedule actually have employees of the

13       customer on it?

14  A.   Typically, yes, and it would be distributed to them.

15  Q.   And then obviously you would have a copy so you would

16       know who you were training and when?

17  A.   Yes.

18  Q.   When you were training employees of the customer about

19       the functionality of the Tyler software, would you have

20       any obligation typically to report back to the customer

21       to advise the customer at a general level how the

22       training was going?

23  A.   In very general terms I'm sure I just told them that

24       they went well or --

25  Q.   Did you ever have to tell them that they didn't go

**EXHIBIT 8**

## FREEDOM COURT REPORTING

1   Q.   How were you advised -- let me ask a different

2        question.  So when I've talked about office work

3        throughout the deposition, to distinguish that from

4        time that you spent either traveling or at a customer

5        location --

6   A.   Yes.

7   Q.   -- correct?

8           So when I've used that term, you have

9        understood it to mean time that you spent at your

10      home -- your home office doing work for Tyler?

11   A.   Yes.

12   Q.   Do you have an estimate of an average, or I'll start

13      with that, with an average number of hours that you

14      contend that you worked while you were at Tyler,

15      average weekly number of hours that you contend you

16      worked while you were at Tyler?

17   A.   It seems like I filled out a document that said

18      something along that line, but I would say I did my

19      travel and my on-site work, and then I would spend two

20      to three hours between the evening and the morning

21      while I was in the hotels.

22   Q.   Okay.

23   A.   But I don't have an actual number right -- I don't

24      remember it if I did.

25   Q.   What is the document that you mentioned that you think

**EXHIBIT 8**

## FREEDOM COURT REPORTING

Page 68

1     you filled out?  Was that something in connection with

2     the lawsuit?

3  A.   Yes.

4  Q.   Do you -- without telling me the number, do you think

5     you put a number in that document?

6  A.   I'm pretty sure there was a question about it, but I'd

7     have to see the document.

8  Q.   What type of document are you thinking of, something

9     that your counsel provided to you?

10  A.   Yes.

11        MS. HOLMES RAY:  I'm going to object.  We're

12     not going to go into attorney-client stuff.

13     BY MR. McKEEBY:

14  Q.   I'm not asking you to refer back to that document, but

15     just based on what you remember today, can you provide

16     an estimate or a range of the average number of hours

17     that you worked at Tyler when you were employed there

18     as an implementation consultant?

19  A.   Per week?

20  Q.   Yes.  On a weekly basis.  I mean are you going to tell

21     the judge in this case that your average was 42 hours,

22     52 hours, some range or something else?

23  A.   I would say 50.

24  Q.   And I understand that's a range, as my question

25     indicated.

**EXHIBIT 8**

## FREEDOM COURT REPORTING

Page 69

1    Did that -- well, did the number of hours that

2    you worked on weeks when you were not traveling, were

3    they less than those weeks in which you were traveling?

4    A.   Yes, I would try very hard to work 40 hours.

5    Q.   Were you as an implementer on the customer's site when

6    they would go live?

7    A.   Yes.

8    Q.   So that we're on the same page, there have been a few

9    occasions today where we haven't been, but what do you

10   mean when you say go live?

11   A.   When they actually start using the software live rather

12   than in a testing or training situation.

13   Q.   What were your responsibilities during the go live

14   process?

15   A.   To answer questions.

16   Q.   Of the end users?

17   A.   Yes.

18   Q.   How long would that process take in the sense of how

19   long were you on the site while the customer was going

20   live or did that depend and vary?

21   A.   That was determined by the project manager.

22   Q.   Okay.  I'm not asking who determined it, I'm asking how

23   long it was?

24   A.   It varied.  I don't know.

25   Q.   Would it be typical that you would make a trip to a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

## FREEDOM COURT REPORTING

1       customer location specifically for the purposes of

2       assisting the client during the go live process?

3   A.  Typical, no.

4   Q.  What would be typical?

5   A.  There were go lives that we were available by Webex or

6       by phone.

7   Q.  So in these cases you would be assisting the customer

8       remotely while they were undergoing the go live

9       process?

10  A.  Yes.

11  Q.  Were there ever occasions where you were at the

12      customer location physically while they went live?

13  A.  I want to say yes, but I can't think of a specific

14      example.  I don't know.

15  Q.  So it would have been more typical for you to have

16      assisted with the go live process either via Webex or

17      by phone?

18  A.  Yes.  And even that would have been very few that I was

19      actually doing that.

20  Q.  Very few means what?

21  A.  It wasn't for every implementation.  I was not there

22      for go live or working with them for go live.

23  Q.  Right.

24  A.  In some cases the project manager might do it or for

25      some reason they didn't want us to be there for go

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 8**

# FREEDOM COURT REPORTING

Page 73

1    A.    I believe it's the 30 days after they go live to answer

2          questions for them.

3    Q.    And am I correct that -- well, let me ask you an

4          open-ended question.  Were there days similar to when

5          what we just discussed about go live support where you

6          were assigned to be at your office to assist with post

7          live support?

8    A.    I would never say that I was assigned to be sitting at

9          my office to do a post live support.  We did the

10         support as it came in.  There was no formal assignment

11         that, Amy, you're going to answer questions from this

12         customer.

13   Q.    Right.  But there was that with respect to the go live

14         support, you knew you had to be at your office on a

15         particular day?

16   A.    No.  It was that 30-day period they could email or

17         leave a voicemail at any time, not that one day.

18   Q.    Right.  But I'm talking about not post live but go

19         live.  I think you told me this, but I want to make

20         sure, is that when you were providing go live support,

21         there were days when your project manager would tell

22         you you need to be at your office to field these

23         questions for this customer while they're going live?

24   A.    For go live, yes.

25   Q.    But not the case for post live?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

# FREEDOM COURT REPORTING

1  A.  That's correct.

2  Q.  Okay.  Because they could send you an email or call you

3       at any time?

4  A.  Any time.

5  Q.  Did they have your cellphone, they being the customers,

6       to call you with these types of questions during this

7       period?

8  A.  They would call the office voicemail or email.

9  Q.  They would call your office voicemail?

10 A.  Uhm.

11 Q.  Is that yes?

12 A.  Yes.

13 Q.  And then they would send you emails?

14 A.  Yes.

15 Q.  Was the 30-day period that you referenced consistent

16      from client to client as to the amount of time you were

17      providing post live support?'

18 A.  Yes.

19 Q.  Did you understand that to be something that was part

20      of the customer's contract or did you have an

21      understanding?

22 A.  I was told that was part of my job.

23 Q.  And the post live support, just so that we're clear,

24      that you would provide is that you would answer their

25      questions about the software that would come up on an

## FREEDOM COURT REPORTING

Page 75

```
1        as-needed basis after they had actually been converted

2        to handling live data on the system?

3   A.   Yes.

4   Q.   Did you ever have any occasions where a customer would

5        contact you after the 30-day period and ask you

6        questions?

7   A.   I don't know.

8   Q.   You don't recall that happening?

9   A.   I don't recall.

10  Q.   Do you recall any Tyler policy or instruction that you

11       received to indicate to you what you were supposed to

12       do if that did happen?

13  A.   I don't recall.

14  Q.   I want to engage in an exercise similar that we did

15       before and ask you to provide me with an estimate of a

16       range of the amount of time at Tyler that was devoted

17       to first go live support.

18  A.   I would -- 1 to 2 percent.

19  Q.   So not much?

20  A.   Very little.

21  Q.   The same with post live support?

22  A.   Yes.

23  Q.   1 to 2 percent, in that range?

24  A.   Yes.

25  Q.   Did you ever provide training to any of Tyler's
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

## FREEDOM COURT REPORTING

```
1       employees?

2  A.   Not that I recall.

3  Q.   Did any of Tyler's implementers ever shadow you?

4  A.   I believe there was an occasion that that happened,

5       yes.

6  Q.   Who was the -- was that an implementer that shadowed

7       you?

8  A.   Yes.

9  Q.   Who was that?

10 A.   I think it was Sam Parker.

11 Q.   Was that a newly hired implementer?

12 A.   Yes.

13 Q.   I'm going to ask you a broad question.  If we need to

14      break it down, we can.  You've given me percentages and

15      estimates and ranges with respect to how big a

16      component, different aspects of your job, were.

17           Do those changes vary or do those percentages

18      vary depending on whether or not you were doing

19      business license support versus permits and code

20      enforcement support, or are they generally the same?

21 A.   I would say generally the same.

22 Q.   I'm going to hand you a document I'm going to mark as

23      Exhibit 3.

24           (Deposition Exhibit No. 3, Performance

25      Evaluation Form, marked for identification.)
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 8**

| | | |
|---|---|---|
| 1 | | that you completed at Tyler? |
| 2 | A. | Yes. |
| 3 | Q. | And is it a correct statement to say that the expense |
| 4 | | reports that you completed throughout your employment |
| 5 | | were in this format? |
| 6 | A. | Not throughout my employment. |
| 7 | Q. | When did it change? |
| 8 | A. | I don't know the exact timing, but it was the spring of |
| 9 | | 2009. |
| 10 | Q. | So towards the end of your employment? |
| 11 | A. | Yes. |
| 12 | | MS. HOLMES RAY:  What's the Bates on that? |
| 13 | | MR. McKEEBY:  Tyler/Beall 081416. |
| 14 | | BY MR. McKEEBY: |
| 15 | Q. | And she's asking -- see we put these numbers at the |
| 16 | | bottom? |
| 17 | A. | Yes. |
| 18 | Q. | They show all the documents that have been produced and |
| 19 | | it lets the lawyers keep track of what's been produced. |
| 20 | | I understand this is something that was added |
| 21 | | after the lawsuit was commenced. |
| 22 | | All right.  Let's talk a little bit about -- |
| 23 | | let me go ahead and mark this as Exhibit 2 to your |
| 24 | | deposition. |
| 25 | | (Deposition Exhibit No. 2, Tyler Expense |

```
1        Report, 11/9/08, marked for identification.)

2        BY MR. McKEEBY:

3   Q.   These would be reports that you would submit to

4        your -- to the accounting department at Tyler?

5   A.   To my supervisor who then I assumed signed it and then

6        it was passed off to the accounting department.

7   Q.   Okay.  And that's your signature here at the upper

8        left-hand side of the document?

9   A.   It is.

10  Q.   Would you -- and is this for a week's period of time?

11  A.   Yes.

12  Q.   And in terms of the -- this summary of activity, do you

13       see that section that I'm pointing to here?

14  A.   Yes.

15  Q.   At the bottom of the document?

16  A.   Yes.

17  Q.   That's something -- you completed these -- that

18       portion, correct?

19  A.   Yes.

20  Q.   One of those columns shows quantity .5 to 1.  Does that

21       refer to a billable day?

22  A.   Yes, billable time.

23  Q.   Billable time.  I notice that this one that has a

24       reference to home office is billed in a .72 amount.

25            First of all, am I correct about that?
```

```
1    A.    I can barely read it, but it does look like .72, and

2          that was for it says verification and testing.

3    Q.    Okay.

4    A.    So it was something I did via Webex with the

5          customer --

6    Q.    Was that billable time?

7    A.    -- prior to an on-site visit.  And yes, that was what I

8          was told to put in there by my supervisor.

9    Q.    Let me ask you a more general question.  You understand

10         that the claim in this lawsuit is that -- part of the

11         claim in the lawsuit is that you worked overtime while

12         you were -- you worked more than 40 hours while you

13         were employed with Tyler?

14   A.    Yes.

15   Q.    And I don't think we're particularly in disagreement

16         about that.

17               Is the -- is there any way to tell from this

18         expense report how many hours you worked for Tyler

19         during this week which appears to be a week in November

20         of 2008?

21   A.    There is not.

22   Q.    And is that -- is your answer specific to this form or

23         is it also true to say that as a general matter, you

24         cannot tell your hours worked from the expense reports?

25   A.    There are -- there were different times while I was
```