**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **PATTY BEALL, MATTHEW MAXWELL,** | § | |
| **DAVID GRAVLEY, TALINA MCELHANY,** | § | |
| **KELLY HAMPTON, CASEY BROWN,** | § | |
| **JASON BONNER, ANTHONY DODD,** | § | |
| **ILENEMEYERS, TOMO'HAVER,** | § | |
| **JOY BIBLES, ANDMELISSA PASTOR,** | § | |
| **Individually and on behalf of all others** | § | |
| **similarly situated;** | § | |
| | § | |
| **Plaintiffs,** | § | **2:08-cv-422 TJW** |
| | § | |
| **TYLER TECHNOLOGIES, INC., AND** | § | |
| **EDP ENTERPRISES, INC.** | § | |
| **Defendants.** | § | |

**PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSE UNDER**
**29 USCA 213 A(1) ADMINISTRATIVE EXEMPTION CLAIM**
**AND BRIEF IN SUPPORT**

Come now the Plaintiffs, Patty Beall *et al.*, individually and on behalf of all others similarly

situated, (hereinafter "Plaintiffs") and pursuant to Rule 56 of the Federal Rules of Civil Procedure

move this Honorable Court for an order directing entry of Partial Summary Judgment on Defendants'

Administrative Exemption Defense in favor of Plaintiffs and against Defendants Tyler Technologies,

Inc. and EDP Enterprises, Inc., dismissing Defendant's affirmative defense.  Plaintiffs  specifically

request that the court  dismiss Defendants' affirmative defense under 29 USCA 213 a(1) claiming

the administrative exemption, on the grounds that as a matter of law, Defendants cannot sustain their

legal burden of establishing through clear and affirmative evidence that each Plaintiff herein meets

every requirement of the administrative exemption under the Fair Labor Standards Act (FLSA).  For

the Court's ease, Plaintiffs' Motion addresses the administrative exemption as to each separate sub

class proposed by Plaintiffs

## I.
## STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiffs are entitled to summary judgment on Defendants' affirmative defense

under 29 C.F.R. § 541.200 (the "administrative exemption" of the FLSA) when Plaintiffs' primary

job duties did not include non-manual work related to the management of general business

operations of the Defendants or the Defendants' customers nor did the Plaintiffs' primary job duties

include the exercise of discretion and independent judgment with respect to matters of significance?

## II.
## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Tyler Technologies, Inc.  is a computer software company specialized in government and
      school application software.

2.    Implementation Consultants/Specialists were employed by EDP Enterprises and/or Tyler
      Technologies at all times relevant to this action.

3.    During the time that Implementation Consultants/Specialists were employed by EDP
      Enterprises and/or Tyler Technologies, Inc. their work involved interstate commerce.

4.    Defendants do not contend that the computer exemption applies to the positions of Trainer
      or Client Liaison.

5.    The only position that Defendants contend is exempt under the computer professional
      exemption is the position of Implementation Consultant and/or Implementation Specialist.

6.    Defendants' software packages are canned software programs.

7.    Implementation Consultants/Specialists were paid more than $455.00 per week in salary.

8.    Implementation Consultants/Specialists were not paid $27.63 per hour for all hours worked.

9.      Implementation Consultants and/or Implementation Specialists employed by Tyler Technologies were uniformly classified as exempt employees.

10.     Implementation Consultants/Specialists, while employed by Defendants, EDP Enterprises, Inc. and/or Tyler Technologies, Inc. routinely worked in excess of 40 hours per week, including evenings and weekends.

11.     Trainers, Client Liaisons, Implementation Consultants and Implementation Specialists did not have management as their primary duty.

12.     Trainers, Client Liaisons, Implementation Consultants and Implementation Specialists did not perform the types of duties described as management activities by the regulations.

13.     The job duties associated with the implementation of Defendants' software products were consistent for every project and included the following responsibilities: (1) business process review; (2) conversion; (3) configuration; (4) training; (5) go live; (6) post go live support.

14.     The time Implementation Consultants/Specialists spent on each implementation task varied depending on the client.

15.     The task of "business process review" involved the gathering of information from the client and reviewing their current business processes in order to determine what the client's current software did and what the client would like the new software to do.

16.     The Implementers responsibility with conversion was limited to reviewing conversion reports that are generated after  the conversion software is run.

17.     Implementers do not create or write conversion software.

18.     Implementers do not load conversion software.

19.     Implementers do not determine how the conversion is to be performed.

20.     The task of "configuration" involves setting up the software according to the client's preferences.

21.     The training process involves simply instructing the customer's employees how to use the software.

22.     Training primarily consists of using canned screen shots from the software and walking the employees through each step in the process.

23.     "Go Live" is the process where the client begins using the software in its operations.

24.    The role of all Implementers during "go live" is to be on site to answer questions, re-train if necessary and address glitches if they occur.

25.    Post go-live support involves answering questions such as the correct  sequence of entering information in order to print checks.

26.    Post go-live support is usually very limited amounting to a de minimis job duty.

27.    Trainers spend the majority of  their time training customers how to use Defendants' software.

28.    Implementation Consultants/Specialists do not write or create computer programs for Defendant.

29.    Implementation Consultants/Specialists do not perform any work on operating systems.

30.    Implementation Consultants and Implementation Specialists routinely spent more than fifty percent of their time training Tyler Technologies customers how to use Tyler's software packages.

31.    Implementation Consultants and Implementation Specialists did not make decisions or recommendations about what programs or program options the customer should use.

32.    The customers made the decision as to what programs and program options it would implement.

33.    Implementation Consultants/Specialists did not supervise any other employees.

34.    Implementation Consultants/Specialists did not have as their primary duty the performance of office or non-manual work directly related to the management or general business operations of Defendant.

35.    Eighty percent (80%) or more of Implementation Consultants/Specialists' job took place on location – meaning at the customer's site.

36.    Implementation Consultants/Specialists job duties were not directly related to Defendants' general business operations or the general business operations of Defendants' customers.

37.    Implementation Consultants/Specialists' duties are related to producing Defendants' product.

38.    Implementation Consultants/Specialists do not exercise discretion or independent judgment with respect to matters of significance.

39.   Implementation Consultants/Specialists  did not have the authority to bind the company or negotiate on behalf of the company.

40.   Implementation Consultants/Specialists job duties did not include the authority to evaluate possible courses of conduct and act after considering the various possibilities.

41.   Implementation Consultants/Specialists did not make recommendations to the customer about the possible courses of conduct.

42.   Implementation Consultants/Specialists were instructed not to give Defendants' customers recommendations or advice on their business processes, instead Implementation Consultants/Specialists were only permitted to present the various options available through the software package.

43.   Project managers were responsible for planning the activities for each implementation.

44.   Some Implementation Consultants/Specialists prepared job agendas from canned agendas, other Implementation Consultants/Specialists were given agendas by their project manager.

45.   Implementation Consultants/Specialists do not "analyze" data.

46.   Implementation Consultants/Specialists' job duties required the use of skill and not the exercise of discretion and independent judgment.

47.   Implementation Consultants/Specialists were not required to have any kind of specialized academic training in order to hold the position of Implementation Consultant or Specialist.

48.   Performance of Implementation Consultants/Specialists' job duties does not require knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.

49.   Defendants had been notified on previous occasions, or should have known, about the violations of the FLSA, but did not take action, despite demands and notice.

50.   Defendant's actions were taken with knowledge that its acts violate the wage and hour provisions of the FLSA.

51.   Defendants knew that Implementation Consultants/Specialists routinely worked more than 40 hours per week .

52.   Defendants did not compensate Implementation Consultants/Specialists for all hours they actually worked.

53.     Defendants did not keep accurate time records of hours worked by Implementation Consultants/Specialists.

### III.
### BACKGROUND

**1. OVERVIEW OF PLAINTIFFS' JOB DUTIES**

3.1     It is undisputed that no matter what Division's software is being implemented the basic implementation process is identical for all divisions of Tyler Technologies. Defendant's corporate representative, Chris Hepburn, President of Tyler's Schools Division,[1] testified to six primary duties implementation employees working for Tyler would perform: (1) a review of customer's current business processes; (2) data conversion and reviewing converted data; (3) software configuration and reviewing the configuration for errors; (4) training; (5) go-live assistance; and (6) post go-live support.[2] These duties are typically performed in this order, save that reviewing the software configuration and converted data could take place throughout the implementation process. Additionally, it is also important to understand that each implementation is overseen by a project manager who dictates when, where and how the implementer is to perform his/her job.[3] Although the implementer is often at the client site alone, the parameters of what the implementer is supposed to do have been pre-determined by the project manager.[4] The following brief description of each of the essential elements of an implementation is instructive:

---

[1] *See* Exhibit "2", Hepburn Dep. 46:5-7.
[2] *See* Exhibit "2", Hepburn Dep. 20:11-21:5.
[3] *See infra* Part II.B.4.
[4] *See infra* Part II.B.4.

**a. Review of Customer's Current Business Processes**

3.2     Business process review is the process of meeting with the client and reviewing their current business processes in order to determine how Tyler's software will need to be set up/configured or customized to fit the customer's processes.[5] Mr. Hepburn described this process as consultation with the client wherein one of Defendants' employees would ask questions to determine what the client's current software did and what the client would like the new software to do.[6]

3.3     Tyler Technologies software programs are "canned" "out of the box" programs with various options built into the programs which can be turned on or off as needed to suit the client's preferences.[7] In other words the MUNIS payroll software is the same whether it is being implemented by Ilene Meyers in the Virgin Islands or Travis Void in Raleigh, North Carolina. The client in the Virgin Islands may want to set up payroll checks on a weekly basis and the client in Raleigh may want to select the option of bi-weekly payroll checks. The **process** is identical for each implementer, i.e. turning on the options chosen by the client within the software modules.

**b.  Conversion**

3.4     Conversion is the process where the client's existing data (i.e. employee names, social security numbers, client names etc.) is converted to a format that can be read by the Tyler software. The process involves the loading of conversion software by the conversion department or programmers and the software converts the client's existing data into a new format. The **only** role

---

[5]*See infra* Part II.B.4.i.a; *see also infra* Part II.B.4.ii.a.; *see also infra* Part II.B.4.iii.a.; *see also infra* Part II.B.4.iv.a.
[6]*See* Exhibit "2", Hepburn Dep. 21:8-28:19.
[7]*See infra* Part II.B.4.iv.c.

that some implementers are involved with in the conversion process is reviewing for conversion errors.[8]  The implementer identifies these errors and notifies the programmers and/or assists the client in correcting the way their existing data is entered so that the conversion software can read and convert it.

### c.  Configuration

3.5     Configuration is the process in which the implementer sets up the software according to the client's preferences as determined in the business process review.[9]

### d.  Training

3.6     The training process is identical for all implementers.[10] It is simply instructing the client's employees how to use the software. The implementers primarily use the screen shots from the software and simply walk the employees through each step in the process.[11]

### e.  Go Live

3.7     Go Live is the process where the client begins using the software in its operations.[12] The implementer is on site to answer questions, re-train if necessary and address glitches if they occur.[13]

### f.  Post go live support

3.8     Post go live support is simply answering questions, in other words more training.[14] The client may have forgotten the sequence of entering information in order to print checks and the

---

[8]*See infra* Part II.B.4.
[9]*See infra* Part II.B.4.
[10]*See infra* Part II.B.4.
[11]*See infra* Part II.B.4.
[12]*See infra* Part II.B.4.iii.f; *see also infra* Part II.B.iv.f.
[13]*See supra* n. 12.
[14]*See infra* Part II.B.4.

implementer merely goes over the steps of the process and walks the client through it, usually over the phone.[15]  Post live support is nothing more than continued training that all implementers perform, it is simply occurring after go live instead of before go live.  Additionally, post live support is usually very limited amounting to a de minimis job duty at best.[16]

## IV.
### LEGAL STANDARDS & ARGUMENTS

### A.  THE STANDARD APPLICABLE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

4.1     A Motion for Summary Judgment must be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[17]  The party moving for summary judgment has the initial burden of informing the Court of the basis for its motion and identifying the pleadings, admissions, discovery documents, and affidavits it contends show the absence of a genuine issue of material fact.[18]  However, the moving party is not required to support its motion with affidavits or other similar materials, nor does the moving party have the burden of negating the other party's claim.[19]  The movant need only "point out" to the District Court that there is an "absence of evidence to support the non-moving party's case."[20]

4.2     The non-moving party must then go beyond its own pleadings to designate specific controverted facts raising genuine triable issues.[21]  In order to establish a genuine issue of material

---

[15]*See infra* Part II.B.4.
[16]*See infra* Part II.B.4.iii.f.
[17]Fed. R. Civ. P. 5(c).
[18]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[19]*Id.* at 322-323.
[20]*Id.* at 324.
[21]*Id.*

fact, "the nonmoving party may not rely on mere denials or allegations in its pleadings, but must designate specific facts showing that there is a genuine issue for trial."[22]  The plain language of Rule 56(c) mandates the entry of summary judgment against a nonmoving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which the party will bear the burden of proof at trial.[23]

### B. The Administrative Exemption

4.3     As a general rule, the FLSA requires that employers compensate employees who work in excess of forty hours per week at a rate of one and a half times their regular pay.[24]  Defendants rely on two exemptions to justify their failure to pay Plaintiffs' overtime wages.   The first such exemption is the administrative exemption, which forms the basis of this Motion for Summary Judgment.   29 C.F.R. § 541.200 defines an "employee employed in a bona fide administrative capacity" as "any employee:"

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.[25]

---

[22]*Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 258 (8th Cir. 1996).
[23]*Celotex Corp. v. Catrett*, 477 U.S. at 322.
[24]*See* 29 U.S.C. §207(a)(1); *see also Brown v. AGM Entm't, Inc.*, 2008 WL 2704657, at *3 (S.D.Tex. 2008).
[25]29 C.F.R. § 541.200(a)

4.4     To qualify as an administrative employee and be exempt from the FLSA overtime provisions, an employee must meet all three of the above criteria.[26]  The employer has the burden to prove that the employee is exempt under the FLSA, and that exemption is construed narrowly against the employer.[27]

4.5.     Plaintiffs do not dispute that they were compensated on a salary or fee basis satisfying § 541.200(a)(1).  For the reasons explained below, Plaintiffs do not meet the remaining two elements and therefore cannot be classified as exempt employees under § 541.200(a), thus warranting summary judgment on Defendants' affirmative defense of the administrative exemption.

## 1. WORK DIRECTLY RELATED TO THE MANAGEMENT OR GENERAL BUSINESS OPERATIONS OF THE EMPLOYER OR THE EMPLOYER'S CUSTOMERS

4.6     Under the second prong of the administrative exemption, in order for employees to be classified as exempt the employees' primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."[28]  This second prong can be broken into three different elements which have to be established by the Defendants:

(1) does the employee perform office or non-manual work; and

(2) is such work "directly related to the management or general business operations of the employer;" or

(3) is such work "directly related to the management or general business operations... of the employer's customers."

---

[26]*Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 216, 262 (5th Cir. 2000).
[27]*Tyler v. Union Oil Co.*, 304 F.3d 379, 402 (5th Cir. 2002) *citing to Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990).
[28]29 C.F.R. § 541.200(a)(2).

4.7     Plaintiffs do not dispute that the majority of their work involved the performance of office or non-manual work. Plaintiffs' primary duties did not, however, directly relate to the management or general business operations of the Defendant or its customers.   According to the Department of Labor at 29 C.F.R. § 541.201(a), "the phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee."[29]

> To meet this requirement, an employee must perform work *directly* related to assisting with the *running* or *servicing* of the business, as distinguished, *for example*, from working on a manufacturing production line or selling a product in a retail or service establishment.[30]

4.8     This provision, and its predecessor, has led to the so-called "administrative-production dichotomy," which many courts have used to determine whether an employee's primary duty relates to management or general business operations.[31]   If an employee is involved in the production or sale of the employer's product, the employee is not exempt.   The regulation, however, provides production and sales only as *an example* of work that does not directly relate to management or general business operations.[32]   As the Southern District of Texas noted in *Kohl v. Woodlands Fire Dept.*, "the case law makes it clear that although production work cannot be administrative, it is not the case that non-production work must be administrative."[33]   Therefore, if

---

[29]29 C.F.R. § 541.201(a).
[30]29 C.F.R. § 541.201(a)
[31]*Andrade v. Aerotek, Inc.*, 700 F.Supp.2d 738 (D.Md. 2010); *Reiseck v. Univ. Comms., Inc.*, 591 F.3d 101 (2nd Cir. 2010); *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2nd Cir. 2009); *Kohl v. The Woodlands Fire Dept.*, 440 F.Supp.2d 626 (S.D.Tex. 2006).
[32]*Id.*
[33]*Kohl v. Woodlands Fire Dept.*, 440 F.Supp.2d 626, 641 (S.D.Tex. 2006) *citing to Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004).

an employee is not involved in the production or sale of the employer's product, the employee may or may not be exempt depending on the nature of the employee's primary job duty.[34]

4.9     The regulations distinguish production work from the administrative operations of the business at 29 C.F.R. § 541.201(a) and thereafter define the administrative operations of the business at 29 C.F.R. § 541.201(b).[35]   The examples of the kinds of job duties which are directly related to management or general business operations, listed in §541.201(b), are functional areas such as:

> tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.[36]

4.10     Thus, an employee's primary job duty is directly related to management or general business operations of the employer or the employer's customers, for purposes of exemption from overtime pay requirements under the FLSA, if the employee engages in running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of its affairs."[37]

4.11     As this element of the administrative exemption relates to an employer's customers, 29 C.F.R. § 541.201(c) provides the example of "employees acting as advisors or consultants to their employer's clients or customers" as persons who "may be exempt."[38]   The regulation specifies, however, the kind of advisory or consulting role that satisfies the element by specifically referencing

---

[34]*See id.*
[35]*Compare* 29 C.F.R. § 541.201(a) *with* 29 C.F.R. § 541.201(b).
[36]29 C.F.R. § 541.201(b).
[37]*Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Circuit 2002); *see also Cotten v. HFS-USA, Inc.*, 620 F.Supp.2d 1342, 1347–48 (M.D.Fla. 2009); *see also Ruggieri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 585 F.Supp.2d 254 (D.Conn. 2008)
[38]29 C.F.R. §541.201(c).

"tax experts" and "financial consultants," that is, persons who are actually engaged in the client's business.  Thus, a recruiter employed by a placement agency who interviews service professionals for contract positions with her employer's clients, negotiated their pay, and helped manage them once they were placed would satisfy the second prong of the administrative exemption,[39] whereas the contractors themselves might not.[40]

### 2. PLAINTIFFS' PRIMARY JOB DUTY MUST INCLUDE THE EXERCISE OF DISCRETION AND INDEPENDENT JUDGMENT WITH RESPECT TO MATTERS OF SIGNIFICANCE.

4.12.   The third element of the administrative exemption requires Defendants to prove that Plaintiffs' "primary job duty includes the exercise of discretion and independent judgment with respect to matters of significance."[41]  The regulations state that the term "exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."[42]

4.13    Additionally, the regulations set out certain factors to consider when determining whether an employee exercises the requisite discretion and independent judgment:

> (1) whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;
>
> (2) whether the employee carries out major assignments in conducting the operations of the business;
>
> (3) whether the employee performs work that affects the business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

---

[39]*Andrade v. Aerotak, Inc.*, 700 F.Supp.2d 738, 746 (D.Md. 2010) *citing to Dep't of Labor Op. Ltr.*, 2005 WL 3308616 (Oct. 25, 2005).
[40]*See id.* at n. 7.
[41]29 C.F.R. § 541.200(a)(3).
[42]29 C.F.R. § 541.202(a).

(4) whether the employee has authority to commit the employer in matters that have significant financial impact;

(5) whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

(6) whether the employee has authority to negotiate and bind the company on significant matters;

(7) whether the employee provides consultation or expert advice to management;

(8) whether the employee is involved in planning long- or short-term business objectives;

(10) whether the employee investigates and resolves matters of significance on behalf of management; and

(11) whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.[43]

4.14   Although the "exercise of discretion and independent judgment" does not require that the employee's decisions have absolute finality or unlimited authority,[44] the requirement places a burden on the Defendant far more stringent than simply proving that Plaintiffs used their mental faculties and made decisions or assessments in conducting their primary duties.  The "exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources."[45]

4.15.   A number of cases are illustrative regarding the application of this element of the administrative exemption as it relates to Plaintiffs herein.  The primary job dutiy that Plaintiffs spent

---

[43] 29 C.F.R. § 541.202(b).
[44] 29 C.F.R. § 541.202(c).
[45] 29 C.F.R. § 541.202(e).

Page 15

the greatest proportion of their time performing is training the customers on how to use Defendants' software.

4.16    In *Kohl v. The Woodlands Fire Department*, one of the plaintiff's primary job duties was to "educate" her employer's customers by teaching classes and giving lectures.[46]  In many instances, plaintiff was provided with the materials and programs she taught.[47]  The court held that teaching "prepackaged classes," delivering "preset lectures," or presenting "pre-established programs," does not involve discretion, and is a non-exempt duty."[48]

4.17    In *Pezzillo v. Gen Tel. & Elec. Inf. Sys., Inc.*, "plaintiffs were employed by the defendant to implement computer systems for certain customers according to specifications."[49]  Although the *Pezzillo* plaintiffs' duties were far more technical than those presented here, plaintiffs were instructed how to set up the system and thereafter performed the implementation according to the specifications they were given.[50]  The court held that "the credible evidence clearly establishes that plaintiffs performed work in which they exercised job skill as contrasted to discretion and independent judgment."[51]

### 3.   MUNIS, ODYSSEY, EAGLE, EDEN, & INCODE PLAINTIFFS' PRIMARY DUTIES WERE A PRODUCT OF DEFENDANT TYLER TECHNOLOGIES, AND THEREFORE NOT ADMINISTRATIVE

---

[46]*Kohl v. The Woodlands Fire Dept.*, 440 F.Supp.2d 626, 628 (S.D.Tex. 2006) *citing to Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 749 (6th Cir. 2000).
[47]*See id.* at 644.
[48]*See id.* at 644 (holding that a training officer that inherits lessons plans, even though he adjusts those place to incorporate additional material, does not exercise discretion or independent judgment) *and Hashop v. Rockwell Space Operations Co.*, 867 F.Supp. 1287 (S.D.Tex. 1994) (holding that technical instructors were not exempt, despite being able to make technical recommendations to alter the classes taught).
[49]*Pezzillo v. Gen. Tel. & Elec. Info. Sys., Inc.*, 414 F.Supp. 1257, 1258 (M.D.Tenn. 1976).
[50]*See id.* at 1259–1265.
[51]*Id.* at 1269.

4.18    In order to determine where Plaintiffs' work falls in this administrative-production dichotomy, it is necessary to first determine what Defendants' products are.  As the First Circuit noted in *Reich v. John Alden Life Ins. Co.,*

> [A]pplying the administrative-production dichotomy is not as simple as drawing the line between white-collar and blue collar workers.  On the contrary, non-manufacturing employees can be considered "production" employees in those instances where their job is to generate (i.e. 'produce') the very product or service that the employer's business offers to the public.[52]

4.19    A business' products, as contemplated by the FLSA, are all of the "goods and services which constitute the business' marketplace offerings."[53]  In the present case, Defendants' "business involves selling and *servicing* proprietary software applications primarily to municipal government and other public sector entities."[54]  The summary judgment evidence clearly establishes that the MUNIS, ODYSSEY, EAGLE, EDEN, and INCODE Plaintiffs' primary duties relate to production activities, as opposed to administrative activities, because Plaintiffs' primary duties as implementation employees *were* a product sold by the Defendant.

4.20    Defendants' potential customers have the option of purchasing not only propriety software but also Plaintiffs' implementation services separate and apart from that software.  These implementation services were sold as a "pool of days," against which the customers were billed based on the records kept by implementation employees.[55]  If the customer utilized all of the days that they had purchased for implementing Defendants' software, they were presented the option of

---

[52]*Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997).
[53]*Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002).
[54]Def's Mot. to Decertify pg. 2.
[55]*See* Exhibit "2", Hepburn Dep. 138:24–139:2.

purchasing additional days.[56]  The more days of implementation work a customer purchased, whether in their "pool" or as additional days, the greater the  Defendants' profits.

    4.21    All of the MUNIS, ODYSSEY, EAGLE, EDEN, and INCODE Plaintiffs filled a "billable role"[57] with the primary focus of generating a service the Defendants' could sell.  While there may be some difference between divisions as to which specific implementation duties certain Plaintiffs performed, it is undisputed that Plaintiffs' primary duties as implementation employees directly relate to the implementation of the customers' software.[58]  All of the time Plaintiffs within these subclasses spent with a customer, whether they were configuring the customer's software, training, or present at a go-live, either on site or remotely, was billable time charged to the customer.[59]

---

[56]*See* Exhibit "5", Meyers Dep. 60:1–8; *See* Exhibit "14", Grimwood Dep. 52:1–8; *See* Exhibit "29", Carrington Dep. 44:8–45:5;

[57]*See* Exhibit "2", Hepburn Dep. 150:2-3; *See* Exhibit "17", Dunning Dep. 43:7–11; *See* Exhibit "8", Dunn Dep. 32:20–22;

[58]*See* Exhibit "2", Hepburn Dep. 20:11–21:5; *see also supra* Part I.A.2; *see generally infra* Part II.B.4.

[59]*See* Exhibit "4", Maynard Dep. 25:13–26:5 (providing services on site or on the phone were billable to the client); *See* Exhibit "9", Void Dep. 25:16–22; *See* Exhibit "5", Meyers Dep. 64:1–4, (go-live support was billable to the client);  *See* Exhibit "5", Meyers Dep. 86:22–87:6 (Time spent on sit with the client and remote services rendered to the client were billable to the client); *See* Exhibit "12", Milburn Dep. 56:14–17; *See* Exhibit "11", Dupree Dep. 71:19–72:1; *See* Exhibit "28", Brown Dep. 68:18–20 (all implementation work done for the client was billed to the client); *See* Exhibit "29", Carrington Dep. 46:1–10 (Tyler's implementation managers pressured implementers to bill the clients all the time they had); *See* Exhibit "30", Dodd Dep. 55:10–23 (phone calls from customers, even if during implementing another customer's software, were billable);*See* Exhibit "30", Dodd Dep. 81:17–18 (client billed for data conversion); *See* Exhibit "18", Bibles Dep. 124:22–23 (time spent with a client was billed to the client); *See* Exhibit "21", Hayner Dep. 65:21–66:20 (Hayner told only to record billable time, that is time spent with the client); *See* Exhibit "19", O'Haver Dep. 87:16–24, 100:11–13 (training hours were billable to the customer as well as office time spent on services for the customer); *See* Exhibit "22", Britt Dep. 78:18–79:3 (time spent with the client was billable, although time spent studying, making notes, etc. was not); *See* Exhibit "20", Wilton Dep. 135:2–16 (whatever hours worked for a particular client were billed to the client); *See* Exhibit "23", Duke Dep. 88:6–7 (whenever Duke was working for the customer, it was billed to the customer); *See* Exhibit "25", Mutch Dep. 27:17–24 (when Mutch was with a client, it was billable); *See* Exhibit "24", Baird Dep. 120:5–9 (time spent with the client was billed to the client).

4.22     In *Davis v. J.P. Morgan Chase & Co.*, the Second Circuit Court of Appeals addressed whether loan underwriters' duties met the second prong of the administrative exemption.[60]   The Court held that their work did not relate to "setting 'management policies' nor to 'general business operations'", but rather concerned the production of loans, which was a profit motivated service provided by the bank.[61]  In so holding, the Court found that evaluations by Chase of the underwriters productivity and incentives offered to those underwriters to increase production indicated that the underwriters were production workers rather than administrative employees.[62]  Moreover, the Court opined that these evaluations and incentives indicated the defendant employer itself understood plaintiffs to be engaged in production work.[63]  In the Court's words, "paying production incentives to underwriters shows that Chase believed that the work of underwriters could be quantified in a way that the work of administrative employees generally cannot."

4.23     In the present case, just as in *Davis*, Plaintiffs were evaluated on their ability to bill hours to a customer and were provided with incentives to maximize the number of billable hours they produced.  Plaintiffs' were given a quota of days that they were supposed to bill during any given month.[64]   Although Plaintiffs had little or no control over when they were scheduled to be with a client or how often,[65] all Plaintiffs' were evaluated on their ability to bill hours to a customer[66] and at least one Plaintiff testified to "catching heat" from his managers if he failed to meet his

---

[60]*Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2nd Cir. 2009).
[61]*See id.* at 534.
[62]*See id* at 534–35.
[63]*See id.* at 534.
[64]*See* Exhibit "12", Milburn Dep. 95:20–96:5 (referencing Milburn's quota).
[65]*See* Exhibit "12", Milburn Dep. 55:25–56:3; *See* Exhibit "13", Mosenthin Dep. 102:20–103:11.
[66]*See* Exhibit "2", Hepburn Dep. 150:17-151:3;*See* Exhibit "12",Milburn Dep. 95:20–96:5 (Milburn received negative marks for billing below her monthly quota); *See* Exhibit "13", Mosenthin Dep. 102:20–23 (stating that it was very frowned upon for an implementer not to be traveling or providing remote training that could be billed to a client).

quota.[67]  Futhermore, Plaintiffs were provided incentives to maximize their production in the form of billable days.  Within MUNIS and EDEN there was the so-called "expertise premium," which rewarded implementers for the number of hours they billed to the customer.[68]  EDEN also offered an incentive called "stretch goals," which provided a $4,000 incentive if the implementer billed more than 135 hours or a $6,000 incentive if the implementer billed more than 165 hours to Defendants' customers.[69]  INCODE offered an incentive to its implementers for billing the greatest number of days to a client possible.[70]  Under this incentive plan, Defendants' assessed how much billable time an implementer performs over the year; the higher the number of days billed, the greater the incentive payment.[71]  Thus, the record clearly indicates that Plaintiffs' primary duties relate directly to the production of a service sold by the Defendants, rather than the administration of the Defendants' business, and, moreover, that Defendants themselves tacitly recognized that production role.

4.24    The next inquiry is whether Plaintiffs primary duties directly related to the management or general business operations of the Defendants' customers.[72]  Defendants' customers are predominately governmental entities, whose "products" are public services.[73]  They were not private sector computer or software businesses whose marketplace offerings included the sale or servicing of software.  Plaintiffs' did not advise the customers as to how their software should be set

---

[67]*See* Exhibit "13", Mosenthin Dep. 102:20–103:11.
[68]*See* Exhibit "1", Sansone Dep. 178:2–25; 186:10–21; *See* Exhibit "15", Tyler EDEN Division Consulting Incentive Compensation Plan [Ex. 9 from Sansone's Dep.].
[69]*See id.*
[70]*See* Exhibit "16", Tyler–INCODE Solution Implementation Consultant Incentive Plan [Sansone Dep. Ex. 10].
[71]*See id.*
[72]29 C.F.R. § 541.200(a)(2).
[73]*Villegas v. Dependable Const. Servs., Inc.*, 2008 WL 5137321, at *8 n. 5 (S.D.Tex. 2008) (noting that the "product" of municipal services is the "primary service goal" of the agency.).

up,[74] nor is there any evidence that they managed the customer's employees.  While Plaintiffs may have been required to learn of the customers' existing software they did so only to implement the software in the most beneficial way for the customers and not to participate in policy-making or to alter their general operations.  Plaintiffs' service in implementing software merely transitioned the customer from the automated processes they previously had to the automated processes offered by Defendant.  Plaintiffs' produced a paid-for service which, although helpful to the customer, was not directly related to their management or general business operations.  Therefore, summary judgment on Defendants' administrative exemption claim is proper.[75]

#### 4.  PLAINTIFFS' PRIMARY JOB DUTIES BY SUBCLASS

4.25    As noted above, there is no dispute regarding what constituted the realm of Plaintiffs' primary job duties as Implementation Specialists or Consultants employed by Defendants.  To the extent there are some small distinctions, Plaintiffs shall now address their primary job duties as they relate to their employment within each of Plaintiffs' proposed subclasses and the application of the above described law to those duties.  The term 'primary duty' means the principal, main, major or most important duty that the employee performs.[76]  While an employees primary duty will typically require over fifty percent of his or her work time,[77] time is not the sole parameter to be considered.[78]

---

[74] *See* Exhibit "2", Hepburn Dep. 25:7–20.

[75] A number of cases also compel this conclusion.  *See Relyea v. Carman Callahan & Ingham, LLP*, 2006 WL 2577829, at *5 (E.D.N.Y. 2006) ("like [escrow] closers..., Plaintiffs applied existing policies and procedures on a case-by case basis.  Their duties do not involve the crafting of those policies, but rather the application of those policies.  As a result, Plaintiffs are better described as 'production,' rather than 'administrative'workers, and they are note exempt from FLSA."); *Casas v. Conseco Finance Corp.*, 2002 WL 507059, at *9 (D.Minn. 2002) (finding that loan originators for a finance company who were "responsible for soliciting, selling and processing loans as well as identifying, modifying and structuring the loan to fit a customers financial needs" were "primarily involved with the 'day-to-day carrying out of the business' rather than 'the running of [the] business [itself]' or determining its overall course or policies.")

[76] 29 C.F.R. § 541.700(b).

[77] *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2001).

[78] *Smith v. City of Jackson, Miss.*, 954 F.2d 296, 299 (5th Cir. 1992).

The employee's primary duty, rather, will usually be what she does that is of principal value to the employer.[79]

## I. THE MUNIS SUBCLASS

4.26    The MUNIS subclass consists of  thirteen individuals, all classified as an Implementation Specialist or Implementation Consultant during all times relevant to this lawsuit.

### a. BUSINESS PROCESS REVIEW

4.27    For the vast majority of MUNIS Plaintiffs, meetings reviewing a customer's pre-existing system or what the client wanted the new software to do was not a job function they performed[80] and, at most, Plaintiffs had such information explained to them from end-users during training.[81]    For the one Plaintiff within the MUNIS subclass that actually testified to having a formal meeting with a customer, Amy Dunn, the process was simple information gathering, during which she would ask questions of the customer.[82]    These questions did not involve the exercise of discretion

---

[79]*Lott*, 203 F.3d at 331.

[80] Only one Plaintiff in the MUNIS subclass testified to performing an initial consultation meeting with a client to determine system functionality.  *See* Exhibit No. "8", Dunn 18:13-23.  Another Plaintiff, Travis Void, testified to performing some review, but it's unclear from his testimony whether this process was more similar to Dunn's or the other Plaintiffs.  *See* Exhibit No. "9", Void Dep. 54:24-55:20.

[81] Bethany Maynard testified that she would know how particular clients wanted to use software by, first, looking at the project plan, and, second, through information that was conveyed to her during training.  *See* Exhibit No. "4", Maynard Dep. 39:16-19, 41:19-42:1.
Joy Flynn stated that she never took part in the initial consultation regarding the software's functionality, but "when I came into the situation [to perform training]… it was more or less the day-to-day functionality that the employees would be doing…." *See* Exhibit No. "10", Flynn Dep. 52:12-53:17.
Betty Dupree stated that she never talked to the customer about whether or not they wanted to purchase particular modules or application, that having been done "long before [she] got there," but information about the everyday functionality of the system would come up during training. *See* Exhibit No. "11",  Dupree Dep. 51:10-52:21.
Similarly, Ilene Meyers stated that she never engaged in any formal consultation with the client to determine what it needed or wanted in terms of software, although she did receive that kind of information during training sessions.  *See* Exhibit No. "5", Meyers Dep. 47:7-49:14, 52:3-19.
Likewise, Laura Milburn testified that she never actually "sat" down with the client to discuss what their needs were with respect to the software in order to design that software, such a role being filled by the project manager. *See* Exhibit No. "12", Milburn Dep. 117:7-118:2; *see also* Exhibit No. "13",  Mosenthin Dep. 64:11-20.
[82]*See* Exhibit "8", Dunn 18:13–23.

and independent judgment, rather relating to the application of a skill.  The questions asked for the code permits and code enforcement software, for example, were "what permits do they use and what do they look like."  This kind of information gathering function is not the kind of task that is involves discretion and independent judgment under the FLSA.[83]

### b. Data Conversion

4.28    Data conversion was not a function performed by Plaintiffs' within the MUNIS subclass.[84]

### c. System Configuration

4.29    The MUNIS Plaintiffs provided system configuration functions to Defendants customers. The software applications provided by the Tyler divisions were basically an "out of the box" program with certain formatting options built into the software.[85]  The configuration process generally consisted of setting up these options based on the customer preferences or walking the customer through those options that were indicated during the course of performing the business

---

[83]*Burns v. Blackhawk Mgmt. Corp.*, 2008 WL 3822565 (S.D.Miss. 2008) (holding that a construction representative whose job was to gather information based on his experience in the construction industry did not exercise "discretion and independent judgment"); *see also* Exhibit "31" *Am. Expert Rep. of Brian T. Farrigan*, pg. 9–12.

[84] *See* Exhibit No. "4", Maynard Dep. 35:22-36:3; *See* Exhibit No. "9", Void Dep. 59:13-21; *See* Exhibit No. "5", Meyers Dep. 59:6-13; *See* Exhibit No. "12", Milburn Dep. 101:20-22; *See* Exhibit No. "10", Flynn Dep. 47:20-48:20; *See* Exhibit No. "13", Mosenthin Dep. 51:18-52:8; *See* Exhibit No. "11", Dupree Dep. 46:5-11; *See* Exhibit No. "8", Dunn Dep. 21:20-22:8.

[85] *See* Exhibit No. "9", Void Dep. 60:11-17; *See* Exhibit No. "5", Meyers Dep. 37:4-13.

process review.[86]  Thus, this function did not involve the exercise of discretion or independent

judgment and is non-exempt.[87]

#### d.  SETTING AGENDAS AND TRAINING SCHEDULES

4.30    MUNIS Plaintiffs had minimal or no involvement in setting agendas and training
schedules.

> Basically all [creating an agenda] was is just taking the training
> manual and just dividing it up….  In other words, obviously as
> trainers, we always had to train…Page 1 through 4 on Day 1, Page 5
> through 6, [etc.]….  Basically going through the manual and [saying]
> which topic are you covering today and which one are you covering
> tomorrow.[88]

4.31    The actual scheduling of customer training was preordained by the project manager

for members of the MUNIS subclass.[89]  The agendas themselves were derived from the training

manual and were substantially or entirely created by the project manager for almost all of the

Plaintiffs within the MUNIS subclass.[90]  Defendant's own job descriptions for implementation

specialists and consultants illustrate the MUNIS Plaintiffs' lack of discretion and judgment in setting

agendas and training schedules, stating: "[Implementation Specialists][Implementation Consultants]

---

[86] *See* Exhibit No. "9", Void Dep. 60:11-22 (implementation specialist position included setting up parameters for the customer based on how they were going to use the software); *See* Exhibit No. "4", Maynard Dep. 37:4-38:8 (implementation position included setting up parameters for the customer based on how they going to use it); *See* Exhibit No. "12", Milburn Dep. 83:15-19 (if the customer needed the software configured to their needs, Milburn would do that as part of the implementation); *See* Exhibit No. "13", Mosenthin Dep. 72:3-11 (helped customers set up the parameters in their system); *See* Exhibit No. "11", Dupree Dep. 47:6-7 (implementation specialists would help the customers build the tables that were going to be used in the MUNIS software); *See* Exhibit No. "8", Dunn Dep. 22:9-21 (implementation consultants would help the customer define where their data went within the MUNIS software); *See* Exhibit No. "14", Grimwood Dep. 24:20-25:4; 27:4-7; 29:10-18 (implementers configured the client's software according to their preferences).

[87] *See supra* Part II.B.2.

[88] *See* Exhibit No. "13", Mosenthin Dep. 36:11-37:4; *see, e.g.,* Exhibit No. "8", Dunn Dep. 59:13-19.

[89] *See* Exhibit No. "3", Ingram Dep. 47:2-11; *See* Exhibit No. "4", Maynard Dep. 27:5-16, 29:22-25, 31:14-23; *See* Exhibit No. "13", Mosenthin Dep.38:7-39:12; *See* Exhibit No. "5", Meyers Dep. 52:20-54:13; *See* Exhibit No. "10", Flynn Dep. 75:22-76:1; *See* Exhibit No. "11", Dupree Dep. 37:9-22, 38:13-39:21; *See* Exhibit No. "12", Milburn Dep. 85:9-10; *See* Exhibit No. "8", Dunn Dep. 8:10-13; *See* Exhibit No. "9", Void Dep. 49:2-6.

[90] *See supra* n. 88

are *given* training assignments and *have minimal authority to deviate from these assignments.*"[91] Thus, Plaintiffs' had little to no autonomy regarding where they would be on particular days or what job duty they would be performing while there, further evincing Plaintiffs' lack of discretion and independent judgment in the performance of their job duties.

### e. CLIENT TRAINING

4.32    All members of the MUNIS subclass provided training to customers on how to use MUNIS software.[92]  This training consisted of "how to utilize the software screen by screen, table by table… how to enter data, the data that they need to put into the Tyler system from an existing system."[93]  Although training was given both on-site and remotely,[94] "[implementation specialists or consultants] use[d] canned reports from the Tyler site to show up on the screen… [which] was the main focus."[95]  That Plaintiffs' were provided with manuals, told what to teach on a given day, and then left to perform that task within those strictures does not, as a matter of law, constitute discretion and independent judgment.[96]

### f. GO-LIVE SUPPORT & POST GO-LIVE SUPPORT

4.33    At the end of the implementation of MUNIS software, customers would proceed through a "go-live" process.  During this phase of the implementation, customers would move from

---

[91] Exhibit No. "32", pg. 2; Exhibit No. "33", pg. 2; *see* Exhibit No. "13", Mosenthin Dep. 39:3-5; *see* Exhibit No. "9", Void Dep. 49:2-51:22.

[92] *See* Exhibit No. "3", Ingram Dep. 50:8-51:10; *See* Exhibit No. "4", Maynard Dep. 14:8-10; *See* Exhibit No. "9", Void Dep. 62:3-63:13; *See* Exhibit No. "5", Meyers Dep. 40:4-6; *See* Exhibit No. "12", Milburn Dep. 87:25-90:7; *See* Exhibit No. "10", Flynn Dep. 78:18-79:18; *See* Exhibit No. "13", Mosenthin Dep. 69:7-10; *See* Exhibit No. "11", Dupree Dep. 41:19-42:6; *See* Exhibit No. "17", Dunning Dep. 72:25-73:1; *See* Exhibit No. "8", Dunn Dep. 16:6-15; *See* Exhibit No. "14",  Grimwood Dep. 29:21-23, 32:2-11.

[93] *See* Exhibit No. "3", Ingram Dep. 50:8-51:0.

[94] *See* Exhibit No. "4", Maynard Dep. 26:23-27:2; *see* Exhibit No. "9", Void Dep. 46:1-3; *see* Exhibit No. "13", Mosenthin Dep. 102:12-15; *see* Exhibit No. "11", Dupree Dep. 42:1-3; *see* Exhibit No. "17", Dunning Dep. 78:15-19; *see* Exhibit No. "8", Dunn Dep. 17:13-18:4 (content of Webex and on-site training is the same).

[95] *See* Exhibit No. "3", Ingram Dep. 50:19-22.
[96] *See supra* Part II.B.2.

using their old software system to using the MUNIS software for their day-to-day business activities.[97]  This go-live process was performed by all MUNIS Plaintiffs who testified regarding the go-live.[98]  The implementor's role during the go-live was mechanical, even though ad hoc.  If the customer had a question, needed assistance, or if an error was discovered, Plaintiffs' would use their skill to answer the question, provide instruction based on the information they had learned from the manual, or resolve the error; if such exceeded Plaintiffs' skill, the issue was escalated to others who could address it. [99]

4.34    Post go-live support within the MUNIS subclass can be broken down into two functions.  The first function involves returning to the customer's site directly after the go-live to answer any additional questions the customer may have and to provide additional retraining as determined by the customer and project manager.[100]  The second function involves answering the customer's questions via telephone or email for a period of time after the go-live had occurred.[101]  All MUNIS Plaintiffs provided post live support by fulfilling one or both of these functions.[102]

---

[97] *See* Exhibit No. "10", Flynn Dep. 84:3-8.

[98] *See* Exhibit No. "4", Maynard Dep. 54:15-17; *see* Exhibit No. "9", Void Dep. 44:24-45:4; *see* Exhibit No. "5", Meyers Dep. 60:18-21; *see* Exhibit No. "12", Milburn Dep. 114:4-6; *see* Exhibit No. "10", Flynn Dep. 84:12-14; *see* Exhibit No. "13", Mosenthin Dep. 76:8-18; *see* Exhibit No. "11", Dupree Dep. 69:21-70:8; *see* Exhibit No. "17", Dunning Dep. 82:9-13; *see* Exhibit No. "8", Dunn Dep. 69:5-7; *See* Exhibit No. "14", Grimwood Dep. 43:4-14.

[99] *See* Exhibit No. "4", Maynard Dep. 55:23-56:2 (purpose was to "provide support to users, any further retraining that was necessary, working with our internal support if something went wrong or wasn't right); *See* Exhibit No. "5", Meyers Dep. 61:21-62:17 (the purpose was to provide support, handle system issues that arose, answer questions, coordinate with technicians); *See* Exhibit No. "12", Milburn Dep. 115:11-13 (during the go-live phase, the implementation specialist is there to provide support); *See* Exhibit No. "11", Dupree Dep. 70:9-10 (present during the go-live phase to provide assistance "on an as-needed basis"); *See* Exhibit No. "8", Dunn Dep. 69:13-17 (purpose was to answer the customer's questions); *See* Exhibit No. "14", Grimwood Dep. 43:10-14, 43:22-44:2.

[100] *See* Exhibit No. "9", Void Dep. 66:15-20, 66:22-67:4.

[101] *Id*. at 68:4-8.

[102] *See* Exhibit No. "4", Maynard Dep. 51:25-52:8 (Maynard testified that during the formal transition to support, she would answer questions from the customer); *see* Exhibit No. "9", Void Dep. 66:15-21; 68:4-8; (Void testified that he would sometimes go to the client site to answer questions and perform additional retraining if required of him and that during the transition to support he would answer the customer's questions);  *see also* Exhibit No. "14", Grimwood Dep. 45:18-47:14 (Grimwood similarly testified that he

Again, however, answering a customer's questions on how to pull up a particular screen or where to input specific information into the database is the use of a skill based on information contained in the software manuals and according to the set procedures by which the software operates and does not constitute discretion or independent judgment.[103]

4.35    Dunn's testimony reflects, moreover, that an implementator may spend 1-2% of their time providing post live support to a customer.[104]

### ii.  The EDEN Subclass

4.36    The EDEN subclass consists of only five individuals classified as implementation specialists or implementation consultants for periods relevant to this lawsuit.

### a.  Business Process Review

4.37    All plaintiffs within the EDEN subclass testified to having conversations with the client regarding the client's legacy system and the implementation of EDEN software in the course of their employment.[105]   During the course of these discussions, Plaintiffs' did not advise the

---

would sometimes be present at the client's site after the go-live to handle any issues and would answer questions via telephone to the extent that he was able); *see* Exhibit No. "5", Meyers Dep. 65:14-17 (Meyers testified that she would take calls from customers she had trained and answer their questions if she knew the answer); *see* Exhibit No. "13", Mosenthin Dep. 74:25-75:5, 75:15-20, 75:21-76:7 (Mosenthin testified to returning to the client's site a day or two after the go-live to answer questions and provide additional retraining if the customer contracted for it); *see* Exhibit No. "11", Dupree Dep. 69:11-20 (Dupree testified that if she received a call from a customer with a question, she would try to answer it); *see* Exhibit No. "8", Dunn Dep. 74:23-75:3 (Dunn testified that during post live support, she would answer questions sent by the customers on an as-needed basis until the customer was fully transitioned to the support department).

[103] *See supra* Part II.B.2.

[104] *See* Exhibit No. "8", Dunn Dep. 75:14-23.

[105] *See* Exhibit No. "18",  McLeod Dep. 93:16-94:1 (Joy McLeod testified to sitting down with the client to figure out how they manage their project in order to translate their previous needs into the new system); *see* Exhibit No. "19", O'Haver Dep. 40:4-8, 32:13-22, 34:9-16, 38:8-18 (Tom O'Haver had telephone conversations or online sessions with clients to gather information to set up the "different parameters within the [purchased] software."); *see* Exhibit No. "20", Wilton Dep. 138:9-139:4 (Eyvonne Wilton also testified that one of her job functions was to go over site fit documentation and questionnaires to "understand how we could process it and put it into the system."); Defendants' also point out that "Britt testified about meeting with customers during what he called a 'consultant review' during which he gathered information about the customer's business processes and the customer's expectations from Tyler's software" and that, likewise, "Hayner testified that his job involved meeting with the customer to go over which variables

customers as to how to set up their software but were purely engaged in gathering information from the  customer to determine how they wanted their software set up.[106]  As has been noted above, this type of information gathering does not involve the use of discretion and judgment and is therefore not exempt.[107]

### b. DATA CONVERSION AND REVIEW OF CONVERSION ERRORS

4.38    None of the Plaintiffs in the EDEN subclass performed data conversion,[108] although EDEN Plaintiffs testified to reviewing converted data for errors in the conversion process.  O'Haver, for example, testified that part of his job would be to "identify any inconsistencies in the data and relay that to the data conversion group."[109]  McLeod also testified that if there were errors in the converted data she would call the conversion team to notify them and have the error resolved.[110]  In other words, Plaintiffs compared the original data to the converted data, and if there was an inconsistency, they called the conversion team.  Thus, reviewing conversion errors is not a function involving discretion and independent judgment.[111]

### c. SYSTEM CONFIGURATION AND REVIEWING FOR CONFIGURATION ERRORS

4.39    Members of the EDEN subclass also configured the software purchased by clients and reviewed those configurations for errors during the course of an implementation.  During the business process review, the customer indicates what features associated with the software the customer wanted activated and then the implementer would go into the system and activate those

---

within Tyler's software it preferred and its new software would be set up.)
[106]See supra note 86.
[107]See supra Part II.B.4.i.a.

[108] See Exhibit No. "18", McLeod Dep.  22:16-23; See Exhibit No. "19", O'Haver Dep. 28:21-29:19; See Exhibit No. "22", Britt Dep. 110:17-111:6.

[109] See Exhibit No. "19", O'Haver Dep. 69:18-24, 72:7-12

[110] See Exhibit No. "18", McLeod Dep. 117:15-118:18.
[111]See supra Part II.B.2.

features.[112]  As with Plaintiffs in the other subclasses who performed this function, the process is

mechanical and relates solely to the application of skill with the software's internal parameters and

the procedures associated with activating those parameters and does not involve the exercise of

discretion or independent judgment.[113]

### d. SETTING AGENDAS AND TRAINING SCHEDULES

4.40    McLeod's testimony illustrates the role that all implementation specialists and

consultants had in developing the training agendas for particular clients.  Specifically, McLeod

testified as follows:

> Q:  How do you come up with that task list?
>
> A:  The task list is already preformed by the packaging of these implementation packages of to do's and the structure of things you have.  You give the agenda to the client….  It's pretty much a recipe.
>
> Q:  And these agendas, they don't have those client nuances listed, correct?
>
> A:  No, Ma'am, they don't.[114]

4.41    Hayner stated that he "would develop… a canned agenda… simply filling it out for

the dates of the trip as it would apply to that specific client."[115]  O'Haver testified that he would

"send out an agenda based upon what was accomplished the first time and what needs to be

accomplished the next time *as specified in our standard implementation plan*."[116]  This testimony

---

[112]*See* Exhibit "22", Britt Dep. 9:17–19; 13:8–12; 103:4–106:5; *see also* Exhibit "21"  Hayner Dep. 10:24–11:9; 34:22–35:25; 41:1–42:12; *see* Exhibit No. "18", McLeod Dep. 93:16-94:1, 98:21-24; *see* Exhibit No. "19", O'Havner Dep. 27:6-15, 42:1-45:4; *see also* Exhibit No. "20", Wilton 48:21-49:15, 52:2-53:2, 66:16-67:12 (although Wilton did not testify that she performed configuration, she did testify to reviewing configurations for errors similar to other Plaintiffs).
[113]*See supra* Part II.B.2.

[114] *See* Exhibit No. "18", McLeod Dep. 97:24-98:20.
[115] *See* Exhibit No. "21", Hayner Dep. 32:6-9.
[116] *See* Exhibit No. "19", O'Haver Dep. 50:18-21.

is echoed also by Britt and Wilton, the other two members of the EDEN subclass.[117]  These are exactly the kind of "preset lectures" and "preestablished programs" that do not involve discretion or independent judgment, as *Kohl*, *Rutlin*, and *Hashop* make clear.[118]

### e. Client Training

4.42    EDEN Plaintiffs provided training to the client end-users following a set training manual  using the same general procedures.  O'Haver testified to the typical process, stating:

> [A]ll [training] follows the planned curriculum that we have that has been provided to me by the company…. [A]ny deviation would be not totally my decision.  It would be based upon what the project manager and my manager and myself agreed would be best….   We have [presentations] and curriculum that are standard for the module training session…written print-outs that we print out for them to follow along while I lecture….   I'm trained on the standard way of conducting the session…[which is] with the…presentation that incorporates – that follows the curriculum and incorporates screen shots [based on the particular client's configuration].[119]

4.43    Additionally, if the clients being trained had access to a computer, whether a personal laptop  or a company desktop in a training room, they would also input data into the software and be able to see the results themselves, in which case Plaintiffs would also observe the users in inputting that data and answer questions.[120]  Like in *Kohl*, these are "preset" lectures which do not involve discretion or independent judgment.[121]

### f. Go-live Support & Post Go-live Support

4.44    All Plaintiffs within the EDEN subclass testified to being on-site during the go-live

---

[117] *See* Exhibit No. "22", Britt Dep. 113:2-16; *See* Exhibit No. "20", Wilton Dep. 23:3-5, 23:19-24:24.
[118] *See supra* n. 47

[119] *See* Exhibit No. "19", O'Haver Dep. 56:12-58:19; *see also* Exhibit No. "22", Britt Dep. 117:19-118:10.
[120] *See* Exhibit No. "19", O'Haver Dep. 59:2-61:2; *see also* Exhibit No. "22", Britt Dep. 118:11-15; *see also* Exhibit No. "20", Wilton Dep. 29:24-30:18; *see also* Exhibit No. "18", McLeod Dep. 101:3-101:20; *see also* Exhibit No. "21", Hayner Dep. 44:9-46:9.
[121] *Kohl v. The Woodlands Fire Dept.*, 440 F.Supp. 2d 626, 644 (S.D.Tex. 2006); *see generally supra* Part II.B.2.

transition, during which they would observe the client in the use of the software, field any questions that the client may have, and observe for any configuration or conversion errors.[122]  Plaintiffs testified that after the client had undergone a successful go-live, their role with the client was, in effect, over.[123]  As has been aforementioned, answering a customer's questions regarding how to use the software does not involve discretion or independent judgment with respect to matters of significance, but is merely the application of Plaintiffs' skill and knowledge of how the system procedures work.[124]  Reviewing the software for configuration or conversion errors is a mechanical process also devoid of discretion and independent judgment with respect to matters of significance.[125]

### iii.  THE INCODE SUBCLASS

4.45    The INCODE subclass consists of seven individuals classified as Implementation Specialists or Implementation Consultants during all periods relevant to this lawsuit.

### a.  BUSINESS PROCESS REVIEW

4.46    INCODE Plaintiffs would meet with the customer at the beginning of the implementation to provide options on how the customer wanted the system set up.[126]  Although all

---

[122] *See* Exhibit No. "18", McLeod Dep. 111:17-112:3; *see also* Exhibit No. "21", Hayner Dep. 49:5-19; *see also See* Exhibit No. "20", Wilton Dep. 70:4-14; *see also* Exhibit No. "22", Britt Dep. 121:10-125:13 (although Britt testified to having an agenda during the go-live transition, his job duties were essentially the same as all other Plaintiffs: to check for configuration and conversion errors and convey those errors to other departments for their resolution).

[123] *See* Exhibit No. "18", McLeod Dep. 112:12-22; *see also* Exhibit No. "20", Wilton Dep. 72:1-17; *see also* Exhibit No. "22", Britt Dep. 126:10-127:19.

[124] *See supra* Part II.B.4.i.f.

[125] *See supra* Part II.B.4.ii.b & c.

[126] *See* Exhibit No. "23", Duke Dep. 83:11-18 (Gayla Duke testified that when she arrived at the client site she would have meetings with the customer discussing different options within the software that they may or may not want to use); *see* Exhibit No. "24", Baird Dep. 47:1-25 (Melanie Baird had conversations with the customer for the purpose of proffering different ways to set up the software); *see* Exhibit No. "25", Mutch Dep. 48:22-49:12; *see also* Exhibit No. "26", Steele Dep. 48:3-7; *see also* Exhibit No. "27", Emde Dep. 94:22-25.

Plaintiffs presented system options to the customer, they were not allowed to advise the customers on which options they should select in setting up their system.[127]   As such, Plaintiffs were to be an information resource for the customer, but did not have authority to make any decisions for them or any recommendations to them on how to set up the software.

### b. Data Conversion

4.47   The INCODE Plaintiffs did not participate in conversions of customers' data.[128]

### c. Software Configuration

4.48   After meeting with the client, the INCODE Implementation Specialists would make sure the fields looked the way the client wanted them to look and, if not, they would configure the software to do so by setting up the system parameters in accordance with the client's preferences.[129]

### d. Client Training

4.49   After the configuration process is completed, INCODE Plaintiffs trained the customer on the Tyler software.[130]  Similar to other divisions, this training could be done in a small group, one-on-one, or over the phone, but regardless of the medium, the training itself was conducted substantially the same way, that is, by walking the end user through the software while illustrating how the software worked.[131]

---

[127] *See* Exhibit No. "23", Duke Dep. 89:17-22, 92:1-93:6; *See* Exhibit No. "25", Mutch Dep. 55:12-19; *See* Exhibit No. "24", Baird Dep. 47:9-10, 47:24-25, 49:2-10; *See* Exhibit No. "26", Steele Dep. 53:15-19.

[128] *See* Exhibit No. "23", Duke Dep. 86:6-8; *See* Exhibit No. "25", Mutch Dep. 49:18; *See* Exhibit No. "27", Emde Dep. 80:17-19; *See* Exhibit No. "24", Baird Dep. 18:20-21, 20:3-5; *See* Exhibit No. "26", Steele Dep. 93:10.

[129] *See* Exhibit No. "23", Duke Dep. 113:24-25, 114:1-15; *See* Exhibit No. "25", Mutch Dep. 52:10-24, 53:4-8; *See* Exhibit No. "27", Emde Dep. 83:7-25, 84:1-22 ; *See* Exhibit No. "24", Baird Dep. 18:16-17, 73:17; *See* Exhibit No. "26", Steele Dep. 93:12-18, 94:1-3, 96:6-18.

[130] *See* Exhibit No. "23", Duke Dep. 114:16-18; *See* Exhibit No. "25", Mutch Dep. 72:19-74:3; *See* Exhibit No. "27", Emde Dep. 95:12-23, 96:15-25; *See* Exhibit No. "24", Baird Dep. 45:5-10; *See* Exhibit No. "26", Steele Dep. 45:14-17.

[131] *See* Exhibit No. "23", Duke Dep. 75:23-77:1, 80:19-24; *See* Exhibit No. "25", Mutch Dep. 58:20-59:7, 72:22-73:4; *See* Exhibit No. "27", Emde Dep. 100:23-101:2; *See* Exhibit No. "24", Baird Dep. 33:14-18.

### e. GO-LIVE SUPPORT AND POST GO-LIVE SUPPORT

4.50    After the training was completed, INCODE Plaintiffs would assist with the "go-live" process, answering questions on an as-needed basis on how the software works and providing additional training where necessary.[132]    After the "go-live" process was completed the Implementation Specialists would provide some follow up support for the customer.[133]

### iii. THE ODYSSEY SUBCLASS

4.51    The ODYSSEY subclass consists of only three Plaintiffs, Jill Brown (Brown), Kim Huynh (Huynh), and Linda Carrington (Carrington).

### a. BUSINESS PROCESS REVIEW

4.52    Each of the deposed Plaintiffs testified to playing the exact same role in the review of the customer's use of ODYSSEY software.  Brown described this process as follows:

> You basically sit there and listen to the project manager talk with the client and client's telling them what their business process is, and you enter in a code to show them and – so that the project manager can show them if that will work to meet their business process….  The project manager is in charge and directs the process, and the client is telling the project manager, "This is how we do this business process."  And the project manager says, "Okay.  You know, Jill, enter the code to show them how that would be done."  So you would enter the code and the client would see how – how that would work for their business process.[134]

4.53    A comparison of this testimony with the testimony of Carrington clearly indicates the substantial similarity amongst Implementation Consultants in this process.  Carrington testified:

> Q:  What did you do, what was your role in conducting the fit analysis?

---

[132] *See* Exhibit No. "23", Duke Dep. 99:10-17; *See* Exhibit No. "25", Mutch Dep. 84:19-22, 85:1-7; *See* Exhibit No. "27", Emde Dep. 106:2-5, 106:21-23, 107:1-8.

[133] *See* Exhibit No. "23", Duke Dep. 100:9-20; *See* Exhibit No. "24", Mutch Dep. 103:12-23; *See* Exhibit No. "24", Baird Dep. 115:19-25; *See* Exhibit No. "26", Steele Dep. 118:12-20, 121:11-16.

[134] *See* Exhibit No. "28", Brown Dep. 51:4-8, 51:14-20.

A:  My role is to drive the computer.  I'm the driver, and I go through the system, and what you're doing is you're making the superusers aware of the procedure, the path that ODYSSEY uses, because the way that they have been working with their old system may not be the way they're going to be able to work with ODYSSEY….

Q:  And in this case, you did it with the project manager?

A: Yes.

Q:  And that would be typical?

A:  Yes….

Q:  What is the project manager's role during the fit analysis?

A:  The project manager is leading the whole thing….

Q:  So the project manager would say, "Okay, let's talk about this?"

A: Right, exactly. [135]

4.54    This kind of function certainly involves no exercise of discretion or independent judgment as to matters of significance.[136]

### b.  Conversion

4.55    ODYSSEY Plaintiffs did not convert customer data, but all were involved in reviewing the  software for conversion errors.[137]

### c.  Configuration

4.56    ODYSSEY Plaintiffs configured software to meet the customer's needs and preferences by setting up the parameters of how the software would look.[138]   This is the same

---

[135] *See* Exhibit No. "29", Carrington Dep. 56:25-57:7, 58:5-9, 63:21-23, 64:12-14.
[136] *See supra* Part II.B.2.

[137] *See* Exhibit No. "28", Brown Dep. 59:5-60:7; *See* Exhibit No. "29", Carrington Dep. 98:9-19.
[138] *See* Exhibit No. "28", Brown Dep. 25:18-26:6; *See* Exhibit No. "29", Carrington Dep. 104:22-105:12.

function performed by other Plaintiffs' in other subclasses and is the mechanical application of a skill to the software and therefore does not involve the exercise of discretion and independent judgment as to matters of significance.

### d. Client Training

4.57    Throughout the course of any given implementation, ODYSSEY implementation specialists would provide training to the customer's employees on how to use the ODYSSEY software.  Whether on-site or through Webex, for the most part this training consisted of walking the customer through how the software worked using the training manual and computer.[139]

### e. Go-live Support

4.58    At the end of an implementation, Plaintiffs would be present during the transition to the new software going live for the purpose of providing support to the customer, by answering questions about how to use the software and additional training as necessary.[140]  As noted numerous times above, this kind of support function does not involve the exercise of discretion and independent judgment with respect to matters of significance.[141]

### iv. The EAGLE Subclass

4.59    The EAGLE subclass consists of only one plaintiff, class representative, Tony Dodd.

### a. Business Process Review

4.60    Tony Dodd was not engaged in performing the business process review of Tyler's clients.[142]

---

[139] *See* Exhibit No. "28", Brown Dep. 58:22-24, 28:13-19, 34:23-35:9; *See* Exhibit No. "29", Carrington Dep. 110:18-112:3, 91:5-16.

[140] *See* Exhibit No. "28", Brown Dep. 43:8-19; *See* Exhibit No. "29",  Carrington Dep. 114:6-18.
[141] *See supra* Part II.B.4.i.f; Part II.B.ii.f.; Part II.B.iii.f.

[142] *See* Exhibit "30", Dodd Dep. 74:2–19.

### b.  Conversion

4.61    Dodd did not convert the customer's data from the legacy system to the new software, but did review the data to verify that the data was brought over." [143]  This included "checking the number of documents on a particular date and time" up until the transition over to the new software. [144]   Sometimes there might be fields in the customer's existing systems that didn't necessarily correspond to Defendants,[145] which would require Dodd to get time approved to work on the error because it would be billed to the customer and to ask the customer how they wanted to handle the discrepancy.  Dodd did not make any recommendations regarding the implementation to the customer, as he was just "the guy in the trenches."[146]  Going through the errors is mechanical and involves no discretion or independent judgment, it's a matter of comparing the information in the old system to information in the new system.  Whether Dodd ultimately addressed an error and how he did so was determined by the customer, and therefore involves no discretion and independent judgment.[147]

### c.  Configuration

4.62    Dodd was involved in configuring the customers software to meet their desired preferences.  Dodd configured the software based on his knowledge of the product, based on what the customer wanted from the "site assessment," and by walking through an "implementer's checklist," which contained a list of instructions for things that had to be done in order to configure the software.[148]  There is no evidence that configuring the customer's software involved anything

---

[143]*See* Exhibit "30", Dodd Dep. 79:1–80:10.
[144]*See* Exhibit "30", Dodd Dep. 80:7–10.
[145]*See* Exhibit "30", Dodd Dep. 80:18–22.
[146]*See* Exhibit "30", Dodd 80:18–82:16.
[147]*See supra* Part.II.B.2; *see also* Exhibit "31"*Am. Expert Rep. of Brian Farrington*, pg. 13-15.
[148]*See* Exhibit "30", Dodd Dep. 76:17–77:19

more than the application of Dodd's knowledge of the software and how it worked or constituted the exercise of discretion or independent judgment.[149]

### d. TRAINING

4.63     Dodd, like other Implementers, provided training to the customers on how to use the software.   The training agenda for which topics would be covered were predetermined and instruction tracked the procedures the software utilized in performing different functions.[150]  Dodd would show the customer's employees how the task was done on his computer, and then the employees would duplicate the process on their training computer, referencing handouts that had been created by Defendant.[151]  This does not constitute the exercise of discretion or independent judgment with respect to matters of significance, and therefore is a non-exempt function.

### e. Go-Live & Post Go-Live Support

4.64     Dodd did participate in the go-live process[152] and was involved in providing to support and addressing issues after the go-live date, such as providing additional training or answering support questions based on Dodd's knowledge of the software.[153]   There is no evidence that any of Dodd's activities herein constituted the exercise of discretion or independent judgment as to matters of significance, as opposed to merely applying his skills and knowledge to support the customer's transition to using the software.

### v. THE EDP CLIENT LIAISON CLASS AND THE EDP IMPLEMENTATION SUBCLASS

---

[149] *See supra* Part II.B.2.
[150] *See* Exhibit "30", Dodd Dep. 37:19–40:12
[151] *See id.*
[152] *See* Exhibit "30", Dodd Dep. 83:24–84:1.
[153] *See* Exhibit "30", Dodd Dep. 21:4–21:14; *see also* Dodd Dep. 25:19–21.

4.65    The job of Client Liaison was to be the point of contact between the school district and the conversion programmer.  Client Liaisons were responsible for contacting the client to get information that had to be entered into the parameter data base so the conversion programmer could do the first conversion.  When the first conversion was completed the Client Liaison would review the conversion data  and get additional information from the client, or tell the customer what they needed to do to correct their data so that EDP could run the conversion again.  Usually at least three different conversions were done, but sometimes more.[154]

4.66    Client Liaisons would initially participate with their project manger in conversion planning meetings with the client. During these meetings the project manager explained the conversion process, the time line, what was going to happen, and what they needed from the client. The Client Liaison was there to listen and to be introduced to the client as the primary contact with EDP was told that the Client Liason would be contacting them for additional information.[155]

4.67    Client Liaisons were given a check list of information that they needed to obtain from the clients.  It would typically take the client liason approximately  30-60 minutes to complete the checklist.[156]

4.68    Client Liaison would enter the client information into the ED Pro data base and inform the conversion programmer that it was ready.  At that point an initial attempt was made for the first conversion.  Any errors were reported back to the Client Liaison, and she was required to go back to the client to get additional information or to tell the client what they needed to fix in their old data in order for the data to convert properly.[157]

---

[154] *See* Exhibit "6", White's Dep. 56:4-25
[155] *See* Exhibit "6",  White's Dep. 61:5-20; 62:21-13
[156] *See* Exhibit "6", White's Dep. 64:1-21; 90:5-15
[157] *See* Exhibit "6", White's Dep. 66:22-18; 68:12-25

4.69    After the client fixed the initial problems, a second conversion was run and the same process was followed until all the data was properly converted.[158]

4.70    In addition to conversion review Client Liaisons provided customer support via telephone.[159]

4.71    Client Liaisons did not make corrections to the clients system but instructed the client how to make their own corrections.[160]

4.72    The Client Liaison would tell the customers how to do something based upon either the ED Pro financial manual and the ED Pro human resources manual.[161]  If the Client Liaison was unable to resolve the problem, she would ask one of the programmers to look at it.

4.73    Client Liaisons assisted the onsite implementation team when they were onsite training the customers.  If the customer said something wasn't right, the trainers relayed that information to the client liaison and they would communicate this to the programmers.  The Client Liaison would then coordinate with the programmer and the trainer to get it fixed during the training process.[162]

4.74    The Client Liaisons had nothing to do with actually programming the ED Pro software, which was done by programmers.[163]

4.75    The Liaisons were supposed to do telephone support for the schools that were converted for six weeks after conversion.

---

[158] *See* Exhibit "6", White's Dep. 70:23-25
[159] *See* Exhibit "6", White's Dep. 78:18-25
[160]  *See* Exhibit "6", White's Dep. 89:1-16
[161]  *See* Exhibit "6", White's Dep. 27:3-23
[162] *See* Exhibit "6", White's Dep. 91:10-23; 92:24-22
[163] *See* Exhibit "6", White's Dep. 94:9-15

4.76    None of these duties arise to the kind of work "directly related to the management or general business operations of the employer or the employer's customers."[164]  Plaintiffs' were not engaged in "running [Defendants' or its customers] business itself" nor did they determine their "overall course or policies,"[165] as would be the case if they had been providing Defendants or its customers  with tax advise, or determining their accounting practices, or auditing their books, or purchasing their goods for resale, or procuring investments for them, or advertising and marketing their services, or managing their personnel's daily activities, or administering employee benefits, or insuring that they complied with the laws or government regulations."[166]  Rather, Plaintiffs were merely engaged in the "day-to-day carrying out of [the Defendants'] affairs," by gathering basic information as denoted in Defendants' checklist, by gathering basic information required by the programmers, conveying information given from the customer to the programmer and from the programmer to the customer, and by answering telephone support questions from the manual or escalating questions to the programmers where necessary.

4.77    Nor do Plaintiffs' primary duties involve "the exercise of discretion and independent judgment as to matters of significance."[167]  The information they gathered was dictated by the checklist Defendants provided them or by the instructions of the programmers.  The information Plaintiffs provided was relayed to them from the programmers or trainers or derived from the software manuals Plaintiffs kept on their desks.  If Plaintiffs' could not answer a question, the question was escalated to someone else with greater skill.  If a customer had a complaint, that was

---

[164]*See* 29 C.F.R. § 541.200(a)(2).
[165]*Bothell v. Phase Metrics, Inc.*, 299 F.3d. 1120, 1125 (9th Cir. 2002);*see also Cotten v. HFS-USA, Inc.*, 620 F.Supp.2d 1342, 1347–48 (M.D.Fla. 2009); *see also Ruggieri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 585 F.Supp.2d 254 (D.Conn. 2008)
[166]*See* 29 C.F.R. § 541.201(b).
[167]*See id.*

likewise escalated to managers who had the authority to address it.  In *Shockley v. City of Newport News*, employees whose primary duty was to respond to requests for information and receive information and whose responses were governed by State law and guidelines they had been provided were held not to qualify for the administrative exemption.[168]  Likewise, in *Lang v. Midwest Adv. Comp. Servs., Inc.*, the court held that a service liaison who became a member on his employer's software conversion team and whose duties included comparing data, debugging the software, and documenting errors, did not meet the requirements of the administrative exemption.[169]

 4.78 None of Plaintiffs' job duties meet satisfy the administrative exemption and therefore summary judgment is proper.

### vi.  THE TRAINER SUBCLASS

 4.79 Prior to becoming a Client Liaison with EDP, Kelly Hampton was employed as a "Trainer" with Defendants.  This position is very similar to the role other Plaintiffs filled within other subclasses.

 4.80 Similar to engaging in the business process review, described above,[170] Hampton gathered information regarding the client's system based on how the customer could set up the system's parameters, which was guided by the Defendants' checklist.[171]

 4.81 After an initial conversion had been done, Hampton would engage in training the customer's employees on how to use the software.  Typically, training was conducted remotely via WebEx,[172]but regardless of whether Hampton was on-site or not, or in an individual or group setting,

---

[168]*Shockley,* 997 F.2d 18,  (4th Cir. 1993).
[169]*See generally Lang v. Midwest Adv. Comp. Servs., Inc.*, 506 F.Supp. 595 (E.D.Mich. 1981)
[170]*See supra* Part I.A.2.
[171] *See* Exhibit "7", Hampton Dep. 75:24–76:10; 77:11–18; 80:1–12.
[172]*See* Exhibit "7", Hampton Dep. 43:13-24.

the training was the same: namely, it consisted merely of walking the employees through the software.[173]

4.82    Moreover, Hampton would get a schedule to know when to meet with a particular employee.[174]  Further, she was told exactly what manuals to take with her from which to provide instruction.[175]

4.83    Hampton also reviewed the software for conversion errors in the customer's data, which consisted of comparing reports generated in the software to determine where errors existed.[176] She would not have corrected the problem, but would have identified the problem, and reported them to the programmers.[177]

4.84    Hampton was also present at the customer's facility when they went live with the EDP software, to provide additional training.[178]

4.85    After the customer went live, Hampton answered support calls, just as client liaisons did during that initial period following the customers going live.[179]

4.86    Hampton does not qualify for the administrative exemption for much the same reasons that implementation consultants and clients liaisons do not qualify.  Training customers, which is Hampton's primary duty, does not involve work directly related to the management or general business operations of the employer or employer's customer where the business is the sale and implementation of software, nor does it involve the exercise of discretion and independent

---

[173] *See* Exhibit "7", Hampton Dep. 87:18 - 24.
[174] *See* Exhibit "7", Hampton Dep. 84:5-15.
[175] *See* Exhibit "7", Hampton Dep. 86:7 - 13.
[176] *See* Exhibit "7", Hampton Dep. 88:5.
[177] *See* Exhibit "7", Hampton Dep. 89:13 - 19
[178] *See* Exhibit "7", Hampton Dep. 35:20-25.
[179] *See* Exhibit "7", Hampton Dep. 98:21 - 25

judgment where software dictates the course of training, the manuals are preselected, and the scope and scheduling of training is preordained.[180]

4.87    Nor does following a checklist of questions provided by the employer or mechanically comparing reports for conversion errors which will be escalated to others invoke the administrative exemption.[181]

### 4. The Department of Labor's Opinion Letters Confirm the Conclusion That Plaintiffs Do Not Satisfy the Administrative Exemption

4.88    A number of Department of Labor Opinion Letters directly support the conclusion that Plaintiffs' do not fall within the ambit of the administrative exemption.

4.89    In a May 11, 2001 Opinion Letter, the Dept. of Labor assessed whether an employee who provided support services to customers and designed computer solutions to fit the client's needs (which involved analyzing the customer's current hardware and software, identifying the customer's hardware and software needs, implementing or integrating new software for the customer, and continuing with support after the implementation is complete).[182]  Even though each workweek differed in projects and responsibilities and depended on what the client needed, and even though the employee was not directly supervised, the Dept. of Labor determined that the employee did not meet the requirements for any exemption.[183]

4.90    In an August 19, 1999 Opinion Letter, the Dept. of Labor addressed the exemption status of an employee with job duties very similar to Plaintiffs, herein.  These employees provided training to employees regarding their employers customer's specialized computer software;

---

[180]*See infra* n. 47.
[181]*Lang v. Midwst Adv. Comp. Servs., Inc.*, 506 F.Supp. 595 (E.D.Mich. 1981).
[182]Dept. of Labor Op. Letter, May 11, 2001, 2001 DOLWH Lexis 4, at *1.
[183]*See id.* at *1–2.

manipulate and modify software settings and specifications (e.g. toolbars and setup) to fit and respond to customer needs (does not include program writing or software developing); install, debug, troubleshoot, and convert data from old systems to the new conversions; test customers' moderns; and conduct customer follow-up visits to ensure customer satisfaction.[184]

4.91    The Dept. determined that, based on the foregoing job duties, the employees would not qualify as bona fide administrative employees, as they performed tasks which do not constitute "making or implementing policy, or the performance of management functions, necessary for the application of the exemption."[185]

# V.
## CONCLUSION

5.1    The overtime requirements of the FLSA were meant to apply financial pressure to "spread employment to avoid the extra wage" and to assure workers "additional pay to compensate them for the burden of a workweek beyond the fixed hours in the act."[186]  It is the employer's burden to establish that the exemptions which circumvent the purpose of those provisions are satisfied.  This is a burden they cannot meet; Plaintiffs' primary duties do not directly relate to the management or general business operations of the employer or the employer's customers, nor do their primary duties require the exercise of discretion or independent judgment as to matter of significance as would bring them under the ambit of the administrative exemption.  For these reasons, Plaintiffs ask the Court to grant this motion and render a partial summary judgment in Plaintiffs' favor.

---

[184]Dept. of Labor Op. Letter, August 19, 1999, 1999 DOLWH Lexis 88, at *1.

[185]*See id.* at *2; *see also* Exhibit "31",  *Am. Expert Report of Brian Farrington*, pg. 22.

[186]*Davis v. J.P.Morgan Chase & Co.*, 587 F.3d 529 (2nd Cir. 2009).

Respectfully submitted,

SLOAN, BAGLEY, HATCHER & PERRY
LAW FIRM

 /s/ Laureen F. Bagley
John D. Sloan, Jr.
State Bar No. 18505100
jsloan@textrialfirm.com
Laureen F. Bagley
State Bar No. 24010522
lbagley@textrialfirm.com
101 East Whaley Street
P.O. Drawer 2909
Longview, Texas 75606
(903) 757-7000
(903) 757-7574 (Fax)

Alexander R. Wheeler
awheeler@rrexparris.com
Jason Paul Fowler
jfowler@rrexparris.com
R. REX PARRIS LAW FIRM
42220 10TH Street West, Suite 109
Lancaster, CA 93534-3428
(661) 949-2595
(661) 949-7524 (Fax)

John P. Zelbst
zelbst@zelbst.com
Chandra L. Holmes Ray
chandra@zelbst.com
ZELBST, HOLMES & BUTLER
P.O. Box 365
Lawton, OK 73502-0365
(580) 248-4844
(580) 248-6916 (Fax)

James E. Wren
Texas State Bar No. 22018200
James_Wren@baylor.edu
One Bear Place #97288
Waco, Texas 76798-7288



(254) 710-7670
(254) 710-2817 (Fax)

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument has been served on all counsel of record via electronic mail on this 5th day of January, 2011, as follows:

Paulo B. McKeeby
Joel S. Allen
Sharon Fast Fulgham
*MORGAN, LEWIS & BOCKIUS, LLP*
1717 Main Street, Suite 3200
Dallas, Texas 75201-7347

Deron R. Dacus
*RAMEY & FLOCK, P.C.*
100 East Ferguson, Suite 500
Tyler, Texas 75702

    s/Laureen F. Bagley
LAUREEN F. BAGLEY

**LIST OF EXHIBITS TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' ADMINISTRATIVE EXEMPTION CLAIM AND BRIEF IN SUPPORT**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 1 | **Deposition excerpts of Robert Sansone** |
| 2 | **Deposition excerpts of Chris Hepburn** |
| 3 | **Deposition excerpts of Geraldine Ingram** |
| 4 | **Deposition excerpts of Bethany Maynard** |
| 5 | **Deposition excerpts of Ilene Meyers** |
| 6 | **Deposition excerpts of Lisa White** |
| 7 | **Deposition excerpts of Kelly Hampton** |
| 8 | **Deposition excerpts of Amy Dunn** |
| 9 | **Deposition excerpts of Travis Void** |
| 10 | **Deposition excerpts of Joy Flynn** |
| 11 | **Deposition excerpts of Betty Dupree** |
| 12 | **Deposition excerpts of Laura Milburn** |
| 13 | **Deposition excerpts of Kevin Mosenthin** |
| 14 | **Deposition excerpts of Ronald Grimwood** |
| 15 | **Tyler EDEN Division Consulting Incentive Compensation Plan** |
| 16 | **Tyler - INCODE Solution Implementation Consultant Incentive Plan** |
| 17 | **Deposition excerpts of Sandra Dunning** |
| 18 | **Deposition excerpts of Joy Bibles McLeod** |
| 19 | **Deposition excerpts of Thomas O'Haver** |
| 20 | **Deposition excerpts of Yvonne Wilton** |
| 21 | **Deposition excerpts of David Hayner** |
| 22 | **Deposition excerpts of Titus Britt** |

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 23 | Deposition excerpts of Gayla Duke |
| 24 | Deposition excerpts of Melanie Baird |
| 25 | Deposition excerpts of Lorraine Mutch |
| 26 | Deposition excerpts of Russell Steele |
| 27 | Deposition excerpts of Eric Emde |
| 28 | Deposition excerpts of Jill Brown |
| 29 | Deposition excerpts of Linda Carrington |
| 30 | Deposition excerpts of Anthony Dodd |
| 31 | Affidavit of Brian T. Farrington |
| 32 | Position Description MUNIS Implementation Consultant dated December 4, 1997 |
| 33 | Position Description MUNIS Implementation Specialist dated May 6, 1999 |