JOY M. BIBLES McLEOD; May 18, 2010

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3  _____

    PATTY BEALL, MATTHEW MAXWELL,  )
 4  TALINA McELHANY and KELLY       )
    HAMPTON, individually and on    )
 5  behalf of all other similarly   )
    situated,                       )  2:08-cv-422 TJW
 6                                  )
          Plaintiff(s),             )
 7                                  )
    vs.                             )
 8                                  )
    TYLER TECHNOLOGIES, INC., and   )
 9  EDP ENTERPRISES, INC.,          )
                                    )
10        Defendant(s).             )

11  _____

              DEPOSITION UPON ORAL EXAMINATION OF
12                  JOY M. BIBLES McLEOD

13  _____

                         1:35 P.M.
14
                       MAY 18, 2010
15
              520 PIKE STREET, 12TH FLOOR
16
                    SEATTLE, WASHINGTON
17

18

19

20

21                                          CERTIFIED
                                           TRANSCRIPT
22

23

24

25  REPORTED BY:  MARY L. GREEN, CCR 2981
```

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

Page 2

```
 1                    A P P E A R A N C E S
 2     FOR THE PLAINTIFF(S):
 3          LAUREEN F. BAGLEY
            Sloan, Bagley, Hatcher & Perry
 4          101 E. Whaley Street
            Longview, TX 75601
 5          903.757.7000
            lbagley@textrialfirm.com
 6
       FOR THE DEFENDANT(S):
 7
            ELLEN L. PERLIONI
 8          Morgan Lewis
            1717 Main Street, Suite 3200
 9          Dallas, TX 75201
            214.466.4142
10          ellen.perlioni@morganlewis.com

11     ALSO PRESENT:  LYNN MOORE, Tyler Technologies

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

Page 3

```
 1                          I N D E X

 2

 3    EXAMINATION BY:                                   PAGE(S)

 4

 5    MS. PERLIONI                                         5

 6    MS. BAGLEY                                         133

 7

 8

 9    EXHIBITS FOR IDENTIFICATION                       PAGE

10

11      1      August 15, 2005, e-mail to Financials from    9

12             Joy Bibles

13      2      Resume                                       10

14      3      Employment Application                       11

15      4      September 13, 2005, offer letter             26

16      5      September 21, 2006, letter to Mindy          36

17             D'Andrea from Joy Michelle Bibles

18      6      October 13, 2006, letter to Joy Bibles       36

19             from Dawn Mitchell

20      7      September 21, 2006, e-mail to EDEN-All       53

21             Users from Mindy D'Andrea

22      8      October 9, 2006, e-mail to Connie Shaw and   53

23             Dawn Mitchell from Mindy D'Andrea

24      9      October 23, 2007, e-mail to TBNT from Joy    55

25             M. Bibles
```

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

8 (Pages 20 to 23)

### Page 20

1  his department did. When I saw Marilyn, she told me
2  about what her department did. Mostly these people
3  told me about what their departments did. They didn't
4  come in to tell me about what they were going to do
5  training me.
6        The consulting manager that I worked with, she
7  had very little time for me because she was on the way
8  from a meeting or to a meeting, so these people were
9  introducing themselves to me to tell me about EDEN.
10 They weren't coming in to tell me how they were going
11 to interact with me, because I didn't work with any of
12 them.
13 Q. Mindy D'Andrea, you mentioned you spoke with
14 her and ultimately she became your supervisor.
15 A. Right.
16 Q. What do you recall from your discussions with
17 Mindy D'Andrea?
18 A. They were very, very brief, because she was on
19 the way somewhere. She's the one that told me she was
20 looking for someone that was a self-starter; that there
21 would be travel; that she would be trained very well,
22 that type of thing, but my time with her was very, very
23 brief, so there wasn't a lot of input about what the
24 expectation would be other than what I already told
25 you.

### Page 21

1  Q. Marilyn, whose last name we don't know, what
2  was her group or her department?
3  A. She -- if I remember right, her module that
4  she implemented was utility billing. Other than her
5  being very pleasant and very friendly, she was telling
6  me what a great company it was to work for, and she was
7  a very positive upbeat person, but I never worked with
8  her.
9  Q. And what was -- Ms. D'Andrea, what was the
10 group, department, module that she supported?
11 A. Auxiliary services. She did some of the
12 auxiliary modules, so we didn't do -- we didn't
13 implement necessarily accounting modules that
14 interfaced with general ledger.
15 Q. Which module did you work on when you were
16 hired?
17 A. The modules that come to mind the most because
18 they were the ones that I remember implementing modules
19 were like project management, and I will have to sit
20 here and try to think of others. That's the one I
21 spent the most time on was project management; that I
22 became the most proficient with.
23 Q. It's actually a software module relating to
24 project management?
25 A. Right.

### Page 22

1  Q. And then you mentioned Darren Dundis.
2  A. Yes.
3  Q. What was his group?
4  A. His group worked with conversions if I recall,
5  and although I interfaced with some of those people, he
6  didn't train me. I didn't do anything with those
7  people.
8  Q. Do you recall anything from your interview
9  with him wherein you might have discussed the position
10 that you were taking in particular?
11 A. If there was a problem in conversion, his
12 group was the people that I contacted. That's what he
13 told me that they worked with conversions. If there's
14 a problem in a conversion, his group was the people
15 that were called.
16 Q. When you say conversion, as I understand it --
17 and tell me if I'm way off base -- they took the
18 customer or client's data and converted it from their
19 old system into the Tyler software.
20 A. That's correct.
21 Q. And you didn't work in that conversion group
22 itself?
23 A. No. But I still did have to deal with them
24 sometimes in that when there was a technical issue even
25 with the auxiliary modules, still their group were

### Page 23

1  people that I sometimes had to deal with, because they
2  were technical support.
3  Q. So you went in and you interviewed with the
4  five different people that we have just mentioned. Did
5  you have any follow-up telephone or in-person
6  interviews with anyone at Tyler Technologies?
7  A. No, Ma'am.
8  Q. How did you --
9  A. Oh, Bruce Volkens was another person I met.
10 He was the VP.
11 Q. What do you recall from your discussion with
12 Mr. Volkens?
13 A. Another person telling me what a great place
14 it was to work, but very distant.
15 Q. What do you mean by distant?
16 A. He just -- he was -- he was executive
17 management, just very, very much -- it's a great place
18 to work, nice to meet you, you know, executive
19 management meeting a prospective employee and just
20 very, very, very friendly but got important things to
21 do. He didn't really give me any information. Very --
22 Q. Didn't spend much time with him?
23 A. Yeah. I mean, he met me more because
24 executive management, I think, needed to meet me, but
25 he didn't give me any information.

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

10 (Pages 28 to 31)

## Page 28

1  salary.
2  Q. And what is your understanding of salary?
3  A. That I wasn't paid hourly.
4  Q. So in other words, is it your understanding
5  that $50,000 that's identified in the document we've
6  marked Deposition Exhibit 4 was what your annual salary
7  would be regardless of the amount of hours worked?
8      MS. BAGLEY: Object to the form. You
9  can answer.
10  Q. (BY MS. PERLIONI) You still answer.
11  A. Yes. I -- yes.
12  Q. Did you ever -- were you ever told by anyone
13  that you would receive additional compensation if you
14  worked over a certain amount of hours or anything like
15  that?
16  A. No. My understanding is salary was different
17  than that.
18  Q. So you don't get overtime pay? There is a
19  flat salary regardless of how many hours you may work?
20      MS. BAGLEY: Form.
21  Q. (BY MS. PERLIONI) Is that your understanding?
22  A. No. That wasn't my understanding.
23  Q. What was your understanding?
24  A. My understanding of salary was that it was
25  equitable hours; that it balanced out.

## Page 29

1  Q. What does that mean? I'm sorry.
2  A. That if they worked you 60 hours one week,
3  that it balanced out in another week, because people I
4  knew who worked salary, that's the way that it worked
5  for them.
6      So my understanding of salary was that if you
7  worked 60 hours one week that your employer would work
8  it out with you the next week that you might be able to
9  work 20 hours or 30 hours and balance things out and
10  that exempt meant -- my understanding of the exempt
11  statement was that you weren't hourly; that you didn't
12  get docked for your pay. If you worked 60, then you
13  and your employer would make that up the next week.
14      That's what I thought salary was, because the
15  people I knew that worked salary, that's the way it
16  worked for them.
17  Q. Did anyone at Tyler Technologies ever tell you
18  that that's how it works at Tyler Technologies?
19  A. No.
20  Q. The people that you knew that worked in such a
21  way that gave you your impression of what it meant to
22  be salary, were any of those Tyler Technologies
23  employees?
24  A. But nobody at Tyler told me that they were
25  going to work me 50, 60 hours a week and not make it up

## Page 30

1  to me either. They didn't tell me that salary meant
2  that they were going to work me regularly over 40, 50,
3  60 hours a week either.
4  Q. Did you ever ask?
5      MS. BAGLEY: Object to the form.
6  A. That they were going to abuse salary? No, I
7  didn't.
8      MS. PERLIONI: Objection; nonresponsive.
9  Q. (BY MS. PERLIONI) Did you ever ask anyone how
10  the exempt or salary status worked or what it meant?
11  A. No. But they never asked me if it was okay to
12  just work me regularly like that either.
13      MS. PERLIONI: I'm going to object to
14  everything beyond no being nonresponsive.
15  Q. (BY MS. PERLIONI) Did you at any time -- I
16  mean, throughout this time period you received your
17  paycheck, correct? Throughout your employment with
18  Tyler Technologies, you received a paycheck, correct?
19  A. Yes.
20  Q. And your paycheck was the same amount
21  regardless of the number of hours you worked, correct?
22  A. Yes.
23  Q. And at any time, did you go talk to anyone at
24  Tyler Technologies management or human resources and
25  question or complain --

## Page 31

1  A. Yes, I did. I talked to my manager more than
2  once.
3      MS. BAGLEY: Let her finish the
4  question.
5      THE WITNESS: Okay.
6  Q. (BY MS. PERLIONI) Your manager, Mindy
7  D'Andrea?
8  A. No. Go ahead and finish your question.
9  Q. We got it. Mindy D'Andrea?
10  A. Yes, I did.
11  Q. Tell me the first time you spoke with
12  Ms. D'Andrea.
13  A. Within two months of employment.
14  Q. And what did you say to Ms. D'Andrea?
15  A. I said, I notice that I seem to regularly be
16  working about 50 hours a week and a couple times 60
17  hours a week, and she said, You're salary, and I said,
18  Well, that doesn't seem fair, and she said, Well, when
19  you're training, you will be working 50, sometimes 60
20  hours a week, but once you're trained, every now and
21  then you'll have a week that's about 30 hours a week.
22  I never saw a 30-hour week and rarely saw a 40-hour
23  week.
24  Q. Anything else in your conversation with
25  Ms. D'Andrea?

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

11 (Pages 32 to 35)

### Page 32

1  A. I had that conversation with her at least
2  three times.
3  Q. I'm asking about the first time, and I want to
4  know everything you can recall under oath that you can
5  attest to you recall you saying it and you recall her
6  response. Anything else you recall from that first
7  conversation?
8      MS. PERLIONI: Can the record reflect
9  how long we're sitting here?
10  A. No. There was nothing else.
11  Q. (BY MS. PERLIONI) You said that first
12  conversation was approximately two months after the
13  beginning of your employment?
14  A. Yes.
15  Q. When was the second conversation you had with
16  Ms. D'Andrea where you raised the issue of the hours
17  you worked?
18  A. It was about three months after that.
19  Q. Real quick going back to the first
20  conversation. Was anyone else present when you had
21  this conversation?
22  A. No, there wasn't.
23  Q. Did you make any notes about this
24  conversation?
25  A. No, I didn't, because I trusted her at her

### Page 33

1  word.
2      MS. PERLIONI: Objection; nonresponsive.
3  Q. (BY MS. PERLIONI) My question was did you make
4  any notes about that conversation?
5  A. I said, no, I didn't.
6  Q. Going to the second conversation apparently
7  three months after the first conversation, can you tell
8  me where the second conversation occurred?
9  A. It was in a conference room.
10  Q. Was anyone present other than you and
11  Ms. D'Andrea?
12  A. No. No one was present.
13  Q. Tell me what you can recall and testify to
14  under oath as you having said and Ms. D'Andrea having
15  responded.
16  A. It was the -- it was almost word for word the
17  same conversation.
18  Q. I'd like you to tell me what you can sitting
19  here recall having said to Ms. D'Andrea and what her
20  response was.
21  A. I reminded Mindy of the conversation we had a
22  couple months earlier, and she said, Well, I told you
23  when you were training that there would be 60-hour
24  weeks, and I said, Well, Mindy, I still haven't seen a
25  30-hour week, and she said, Well, you're still

### Page 34

1  training, and I said, Well, Mindy, when am I going to
2  get a break? When am I going to get a lighter week?
3  So she said, Well, you're still training, but when
4  you're done training, you'll see a 30-hour week.
5      So I left and figured, well, maybe I'll just
6  get to see a 30-hour week in the future. About three
7  months later, I had approached her again. No, no one
8  was present. No, I didn't make a record of the
9  conversation. She told me again I was still training
10  even though I had been going out to client sites by
11  myself.
12  Q. Anything else that you recall during this
13  third conversation you had with Ms. D'Andrea?
14  A. Other than I was getting increasingly
15  frustrated, no.
16  Q. Did you ever speak with anyone other than
17  Ms. D'Andrea about your concerns with the number of
18  hours you were working?
19  A. Yes. I spoke with Connie Shaw.
20  Q. How many times did you speak with Ms. Shaw?
21  A. Once.
22  Q. Do you recall when that conversation with
23  Ms. Shaw occurred?
24  A. Probably about -- let's see -- a month after
25  the second conversation I had with Mindy. No, I didn't

### Page 35

1  make a record of the conversation. No, no one else was
2  present. And she told me you're salary.
3  Q. She's obviously responding to something. What
4  is it that you asked Ms. Shaw?
5  A. I told Ms. Shaw about the conversation I had
6  with Mindy but not in specific detail, because I was
7  trying to be protective of my manager and not be
8  specific. I broached the subject about being salary
9  and working so many hours and asked about light weeks,
10  and she said that's up to your manager.
11  Q. What do you mean when you say light weeks?
12  What did you ask her about light weeks?
13  A. Weeks less than 50 or 60 hours.
14  Q. And you say Ms. Shaw -- her exact words were
15  that's up to your manager?
16  A. That's up to your manager.
17  Q. And when she said you're salaried, did you ask
18  her what that means?
19  A. No, I did not. She just said that was the pat
20  answer. You're salary.
21  Q. Did she explain to you that means the salary
22  remains the same regardless the number of hours you
23  work?
24  A. She just said you're salary.
25  Q. Did you ask her at any point in time is my

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

26 (Pages 92 to 95)

### Page 92

1  process of some of the auxiliary modules of their EDEN
2  financial software" package.
3       Do you see that?
4       MS. BAGLEY: Purchase.
5       MS. PERLIONI: I'm sorry. Purchase.
6  Thank you.
7    A. Yes.
8    Q. (BY MS. PERLIONI) What do you mean by that?
9    A. The implementation process, we had as I said
10 before the training materials that showed them or
11 walked us through the configuration. There were
12 certain things they couldn't even train on until the
13 site was configured. That meant plugging in required
14 data.
15      Then we had this prepackaged thing to show
16 them how to train. They got their training materials,
17 and then we showed them how to use the software. We
18 put in the required information they would need. For
19 example, project accounting, we had to help or they
20 showed us whether or not they needed phases.
21      We didn't help them make decisions, but if
22 they had, for example, construction accounting, if they
23 wanted phases or if they wanted tasks, we showed them
24 how to put that information in. Then we showed them
25 how to use the project accounting service.

### Page 93

1       Then they had an agenda and a checklist of
2  things they had to have done so when we came back we
3  could proceed with showing them how to use it, and then
4  we just walked them through this agenda step by step.
5  It was kind of a turnkey thing. And then we turned it
6  over to them so they could use it.
7    Q. What do you mean by -- you go in there and
8  you're sitting down with the customer, with the client.
9  Are you presenting with a PowerPoint?
10   A. Not with project accounting. Sometimes they
11 started with a PowerPoint because it was an overview of
12 this is how project accounting works to help them
13 understand how to frame in the things that they were
14 going to need to do so they could make their own
15 decisions.
16   Q. So then you sit down and you engage with the
17 client to figure out how they manage their project
18 accounting -- I think you said differently -- phasing
19 and things like that?
20   A. Yes, Ma'am.
21   Q. What is it you're trying to understand when
22 you're making this inquiry of your client?
23   A. How they translate their project accounting
24 process from whatever they're doing currently so they
25 can translate it into the project accounting system

### Page 94

1  that they purchased.
2    Q. Is every client the same?
3    A. No, Ma'am.
4    Q. What kind of nuances would you come across?
5    A. Some people might just have phases. Some may
6  have phases and task. Some might have phases, tasks,
7  subtasks. Some may be a parks department. Some may be
8  the city where they handle construction, where they do
9  construction for the city.
10      So they might all use it different ways, but
11 the basic idea is the same that they want to be able to
12 use their budget and budget each phase and task.
13   Q. But because of the nuances, do you have to
14 change the preferences within the software to be able
15 to facilitate the type of project accounting this
16 particular client may utilize?
17   A. Yes, Ma'am, because some people may want it to
18 autonumber. Some people might say we want to pick our
19 own numbers. Some people might say we only want a
20 five-digit phase number. We configure that for them so
21 that once the configuration is done and we set the
22 preferences, they can go in and manage it.
23   Q. As you're having these discussions with them,
24 are you showing them how to do it or is there initial
25 discussion to set it up with all the preferences based

### Page 95

1  on how they run project accounting and then later you
2  show them how to do it?
3    A. Yes.
4       MS. BAGLEY: Object to form.
5    Q. (BY MS. PERLIONI) Am I correct in that?
6    A. Well, we would go ahead and configure it to
7  decide how many digits do you want, do you want phases
8  or tasks, and then once we decide -- the client decides
9  what they want and we configure it, then we'd say,
10 okay, now that you understand what the structure is,
11 you need to set this up. This is your to do list.
12 Before we come back, these things have to be done.
13 Then we come back and we'll show you what you need to
14 do next.
15   Q. When you say we, who is the we?
16   A. I'm sorry. The client. We show the client
17 what they need to be done. When I say we, I mean the
18 client. I show the client.
19   Q. Typically it would just be you and one or two
20 people from the client?
21   A. Usually a team, the implementation team on the
22 client side. If I'm shadowing, then the we would be
23 the EDEN person and I or the Tyler Technologies person
24 and I.
25   Q. Let me make sure this is clear for the record.

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

## Page 96

1. If you're shadowing, that means you're going along with
2. another Tyler Technologies person to watch them go
3. through the implementation process?
4. A. Or they're watching me because I'm training
5. them.
6. Q. So if it's not a situation where you're
7. shadowing someone or they're shadowing you while you're
8. training them, it's just you and the client team?
9. A. Yes, Ma'am.
10. Q. Who would be amongst that client team?
11. A. It could be the treasurer. It could be the
12. accounting department. Sometimes it's like persons
13. from all the other groups, parks and recreation,
14. construction, other people who would be involved that
15. will be affected by the projects, because they might
16. have to set up their own project. You might have parks
17. and recreation, the library, anybody who would have
18. need to use that project.
19. Q. And does that differ by client as well?
20. A. Yes, Ma'am.
21. Q. And going into it, do you know these types of
22. nuances that are client specific?
23. A. At the first configuration meeting, you may
24. not.
25. Q. And that's a face-to-face meeting?

## Page 97

1. A. Yes, Ma'am.
2. Q. And approximately how long does your first
3. configuration meeting typically last?
4. A. It could be two days. It depends on how big
5. the client is.
6. Q. It could be two days. It could be what?
7. A. It could be one day. It could be two days. I
8. guess if it's a county, it could be three days. It
9. depends on who comes to the meeting.
10. Q. Why does it take so long to have those types
11. of discussions?
12. A. Because sometimes you're deciding -- it could
13. be because you're configuring the client. It could be
14. because only certain people can be there for the first
15. meeting to get these decisions hammered out. It could
16. be certain departments are going to be at the first
17. meeting and then you're showing another group for the
18. second meeting. It just depends.
19. Q. As you work through the different variables or
20. nuances for this particular client and you configure it
21. in their system, you said you then give them sort of a
22. task list?
23. A. Yes, Ma'am.
24. Q. How do you come up with that task list?
25. A. The task list is already preformed by the

## Page 98

1. packaging of these implementation packages of to dos
2. and the structure of things you have. You give the
3. agenda to the client. We have this list of things that
4. we're supposed to do, and we present that to the
5. client. We have these things that we implement from,
6. tried and true implementation guides, and that's
7. what --
8. Q. Like what kind of thing? Is it like a recipe
9. where you say I need to tell you now that you need
10. to --
11. A. Yes, Ma'am. It's pretty much a recipe.
12. Q. You use no discretion in there whatsoever?
13. You don't use your brain basically?
14. MS. BAGLEY: Object to the form.
15. A. No. We go -- if we go off the guide, we're
16. supposed to contact the consulting manager or the
17. project manager.
18. Q. (BY MS. PERLIONI) And these agendas, they
19. don't have those client nuances listed, correct?
20. A. No, Ma'am, they don't.
21. Q. So you have to talk to the client and find out
22. what the nuances are for any particular client,
23. correct?
24. A. That's correct.
25. Q. And then you configure based on the different

## Page 99

1. nuances of this particular client?
2. A. Yes, Ma'am.
3. Q. And then when you give them their task list,
4. does that have to be in any way altered based on the
5. nuances that the particular client brings to the table?
6. A. Well, the implementation guide allows for
7. those nuances, because particularly with project
8. management, the software is configured with enough
9. variety or enough diversity to allow for those.
10. So there's a lot of flexibility in the way
11. that those modules are, particularly the module that I
12. implemented, in that if it can't fit within this box
13. with all these different varieties, then we contact the
14. project manager and say it won't fit into the mold with
15. all these variations. The client wants to do this.
16. What should I do?
17. Q. Just so I'm understanding, the software has so
18. many variables or options that are available?
19. A. Yes, Ma'am.
20. Q. And then you sit down and go over that with
21. the customer --
22. A. Yes, Ma'am.
23. Q. -- and determine what they want to do, and
24. then you configure all these different available
25. options within the software?

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

28 (Pages 100 to 103)

Page 100

1  A. Yes, Ma'am.
2  Q. So that's your first meeting?
3  A. (Nodding head).
4  Q. Then what happens at your second meeting with
5  the client?
6  A. We leave the client with a to do list
7  according to the agenda. They have a checklist, a task
8  list. Then if they're not done and they're not ready
9  for that second meeting, we just don't have it, because
10 we can't proceed -- according to the implementation
11 recipe, we can't proceed with the next step, and the
12 client is supposed to be ready.
13     When they are, we come back with the next
14 phase, and then we say, okay, now we're going to go
15 ahead and proceed with the training. You're set up.
16 You're configured. Now let's show you how you're going
17 to handle this.
18     That's when they go in, they do their
19 training, and they start finishing putting in their
20 budgets, for example, with the module I did, and at
21 that point it becomes turnkey. They go in, they start
22 using it.
23     At that point they're actually testing the
24 system as well, and if they have any problems, we're
25 there with support. We work with technical if there's

Page 101

1  any problems, and they're running the system through
2  the hoops.
3  Q. Back up. When you go back the second time,
4  are you sitting down at their actual computers?
5  A. I'm not. They are.
6  Q. And you're walking around looking over their
7  shoulders?
8  A. Yes, Ma'am.
9  Q. And what are you having them do on their
10 computers?
11 A. They're entering data. They're setting up
12 their phases for their projects.
13 Q. And is this a live scenario or a test
14 scenario?
15 A. In most cases it's a live scenario.
16 Q. The second time you go in?
17 A. I believe so.
18 Q. The data they're entering is actually live on
19 their system?
20 A. Yes. I'm trying to think of the last city
21 that I implemented. I believe it was a test -- I
22 believe it was a live environment.
23 Q. Did you ever get a skeletal or test
24 environment that once it's gone through configuration
25 and it's set up in the initial set-up for the client

Page 102

1  where you can go in and look at it and understand how
2  the particular client is set up?
3  A. Could you please -- I don't understand your
4  question.
5  Q. Someone goes in and takes the client's data
6  and converts it into Tyler Technologies software based
7  on whatever the agreement is with that particular
8  client, right?
9  A. Uh-huh.
10 Q. And that's going to -- the ultimate configured
11 software is going to differ between clients, right?
12 A. Right.
13 Q. So you got to look at it, I would think,
14 before you walk in to train on it.
15 A. Oh, you mean like a test database?
16 Q. Yes.
17 A. Oh, okay. Yes.
18 Q. So once you get the test database, what do you
19 do with it?
20 A. Like preview the data that's in there?
21 Q. Do you do any preparation so you understand
22 what these systems are?
23 A. I deal with auxiliary modules. I mean, it's
24 not like I look at the core ledger. I'm not looking at
25 general ledger or accounts payable or anything like

Page 103

1  that, so with the auxiliary modules, there wasn't a lot
2  for me to see.
3      So, I mean, you go in and you make sure
4  there's data there. You make sure that things look the
5  way you expect them to see to make sure that they're
6  linked and set up, so, yes, there is some preview of
7  things, but it's not the same thing as with the general
8  ledger or core modules.
9  Q. The companies or the clients that you worked
10 with are governmental entities, municipalities,
11 whatnot?
12 A. Yes, Ma'am.
13 Q. And what were their hours?
14 A. Their hours were -- sometimes people were in
15 at 7:30, 8, 8:30. We usually started trainings at
16 8:00.
17 Q. And would end at what time?
18 A. End at 4, 4:30. Sometimes people -- when I
19 worked with the City of Albany, I'd get there sometimes
20 at 7:30.
21 Q. And leave when?
22 A. Sometimes 5, sometimes 6.
23 Q. But the employees are gone. They work their
24 set schedules, correct?
25 A. They do, but IT would be there later or

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

30 (Pages 108 to 111)

### Page 108

1  Q. So you were required to say we followed
2  schedule today?
3  A. Even if that's all the e-mail was. An e-mail
4  to the project manager every day to say training went
5  fine, training didn't go fine, training went fine, this
6  person is being difficult, we're on schedule, we're not
7  on schedule. We were required to e-mail the project
8  manager every day.
9  Q. That's my point is it's not going to be the
10  same every day. Sometimes you're going to be on
11  schedule. Sometimes you're not.
12  A. Right.
13  Q. Why wouldn't you be on schedule on certain
14  days?
15  A. You might have somebody in class who is being
16  difficult. There might be a problem with IT. The
17  Internet might have gone down. There could be any
18  number of reasons.
19  Q. How do you figure out if a particular employee
20  is not understanding what you're trying to explain to
21  them?
22  A. Because you have to stop class several times
23  to explain.
24  Q. Because they're asking questions?
25  A. Uh-huh.

### Page 109

1  Q. And do you ever watch the employees that
2  you're training and say, okay, this person is not
3  asking questions and get the impression that they're
4  not understanding because they're being quiet as
5  opposed to asking lots of questions?
6  A. Uh-huh.
7  Q. And what do you do then?
8  A. Then you just try to engage them.
9  Q. How do you do that?
10  A. You call on them. You ask them questions.
11  You tactfully, diplomatically try to include them.
12  Q. So tell me some of the strategies you utilized
13  for trying to get these employees to really grasp the
14  system that you're trying to explain to them.
15  A. I would ask them, for example, or say why
16  don't you give me some examples of how that works in
17  your department and just kind of call them out.
18  There could be any number of reasons they
19  weren't engaged. They didn't like the fact that their
20  department was going through change. They're sitting
21  there on the Internet playing. They're resentful about
22  having to be there when there's a whole bunch of work
23  on their desk.
24  There could be any number of reasons, so I try
25  to figure out why they're not engaging, first of all,

### Page 110

1  and then if I can identify what the reason is.
2  Sometimes it just boils down to the fact that they're
3  not going to engage no matter what, and then I turn
4  that over to the person who is senior in class and see
5  what they can do. A lot of time I don't have to take
6  care of that at all because the senior person in class
7  has already figured it out and takes care of it
8  themselves.
9  Q. So as you're interacting with the employees
10  and they're playing with their system, I assume they're
11  asking any number of questions about what they're
12  viewing on their screens.
13  A. Uh-huh.
14  Q. You have to be able to respond to those
15  questions, right?
16  A. Right.
17  Q. As you're getting the questions, do you ever,
18  okay, I see by the questions they're asking they didn't
19  grasp something we already went over and then decide to
20  go back and go to whatever it is they hadn't grasped to
21  make sure they got that before moving on to the next
22  subject?
23  A. Uh-huh.
24  Q. I would assume it has to be somewhat fluid,
25  because you don't know what the customer is going to

### Page 111

1  grasp, not grasp, right?
2  A. Right.
3  Q. So you have the initial set-up session. Then
4  you have the go back, this training session you've
5  described. How many times did you go back for those
6  training sessions?
7  A. We didn't ever do a repeat session unless the
8  client asked for it. The training session usually
9  would be if they had a test database, it would be on
10  the test database and then we'd move over to live,
11  their live environment where they're really working on
12  things and getting real data in there. So generally
13  like a set-up test and then usually three visits would
14  do it. Then we turned it over to them.
15  Q. Is that the Go Live time?
16  A. Yeah.
17  Q. And you participate in that Go Live as well?
18  A. Uh-huh. That's on-site support when they're
19  in live environments.
20  Q. So what do you do when it's Go Live and
21  they're in their live environment? Are you basically
22  just watching them do their work and a resource in case
23  anything goes wrong?
24  A. Absolutely. An on-site person so that if
25  there's a problem, then direct line to support, to the

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

31 (Pages 112 to 115)

### Page 112

1. technical consultant. If they're doing their data
2. check, checking for data validations, that sort of
3. thing.
4.    Q. And after the Go Live, do you have any
5. follow-up contact with the customers?
6.    A. If they have a follow-up visit, if that's -- I
7. guess if that's part of their -- if the project
8. managers work that out with them, there would be a
9. follow-up visit to see how things are going. Again, I
10. didn't work with the general ledger, so I wouldn't do
11. any visits like that.
12.    Q. After you leave the client's site, do you have
13. any further customer support?
14.    A. The client always had customer support but not
15. on-site support with me as the implementation
16. consultant.
17.    Q. So once you're done, you've taken them through
18. implementation and Go Live, then from there any further
19. support was through somebody else?
20.    A. Yes. They wouldn't have seen me again unless
21. there was another auxiliary module that I would be
22. implementing.
23.    Q. Let's go back to Deposition Exhibit 11. I'm
24. continuing to what I had read before, so the next
25. sentence says, "This process involves the conversion of

### Page 113

1. the customer's data from their existing software to the
2. new EDEN software, helping troubleshoot the software
3. modules if there were support issues, and training the
4. customers' employees on the use and operation of the
5. EDEN software."
6.    Do you see that?
7.    A. Yes, Ma'am.
8.    Q. Is that a true and accurate statement?
9.    A. Yes, it is, but I need to correct the
10. statement of conversion of the customer's data, because
11. with the auxiliary modules, there wasn't conversion of
12. the data, and as we've talked the process through, I'm
13. realizing we didn't convert -- the conversion process
14. as a whole there was from the GL but not on auxiliary
15. modules.
16.    Q. So despite signing Deposition Exhibit 11 and
17. declaring under penalty of perjury that it's true and
18. correct, you're now stating that that particular
19. statement is not true?
20.    A. Not for the auxiliary modules it wasn't.
21.    Q. You worked on the auxiliary modules, correct?
22.    A. You're right, but as I'm talking the process
23. through now, I'm remembering there wasn't conversion of
24. data. I didn't remember that part. It wasn't -- I
25. wasn't trying to be misleading. I just didn't remember

### Page 114

1. that they didn't convert data.
2.    Q. Let's read the next sentence. Actually, I
3. want to make sure, because we talked really about the
4. first part of that sentence. What about helping
5. troubleshoot the software modules if there were support
6. issues and training the customer's employees on the use
7. and operation of the EDEN software? That's true?
8.    A. All those things are true.
9.    Q. The next one, "I would assist with verifying
10. the customer's data after it was converted and set up
11. various software modules."
12.    A. It did get converted from test database, and
13. this is where I was coming from from the test database
14. to the production site but not from the legacy system.
15.    Q. So where you are working with assisting with
16. verifying the customer's data after it was converted
17. and set up the various software modules, that's from
18. the test --
19.    A. From test, right.
20.    Q. -- to the live data?
21.    A. Yes, Ma'am.
22.    Q. So you're helping them once it's already
23. converted to get things ready to Go Live?
24.    A. Where they're verifying -- like if something
25. went from test to their live and there was something

### Page 115

1. wrong like a misalignment of data and stuff, that's
2. when I call support and I say something happened when
3. it got converted from test to production. That's when
4. I place the calls.
5.    But they didn't have data get converted from
6. like a legacy system to the other, not with project
7. accounting. I don't recall with the other modules that
8. I did, and I'm sorry my memory is fuzzy. They may have
9. had conversion on the other auxiliary modules, and when
10. I talked about this, that may be what I'm recalling,
11. but I can't tell you right now.
12.    Q. How did you identify problems with the data
13. that had already been converted and was in the test
14. program?
15.    A. That went to production? For example, if it
16. was supposed to be -- if we knew that a project
17. accounting phase was supposed to be all alpha and we
18. saw something in there that was all numeric, I knew
19. right away that's a problem, and I would get on the
20. phone with the conversion team and say something
21. happened when this went into production.
22.    Q. How would you know it should be all alpha? Is
23. that from your discussions with the client?
24.    A. Exactly. We configured it and we said we need
25. all alpha phases and we've got numeric subtexts. We've

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

32 (Pages 116 to 119)

### Page 116

1  got a problem.
2  Q. Give me some other examples of types of
3  problems that you personally were able to identify when
4  looking at the customer's data in the test program.
5  A. If we would have had subtasks that said things
6  like land use, permitting, and those ended up in phase
7  descriptions, that would have said construction 1,
8  construction 2, construction 3, and those descriptions
9  ended up in phases, I would have known we've got a
10 problem here because those are subtask descriptions in
11 phase descriptions. That's an issue.
12     So those are the kinds of things that would
13 have jumped out. If we would have had budgeting
14 numbers in phase descriptions, those would have been a
15 problem.
16 Q. How do you know that, though?
17 A. Well, when you see the client, you set it up
18 and you work with project accounting enough, you start
19 recognizing what phase descriptions are, and when you
20 see budget numbers show up in a phase description, you
21 know at first glance that we have a problem.
22 Q. So that's based on your prior experience?
23 A. Exactly.
24 Q. What other kind of things are you looking
25 through of the test data to look for to try to

### Page 117

1  troubleshoot or see if there are any problems?
2  A. When the client imports budgets and you know
3  they've imported budgets and they were there in test
4  and they're not in production, that's a problem.
5  Q. Any other kind of things that you're looking
6  for to try to see if there are any problems with the
7  data?
8  A. The client does the validating, and then when
9  they say there's a problem, I come and confirm that
10 there's a problem, and then I would go ahead and call.
11 Q. When you say validating, you mean comparing, I
12 guess, what the Tyler software is showing and what they
13 expect it to show?
14 A. Exactly.
15 Q. Let's go back to your declaration that we
16 marked Deposition Exhibit 11. "If there were errors in
17 the converted data, I would assist the customer with
18 developing a plan for correcting errors in their
19 existing database."
20     What does that mean?
21 A. Well, if they had errors -- well, let's say
22 the budgets were missing. Then we would sit there and
23 I would say, okay, first of all, I'm going to call the
24 conversion team and we'll see what we can do to get
25 that taken care of. Obviously you can't roll this out.

### Page 118

1  I'm going to call the project manager. Those are the
2  kinds of things I would do.
3      I would never go off what our plan was, call
4  the project manager, call conversion, because Tyler
5  Technologies had their own plan about what to do if
6  there was a problem, but the client also had to develop
7  a plan about what they were going to do.
8      If their Go Live date was June 1, obviously
9  they couldn't do that, so when they developed their
10 plan, it had to also include what we were going to do
11 as a company, which meant we were going to work with
12 our conversion team, talk to the consulting manager,
13 because obviously that meant another trip for me to
14 come down there once everything was cleaned up.
15 Q. So you're collaborating with the client.
16 You're collaborating with Tyler. You're all working
17 together to come up with a plan for whatever it is
18 you've discovered when you're looking at the software?
19 A. Right.
20 Q. "I also trained clients on how to operate the
21 new software program."
22     Do you see that? What different methods did
23 you utilize to train clients? I mean, it could be
24 classroom training with a PowerPoint, pure lecture,
25 sitting down at computers, one-on-one with some people

### Page 119

1  that are struggling. Just give me some of the various
2  different types of training that you utilized when
3  working with clients to teach them how to operate the
4  new software program.
5  A. Well, I didn't deviate from the Tyler plan. I
6  had to stay with that, because that's duplicatable, so
7  everything was based on that.
8  Q. What Tyler plan are you talking about?
9  A. The Tyler training plan for whatever module we
10 were implementing, because the whole idea is if
11 something happened to me, somebody else had to pick up
12 right where I left off, and people couldn't be told
13 something different or be confused by that.
14 Q. But the plan, is that like a customer
15 hand-out? Is that something you're giving to the
16 client?
17 A. Yeah. There's a training guide. There's an
18 instruction manual. Everything has to be duplicatable,
19 so whatever it was, it had to stay with that. So if I
20 was working with a client, that was always the
21 foundation to keep that duplicatable.
22     If I was out of the picture, we couldn't
23 confuse the client so that if somebody else came in
24 that the client was saying, well, Joy was just here,
25 and that's not how she trained us. So it always had to

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

33 (Pages 120 to 123)

### Page 120

1  be with that, whether it was one-on-one, whether it was
2  a group of people, whether it was city, county,
3  whatever it was.
4       There was a PowerPoint to do an overview.
5  There was always an agenda that went to the client
6  before the trip. Then we just showed them whatever was
7  in the Tyler training, the Tyler training materials,
8  the overhead hands-on, and then usually picked somebody
9  from the class to do the driving.
10       We called it the driving so they could roam
11  around the application, which left us free to go around
12  the classroom, so if someone was struggling we could
13  help them, hold people more accountable if they were
14  going to check e-mail or be on the Internet, and then a
15  lot of questions and answers and some exercises so that
16  people could get some hands-on with that.
17       Q. You write, "I performed my job primarily at
18  the customers' offices where I would remain until the
19  training was complete and the customer was up and
20  running on EDEN software."
21       Approximately how many times did you actually
22  go out to a customer site?
23       A. I believe it was a minimum of three.
24       Q. Is that per implementation or is that three
25  times total during your employment?

### Page 121

1       A. Per implementation.
2       Q. And do you recall how many implementations you
3  did?
4       A. No, Ma'am, I do not.
5       Q. I'm going to hand you a document that I marked
6  as Deposition Exhibit 13. If you'll take a look at
7  Deposition Exhibit 13 and tell me if you recognize it.
8       A. No.
9       Q. If you look at it -- and I'll represent to you
10  I think this is information that was printed out of
11  Tyler Technologies' system. If you see customer name
12  sort of in the middle of Deposition Exhibit 13, do you
13  see City of Pensacola?
14       A. Yes, Ma'am.
15       Q. Was that a client that you performed training
16  for?
17       A. I think so, and Mindy shadowed me.
18       Q. Look over at the far right where it says what
19  -- I believe the heading is supposed to be description.
20  Do you see that?
21       A. Yes.
22       Q. Do the entries under description mean anything
23  to you?
24       A. (Reviewing). Vaguely. BQ, what was that? I
25  can't remember what that module was. Set-up ops go

### Page 122

1  live. I don't know what no conv means.
2       Q. Can you hand me Deposition Exhibit 13 back?
3       A. (Handing).
4       Q. I'm going to hand you something else. This
5  one I'm marking Deposition Exhibit 14, and this may be
6  easier to read.
7            (Deposition Exhibit 14 was marked for
8            identification.)
9            MS. PERLIONI: I'm sorry. My pages got
10  stuck together.
11       Q. (BY MS. PERLIONI) Take a look at Deposition
12  Exhibit 14. See if you recognize that.
13       A. (Reviewing). No.
14       Q. You might not recognize the actual print-out
15  or the format of this report. I'm just wondering if
16  you look on it if any of the data or information that's
17  contained on Deposition Exhibit 14 looks familiar to
18  you.
19       A. (Reviewing). It looks like some time entry.
20       Q. Under sold to short name on Deposition
21  Exhibit 14, do you see the first one says Highland?
22       A. Uh-huh.
23       Q. Who do you believe that to be?
24       A. I don't know.
25       Q. What about below that, Albany?

### Page 123

1       A. Uh-huh. Yeah. In Oregon.
2       Q. What is that?
3       A. That was a client I did project accounting
4  for.
5       Q. I thought you didn't do any project
6  accounting.
7       A. I did do -- that's what I've been talking
8  about is project accounting.
9       Q. I thought you didn't do the accounting module
10  at all.
11       A. Project accounting is an auxiliary module.
12       Q. You're right. I'm sorry. Tumwater.
13       A. Another client I did project accounting for.
14       Q. So did this appear to be if you look through
15  the different sold to, short name the clients for whom
16  you worked during the time that you were with Tyler
17  Technologies?
18       A. Uh-huh.
19       Q. Are there any clients that you recall working
20  with that are not reflected in Deposition Exhibit 14?
21       A. I don't know. I don't remember all the
22  clients I worked for.
23       Q. Sitting here today, though, you don't?
24       A. I don't. They don't come to mind, no.
25       Q. Look at what we have as 13 and 14. It appears

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 18**

JOY M. BIBLES McLEOD; May 18, 2010

34 (Pages 124 to 127)

### Page 124

1  that 13 is the time period beginning in late 2005 and
2  going --
3       A. City of Pensacola, City of Albany.
4           MS. BAGLEY: Let the record reflect that
5  we're all sitting here while counsel is talking. That
6  was a joke.
7           MS. PERLIONI: I'd be willing to comment
8  and go off the record. In fact, why don't we take a
9  break and let me see if I have much more. I think I'm
10 pretty close.
11          (Recess taken.)
12      Q. (BY MS. PERLIONI) I had a few follow-up
13 questions. I wanted to go back to the work you were
14 doing in the evenings that you were talking about that
15 you would do in your hotel when you were out at a
16 client site. Is that work you considered billable work
17 or nonbillable work?
18      A. No. It was nonbillable work.
19      Q. So that was work that you were tracking on
20 your spreadsheet but not including in the EDEN software
21 system?
22      A. Yes. We were told billable work was only the
23 time we spent with a client.
24      Q. You mentioned earlier that you were -- were
25 you in school during the time that you were working

### Page 125

1  with Tyler Technologies?
2       A. Yes. Starting in October.
3       Q. So in October of -- if you started at Tyler
4  Technologies in September of '05, you would have
5  started a month -- school a month after you started
6  with Tyler?
7       A. Yes. I believe so.
8       Q. How many classes were you taking?
9       A. I think it was two, but they were accelerated
10 courses.
11      Q. So you were taking two accelerated courses.
12 Do you remember what you were taking courses in?
13      A. There was two, and I don't remember what the
14 first two were.
15      Q. When you say two courses, are they like 3-hour
16 courses, like 3 credit hours?
17      A. No. They were 4 or 5 credits. I don't
18 remember how many -- because when I finished with them,
19 I was getting 6 credit hours, 6 to 8 credit hours when
20 I finished with them. They were online courses, and so
21 depending on the classes, they were 6 to 8 credit hours
22 posted when they were finished.
23      Q. Is that per class or --
24      A. No. For the two of them.
25      Q. And when were you taking the online classes?

### Page 126

1       Q. When were you doing that work?
2       A. When was I doing the studying work?
3       Q. You got to take the class online and then
4  study.
5       A. Oh, in the evenings.
6       Q. How often were you doing that? Every night?
7       A. Pretty much.
8       Q. So about how many hours would you spend each
9  night either taking the online class or studying the
10 material for the online class?
11      A. Probably a couple hours during the week,
12 because I did most of my work on the weekends.
13      Q. So only 2 hours during the week actually
14 taking and studying?
15      A. About 90 minutes to 2 hours in the evenings a
16 night.
17      Q. I'm sorry. So each night?
18      A. Each night, yes, Ma'am.
19      Q. How long did those classes last if you started
20 in October?
21      A. I don't recall, because I was on hiatus for a
22 while.
23      Q. What do you mean by on hiatus?
24      A. I went on medical leave because my migraine
25 headaches during and after working for Concur went

### Page 127

1  really bad, so I was on hiatus for a while.
2       Q. During and after working for Concur?
3       A. I'm sorry. For Tyler Technologies.
4       Q. So when did the migraines start?
5       A. I've always had them, but when I was working
6  with Concur, they got very, very bad.
7       Q. Have you ever worked for Concur?
8       A. I'm sorry. I work for Concur now. When I was
9  working for EDEN they got very, very bad.
10      Q. So would they hit you in the evening? Would
11 it hit you during the day?
12      A. They would get really bad during the day.
13      Q. And what would you do when you had these bad
14 migraine headaches?
15      A. I tried to work through them, the cluster
16 headaches, and then I'd start having cluster headaches
17 at night. A lot of my having to go home had to do with
18 the headaches.
19      Q. What are cluster headaches?
20      A. Cluster headaches are another type of headache
21 that strike in the middle of the night.
22      Q. So initially you were getting some during the
23 day, and then you were getting them at night as well?
24      A. Right. And they were interrupting my sleep,
25 and so between the injections and stuff, the Imitrex

**EXHIBIT 18**