DAVID HAYNER; May 19, 2010

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PATTY BEALL, MATTHEW MAXWELL, TALINA McELHANY and KELLY HAMPTON, individually and on behalf of all other similarly situated,<br><br>Plaintiff(s),<br><br>vs.<br><br>TYLER TECHNOLOGIES, INC., and EDP ENTERPRISES, INC.,<br><br>Defendant(s). | ) 2:08-cv-422 TJW |

DEPOSITION UPON ORAL EXAMINATION OF
DAVID HAYNER

2:05 P.M.

MAY 19, 2010

520 PIKE STREET, 12TH FLOOR

SEATTLE, WASHINGTON

YAMAGUCHI OBIEN MANGIO, LLC
ORIGINAL
COURT REPORTING

REPORTED BY: MARY L. GREEN, CCR 2981

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

EXHIBIT 21

DAVID HAYNER; May 19, 2010

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF(S):

LAUREEN F. BAGLEY
Sloan, Bagley, Hatcher & Perry
101 E. Whaley Street
Longview, TX 75601
903.757.7000
lbagley@textrialfirm.com

FOR THE DEFENDANT(S):

ELLEN L. PERLIONI
Morgan Lewis
1717 Main Street, Suite 3200
Dallas, TX 75201
214.466.4142
ellen.perlioni@morganlewis.com

ALSO PRESENT: LYNN MOORE, Tyler Technologies

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

EXHIBIT 21

DAVID HAYNER; May 19, 2010

Page 3

INDEX

| EXAMINATION BY: | PAGE(S) |
| --- | --- |
| MS. PERLIONI | 4 |
| MS. BAGLEY | 95 |

| EXHIBITS FOR IDENTIFICATION | | PAGE |
| --- | --- | --- |
| 1 | Resume | 10 |
| 2 | Employment Application | 12 |
| 3 | February 9, 2005, letter to David Hayner from Connie Shaw | 19 |
| 4 | Salary increase letters | 21 |
| 5 | Performance Review from February 1, 2005, to January 31, 2006 | 23 |
| 6 | Performance Evaluation Form for 6-1-09 to 9-25-09 | 77 |
| 7 | October 14, 2009, memo to Dav Hayner from Carole Agard | 77 |
| 8 | March 12, 2009, e-mail to Dawn Mitchell from Bruce Volkens | 90 |

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 21**

Page 28

contacting Jeff in situations. What are you referring to there or what is that describing?

A. It's describing an instance where perhaps I wasn't able to demonstrate something that a client wanted to see from our software.

Quite often our normal process is to call our support team and figure out the solution so that we can then demonstrate the desired quality or desired functionality for the client, and in certain cases, if the team was unavailable, I would call Jeff.

My goal at this point in time was to become better with our software so that I would call Jeff even less.

Q. So as you become more knowledgeable on the software itself, less and less you have to call in --

A. I have to rely on Jeff's knowledge to be able to satisfy the client's needs.

Q. Can you walk me through -- so let's take an implementation from start to finish. So if a -- see, I'm a customer, and I have purchased for the first time Tyler's software. Take me from that point through the Go Live process and explain your involvement in that if you will as the implementation consultant.

A. Well, let's take the simplest piece of software in terms of implementation that I work with,

Page 29

and that's GASB 34. The reason that's the simplest is because it's a stand-alone module. It's not integrated with Tyler or with EDEN software.

Q. Actually, that's a good question, a good point. Before we move on, so the GASB 34, it's a stand-alone module?

A. Correct.

Q. And you said it's the simplest, and what makes it -- is it just the fact that it's a stand-alone or are there other variables that make it --

A. Partially because it's stand-alone, partially because it's a very direct module.

Q. What do you mean by that?

A. Implementing purchasing and accounts payable, for example, the two modules, while individual modules, rely heavily to feed information back and forth to each other.

GASB takes an export from EDEN and then it works all by itself, so it's very straightforward. It doesn't have a lot of interaction with the other modules. It's a very simple one for demonstrating what I do.

Q. What makes it more difficult when you have these modules like purchasing and accounts payable that feed back and forth?

Page 30

A. You have to understand the interlink, the interconnections. It just means that you have to be much more aware of how the software operates in an integrated fashion as opposed to GASB 34 does its own thing and you don't have to worry about affecting something else.

Q. And how does that impact your implementation? If they were related, does that mean you have to actually train on purchasing and accounts payable at the same time or would the modules be rolled out at different times? How does that work?

A. Generally when you're dealing with an implementation, an initial implementation, general ledger, accounts payable, and purchasing are all done together, and the reason for that is because they're interrelated and they have to be done in a single sequence.

Unless you have a general ledger, it makes no sense to have purchasing, because there's no place to summarize your purchasing capabilities. Without purchasing, you can do accounts payable, but you're not creating accounts payable because you have no purchasing to create the accounts payable, so they're interrelated.

GASB again takes a feed from EDEN one time and

Page 31

then it stands alone. It doesn't feed to anywhere or doesn't interrelate with anything. It's simply a piece of software just like using Excel.

Q. So if the GL, the AP, and the purchasing modules are done together, is there an implementer for each different module or would you as the implementation consultant be doing training and implementing all three?

A. Yes to both.

Q. Can you explain?

A. It can be done either way. It just depends upon scheduling. The person who does the general ledger doesn't have to be the person who does the purchasing. The person who does purchasing doesn't have to be the one who does the accounts payable.

But you have to be an individual who is aware of that connection and the flow of information from one to the other. Anybody can do any of the pieces. You just have to be aware of all of them.

Q. But you say done together in sequence. Does that mean that you'll do one, then the other module and then the next module? It's not a combined implementation and training of all three at the same time?

A. Generally not, yeah.

**EXHIBIT 21**

Q. So we can go back to you were telling me -- you were going to walk me through the implementation.

A. The implementation process, the start of an implementation process is when I'm informed that I'm going to a certain client for in this example GASB 34, and at that point in time for GASB 34, I would develop an agenda. It's a canned agenda. I'm simply filling it out for the dates of the trip as it would apply to that specific client.

Then generally with GASB 34, there is a phone call where I talk to the client before I go out simply because GASB has a lot of requirements. We need to make sure that when the timing is going to be that those requirements will be fulfilled so we understand when -- we want to make sure that when we're going out is a good time for the client, a good time to be doing this piece of software, so I generally have about an hour long conversation with them before I go out.

Q. Would you have that same kind of conversation if you were going to implement GL, AP, or purchasing?

A. No.

Q. Would you have any advance conversation with the client for --

A. Most likely not.

Q. So this call with the client --

A. Is specialized to GASB because of its nature. GASB reporting has to be done in a certain period of time, and you want to make sure that you're not coming a month before they've got the data, because then you have no reason to be there.

You also want to make sure that you're not coming six months early, because they'll forget how to use it before they need it. That's what the call is primarily to discover for that.

Q. So what happens next in the process?

A. Then after I've sent them the agenda, I show up with GASB. Its functionality -- I never touch a computer with a client for the most part. Any computer on which GASB has been installed, the client is the one who is always sitting at the computer and driving, because people learn better by doing than just by hearing me talk about it and showing them.

Q. Is that your style? Do you know whether other implementers do the same thing or have different strategies?

A. I know that everybody has their own style. My style is I never touch the computer just because, again, I believe people learn better by doing it than by my talking about it. So I would sit down.

With GASB 34, you have to basically input the

labels for the accounts, so what the asset accounts are, things like cash and fixed assets and accounts payable, so there's a great deal of labeling that's done, and I walk the client through basically showing them, okay, here's where you do it and here's how you do it. Now what labels do you want to create? I show them how to create those labels.

Q. When you say what labels, does that mean the type of accounts may differ amongst clients? They may want different variables?

A. One may have cash on their financial statements. One may have cash investments. One may have a separate label for cash and another one for investment. So it's simply finding out what their financial statements have on them and showing them where they can input those and then teaching them how they can input those.

Q. I notice that you have an accounting background and I believe are a CPA, correct?

A. I was a CPA. I have been certified in the past.

Q. And does that knowledge and experience that you have assist you in being able to work with the client to help them set up these accounts within their software?

A. It definitely helps me with knowing whether or not the way that we're going to be using the software will work for them, yes, and whether or not what they're asking to input is an asset versus a liability.

Q. How does that make a difference?

A. Because you enter them in different pieces of the software, so I wouldn't obviously want to direct them to input a liability into the revenue section of the software.

Q. I'm sorry. Thank you. Go ahead. Continue. You were talking about then sitting down with the customer, them driving, and you're going through and helping them input the labels and explaining how to do that.

A. Correct. Once I've input the labels, then basically there's a piece of the software that matches the labels with their actual GL accounts, and so I demonstrate how they do those, and then for the most part the rest of that trip is them sitting there and matching the labels with their accounts and my demonstrating how they would use the software to reconcile what they've input to their previous year's financial statements so that they can match the totals coming out of GASB with what's in their software or what's in their financial statements.

**EXHIBIT 21**

Page 44

three to five. What about purchasing?
A. Three to five. Depends on the client and how adept they are and how large they are and how many people they have, so there are so many variables to include. It just depends on the client.
Q. Let's talk about some of those variables. Let's first talk about the client, and you mentioned how adept they are, so how do you as you're training -- I mean, obviously you've got to get your end users to understand the product.
A. Uh-huh.
Q. And you said your strategy is putting them at the computer because you think they learn better by doing.
A. I think they learn better faster.
Q. And if someone's not -- at least you think someone's not getting it, what do you do? What are your different strategies?
A. It depends upon the situation. I mean, I generally try and pick one of the more computer savvy individuals as we are having our initial discussions. I try to find somebody who would be one of the better ones to drive at least to start so that I'm not having to constantly retrain.
So my goal is to get the majority of the staff

Page 45

there capable. My goal isn't to get every single individual. It varies upon the client, but most clients I'm usually training three to five people, and so usually one to two are really good and one to two are capable and somebody back there just forgot that they were supposed to be in class.
Q. What techniques do you use to try to figure out amongst your class who is going to fit within those?
A. I start off. I rotate everybody through the computer on the first day, so they each get it an hour or so to drive.
Q. Oh, okay. So I didn't understand that. So they're not all at a computer. There's one computer?
A. It depends on the class. Sometimes they can each have their own computer, but there's always one that's hooked to a projector, and that's what I mean by driving. Somebody who is at the computer with the projector attached to it is the one who is rotating through.
Q. And is that how -- do you know if other implementers do it that way?
A. No idea.
Q. No idea?
A. Yeah. I've gone out with a couple of

Page 46

implementers, but, yeah, most of us use a hands-on technique of some sort, but I tend to -- like I said, I do a hundred percent hands-on.
Q. Do you ever use PowerPoints?
A. Haven't yet.
Q. I mean, do you stand up and do any like lecture or, you know, anything like that or is it really the entire time is sit down together at the computers?
A. No. We have times when I do theories trying to figure out, okay, for example, on budgeting, how do you budget, and I try and diagram it on the board to make sure I understand what their process is.
Sometimes I'm trying to say these are the ways you can use our software. Okay. Pick one of these ways that you think best fits your process and let's see if we can work this out so that you can use our software to do what you want to accomplish.
I mean, it's not a hundred percent driving, but as you see, I tend to use my hands a lot. It's true in the classroom, except I use a pen and a whiteboard or a pen and a flip chart.
Q. And flip chart meaning like --
A. Like paper and ink to draw it out.
Q. And as you're going through and having this

Page 47

interaction with the client and diagramming whether it's their budget or whatever process, are you describing to them, you know, pros and cons of different options within the software?
A. Yes and no. It depends. Sometimes I'm just simply delineating this is the options that you have. You can do it this way or this way.
Sometimes I'll say, okay, this one -- for example, in advanced budgeting, there's two main ways that you can implement advanced budgeting. This one has the advantage of it's easy to go through the process but it's difficult to reconcile, this method it's easy to reconcile but it's harder to go through the process, and this way down here is a completely different one and we're not going to talk about that one simply because it doesn't fit their situation.
So sometimes. I mean, I don't tell them, okay, you have to do it this way or you have to do it this way. It's like try and draw out what are the pros and cons of whichever way and let them decide.
Q. But you don't know those methods going into it before you sit down and meet with a client?
A. No.
Q. I mean, you mentioned just talking about the GL five to six weeks, so how much of it are you doing

**EXHIBIT 21**

Page 48

like you just described where you're diagramming, coming up with options and helping them establish how they want their software program versus, you know, them then sitting at the computer driving? I'm just trying to get a gauge of those five to six weeks.

A. Generally a week of finding out what they want, a week of helping them to set it up, and three weeks then of walking through the process to make sure that it's what they wanted.

So it's like one week of is this what you wanted? Yes. Then the second week is, okay, now that you said this is what you wanted, now we have your people in and start training them, showing them how to do it, and then the third week is usually when they actually use it, and then after that they're considered what we call live.

Q. And can you describe for me using the example we were just talking about, the GL implementation, what is the Go Live process for that GL module?

A. I'm not sure I understand. You mean the week of going live --

Q. Is it a week?

A. Well, the Go Live is actually the whole five-week process. Like I said, it depends upon the client. It can be from three to seven. I've had

Page 49

clients that have gone ten weeks going live on GL, but the point being it depends upon their people and their qualifications and whether or not their system works the way they want it to function.

Going live means you've found out what they want, you've helped them set it up, you've tested it for a week, you've trained them for a week, and then the next week when you're there they actually use it to do the processing of their transactions, and that's what we call going live is when they actually use it to do something, not when they're practicing.

Q. So that last week when they're actually using it, it's their live data, they're doing it, and what are you doing during that process?

A. Mostly I'm sitting on my hands and trying not to say anything, because it's their Go Live week. This is when they have to know how the system works. This is when they have to -- usually they only ask me questions if they're having a problem.

Q. I would imagine, then, your goal --

A. Is to be bored.

Q. Because you've done your job. They know what they're doing.

A. Exactly.

Q. How often does that actually occur where you

Page 50

get to that last week and they get it, everybody can do it?

A. Has it ever happened quite that way? No. I've had it happen where I've been close to bored, but it's never exactly that.

Q. They're learning a new software.

A. They're learning a new software, and they'll come up with a transaction that we didn't consider during training, and they want to know how they would process it, and we talk about it and come up with a solution for them, and they go off and I go back and sit down and watch.

Q. You mentioned earlier about testing. What do you mean by testing?

A. It's the part of, okay, the second week after we've kind of -- I guess it would be the third week when we're testing things is when they're bringing live transactions and we're running it through the system to see if what we've configured to that point is what they wanted, because just because we set it up that way doesn't mean it necessarily will function the way they wanted it to.

Testing is they bring their transactions. They input it into our system just like it was in their system to see if it came out the other side the way

Page 51

they wanted it.

Q. What if it doesn't come out the other side the way they wanted it?

A. Then we go back and say, okay, what do we do? What happened here? What did we configure incorrectly? We try and figure out why it didn't happen and then figure out the setting. Maybe there's one of those 700 things that's set the wrong way. We flip the switch the way it should be, run the transaction back through again. Hopefully it will work the way we want.

Q. When you say we go back, who are you meaning? You and the client?

A. The client would be doing it, but I'll be trying to talk to them about what the options are and I'll be helping them with research to find out what we may have done -- what may have been set incorrectly.

Q. I guess I just was wondering. So we you mean you and the client there on-site as opposed to calling back to someone at Tyler?

A. Right.

Q. Are there any other nuances? You talked a bit about the GASB 34, the GL. I mean, any other nuances or unique things with any of the GL, AP, or purchasing implementations that we haven't --

A. Not of which I'm aware. I do want to kind of

**EXHIBIT 21**

Page 88

options and all the linkages that have been demonstrated.

Q. Is it that you have a -- when you say your very own payroll module, is that just like on your computer, like a test set-up or a dummy set-up to where you can go through and just tinker with it?

A. Yes.

Q. And is there anything you follow or guidelines you follow or you just go in there and play and try to figure out the different variables within the software?

A. Well, since the disastrous first attempt, Carole has been taking a much more involved approach in terms of giving me assignments. For example, with my next implementation, she gave me a list of based on what we found when we went out and talked to them you need to know how to do these things, and so I've been going through and in my database been setting up those things that they have that are not what you would normally find in an implementation.

Q. So after having that interactive discussion with the client and finding out what their needs are, she's given you some guidance to help you now dig to make sure you're prepared once you go back to meet with the client?

A. Correct.

Page 89

Q. And then practice, practice, practice, reading your --

A. Our help. We have help information within our database.

Q. Anything else that you've been doing on your own just to make sure that you're completely prepared for your next implementation?

A. There's not a whole lot else to do at the moment. Get familiar with the client, get familiar with the software and try to see how you would set up their information on your database to fit their needs.

Q. Are there any nuances with the client where you might alter your strategy for how you will train them?

A. Sure. There's all kinds of potentials. The most unique thing about them is they're the only entity I've seen in years that does a monthly payroll, which is not very common anymore. Almost all of our clients are biweekly.

And that brings up a whole nother issue, especially with entities like firemen who work 48-hour shifts and don't necessarily fall into a biweekly or a monthly. It's easy when you got an individual who works eight 5s or five 8s. Get the terms right here. Somebody works five 8s, and all of a sudden you've got

Page 90

somebody that works a shift that's seven 48s, and how do you fit that into a monthly schedule? Sure. There's all kinds of --

Q. That's the type of information you need to be able to understand to be able to then go out and advise the client once you're out there on-site?

MS. BAGLEY: Object to the form.

A. Advise, yeah. Show the client how our software can adapt to that kind of a situation, what they need to do to set their system up.

Q. (BY MS. PERLIONI) I'm going to hand you another document. This one I am marking Deposition Exhibit 8.

(Deposition Exhibit 8 was marked for identification.)

Q. (BY MS. PERLIONI) Would you take a look at Deposition Exhibit 8 and tell me if you recognize it? Frankly, you might not recognize -- I'll represent for the record it's a string of e-mail exchanges. You might not recognize all of them, but take a look.

A. (Reviewing). I have never seen this one before. Let's see. That's probably why. I realize I'm not on the ending e-mail. Okay.

Q. In Deposition Exhibit 8, do you recognize at least the initial e-mail in the string? I believe it's

Page 91

an e-mail you sent to Dawn Mitchell and Caryn Axelrad dated March 11, 2009.

A. Yes. I do recognize that.

Q. Looking at the top one, I understand you say you don't recognize it, but they're talking in here about an expertise premium. Do you understand what that is or can you explain that for the record?

A. An expertise premium is an amount that you're paid for billable days. It breaks down to a certain amount per hour.

Q. So what do you consider a billable day?

A. A billable day would be 8 hours of instruction time spent on-site with a client.

Q. So for each 8 hours spent on-site giving instruction to a client, you get an expertise premium?

A. Correct.

Q. And if I'm understanding this e-mail string correctly, which is Exhibit 8, the expertise premium you received when you came back in the role as implementation consultant was $120 a day?

A. Correct. Basically it's paid to me $15 per billable hour.

Q. So does that encompass only -- say you're going out to a client's site to do an implementation. Would that encompass any of the time on, say, your

**EXHIBIT 21**

Page 92

Monday travel time?
A. No.
Q. So it's exclusively instruction time?
A. Billable hours (nodding head).
Q. Do you or are you eligible to receive any other type of incentive compensation, bonus or anything like that?
A. I guess it would be considered an incentive. I get $30 per day spent in the hotel, so if I met a client for five days and I spent four days in a hotel, I get an additional $30 per day.
Q. Any other compensation that you receive or reimbursement that you receive?
A. Reimbursements, I mean, for expenses, per diem, that kind of thing, hotel costs, airfare, taxis.
Q. Those kind of things are just reimbursed based on you submitting --
A. Based on my costs.
Q. What about any annual bonus or anything like that?
A. I receive an annual bonus similar to any other standard Tyler employee.
Q. And is that a set amount or just a discretionary amount?
MS. BAGLEY: Object to the form.

Page 93

A. It's essentially a percentage of your annual salary or annual earnings allocated companywide.
Q. (BY MS. PERLIONI) How do you know it's a percentage of your particular annual earnings?
A. It's a certain amount of -- the letter that comes out describes the formula, and my recent one I think was a week and a half. I'm not exactly sure how they come up with that.
Q. It's not a set amount that you receive each year?
A. No. It's varied.
Q. Since the time that you opted into this lawsuit, have you had any discussions with your manager about the lawsuit?
A. No.
Q. Do you know one way or the other whether she even knows whether or not you're a part of the lawsuit?
A. No.
Q. Since the time that you opted into the lawsuit, have you felt like there was any treatment that you believe was somehow tied to the fact that you had been elected to participate in the lawsuit?
A. That's asking two different questions. One is the question do I know that they've done anything in response to the lawsuit or do I feel they've done

Page 94

anything in response to the lawsuit? Those two are not necessarily the same, so could you ask me which one you really want me to answer and then I'll answer that one? If you want to ask them both, I'll answer them both.
Q. Do you believe anyone has treated you differently based on the fact that you opted into the lawsuit?
A. Okay. Again, it's that belief, belief or feeling.
Q. Let's start with --
A. Do I think anybody has treated me differently since the lawsuit? To be honest, I don't know. Do I think so? Carole stopped trying to tell me to change my time sheets. That's the only indication I have that maybe she's aware that I'm part of the lawsuit. Other than that, not really.
Q. So you're making an assumption, though?
A. You asked me belief or feeling, and I was demonstrating do I feel? Do I believe? Belief would indicate that I had some kind of basis that she really did. No, I don't.
Q. I think it's clear. What I'm understanding you to say is you're making an assumption but you don't necessarily know?
A. Yeah.

Page 95

MS. BAGLEY: I'm going to object to the form of that.
Q. (BY MS. PERLIONI) I just want to make sure. The assumption you're making is that she may know you're part of the lawsuit; is that correct?
A. I'm saying that the possibility is that she knows and that that's why she stopped correcting my time sheets. I'm not saying I know that she did so.
Q. Putting that aside, whether or not she knows or doesn't know, has she done anything to you that you thought was unfair or inappropriate --
A. Based on this?
Q. Yes.
A. No. Quite the opposite. I think she's been -- since the review she's been trying very hard to correct our relationship.
MS. PERLIONI: Let me look through real quick. I think I'm almost done. I just want to -- can you give us one second?
MS. BAGLEY: Yes.
(Recess taken.)
MS. PERLIONI: I pass the witness.
EXAMINATION
BY MS. BAGLEY:
Q. Mr. Hayner, were your supervisors aware that

EXHIBIT 21

DAVID HAYNER; May 19, 2010

27 (Page 96)

Page 96

you were working more than 40 hours a week during the time you were working for Tyler Technologies?

MS. PERLIONI: Objection; form.

A. I believe so.

Q. No further questions. Thank you, Mr. Hayner.

MS. PERLIONI: No more for me either.

(Deposition concluded at 4:37 p.m.)

(Signature was reserved.)

Yamaguchi Obien Mangio, LLC Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

**EXHIBIT 21**


Page 60

Q. Can you give me an explanation -- I mean, what is advanced budgeting?

A. The budgeting system that was included in the Tyler software previously was pretty outdated, so they came up with a new module that updated the processing so that it would match with a lot of the budgeting theory that's out there now so it would be flexible enough to handle that. They developed a new module called advanced budgeting.

Q. And what kind of -- we talked about these budgeting theories and having the software be flexible enough to handle those. What kinds of theories are you referring to?

A. Things like zero-based budgeting, priority-based budgeting, performance measurement budgeting. All of these are different types of budgeting processes that different clients are experimenting with, so trying to come up with a way to deal with the current financial situation with the country.

Q. And you work with the different clients to -- same type of interactive process to come up with what it is they want within the advanced budgeting software?

A. Correct.

Q. So no longer -- you're not including the

Page 61

general ledger, the accounts payable, and purchasing in what you're currently implementing?

A. I haven't up to this point since I started again. Because of the situation right now, they're trying to hold the number of implementers down because of the economy, and so they're asking if I'd like to go back to doing some of that.

Q. And is that something you're interested in doing?

A. Sure. I mean, I'll do whatever is profitable for the company. Let me rephrase that. I'll do whatever I can within guidelines of my job to help the company be profitable.

Q. Throughout -- and I want to go back to including the first period of time that you were an implementation consultant and now. You talked earlier about going into the office on days when you weren't with the client. Are you still -- on nonclient time, are you still going into the office?

A. It's kind of hard to do so from Kansas.

Q. That's what I figured. When did you start working remotely?

A. November 23 of 2009.

Q. And was that a request you made?

A. Yes.

Page 62

Q. And why did you make that request?

A. It's a very long story. How much detail do you want?

Q. I don't need all the --

A. I got divorced in November. My grandkids live in Kansas.

Q. Where in Kansas?

A. Wichita.

Q. So now if you're not on-site with a client, you work --

A. From my home office.

Q. Would you say that being able to work from your home office affords you a level of flexibility?

A. It can.

MS. BAGLEY: Object to the form.

Q. (BY MS. PERLIONI) I mean, do you have set hours where you have to be sitting at your desk at your home office each day?

MS. BAGLEY: Form.

A. Set hours, no. Am I expected to put in 8 hours a day? Yes.

Q. (BY MS. PERLIONI) Who did you talk to -- you know, you said you're expected to put in 8 hours a day. Who did you talk to about that in coming up with the structure of the arrangement for you to be able to work

Page 63

remotely?

A. Conversations with my current supervisor.

Q. And who is that?

A. Carole Agard. There's an E on Carole.

Q. Thank you. So currently in this last window of time, approximately how often are you working on-site with clients versus working from your home?

A. Kind of an example, since the first of the year I've been in Seattle more than I've been home, so I've been home two weeks since the beginning of the year, so not very much.

Q. So other than that two week -- so since January 1 of this year, you were on client sites?

A. Well, since January 11. I was on vacation the first week. Since then I've been home twice, two weeks.

Q. And do you try to take one, two weeks vacation each year?

A. Actually, I try to take five to six by stretching it. It's hard for implementation consultants to get to a client and do a week's worth of work on a short week, so I try to structure my vacation around holidays when clients aren't going to be there anyway.

Q. That's right, because they observe all federal

**EXHIBIT 21**

Page 64

holidays, correct?
A. Yup. And, for example, I would probably be in California the first week of June, but the 1st is a holiday, and the client that I was going to be at works Monday to Thursday, so it would be a three-day week. I'm taking vacation that week, so that's just...
Q. So you're taking the entire first week of June off?
A. Yeah.
Q. Have you ever had to work on any --
A. Holidays?
Q. Uh-huh.
A. Uh-huh.
Q. How often?
A. I don't know. I never really tracked it, but, I mean, as an example, this year all of the implementation consultants flew into Seattle for a meeting Tuesday through Friday on a holiday, on the Monday holiday, so it's not too terribly uncommon. I have worked -- I have flown on the 4th of July, so it's not uncommon.
Q. It sounds to me like both your examples, though, were traveling on the particular holiday.
A. Right.
Q. I want to talk about --

Page 65

A. Sorry. Just to kind of clarify, I kind of consider my days of travel as part of my anticipated work efforts, so I have to get there somehow.
Q. Let's go back and talk about the initial time period prior to going to the quality assurance analyst, that initial implementation. Did you keep track of the hours that you worked during this time period?
A. I believe so. To be honest, I don't really remember. I got so out of the habit of keeping time I don't remember if in that time period if we kept track of only the time on-site or if we kept track of all time. It's just been too long to remember. Sorry.
Q. So at least for that time period prior to going to work in the QA group, you're not sure whether the time you kept would be only that that's on-site with the client or would encompass both on-site and other work?
A. Right. Billable versus administrative.
Q. What about in this most recent time period as an implementation consultant?
A. I have a number of times attempted to track all of my time and have twice gotten correspondence from my supervisor that we only track the time we're at a client's, or when we're in our home office, we have to record administrative time. It's kind of a double

Page 66

standard there.
MS. PERLIONI: I'm going to object to the comment as nonresponsive.
Q. (BY MS. PERLIONI) Let's go back. Tell me the first time you spoke with anyone about what the appropriate time that you needed to keep track of was.
A. I'm not sure the exact date. It was sometime in June or July of 2009, and I had been on-site with a client and recorded travel time and some administrative time as well as the time on-site.
Q. And was it Ms. Agard that you spoke with about that?
A. Yes.
Q. Did you speak with her or by e-mail?
A. She e-mailed me.
Q. What do you recall the e-mail indicating?
A. It just indicated that we don't keep track of the administrative time.
Q. So just the time that you were actually on-site with a client?
A. Uh-huh.
Q. And did she say anything about the travel time?
A. Well, she had me resubmit my time and remove everything except for the time on-site.

Page 67

Q. And did she explain to you why?
A. No.
Q. Did you ask her why?
A. No. Not as far as I recall.
Q. And you said on another occasion you had a discussion or at least an e-mail from Ms. Agard about something similar. When was that?
A. I'm not sure the exact date. Sometime in August, September, and again earlier this year actually, I believe, now that I think about it.
Q. Let's talk about the August, September.
A. Same comment only in that point in time we had had a couple of verbal discussions about the fact that while we didn't record administrative time while we're on-site with a client we recorded the administrative time when we were in office.
Q. Can you tell me what you recall from those discussions with Ms. -- those were all with Ms. Agard? Am I saying it right?
A. Agard.
Q. What can you recall about those discussions?
A. Not a whole lot. I mean, again, mostly the two or three times that we had the discussion -- I won't say discussion -- two or three times that it was communicated to me that I needed to remove the

**EXHIBIT 21**