# FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION
3
    PATTY BEALL; MATTHEW MAXWELL;  )
4   TALINA MCELHANY; AND KELLY     )
    HAMPTON, individually and on   )
5   on behalf of all others        )
    similarly situated,            )
6                                  )
           Plaintiffs,             )  2:08-cv-422 TJW
7                                  )
    vs.                            )
8                                  )
    TYLER TECHNOLOGIES, INC.       )
9   AND EDP ENTERPRISES, INC.,     )
                                   )
10         Defendants.             )
    _____)

11
12
13
14         Deposition of TITUS J. BRITT
15           (Taken by Defendants)
16          Greensboro, North Carolina
17          Wednesday, July 28, 2010
18
19
20
21
22         Reported in Stenotype by
           Alicia S. Clement, RPR
23  Transcript produced by computer-aided transcription

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

# FREEDOM COURT REPORTING

```
1                    APPEARANCES
2    ON BEHALF OF PLAINTIFFS:
3           LAUREEN F. BAGLEY, Esquire
            Sloan, Bagley, Hatcher & Perry Law Firm
4           101 East Whaley Street
            Longview, Texas   75601
5           (903) 757-7000
6    ON BEHALF OF DEFENDANTS:
7           PAULO B. MCKEEBY, Esquire
            Morgan, Lewis & Bockius LLP
8           1717 Main Street, Suite 3200
            Dallas, Texas   75201
9           (214) 466-4000
10
11
12
13
14
15
16           DEPOSITION OF TITUS J. BRITT, a witness
17    called on behalf of Defendants, before Alicia S.
18    Clement, Registered Professional Reporter and Notary
19    Public, in and for the State of North Carolina, at
20    the Offices of Ogletree, Deakins, Nash, Smoak &
21    Stewart, PC, 2725 Horse Pen Creek Road, Suite 101,
22    Greensboro, North Carolina, on Wednesday, July 28,
23    2010, commencing at 9:27 a.m.
```

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1               INDEX OF EXAMINATIONS

2     BY MR. MCKEEBY . . . . . . . . . . . . . . .   PAGE 4

3

4               INDEX OF EXHIBITS

5     NUMBER          EXHIBIT                MARKED

6     1- Tyler EDEN Division Consulting
          Incentive Compensation Plan . . . . . .   17
7
      2- Letter to Mr. Britt from
8         Ms. Shaw, 11/13/07. . . . . . . . . . . .   21

9     3- E-mail String, 7/08 . . . . . . . . .   51

10    4- Bonus Tracking. . . . . . . . . . . . .   73

11    5- E-mail String, 7/21/08. . . . . . . . .   74

12    6- E-mail from Ms. DeLaney to Mr. Britt
          Re June Bonus, 7/25/08. . . . . . . . .   80
13
      7- E-mail from Ms. DeLaney to
14        Mr. Britt, 8/30/08. . . . . . . . . . .   83

15    8- E-mail String and CareerBuilder Job
          Application . . . . . . . . . . . . . .   128
16
      9- Letter from Mr. Britt to Human
17        Resources, 9/4/08 . . . . . . . . . . .   132

18    10- Consent to Opt In. . . . . . . . . . .   132

19    11- Résumé . . . . . . . . . . . . . . . .   135

20

21

22

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1   thing?

2      A.   Correct.

3      Q.   Now, you might have had to use PTO.  And

4   I -- I know you've told me about that.

5      A.   Right.  Okay.

6      Q.   So I'm not saying that you didn't lose

7   something.  But in terms of just what your paycheck

8   said, your paycheck said the same thing every week?

9      A.   Correct.

10     Q.   What did you get it?  Biweekly (sic)?

11     A.   I think they were twice a month, yeah.

12  Certain two days.

13     Q.   Okay.  And so those -- at least with

14  respect to the salary component of your

15  compensation, it was the same?

16     A.   Yes.

17     Q.   Okay.  Did you also communicate with

18  Ms. DeLaney about working more than 40 hours in a

19  week?

20     A.   Could you provide more insight to -- what

21  do you mean by that?

22     Q.   Yeah.  You've told me so far that the

23  communications that you've had with Sharon DeLaney

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1   related to whether or not you would be paid for time

2   over 40 hours billed to the customer.  And you've

3   told me about this PTO issue.  And you had

4   discussions, as I understood it, with Sharon DeLaney

5   about those issues, correct?

6       A.   Correct.

7       Q.   What about just the notion of you working

8   more than 40 hours?  Is that something that -- did

9   you ever complain to her about that or raise that as

10  an issue and say, "Hey, I thought I signed up for a

11  job that was only 40 hours a week"?

12      A.   Yes.

13      Q.   All right.  And you did that in telephone

14  calls and meetings?

15      A.   Could be -- yeah, telephone call -- yeah.

16  We're on the road a lot, so it -- probably it was

17  more either telephone call or e-mail.

18          MS. BAGLEY:   Paulo, can we take a

19      quick break?

20          MR. MCKEEBY:   Yes.

21      (SHORT BREAK TAKEN FROM 10:29 A.M. TO 10:36 A.M.)

22      (EXHIBIT NUMBER 3 WAS MARKED FOR IDENTIFICATION)

23  ///

**EXHIBIT 22**

## FREEDOM COURT REPORTING

Page 52

```
1    BY MR. MCKEEBY:

2        Q.   All right.  Let me hand you a document

3    that I'll mark as Exhibit 3 and ask you, first of

4    all, that appears to be an e-mail exchange between

5    you and Ms. DeLaney?

6        A.   All right.  I got it.

7        Q.   Do you -- do you -- after reviewing this,

8    do you recall this exchange?

9        A.   Yes.

10       Q.   Let's start with the first e-mail from you

11   to Ms. DeLaney on the second page of the document

12   that's marked as Exhibit 3 that's dated Friday,

13   June -- July 18th.

14       A.   Okay.

15       Q.   And it's your request that you would like

16   to take August 25th as the 4th of July holiday

17   and August 28th as July 26, 2008.

18       A.   Correct.

19       Q.   What did that mean?

20       A.   If I remember correctly, these were days I

21   had traveled on the weekends and -- and worked on a

22   holiday.

23       Q.   So you -- you worked on the 4th of July?
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

## FREEDOM COURT REPORTING

Page 109

1   "go live."

2       Q.   Is there any training that occurs before

3   the "go live"?

4       A.   It all depends.  Sometime the training

5   occurred after the "go live" because you're training

6   them on their actual software or the training would

7   occur -- could occur before the "go live."

8       Q.   So sometimes you -- you didn't perform any

9   training prior to "go live"?

10      A.   Well, I mean -- so what "go live" -- and

11  let me -- I guess it's not "go live."  It's more

12  when the software's installed into their production

13  environment.  That's where the -- the actual "go

14  live" is after they've been trained.

15      Q.   So it's software installed in the

16  production environment?

17      A.   Right.  And then the training would begin.

18      Q.   And that's prior to going live?

19      A.   Right, that's prior to going.

20      Q.   Just so that we have a working definition

21  between you and me, "go live" --

22      A.   Is --

23      Q.   -- means what?

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 22**

# FREEDOM COURT REPORTING

1      A.    When they are actually switching from the

2    old system to the new system.

3      Q.    Okay.  So the software's been installed.

4    And I take it there's someone else that actually

5    installs the software?

6      A.    Yeah.

7      Q.    And that occurs after it's been

8    configured?

9      A.    Or could be.

10     Q.    Okay.

11     A.    Yeah.  The --

12     Q.    Who -- who installs the software?

13     A.    I don't know.  Some other department.  I

14   can't -- I don't know if they call it implementation

15   or ...

16     Q.    Conversion?

17     A.    No.  Conversion, they just did data

18   conversion.  So it could have been the IT

19   department, actually, that did the installs.

20     Q.    And by "data conversion," you're meaning

21   taking the information that's in the customer's

22   legacy system, the data, and putting it into

23   Tyler's --

**EXHIBIT 22**

## FREEDOM COURT REPORTING

```
1        A.    Correct.

2        Q.    That's something that a data conversion

3  department did?

4        A.    Correct.

5        Q.    Not that implementation consultant?

6        A.    No.

7        Q.    Okay.  So let's talk about the -- the

8  training.  Who -- who -- you were training end users

9  or someone else?

10       A.    Trained whoever they deemed required the

11 training for the new software.  The customer

12 determined that.

13       Q.    Okay.  So this, I take it, involves

14 a -- would involve a separate week's trip to the

15 customer location?

16       A.    Yes.

17       Q.    And -- okay.  So, if I'm understanding you

18 correctly, the -- you've had your initial consulting

19 phase.  The -- obviously, the data has been

20 converted at that point and you've done your

21 configuration work and so you're ready to commence

22 training.  How -- and -- and I take it the schedule

23 tells you when you're supposed to commence training?
```

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1       A.    Right.

2       Q.    Does the schedule tell you -- and you know

3   you're doing utility billing training --

4       A.    Right.

5       Q.    -- on that software application?

6       A.    Right.

7       Q.    Does it tell you -- well, let me ask you

8   this:  Were there different aspects of the utility

9   billing software that you had to train on in the

10  sense of -- you know, was it just one training

11  program that you were doing repeatedly for clients

12  or were there different types of training that you

13  provided?

14      A.    Different types based on what options they

15  selected to use.

16      Q.    Okay.

17      A.    Utilize.

18      Q.    And you knew those options based on the

19  work that you had done previously with respect to

20  the initial phases of the implementation?

21      A.    Yes.

22      Q.    And you would also know it based on the

23  configuration work that you did as well?

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 22**

## FREEDOM COURT REPORTING

Page 113

1       A.   Yes.

2       Q.   So in terms of the training that you

3    provided, was there, like, a schedule or agenda set

4    up then between you and the customer?

5       A.   Right.  So we -- we had standard agendas

6    that we -- everybody used based on the previous

7    information we talked about.

8       Q.   Standard agendas based on the types of

9    options that the customer would have selected?

10      A.   Correct.

11      Q.   Well, didn't you have to modify those

12   agendas based on the customer preferences?

13      A.   Some.  So the -- the standard -- you know,

14   there are different modules within utility billing.

15   So if they have this module, here's what you should

16   cover.  So there were high-level categories.

17      Q.   What about with respect to scheduling the

18   actual training?  Is that something that you would

19   coordinate with the customer?

20      A.   No.  That's the PM.

21      Q.   Project manager would do that?

22      A.   Yes.

23      Q.   So before you leave for your trip in which

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1    you're doing training, did you know what -- you

2    know, where you were supposed to be and when?

3         A.    Yes.

4         Q.    And what would tell you that?  What

5    document would tell you that?

6         A.    Just -- I don't know if we had a document.

7    I don't think there ever -- some -- we got the

8    information from the PM.  I'm not sure if it's off

9    the project schedule or if there was something

10   separate that they sent us.  I'm sure there's --

11   there's something -- there's some document that they

12   provided us that told us when the training start --

13   what time we're supposed to be there and -- and the

14   number of days.

15        Q.    But you don't remember any document like

16   that?

17        A.    No.  I'm -- there was a document.  But I

18   can't tell you if it had a name or if it was -- or

19   if it's something that they sent in a Word file and

20   attached to -- in an e-mail to us.  But it -- we did

21   get that information from project management.

22        Q.    Does the term "agenda template" mean

23   anything to you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

## FREEDOM COURT REPORTING

Page 116

1    Q.   How -- how long a document are we talking

2    about in the agenda template?

3    A.   All depends on how many days.  So if it's

4    three or four days, could be one or two pages.

5    Q.   Okay.  And does the agenda template --

6    it -- I'm thinking of -- "agenda" could mean two

7    things.  It could mean agenda in the sense of, okay,

8    from a schedule, like from 12 to 2, here's when I'm

9    going to be training on this topic; or the agenda

10   might mean here's how I'm going to do particular

11   training in terms of the type -- the substance of

12   the training.  When you use the term "agenda

13   template," do either of those descriptions that I

14   gave fit?

15   A.   The first one.  The agenda -- first --

16   because they needed to bring in certain people at

17   different times.

18   Q.   I see.

19   A.   So we would try to guess how long it's

20   going to take to --

21   Q.   I see.  So the agenda templates relates

22   more to the scheduling?

23   A.   Right.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

# FREEDOM COURT REPORTING

Page 117

1    Q.    So your -- your -- in the agenda -- let me

2    make sure I have this right.  You know the different

3    modules that the customer has selected?

4    A.    Correct.

5    Q.    And you base the agenda on those modules?

6    A.    Yes.

7    Q.    And create an agenda template which you

8    submit to the project manager?

9    A.    Which that -- which is a generic one that

10   we already have and just got to move it around as

11   a ...

12   Q.    Okay.  And you provided that to the

13   project manager?

14   A.    Yes.

15   Q.    And then when you're training, are you

16   training the end users or someone else or both?

17   A.    Again, it's a customer's decision who is

18   in the training.  So we train whoever they provide.

19   Q.    And how do you do the -- the training?  Do

20   you do it -- is it like a PowerPoint presentation

21   that you -- that you prepare or do you -- are you

22   training on the actual system?

23   A.    We're training -- we -- we use manuals

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

**FREEDOM COURT REPORTING**

Page 118

1    that we're provided and then, also, we're displaying

2    their software and going through it.

3         Q.   Displaying the software on a projection

4    screen?

5         A.   Right.

6         Q.   And going through different programs and

7    options for the people that are in the class?

8         A.   Based on the agenda, yeah, and -- and

9    according to the instructions that are in our

10   manuals.

11        Q.   And do the people at the meetings have

12   laptops themselves that they're going off of or --

13        A.   Sometimes.  Sometimes they have -- they're

14   in a training room and they have computers.  At

15   other times, they're just looking at what we have.

16        Q.   When you were at Tyler, did you ever see a

17   job description for your position?

18        A.   Yes.  I'm sure.  Yes.

19        Q.   All right.  Then did you have any

20   responsibilities to document the training in the

21   sense of providing the project manager or someone

22   else with an assessment of how the training had

23   gone?

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1     A.    We -- it would all depend on the client.

2   Sometimes we would have calls with the project

3   manager a couple days later or daily.  Some PMs

4   wanted us to e-mail them every day after the

5   training and say how we thought things were going.

6     Q.    And what kind of things would you tell the

7   project managers in terms of either via e-mail or

8   orally?  And is that, like, just how things were

9   going in terms of how well the clients were taking

10   to the training? how long it was taking? those kinds

11   of things?

12     A.    Right.  And if we're -- if we feel like

13   we're on target.

14     Q.    "On target" meaning can you complete the

15   training by a particular date?

16     A.    Right.  Yeah.  Today we accomplished

17   everything that was on the agenda or we did --

18   weren't able to.

19     Q.    And the target was something of which you

20   were aware, I take it?

21     A.    In the beginning, yeah.

22     Q.    And by "target," you mean a particular

23   date when the training is supposed to be completed?

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1    A.    Right.

2    Q.    And reasons you might be off of target is

3    because the training was taking too long because the

4    customer representatives weren't picking it up

5    quickly enough or something along those lines?

6    A.    A lot of questions, software not working

7    when you're showing it to them, then at which --

8    sometimes you have to stop and then call back and

9    get somebody to do something, so ...

10    Q.    Okay.  And what would be done if you were

11    not able to make target?

12    A.    Then the PM worked to probably extend it

13    or cut something or reschedule sometimes.

14    Q.    So the PM would coordinate with the

15    customer on that?

16    A.    Correct.

17    Q.    Were you ever involved in those

18    discussions?

19    A.    Sometimes.  If they -- if the customer

20    called, we're -- called in right there and the

21    customer's there, we'd talk and say, "The customer

22    agrees we need, you know, another week.  Can you fit

23    it in the schedule"? something, or --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1      Q.    Right.  So then you would convey that to

2  the project manager?

3      A.    Yeah.  We would all probably do -- I've

4  never probably done it by myself.  The customer's

5  always been involved in it.

6      Q.    But sometimes the customer would discuss

7  it with you prior to there being any involvement on

8  the project manager side?

9      A.    Correct.

10     Q.    All right.  And then, let's say, the

11  training is done and it's done on target.  Is the

12  next step the support that you provided during the

13  "go live" process?

14     A.    Correct.

15     Q.    And I take it that's -- would typically be

16  a separate trip to the customer?

17     A.    Yeah.  Could be the following Monday, but

18  may have been a couple of weeks later.

19     Q.    Okay.  So how did you describe "go live"?

20  That's when you're flipping the -- tell me again.

21     A.    So for us go -- "go live" was someone back

22  in EDEN flipping the switch, saying that we're

23  ready -- that, you know, now we can start billing

**EXHIBIT 22**

# FREEDOM COURT REPORTING

Page 122

1   out of the -- the new system.  And then you're --

2   you're really there for troubleshooting to -- and

3   there's a certain process outlined that we're

4   supposed to -- things we're supposed to check.  So

5   we start checking those things to make sure they

6   work.

7        Q.   Now, when you're doing -- let me jump back

8   to the training.  When you're doing the training,

9   are you -- is there anybody else from Tyler that's

10  with you?

11       A.   I'm trying to think.

12       Q.   What would be typical?

13       A.   No.  It's generally just --

14       Q.   Just the implementation consultant?

15       A.   Unless somebody's shadowing on -- unless

16  you were shadowing somebody or whatever, the

17  opposite.  But, no.

18       Q.   Or someone was shadowing you?

19       A.   Correct.

20       Q.   Did anyone ever shadow you?

21       A.   I was thinking.  Actually, yeah, I did

22  have someone one time.

23       Q.   Do you remember where that was?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

# FREEDOM COURT REPORTING

Page 123

1      A.    I want to say in Maryland.

2      Q.    The -- what about during the "go live"

3   support where you're doing system troubleshooting?

4   Is there anyone else from Tyler on the premises?

5      A.    No.

6            MS. BAGLEY:   Object to form.

7   BY MR. MCKEEBY:

8      Q.    And so are you -- do you have particular

9   assigned tasks during this "go live" support or are

10  you just kind of there to provide the support as --

11  on an as-needed basis?

12     A.    No.  We have a -- an agenda of things that

13  need to be accomplished to ensure that the customer

14  is -- the system's working properly.  And there's

15  stages in it.

16     Q.    And is that an agenda that someone drafts?

17     A.    Yes.  That's, again, a template for "go

18  live" for utility billing.

19     Q.    So, then, different -- these different

20  stages needed to be scheduled within the week in

21  which you're providing "go live" support?

22     A.    Yes.

23     Q.    And is that something you do in

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1    consultation with the customer?

2        A.    The PM schedules that.

3        Q.    Okay.

4        A.    Because it coordinates with people in the

5    office, so ...

6        Q.    So what do you -- what do you do when

7    you're on site as the implementation consultant?

8        A.    So, if I can remember correctly, let's say

9    we're -- we're starting off with meter reads.  So

10   they've converted the meter reads.  Then we go in

11   and generate reads and see if they have the

12   correct -- and run reports and check that off.  And

13   then you go to the next stage.  And the ultimate

14   stage is to generate a billing that doesn't have a

15   million-dollar bill in it.

16       Q.    That doesn't have a what?

17       A.    A million-dollar bill.

18       Q.    Why?  I don't understand.

19       A.    That's the -- the -- in utility billing,

20   if everything's done right, then the bill should

21   come out correctly.  But there's always like -- like

22   a thousand -- you know, elaborate bill that comes

23   out which means something's wrong.

**EXHIBIT 22**

FREEDOM COURT REPORTING

Page 125

1     Q.    So you have to go in and fix that?

2     A.    Yeah.

3           MS. BAGLEY:  Form.

4  BY MR. MCKEEBY:

5     Q.    How -- how do you -- how do you address

6  that?

7     A.    Call back to the office to figure out what

8  they did wrong.

9     Q.    Who would you call back at the office?

10    A.    Depending on what department was in

11  data -- sometime it could be data conversion.  You'd

12  start with the PM and figure out where it needs to

13  go.

14    Q.    How long would you typically provide the

15  "go live" support that you've mentioned?

16    A.    "Go live," again, could be from one week

17  to two weeks.

18    Q.    Was there ever an example where you spent

19  the weekend at the location where the client was --

20    A.    Yes.

21    Q.    -- as opposed to returning home?

22    A.    Yeah.

23    Q.    Is that in Park Cities (sic) or ...

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 22**

## FREEDOM COURT REPORTING

1       A.      Inglewood was one.

2       Q.      Uh-huh.  Park Cities (sic), no, though?

3       A.      Park City, no.

4       Q.      All right.  So as an implementation

5    consultant, after this "go live" period, be it --

6    you said it was one to two weeks.  After that one to

7    two weeks, whichever one it happened to be, expires,

8    do you have any additional responsibilities with

9    respect to that customer?

10      A.      After they're live, what do we do after

11   that?  It's kind of hard for me, you know, because

12   I'm doing customer service now.  So I know what we

13   do now which is not the same.

14      Q.      Right.

15      A.      So I -- actually, I don't think we

16   know -- after they "go live," we're -- they're done

17   with us and then somebody else is involved.

18      Q.      Right.  So if they have day-to-day

19   questions, they go to the support team?

20      A.      Yeah.  They contact some -- someplace

21   else.

22      Q.      I mean, is it true that -- I mean, at that

23   point you would have been onto doing additional

**EXHIBIT 22**

## FREEDOM COURT REPORTING

Page 127

1   implementation work for another customer?

2        A.   Correct.

3        Q.   Did you ever get calls from customers

4   saying, "Hey, you know, you did this implementation

5   last week or two weeks ago and we've gone live and I

6   have these kinds of questions"?

7        A.   Then we send them to the PM.

8        Q.   To the project manager?

9        A.   Yes.

10       Q.   Because you were working on a different

11   project at that point?

12       A.   Yeah.  And -- and, plus, we were no

13   longer -- we're --

14            MS. BAGLEY:  Form.

15            THE WITNESS:  -- technically done

16       with them, so ...

17            MR. MCKEEBY:  Okay.

18            THE WITNESS:  Whether we were working

19       on something or not, we're done with them.

20   BY MR. MCKEEBY:

21       Q.   Mentioned the résumé that you submitted at

22   the beginning of your employment with Tyler.  And I

23   didn't mark that as an exhibit.  Does this look like

**EXHIBIT 22**

# FREEDOM COURT REPORTING

1    the résumé (indicating)?

2        A.    Yeah.

3        Q.    And you submitted that in an -- in an

4    e-mail form to Ms. Shaw?

5        A.    Submitted on the portal.  So I don't know

6    who -- how it ended up, but ...

7        Q.    I'm going to mark this as a deposition

8    exhibit, Number 8.

9        (EXHIBIT NUMBER 8 WAS MARKED FOR IDENTIFICATION)

10   BY MR. MCKEEBY:

11       Q.    I'm just going to go over your educational

12   background.  What's your highest level of education?

13       A.    I attended college, but I don't have a

14   degree.

15       Q.    You do not have a degree?

16       A.    No.

17       Q.    And at the end of the document are the

18   list of colleges that you've attended?

19       A.    Yeah.

20       Q.    Is that the same today?

21       A.    Yes.

22       Q.    Have you updated your résumé since you

23   were employed by Tyler?

1    consulting --

2        A.    Yes.

3        Q.    -- project?

4        A.    Yeah.

5        Q.    Why was it that you only billed the 60.75

6    as opposed to the full amount?

7        A.    Probably it's stuff that I could justify

8    that would -- the client would approve.  But there's

9    other stuff that I had to do to get to that point,

10   so ...

11       Q.    So this wasn't a set number that

12   Ms. DeLaney gave you?

13       A.    No.

14       Q.    This was based on your understanding of

15   what you could bill and what you couldn't bill?

16       A.    Right, what category it could fall into.

17       Q.    Did you discuss that in this instance with

18   Ms. DeLaney or did you just --

19       A.    We -- we had that discussion earlier.

20       Q.    Earlier being what?

21       A.    I mean, earlier when I was told that I

22   need to get approval to bill the extra hours.

23       Q.    So how many weeks --

**EXHIBIT 22**

**Freedom Court Reporting, Inc**                                    78

1        A.    Well, I could -- what I would probably

2    say, this is probably hours that I actually was at

3    the site that I billed, so the -- the consultant

4    could justify that I was there.  And then if

5    something happened that day and I was going back to

6    my room to work on it and he agreed that I should

7    work on it, then those hours are also included in

8    there.

9        Q.    Included in the 60.75?

10       A.    Right.

11       Q.    What's not included in the 60.75?

12       A.    The stuff that they wouldn't allow me to

13   bill.

14       Q.    "They" being Tyler?

15       A.    Tyler.

16       Q.    Or "they" being the customer?

17       A.    Both.

18       Q.    And what -- when you say stuff that they

19   wouldn't allow you to bill, what stuff are you

20   talking about?

21       A.    Studying more about the customer site or

22   reviewing stuff that happened that day, doing my

23   notes --

1       Q.    And --

2       A.    -- entering time, all kinds of other

3    things that would -- you would normally do.

4       Q.    And was there any document that you were

5    given that told you which of those particular

6    assignments you could bill to the client versus

7    which ones you couldn't bill to the client?

8       A.    Any document.  I think the -- I think the

9    general rule was eight hours on site you could bill

10   to the client and anything after that the client had

11   to approve.

12      Q.    Right.  But I'm talking about this

13   instance in which you billed 60.75 hours in a week

14   to this client.  There was, obviously -- you're

15   telling me that that wasn't the total number of

16   hours that you worked that week.

17      A.    Right.

18      Q.    And my question is -- that you answered --

19   is that there's some --

20      A.    There's probably --

21      Q.    -- some -- let me finish.

22      A.    Okay.

23      Q.    There's some functions or some services

EXHIBIT 22

1      that you provided that you didn't bill for?

2          A.    Correct.

3          Q.    So my only question is -- is that, is

4      there a document that I can look at that you saw

5      during your employment with Tyler that tells you:

6      You can bill for these functions --

7          A.    No.

8          Q.    -- but you can't bill for these functions?

9          A.    No.

10         Q.    And some of the functions that you

11     described, your time and other things, they -- that

12     could be done at the customer site, correct?

13         A.    No.

14         Q.    Why not?

15         A.    Because at the customer site you're

16     training and you're doing -- you're -- they have a

17     classroom with people there and you're working with

18     them.

19         Q.    All right.  I think you mentioned -- I'm

20     going to mark this as Exhibit 6.

21         A.    Oh, okay.

22     (EXHIBIT NUMBER 6 WAS MARKED FOR IDENTIFICATION)

23     ///

EXHIBIT 22