# FREEDOM COURT REPORTING

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION
 3   PATTY BEALL, MATTHEW          )
     MAXWELL, DAVID GRAVLEY,       )
 4   TALINA MCELHANY, KELLY        )
     HAMPTON, KEVIN TULLOS,        )
 5   CASEY BROWN, JASON BONNER,    )
     ANTHONY DODD, ILENE           )
 6   MEYERS, TOM O'HAVER, JOY      )
     BIBLES, DON LOCCHI AND        )
 7   MELISSA PASTOR,               )
     Individually and on behalf    ) CIVIL ACTION
 8   of all others similarly       )
     situated,                     ) NO.: 2:08-CV-422 TJW
 9                                 )
                    PLAINTIFFS,    )
10                                 )
     VS.                           )
11                                 )
                                   )
12   TYLER TECHNOLOGIES, INC.      )
     AND EDP ENTERPRISES, INC.,    )
13                                 )
                    DEFENDANTS.    )
14
15           ------------------------------------
16                ORAL DEPOSITION OF
17                   MELANIE BAIRD
18                  APRIL 26, 2010
19           ------------------------------------
20
21        ORAL DEPOSITION OF MELANIE BAIRD, produced as a
     witness at the instance of the DEFENDANTS, and duly
22   sworn, was taken in the above-styled and numbered cause
     on the 26th day of April, 2010, from 1:22 p.m. to
23   4:30 p.m., before Elaine Fowler, CSR in and for the
     State of Texas, reported by machine shorthand, at the
24   offices of Cathy Sosebee & Associates, 901 Mac Davis
     Lane, Lubbock, Texas, pursuant to the Federal Rules of
25   Civil Procedure and the provisions stated on the record
```

**EXHIBIT 24**

# FREEDOM COURT REPORTING

Page 2

```
 1                    A P P E A R A N C E S
 2
      FOR THE PLAINTIFFS PATTY BEALL, MATTHEW MAXWELL, DAVID
 3    GRAVLEY, TALINA MCELHANY, KELLY HAMPTON, KEVIN TULLOS,
      CASEY BROWN, JASON BONNER, ANTHONY DODD, ILENE MEYERS,
 4    TOM O'HAVER, JOY BIBLES, DON LOCCHI AND MELISSA PASTOR,
      Individually and on behalf of all others similarly
 5    situated:
 6         MS. CHANDRA L. HOLMES RAY
           Zelbst, Holmes & Butler
 7         P.O. Box 365
           Lawton, Oklahoma 73502-0365
 8         (580) 248-4844
 9    FOR THE DEFENDANTS TYLER TECHNOLOGIES, INC. AND EDP
      ENTERPRISES, INC.:
10
           MS. FARIN KHOSRAVI
11         Morgan, Lewis & Bockius, L.L.P.
           1717 Main Street
12         Suite 3200
           Dallas, Texas 75201-7347
13         (214) 466-4146
14
15
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT 24**

# FREEDOM COURT REPORTING

1                          INDEX

                                                    PAGE
2   Appearances........................................  2
3   MELANIE BAIRD
4        EXAMINATION BY MS. KHOSRAVI....................  4
         EXAMINATION BY MS. HOLMES RAY:.................141
5        EXAMINATION BY MS. KHOSRAVI....................147
6
    Reporter's Certificate............................  159
7
                         EXHIBITS
8
    NO.   DESCRIPTION                               PAGE
9
     1    3-9-06 Performance Review.................... 41
10   2    Performance Review from 2006 to 2007.......... 74
     3    Performance Review 2007 to 2008............... 97
11   4    Answers to interrogatories...................117
     5    Resume.......................................128
12   6    Consent to Opt In............................136
13
14
15
16
17
18
19
20
21
22
23
24
25

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1    support?  What is the business of Tyler?

2        A.  They design software for governments so they

3    can operate.

4        Q.  But the time you were employed as software

5    support, the software that Tyler sold to the municipal

6    government, those clients would then call you if they

7    had questions about the software?

8        A.  Questions or problems.

9        Q.  And did I understand you that those problems or

10   concerns would be communicated to you by the customer or

11   the client making a telephone call to you?

12       A.  They would call into a phone queue.

13       Q.  And when you say phone queue, tell the jury

14   what you mean by that.

15       A.  Where they call in and their call is taken in

16   the order it was received.

17       Q.  So you never knew what call you were going to

18   receive when you answered a telephone call?

19       A.  That is correct.

20       Q.  How long did you remain in the software support

21   specialist position?

22       A.  Approximately four years.

23       Q.  When you first became employed by Tyler your

24   starting salary was around $28,000; is that right?

25       A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1    Q.  But by the time you resigned in 2008 you had

2  received several raises; is that right?

3    A.  Yes.

4    Q.  And your ending salary was about $34,984 per

5  year?

6    A.  Something like that.

7    Q.  As an implementation specialist, what was your

8  job duty and responsibility?

9    A.  As an implementation specialist I worked with

10  the project managers to implement contracts.

11    Q.  Tell me what that means, implementing

12  contracts.

13    A.  Okay.  Marketing would sell the applications to

14  the customer and then implementation, we -- project

15  managers would, you know, work out the details with the

16  customers and then we would configure the software into

17  a conversion and then train them on the application.

18    Q.  So as an implementation specialist, one of your

19  jobs was to convert and configure; is that right?

20    A.  I didn't work on the conversions as much as the

21  trainers did.

22    Q.  Did you ever work on conversions?

23    A.  I would help them -- in a conversion, I would

24  help them figure out what information needed to go in

25  which field in the software.  So, yes, I did work on

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1    conversions.

2        Q.   Good.   You were starting to explain to me what

3    conversions meant.   That was my next question.

4        A.   Yes.   A conversion is where you take them from

5    a software package they were using with another company

6    and bring that information into our software.

7        Q.   Give me an example, because I am trying to

8    envision and understand what it is that you were doing.

9    And I do not have a technical background.

10       A.   Okay.   Let's say that -- I am trying to think

11   of what you might use.

12       Q.   Give me an example of one of the projects you

13   worked on.

14       A.   Okay.   Say you were using -- say you were using

15   Lotus Notes for your email and you went to Outlook.

16       Q.   Okay.

17       A.   So it would be bringing those emails into the

18   new program.

19       Q.   And with you being involved in the conversion

20   process, what specifically would be involved in taking

21   my email in Lotus Notes over to Outlook?

22       A.   That was where the programmers would come in.

23   They would have to write programs to bring that

24   information over.   We just had to tell them where to put

25   it.

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 20

1      Q.   So your role in the conversion process was

2   where to put what?

3      A.   Like we would have to, say, find the customer's

4   name in this software and put it in this field in our

5   software.

6      Q.   And who would you give those directions to?

7      A.   The project managers, and then they would

8   communicate that with development.

9      Q.   So if the subject of the mail was depositions,

10  you would tell the project manager in Lotus Notes the

11  subject field says depositions, in Outlook there is also

12  a field called subject matter, so make sure that the

13  name deposition is incorporated into this field.  Am I

14  understanding that correctly?

15     A.   Yes.

16     Q.   So you were involved in the conversion process

17  in that way.  And I think you also said configuration?

18     A.   Yes.

19     Q.   Help me understand what configuration means.

20     A.   Say in like a utility billing software, when --

21  before the customer can bill you how much water or gas

22  or electric you use they have to send a meter reader out

23  to read your meter to get readings.

24     Q.   You mean the utility services to the customer?

25     A.   Yes.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

FREEDOM COURT REPORTING

1    Q.  Okay.

2    A.  And so the meter reader will have to go out and

3  get a reading.  And then they have a device that they

4  type the reading in.  And then we would have to

5  configure based off of the software they used for that

6  how to get that information into the INCODE software.

7  So we have to say the meter number is here, the reading

8  is here, the address is here.

9    Q.  And when you say "here", you don't mean a hard

10  copy document, you mean --

11    A.  Right.

12    Q.  -- a different software application?

13    A.  Yes.

14    Q.  Okay.  Go on.

15    A.  We would tell it, you know, the address is in

16  field one, you know, for 10 characters, the name is in

17  field 11 for five characters.  We would have to, you

18  know, configure our software to know how to recognize

19  that information.

20    Q.  And what steps did you take to configure?  I am

21  trying to understand that.

22    A.  It would depend on which company they used for

23  their meter reading, because they were all different.

24    Q.  Give me an example of one that you can think

25  of.

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1     Q.   They continued to use the old software and the

2   new one that they purchased from Tyler?

3     A.   No.   The old software would be -- we would

4   replace that software.   This is other software they used

5   in addition to.

6     Q.   So, for example, if your client was switching

7   from -- the example you gave earlier, switching from

8   Lotus Notes to Outlook, it didn't mean that they were

9   also switching from Microsoft Word to Word Perfect, you

10   had to make sure that Microsoft Word was communicating

11   with the new software, Outlook?

12     A.   Yes.

13     Q.   Am I following you?

14     A.   Yes.

15     Q.   So you trained them over the phone on

16   interface (sic)?

17     A.   Yes.

18     Q.   How was your training in person that you did on

19   clients' sites different from doing the training by

20   phone?

21     A.   You were hands-on with the customer.   When you

22   are on-site you could actually say, okay, you need to do

23   this, this and this.   When you are on the phone it is

24   very hard to, you know, actually show them what they

25   need to do.

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 33

1      Q.   So when you are on-site training a client you

2   are actually sitting beside or near the user on their

3   computer screen showing them?

4      A.   Yes.

5      Q.   And when you are doing it by phone, are you

6   logged onto the client's computer to show them this?   I

7   am trying to envision how you actually trained when you

8   are remote.

9      A.   When we had the opportunity to do it, we would

10  connect to their computers.   Sometimes they would have

11  IT stuff that would not let us do that.

12     Q.   So when you were not able to remote in, how did

13  you train them by phone?

14     A.   I would actually have their screen pulled up on

15  my screen and just say, you know, in the upper

16  right-hand corner you see this, you know, if you look

17  below that you see this and if you look to the left you

18  see that, just guide them the best you could.

19     Q.   What training did Tyler Technologies provide

20  for you in the beginning when you first became an

21  implementation specialist?

22     A.   None.

23     Q.   How did you know how to do your job as an

24  implementation specialist when you first became one?

25     A.   I learned as I went.   They would give me a task

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 34

1    and I would just have to learn how to do it.

2        Q.  So day one when you first became an

3    implementation specialist, did somebody send you to a

4    client site and say, Ms. Baird, go and train them on --

5    name a software, I don't know, INCODE -- is that how it

6    happened?

7        A.  No.

8        Q.  Okay.  So what was done by Tyler to prepare you

9    for your first trip out to a client's site to be able to

10   train them?

11       A.  I waited -- I didn't have any formal training.

12       Q.  And I am not limiting my question to any formal

13   training.  Me, Farin Khosravi, sitting here today, I am

14   trying to understand how you did your job as an

15   implementation specialist with not having any

16   background.  So when you went in as an implementation

17   specialist, did you already have an understanding of how

18   INCODE functioned?

19       A.  Functioned in which way?

20       Q.  Functioned in any way.  Were you familiar with

21   INCODE from previous jobs, from previous training, from

22   previous positions you had with the company?

23       A.  I mean, I knew how the software worked from

24   working in support.

25       Q.  Let's go back to that then.  Before you became

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1      A.   Exceptional knowledge of all aspects of the

2  job.

3      Q.   And then the next sentence is?

4      A.   Considered an expert in the field.

5      Q.   Why did you consider yourself to be an expert

6  in the field?

7      A.   I was trying to get a good raise.

8      Q.   Any other reasons?  Were you being truthful

9  when you marked that?

10     A.   Yes.

11     Q.   Any other reasons besides trying to get a raise

12  that you believed you were an expert in your field?

13     A.   Well, I just always did a good job.

14     Q.   And what did you consider doing a good job?

15  You have said that several times, you did a good job.

16  But what is it specifically that you did that you

17  considered yourself doing a good job?

18     A.   Well, I just always took care of the customer

19  to the best of my abilities.

20     Q.   Lets turn the page together to the second page

21  of the performance review.  Now, look with me under Item

22  Number 3, which is problem solving, and under employee

23  comments.  Read me what you put down for problem solving

24  under employee comment.

25     A.   This one is difficult because this is done on a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 45

1    customer by customer basis and is usually handled

2    between the trainer and I.  It usually pertains to the

3    way routes are set up for customers and what the best

4    way to set them up for them is.

5        Q.  When you say it is usually handled between the

6    trainer and I, help me understand.  I thought you were

7    the trainer who trained the customers.  What did you

8    mean by that sentence?

9        A.  Well, I trained them on the interfaces.  We had

10   trainers that went on-site to train them on the modules.

11       Q.  So you didn't train them on how to use Tyler's

12   software, you only trained them on how to make two

13   softwares communicate, correct?

14              MS. HOLMES RAY:  Object to the form.

15       A.  Correct.

16       Q.  (BY MS. KHOSRAVI)  And what do you mean by the

17   second sentence, it usually pertains to the way routes

18   are set up for customers?

19       A.  Well, every customer was different.

20       Q.  The routes are set up, what does that phrase

21   mean?

22       A.  Routes are like the order the meter readers

23   would read the meters.  Like every city is set up

24   differently and they have different ways of doing

25   things.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

```
1      Q.  So you had to actually communicate with the
2   client and find out how they set those up, correct?
3      A.  Yes.
4              MS. HOLMES RAY:  Objection, form.
5      Q.  (BY MS. KHOSRAVI)  And you would have to
6   understand that from the client to then know how to
7   assist them with their problems; is that right?
8              MS. HOLMES RAY:  Object to the form.
9      Q.  (BY MS. KHOSRAVI)  You may answer the question.
10     A.  Can you repeat that, please.
11             MS. KHOSRAVI:  Would you read that back,
12  please.
13             (The reporter read the last question.)
14     A.  Correct.  Can I ask what time it is?
15             MS. HOLMES RAY:  10 minutes after 2.
16             THE WITNESS:  I have to notify my daughter
17  if she has to ride the bus home or not.  She gets out at
18  3:15.
19             MS. HOLMES RAY:  Off the record.
20             (Break taken from 2:11 p.m. to 2:14 p.m.)
21     Q.  (BY MS. KHOSRAVI)  Ms. Baird, before we took a
22  quick break we were discussing your employee comments on
23  your performance review with respect to problem solving.
24  Do you remember that?
25     A.  Yes.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

# FREEDOM COURT REPORTING

Page 47

1      Q.  And we were discussing your comment where it

2  says it usually pertains to the way routes are set up

3  for customers and what the best way to set them up for

4  them is.  Do you remember having put that down on your

5  performance evaluation?

6      A.  Yes.

7      Q.  And was it you then that decided what the best

8  way was to set up the routes for your customers?

9      A.  I would make suggestions to the customers, but

10 it was ultimately their decision how it was set up.

11     Q.  And how do you decide what suggestions to make

12 to your customers?

13     A.  Just -- after doing it for so long you just

14 learn it, you --

15     Q.  So you determine what the best route would be

16 provided under the comment?

17

18          MS. HOLMES RAY:  Objection, form.  You can

19 answer.

20     A.  Okay.  I would just -- pretty much what I would

21 do, I would say -- you know, I never knew how their old

22 software worked, so I would say this is how our software

23 works and this would be the easiest way for you to do

24 it.  But ultimately it was up to them how we set it up,

25 the way they did their day-to-day work.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1      Q.  Now, I want you to go up two lines, again I am

2   on problem solving, and tell me how you rated yourself.

3   Do you see your own ranking under box that has got a

4   capital E on top?

5      A.  Yes.  There is two of them marked there.  I do

6   not know why there is two of them marked there, so I

7   don't know which one I actually picked.

8      Q.  Why don't you read me the first one that has an

9   employee checkmark next to it.

10     A.  Consistently analyzes problems, recognizes and

11  implements appropriate solutions, finds new and better

12  ways to do things.

13     Q.  Tell me what you meant by saying that you

14  recommended and implemented appropriate solutions.  Do

15  you remember an example?

16            MS. HOLMES RAY:  I am going to object to

17  the form.  You can answer.

18     A.  Like an example would be -- like, say, they

19  would tell me that they have like 10 routes and we -- I

20  don't know what orders their meter readers would read

21  in, but I would need to find out from them like what

22  account numbers they wanted in each route.  And then we

23  would have different configurations that we could set up

24  for them so they could make sure the right account

25  numbers and right meters came up for the meter reader on

FREEDOM COURT REPORTING

Page 49

1    their devices.

2        Q.  Did you suggest to the city what configurations

3    to use?

4        A.  I would give them options because they -- you

5    know, it is the type of situation where you can't say

6    you have to do it this way, because they had multiple

7    options they could do.  I would just tell them like what

8    is the easiest way to do it versus the hardest way to do

9    it.  Then they could make a more informed decision that

10   way.

11       Q.  And how did you know of these options that you

12   were telling the clients they could use?

13       A.  What do you mean?

14       Q.  You said you would give them different options.

15   I am trying to figure out how did you know what options

16   were available.

17       A.  I would try to find out from them what --

18       Q.  From the client?

19       A.  Yes, from the client, what they needed.  What

20   do you need and then I would say, okay, here is your

21   option based on their needs.

22       Q.  Now back to that same sentence.  Did you

23   consider yourself consistently analyzing problems?

24

25           MS. HOLMES RAY:  Object to the form.  You

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1    can answer.

2         A.  Yes.

3         Q.  (BY MS. KHOSRAVI)  And tell me why it is that

4    you considered yourself consistently analyzing problems.

5         A.  Well, I mean, the job that I did was the same

6    all the time.  So I was -- you know, for every customer

7    I would talk to, I would -- it would be consistently

8    doing the same thing with them just based off of their

9    different needs.

10        Q.  And when you say doing the same thing, you mean

11   analyzing their problems?

12        A.  Yes.

13        Q.  That is what you were referring to?

14        A.  Yes.

15        Q.  But as you said before, every customer was

16   different, you had to tailor your suggestions to their

17   needs, correct?

18        A.  Right, but it was still the same process.

19        Q.  The same process of what?

20        A.  You know, you would still ask them the same

21   questions; you would just have to figure out, you know,

22   what -- how they did things differently than the other

23   customers, then make the suggestions based on that.

24        Q.  Let's turn the page, Ms. Baird.  On the top of

25   the third page of your performance review under employee

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 72

1      Q.   So who became the contact for the trainers?

2      A.   They continued to contact their project

3   managers.

4      Q.   I see.  And you are testifying that the project

5   managers did not have the knowledge and expertise that

6   you did?

7      A.   Yes.

8             MS. HOLMES RAY:  Object to the form.

9      Q.   (BY MS. KHOSRAVI)  Would you read the next

10   sentence for me, please.

11      A.   "I would also like to take a class on Microsoft

12   Front Page to learn it better."

13      Q.   Tell me what Microsoft Front Page is.

14      A.   That is a program for designing web pages.

15      Q.   Why did you want to attend that class?

16      A.   Because the InSite program, that would have

17   been a way for me take more control of it, to do the

18   set-up so I didn't have to wait on other people to do

19   it.

20      Q.   Did you make that suggestion to Dyke Ellison?

21      A.   Yes.

22      Q.   What did he think?

23      A.   He said no.

24      Q.   Did he tell you why?

25      A.   No.

# FREEDOM COURT REPORTING

Page 73

1    Q.  Would you read the next sentence for me,

2    please.

3    A.  "I would also like to be the person to build

4    the site and purchase the SSL certificates and install

5    them."

6    Q.  These SSL certificates were the security bar

7    codes you were telling me about?

8    A.  No.  That was the security software that

9    encrypts your credit card when you make a purchase

10   on-line.

11   Q.  And remind me why you were suggesting that you

12   would be the person who builds the site and purchases

13   the certificate.

14   A.  Because we had -- I had to wait on other

15   departments to do all of that.

16   Q.  In order to --

17   A.  In order to do my configuration and my

18   training.

19   Q.  Did you make that suggestion to Dyke Ellison?

20   A.  Yes.

21   Q.  And that was declined, correct?

22   A.  Yes.

23   Q.  Did he explain to you why that was being

24   declined?

25   A.  No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

# FREEDOM COURT REPORTING

1      Q.  Did you ever ask or follow up?

2      A.  Yes.

3      Q.  And the result was?

4      A.  He would just not respond.

5      Q.  Look at the very last sentence in that

6   paragraph starting with "Joe and Michael".  Read that

7   for me.

8      A.  "Joe and are much better, but I would be able

9   to do my job more efficiently if I could do these other

10  parts."

11     Q.  Who were you referring to when you said Joe and

12  Michael?

13     A.  Joe was the programmer and Michael was the IT

14  person that -- they were the two people that I had to

15  wait on in the other department to do their job before I

16  could do mine.

17     Q.  So they were Tyler employees?

18     A.  Yes.

19     Q.  Okay.  If you will go ahead and put that aside

20  for me.  Now I am going to hand you another one.

21              (Exhibit 2 marked.)

22     Q.  Ms. Baird, I am going to hand you what has been

23  marked as Deposition Exhibit Number 2.  Take a look at

24  that and tell me if you recognize that document, please.

25     A.  Yes.

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1   accounting functions for our regional office, but I also

2   handled the billing and the payments when they came in.

3       Q.  When you were being interviewed for a position

4   with Tyler, during the interview process were you told

5   that you were going to be receiving a salary and not

6   overtime pay?

7       A.  No.

8       Q.  So when did you first become aware that you

9   were not getting paid overtime pay for the hours worked

10  over 40?

11      A.  When I started working at Tyler and I asked if

12  we got overtime pay and I was told no.

13      Q.  And you realized that even if you worked 45

14  hours you were still getting the same salary as if you

15  worked 40 hours per week, right?

16      A.  That was the way it was explained to me.

17      Q.  But, in fact, was it reflected in your paycheck

18  that the pay didn't change no matter how many hours you

19  worked?

20      A.  That is correct.

21      Q.  And did your hours change as well?  Were you

22  working a set number of hours per week or were they

23  different?

24      A.  The hours that we were, you know, required to

25  work was 8 to 5.  But if you didn't complete something,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

Page 112

1   they would ask, you know, why didn't you stay over and

2   do that.

3        Q.   So your hours, depending on your work load,

4   would change week to week, right?

5        A.   Yes.

6        Q.   It was possible one week you worked 40 and one

7   week you worked 45, for example, correct?

8        A.   Yes.

9        Q.   And did you ever work less than 40 hours per

10  week?

11       A.   Only if I took like a day off in the middle of

12  the week.  But not when I worked five days, no.

13       Q.   Did you ever make any complaints to anybody at

14  Tyler about overtime pay?

15       A.   I expressed my concerns to Dane Womble.

16       Q.   Tell me what you told Dane Womble.

17       A.   I just told him that, you know, I worked well

18  over 40 hours a week and I felt I should have been

19  compensated for that, and he said we don't do that.

20       Q.   So when you said you felt like you should be

21  compensated, you were referring to overtime pay?

22       A.   Yes.

23       Q.   What were the maximum number of hours that you

24  worked in a given week?

25       A.   Like any week?

**EXHIBIT 24**

FREEDOM COURT REPORTING

Page 113

1    Q.  Yeah, on average I want to know the maximum
2    number of hours that you worked.
3    A.  Do you want a maximum or do you want an
4    average?
5    Q.  No.  Give me a maximum that you ever worked in
6    a given work, that you can remember.
7    A.  The maximum that I can ever remember, I worked
8    90 hours one week.
9    Q.  What was the situation?  Talk to me about that.
10   A.  I was travelling and still doing all of my
11   normal work.  And it was a very -- we had a very large
12   load that week -- or I had a very large load that week.
13   And that is just what it took me to get the job done.
14   Q.  When you say I was travelling and my normal
15   work, why are you distinguishing between the normal -- I
16   don't understand by normal work and then travelling.
17   A.  That probably wasn't the best way to word that.
18   Like I had all the interfacing and everything and then
19   they added the Audiotel onto that.  So I was not always
20   in the office; I was also travelling and I was away from
21   my desk.  So I could not do the remainder of my work
22   while I traveled because I would be at the customer
23   site, you know -- I was giving them my attention and
24   not --
25   Q.  Instead of --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1       A.   Right.   Instead of everything else.   I couldn't

2    do all of it at once where I would be able to put more

3    attention on more things while I was at my desk.

4       Q.   So you mean while you were at a client's site

5    you couldn't then assist other clients who were calling

6    you on the phone asking you about another software?

7       A.   Yes.

8       Q.   Okay.   So once you finished with the client's

9    site that you were visiting, once you returned back to

10   your desk you would contact that client, or how did that

11   work?  How did you then attend to that client who was

12   trying to reach you?

13      A.   I would call them back -- I would return all of

14   my messages and emails and everything.   I would just get

15   to them, you know, in the order I received them or if

16   there was something more pressing I would have to

17   prioritize them.

18      Q.   I am trying to figure out how it is that you

19   were working 90 hours that week.   What were the hours of

20   your clients usually, their office hours?  They were

21   municipalities, correct?

22      A.   They were usually 8 to 5.

23      Q.   So then you were pretty much working 8 to 5?

24      A.   I would work 8 to 5, but then I would also work

25   in my hotel room afterwards.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1        Q.   Okay.  And what type of work were you doing at

2    your hotel room afterwards?

3        A.   I would answer emails.  I would call in and get

4    my voice mails.  You can't call the customers back at

5    that point, but I would send them emails.  I would

6    answer emails.  I would contact project managers.  We

7    were in constant contact with project managers.  So they

8    were the ones that you had to go to for any project.

9    Even if someone bought a software package after they had

10   already gone live on the main system, the project

11   manager was still in charge of that project.  So I was

12   always in contact with the project managers.

13       Q.   When you say that you were constantly in

14   contact with the project managers, tell me in what way.

15   Because I am envisioning you being in constant contact

16   with the clients who were calling you regarding issues

17   and problems that they were having.  Help me understand

18   that.

19       A.   Well, I was in contact -- the clients would

20   call in with issues they were having when I was in

21   support.  When I was in implementation we were actually

22   implementing programs.  We were setting them up,

23   training them how to use them and making them work.  I

24   didn't do as much support once I was in implementation.

25   I still did some support.  But the project managers are

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

## FREEDOM COURT REPORTING

1    the ones who we were in contact with when there would be

2    -- arise a problem with a customer, because that was

3    their customer.

4        Q.  Okay.  So you would be in contact with a

5    project manager once a problem arose?

6        A.  Yes.

7        Q.  After you had set it up?

8        A.  Right.  And when I was travelling, you know, I

9    didn't have access to my computer, to my physical

10   computer at the office.  So I would have to contact

11   them, you know, we need to do this for this customer or

12   we need to do that for that.  And they would have to go

13   over to my desk or get on my computer or something to

14   try to find some of that information.  So I had a lot of

15   back and forth communication with the project managers.

16       Q.  How many weeks during your employment with

17   Tyler as an implementation specialist do you remember

18   working 90 hours, the maximum that you testified?

19       A.  90 hours, I only remember working one, you

20   know.

21       Q.  Okay.  Now, on average how many hours a week

22   were you working?

23       A.  An average -- I came up with about 60 hours

24   average.

25       Q.  And how did you come up with that number?

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

**EXHIBIT 24**

1        A.   We only recorded the paid leave.  We didn't

2    record like what we worked every day throughout the

3    week.

4        Q.   That is fine.  I want to get something

5    clarified on the record.  Earlier when I asked you about

6    whether or not you ever recorded your time you said we

7    only recorded our time when we took paid leave.  Do you

8    remember?

9        A.   Yes.

10       Q.   Now I want you to look at this answer and

11   correct that testimony, if you need to, because here it

12   says --

13            MS. HOLMES RAY:  Are you saying paid or

14   unpaid?

15            MS. KHOSRAVI:  She said paid leave only.

16       Q.   (BY MS. KHOSRAVI)  So based on this answer

17   where you said you submitted your time in an Epicor

18   program for all travel and consulting hours that you

19   worked, is it true then that you also recorded some of

20   your time when you were travelling and consulting?

21       A.   Some of it, but not all of it.

22       Q.   Okay.  Let's talk about that.

23       A.   This was only -- this was time that was

24   actually going to get billed to the customer at an

25   hourly rate.  This was not time that I entered in saying

EXHIBIT 24

1   that I worked "X" number of hours a week.

2       Q.  So this was -- you were recording on Epicor

3   your billable time to your clients only?

4       A.  Yes.

5       Q.  And the billable time to the client would have

6   been what sort of work?  Walk me through that.

7       A.  That is the time that it took to get to the

8   customer site, the travel time, and the time I was

9   on-site.

10      Q.  Okay.

11      A.  That was it for time.

12      Q.  And did you always record that type of time

13  when it was being billed to the client?

14      A.  Only when it was being billed to the client.

15      Q.  And when did you know that time was being

16  billed to the client in order to determine whether or

17  not you needed to record it?

18      A.  When I would be told I was -- I am not saying

19  that right.  When they would tell me I needed to travel

20  to a site; that was how I knew I would enter it in

21  there.  Because we also entered our travel expenses in

22  this program.

23      Q.  So when you were not travelling to a client's

24  site when you were doing your work out of the Tyler

25  offices you were not recording your time?

1        A.   No.

2        Q.   So the 60 hours on average that you testified

3   earlier, you are estimating that that is how many hours

4   per week that you worked?

5        A.   Yes.

6        Q.   Okay.   What is the least amount of hours per

7   week that you remember on average that you worked?

8        A.   Are you talking about also including like if

9   you took a vacation day in the middle of the week or --

10       Q.   No.   Forget vacation, just working.   If you

11   worked five days a week, you said on average you

12   worked -- I am sorry.   The maximum that you remember

13   working in one week was 90 hours?

14       A.   Uh-huh.

15       Q.   Now go back and think what was the least number

16   of hours you ever worked per week.

17       A.   The only time I ever took off early was if my

18   child or I was sick or I just took a couple of hours

19   off, but that was always paid leave.   So I don't -- I

20   don't know.   There could have been a week I may have

21   worked 35 hours, maybe.

22       Q.   And during the time period that you were

23   working at Tyler from 2001 until around 2008, you had

24   your daughter during that time?

25       A.   Uh-huh.

**EXHIBIT 24**

| | | |
|---|---|---|
| 1 | | letter is dated May 18, 2009 from Penny Parsons to you; |
| 2 | | is that right? |
| 3 | A. | Correct. |
| 4 | Q. | And in this first part of the letter it seems to say |
| 5 | | that the company has a concern because you were given |
| 6 | | two knowledge assessment tests, and based on those |
| 7 | | tests your knowledge of MUNIS is not adequate for the |
| 8 | | role of implementation consultant.  Is that right? |
| 9 | A. | That's what it says. |
| 10 | Q. | Okay.  Did anyone ever explain to you what they meant |
| 11 | | by your knowledge not being adequate for the role?  In |
| 12 | | connection with this letter and in connection with this |
| 13 | | concern, did you have any verbal communications with |
| 14 | | Penny Parsons or Patty Smithey regarding -- |
| 15 | A. | It would have been Patty Smithey. |
| 16 | Q. | Okay.  Think back and tell me if you had any |
| 17 | | conversations with her about what she meant by your |
| 18 | | knowledge not being adequate. |
| 19 | A. | Oh, absolutely.  I would have asked her specifically, |
| 20 | | and I would have requested her assistance in improving. |
| 21 | Q. | You said I would have, I would have.  Did you? |
| 22 | A. | I'm sure, yes, I did. |
| 23 | Q. | Okay.  So tell me what you remember.  What was it that |
| 24 | | was going on that they said your knowledge was not |
| 25 | | adequate? |

EXHIBIT 24

## Freedom Court Reporting, Inc                95

```
 1    A.    I don't know.

 2    Q.    Okay.  It says your knowledge of MUNIS is not adequate.

 3          Was MUNIS this particular software that you were

 4          training the clients on, the name of a software?

 5    A.    Yes.

 6    Q.    Do you remember taking two knowledge assessment tests?

 7    A.    No, not specifically.  I only recall the one.

 8    Q.    Do you see that sentence where it says:  As a result of

 9          the second assessment test given to you today, meaning

10          May 18, 2009, we are concerned as you continue to be

11          unable to perform the implementation role at the

12          expected level.  Do you see that sentence?

13    A.    Correct.

14    Q.    Does that help refresh your memory as to what test this

15          letter is referring to?

16    A.    No.

17    Q.    Do you have any reason to dispute that there was

18          actually two knowledge assessment tests given to you?

19    A.    No.

20    Q.    Okay.  Let's look at the "Billability" part of this

21          letter.

22    A.    Mm-hmm.

23    Q.    Do you see a sentence there that says:  The occasions

24          where you did have to train clients have not gone well.

25          Do you see that?
```

**EXHIBIT 24**

1    A.    I see it.

2    Q.    And then it says:  In 11 months you have been billable

3          well below the monthly quota required and it is

4          challenging at this point to find clients who are

5          willing to work with you.

6                Do you see that?

7    A.    I do.

8    Q.    Can you tell me -- can you expand on that for me as to

9          what this is referring to.  What happened?

10   A.    I don't agree with that sentence, so I can't expand on

11         it.

12   Q.    Did you discuss this with anybody to tell them, I don't

13         agree with this?

14   A.    Patty Smithey.

15   Q.    Okay.  So based on your discussion with her, why did

16         you say you do not agree with this?

17   A.    The billability, I mean it wasn't something I could

18         control.  I was --

19   Q.    Because?

20   A.    Because it's given to you by your project manager.

21         It's given to you by the very sales process of MUNIS.

22   Q.    You mean, when you say billability is not something I

23         can control, it is because travel to the client site is

24         assigned to you by a project manager?

25   A.    Correct.

| 1 | Q. | So you can't just get up and travel somewhere; correct? |
|---|----|---------|
| 2 | A. | And you can't just bill a client for something.  It was |
| 3 |  | all given to you by the project manager. |
| 4 | Q. | So it seems they're saying they can't give you any |
| 5 |  | billable work or send you to the clients because the |
| 6 |  | occasions when you did train clients did not go well. |
| 7 |  | Did you talk to them and see what they were talking |
| 8 |  | about? |
| 9 | A. | They never gave me specifics. |
| 10 | Q. | You discussed it with them and they didn't -- |
| 11 | A. | Patty Smithey. |
| 12 | Q. | Okay.  Under Product Knowledge it's referring to a |
| 13 |  | company called Crisp Co. |
| 14 | A. | Crisp County. |
| 15 | Q. | I'm sorry, Crisp County.  And Patty Smithey seems to be |
| 16 |  | saying that in preparation for some of your recent |
| 17 |  | billable work, Patty spent hours with you making sure |
| 18 |  | you were ready for the sessions at Crisp County, and |
| 19 |  | that you were unable to complete the session without |
| 20 |  | extensive help from the support department. |
| 21 |  | Do you remember the incident at Crisp County? |
| 22 | A. | No. |
| 23 | Q. | Do you remember you going to Crisp County? |
| 24 | A. | Yes. |
| 25 | Q. | Do you remember anything that would have led to this |

**EXHIBIT 24**

**Freedom Court Reporting, Inc**                          **54**

```
1    A.    Typically.

2    Q.    Why do you say typically?

3    A.    I -- I wouldn't say -- I mean that was the time frame,

4          8 to 5.

5    Q.    8 to 5 is when you were expected to be at the office

6          during that time period; correct?

7    A.    Correct.   Correct.

8    Q.    Was there any reason to stay at the office beyond 5:00

9          during that initial period when you were training

10         yourself?

11   A.    No.

12               MS. KHOSRAVI:  Good point, Laureen.

13   BY MS. KHOSRAVI:

14   Q.    Ms. Milburn, if you were ever sent to a client site,

15         did you typically fill out an expense report for the

16         expenses that you incurred during your trip to a client

17         site?

18   A.    Yes.

19   Q.    Was there ever a time that you went to a client site

20         and you did not incur any expenses that Tyler

21         Technologies needed to reimburse you for?

22   A.    No.

23               MS. KHOSRAVI:  Okay.  Let's mark this.

24               DEPOSITION EXHIBIT 3

25               MARKED BY THE REPORTER
```

```
 1                    FOR IDENTIFICATION

 2    BY MS. KHOSRAVI:

 3    Q.    While you were employed at Tyler Technologies,

 4          Ms. Milburn, did you record your time?

 5    A.    No.

 6    Q.    You never recorded your time while you were working for

 7          Tyler Technologies?

 8                MS. BAGLEY:  Form; asked and answered.

 9    BY MS. KHOSRAVI:

10    Q.    You're hesitating to answer.  Tell me, is there --

11    A.    I'm trying to remember if -- if this was a prior

12          company I worked with or this was Tyler, whether I had

13          to go on-line and submit a time sheet.  I think it was

14          exception-based.  You only had to submit time.

15    Q.    Are we talking about Tyler now or your previous

16          employer?

17    A.    That's what I'm trying to remember.

18    Q.    Ah.

19                How did you keep track of how many hours you

20          worked while you were employed at Tyler Technologies?

21                MS. BAGLEY:  Form.

22    A.    I didn't.  Well, I mean I don't understand.  What do

23          you mean how did I keep track?  I --

24    BY MS. KHOSRAVI:

25    Q.    How did Tyler Technologies know how to bill its clients
```

**EXHIBIT 24**

## Freedom Court Reporting, Inc                                   56

```
 1              with respect to the time you spent on a client project?

 2    A.        It was all handled.  It was not in my control at all.

 3              Project manager was responsible for that.

 4    Q.        If you were at the client site for ten hours one day,

 5              let's say, were you supposed to record that:  I spent

 6              at a client site ten hours today doing X, Y and Z?

 7              Were you hired or supposed to record that time

 8              anywhere?

 9    A.        Yes, we did trip reports.  So we would list the time we

10              got there and the time we left.  However, I -- I think,

11              you know, as far as what the client was paying was

12              handled differently.

13    Q.        And I don't care what the client was paying.  I care

14              about how -- was your time ever billed to the client?

15              Do you know whether your time was ever billed to the

16              client?

17    A.        My time was billed.

18    Q.        So if you did not record your time -- help me

19              understand this.

20    A.        I did record it on the trip report.

21    Q.        Trip report.  And tell me what a trip report is again.

22    A.        It was a daily report that you would -- you'd have to

23              have signed off by the client on what you covered.

24    Q.        And did the trip report say:  Ms. Milburn was at my

25              offices from, let's say, 8:00 in the morning until 4:00
```

**EXHIBIT 24**

| 1 | | in the afternoon?  Is that what a trip report |
| 2 | | contained? |
| 3 | A. | It had the time in, the time out, and the events of the |
| 4 | | day, and a signature by myself and the client. |
| 5 | Q. | Would you have the client fill that out once you were |
| 6 | | leaving the client site? |
| 7 | A. | We had to get the client to sign off on it. |
| 8 | Q. | You said we.  Who's we? |
| 9 | A. | Well, implementation consultants is we.  I had to have |
| 10 | | the client sign it. |
| 11 | Q. | When you say we had to get that done, you were speaking |
| 12 | | for all the implementation consultants? |
| 13 | A. | Yes. |
| 14 | Q. | And how do you know that all the implementation |
| 15 | | consultants were supposed to do that? |
| 16 | A. | I don't. |
| 17 | Q. | Okay.  So let's make sure -- |
| 18 | A. | I just know that Joy did and Laura did.  So people |
| 19 | | around me did, but I don't know. |
| 20 | Q. | The implementation consultants that actually worked |
| 21 | | with you on the same projects? |
| 22 | A. | Correct. |
| 23 | Q. | I see.  Now I want to know about your practice, |
| 24 | | Ms. Milburn.  I want to know about you specifically. |
| 25 | | When you left the client site, did you actually give |

**EXHIBIT 24**

| | | |
|---|---|---|
| 1 | | letter is dated May 18, 2009 from Penny Parsons to you; |
| 2 | | is that right? |
| 3 | A. | Correct. |
| 4 | Q. | And in this first part of the letter it seems to say |
| 5 | | that the company has a concern because you were given |
| 6 | | two knowledge assessment tests, and based on those |
| 7 | | tests your knowledge of MUNIS is not adequate for the |
| 8 | | role of implementation consultant.  Is that right? |
| 9 | A. | That's what it says. |
| 10 | Q. | Okay.  Did anyone ever explain to you what they meant |
| 11 | | by your knowledge not being adequate for the role?  In |
| 12 | | connection with this letter and in connection with this |
| 13 | | concern, did you have any verbal communications with |
| 14 | | Penny Parsons or Patty Smithey regarding -- |
| 15 | A. | It would have been Patty Smithey. |
| 16 | Q. | Okay.  Think back and tell me if you had any |
| 17 | | conversations with her about what she meant by your |
| 18 | | knowledge not being adequate. |
| 19 | A. | Oh, absolutely.  I would have asked her specifically, |
| 20 | | and I would have requested her assistance in improving. |
| 21 | Q. | You said I would have, I would have.  Did you? |
| 22 | A. | I'm sure, yes, I did. |
| 23 | Q. | Okay.  So tell me what you remember.  What was it that |
| 24 | | was going on that they said your knowledge was not |
| 25 | | adequate? |

**EXHIBIT 24**

1    A.    I don't know.

2    Q.    Okay.  It says your knowledge of MUNIS is not adequate.

3          Was MUNIS this particular software that you were

4          training the clients on, the name of a software?

5    A.    Yes.

6    Q.    Do you remember taking two knowledge assessment tests?

7    A.    No, not specifically.  I only recall the one.

8    Q.    Do you see that sentence where it says:  As a result of

9          the second assessment test given to you today, meaning

10         May 18, 2009, we are concerned as you continue to be

11         unable to perform the implementation role at the

12         expected level.  Do you see that sentence?

13   A.    Correct.

14   Q.    Does that help refresh your memory as to what test this

15         letter is referring to?

16   A.    No.

17   Q.    Do you have any reason to dispute that there was

18         actually two knowledge assessment tests given to you?

19   A.    No.

20   Q.    Okay.  Let's look at the "Billability" part of this

21         letter.

22   A.    Mm-hmm.

23   Q.    Do you see a sentence there that says:  The occasions

24         where you did have to train clients have not gone well.

25         Do you see that?

## Freedom Court Reporting, Inc 96

| | | |
|---|---|---|
| 1 | A. | I see it. |
| 2 | Q. | And then it says:  In 11 months you have been billable |
| 3 | | well below the monthly quota required and it is |
| 4 | | challenging at this point to find clients who are |
| 5 | | willing to work with you. |
| 6 | | Do you see that? |
| 7 | A. | I do. |
| 8 | Q. | Can you tell me -- can you expand on that for me as to |
| 9 | | what this is referring to.  What happened? |
| 10 | A. | I don't agree with that sentence, so I can't expand on |
| 11 | | it. |
| 12 | Q. | Did you discuss this with anybody to tell them, I don't |
| 13 | | agree with this? |
| 14 | A. | Patty Smithey. |
| 15 | Q. | Okay.  So based on your discussion with her, why did |
| 16 | | you say you do not agree with this? |
| 17 | A. | The billability, I mean it wasn't something I could |
| 18 | | control.  I was -- |
| 19 | Q. | Because? |
| 20 | A. | Because it's given to you by your project manager. |
| 21 | | It's given to you by the very sales process of MUNIS. |
| 22 | Q. | You mean, when you say billability is not something I |
| 23 | | can control, it is because travel to the client site is |
| 24 | | assigned to you by a project manager? |
| 25 | A. | Correct. |

**EXHIBIT 24**

| 1 | Q. | So you can't just get up and travel somewhere; correct? |
|---|----|---------|
| 2 | A. | And you can't just bill a client for something.  It was |
| 3 |    | all given to you by the project manager. |
| 4 | Q. | So it seems they're saying they can't give you any |
| 5 |    | billable work or send you to the clients because the |
| 6 |    | occasions when you did train clients did not go well. |
| 7 |    | Did you talk to them and see what they were talking |
| 8 |    | about? |
| 9 | A. | They never gave me specifics. |
| 10 | Q. | You discussed it with them and they didn't -- |
| 11 | A. | Patty Smithey. |
| 12 | Q. | Okay.  Under Product Knowledge it's referring to a |
| 13 |    | company called Crisp Co. |
| 14 | A. | Crisp County. |
| 15 | Q. | I'm sorry, Crisp County.  And Patty Smithey seems to be |
| 16 |    | saying that in preparation for some of your recent |
| 17 |    | billable work, Patty spent hours with you making sure |
| 18 |    | you were ready for the sessions at Crisp County, and |
| 19 |    | that you were unable to complete the session without |
| 20 |    | extensive help from the support department. |
| 21 |    | Do you remember the incident at Crisp County? |
| 22 | A. | No. |
| 23 | Q. | Do you remember you going to Crisp County? |
| 24 | A. | Yes. |
| 25 | Q. | Do you remember anything that would have led to this |

**EXHIBIT 24**