FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

Case No. 2:08-cv-422- TJW

---

DEPOSITION OF LORRAINE MUTCH          May 6, 2010

PATTY BEALL, MATTHEW MAXWELL, TALINA McELHANY and
KELLY HAMPTON, individually and on behalf of all
others similarly situated,

Plaintiffs,

vs.

TYLER TECHNOLOGIES, INC., and EDP ENTERPRISES, INC.,

Defendants.

---

APPEARANCES:

        ZELBST, HOLMES & BUTLER
            By Chandra L. Holmes Ray, Esq.
            P.O. Box 365
            Lawton, Oklahoma  73502
             Appearing on behalf of Plaintiffs.


        MORGAN, LEWIS & BOCKIUS, LLP

            By Paulo B. McKeeby, Esq.

            1717 Main Street, Suite 3200

            Dallas, Texas  75201-7347

             Appearing on behalf of Defendants.


        Also Present:  H. Lynn Moore, Jr.

FREEDOM COURT REPORTING

Page 2

1           Pursuant to Notice and the Federal Rules

2      of Civil Procedure, the deposition of LORRAINE

3      MUTCH, called by Defendants, was taken on Thursday,

4      May 6, 2010, commencing at 8:18 a.m., at 216 16th

5      Street, Suite 650, Denver, Colorado, before Beth

6      Milliken, Court Reporter and Notary Public within

7      and for the State of Colorado.

8

9                     I N D E X

10     DEPOSITION OF LORRAINE MUTCH

11     EXAMINATION BY:                          PAGE

12         Ms. Holmes                     114, 116

13         Mr. McKeeby                       3, 115

14
       EXHIBITS                      INITIAL REFERENCE
15
       Exhibit 1   Letter from Boen to          11
16                 Mutch, 11/9/06

17     Exhibit 2   Time Report pertaining       104
                   to Mutch, 12/3/06 to
18                 7/22/07

19     Exhibit 3   Resume of Lorraine Mutch     108

20     Exhibit 4   Consent to Opt In            111
                   pertaining to Lorraine
21                 Mutch, 7/23/09

22

23

24

25

367 VALLEY AVENUE
(205) 397-2397   BIRMINGHAM, ALABAMA 35209   877-373-3660

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 32

1    work, data entry, helping them out with the

2    implementation.  So seeing everything they did, no;

3    doing a lot of the work, yes.

4         Q    I'm not sure if I understood your last

5    answer.  You -- let me see if I can help you.

6         You spent less time working while you were

7    shadowing because you were doing only part of the

8    work?

9         A    Not less time, but I did a lot of the

10   data entry that typically the client would do or

11   they would have to do.

12        Q    So the -- okay.  Well, let me make sure I

13   understand.  I think you said that in terms of

14   comparing the number of hours that you worked on a

15   weekly basis, they would have been higher when you

16   were on your own doing implementations?

17        A    Correct.

18        Q    And -- and -- okay.  So I apologize if I

19   misunderstood.  But why is that?

20        A    Because I was junior --

21        Q    Okay.

22        A    -- I didn't have the experience of the

23   seniors --

24        Q    Okay.

25        A    -- to do an implementation.

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 33

1      Q      So it just took you longer?

2      A      Correct.

3      Q      Okay.  I just want to make sure I

4    understand.  So can you -- if we looked at your

5    Day-Timer, assuming it still exists, what do you

6    think it would say with respect to the number of

7    hours that you worked average during a work week

8    while you were shadowing the three implementation

9    specialists that we've talked about?

10     A      60.

11     Q      And in that 60 hours, are you including

12   your travel time?

13     A      No.

14     Q      That 60 hours is just time spent at the

15   customer site?

16     A      Yes.  55, 60 hours.

17     Q      And is there any other document, other

18   than your Day-Timer, that we might look to to

19   determine what particular number of hours you might

20   or you may have worked during particular weeks?

21     A      No.

22     Q      Same -- well, let me -- similar question.

23   With respect to the time that you spent when you

24   were doing implementations on your own, what would

25   be the estimate of the hours that you work on a

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 34

1   weekly basis during that period?

2       A    55, 60 hours.

3       Q    Okay.  And I take it that there are no

4   documents, other than the Day-Timer, if we could

5   track it down, that you could identify that would --

6   we could look at to show how many hours during a

7   particular week during that period of time when you

8   were doing implementations on your own?

9       A    No.

10      Q    What was the software that you were

11  implementing?

12      A    INCODE financials.

13      Q    So when you're going to these different

14  customers, you're dealing with government bodies?

15      A    Yes.

16      Q    Any -- can we be more specific than that?

17      A    Cities, small cities.

18      Q    Okay.  So let me take an example of --

19  let's just use Bonifay, Florida, for an example so

20  that you can kind of walk me through what you did.

21      I take it that at some point you would have

22  received a communication either by e-mail or

23  telephone that you would be going to Bonifay,

24  Florida, to assist with an implementation?

25      A    Correct.

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 35

1      Q      What would you be given, in terms of any

2   documents, before you go on the trip to Bonifay,

3   Florida, for the implementation?

4      A      I don't recall receiving any documents.

5   They would have just had the basic contract.

6      Q      The contract between Tyler and the city?

7      A      Uh-huh.

8      Q      Is that yes?

9      A      But I -- yes.

10     Q      What were you going to say?

11     A      I don't recall what documents I would

12  get, minimum what the implementation would include.

13     Q      Okay.  Would there be any information

14  about the -- the city's previous software systems

15  that you would need to learn?

16     A      No.

17     Q      Would there be any schedule that you

18  would need to look at that would govern the work

19  that you were to perform while you were at the

20  customer site, or was that something that was worked

21  out once you got there?

22     A      I don't recall.

23     Q      Did you ever -- while you were on one of

24  your plane flights to the customer site, like -- for

25  example, when I was flying to Denver for your

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 47

1      Q      And would you use some type of form to

2  communicate, or would you just do a narrative e-mail

3  or some other alternative?

4      A      Narrative e-mail, phone.

5      Q      Did you have different project managers

6  to whom you were assigned, or was it just one

7  person?  And I'm not talking about generally at

8  Tyler.  Did each different location have a different

9  project manager?

10     A      No.

11     Q      It was one project manager?

12     A      One project manager.

13     Q      And was it the same project manager for

14  each of these locations?

15     A      That's correct.

16     Q      And who was that?

17     A      Dyke was a contact.  And there was

18  another lady that was also a contact that was -- I

19  don't remember her name.  So they were both, like,

20  project managers, contacts there.

21     Q      Was it Darlene?

22     A      Darlene.

23     Q      Is that her name?

24     A      I don't -- I don't recall what her name

25  was.  It could have been.

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 48

1    Q      But Dyke served as a project manager?

2    A      Yes.  Or point of contact.

3    Q      But when you say you would be sending

4    narrative e-mails of the findings that came from

5    your information gathering that you testified to,

6    that would have been sent either to Dyke Ellison or

7    this woman that you mentioned?

8    A      Correct.

9    Q      Is security setup, does that mean setting

10   up the system to determine what data goes to what

11   individuals, or what does security setup mean?

12   A      No.  It actually means -- user ID.  You

13   as a user, you as a user, you as a user.  So

14   everyone has an ID.  And -- and the security sets up

15   as you have access to whatever data.  The server --

16   the server has all the data on it.  You would be

17   able to access certain portions of that accounting

18   software, but you wouldn't be able to see.  Say you

19   are human resources --

20   Q      Okay.

21   A      -- you wouldn't see financial.

22   Q      Okay.  So then what I'm -- if I'm hearing

23   you correctly and understanding you correctly, the

24   security setup aspect of this would be you talking

25   to your contact to determine what portions of the

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 49

1  database or what data would need to be provided to

2  particular persons?

3       A     Yes.

4       Q     That's what's involved in security setup?

5       A     Yes.

6       Q     And you need to know that information as

7  an implementer because you need to configure the

8  Tyler software to match their expectations?

9       A     Their -- yes.  Their -- not -- not

10 totally everything, but the security user IDs,

11 security setup, those types of things.  The

12 configuration, really.

13      Q     Right.  But at a general level, you're

14 gathering this information about user IDs, about

15 security setup, about reporting to help with the

16 configuration process and the conversion process to

17 the new Tyler software?

18      A     I didn't do the conversion.  Somebody

19 else handled the conversion.  But, yes, in setting

20 up the user IDs, identifying -- I will say cities do

21 business the same way.  They're, you know, bonds,

22 grants.  They all do business the same way.  It's

23 not, you don't go to one location and they're doing

24 something entirely different with a different set of

25 business rules.  Everybody kind of does business the

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 50

1    same way with the city and county.

2         Q      Well, at least with the respect to the

3    ones that you worked with at Tyler?

4         A      Correct.  Payroll.

5         Q      Who did the configuration if it wasn't

6    you?  Or did you say conversion?

7         A      Conversion.

8         Q      Is there -- is there a difference in your

9    mind between conversion and configuration?

10        A      Absolutely.

11        Q      Okay.  Tell me, if you can, what does

12   conversion mean in the context of the Tyler

13   software?

14        A      Conversion is converting their data.

15        Q      From the old system to the new system?

16        A      Correct.

17        Q      And that's something that you did not do?

18        A      I did not.

19        Q      Who at Tyler, while you were employed

20   there, converted -- did the conversion work?

21        A      They had a team that worked on the

22   conversion of data --

23        Q      And that --

24        A      -- so they would log on to the server.

25        Q      And that was a team that was based in

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 51

1    Lubbock?

2         A      Yes.

3         Q      Did they call it the conversion team?

4         A      I don't recall what they were called.

5         Q      Did you interact or interface with the

6    conversion team at all in terms of your functions as

7    an implementation specialist?

8         A      Well, you had to sign on or call them so

9    they could sign onto the server.  So they did their

10   own portion of that work.

11        Q      Okay.  You weren't communicating the

12   results of your information gathering in the, what

13   we've talked about, determining security setup,

14   looking at reports and user IDs, you weren't

15   communicating the information that you learned from

16   that process to the conversion team?

17        A      No.  That was all done through the

18   project manager.

19        Q      All right.  What does configuration mean?

20        A      Configuration is the setup of security,

21   user IDs, basic setup.

22        Q      Did you do that?

23        A      Yes.

24        Q      That was part of your implementation

25   functions?

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 52

1       A       (Nodded head.)

2       Q       Is that yes?

3       A       Configuration, yes.

4       Q       Would you do any configuration typically

5  during that first week while you were at the client

6  site, or would that come later?

7       A       That was usually done in the very

8  beginning.

9       Q       So during that first week?

10      A       The first week everybody was set up with

11  access to the database because at that point they

12  weren't live.

13      Q       Right.

14      A       It was just...

15      Q       Well, the setup, the security setups and

16  the user IDs, that had to be established in the new

17  software, correct?

18      A       Correct.

19      Q       And that's what configuration is?

20      A       That's correct.

21      Q       And you -- part of your work as

22  implementation specialist was to do that

23  configuration?

24      A       Work with the customer to do that.  The

25  customer was -- you want to make the customer have

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 53

1    ownership of the software as quickly as possible.

2    So we didn't do anything alone.  The customer was

3    involved in everything we did.

4        Q    So when you're doing the configuration,

5    you're involving the customer in terms of getting

6    the customer's input as to how they want the system

7    configured?

8        A    Yes.

9        Q    And, again, this is that contact person?

10       A    Yes.

11       Q    And so does this dialogue occur during

12   this first week that you are at the customer site?

13       A    Yes.

14       Q    And this is obviously before you go live?

15       A    Yes.

16       Q    And I take it that the go-live process

17   doesn't occur during the first week?

18       A    No.

19       Q    How -- I'll ask it this way:  How long

20   did the configuration process take place at the

21   Bonifay, Florida, implementation?

22       A    We were there a week.

23       Q    And did it take you a week to do the

24   configuration?

25       A    Yes.

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 54

1      Q      And does the configuration aspect of the

2  implementation that took a week in Bonifay, Florida,

3  involve you having discussions, I take it, with your

4  contact person?

5      A      Yes.

6      Q      To learn what the customer's preferences

7  are with respect to system setup?

8      A      Yes.

9      Q      And are you also learning -- are you also

10  advising the customer during that dialogue about

11  what Tyler software can do?

12      A      No.

13      Q      This doesn't come into play at all?

14      A      No.

15      Q      And this one-week period to do the

16  configuration, is that representative of other

17  implementations that you -- that you did?

18      A      Yes.

19      Q      Were you ever on the work site of the

20  customer after hours?

21      A      Yes.

22      Q      What would you be doing after hours?

23      A      Working with customer.  The customer

24  always had to be there, obviously.  Their door is

25  locked after a certain time, so the customer was

367 VALLEY AVENUE
(205) 397-2397   BIRMINGHAM, ALABAMA 35209   877-373-3660

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 55

1    there.

2         Q      So just some of the configuration

3    functions that you described was after the customer

4    had locked the doors?

5         A      Yes.  They still had to carry on their

6    day-to-day work.

7         Q      Sure.  Which meant that they didn't

8    always have time for you to do -- to work with you,

9    I take it?

10        A      Well, I would sit with them and observe

11   what they were doing.

12        Q      During this dialogue related to

13   configuration, would the customer ever ask you

14   questions about different options that they might

15   have with respect to security setups or anything

16   like that?

17        A      No.  They're the ones that identified

18   what their security was going to be.  I wasn't there

19   to give them advice.

20        Q      What about with respect to the reporting

21   functions of the software?  Did they ever ask

22   questions about what Tyler software could do with

23   respect to what types of reports it could generate?

24   Was your function explaining any of that process?

25        A      Whoever had completed the sale actually

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 56

1    showed -- probably showed them a demo.  I wasn't

2    involved in that.  So they had -- they knew most of

3    that going into the -- when they purchased the

4    software.

5         Q     But did they ever ask -- did the customer

6    ever ask you questions about different types of

7    reports that the Tyler system might be able to run

8    that may have been different from the systems that

9    they generated under their previous software?

10        A     No, no.

11        Q     Why was it important for you to -- you

12   told me that one of the things that you did to

13   prepare for these meetings was to review the manuals

14   that we talked about.  Why was that important for

15   you to know that?

16        A     Just the applications themselves.

17        Q     Yes.  Why?  What about -- what part of

18   your job while you were at the customer site

19   required you to know the contents of the manuals and

20   the specifications of the software that Tyler was

21   providing?

22        A     It didn't have specifications.  It was

23   just screen shots of the application itself.

24        Q     And -- okay.  Why was it important for

25   you to know the screen shots of the application

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 57

1    itself in connection with a function that you were

2    performing?

3         A    Just to familiarize myself.  We did

4    after -- after hours, we always prepared for the

5    next day.  We had the software on our computer.  We

6    did -- went over --

7         Q    The Tyler software?

8         A    -- went over what we were doing, just to

9    prepare for the next day, like you probably would.

10        Q    What type of training did you perform

11   during this first week?  Again, using Bonifay as an

12   example, but more asking about the typical process.

13        A    Training the first week?

14        Q    Yeah.  Did you do any training?

15        A    The customer was involved from the very

16   beginning of -- of your point -- your first contact

17   there, the customer was involved, which is training

18   the customer.

19        Q    Okay.  Was there any part of this first

20   week's activity that involved sitting down with

21   users and explaining to them how to work with the

22   Tyler software?

23        A    No.  Other than setting up the user IDs,

24   that type of thing.  So, in fact, when you're

25   showing them how to do that, that is training.

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 58

1      Q      And the person that you're showing how to

2  do that is the contact person?

3      A      Would be the contact person.  Or let's

4  say there is a payroll person, that is your contact.

5  Whoever that contact is is who you're sitting down

6  with talking to.

7      Q      And how about -- let's take an example

8  of, one of the things that Tyler software does is to

9  run payroll reports, right?

10     A      The customer runs those.

11     Q      Right.  But the software, they run it

12  with the software?

13     A      Sure, yes.

14     Q      Okay.  And that's -- that's one of the

15  functionalities of the software, is to do the

16  company's payroll?

17     A      Correct.

18     Q      The customer's payroll, correct?

19     A      Correct.

20     Q      Okay.  Did you ever do any training, in

21  the sense of here's how the Tyler software works

22  with respect to, for example, payroll; here's the

23  types of reports you can run; here's the types of

24  functionalities that the software has.  And, you

25  know, sitting with a user, explaining to them how to

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 59

1    use the software.  Is that -- was that something you

2    did or something that someone else did or do you

3    know?

4         A      Not the first week, no.

5         Q      That was something that was done by you

6    later on?

7         A      Later on, that was part of the training.

8         Q      Right.  And the training that you're

9    talking about that went on during the first week was

10   the customer interaction and explaining to the

11   customers the different security setups and working

12   with the customer in that sense.

13        A      The security setups that they gave you,

14   yes.

15        Q      That the customer gave you?

16        A      Yes.

17        Q      So that's -- I just want to make sure

18   that you're comfortable with a distinction between

19   that type of training versus showing someone how to

20   use the software.

21        A      I didn't show them.  They -- they were

22   involved.  We didn't show them how to use it.  We

23   let them -- told them -- walked them through it, you

24   know, so they would have ownership of it, know how

25   to use it.

367 VALLEY AVENUE
(205) 397-2397   BIRMINGHAM, ALABAMA 35209   877-373-3660

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 60

1     Q     But in terms of showing users that may be

2   different from this first contact person that you

3   dealt with different functionalities associated with

4   different software, either one or one or in a

5   classroom, is that something that you did --

6     A     We're not -- one on one.

7     Q     Okay --

8     A     One on one.

9     Q     -- and you did that later on, not

10  necessarily during the first week?

11    A     Not during the first week, no.

12          MR. McKEEBY:  Okay.  Let's take a short

13  break.

14          (Recess from 9:35 a.m. to 9:44 a.m.)

15    Q     (By Mr. McKeeby)  All right.  Ms. Mutch,

16  I want to come back to some of the topics we were

17  talking about before the break.

18    With respect to configuration as a process

19  generally, you talked about setting up user IDs and

20  doing security setups as, as I understood it,

21  examples of some of the things that you did when

22  you're in the configuration process; is that

23  correct?

24    A     That's correct.

25    Q     Is there -- there's other elements of

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 71

1      Any other ways that you would communicate this

2  information to the project manager, other than

3  telephone?

4      A     No.  Is there any other way?

5      Q     I don't know.  Maybe there's a different

6  form or some type of form.  That's all I can think

7  of.  But there was no other form?

8      A     No.

9      Q     Okay.  So when you would -- after that

10  first week with the customer, would you -- would

11  there be a schedule in place such that you would

12  know you would have to come back in a certain amount

13  of time?

14      A     Yes.

15      Q     And would you know what that certain

16  amount of time would be, or would that be set up at

17  some later time?

18      A     That would be a schedule that was

19  communicated by Tyler because they set up the

20  flights, set up the time, time for you to go back.

21      Q     So when you're on your plane from Florida

22  to Denver returning from the Bona -- what is it?

23      A     Bonifay.

24      Q     Bonifay implementation, do you know,

25  okay, I know I'm going to have to come back here in

FREEDOM COURT REPORTING

Page 72

1    two weeks?  Or do you just know you're going to have

2    to come back, and you'll be told when you're going

3    to have to come back?

4        A    It was usually two to three weeks.  I

5    mean, you kind of had an idea.

6        Q    Okay.  Nothing had been scheduled firm at

7    that point?

8        A    No.

9        Q    Okay.  And --

10       A    I don't believe so.  It -- it might have

11   been.

12       Q    Okay.

13       A    I don't remember.

14       Q    All right.  At some point, you would go

15   back?

16       A    Yes.

17       Q    And you would be told when to go back?

18       A    Yes.

19       Q    And this would be for the second week of

20   the implementation that you were involved in?

21       A    Yes.

22       Q    And this second week, I take it, involved

23   training?

24       A    Uh-huh.

25       Q    Is that yes?

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 73

1        A      Yes.

2        Q      And this is the one-on-one training that

3    we talked about?

4        A      Yes.

5        Q      And it would also involve the go-live

6    process?

7        A      Yes.

8        Q      Would it involve additional configuration

9    that would come up?

10       A      Not typically.

11       Q      Okay.  That's because the configuration

12   work had been performed during that first week?

13       A      Correct.

14       Q      Okay.  So other than training and

15   assisting with go-live, any other discrete

16   categories of your function as an implementation

17   specialist you can assign to this second week when

18   you would return to the customer site?

19       A      Well, depending on how much information

20   that they needed to bring over.  If they were doing

21   a year, sometimes it meant helping them, showing

22   them how to enter the data, helping them with that

23   process.  So you might actually be entering -- you

24   might both be entering in data at the same time for

25   the same, let's say, accounts payable, whatever.  So

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 74

1    you show them how to do it, make sure they

2    understand that.  And then you're helping do that

3    process along with them.

4         Q     Okay.  Is that function discrete from the

5    one-on-one training that you described?

6         A     Yes.

7         Q     How so?

8         A     It is training in the fact that you show

9    them how to do it.  But depending on if they're

10   bringing over a year's worth of data, you want to

11   make sure that the data is all there, that you've

12   entered everything.

13        Q     So you're just confirming that the

14   conversion has been done correctly?

15        A     In that process, some of it includes

16   depending on how much information they need to bring

17   over.  But the current year, yes, you want to make

18   sure that the data is brought over correctly.  So

19   some -- many times it's entry work, just helping

20   them with their entry work to move that process

21   along a little bit quicker.

22        Q     And how do you know whether or not data

23   was brought over correctly?

24        A     Well, if you're doing the entry, you're

25   actually entering in the data from -- from, like,

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 75

1   the -- you can do in-total, or you can do line by

2   line, whatever the customer would like to do.

3        Q    Right.  But how do you know if there's

4   been a problem with the conversion?  What is it that

5   you're seeing on the system to alert you that

6   something hadn't been converted properly, if that's

7   what we're talking about?

8        A    Well, it's -- it's two different things.

9   If you are -- if they're not bringing over any

10  history, they're only doing, like, ending balances,

11  then you would do the entry work.  They would be

12  doing entry work on, say, their customers; payroll

13  entry; you know, detail; the balances from the

14  previous year for their, you know, 1099s, or

15  whatever, or W-2s.

16       Q    I don't think you're answering my

17  question.  My question is:  One of the things that,

18  at least as I understand your testimony, that you

19  would do during this second week would be to assist

20  with entering data and making any corrections that

21  were the result of any conversion problem.

22       Do I have it wrong about this last step, that

23  you're not -- that corrections weren't a result of

24  the conversion problem?

25       A    No, no.

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 83

1      A      Yes.

2      Q      And that's a different checklist than

3   we've talked about today?

4      A      Same.  I mean, same checklist.

5      Q      And so your testimony is that you used

6   that checklist and talked to the client and set out

7   a time line for that week's activities?

8      A      Yes.

9      Q      And does -- is it typical for the

10  customer to go live during that second week, or is

11  that something that happens later?

12     A      It happens the third week.

13     Q      Are you there when it happens the third

14  week?

15     A      Yes.

16     Q      Okay.  Does that mean you typically stay

17  that weekend at the location, or do you fly back and

18  forth?

19     A      It was easier for me to stay that

20  weekend.

21     Q      And so that's what you did?

22     A      Yes.

23     Q      So this time line or schedule that is the

24  result of your meeting with the contact, I take it

25  that has times for you to meet with different

367 VALLEY AVENUE
(205) 397-2397   BIRMINGHAM, ALABAMA 35209   877-373-3660

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 84

1    personnel?

2         A     Yes.

3         Q     What else does it have in terms of

4    outline of what you're going to be doing that week?

5    Meetings with different personnel is one.  What are

6    other elements of that -- of that schedule or time

7    line?

8         A     Getting their chart of accounts set up,

9    helping with -- for example, if it was payroll,

10   helping them with the -- you know, the payroll

11   setup, just trying to get everything set up so when

12   they did go live, everything would be ready to go.

13        Q     And that's on this time line, or...

14        A     Yeah.  The second week.  And that gives

15   you time to -- if there are any problems or any

16   issues with anything, to move forward with, you

17   know, any -- any problems that they had or that you

18   may, you know, anticipate, or...

19        Q     The -- let me just kind of give a -- get

20   a preview of the third week.  The third week is the

21   week in which they go live?

22        A     Yes.

23        Q     And do they go live typically at the

24   beginning of the week, at the end of the week, or

25   any particular period of time?

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 85

1      A      We try to -- it's usually, you know, at

2    the end of the week.  Because that third week, we

3    try to let them run parallel payroll, do some

4    parallel functions to make sure everything is

5    correct.

6      Q      And do you monitor those functions?

7      A      Yes.

8      Q      And when you say to ensure everything is

9    correct, what does that mean?

10     A      The reporting, the payroll.  If they're

11   doing a parallel payroll, you look at the payroll

12   that they did in the old system, the payroll they

13   did in the new system, if there's any discrepancies,

14   then you have -- definitely have a problem.  You

15   need -- something -- either a code isn't coming over

16   correctly or is not set up correctly.  So just those

17   type of things.

18     Q      What would you do if there was such a

19   discrepancy?

20     A      You try to help them figure out what the

21   problem is.  It's usually something that hasn't been

22   entered quite right or a pay code not -- not

23   entered.

24     Q      And would that have been something that

25   the conversion team had done incorrectly?

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 86

1    A    Typically, no.

2    Q    Okay.

3    A    It might be something that they forgot to

4    communicate, or...

5    Q    In any event, it's, at a general level,

6    without saying who's fault it was, it wasn't --

7    A    Absolutely.

8    Q    -- it's a -- it's a problem with the

9    conversion, though?

10   A    Yes.

11   Q    So as of that third week while you're

12   there, the conversion had been completed?

13   A    Yes.

14   Q    At least initially before you discovered

15   any problems that required additional conversion?

16   A    Yes.

17   Q    All right.  Let me go back to week two.

18   A    Okay.

19   Q    That was my preview for week three.  The

20   setting up times to meet with different personnel, I

21   take it this is the one-on-one training that you

22   talked about before we broke?

23   A    Yes.

24   Q    And how do you determine how much

25   training to provide a particular employee?  Is there

367 VALLEY AVENUE
(205) 397-2397   BIRMINGHAM, ALABAMA 35209   877-373-3660

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 102

1    should be, like, the last thing you do.

2          Q      Okay.  And what did you do in that

3    example that you're thinking of when -- when the

4    pooled cash wasn't properly set up?

5          A      Then you had to get the project manager

6    involved to help with that.

7          Q      And what, in terms of what you did, did

8    getting the project manager involved entail?

9          A      A phone call.

10         Q      Okay.  So you would explain the problem

11   to the project manager, and they would do whatever

12   they needed to do to try to resolve it?

13         A      Uh-huh, yes.

14         Q      And then would there -- they run the

15   software again and you would monitor it to make sure

16   the problem had been corrected?

17         A      That's correct.

18         Q      How many days did you spend at the

19   customer's facility after they had gone live,

20   typically?

21         A      Provided everything went great, you could

22   leave on Friday.  If there was some other problems,

23   you may be there over the weekend, you know, trying

24   to get that resolved --

25         Q      Anything --

**EXHIBIT 25**

FREEDOM COURT REPORTING

Page 103

1     A     -- maybe the following week.

2     Q     So -- but -- okay.  When the customer --

3   maybe it's not a question you can answer.  But would

4   the customer typically go live on like a Thursday,

5   or was there a particular day, or did it just

6   depend?

7     A     It would just depend.

8     Q     And the amount of time you would have to

9   spend after the customer went live also would depend

10  on how many problems the customer was encountering?

11    A     Yes.

12    Q     Did you provide any support to the

13  customer after you had left the facility and moved

14  on to your next implementation, or did you transfer

15  them to the support team?

16    A     If they had any questions, they knew that

17  they could call us.  We set them up with, you know,

18  right away saying, if it's anything major, they

19  would have to contact the support team.  But we

20  tried to give them as much support as possible

21  after, you know, after the go-live date --

22    Q     Was there --

23    A     -- for a certain extent.

24    Q     Was there a particular period of time in

25  which they could call you?

FREEDOM COURT REPORTING

Page 104

1      A      No, not really.  I mean -- and during

2   those first couple of weeks, two or three weeks in

3   between times, you know, some of the customers would

4   have a question, and they felt comfortable calling

5   us and asking us.

6      Q      And when you say "us," you mean...

7      A      Well, me or whoever was doing their

8   implementation, yes.

9      Q      Okay.  But you would get calls after you

10  had left, after the customer had gone live, about,

11  you know, particular issues that would come up?

12     A      Yes.

13     Q      And that would be when you were on the

14  site of a different implementation?

15     A      Yes.

16     Q      Have --

17            MR. McKEEBY:  -- I'm going to show her

18  this document.

19     Q      (By Mr. McKeeby)  This is a document that

20  I'll represent to you the company produced in the

21  case that -- in the lawsuit -- that I understand to

22  have entries for your times during your employment?

23     A      Yes.

24     Q      Let me ask you, first:  Have you ever

25  seen a document like this?

**EXHIBIT 25**

1    implementation specialists whose names you can't

2    remember?

3         A    That's correct.  John-somebody and

4    Gary-somebody.

5         Q    Okay.  That at least gives us a first

6    name.  Let me ask you about how you recorded your

7    time while you were first in the shadowing capacity

8    that we discussed.

9         A    I didn't record my time.

10        Q    At any point during your employment with

11   Tyler Technologies?

12        A    No.

13        Q    Let me ask you that in a different way,

14   because we got kind of a double-negative.

15        At any point in time -- did you, at any point

16   in time during your employment with Tyler

17   Technologies, record your time?

18        A    No.

19        Q    And when I'm using the term "record your

20   time," I'm using that term, or intending to use that

21   term, fairly broadly, in the sense of did you enter

22   the amount of hours that you worked into a computer

23   program?  Did you enter it into some type of form?

24   Anything like that to record particular time spent

25   on particular functions, travel time, for example,

```
 1   or anything like that?

 2        A     Not that I recall.

 3        Q     Do you know if, independent from anything

 4   that you did, whether or not the company did

 5   anything to track your time?

 6        A     No.  I don't know.

 7        Q     And from that, I'll take it you never saw

 8   any time reports or anything, time sheets, or

 9   anything like that where it would attribute

10   particular numbers of hours to work that you

11   performed?

12        A     No.

13        Q     Were you ever required to give anything

14   like that to any of the customers at Tyler that you

15   visited?

16        A     No.

17        Q     Did you have any concept during your

18   employment at Tyler as to whether or not certain

19   functions that you performed at Tyler were

20   billable -- was billable time as opposed to

21   non-billable time?

22        A     When I was at Tyler Technologies, it was

23   non-billable.  When I was at a client, it was

24   billable to the client.

25        Q     So by that you mean when you were on site
```

**EXHIBIT 25**

```
 1    at the client, you had an understanding that your

 2    time at the client was billable to the client?

 3         A      Correct.

 4         Q      Did you have an understanding of how

 5    Tyler billed your time to the client, in the sense

 6    of how did Tyler know how much time to bill a

 7    particular client, or is that something that just

 8    wasn't used?

 9         A      I -- I don't recall.

10         Q      Did you keep any personal documents like

11    a journal, a Day-Timer, a calendar, or anything like

12    that that would record the number of hours that you

13    worked while you were employed at Tyler?

14         A      I did have a Day-Timer.

15         Q      And I take it by your verb tense that you

16    no longer have the Day-Timer?

17         A      I would doubt it.

18         Q      Have you looked for it?

19         A      No.

20         Q      So it's possible that you still have it?

21         A      Possible, not probable.

22         Q      What type of entries did you have in your

23    Day-Timer as to your services with Tyler?

24         A      Hours spent at the client.

25         Q      And what was your purpose in recording
```

**EXHIBIT 25**