Russell Steele - 4/9/10

1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE EASTERN DISTRICT OF TEXAS
2  MARSHALL DIVISION

3

PATTY BEALL, MATTHEW      )
4  MAXWELL, TALINA MCELHANY )
   AND KELLY HAMPTON,        )
5  individually and on behalf)
   of all other similarly    )
6  situated;                 )
                             )
7     Plaintiffs,            )
                             )
8  vs.                       )   2:08-cv-422 TJW
                             )
9  TYLER TECHNOLOGIES, INC.  )
   AND EDP ENTERPRISES, INC. )
10                           )
    Defendants.       )
11  **********************************

12  ORAL DEPOSITION OF

13  RUSSELL STEELE

14  APRIL 9, 2010

15  **********************************

16  ORAL DEPOSITION OF RUSSELL STEELE, produced as a

17  witness at the instance of the Defendants and duly

18  sworn, was taken in the above-styled and -numbered cause

19  on the 9th day of April, 2010, from 9:17 a.m. to

20  12:35 p.m., before Brenda Fleming, CSR in and for the

21  State of Texas, reported by machine shorthand at the

22  offices of Morgan, Lewis, & Bockius, LLP, 1717 Main

23  Street, Suite 3200, Dallas, Texas  75201-7347, pursuant

24  to the Federal Rules of Civil Procedure and the

25  provisions stated on the record.

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 26**

Russell Steele - 4/9/10

2

1              A P P E A R A N C E S

2    FOR THE DEFENDANTS:

3       Ms. Farin Khosravi
        MORGAN, LEWIS & BOCKIUS, LLP
4       1717 Main Street
        Suite 3200
5       Dallas, Texas  75201-7347
        (214) 466-4146 (telephone)
6       (214) 466-4001 (facsimile)

7    FOR THE PLAINTIFFS:

8       Ms. Laureen F. Bagley
        SLOAN, BAGLEY, HATCHER & PERRY
9       101 East Whaley Street
        Longview, Texas  75606
10      (903) 757-7000 (telephone)
        (903) 757-7574 (facsimile)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 26

Russell Steele - 4/9/10

3

1                    I N D E X

2                         PAGE

3   Appearances .......................2

4   RUSSELL STEELE

5   Examination by Ms. Khosravi ....................4
    Examination by Ms. Bagley ....................159
6   Further Examination by Ms. Khosravi ............165
    Changes and Signature Page  ....................170
7   Reporter's Certification ........................172

8

9

10

11

12                    EXHIBITS

13

14   EXHIBIT NO.        DESCRIPTION           PAGE

15   1        Consent to opt in signed by        11
             Russell Steele on 9-23-09
16
     2        Résumé of Rusty E. Steele          24
17

18

19

20

21

22

23

24

25

**EXHIBIT 26**

Russell Steele - 4/9/10

44

1  computer monitor and everything set up there, or would

2  you pull up yours?

3      A.  No.  They would have their own.

4      Q.  So INCODE is actually on their machine,

5  correct?

6      A.  That's correct.

7      Q.  So then you would sit with them next to their

8  computer and train them on INCODE, correct?

9      A.  That's correct.

10     Q.  Okay.  So that's what I'm trying to understand.

11  So now I'm with you up to that point.  From there how

12  did you decide what to train them with?  How did you

13  know -- say, Farin, me, I'm one of the city employees

14  court employees, and you are here to train me today.

15  How do you get started?  Do you need to find out what I

16  know, what I don't know?  How do you determine what to

17  train me on?

18     A.  Prior use of the software of my experience with

19  the city -- because I used INCODE with the court --

20  actually allowed me to tell them:  You have an

21  administrative side.  The administrative side controls,

22  say, the fee tables, what you're going to charge on the

23  citation, what you're going to -- what offenses are you

24  going to write within -- you know, the State of Texas

25  has a specific list of things that they actually tell

**EXHIBIT 26**

Russell Steele - 4/9/10

45

1    you, you can write tickets for, for moving violations.

2    The city also has ordinances that they write tickets

3    for, that if you violate those city ordinances.

4        Q.  Did you have to know those?  I don't know

5    those.  Did you have to know those in order to do this

6    training?

7            MS. BAGLEY:  Object to form.

8        A.  I didn't have to know those, no.

9        Q.  Okay.  So that didn't matter.  All you were

10   doing was training them on -- then what were you

11   training them on?

12           MS. BAGLEY:  Object to the form of the

13   question.

14       A.  I was training them on the use of the software:

15   Where they would enter a ticket, the different fields

16   that they have for the different -- the citation would

17   have fields on it that the officer had written in.

18       Q.  Date, name?

19       A.  Date, name, offense, whatever it might be.  You

20   transferred that into the INCODE system in the fields

21   they provided.

22       Q.  So would the person you are training be sitting

23   there with an actual paper ticket incorporating that

24   data onto software?

25       A.  Yes.

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 26**

Russell Steele - 4/9/10

46

1    Q.   So you're training them on how to incorporate

2  the information on the actual paper copy of the ticket

3  into the various fields in the INCODE software?

4    A.   Right.

5    Q.   That's what you were training them on?

6    A.   Yes.

7    Q.   So you would tell them, for the date, you need

8  to go to this portion of the database and enter it there

9  and then press enter?  Is that -- again, I'm trying to

10  understand.

11    A.   The fields were similarly in the same place.

12  If it pertained to a person's appearance -- brown eyes,

13  brown hair, whatever it might be -- those fields are on

14  the same page.  And they coordinate, you know, kind of

15  in the same place on the ticket.  So they're not on

16  different screens, but they're within the same place.

17    Q.   In this example of teaching them how to

18  incorporate the information from the various fields on

19  the paper copy of the ticket into the electronic fields

20  on the INCODE software, how long did that take you to

21  do, to train them on that particular aspect of the

22  software?

23    A.   On that particular?  It was ongoing throughout

24  the week, because they would forget or they would need

25  additional training.  That one lasted all week.  Just,

**EXHIBIT 26**

Russell Steele - 4/9/10

47

1   how do you do this again?  How do you do that again?

2       Q.   So other than this particular type of training

3   that you described for me, what else would you train

4   them on?  So that was one, one type of training.

5       A.   Citation issuance -- or not citation issuance.

6   Citation entry, warrant issuance.  And basically if you

7   didn't do something with your citation, you were issued

8   a warrant for failure to appear before the judge.  That

9   process, I trained them on that.

10      Q.   Was that, again, how to enter the information

11  from a paper document onto the software?

12      A.   No.

13      Q.   No?

14      A.   No.

15      Q.   What was that then?  What did that entail?  So

16  that was different from the first one you described for

17  me?

18      A.   Yeah.  The citation, you have a paper document

19  in your hand.  In the State of Texas all the court

20  clerks knew that the State of Texas had a special -- had

21  a way of actually processing the warrants.  So you

22  understood by what the state gave you as to what you

23  needed to do in order to issue warrants and why you

24  needed to issue warrants for those citations.  All the

25  court clerks knew that, or they were supposed to know

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 26**

Russell Steele - 4/9/10

48

1    that.

2       Q.   Okay.

3       A.   So when it would come time for me to know -- or

4    for me to train them on the issuance of those warrants,

5    I would ask them:  How do you issue warrants?  What is

6    your procedures on issuing warrants?  This is what the

7    software does.  What do you do?

8       Q.   What if the two didn't match, if the two

9    criteria -- if her criteria didn't match what the

10   software was set up for?

11      A.   Then they try to figure out -- you know, I just

12   told them, This is what the software's designed to do.

13   If you are not following this, then you may discuss this

14   with your finance director and find out why.  Maybe

15   you're not -- maybe there's something you're doing that

16   the state's not doing.  I would refer them back to the

17   state's procedures.

18      Q.   Just to make sure I'm understanding

19   correctly -- and you may actually interrupt me if I'm

20   not saying it correctly so you can clarify.

21           INCODE was designed pursuant to certain

22   state laws to do something with respect to the warrant

23   issuance?  And when you are talking to the clerk telling

24   them that the warrants will be issued based on INCODE

25   using these criterias, the person you are training might

**EXHIBIT 26**

Russell Steele - 4/9/10

49

1    say, Well, that's not how I do them.

2            Was that typically because the laws were

3    different?  Why would there be that discrepancy?

4            MS. BAGLEY:  Object to the form.

5        A.   The developers of INCODE, they do their thing

6    on how they actually get the information from the State

7    of Texas, you know, how they -- how they wrap their

8    software around what the State of Texas --

9        Q.   Requires?

10       A.   -- requires.  So that's basically -- and it was

11   all set up before.  I didn't tell the developers or

12   anybody anything on how to do their job, because by the

13   time I started training on it, it was already to a point

14   to where those are the fields that the state -- it was

15   never an issue.

16       Q.   It was a live system?  It was up and running by

17   the time you got there?

18           MS. BAGLEY:  Object to the form.

19       A.   It was a training system by the time I got

20   there.  It was installed.  There was data that we

21   entered manually, normally, like citations.  And then we

22   played with the citations.  And then the project

23   manager, or somebody on that side, would take the system

24   live.

25       Q.   So you were doing the training before the

**EXHIBIT 26**

Russell Steele - 4/9/10

52

1   There really wasn't any kind of agenda.  We just went

2   and trained.  You know, we started off with the -- not

3   the database, but the -- we started off with entering

4   citations, which was the most common thing on a

5   day-to-day operations.  And then you moved on from

6   there, the life of a citation to the process.

7       Q.   So I'm understanding this correctly, there

8   wasn't an actual document with you where you were

9   sitting there looking at it going:  Number one, I need

10   to teach her how to enter citations.  Okay.

11          It didn't work that way?

12          MS. BAGLEY:  Object to form.

13      A.   Not that I recall.  I don't remember doing

14   anything like that.

15      Q.   Because that's my question to you.  I'm trying

16   to figure out how is it that you knew how to train them.

17   You didn't have a document that you had prepared prior

18   to your trip up there?

19      A.   Right.

20      Q.   You didn't prepare anything that prepared you

21   for the actual training?  It was all in your head?

22      A.   Yes.

23      Q.   And when you got there with the personnel,

24   again, you didn't have a document, an agenda, item

25   numbers 1 through 10, going across and checking those

**EXHIBIT 26**

Russell Steele - 4/9/10

53

1   off; or did you?

2      A.   I don't recall.

3      Q.   Now, when you were teaching them as to how to

4   enter the citations, did you have a document with you

5   that you would flip through and read in order to try to

6   train them?  Or, again, it was all your knowledge that

7   you were training them on?

8      A.   Right.  Previous experience with the software.

9   There was nothing that I had that marked everything off.

10     Q.   I understand now.

11          And what if they asked you questions, did

12  you just -- during your training was this an interactive

13  process, where if they asked you questions, you would

14  then work through it with them?

15     A.   Yes.  I would tell them what the software is

16  designed to do.  And if they asked me any legal

17  questions as of what is it supposed to be, I would refer

18  them back to their city attorney or their city finance

19  director, whoever it might be.

20     Q.   And, again, when they are asking you questions,

21  they're interrupting you.  Let's say you are showing

22  them how to enter a citation.  And they go, Oh, Rusty,

23  wait, but I don't know how, you know, X, Y, and Z will

24  play out.

25          You would then show them right then and

**EXHIBIT 26**

Russell Steele - 4/9/10

54

1   there to answer their question, or no?  Would you go

2   grab a document and turn to the page that said, If they

3   ask this, then this is the answer you give?

4      A.   No, there was no document.  It was just, we

5   would go ahead, and if they had a question about the

6   software, we would -- I would tell them, This is how you

7   do it.

8      Q.   And this was based on your knowledge having

9   worked with the software previously?

10     A.   That's correct.

11        MS. BAGLEY:  Object to the form.

12     Q.   I think I'm understanding now.

13        So that was initially when you went on

14  board with INCODE.  And you said your position was a

15  trainer?

16     A.   I'm trying to remember exactly what my title

17  was.

18     Q.   And I don't care about the title.

19  Functionality-wise, is that what you did, you trained?

20     A.   Yes.

21     Q.   Did it change in any way after that?

22     A.   The title changed.  The position -- the

23  functionality did not.

24     Q.   Okay.  So your title changed.  It became

25  something else.  Do you remember what your title became?

**EXHIBIT 26**

Russell Steele - 4/9/10

92

1          THE WITNESS:  Okay.

2          MS. BAGLEY:  Almost, well, two hours.

3          (Break from 10:54 to 11:06)

4     Q.   (By Ms. Khosravi)  Rusty, I want to make sure

5    you realize that you are still under oath even though we

6    took a break.

7     A.   Yes.

8     Q.   Since we took a break, do you have any changes

9    to any of the answers that you've given previously that

10   you need to make?

11    A.   One of the things I didn't clarify on was, that

12   I can remember, in the applications that I actually did,

13   that I actually trained on -- the miscellaneous

14   applications, the court application -- those

15   applications rarely had a conversion with them.

16   Sometimes they had a conversion.

17    Q.   I have no idea what that means, Rusty.

18    A.   A conversion?

19    Q.   Uh-huh.

20    A.   You are converting from the previous software

21   that the city had to the INCODE software.  So you are

22   taking data from one software, and you are trying to

23   convert it to the fields of the INCODE software.

24    Q.   You are saying you did have input with

25   conversion of data, or you did not?

**EXHIBIT 26**

Russell Steele - 4/9/10

93

1    A.   I would verify data with the conversions.  If

2   there was a conversion, I would verify.  When I would be

3   on site, when I would go onto the city's site, I would

4   have my contact point.  And if there was a conversion

5   that was involved, then I would say, Well, here's the

6   data.  This is what we converted.  We need to look it

7   over and make sure it looks okay to you.

8    Q.   So you had -- in this situation you would have

9   converted data to the new software?

10    A.   I didn't do the conversion.

11    Q.   Yeah.  Who would have?

12    A.   I guess the developers.  The project manager

13   would actually obviously take ahold of all that and tell

14   the developer, We're doing a conversion.  And then the

15   developer does -- I don't know what they do as far as

16   the conversion.  But I would get on site on Monday, or

17   whenever it was, and any conversion that had taken

18   place, I would verify the data with the city personnel.

19    Q.   So somebody at Tyler would say, Rusty, we did a

20   conversion.  And so you knew a conversion of documents

21   had taken place?

22    A.   A conversion of data had taken place, yes.

23    Q.   Of data.  Excuse me.

24    A.   That's correct.

25    Q.   So when you got on site, you would review the

**EXHIBIT 26**

Russell Steele - 4/9/10

94

1    data to make sure it was converted correctly into

2    INCODE?

3       A.   Yes.

4       Q.   What does that process entail?

5       A.   I'll give you an example.  We had -- let's say,

6    if it was accounts receivable.  There are customers that

7    obtain or are billed for, you know, for the city mowing

8    their yard or what have you.  They owe the money to the

9    city for some reason, some service that the city

10   provided.  And now the city is trying to collect it.

11   You are trying to receive that debt.

12            If there was a conversion involved, then

13   the customer's name, the customer's mailing address, the

14   city, state, ZIP codes were in certain fields in the old

15   software.  Therefore, when they convert, they need to be

16   in the same fields in the new software.

17            And I would review that data with the

18   customer.

19      Q.   Would you do it when you were there for

20   training?

21      A.   Yes.

22      Q.   Okay.  Go on.

23      A.   Verifying conversion data would happen first

24   before you ever started doing training.  And once you

25   got to a point to where you thought the conversion was

**EXHIBIT 26**

Russell Steele - 4/9/10

95

1    okay and the data is okay and basically the customer

2    signed off on it, then you went ahead and did your

3    training.

4       Q.   Let me interrupt one second.

5            How long did this reviewing of conversion

6    take place?  Because in my mind, this is what I'm

7    imagining, because I don't know anything about this

8    conversion process.  I'm imagining you would have to

9    click on every invoice or every -- you are talking about

10   weeds, for example, being high.  Let's see.

11           Would you be going through every invoice

12   and document that is on the system to verify all those

13   information is correct?

14      A.   No.

15      Q.   How is it done?

16      A.   You took a random sampling --

17      Q.   Sampling?

18      A.   -- of some of the customers.

19      Q.   And how did that happen?  Is there a computer

20   statistical program that does that?

21      A.   No.

22      Q.   How did you take a random sample?

23      A.   You would take maybe a customer that the city

24   employee is familiar with, maybe they always mow their

25   yard.  Maybe --

**EXHIBIT 26**

Russell Steele - 4/9/10

96

1    Q.   So you would ask the personnel to suggest --

2    A.   Right.

3    Q.   -- which ones to look at?

4         MS. BAGLEY:  Object to the form.

5         Let him finish his answer.

6    A.   So you would ask the city personnel:  Do you

7    know of somebody who is always getting a citation for

8    high grass and weeds?  And you know that this is a good

9    mailing address for them and you know them maybe on a

10   personal level or you know them enough that you know

11   what their data should be or what their address

12   information should be.

13        I would ask them to get that

14   information -- or look at this particular customer.  And

15   they would tell me yea or nay, that it looks like it's

16   correct, the fields are on the correct place.

17        And that's what I mean by verifying with

18   the customer the data.

19   Q.   And how many of these samples would you take

20   randomly?

21   A.   That depends on how big the conversion was.  If

22   it's a really big customer, you might take a little bit

23   more customers, just to make sure you have a good

24   sampling of it.  It just depends.  Kind of a judgment

25   call on the city employee's part of how many they think

**EXHIBIT 26**

Russell Steele - 4/9/10

97

1   they need to look at before they go on.

2       Q.   Would you say five, six, 10, 20, 50?  I'm

3   trying to get a sense as to how long this would go on.

4       A.   Normally you would have somewhere between maybe

5   30 to 60 customers that you look at, because there might

6   be somebody that had something different than what

7   you're not used to.

8       Q.   So what happens if you are looking at this and

9   all of a sudden you notice that, oh, wait, in the

10  previous software it had the home address in this field,

11  and now we've got garbage in this field?  It didn't

12  transfer.

13      A.   Right.  You would write those down.  You

14  wouldn't obviously call the person, call your project

15  manager for every, you know, everything that's missing.

16  You would basically call -- you would write something

17  down, This is the fields that don't look right.

18      Q.   On a piece of paper?

19      A.   On a piece of paper.  And -- or, you know,

20  whatever it might be.  And you would relay those to the

21  project manager.  And the project manager would then get

22  to whoever their developer or whoever it is that did the

23  conversion.  And they would tell you -- you know, they

24  would -- you'd basically go to the project manager.  The

25  project manager goes to their place.  And it just goes

**EXHIBIT 26**

Russell Steele - 4/9/10

117

1   example of an issue that they would tell you about.

2      A.   If it's during the courts, they would call and

3   say, How do I issue a warrant?

4      Q.   Using the INCODE software?

5      A.   That's it.

6      Q.   And you would walk them through how to --

7      A.   -- issue a warrant based on my training that I

8   had received while observing the veteran trainers.

9      Q.   Any of the calls assigned to you were not

10  questions regarding how to use the system and were, in

11  fact, questions about something that wasn't working

12  properly?

13     A.   Normally, no, because that's hardware, and that

14  would be the INCODE side, hardware side.  Their IT

15  department would handle those.

16     Q.   You said "normally, no."  So was it possible

17  that sometimes you got a call, and they told you, Look,

18  INCODE is not doing what it's supposed to.  I keep doing

19  this, and it's not letting me through.

20          Did you have calls like that?

21     A.   I would have calls like that because they were

22  mislabeled by the receptionist.

23     Q.   Okay.  So how would you handle those calls

24  then?

25     A.   I would tell the customer it got mislabeled as

**EXHIBIT 26**

Russell Steele - 4/9/10

118

1   a municipal court call.  Then I would -- there's a place

2   on there, you can tell it, it's either municipal court

3   or it's hardware.  You would tell it it's hardware.  You

4   would switch it, basically, from municipal courts to

5   hardware, and then you would assign it to one of the

6   hardware guys.  Or you would just put it back in the

7   queue, and one of the hardware guys would pick it up.

8      Q.   So you would just tell the client that somebody

9   else was going to give them a call?

10     A.   That's correct.  Somebody with more knowledge

11  than I had.

12     Q.   Okay.  On the support side, when you were

13  answering these calls or you were calling the clients

14  back, your role was just to, again, train them, but off

15  site, as to how to accomplish a goal that they were

16  trying to accomplish?

17     A.   On the support side they had a specific issue.

18  They had a specific issue that they had a problem with.

19  When you're on site, they don't know how to use the

20  software.

21     Q.   So you just train them on the whole thing?

22     A.   You train them on the whole thing when you're

23  on site.  With the calls you had coming in, they had one

24  issue.  And it lasted anywhere from, you know, seconds

25  to minutes.

**EXHIBIT 26**

Russell Steele - 4/9/10

119

1    Q.   And, again, you helping them through that issue

2   was based on your initial training, having observed a

3   veteran trainer, and the information that was in your

4   head?

5    A.   It was mainly -- well, I was trained prior,

6   when I worked for the City of Watauga on INCODE, through

7   their trainer.

8    Q.   Through INCODE's trainer?

9    A.   INCODE's trainer.  When INCODE came into the

10   City of Watauga, their trainer trained me on it.  From

11   that training -- of course, I didn't have INCODE at

12   Southlake, so I didn't have to do anything over there.

13        When I started working with INCODE, I took

14   the training that I received from the first trainer that

15   I, you know, talked to with me, with the other veteran

16   trainers that I was going out on site with.

17    Q.   I guess what I'm trying to -- I'm trying to

18   imagine you sitting there answering these calls.  You're

19   not sitting there with, you know, a 10-page document.

20   And they tell you, I'm trying to -- what did you say --

21   get a warrant ready?

22    A.   Issue a warrant.

23    Q.   Issue a warrant.  You wouldn't then look at the

24   index:  Warrant, Page 10.  And then based on a piece of

25   document, walk them through it.  That's not how you did

**EXHIBIT 26**

Russell Steele - 4/9/10

120

1   it?

2       A.   Well, that's not how I did it, but those pieces

3   were available.  They had --

4       Q.   For the users?

5       A.   For the users.  There were help documents that

6   they could use if they wanted to.  They didn't always

7   help them out.

8       Q.   Why didn't they -- if they had those, why were

9   they calling you and not going to the documents?

10      A.   Because I knew their -- if I had trained them

11  prior, they knew that I knew their software, and I had a

12  rapport with them.  Therefore, they learned better from

13  me than from the documents themselves.

14      Q.   Back to the number of hours we were talking

15  about.  Let's try to explore that a little bit further.

16          So sitting here today, having opted into

17  the lawsuit, you are seeking compensation for anything

18  that you worked beyond 40 hours per week, correct?

19      A.   That's correct.

20      Q.   How many hours did you work beyond 40 on a

21  weekly basis on average?

22      A.   On average?

23      Q.   Unless you can sit there and go week by week

24  for me and tell me how many hours.

25      A.   No.  That's impossible for me.  My memory ain't

**EXHIBIT 26**

Russell Steele - 4/9/10

121

1   that good.

2           Probably anywhere from --

3           MS. BAGLEY:  Do you need some time to

4   think about it?

5       A.  Average?  40-hour week?

6           Probably anywhere from 10 to 15 hours,

7   average.

8       Q.  Now let's talk maximum/minimum.  During your

9   employment with Tyler, what was the minimum number of

10  hours that you worked in a week?

11      A.  The minimum number of hours that I worked in a

12  week, 40.  Because if I wasn't training on site, I was

13  doing support.  And if I wasn't doing support, I was

14  going over scenarios of what the trainers had gone over

15  when I had gone on site with them.  Just kind of get

16  some notes together.

17      Q.  Tell me about the scenarios again.

18      A.  Well, they're just notes, like the notes that I

19  got from the trainers.

20      Q.  When you were getting trained?

21      A.  When I was getting trained.  Just kind of

22  refreshing my memory on what to look for or what to see.

23      Q.  What to identify as a problem when you're

24  there?

25      A.  Right.  Or what to make sure the customer is

**EXHIBIT 26**

Russell Steele - 4/9/10

122

1    aware of.

2       Q.   Okay.

3       A.   Right.  If my memory -- it's not that good, but

4    I want to say I probably recorded 40 hours every week.

5       Q.   Okay.  That's the minimum that you are

6    estimating?

7       A.   That I recall.

8       Q.   Okay.

9       A.   Maximum?  Probably 70 hours in a week.

10      Q.   And how many times during your employment with

11   Tyler are you saying you worked 70 hours in a week?

12      A.   That normally happened when I had traveled from

13   DFW Airport, and I had to, say, go to, let's say, to

14   California.  Where it doesn't take but -- you know, if

15   you go to San Antonio, it takes 30 minutes on a flight

16   or an hour on a flight to get there.  California, you

17   had to make stops on Southwest.  That's usually who we

18   took.  And getting there, there's times when I would

19   leave my house at 8:00, and I wouldn't get there until

20   11:00 o'clock at night.

21      Q.   Let's talk about your traveling time.  You told

22   me previously that before going onto a client's site,

23   other than making your travel arrangements, you said you

24   didn't do any preparations for the actual training,

25   right?  Do you remember that testimony?

**EXHIBIT 26**