Linda Estes Carrington - 4/8/10

1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                 MARSHALL DIVISION

 3   PATTY BEALL, MATTHEW      )
     MAXWELL, TALINA McELHANY, )
 4   AND KELLY HAMPTON,        )
     individually and on behalf )
 5   of all other similarly    )
     situated,                 )
 6         Plaintiffs,         )
                               )  No. 2:08-cv-422
 7   VS                        )
                               )
 8   TYLER TECHNOLOGIES, INC.  )
     AND EDP ENTERPRISES, INC., )
 9         Defendants.         )

10

11

12

13           ------------------------------------
             ORAL DEPOSITION OF

14           LINDA ESTES CARRINGTON

15                 4/8/10
             ------------------------------------
16

17           ORAL DEPOSITION OF LINDA ESTES CARRINGTON,

18   produced as a witness at the instance of the DEFENDANTS,

19   and duly sworn, was taken in the above-styled and

20   numbered cause on the 8th day of April, 2010, from

21   9:18 a.m. to 12:23 p.m., before TINA TERRELL BURNEY, CSR

22   in and for the State of Texas, reported by machine

23   shorthand, at the offices of MORGAN, LEWIS & BOCKIUS LLP,

24   1717 Main Street, Suite 3200, Dallas, Texas 75601,

25   pursuant to the Federal Rules of Civil Procedure.
```

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

2

1                A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        Ms. Laureen F. Bagley
         SLOAN, BAGLEY, HATCHER & PERRY
4        101 East Whaley Street
         Longview, Texas 75601
5
         (903) 757-7000 (telephone)
6        (903) 757-7574 (facsimile)

7

8    FOR THE DEFENDANTS:

9        Mr. Paulo B. McKeeby
         MORGAN, LEWIS & BOCKIUS LLP
10       1717 Main Street
         Suite 3200
11       Dallas, Texas 75201

12       (214) 466-4000 (telephone)
         (214) 466-4001 (facsimile)
13

14   ALSO PRESENT:

15       Mr. Lynn Moore

16

17

18

19

20

21

22

23

24

25

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

3

1              INDEX

2                              PAGE

3      Appearances..................................  2

4      LINDA ESTES CARRINGTON

5      Examination by Mr. McKeeby....................   4

6      Examination by Ms. Bagley......................133

7      Further Examination by Mr. McKeeby.............135

8      Further Examination by Ms. Bagley..............136

9      Signature and Changes..........................140

10     Reporter's Certificate.........................142

11

12                           EXHIBITS

13     NO.  DESCRIPTION                        PAGE

14     1 -  Ms. Carrington's resume            15

15     2 -  Letter from Mr. McMain to Ms. Carrington    24
           1/6/07

16

       3 -  Ms. Carrington's time sheets       53

17

       4 -  Ms. Carrington's Performance      117

18          Review/Increase Information

19     5 -  Ms. Carrington's 2008 Performance    120
           Evaluation Form

20

       6 -  Ms. Carrington's Consent to Opt In   129

21

22

23

24

25

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

55

1    A.   Never.

2    Q.   Did you fill out everything on this time sheet,

3  or did anyone else complete part of the time sheet?

4    A.   On this particular one?

5    Q.   Well, I'm not -- I've got this particular one

6  just so you have it as an example, but my question is

7  intended to be more general, so let me phrase it as such.

8  Look at this as an example, if you want, but my question

9  is:  Were there portions of the time sheet that someone

10 other than yourself completed on a regular basis?

11   A.   On a regular basis?

12   Q.   Yes.

13   A.   Not on a regular basis, no.

14   Q.   Were there portions of the time sheets that

15 someone else completed on something other than a regular

16 basis?

17   A.   Yes, as I previously testified to.

18   Q.   What portions are you referring to or were you

19 referring to in your previous testimony?

20   A.   It would be the actual time and where it went.

21   Q.   Okay.  So let's look at this sheet again by way

22 of example.  How do you pronounce this (indicating)

23 county?

24   A.   Nueces.

25   Q.   Nueces County.  So this refers to a project --

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

56

1  an implementation at Nueces County I take it.

2     A.  It's a fit analysis.

3     Q.  What's a fit analysis?

4     A.  Where we go in, and it's prior to

5  implementation.

6     Q.  What do you do in a fit analysis?

7     A.  That's what Collin County did with us that

8  week.

9     Q.  That introductory --

10     A.  It's an introductory, and you're bringing in

11  all the key users, you know, not every clerk.  You're

12  just bringing in what are considered superusers.

13     Q.  And you have this introductory session for

14  them?

15     A.  You try, yeah.  And the project manager is --

16  we're all benefiting from it, every aspect of the team.

17     Q.  But this is something you said you didn't

18  specifically attend as an implementation specialist?

19     A.  Implementation people do conduct fit analysis.

20     Q.  Did you conduct this fit analysis at Nueces

21  County?

22     A.  Yes, I did with the project manager as the

23  lead.

24     Q.  What did you do, what was your role in

25  conducting the fit analysis?

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

57

1      A.   My role is to drive the computer.  I'm the

2   driver, and I go through the system, and what you're

3   doing is you're making the superusers aware of the

4   procedure, the path that Odyssey uses, because the way

5   that they have been working with their old system may not

6   be the way they're going to be able to work with Odyssey.

7   They may have to change some of the procedures.

8          In other words, they begin the same, and

9   the result will be the same, but in between we may need

10  to help them.

11     Q.   How they get there is going to be different?

12     A.   Right.

13     Q.   And that's as a result of the differences in

14  the software?

15     A.   You're just doing a fit analysis to figure out

16  how their organization is set up --

17     Q.   Does the --

18     A.   -- and where the rights and roles are.

19     Q.   So the fit analysis involves some input from

20  the superusers as well?

21     A.   That's what you're doing.

22     Q.   They are giving you information?

23     A.   They are giving you information.

24     Q.   Okay.  And you consider this discrete from the

25  implementation process itself?

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

58

1     A.   It's part of the implementation process.

2     Q.   So it's part of something that you did as an

3 implementation specialist?

4     A.   Yes.

5     Q.   And in this case, you did it with the project

6 manager?

7     A.   Yes.

8     Q.   And that would be typical?

9     A.   Yes.

10     Q.   It would be you and the project manager?

11     A.   And a business analyst.

12     Q.   Okay. Would this be like in a classroom

13 setting?

14     A.   It would be in a room like this.

15     Q.   A conference room?

16     A.   A conference room.

17     Q.   Each person would have their own terminal I

18 take it.

19     A.   No, it would be broadcast. It would be

20 reflected on a screen.

21     Q.   So during the fit analysis, you would get

22 information from the customer?

23     A.   The project manager -- I mean, you know, you

24 ask questions and everything, and the business analyst

25 has a big part of the program. My role as implementation

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

59

1  person is mainly to be driving the computer.

2      Q.   What does that mean, driving the computer?

3      A.   Well, going through the different aspects of

4  the software.

5      Q.   So that was part of the training that you

6  conducted?

7      A.   During a fit analysis, you aren't really

8  training.  You're just -- you are just exposing them to

9  the system.

10     Q.   But you would speak during these fit analysis?

11     A.   Oh, yes.

12     Q.   Would there be a PowerPoint or anything like

13  that?

14     A.   No.

15     Q.   Would you have some -- how would you know what

16  your role was to be?  Would there be like a schedule of

17  who was doing what at particular times during the fit

18  analysis?

19     A.   Depending on how the project manager wanted it

20  to go.

21     Q.   And that would vary from project to project?

22     A.   Uh-huh.

23     Q.   Is that yes?

24     A.   Yes, sir, I'm sorry.

25     Q.   Depending on the particular project manager's

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

62

1   processes they were doing by hand and not by automation.

2       Q.   I see.  So let me get a better sense of what a

3   fit analysis looks like.  It's in a conference room.

4   It's you, the business analyst, and the project manager,

5   and is it just a free-for-all discussion --

6       A.   No.

7       Q.   -- between them, or is there like a program,

8   how does it work?

9       A.   I'm sitting at that (indicating) end, and I'm

10   introducing Odyssey.  You know, here it is.  This is Step

11   Number 1.  And the business analyst mainly is asking a

12   ton of questions and gathering all that information that

13   you're asking about.

14       Q.   What information?

15       A.   That you were asking about just a minute ago.

16       Q.   About their current system?

17       A.   Right, and about their policies and procedures.

18       Q.   And when you say -- I want to take this at a

19   real basic level so I understand it.  When you're saying

20   you're introducing the system, what are you doing?

21   You're talking about Odyssey?  You're showing them

22   Odyssey?

23       A.   I'm showing them how Odyssey works.

24       Q.   How?

25       A.   In a very basic way.

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

63

1    Q.   But how, through a computer?

2    A.   Yeah, with the software on the machine, on the

3    computer.

4    Q.   So are they looking at your machine, or are

5    they looking at a screen?

6    A.   They are looking at a projection on the wall.

7    Q.   So you're walking through during this fit

8    analysis just generally how the software works?

9    A.   On their day-to-day process.  You know, like if

10   you've got the probate clerks in there, you're showing

11   them from beginning to end how the basic process would

12   work, is going to work when they get Odyssey into their

13   offices.

14   Q.   So at this point during the fit analysis, you

15   haven't incorporated any information or any data from

16   their old system into the program, correct?

17   A.   No.

18   Q.   No, that's not correct?

19   A.   I'm agreeing with you.  There has been no data

20   entered into their system at this time.

21   Q.   What is the project manager's role during the

22   fit analysis?

23   A.   The project manager is leading the whole thing

24   and asking questions too and working in tandem with the

25   business analyst, because at that time the project

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

64

1   manager is probably -- I'm assuming, I'm making an

2   assumption -- is trying to figure out how long this

3   project is going to take.  This is a good time to figure

4   all that out but...

5      Q.   All right.  So during one of these fit

6   analysis, how do you know when you're supposed to have a

7   particular role?  When do you know that you're supposed

8   to start walking through the presentation on the screen

9   to show how Odyssey works?

10     A.   Well, it's informal, and the project manager

11   will be directing.

12     Q.   So the project manager would say, okay, let's

13   talk about this?

14     A.   Right, exactly.

15     Q.   Let's talk about appeals?

16     A.   Right, and ask the business analyst, do you

17   have any other questions?  Is there anything else we need

18   to cover that you don't have covered?

19     Q.   And you would ask questions as well during the

20   fit analysis?

21     A.   But my questions aren't as important as the

22   business analyst's and the project manager's during this

23   forum.

24     Q.   What kind of questions would have been

25   important to you as an implementation specialist during

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

65

1   the fit analysis?

2      A.  How many users are there going to be, that

3   would be a good question right there.

4      Q.  Because that would affect --

5      A.  But the business analyst is also asking those

6   same questions.

7      Q.  What other kinds of questions would you ask

8   during the fit analysis?

9      A.  Oh, there would be -- like I said, how many

10  users would be using that one particular aspect of the

11  program, or explaining to them rights and roles for

12  configuration, or asking them how many codes need to be

13  configured.

14     Q.  Okay.  I'll come back to that.  Look at the

15  document ending at 61.  I think it's the third one in.

16     A.  Right.

17     Q.  This lists a function midway through of

18  "go-live support."

19     A.  Uh-huh.

20     Q.  Is that yes?

21     A.  Yes, sir.  Sorry.

22     Q.  And that's another function you performed as an

23  implementation consultant, correct?

24     A.  Yes.

25     Q.  Maybe it would be helpful to get just kind of a

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

90

1     A.   Yeah.

2     Q.   You entered eight hours for being absent for a

3  holiday?

4     A.   Well, we had to count our hours on those

5  holidays.  You had to put it in.

6     Q.   Right.  That was the instruction given to you?

7     A.   Yes.

8     Q.   And you also did the same thing for the next

9  day where you took a day of PTO on Friday?

10     A.   Yes, I took a vacation day.

11     Q.   And you entered that time as well?

12     A.   Yes.

13     Q.   And you were told to enter that time as well?

14     A.   Yes.

15     Q.   Look at the Monday entry down below where it

16  has the description "prepared and taught class on eFiling

17  per R. Matkin's request."  That's Ryan Matkin?

18     A.   Yes.

19     Q.   And eFiling is the system by which lawyers file

20  documents with the courts?

21     A.   Yes.

22     Q.   And who -- I take it this is internal training.

23     A.   Yes.

24     Q.   To people at Tyler?

25     A.   Well, I did two classes that day -- well, I did

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

91

1    it several days.  I did classes not only for Tyler, but I

2    also did a WebEx for Collin County.

3        Q.   That same day?

4        A.   I'm not quite sure.

5        Q.   So the WebEx for Collin County was a training

6    session done over the Internet?

7        A.   Yes, using WebEx.

8        Q.   Right.  WebEx is a program?

9        A.   Yes.  It's like a telephone conference via --

10   it's like Skype now.

11       Q.   Right.  So you're putting on a presentation,

12   and they are looking at the presentation over the

13   Internet?

14       A.   Right.

15       Q.   And you're talking over a telephone?

16       A.   It's a training.  It's just not in person.

17       Q.   Did you -- there's a presentation that's on the

18   computer that's being clicked through as you're talking

19   though, right?

20       A.   Right.

21       Q.   Did you put that together?

22       A.   Yes.

23       Q.   And that was on eFiling?

24       A.   Yes.

25       Q.   Is that the same presentation that you gave to

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

92

1   the internal folks at Tyler?

2       A.   Yes.

3       Q.   And were those implementation specialists or

4   all different groups of employees?

5       A.   Mainly implementation.

6           MR. McKEEBY:  Let's go off the record for

7   just a second.  Is that okay?

8           MS. BAGLEY:  Sure.

9           (Recess.)

10          MR. McKEEBY:  Back on the record.

11      Q.   I think I'm done with the time sheets, at least

12  for now.  I wanted to ask you something about travel

13  though.  Do you have that -- we talked about a couple of

14  entries where you had travel on your time sheets, and I

15  take it that means the trip between your home and the

16  actual county courthouse, for example, in the Decatur

17  example that we gave?

18      A.   Right.

19      Q.   And you drove your own vehicle to that

20  courthouse typically?

21      A.   In most cases I would.

22      Q.   Sometimes you would drive someone?

23      A.   Or sometimes we would rent a car if it was...

24      Q.   Would you rent the car, or would someone else

25  do that?

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

97

1    A.  Yes.  And truancy.

2    Q.  There's a truancy court?

3    A.  Yes.

4    Q.  And did you do the implementations for all of

5  those?

6    A.  Uh-huh.

7    Q.  Is that yes?

8    A.  Yes, sir.

9    Q.  I don't need the sir part, just the yes.

10    A.  I'm just not doing well with that at all.

11    Q.  That's all right.  We'll get there.

12        All right.  So you did the implementation

13  for all three of those, and how long did each of them

14  last?  First of all, probate.

15    A.  Probate lasted for almost a year.

16    Q.  And civil?

17    A.  I don't remember when we started civil.  Civil

18  took about six months.

19    Q.  And truancy?

20    A.  Truancy only took about three or four months.

21    Q.  In which one of the implementations did the

22  hardware problem exist in that you told me about, or did

23  that apply to all of them?

24    A.  Probably almost all them.  Yeah, it did apply

25  to almost all of them in varying degrees.

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

98

1    Q.   And because of that time delay, that was an

2    implementation where the training component was larger

3    than in other implementations?  Is that what you're

4    explaining?

5    A.   Yes.  I was just giving you an example.

6    Q.   Right.  And I just want to make sure I

7    understand the example.

8    A.   Yes.

9    Q.   All right.  Let's talk about conversion of

10   data.  That was one of the elements of the implementation

11   process?

12   A.   Yes, sir.

13   Q.   Is that something that the implementation

14   specialist is involved in?

15   A.   In conversion of data?

16   Q.   Yes.

17   A.   We don't -- the implementation person is not

18   really converting data as much as they are checking to

19   make sure data has been converted properly.

20   Q.   But that's part of the conversion process?

21   A.   Yes.

22   Q.   Who is doing the actual data conversion, the

23   programmer?

24   A.   Yes.  There's another whole department that's

25   in charge of conversion.

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

99

1    Q.  Right, but are those programmers?

2    A.  Developers.

3    Q.  But those are people with whom you would

4  coordinate with in the implementation process?

5    A.  Well, we don't really have to coordinate with

6  them.  I mean, we have to...

7    Q.  Well, what would you do to make sure data has

8  been converted properly by the developers?

9    A.  You -- they're going to pull reports, and

10  you're going to check the codes.

11    Q.  Is this something that's done at the client's,

12  at the courthouse?

13    A.  It can be done at the client's site, but it's

14  done more often at the office.

15    Q.  So what are you reviewing in the report to make

16  sure that the conversion has been done accurately?

17    A.  You're reviewing the data and the codes that

18  match that data.

19    Q.  And that information is conveyed to you in

20  these reports that you mentioned?

21    A.  Yes.

22    Q.  How do you know whether or not the codes match

23  the data?

24    A.  Well, that's because you've got a list.  You've

25  already -- for example, when we were talking about on

Osteen Reporting Services  (817) 498-9990

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

103

1    would depend on the nature of the problem involved?

2        A.   Yes.

3        Q.   How long -- let's give the Dallas County

4    example.  Did you do the conversion for the -- I'm sorry.

5    Did you do the code mapping for the truancy courts?

6        A.   Yes.  Dallas is a unique situation in that they

7    have a giant IT department, absolutely giant, so they do

8    their own conversion.

9        Q.   So did you do any code mapping?

10       A.   Yes, but that was with them, alongside them,

11   because they do their own data conversion.  And this was

12   also uniquely different in that we were -- truancy was

13   also interfacing with another system through all of the

14   ISDs, Richardson, Garland, Mesquite, Carrollton and DISD.

15       Q.   So in that example of Dallas County, you would

16   be communicating with the customer about the problems

17   that you saw during the code mapping process?

18       A.   And Tyler, because we had brought in a couple

19   of people from the office because this was such a unique

20   situation, so we were all working together.

21       Q.   So more than one person was doing the code

22   mapping?

23       A.   Well, Dallas was in charge of code mapping, and

24   we had brought in two experts from the office to help

25   them.

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

104

1    Q.  But did you do the code mapping in Dallas
2  County?
3    A.  I went through the reports and looked for --
4  and looked for data that might have been misplaced or
5  incorrectly entered.
6    Q.  Right, which is the process that we just
7  discussed?
8    A.  Uh-huh.
9    Q.  Agree?
10   A.  Yes, sir.
11   Q.  Okay.  How is that different from
12  configuration?  How is the conversion process that you
13  just discussed different from configuration?
14   A.  In conversion you're taking their data, this
15  massive amount of data, and you're converting it into the
16  Odyssey system.  You're taking all these records and
17  reports, all this stuff, and converting it over.
18  Configuration is like taking a suit and altering it.
19   Q.  A suit?
20   A.  Uh-huh.  It's taking a suit and having it
21  altered.
22   Q.  What was the implementation specialist's role
23  in the configuration process?
24   A.  Well, we would configure the system to fit
25  their particular needs.  In other words, you put in all

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

105

1   the rights and roles.  You put in the names of the users.

2   You put in the types of fees that they've got and the

3   amount of those fees.  You put in the types of

4   dispositions they have.  You put in the types of hearings

5   they have.  You set up their dockets the way they want

6   them set up.

7       Q.  And that's something --

8       A.  I could keep going on and on, but that's

9   configuration.

10      Q.  And that's something the implementation

11  specialist did?

12      A.  Yes.

13      Q.  And that's you?

14      A.  Uh-huh.

15      Q.  Is that yes?

16      A.  Yes, sir.  And --

17      Q.  How did you know -- well, go ahead.

18      A.  Depending on the county or the sophistication

19  of the county or how that county wanted to operate, a lot

20  of times they wanted to do their own configuration and

21  for you to teach them how.

22      Q.  So that's --

23      A.  For example, Minnesota, Minnesota is extremely

24  sophisticated, so, you know.  And these are all decisions

25  made by a project manager, not by an implementation

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

106

1  person.

2      Q.  Right, in terms of whether or not they wanted

3  to do their own configuration?

4      A.  Right.

5      Q.  But if they did want to do their own

6  configuration, you would train them how to do that?

7      A.  You would help them if you were told to help

8  them.

9      Q.  Is that different from training them as to how

10  to do configuration?

11      A.  Well, you're probably going to sit with them

12  side by side.  It's more one-on-one where training is

13  more in a classroom environment.

14      Q.  Okay.  Was the configuration when you did it as

15  an implementation specialist, was that something done at

16  the customer's site or at Tyler's offices?

17      A.  Both.

18      Q.  And when you said put in the rights and roles,

19  what does that mean?

20      A.  Odyssey works on a rights and roles system.

21  That's how it works.  That's how its security is built

22  upon.  In other words, you'll have a clerk over here who

23  only has access to certain parts of the system, where

24  over here you have her boss or the head of the office who

25  has access to every court case, every court file, every

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

109

1   their own Odyssey project manager, you know, who's also

2   there to make decisions.

3       Q.   But you have a dialogue with the customer as

4   well to tell them different access options?

5       A.   Uh-huh.

6       Q.   Is that right?

7       A.   Yeah.  And that's why you're showing them --

8   that's why you do a fit analysis, so that you can show

9   them the capability so they can start thinking about what

10  rights and roles they want to give to their people.

11      Q.   Do you make any recommendations based on past

12  experience as an implementation specialist?

13          MS. BAGBY:  Object to the form.

14      A.   No, you try not to.

15      Q.   Not at all?

16      A.   No.

17      Q.   Why not?

18      A.   Because every county is different, and they

19  know what they want, and they've got their own culture

20  and their own thing.

21      Q.   What if they asked you?

22      A.   You just explain to them that it's -- I'll tell

23  you how it works, but I'm not going to tell you how you

24  need to run your office.

25      Q.   That's a customer decision ultimately?

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

110

1    A.  Right, exactly.

2    Q.  When we move to the training element of the

3  implementation, at that point have these decisions with

4  respect to configuration and roles and rights already

5  been made?

6    A.  By the time you get to training?

7    Q.  Yes.

8    A.  Hopefully.  You ideally would like for it to

9  be.

10   Q.  But not in every case?

11   A.  No, plus it's fluid.

12   Q.  And you told me, I think, based on your

13  previous discussion, that the type of training that you

14  would provide as an implementation specialist would vary

15  from project to project?

16       MS. BAGBY:  Object to the form.

17   A.  You're talking about the training of the users?

18   Q.  Yes.  Was it always classroom training, for

19  example?

20   A.  Most of the time you're going to have a

21  classroom environment for the clerks for the general

22  discussions.  With the court admin, you may do

23  one-on-one.

24   Q.  Okay.  So you would do both classroom training

25  and one-on-one training as part of the training element

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

111

1  of implementation?

2      A.   Right.  And sometimes with judges if they

3  wanted training.  Not all judges wanted training.

4      Q.   But sometimes you would train judges?

5      A.   One-on-one, right, or in a group.

6      Q.   And these classroom training sessions, would

7  there be questions and dialogue from the users?

8      A.   Oh, yes.

9      Q.   And would you typically be doing these

10  trainings on your own?

11      A.   Yeah.

12      Q.   And would you have a PowerPoint or a

13  presentation, or would you just be walking through, or

14  how would you do it?

15      A.   Well, they each have a computer, and they each

16  have Odyssey on their computer, and we also had -- we had

17  training manuals with screen shots.

18      Q.   What does that mean, training manuals with

19  screen shoots?  That was part of the presentation?

20      A.   Right, that we would hand them.

21      Q.   Okay.  So these would be handouts?

22      A.   Yes.

23      Q.   So you would walk them through the process at

24  that point?

25      A.   Right.  You would go through whatever -- let's

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

112

1    say we were training on setting up hearings and

2    documenting hearing results, then you would go through

3    the whole process on that module.

4        Q.   Would you ever encounter mistakes during that

5    training process?

6        A.   You mean mistakes in the system?

7        Q.   Yes.

8        A.   Yes.

9        Q.   What would you have to do in those instances?

10       A.   You would note down that you needed -- that

11   somebody, either you or somebody, needed to go in and

12   correct it.

13       Q.   How would you know there was a mistake in the

14   system?

15       A.   Well, let's say you went in and you did the

16   drop-down box for hearing times, and you didn't have all

17   the hearing times in there.

18       Q.   And you would know that through a dialogue with

19   the people in the training session?

20       A.   Right.

21       Q.   So then you would know to go back to the --

22   who, the programmer to --

23       A.   No.  An implementation person can go in and

24   change that.

25       Q.   I see.

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

113

1      A.   But you want to make sure before you make any

2   changes.  You don't want to make any changes with

3   somebody's system.  You want to make sure with the powers

4   that be before you make any changes.

5      Q.   So a change might be recommended or you might

6   be aware of a change that you thought needed to be

7   implemented as a result of the training, and to do that,

8   you would go to the project manager, for example, and get

9   authorization?

10      A.   Yeah.  I mean, it depended on the project, but

11   by that time when you're doing the training, you know who

12   needs to be told on what's going on, but primarily it's

13   going to be the project manager.

14      Q.   And the project manager is the person you would

15   go to for authorization to make a change to the program?

16      A.   Right, right.

17      Q.   Which, in my example, might come up during the

18   course of the training when you realized that there

19   wasn't some -- a particular code that had been entered

20   properly?

21      A.   Right.  And like I said, in those big counties,

22   they have also got their own Odyssey project manager.

23      Q.   That's an actual employee of the county?

24      A.   Right.  Or on a contract job, you know, and

25   they're always there.

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

114

1   Q.   So you might be reporting that to them?

2   A.   Uh-huh.

3   Q.   Is that yes?

4   A.   And, see, they're also going to be doing

5   configuration.

6   Q.   Got it.  All right.  What's the role that you

7   had in the go-live process as an implementation

8   specialist?

9   A.   In the go-live process?

10  Q.   Right.

11  A.   You have to make sure that everything is --

12  you're right there, and everything is working the way it

13  should be working.  And a lot of times the clerks have

14  forgotten what they've been taught, and you have to help

15  them through a process.  You're there to answer

16  questions, and you're there to -- when problems arise, to

17  try as calmly as possible to get them resolved as quickly

18  as possible.

19  Q.   And just so we're clear, go-live means when the

20  Tyler software is actually being used?

21  A.   Right.  It's been turned on.

22  Q.   So in that -- would you characterize that as a

23  support role as well, a support role in the sense that

24  you're actually at the facility answering questions that

25  come up?

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

115

1    A.   Yeah, it's a support role.

2    Q.   How long does this go-live process typically

3   take, or does that vary?

4    A.   That varies greatly.

5    Q.   Depending on what?

6    A.   Depending on how well the go-live is going and

7   what problems you have come into.  In truancy we did

8   great.  We had very few problems, and we had a two-day

9   go-live.  I mean, it went great, and we didn't have any

10   problems after that.  Wise County, we were there for two

11   weeks, and then I went on to another county that third

12   week and was back the fourth.  I mean, they had issues.

13    Q.   With the go-live?

14    A.   Well, at the go-live.

15    Q.   What were the issues that they had?

16    A.   Their data and the system that they had

17   previously used, it just would not convert properly.  It

18   was just lots of technical issues.

19          But I'm just saying typically -- your

20   question was typically?

21    Q.   Yes.

22    A.   You ideally would like to go no longer than a

23   week and a half or two weeks.

24    Q.   In the go-live process?

25    A.   (Nods head.)

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

132

1      Q.   That's all right.  Do you have a bachelor's

2    degree?

3      A.   Yes, sir.

4      Q.   Where is that from?

5      A.   Mississippi State College for Women, Columbus,

6    Mississippi.

7      Q.   What was that specialization in?

8      A.   It was a bachelor of science in political

9    science and history, and I got a secondary education

10   certification.

11     Q.   When did you get your degree?

12     A.   1968.

13     Q.   So the degree that you have from SMU, that's

14   not a master's degree, it's a certificate?

15     A.   It's the equivalent now of one, but it's a

16   certificate.

17     Q.   Equivalent to a master's degree?

18     A.   Yeah.

19     Q.   When did you get that?

20     A.   2003 or '04, somewhere around there.

21     Q.   Have you ever done a mediation?

22     A.   Oh, yeah, many.

23     Q.   I'm sure we could spend some time talking about

24   that, and that might be more interesting than the way we

25   have occupied our last three hours.

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

133

1          Ms. Carrington, I just want to thank you

2     for your professionalism and bearing with me, and I

3     appreciate you cooperating with us.

4          A.   Oh, you're very welcome.

5          MR. McKEEBY:  I have no other questions at

6     this point.

7          THE WITNESS:  Well, thank you.

8          MR. McKEEBY:  You're welcome.

9          MS. BAGBY:  I have a couple of questions

10    for you, Ms. Carrington.

11          EXAMINATION

12    BY MS. BAGBY:

13       Q.   Did your supervisors, either your direct

14    supervisor or the supervisor over them, have direct

15    knowledge that you were working more than 40 hours per

16    week during the time that you were working for Tyler

17    Technologies?

18       A.   Yes.  In fact, it's documented on this review.

19       Q.   Were your supervisors aware that you were not

20    recording all of the hours you worked on the time sheets

21    that have been entered as Exhibit Number 3 in this

22    deposition?

23       A.   Yes.

24       Q.   How many hours of overtime do you believe you

25    averaged per week during the time that you worked for

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

134

1    Tyler Technologies?

2        A.   I would conservatively say between 15 and 20

3    hours a week over.

4        Q.   Are there any written instructions on how to

5    fill out a time sheet with Tyler Technologies?

6        A.   I'm sure there probably are, but...

7        Q.   Have you ever seen written instructions on how

8    you're supposed to complete a time sheet?

9        A.   If I did, it was a long time ago, and it was

10   that first week I was hired.

11       Q.   What percent of your overall time that you

12   spent on your job, including overtime hours, what percent

13   of the time do you believe that you spent putting

14   together PowerPoint presentations for training sessions?

15       A.   Well, we didn't really put together

16   PowerPoints.  We just put together handouts with screen

17   shots on them.

18       Q.   When you say screen shot, what does that mean?

19       A.   Well, I would take a screen shot showing them

20   how to like set a hearing or set a hearing date or

21   release a bond.

22       Q.   Where did the screen shot come from?

23       A.   From the Odyssey program.

24       Q.   So you would just take a screen shot from the

25   Odyssey program, print it out, and then show it on the

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

43

1    sheet?

2        A.   We had to put our time in at the end of each

3    week.

4        Q.   Did anyone train you on how to do that at Tyler

5    Technologies?

6        A.   Well, that first week there, you learn how to

7    do it.

8        Q.   My question is:  How did you learn?  Was there

9    a classroom that showed you what to do --

10       A.   No.

11       Q.   -- or did someone just kind of sit over your

12   desk and tell you what to do?

13       A.   No.  Someone just showed us what to do.

14       Q.   And so you said that's something you did at the

15   end of the week?

16       A.   Or on Monday morning.

17       Q.   What was your practice?

18       A.   I would try and do it on the weekend.

19       Q.   I take it this would be from home.

20       A.   You could do it from home.  You could do it

21   remotely.

22       Q.   Is that how you did it?

23       A.   Yes, because I would -- 90 percent of the time

24   I was already gone on-site somewhere.

25       Q.   So you couldn't really do it from the office?

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

44

1      A.   Well, if I were in the office I could, but you

2   didn't have to.  I mean, it was strictly...

3      Q.   How long would it take for you to do your time

4   for the week?

5      A.   Oh, I'd say 15 or 20 minutes.

6      Q.   And did anyone at Tyler ever explain to you the

7   purpose in recording your time?

8      A.   Well, our understanding was -- because it was

9   quite emphatic to bill hours -- was to show the time

10   being used in a project.

11      Q.   You had an understanding that the amount of

12   time that you billed on a particular project had some

13   correlation to the amount of money that Tyler received

14   for the project?

15      A.   No, not necessarily.

16      Q.   What was your understanding with respect to any

17   relationship between the number of hours you billed to a

18   particular project and the amount the customer paid for

19   that project, if there was such a correlation?

20      A.   Well, there's different aspects to it.  You

21   have time that has already been built into a project.

22      Q.   Is that considered billable time in the way

23   that Tyler used the term?

24      A.   Yes.

25      Q.   When you say already built into a project, you

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

45

1    mean that Tyler has billed the client an amount that

2    assumes that a certain amount of time is going to be

3    spent by an implementation specialist doing functions?

4        A.   Time has been paid for and has been built into

5    the project.

6        Q.   Right.  Okay.  Was there any time that you

7    worked that wasn't built into the project for which you

8    understood Tyler was being paid discretely?  Did you

9    understand that question?

10       A.   No, sir.

11       Q.   You just explained the concept of billable time

12   that included time built into the project.  You still

13   characterized that as billable time, though?

14       A.   Yes.

15       Q.   Was there any time that was billable that was

16   not built into the project?

17       A.   Yes.

18       Q.   And how would you characterize that time?

19       A.   In other words, how would I document that time?

20       Q.   Okay.  Yes.

21       A.   Is that --

22       Q.   How would you document that?

23       A.   Is that a fair question?

24       Q.   I'll call it a fair question.  How would you

25   document that time?

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

46

1    A.   You would try to put in all the time that you

2    had put in there because you would have one side telling

3    you to bill, bill, bill, and then on the other hand

4    though, you had a project manager who did not have the

5    time available for you to put that time in there.

6    Q.   Who was the side that was telling you to bill,

7    bill, bill?

8    A.   Implementation.

9    Q.   Your implementation managers?

10   A.   Yes.

11   Q.   But in terms of how you input your time into

12   the software program, you didn't -- you would put in your

13   time -- your billable time whether or not it was built

14   into a project or was not built into a project?

15   A.   You would try to, yes, to reflect how much time

16   you were spending on that project.

17   Q.   And did you have any knowledge of what time

18   that you spent on a particular project was already built

19   into the project as opposed to time that would be billed

20   separately?

21   A.   No.

22   Q.   So you wouldn't know that?

23   A.   Not really.

24   Q.   When you input your time, would you designate

25   it as billable or nonbillable?

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

45

1    mean that Tyler has billed the client an amount that

2    assumes that a certain amount of time is going to be

3    spent by an implementation specialist doing functions?

4        A.   Time has been paid for and has been built into

5    the project.

6        Q.   Right.  Okay.  Was there any time that you

7    worked that wasn't built into the project for which you

8    understood Tyler was being paid discretely?  Did you

9    understand that question?

10       A.   No, sir.

11       Q.   You just explained the concept of billable time

12   that included time built into the project.  You still

13   characterized that as billable time, though?

14       A.   Yes.

15       Q.   Was there any time that was billable that was

16   not built into the project?

17       A.   Yes.

18       Q.   And how would you characterize that time?

19       A.   In other words, how would I document that time?

20       Q.   Okay.  Yes.

21       A.   Is that --

22       Q.   How would you document that?

23       A.   Is that a fair question?

24       Q.   I'll call it a fair question.  How would you

25   document that time?

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

46

1     A.   You would try to put in all the time that you

2   had put in there because you would have one side telling

3   you to bill, bill, bill, and then on the other hand

4   though, you had a project manager who did not have the

5   time available for you to put that time in there.

6     Q.   Who was the side that was telling you to bill,

7   bill, bill?

8     A.   Implementation.

9     Q.   Your implementation managers?

10     A.   Yes.

11     Q.   But in terms of how you input your time into

12   the software program, you didn't -- you would put in your

13   time -- your billable time whether or not it was built

14   into a project or was not built into a project?

15     A.   You would try to, yes, to reflect how much time

16   you were spending on that project.

17     Q.   And did you have any knowledge of what time

18   that you spent on a particular project was already built

19   into the project as opposed to time that would be billed

20   separately?

21     A.   No.

22     Q.   So you wouldn't know that?

23     A.   Not really.

24     Q.   When you input your time, would you designate

25   it as billable or nonbillable?

**EXHIBIT 29**

Linda Estes Carrington - 4/8/10

47

1    A.   Yes.

2    Q.   And how would you know whether it was billable

3  or nonbillable, just based on the nature of the task you

4  were performing?

5    A.   No.

6    Q.   What would it be based on?

7    A.   No.  The computer would not allow you to -- it

8  would kick you out if you were putting in time that the

9  project manager hadn't put in there.  Each week you

10  would -- well, I don't know, they all did it at different

11  times -- but there would be a certain number of hours

12  available to be billed in there.

13    Q.   On a particular project?

14    A.   Uh-huh.

15    Q.   Is that yes?

16    A.   Yes, sir.

17    Q.   And so if you exceeded that project, the system

18  would kick you out?

19    A.   You wouldn't be allowed to put those hours in

20  there.

21    Q.   You would have to put it in as nonbillable

22  hours?

23    A.   Yes, or not put them in at all.

24    Q.   What would determine whether or not you put

25  them in as nonbillable hours or not put them in at all?

**EXHIBIT 29**