IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PATTY BEALL,  MATTHEW MAXWELL, | § | |
| DAVID GRAVLEY, TALINA MCELHANY, | § | |
| KELLY HAMPTON, CASEY BROWN, | § | |
| JASON BONNER, KEVIN TULLOS, | § | |
| ANTHONY DODD, ILENE MEYERS, | § | |
| TOM O'HAVER, JOY BIBLES, DON | § | |
| LOCCHI AND MELISSA PASTOR , | § | |
| Individually and on behalf of all others | § | |
| similarly situated; | § | |
| | § | |
| Plaintiffs, | § | 2:08-cv-422 TJW |
| | § | |
| TYLER TECHNOLOGIES, INC. AND | § | |
| EDP ENTERPRISES, INC. | § | |
| Defendants. | § | |

## AFFIDAVIT OF BRIAN T. FARRINGTON

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF GREGG | § |

Before me, the undersigned notary, on this day personally appeared Brian T. Farrington, the

affiant, a person whose identity is known to me.  After I administered an oath to affiant, affiant

testified:

"My name is Brian T. Farrington.  I am capable of making this affidavit.  My practice

consists of consulting with employers to assist them in compliance, and representing them in

investigations by the U.S. Department of Labor, Wage and Hour Division.  I also advise clients

on compliance with state wage and hour laws, and represent them in investigations by the State

Departments of Labor. I also advise employers on compliance with anti-discrimination laws, and

1

respond on behalf of clients to charges of discrimination filed with the Equal Employment Opportunity Commission and/or analogous state agencies. In connection with my work on this case I prepared an Original Expert Report dated September 3, 2010, and an Amended Expert Report dated September 13, 2010. I have read my Original and Amended Reports attached to my affidavit as Exhibit 'A' and Exhibit 'B' respectively. Exhibit 'A' is a true and correct copy of my Original Report. Exhibit 'B' is a true and correct copy of my Amended Report. My educational background and qualifications are set forth in my curriculum vitae of which a true and correct copy is attached hereto as Exhibit "C." I incorporate by reference herein all of the facts, testing, supporting documents and opinions set forth in both my Original and Amended Reports and verify that the information and opinions set forth in both reports are within my personal knowledge and are true and correct. The opinions that I expressed in both my Original and Amended Reports are based upon my education, training and experience. Each and every opinion that I expressed in my Original and Amended Reports were reached as a result of the methodology stated therein, and I am prepared to offer each and every opinion at trial."

Further Affiant sayeth not.

BRIAN T. FARRINGTON

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 5th day of

January, 2011, to certify which witness my hand and seal of office.

ROSE MARIE FEAZELL
Notary Public, State of Texas
My Commission Expires
November 01, 2013

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

2

# EXPERT REPORT OF BRIAN T. FARRINGTON



EXHIBIT

"A"

**EXPERT REPORT OF BRIAN T. FARRINGTON IN *BEALL, et al. v. TYLER TECHNOLOGIES, INC., AND EDP ENTERPRISES, INC.***

I was retained by Sloan, Bagley, Hatcher & Perry Law Firm, to provide a professional opinion on whether the job duties and responsibilities of the plaintiffs and other employees alleged to be similarly situated in this case require the exercise of discretion and independent judgment according to the standards applied by the U.S. Department of Labor, Wage and Hour Division ("USDOL/WH").

**BACKGROUND**

I was employed by the United States Department of Labor, Wage and Hour Division ("Wage and Hour") from 1975 to 1989, with 18 months off for graduate school. From 1975 to 1984, I was a Compliance Officer (an investigator) in Chicago, Illinois and then in Fort Worth, Texas. My primary function was to enforce the laws administered by the Wage and Hour Division, primarily the Fair Labor Standards Act ("FLSA"). I conducted anywhere from 500 to 600 full investigations during this time, as well as 300 to 400 more limited compliance actions. From 1984 to 1989 I was the Assistant District Director in Dallas (the position is now called "Director of Enforcement"). I supervised from 12 to 16 investigators in this position. I assigned them their cases, assisted and advised them during the conduct of their investigations, and reviewed their completed case files. During this review, I evaluated whether the evidence supported the investigators' findings and conclusions and whether the FLSA had been properly applied. I determined whether claimed and/or potentially applicable exemptions had been correctly found to be applicable or not. I also reviewed the interviews conducted by the investigator to see if they supported the investigator's findings adequately. When back wages were computed, I reviewed those computations for both accuracy and proper methodology.

When the investigator was unable to resolve outstanding issues, I met with employers and/or their attorneys in second level conferences to attempt to settle the cases. If no resolution acceptable to the agency could be reached, I made the decision whether a file was suitable to send to the Regional Solicitor of Labor with a recommendation for litigation. If litigation was recommended, I ensured that conclusions were sound and supported by the evidence, and commented on additional factors such as evidence of willfulness. I estimate that I supervised approximately 5,000 investigations while I was Assistant District Director.

I left the Department of Labor in 1989 and went into private consulting on wage and hour and other labor matters with a consulting firm called Harry Weisbrod Associates, which I have since purchased. I also attended law school after leaving the Department of Labor and received my J.D. from the Texas Wesleyan School of Law and was licensed to practice law in 1994. My law practice consists almost exclusively of representing and advising clients in wage and hour and EEOC matters. When appearing

as an expert witness, I have been engaged by both plaintiffs and defendants. I also do many speeches, seminars and training programs on FLSA and other employment issues.

Since 1989, I have spent a substantial portion of my time in dealing directly with USDOL/WH while representing clients in investigations. I also maintain professional relationships with a number of agency personnel, and discuss developments in the law and in agency policies, procedures, and interpretations of the law with them. I am therefore up to date on the agency's policies, procedures, interpretations, and enforcement positions. In addition, I keep myself informed on developments in the statutes enforced by USDOL/WH, especially the FLSA, and in relevant regulations and opinions. I also keep up with FLSA case law. I apply this knowledge continuously in advising employers on wage-hour issues and representing them in USDOL/WH investigations. I continue to publish on such issues, as noted below.

## DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS

1.      Depositions of Talina McElhaney, Lisa White, Linda Carringt0n, Russell Steele, Melanie Baird, Tony Dodd, Eric Emde, Lorraine Mutch, Eyvonne Wilton, Thomas O'Haver, Joy Bibles McLeod, David Hayner, Sandra Dunning, Kelly Hampton, Bethany Maynard, Joy Flynn, Titus Britt, Geraldine Ingram, Travis Void, Ilene Meyers, Christopher Hepburn.

2.      Declarations of Kim Huynh, Talina McElhany, Lisa White, Kelly Hampton, Tony Dodd, Ilene Meyers, Tom O'Haver, Joy Bibles.

3.      Plaintiffs' First Amended Collective Action Complaint

4.      Defendants' Answer to Plaintiffs' First Amended Collective Action Complaint

5.      Chart of IS Plaintiffs by Division and job duties

## OTHER CASES IN WHICH I HAVE TESTIFIED AS EXPERT IN AT LEAST THE LAST FOUR YEARS

1.      United States District Court for the Northern District of Georgia, Rome Division, Case No.: 4:99-CV-0001-HLM (*McDermott, et al. v. Cracker Barrel Old Country Store, Inc.*). Expert for Plaintiffs on compensability of lock-in time, and payment of minimum wage for side work. Deposition.

2.      United States District Court for the District of Oregon, Case No. MDL Docket No. 1439, (*In re: Farmer's Insurance Exchange Claims Representatives' Overtime Pay Litigation*). Witness for Defendant re: claims representatives in FLSA case. [Note: gave no opinion testimony, but reported on results of test sample claims.] Trial testimony.

3.      District Court, City and County of Denver, Case No. 01CV4773 (*Chase v. Farmer's Insurance Exchange, Inc.*) Expert for Defendant re:  exercise of discretion and independent judgment by claims representatives in Colorado wage and hour case.  Deposition.

4.      District Court, Fourth Judicial District, State of Minnesota, County of Hennepin, Court File EM 01-015004 (*Milner, et al. v. Farmers Insurance Exchange, et al.*), Expert for Defendant re:  exercise of discretion and independent judgment by claims representatives in Minnesota wage and hour case.  Deposition.

5.      United States District Court for the Western District of Texas, Case No.    EP-02-CA-0564-FM) *(Acosta v. County of El Paso),* Expert for Defendant re:  off clock hours allegedly worked by detention officers, and offset of off-clock hours by paid lunch period.  Deposition.

6.      United States District Court for the Northern District of Alabama, Western Division, Civil Action No. CV-01-C-0303-W, (*Morgan et al. v. Family Dollar Stores, Inc.*) Expert for the Plaintiffs re:  application of the executive exemption. Deposition.

7.      United States District Court for the District of Arizona, Case No. CIV03 2262 PHX ROS (*Hutton v. Bank of America*), Expert for Defendant re:  administrative exemption, back wage computation, willfulness.  Deposition.

8.      Judicial Court, 49th Judicial District, Webb Co., Texas, Case No. 2003 CV F000553D1, (*The Laredo National Bank and Homeowners Loan Corporation v. Jacob Monty and the Monty Law Firm, P.C.*)  Expert for Defendant re: reasonableness of attorney's opinion on administrative exemption.  Deposition.

9.      United States District Court for the Southern District of Florida, Case No. 04-22640 CIV-JORDAN (*Garcia v. Port Royale Trading Co., Inc., et al.*).  Expert for Defendant re:  back wage calculation.  Deposition.

10.     United States District Court for the Northern District of Alabama, Southern Division, Case No. CV-02-TMF-1174-S (*Chao v. Tyson Foods, Inc.*), Expert for Defendant re:  willfulness.  Deposition.

11.     United States District Court for the Northern District of Alabama, Western Division, Case No. 7:06-CV-01538-LSC (*Womack v. Dolgencorp, Inc., et al.*), Expert for Plaintiffs re:  executive exemption. Deposition.

12.     Long John Silver

**PUBLICATIONS**

1. <u>Wage-Hour Compliance</u>.  Authored book published 1995 by Warren, Gorham and Lamont, NY, NY.

2. <u>Wage Hour and EEOC Compliance and Litigation Prevention</u>.  Published 1991 by the Professional Development Institute at the University of North Texas, Denton, TX.  Authored training manual for all day course on the subject.

3. <u>A CPA's Guide to Workplace Regulation</u>.  Published 2000 by the American Institute of CPA's.  Training manual for an all day course on the subject.

4. Society for Human Resource Management, "Legal Report" on the 1996 FLSA Amendments.

5. I wrote several articles for "Payroll Perspectives," a newsletter published by Ernst and Young.

6. I wrote several articles for "Auto, Inc.," a magazine published by the Automotive Service Association.

7. I wrote several articles for "Self Storage," a magazine published by the Self Storage Association.

8. Harry Weisbrod Associates previously published a bi-monthly newsletter in which I wrote regularly.

9. I have written other articles for industry groups over the years that I have not kept track of.

10. <u>A Wage and Hour Guide for the Self Storage Industry.</u>  Published 2006 by the Self Storage Association, Alexandria, Virginia.  Review of FLSA requirements and of major state wage and hour law considerations as they apply to employers in the self storage industry.

**OPINIONS AND BASIS**

**METHODOLOGY**

The principal method which USDOL/WH enforcement personnel use to make determinations on the application of the administrative exemption (among others) is to conduct interviews with employees in the job or jobs at issue.  USDOL/WH investigative procedure is for the investigator to select employees from among current and former incumbents in the jobs at issue, and to interview them either in person or by telephone

and obtain from them information about their job duties and responsibilities.  There are no hard and fast rules on the number or distribution, geographic or organizational, of employees to be interviewed.  The investigator is to interview enough employees to allow him to feel confident that he has a good understanding of what the employees in the subject jobs do.

In this case I was able to read a number of depositions of opt-in Plaintiffs, which included, among other things, their accounts of their duties and responsibilities.  In addition, I read the deposition of the person deemed by the defendants to be most knowledgeable concerning the duties and responsibilities of the plaintiffs, so that I could get the employer's perspective.

The opinions I express in this report are of the same type that I would have developed in my work for the USDOL/WH, and subsequently in advising clients on wage and hour issues.  I hold all of my opinions to a reasonable degree of certainty in my field.  The work I have done and the methods I used in this case are the same type of work that I did while employed at USDOL/WH and use the method I used at the agency when addressing possible overtime violations.  I was as careful in performing the work in this case as I was when at USDOL/WH, and in my normal professional activities.

## DISCRETION AND INDEPENDENT JUDGMENT

The Fair Labor Standards Act of 1939, as amended (29 U.S.C. §§ 201 et seq.) (hereinafter "FLSA" or the "Act") generally requires that employees be paid overtime when they work in excess of 40 hours in a workweek, unless an exemption applies.  There are, however, a number of exemptions from the overtime requirements of the Act.  The most important of these exemptions is the exemption from minimum wage and overtime contained in Section 13(a)(1) of the Act (29 U.S.C. 213(a)(1)) for bona fide executive, administrative, and professional employees, and outside salespeople.  The statute itself does not define the terms "executive," "administrative," "professional," or "outside sales," however.  Rather, the statute authorizes the Secretary of Labor to define and delimit those terms by appropriate regulation.  The regulation in which these terms are defined and delimited is 29 CFR 541.

From the materials and information available to me, employees like Plaintiffs did not supervise other employees, nor were they engaged in work requiring knowledge of an advanced type in a field of science or learning, nor were they involved in sales activities.  Therefore, the executive, professional, and outside sales exemptions could not be applicable to them, leaving the administrative exemption.

There are several elements to the administrative exemption in addition to the performance of some work requiring the exercise of discretion and independent judgment, but I have not been asked to opine on those elements. I have been asked to review the duties and responsibilities of employees included in this action and give an opinion as to whether, under the standards applied by the USDOL/WH, the work of the plaintiffs does, in fact, require the exercise of discretion and independent judgment.

The current regulation defines discretion and independent judgment as follows:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.  29 CFR 541.202(a).

The regulation continues:

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

It is true that the exercise of discretion and independent judgment does not require that employees make final decisions.  Rather, employees who make recommendations can meet the regulatory requirement, as long as their recommendations are given particular weight.  However, the recommendations must themselves involve the exercise of discretion and independent judgment.

On the other hand:

> (e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. *See also* § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive,

recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

(f) An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly....

This standard is not significantly different from the standard in the previous (i.e., prior to August 23, 3004) version of the regulation, which stated that discretion and independent judgment:

...[involving] the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in the regulations in subpart A of this part, more over, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance....

Further, both prior enforcement positions of USDOL/WH and prior court cases on this issue remain relevant—as the Preamble to the current regulation states:

Accordingly, while retaining this standard from the existing regulations, final section 541.202 clarifies the definition of discretion and independent judgment to reflect existing federal case law and to eliminate outdated and confusing language in the existing interpretive guidelines. The Department intends the final rule to clarify the existing standard and to make the standard easier to understand and apply to the 21st Century workplace.

Final section 541.202(a) thus restates the requirement that the exempt administrative employee's primary duty must "include" the exercise of discretion and independent judgment and includes the general definition of this term, taken word-for-word from the existing interpretive guideline at subsection 541.207(a): "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 69 FR 22142

## CATEGORIES OF EMPLOYEES INVOLVED

I have been asked to look at Implementation Consultants. According to the deposition testimony, these kinds of employees are/have also been referred Implementation Specialists, and Client Liaison at various times and in different divisions of the defendants. In addition, the duties of employees known as Trainers performed duties similar to employees with the other titles mentioned above, although Trainers may

not have done all the functions that the other employees did.  In any event, I will refer to the position(s) in question as Implementation Consultants, or "IC's."

## APPLICABLE STANDARDS

### REGULATIONS

Since this action was filed in May, 2009, and since the maximum statute of limitations under the FLSA is three years, the applicable regulatory standard is the current version of 29 CFR 541, which has been in effect since August 23, 2004.

DUTIES OF IC'S

According to Christopher Hepburn, who is the person designated by the defendants as most knowledgeable about the duties of the plaintiffs, the primary duties involved in the implementation process would be:

-analyze clients' current business practices
-determine any changes to business practices
-configure software to "adhere to" the changed business practices
-review configuration with clients
-receive client acceptance
-review conversion files
-load conversion files
-educate senior staff and other staff on the particular Tyler Technologies' application in question
-assist with the "go live" transition
-assist with post-go live support

(see Hepburn deposition, p. 232, lines 11 – 18).

The testimony of the IC's includes most of these duties, although their descriptions or characterizations of the functions often differ from those of Mr. Hepburn. In any event, none of the functions listed by Mr. Hepburn would involve the exercise of discretion and independent judgment as that term is used in the regulations. Rather, they involve product knowledge, and the use of skill in applying well-established techniques, procedures or specific standards. I will examine each in turn.

The analysis of clients' current business practices was simply the determination of what particular steps, processes, forms, etc., the client was using, so that the defendants could adapt their software to allow the client to carry out its functions.  It primarily involved questioning client employees.  This "analysis" was simply information gathering, in light of the gatherers' knowledge of what the software did. Combined with questions about what the client was currently doing was what changes the

client might want to make.  It is important to note, however, that this did not involve advising the client on what they should do.  Rather, it was simply ascertaining what they did do, and what they wanted to do.  As Mr. Hepburn put it:

> A.    We'll take accounts payable [as an example].  They have a choice whether they would like to centralize accounts payable functions of decentralize accounts payable functions....
>
> Q.    Okay.  And would you tell the client which on they should do?
>
> A.    No.  my role was to explain the division—the divisions, the pros of one the cons of one, pros of the other , cons of other.  Ultimately, it's their decision.  My role would be to offer—
>
> Q,.   Options?
>
> A.    --options and the detailed analysis of those options backup not a recommend.  (Hepburn deposition, p. 25, ll. 7 – 20)

This sort of process in this sort of setting, knowing what questions to ask, how to follow up on those questions to elicit the information needed to implement the defendants' software, has always been treated by USDOL/WH as a skill, not the exercise of discretion and independent judgment.  In addition, in many cases this sort of function is performed by solely or primarily by project managers rather than by IC's:

> Q.    Did you as an implementation consultant—I'm sorry—implementation specialist at Tyler ever undertake an analysis of what the client needs and wants—similar to how you described the project manager typically does?
>
> A.    No.  That was the project manager's duties.  (Meyers' deposition, p. 48, ll. 2 – 7).

In addition, in some cases checklists were used:

> Q.    All right.  So during this initial call you would gather information about the existing customer's data?
>
> A.    Yes.
>
> Q.    And how would you know what questions to ask?
>
> A.    We had a list, a checklist more or less, of questions that we had to ask and answer and check off as they answered them.  (McElhany deposition, p. 53, ll. 11 – 18)

10

Thomas Dodd says:

Q.       It is titled Implementation Checklist 1.9, correct?

A.       Correct.

                *          *          *          *

Q.       Okay, what is it?

A.       It looks like just a checklist for what we did to go throught for
         implementation.

Q.       Do you recognize the document?

A.       I do.  There is numerous versions of this, but it is a general
         outline of how to do…how to stage software and whatnot.

Q.       So you would use that at the configuration staging?

A.       In the staging phase of the implementation.

Q.       Did you ever use this in connection with your job?

A.       Oh, certainly.  This, or a more modern version.

Q.       Is this a document that is tailored to a particular project?

A.       No.  It just happened to be one that I printed out.  I mean, they
         had a lot of documents similar to this available on line, on the
         Internet.  (Dodd deposition, p. 45, 1. 17 – 46, l. 23

 And Mr. Hepburn acknowledges that what an IC offers is not a recommendation, but a
set of options (Hepburn deposition, p. 25, ll. 7 – 20) (and those options, of course, are
only those contained in the software, not invented by the project manager or IC).

        The point that Mr. Hepburn made, that the IC's don't make recommendations,
but rather offer options, was echoed by the IC's.  For example:

Q.       Do you make recommendations based on past experience as an
         implementation specialist?  (objection omitted)

A.       No, you try not to.

Q.       Not at all?

11

A.      No.

Q.      Why not?

A.      Because every county is different, and they know what they
        want, and they've got their own culture and their own thing.

Q.      What if they asked you?

A.      You just explain to them that it's—I'll tell you how it works,
        but I'm not going to tell you how to run your office.
        (Carrington deposition, p. 109, ll. 11 – 24)

Next, Mr. Hepburn says, the defendants' software had to be "configured"—that
is, the particular options contained within the software which the client had chosen had to
be activated.  For instance, if a deputy court clerk was supposed to have access to one set
of files, while the clerk himself or herself had to have access to all files, the software had
to be set to allow the appropriate level of access.  The actual technical process of
adjusting the software might be done by a developer/programmer if it was complex, or by
an IC.  In either case, however, this does not entail the exercise of discretion and
independent judgment.  The client has determined who gets what level of access.  The
software has the ability to be set to provide the determined level of access.  It's simply a
matter of skill and product knowledge to set or configure the software to assign the
determined level of access.  Indeed, Mr. Hepburn himself, describing the process (in
terms of financial software), said that once the client's parameters had been determined,
actually configuring the software was "filling out data tables."  (p. 34, ll. 8 – 9).

Mr. Hepburn referred to reviewing the configuration with clients.  During both
testing and training, the IC's would review what the software did in any particular
situation with the client to ensure that it was functioning properly and doing what the
client wanted it to do. He described it as building tables and then showing the client an
example (p. 36, ll. 17 – 19), a "dry run." Again, this is routine and does not involve
discretion and independent judgment:

Q.      As you work through the different variables or nuances for this
        particular client and you configure it to their system, you said
        you then give them sort of a task list?

A.      Yes, Ma'am.

Q.      How do you come up with that task list?

A.      The task list is already preformed [sic] by the packaging of
        these implementation packages of to do's and the structure of
        things you have.  You give the agenda to the client.  We have

> this list of things that we're supposed to do, and we present
> that to the client.  We have these things that we implement
> from tried and true implementation guide, and that's what—

Q.     Like what kind of thing?  Is it like a recipe where you say I
       need to tell you now that you need to---

A.     Yes, Ma'am.  It's pretty much a recipe.  (Bibles McLeod
       deposition, p. 97, l. 19 – p. 98, l. 11).

Mr. Hepburn mentions client acceptance, which he describes merely as getting a
"green light" from the client to move forward, based on the "dry run" examples.

The next duties discussed by Mr. Hepburn are reviewing conversion files and
loading conversion files.  This involves the client identifying the files they want to be
transferred electronically to the new software, rather than having to enter the data
manually, and then actually transferring that data to the new software.  The purely
technical aspects of accomplishing this were done by the programmers:

A.     We don't—the implementation person is not really converting
       data as much as they are checking to make sure data has been
       converted properly.

Q.     But that's part of the conversion process?

A.     Yes.

Q.     Who is doing the actual data conversion, the programmer?

A.     Yes.  (Carrington deposition, p. 98, ll. 17 – 24).

Another IC said:

A.     I didn't do the conversion.

Q.     Yeah.  Who would have?

A.     I guess the developers.  (Steele deposition, p. 93, ll. 10 – 12).

The IC's would review the results with the client, identify any problems and notify the
programmers so that these problems could be fixed, review again until it appeared that
the data had been successfully converted to the new software.

A.     Once you have given that to the programmer he'll run the
       initial conversion  through the conversion process.  And then
       he would either come and tell us it completely bombed, and

> this is what I think is wrong, so gather X, Y, Z information from the customer, or if they had good, clean data, he might could tell you specific areas that needed attention. So you would go back to your customer and say, I need you to do this, this, and this. (McElhaney deposition, p. 63, ll. 6 – 14).

Neither the determination of errors nor their correction was discretionary:

> Q.    What did you do to verify the customer's data after it was converted?
>
> A.    I would compare—once the conversion programmer had gotten a clean enough run through the conversion that he could actually populate the EDPro database, then we would compare certain areas in the Unix data to areas in the EDPro data. I believe I mentioned earlier about once you got to the point where you had data in the database, you could actually run error reports in EDPro, and it would tell you there was missing data here and stuff like that, and then you could go back and look at the Unix data and see why it was missing.
>
> Q.    So were these error reports—you would run error reports?
>
> A.    It was part of the EDPro program.
>
> Q.    Would it happen automatically, our would you have to generate the report?
>
> A.    You'd just click a button. (McElhaney deposition, p. 79, l. 19 – p. 80, l. 12).

Nothing the IC's do in this process requires the exercise of discretion and independent judgment. The client identifies the data which must be transferred. The transfer itself is a technical process. The results are either right or wrong—the identified data is either successfully transferred or it is not.

At one point Mr. Hepburn tries to argue that discretion and judgment are used in the conversion process because the IC is "recommending" which data should be converted. After a rather lengthy discussion, though, he ultimately concedes that:

> The client would just as soon convert everything because it means less work for them. It's the implementation consultant's job to give them the pros and cons of their decisions that they choose to make meaning I could—an implementation consultant could tell their client we convert you will have more work to do than if we don't convert. Then that

implementation consultant articulates with certainty and conviction why converting data means more work for the client when it would clearly simplistically seem to anyone the converting data would mean less work for a client. It's their—and ultimately the client can still choose hey I want to go down that path and then the implementation consultant lives with that decision and executes. (p. 115, l. 18 – p. 116, l. 6)

The next IC duty identified by Mr. Hepburn is training—educating staff about how to use the software. For most of the IC's, this was the largest or one of the largest components of their duties. And again, there was nothing about the training that required discretion or independent judgment. The software operates the way it operates, and the IC's were familiar with it. They would simply show the client's employees how to perform the operations of their departments using the software. Some IC's used training manuals or guidelines, which they themselves did not design or prepare ("Prepare appropriate training materials as new products are developed, didn't have anyting to do with writing training documentation" (Bibles McLeod deposition, p. 90, l. 14 – 16)), which included instructions and screen shots of what the client's employees would see while using the software:

> A.    Well, they each have a computer, and they each have Odyssey on their computer, and we also had—we had training manuals with screen shots. (Carrington deposition, p. 111, l. 15 – 17.

And another IC:

> Q.    Was there anything—what were the handouts that you would provide?

> A.    They were documents provided by Tyler that were instructions sheets on—it essentially covered what we were covering in the classroom.

> Q.    Okay. Did you determine the agenda for the training in the sense of what particular topics to cover with the employees?

> A.    No. That was pretty predetermined, you know. It was provided, like I said, in the examples and then I went by the example of the guy that trained me.

> Q.    When you say examples, what do you mean?

> A.    Shauna would send out a training template and say here is what we did in such and such county, you know, go by this. And I would go by that training schedule. (Dodd deposition, p. 39, l. 22 – p. 40, l. 12).

Another IC:

A.          The only thing I would receive is what module I was teaching. And then I would have the material that was developed by MUNIS or Tyler—whoever—the training material I would have that training material to use.

Q.          And what—when you say training material, to what do you refer?

A.          It's just a manual for each of the modules.  (Meyers, p. 45, l. 6 – 13).

Other IC's had their teaching material "in their head":

Q.          You didn't prepare anything that prepared you for the actual training?  It was all in your head?

A.          Yes.

Q.          And when you got there with the personnel, again, you didn't have a document, an agenda, item numbers 1 through 10, going across and checking those off, or did you?

A.          I don't recall.

Q.          Now, when you were teaching them as to how to enter the citations, did you have a document with you that you would flip through and read in order to try to train them?  Or again, it was all your knowledge that you were training them on?

A.          Right.  Previous experience with the software.  (Steele deposition, p. 52, l. 20 – p. 53, l. 8)

IC's had no authority to deviate from the prescribed training:

A.          Well, I didn't deviate from the Tyler plan.  I had to stay with that, because that's duplicatable, so everything was based on that.

Q.          What Tyler plan are you talking about?

A.          The Tyler training plan for whatever module we were implementing, because the whole idea is if something happened to me, somebody else had to pick up right where I left off, and people couldn't be told something different or be

16

confused by that.

Q.     But the plan, is that like a customer hand-out?  Is that
       something you're giving to the client?

A.     Yeah.  There's a training guide.  There's an instruction
       manual.  Everything has to be duplicatable, so whatever it was,
       it had to stay with that.  So if I was working with a client, that
       was always the foundation to keep that duplicatable.  (Bibles
       McLeod deposition, p. 119, l. 5 – 21).


    USDOL/WH does not consider this sort of training, which merely involves
product knowledge and certain communications skills, as involving discretion and
independent judgment.  This would be the case whether the IC taught from training
manuals, handouts, PowerPoint presentations, or simply relied on his/her knowledge and
experience.

    Mr. Hepburn tried to argue that this training involved discretion and judgment
because the IC is on his/her own in front of the class and has to assess how the training is
going and whether the knowledge is being successfully transferred.  The IC might have to
decide to go over some information again.  He also contends that discretion and judgment
may be used because some of the employees being taught are opposed to the decision to
adopt new software, and may be resistant.

    Such issues are common to virtually every training scenario, and do not change
the USDOL/WH position that such training is a matter of product knowledge and skill.

    In addition, questions can come up which may identify problems which have to
be brought to the attention of the developers or project managers, and Mr. Hepburn
suggests that the decision as to which of such questions should be forwarded, and when,
is discretionary.  Again, however, those decisions are determined by the IC's knowledge
of the product and the employer's procedures.

Q.     What if there was a situation where the customer's employees
       who you were training were not picking up on the training
       such that the training was not on time?  Would you discuss
       with the project manager the need to have additional training?

A.     Yes, I would definitely pass that type of information along.

Q.     And then I guess it was up to the project manger to work that
       out with the client?

A.    And it also always depended on the contract.  Whatever contract the customer had with Tyler they were allowed so many hours of implementation or billable days of implementation.  So if it fell within that parameter—otherwise there would be an additional charge to the customer.  So it all had to be worked around.  I didn't do any of that.  I just passed the information along.  (Meyers deposition, p. 59, l. 14 – p. 60, l. 8)

Another IC:

Q.    So you made a decision whether or not it needed to be brought to the project manager's assistance right then or there or whether it could wait to be done later, after you left for your hotel?

A.    If it didn't interrupt my training, then I continued on with my training, and I contacted them later.

Q.    But you made that decision as to when you were going to contact your project manager?

A.    Depending on the importancy of the—of the—I mean, if we're missing names, obviously I can't train without names.

Q.    Right.

A.    If I'm missing a ZIP code I can train without a ZIP code. (Steele deposition, p. 102, l. 21 – p. 103, l. 10)

The final duties which Mr. Hepburn identifies are assisting with the "go live" transition and with post go live support.  These functions merely involve answering questions about the software as it is configured and adapted to the particular client's procedures.  Often it involves going over while on site during the go live the same material the IC taught to the client's employees earlier during the site visit, which they may not have fully absorbed or which they may simply have forgotten.  Post go live support is answering such questions after the IC has left the site.  These duties clearly require general product knowledge and specific knowledge of how the software has been configured to work for that particular client, not discretion and independent judgment.

As noted above, 29 CFR 541.202(b) lists a number of functions which can involve the exercise of discretion and independent judgment.  Now that we have

reviewed the duties of the IC's, it would be useful to compare them to the list in 541.202(b).

-IC's do not have authority to formulate, affect, interpret, or implement management policies or operating practices.  Their work has nothing to do with management policies or practices.

-they do not carry out major assignments in conducting the operations of the business. Rather, they are part of a team providing a product/service to customers.

-their work does not affect business operations to a substantial degree.  Their failures might cost the company money by disappointing or offending a client, but that does not signify that they use discretion and independent judgment (see 541.202 (f)).

-they do not have authority to commit the employer in matters that have significant financial impact.

-they do not have authority to waive or deviate from established policies and procedures without prior approval.

-they do not have authority to negotiate and bind the company on significant matters.

-they do not provide consultation or expert advice to management.

-they are not involved in planning long- or short-term business objectives.

-they do not investigate and resolve matters of significance on behalf of management.

-they do not represent the company in handling complaints, arbitrating disputes or resolving grievances.

　　　　Even if the IC's duties could be construed to meet one of these factors, and I contend they cannot, that would not be sufficient.  An October 26, 2006 Opinion Letter reminds us that:

> As the preamble to the final rule explained, federal courts generally conclude that employees who meet at least two or three of the indicators mentioned in 29 C.F.R. § 541.202(b) are exercising discretion and independent judgment, although a case-by-case analysis is required. *See* 69 Fed. Reg. at 22,143.

## OPINION LETTERS

　　　　Until quite recently, USDOL/WH would, from time to time, issue Administrator's Opinion Letters in response to questions from the public.   These letters expressed the opinions, interpretations, or enforcement positions of USDOL/WH with regard to specific matters.  There are very few opinion letters which deal with employees performing duties similar to those of the plaintiffs, and those there are do not analyze the specific issue of the exercise of discretion and independent judgment in great depth.

Nevertheless, I am aware of no instance in which the agency has found employees with duties similar to those of the plaintiffs to be exercising discretion and independent judgment, or to be exempt.

An October 26, 2006 Opinion Letter addressed the exempt status of an IT Support Specialist under both the administrative and computer professional exemptions. The letter stated that:

> …testing by various systematic routines to see that a particular…computer application is working properly according to the specifications designed by others are examples of work that lacks the requisite exercise of discretion and independent judgment within the meaning of the administrative exemption. Employees performing such activities are using skills and procedures or techniques acquired by special training or experience. Their duties do not involve, with respect to matters of significance, the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered as required by 29 C.F.R. § 541.202(a).

The letter also points out that a Sixth Circuit case held that (inter alia) configuring hardware and software is not an exempt function:

> See *Martin v. Ind. Mich. Power Co.,* 381 F.3d 574, 581-84 (6th Cir. 2004) (IT Support Specialist responsible for installing and upgrading hardware and software, configuring desktop computers, and testing and troubleshooting equipment is not exempt as administrative employee under pre-2004 regulations because such work is not directly related to management policies or general business operations and is not of substantial importance to management or operation of the business)….

The October 26 letter also refers to an August 19, 1999 Opinion Letter.  That letter addresses employees with duties very similar to those of the plaintiffs:

> This is in response to your letter requesting an opinion regarding the application of the FLSA to individuals employed as customer training consultants (CTCs). You ask whether the CTCs would qualify as either exempt administrative employees or exempt computer professional employees.

> The CTCs are employed in your client's information management firm. The firm engages in, among other things, the installation of computer systems and customer training on the installed software. CTCs provide training to employees on customers' specialized computer software; manipulate and modify software settings and specifications (e.g. toolbars

and setup) to fit and respond to customer needs (does not include program writing or software developing); install, debug, troubleshoot, and convert data from old systems to the new conversions; test customers' moderns; and conduct customer follow-up visits to ensure customer satisfaction.

You state that CTCs are paid a salary of approximately $ 26,000 to $ 27,000. Some CTCs have bachelors' degrees in a business or technical discipline, and others have a strong industry, technical or business background.

Section 13(a)(1) of the FLSA provides a complete [*2]  minimum wage and overtime exemption for any employee employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in Regulations, 29 CFR Part 541 (copy enclosed). An employee may qualify for exemption if all the pertinent tests relating to duties, responsibilities and salary, as discussed in the appropriate section of the regulations, are met.

An employee who is paid on a salary or fee basis of at least $ 250 per week may qualify for exemption as a bona fide administrative employee if the employee's primary duty is office or nonmanual work directly related to management policies or general business operations of his/her employer or his/her employer's customers, and the employee's work requires the exercise of discretion and independent judgment.

Under section 541.205 of the regulations, activities that are "directly related to management policies or general business operations" of an employer are those relating to the administrative operations of a business. The exemption is limited to employees who perform work of substantial importance to the management or operation of the employer's business. The administrative operations of the business [*3]  include white collar employees engaged in servicing a business. Examples of such activity include advising the management, planning, negotiating, representing the company, and business research. The phrase "directly related to management policies or to general business operations" include those whose work affects policy or whose responsibility it is to carry it out. This includes employees who are advisory specialists and consultants of various kinds.

Based on the information in your letter, it is our opinion that the CTCs would not qualify as bona fide administrative employees. These individuals perform technical tasks, which do not constitute making or implementing policy, or the performance of management functions, necessary for the application of the exemption.

This letter, while it concludes that employees quite similar to plaintiffs are not exempt, bases its conclusion more explicitly on the previous regulations requirement that the primary duty of administrative employees be directly related to management policies or general business operations rather than the requirement for the exercise of discretion and independent judgment.  It is significant, of course, that it does not support the notion that the CTC's under discussion exercise discretion and independent judgment. Moreover, the October 26, 2006 letter cites this August 19, 1999 letter for a conclusion that IT Support Specialists don't exercise discretion and independent judgment:

> Their duties do not involve, with respect to matters of significance, the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered as required by 29 C.F.R. § 541.202(a). *See* Wage and Hour Opinion Letter August 19, 1999 (copy enclosed).

Thus the August 19, 1999 letter does support my opinion that duties such as those of the plaintiffs do not involve the exercise of discretion and independent judgment.

## CONCLUSIONS

Based on my education, training and experience, it is my opinion that the duties of the IC's did not involve the exercise of discretion and independent judgment.  Rather, they involved product knowledge, following prescribed policies, procedures, and guidelines, and the use of skill and experience.  While there were some variations in the duties of the plaintiffs, none of these differences were significant enough to prevent me from reaching the conclusion that all the plaintiffs whose depositions I read did not exercise discretion and independent judgment.  As a USDOL/WH investigator and supervisor, I routinely made decisions about whether the duties of a group of employees were sufficiently similar that I could reach a conclusion about the entire group, and in this case it is my conclusion that the duties of plaintiffs were sufficiently similar that I could conclude that they did not exercise discretion and independent judgment.

I am aware that there will be additional depositions and discovery in this case.  I therefore reserve the right to supplement and/or amend my report accordingly.

## COMPENSATION

I am billing $300 per hour for all work on this case other than testimony, plus reasonable expenses.  Testimony in deposition or in court will be billed at $350 per hour.

Dated:  September 3, 2010

Brian T. Farrington

# AMENDED EXPERT REPORT OF BRIAN T. FARRINGTON

EXHIBIT

"B"

**AMENDED EXPERT REPORT OF BRIAN T. FARRINGTON IN *BEALL, et al. v. TYLER TECHNOLOGIES, INC., AND EDP ENTERPRISES, INC.***

I was retained by Sloan, Bagley, Hatcher & Perry Law Firm, to provide a professional opinion on whether the job duties and responsibilities of the plaintiffs and other employees alleged to be similarly situated in this case require the exercise of discretion and independent judgment according to the standards applied by the U.S. Department of Labor, Wage and Hour Division ("USDOL/WH").

**BACKGROUND**

I was employed by the United States Department of Labor, Wage and Hour Division ("Wage and Hour") from 1975 to 1989, with 18 months off for graduate school. From 1975 to 1984, I was a Compliance Officer (an investigator) in Chicago, Illinois and then in Fort Worth, Texas.  My primary function was to enforce the laws administered by the Wage and Hour Division, primarily the Fair Labor Standards Act ("FLSA").  I conducted anywhere from 500 to 600 full investigations during this time, as well as 300 to 400 more limited compliance actions.  From 1984 to 1989 I was the Assistant District Director in Dallas (the position is now called "Director of Enforcement").  I supervised from 12 to 16 investigators in this position.  I assigned them their cases, assisted and advised them during the conduct of their investigations, and reviewed their completed case files.  During this review, I evaluated whether the evidence supported the investigators' findings and conclusions and whether the FLSA had been properly applied. I determined whether claimed and/or potentially applicable exemptions had been correctly found to be applicable or not.  I also reviewed the interviews conducted by the investigator to see if they supported the investigator's findings adequately.  When back wages were computed, I reviewed those computations for both accuracy and proper methodology.

When the investigator was unable to resolve outstanding issues, I met with employers and/or their attorneys in second level conferences to attempt to settle the cases. If no resolution acceptable to the agency could be reached, I made the decision whether a file was suitable to send to the Regional Solicitor of Labor with a recommendation for litigation.  If litigation was recommended, I ensured that conclusions were sound and supported by the evidence, and commented on additional factors such as evidence of willfulness.  I estimate that I supervised approximately 5,000 investigations while I was Assistant District Director.

I left the Department of Labor in 1989 and went into private consulting on wage and hour and other labor matters with a consulting firm called Harry Weisbrod Associates, which I have since purchased.  I also attended law school after leaving the Department of Labor and received my J.D. from the Texas Wesleyan School of Law and was licensed to practice law in 1994.  My law practice consists almost exclusively of representing and advising clients in wage and hour and EEOC matters.  When appearing

as an expert witness, I have been engaged by both plaintiffs and defendants. I also do many speeches, seminars and training programs on FLSA and other employment issues.

Since 1989, I have spent a substantial portion of my time in dealing directly with USDOL/WH while representing clients in investigations. I also maintain professional relationships with a number of agency personnel, and discuss developments in the law and in agency policies, procedures, and interpretations of the law with them. I am therefore up to date on the agency's policies, procedures, interpretations, and enforcement positions. In addition, I keep myself informed on developments in the statutes enforced by USDOL/WH, especially the FLSA, and in relevant regulations and opinions. I also keep up with FLSA case law. I apply this knowledge continuously in advising employers on wage-hour issues and representing them in USDOL/WH investigations. I continue to publish on such issues, as noted below.

## DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS

1. Depositions of Talina McElhaney, Lisa White, Linda Carringt0n, Russell Steele, Melanie Baird, Tony Dodd, Eric Emde, Lorraine Mutch, Eyvonne Wilton, Thomas O'Haver, Joy Bibles McLeod, David Hayner, Sandra Dunning, Kelly Hampton, Bethany Maynard, Joy Flynn, Titus Britt, Geraldine Ingram, Travis Void, Ilene Meyers, Christopher Hepburn.

2. Declarations of Kim Huynh, Talina McElhany, Lisa White, Kelly Hampton, Tony Dodd, Ilene Meyers, Tom O'Haver, Joy Bibles.

3. Plaintiffs' First Amended Collective Action Complaint

4. Defendants' Answer to Plaintiffs' First Amended Collective Action Complaint

5. Chart of IS Plaintiffs by Division and job duties

## OTHER CASES IN WHICH I HAVE TESTIFIED AS EXPERT IN AT LEAST THE LAST FOUR YEARS

1. United States District Court for the Northern District of Georgia, Rome Division, Case No.: 4:99-CV-0001-HLM (*McDermott, et al. v. Cracker Barrel Old Country Store, Inc.*). Expert for Plaintiffs on compensability of lock-in time, and payment of minimum wage for side work. Deposition.

2. United States District Court for the District of Oregon, Case No. MDL Docket No. 1439, (*In re: Farmer's Insurance Exchange Claims Representatives' Overtime Pay Litigation*). Witness for Defendant re: claims representatives in FLSA case. [Note: gave no opinion testimony, but reported on results of test sample claims.] Trial testimony.

3.    District Court, City and County of Denver, Case No. 01CV4773 (*Chase v. Farmer's Insurance Exchange, Inc.*) Expert for Defendant re:  exercise of discretion and independent judgment by claims representatives in Colorado wage and hour case.  Deposition.

4.    District Court, Fourth Judicial District, State of Minnesota, County of Hennepin, Court File EM 01-015004 (*Milner, et al. v. Farmers Insurance Exchange, et al.)*, Expert for Defendant re:  exercise of discretion and independent judgment by claims representatives in Minnesota wage and hour case.  Deposition.

5.    United States District Court for the Western District of Texas, Case No.    EP-02-CA-0564-FM) *(Acosta v. County of El Paso)*, Expert for Defendant re:  off clock hours allegedly worked by detention officers, and offset of off-clock hours by paid lunch period.  Deposition.

6.    United States District Court for the Northern District of Alabama, Western Division, Civil Action No. CV-01-C-0303-W, (*Morgan et al. v. Family Dollar Stores, Inc.)* Expert for the Plaintiffs re:  application of the executive exemption. Deposition.

7.    United States District Court for the District of Arizona, Case No. CIV03 2262 PHX ROS (*Hutton v. Bank of America*), Expert for Defendant re:  administrative exemption, back wage computation, willfulness.  Deposition.

8.    Judicial Court, 49th Judicial District, Webb Co., Texas, Case No. 2003 CV F000553D1, (*The Laredo National Bank and Homeowners Loan Corporation v. Jacob Monty and the Monty Law Firm, P.C.)* Expert for Defendant re:  reasonableness of attorney's opinion on administrative exemption.  Deposition.

9.    United States District Court for the Southern District of Florida, Case No. 04-22640 CIV-JORDAN (*Garcia v. Port Royale Trading Co., Inc., et al.*).  Expert for Defendant re:  back wage calculation.  Deposition.

10.    United States District Court for the Northern District of Alabama, Southern Division, Case No. CV-02-TMF-1174-S (*Chao v. Tyson Foods, Inc.*), Expert for Defendant re:  willfulness.  Deposition.

11.    United States District Court for the Northern District of Alabama, Western Division, Case No. 7:06-CV-01538-LSC (*Womack v. Dolgencorp, Inc., et al.)*, Expert for Plaintiffs re:  executive exemption. Deposition.

12.    Long John Silver

**PUBLICATIONS**

1.  <u>Wage-Hour Compliance</u>.  Authored book published 1995 by Warren, Gorham and Lamont, NY, NY.

2.  <u>Wage Hour and EEOC Compliance and Litigation Prevention</u>.  Published 1991 by the Professional Development Institute at the University of North Texas, Denton, TX.  Authored training manual for all day course on the subject.

3.  <u>A CPA's Guide to Workplace Regulation</u>.  Published 2000 by the American Institute of CPA's.  Training manual for an all day course on the subject.

4.  Society for Human Resource Management, "Legal Report" on the 1996 FLSA Amendments.

5.  I wrote several articles for "Payroll Perspectives," a newsletter published by Ernst and Young.

6.  I wrote several articles for "Auto, Inc.," a magazine published by the Automotive Service Association.

7.  I wrote several articles for "Self Storage," a magazine published by the Self Storage Association.

8.  Harry Weisbrod Associates previously published a bi-monthly newsletter in which I wrote regularly.

9.  I have written other articles for industry groups over the years that I have not kept track of.

10. <u>A Wage and Hour Guide for the Self Storage Industry</u>.  Published 2006 by the Self Storage Association, Alexandria, Virginia.  Review of FLSA requirements and of major state wage and hour law considerations as they apply to employers in the self storage industry.

**OPINIONS AND BASIS**

**METHODOLOGY**

The principal method which USDOL/WH enforcement personnel use to make determinations on the application of the administrative exemption (among others) is to conduct interviews with employees in the job or jobs at issue.  USDOL/WH investigative procedure is for the investigator to select employees from among current and former incumbents in the jobs at issue, and to interview them either in person or by telephone

and obtain from them information about their job duties and responsibilities.  There are no hard and fast rules on the number or distribution, geographic or organizational, of employees to be interviewed.  The investigator is to interview enough employees to allow him to feel confident that he has a good understanding of what the employees in the subject jobs do.

In this case I was able to read a number of depositions of opt-in Plaintiffs, which included, among other things, their accounts of their duties and responsibilities.  In addition, I read the deposition of the person deemed by the defendants to be most knowledgeable concerning the duties and responsibilities of the plaintiffs, so that I could get the employer's perspective.

The opinions I express in this report are of the same type that I would have developed in my work for the USDOL/WH, and subsequently in advising clients on wage and hour issues.  I hold all of my opinions to a reasonable degree of certainty in my field.  The work I have done and the methods I used in this case are the same type of work that I did while employed at USDOL/WH and use the method I used at the agency when addressing possible overtime violations.  I was as careful in performing the work in this case as I was when at USDOL/WH, and in my normal professional activities.

**DISCRETION AND INDEPENDENT JUDGMENT**

The Fair Labor Standards Act of 1939, as amended (29 U.S.C. §§ 201 et seq.) (hereinafter "FLSA" or the "Act") generally requires that employees be paid overtime when they work in excess of 40 hours in a workweek, unless an exemption applies.  There are, however, a number of exemptions from the overtime requirements of the Act.  The most important of these exemptions is the exemption from minimum wage and overtime contained in Section 13(a)(1) of the Act (29 U.S.C. 213(a)(1)) for bona fide executive, administrative, and professional employees, and outside salespeople.  The statute itself does not define the terms "executive," "administrative," "professional," or "outside sales," however.  Rather, the statute authorizes the Secretary of Labor to define and delimit those terms by appropriate regulation.  The regulation in which these terms are defined and delimited is 29 CFR 541.

From the materials and information available to me, employees like Plaintiffs did not supervise other employees, nor were they engaged in work requiring knowledge of an advanced type in a field of science or learning, nor were they involved in sales activities.  Therefore, the executive, professional, and outside sales exemptions could not be applicable to them, leaving the administrative exemption.

There are several elements to the administrative exemption in addition to the performance of some work requiring the exercise of discretion and independent judgment, but I have not been asked to opine on those elements. I have been asked to review the duties and responsibilities of employees included in this action and give an opinion as to whether, under the standards applied by the USDOL/WH, the work of the plaintiffs does, in fact, require the exercise of discretion and independent judgment.

The current regulation defines discretion and independent judgment as follows:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.  29 CFR 541.202(a).

The regulation continues:

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

It is true that the exercise of discretion and independent judgment does not require that employees make final decisions.  Rather, employees who make recommendations can meet the regulatory requirement, as long as their recommendations are given particular weight.  However, the recommendations must themselves involve the exercise of discretion and independent judgment.

On the other hand:

> (e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. *See also* § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive,

recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

(f) An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly....

This standard is not significantly different from the standard in the previous (i.e., prior to August 23, 3004) version of the regulation, which stated that discretion and independent judgment:

> ...[involving] the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in the regulations in subpart A of this part, more over, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance....

Further, both prior enforcement positions of USDOL/WH and prior court cases on this issue remain relevant—as the Preamble to the current regulation states:

> Accordingly, while retaining this standard from the existing regulations, final section 541.202 clarifies the definition of discretion and independent judgment to reflect existing federal case law and to eliminate outdated and confusing language in the existing interpretive guidelines. The Department intends the final rule to clarify the existing standard and to make the standard easier to understand and apply to the 21st Century workplace.

Final section 541.202(a) thus restates the requirement that the exempt administrative employee's primary duty must "include" the exercise of discretion and independent judgment and includes the general definition of this term, taken word-for-word from the existing interpretive guideline at subsection 541.207(a): "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 69 FR 22142

CATEGORIES OF EMPLOYEES INVOLVED

I have been asked to look at Implementation Consultants. According to the deposition testimony, these kinds of employees are/have also been referred Implementation Specialists, and Client Liaison at various times and in different divisions of the defendants. In addition, the duties of employees known as Trainers performed duties similar to employees with the other titles mentioned above, although Trainers may

not have done all the functions that the other employees did.  In any event, I will refer to the position(s) in question as Implementation Consultants, or "IC's."

## APPLICABLE STANDARDS

<u>REGULATIONS</u>

Since this action was filed in May, 2009, and since the maximum statute of limitations under the FLSA is three years, the applicable regulatory standard is the current version of 29 CFR 541, which has been in effect since August 23, 2004.

DUTIES OF IC'S

According to Christopher Hepburn, who is the person designated by the defendants as most knowledgeable about the duties of the plaintiffs, the primary duties involved in the implementation process would be:

-analyze clients' current business practices
-determine any changes to business practices
-configure software to "adhere to" the changed business practices
-review configuration with clients
-receive client acceptance
-review conversion files
-load conversion files
-educate senior staff and other staff on the particular Tyler Technologies' application in question
-assist with the "go live" transition
-assist with post-go live support

(see Hepburn deposition, p. 20, line 22 – p. 21, l. 7).

The testimony of the IC's includes most of these duties, although their descriptions or characterizations of the functions often differ from those of Mr. Hepburn. In any event, none of the functions listed by Mr. Hepburn would involve the exercise of discretion and independent judgment as that term is used in the regulations. Rather, they involve product knowledge, and the use of skill in applying well-established techniques, procedures or specific standards. I will examine each in turn.

The analysis of clients' current business practices was simply the determination of what particular steps, processes, forms, etc., the client was using, so that the defendants could adapt their software to allow the client to carry out its functions.  It primarily involved questioning client employees.  This "analysis" was simply information gathering, in light of the gatherers' knowledge of what the software did. Combined with questions about what the client was currently doing was what changes the

client might want to make.  It is important to note, however, that this did not involve advising the client on what they should do.  Rather, it was simply ascertaining what they did do, and what they wanted to do.  As Mr. Hepburn put it:

> A.  We'll take accounts payable [as an example].  They have a choice whether they would like to centralize accounts payable functions of decentralize accounts payable functions....
>
> Q.  Okay.  And would you tell the client which on they should do?
>
> A.  No.  my role was to explain the division—the divisions, the pros of one the cons of one, pros of the other , cons of other.  Ultimately, it's their decision.  My role would be to offer—
>
> Q,.  Options?
>
> A.  --options and the detailed analysis of those options backup not a recommend.  (Hepburn deposition, p. 22, ll. 17 – p. 23, l. 5)

This sort of process in this sort of setting, knowing what questions to ask, how to follow up on those questions to elicit the information needed to implement the defendants' software, has always been treated by USDOL/WH as a skill, not the exercise of discretion and independent judgment.  In addition, in many cases this sort of function is performed by solely or primarily by project managers rather than by IC's:

> Q.  Did you as an implementation consultant—I'm sorry— implementation specialist at Tyler ever undertake an analysis of what the client needs and wants—similar to how you described the project manager typically does?
>
> A.  No.  That was the project manager's duties.  (Meyers' deposition, p. 48, ll. 2 – 7).

In addition, in some cases checklists were used:

> Q.  All right.  So during this initial call you would gather information about the existing customer's data?
>
> A.  Yes.
>
> Q.  And how would you know what questions to ask?
>
> A.  We had a list, a checklist more or less, of questions that we had to ask and answer and check off as they answered them.  (McElhany deposition, p. 54, ll. 11 – 18)

Thomas Dodd says:

Q.      It is titled Implementation Checklist 1.9, correct?

A.      Correct.

        *         *         *         *

Q.      Okay, what is it?

A.      It looks like just a checklist for what we did to go through for
        implementation.

Q.      Do you recognize the document?

A.      I do.  There is numerous versions of this, but it is a general
        outline of how to do…how to stage software and whatnot.

Q.      So you would use that at the configuration staging?

A.      In the staging phase of the implementation.

Q.      Did you ever use this in connection with your job?

A.      Oh, certainly.  This, or a more modern version.

Q.      Is this a document that is tailored to a particular project?

A.      No.  It just happened to be one that I printed out.  I mean, they
        had a lot of documents similar to this available on line, on the
        Internet.  (Dodd deposition, p. 44, l. 17 – p. 46, l. 23

And Mr. Hepburn acknowledges that what an IC offers is not a recommendation, but a
set of options (Hepburn deposition, p. 22, ll. 17 – p. 23, l. 5) (and those options, of
course, are only those contained in the software, not invented by the project manager or
IC).

        The point that Mr. Hepburn made, that the IC's don't make recommendations,
but rather offer options, was echoed by the IC's.  For example:

Q.      Do you make recommendations based on past experience as an
        implementation specialist?  (objection omitted)

A.      No, you try not to.

11

Q.      Not at all?

A.      No.

Q.      Why not?

A.      Because every county is different, and they know what they
        want, and they've got their own culture and their own thing.

Q.      What if they asked you?

A.      You just explain to them that it's—I'll tell you how it works,
        but I'm not going to tell you how to run your office.
        (Carrington deposition, p. 109, ll. 11 – 24)

Next, Mr. Hepburn says, the defendants' software had to be "configured"—that is, the particular options contained within the software which the client had chosen had to be activated. For instance, if a deputy court clerk was supposed to have access to one set of files, while the clerk himself or herself had to have access to all files, the software had to be set to allow the appropriate level of access. The actual technical process of adjusting the software might be done by a developer/programmer if it was complex, or by an IC. In either case, however, this does not entail the exercise of discretion and independent judgment. The client has determined who gets what level of access. The software has the ability to be set to provide the determined level of access. It's simply a matter of skill and product knowledge to set or configure the software to assign the determined level of access. Indeed, Mr. Hepburn himself, describing the process (in terms of financial software), said that once the client's parameters had been determined, actually configuring the software was "filling out data tables." (p. 28, l. 20 – p. 30, l. 21).

Mr. Hepburn referred to reviewing the configuration with clients. During both testing and training, the IC's would review what the software did in any particular situation with the client to ensure that it was functioning properly and doing what the client wanted it to do. He described it as building tables and then showing the client an example (p. 36, l. 4 – 19), a "dry run." Again, this is routine and does not involve discretion and independent judgment:

Q.      As you work through the different variables or nuances for this
        particular client and you configure it to their system, you said
        you then give them sort of a task list?

A.      Yes, Ma'am.

Q.      How do you come up with that task list?

A.      The task list is already preformed [sic] by the packaging of
        these implementation packages of to do's and the structure of

> things you have.  You give the agenda to the client.  We have
> this list of things that we're supposed to do, and we present
> that to the client.  We have these things that we implement
> from tried and true implementation guide, and that's what—

Q.     Like what kind of thing?  Is it like a recipe where you say I
       need to tell you now that you need to---

A.     Yes, Ma'am.  It's pretty much a recipe.  (Bibles McLeod
       deposition, p. 97, l. 19 – p. 98, l. 11).

Mr. Hepburn mentions client acceptance, which he describes merely as getting a
"green light" from the client to move forward, based on the "dry run" examples.

The next duties discussed by Mr. Hepburn are reviewing conversion files and
loading conversion files.  This involves the client identifying the files they want to be
transferred electronically to the new software, rather than having to enter the data
manually, and then actually transferring that data to the new software.  The purely
technical aspects of accomplishing this were done by the programmers:

A.     We don't—the implementation person is not really converting
       data as much as they are checking to make sure data has been
       converted properly.

Q.     But that's part of the conversion process?

A.     Yes.

Q.     Who is doing the actual data conversion, the programmer?

A.     Yes.  (Carrington deposition, p. 98, ll. 17 – 24).

Another IC said:

A.     I didn't do the conversion.

Q.     Yeah.  Who would have?

A.     I guess the developers.  (Steele deposition, p. 93, ll. 10 – 12).

The IC's would review the results with the client, identify any problems and notify the
programmers so that these problems could be fixed, review again until it appeared that
the data had been successfully converted to the new software.

A.     Once you have given that to the programmer he'll run the
       initial conversion   through the conversion process.  And then

> he would either come and tell us it completely bombed, and this is what I think is wrong, so gather X, Y, Z information from the customer, or if they had good, clean data, he might could tell you specific areas that needed attention.  So you would go back to your customer and say, I need you to do this, this, and this.  (McElhaney deposition, p. 62, ll. 6 – 14).

Neither the determination of errors nor their correction was discretionary:

> Q.      What did you do to verify the customer's data after it was converted?
>
> A.      I would compare—once the conversion programmer had gotten a clean enough run through the conversion that he could actually populate the EDPro database, then we would compare certain areas in the Unix data to areas in the EDPro data.  I believe I mentioned earlier about once you got to the point where you had data in the database, you could actually run error reports in EDPro, and it would tell you there was missing data here and stuff like that, and then  you could go back and look at the Unix data and see why it was missing.
>
> Q.      So were these error reports—you would run error reports?
>
> A.      It was part of the EDPro program.
>
> Q.      Would it happen automatically, our would you have to generate the report?
>
> A.      You'd just click a button.  (McElhaney deposition, p. 76, l. 19 – p. 79, l. 12).

Nothing the IC's do in this process requires the exercise of discretion and independent judgment.  The client identifies the data which must be transferred.  The transfer itself is a technical process.  The results are either right or wrong—the identified data is either successfully transferred or it is not.

At one point Mr. Hepburn tries to argue that discretion and judgment are used in the conversion process because the IC is "recommending" which data should be converted.  After a rather lengthy discussion, though, he ultimately concedes that:

> The client would just as soon convert everything because it means less work for them.  It's the implementation consultant's job to give them the pros and cons of their decisions that they choose to make meaning I could—an implementation consultant could tell their client we convert

you will have more work to do than if we don't convert.  Then that implementation consultant articulates with certainty and conviction why converting data means more work for the client when it would clearly simplistically seem to anyone the converting data would mean less work for a client.  It's their—and ultimately the client can still choose hey I want to go down that path and then the implementation consultant lives with that decision and executes.  (p. 117, l. 15 – p. 118, l. 4)

 The next IC duty identified by Mr. Hepburn is training—educating staff about how to use the software.  For most of the IC's, this was the largest or one of the largest components of their duties.  And again, there was nothing about the training that required discretion or independent judgment.  The software operates the way it operates, and the IC's were familiar with it. They would simply show the client's employees how to perform the operations of their departments using the software. Some IC's used training manuals or guidelines, which they themselves did not design or prepare ("Prepare appropriate training materials as new products are developed, didn't have anyting to do with writing training documentation" (Bibles McLeod deposition, p. 90, l. 14 – 16)), which included instructions and screen shots of what the client's employees would see while using the software:

> A. Well, they each have a computer, and they each have Odyssey on their computer, and we also had—we had training manuals with screen shots. (Carrington deposition, p. 111, l. 15 – 17.

And another IC:

> Q. Was there anything—what were the handouts that you would provide?

> A. They were documents provided by Tyler that were instructions sheets on—it essentially covered what we were covering in the classroom.

> Q. Okay.  Did you determine the agenda for the training in the sense of what particular topics to cover with the employees?

> A. No.  That was pretty predetermined, you know.  It was provided, like I said, in the examples and then I went by the example of the guy that trained me.

> Q. When you say examples, what do you mean?

> A. Shauna would send out a training template and say here is what we did in such and such county, you know, go by this. And I would go by that training schedule. (Dodd deposition, p. 39, l. 22 – p. 40, l. 12).

15

Another IC:

A.     The only thing I would receive is what module I was teaching.
       And then I would have the material that was developed by
       MUNIS or Tyler—whoever—the training material I would
       have that training material to use.

Q.     And what—when you say training material, to what do you
       refer?

A.     It's just a manual for each of the modules.  (Meyers, p. 45, l. 6
       – 13).

Other IC's had their teaching material "in their head":

Q.     You didn't prepare anything that prepared you for the actual
       training?  It was all in your head?

A.     Yes.

Q.     And when you got there with the personnel, again, you didn't
       have a document, an agenda, item numbers 1 through 10,
       going across and checking those off, or did you?

A.     I don't recall.

Q.     Now, when you were teaching them as to how to enter the
       citations, did you have a document with you that you would
       flip through and read in order to try to train them?  Or again, it
       was all your knowledge that you were training them on?

A.     Right.  Previous experience with the software.  (Steele
       deposition, p. 52, l. 20 – p. 53, l. 8)

IC's had no authority to deviate from the prescribed training:

A.     Well, I didn't deviate from the Tyler plan.  I had to stay with
       that, because that's duplicatable, so everything was based on
       that.

Q.     What Tyler plan are you talking about?

A.     The Tyler training plan for whatever module we were
       implementing, because the whole idea is if something
       happened to me, somebody else had to pick up right where I

left off, and people couldn't be told something different or be confused by that.

Q.      But the plan, is that like a customer hand-out?  Is that something you're giving to the client?

A.      Yeah.  There's a training guide.  There's an instruction manual.  Everything has to be duplicatable, so whatever it was, it had to stay with that.  So if I was working with a client, that was always the foundation to keep that duplicatable.  (Bibles McLeod deposition, p. 119, l. 5 – 21).

USDOL/WH does not consider this sort of training, which merely involves product knowledge and certain communications skills, as involving discretion and independent judgment.  This would be the case whether the IC taught from training manuals, handouts, PowerPoint presentations, or simply relied on his/her knowledge and experience.

Mr. Hepburn tried to argue that this training involved discretion and judgment because the IC is on his/her own in front of the class and has to assess how the training is going and whether the knowledge is being successfully transferred.  The IC might have to decide to go over some information again.  He also contends that discretion and judgment may be used because some of the employees being taught are opposed to the decision to adopt new software, and may be resistant.

Such issues are common to virtually every training scenario, and do not change the USDOL/WH position that such training is a matter of product knowledge and skill.

In addition, questions can come up which may identify problems which have to be brought to the attention of the developers or project managers, and Mr. Hepburn suggests that the decision as to which of such questions should be forwarded, and when, is discretionary.  Again, however, those decisions are determined by the IC's knowledge of the product and the employer's procedures.

Q.      What if there was a situation where the customer's employees who you were training were not picking up on the training such that the training was not on time?  Would you discuss with the project manager the need to have additional training?

A.      Yes, I would definitely pass that type of information along.

Q.      And then I guess it was up to the project manger to work that out with the client?

17

A.      And it also always depended on the contract.  Whatever contract the customer had with Tyler they were allowed so many hours of implementation or billable days of implementation.  So if it fell within that parameter—otherwise there would be an additional charge to the customer.  So it all had to be worked around.  I didn't do any of that.  I just passed the information along.  (Meyers deposition, p. 59, l. 14 – p. 60, l. 8)

Another IC:

Q.      So you made a decision whether or not it needed to be brought to the project manager's assistance right then or there or whether it could wait to be done later, after you left for your hotel?

A.      If it didn't interrupt my training, then I continued on with my training, and I contacted them later.

Q.      But you made that decision as to when you were going to contact your project manager?

A.      Depending on the importancy of the—of the—I mean, if we're missing names, obviously I can't train without names.

Q.      Right.

A.      If I'm missing a ZIP code I can train without a ZIP code. (Steele deposition, p. 102, l. 21 – p. 103, l. 10)

The final duties which Mr. Hepburn identifies are assisting with the "go live" transition and with post go live support.  These functions merely involve answering questions about the software as it is configured and adapted to the particular client's procedures.  Often it involves going over while on site during the go live the same material the IC taught to the client's employees earlier during the site visit, which they may not have fully absorbed or which they may simply have forgotten.  Post go live support is answering such questions after the IC has left the site.  These duties clearly require general product knowledge and specific knowledge of how the software has been configured to work for that particular client, not discretion and independent judgment.

As noted above, 29 CFR 541.202(b) lists a number of functions which can involve the exercise of discretion and independent judgment.  Now that we have

reviewed the duties of the IC's, it would be useful to compare them to the list in 541.202(b).

-IC's do not have authority to formulate, affect, interpret, or implement management policies or operating practices.  Their work has nothing to do with management policies or practices.

-they do not carry out major assignments in conducting the operations of the business. Rather, they are part of a team providing a product/service to customers.

-their work does not affect business operations to a substantial degree.  Their failures might cost the company money by disappointing or offending a client, but that does not signify that they use discretion and independent judgment (see 541.202 (f)).

-they do not have authority to commit the employer in matters that have significant financial impact.

-they do not have authority to waive or deviate from established policies and procedures without prior approval.

-they do not have authority to negotiate and bind the company on significant matters.

-they do not provide consultation or expert advice to management.

-they are not involved in planning long- or short-term business objectives.

-they do not investigate and resolve matters of significance on behalf of management.

-they do not represent the company in handling complaints, arbitrating disputes or resolving grievances.

       Even if the IC's duties could be construed to meet one of these factors, and I contend they cannot, that would not be sufficient.  An October 26, 2006 Opinion Letter reminds us that:

> As the preamble to the final rule explained, federal courts generally conclude that employees who meet at least two or three of the indicators mentioned in 29 C.F.R. § 541.202(b) are exercising discretion and independent judgment, although a case-by-case analysis is required. *See* 69 Fed. Reg. at 22,143.

OPINION LETTERS

       Until quite recently, USDOL/WH would, from time to time, issue Administrator's Opinion Letters in response to questions from the public.   These letters expressed the opinions, interpretations, or enforcement positions of USDOL/WH with regard to specific matters.  There are very few opinion letters which deal with employees performing duties similar to those of the plaintiffs, and those there are do not analyze the specific issue of the exercise of discretion and independent judgment in great depth.

Nevertheless, I am aware of no instance in which the agency has found employees with duties similar to those of the plaintiffs to be exercising discretion and independent judgment, or to be exempt.

An October 26, 2006 Opinion Letter addressed the exempt status of an IT Support Specialist under both the administrative and computer professional exemptions. The letter stated that:

> …testing by various systematic routines to see that a particular…computer application is working properly according to the specifications designed by others are examples of work that lacks the requisite exercise of discretion and independent judgment within the meaning of the administrative exemption. Employees performing such activities are using skills and procedures or techniques acquired by special training or experience. Their duties do not involve, with respect to matters of significance, the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered as required by 29 C.F.R. § 541.202(a).

The letter also points out that a Sixth Circuit case held that (inter alia) configuring hardware and software is not an exempt function:

> See *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 581-84 (6th Cir. 2004) (IT Support Specialist responsible for installing and upgrading hardware and software, configuring desktop computers, and testing and troubleshooting equipment is not exempt as administrative employee under pre-2004 regulations because such work is not directly related to management policies or general business operations and is not of substantial importance to management or operation of the business)….

The October 26 letter also refers to an August 19, 1999 Opinion Letter.  That letter addresses employees with duties very similar to those of the plaintiffs:

> This is in response to your letter requesting an opinion regarding the application of the FLSA to individuals employed as customer training consultants (CTCs). You ask whether the CTCs would qualify as either exempt administrative employees or exempt computer professional employees.

> The CTCs are employed in your client's information management firm. The firm engages in, among other things, the installation of computer systems and customer training on the installed software. CTCs provide training to employees on customers' specialized computer software;

manipulate and modify software settings and specifications (e.g. toolbars and setup) to fit and respond to customer needs (does not include program writing or software developing); install, debug, troubleshoot, and convert data from old systems to the new conversions; test customers' moderns; and conduct customer follow-up visits to ensure customer satisfaction.

You state that CTCs are paid a salary of approximately $ 26,000 to $ 27,000. Some CTCs have bachelors' degrees in a business or technical discipline, and others have a strong industry, technical or business background.

Section 13(a)(1) of the FLSA provides a complete [*2] minimum wage and overtime exemption for any employee employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in Regulations, 29 CFR Part 541 (copy enclosed). An employee may qualify for exemption if all the pertinent tests relating to duties, responsibilities and salary, as discussed in the appropriate section of the regulations, are met.

An employee who is paid on a salary or fee basis of at least $ 250 per week may qualify for exemption as a bona fide administrative employee if the employee's primary duty is office or nonmanual work directly related to management policies or general business operations of his/her employer or his/her employer's customers, and the employee's work requires the exercise of discretion and independent judgment.

Under section 541.205 of the regulations, activities that are "directly related to management policies or general business operations" of an employer are those relating to the administrative operations of a business. The exemption is limited to employees who perform work of substantial importance to the management or operation of the employer's business. The administrative operations of the business [*3] include white collar employees engaged in servicing a business. Examples of such activity include advising the management, planning, negotiating, representing the company, and business research. The phrase "directly related to management policies or to general business operations" include those whose work affects policy or whose responsibility it is to carry it out. This includes employees who are advisory specialists and consultants of various kinds.

Based on the information in your letter, it is our opinion that the CTCs would not qualify as bona fide administrative employees. These individuals perform technical tasks, which do not constitute making or implementing policy, or the performance of management functions, necessary for the application of the exemption.

21

This letter, while it concludes that employees quite similar to plaintiffs are not exempt, bases its conclusion more explicitly on the previous regulations requirement that the primary duty of administrative employees be directly related to management policies or general business operations rather than the requirement for the exercise of discretion and independent judgment. It is significant, of course, that it does not support the notion that the CTC's under discussion exercise discretion and independent judgment. Moreover, the October 26, 2006 letter cites this August 19, 1999 letter for a conclusion that IT Support Specialists don't exercise discretion and independent judgment:

> Their duties do not involve, with respect to matters of significance, the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered as required by 29 C.F.R. § 541.202(a). *See* Wage and Hour Opinion Letter August 19, 1999 (copy enclosed).

Thus the August 19, 1999 letter does support my opinion that duties such as those of the plaintiffs do not involve the exercise of discretion and independent judgment.

## CONCLUSIONS

Based on my education, training and experience, it is my opinion that the duties of the IC's did not involve the exercise of discretion and independent judgment. Rather, they involved product knowledge, following prescribed policies, procedures, and guidelines, and the use of skill and experience. While there were some variations in the duties of the plaintiffs, none of these differences were significant enough to prevent me from reaching the conclusion that all the plaintiffs whose depositions I read did not exercise discretion and independent judgment. As a USDOL/WH investigator and supervisor, I routinely made decisions about whether the duties of a group of employees were sufficiently similar that I could reach a conclusion about the entire group, and in this case it is my conclusion that the duties of plaintiffs were sufficiently similar that I could conclude that they did not exercise discretion and independent judgment.

I am aware that there will be additional depositions and discovery in this case. I therefore reserve the right to supplement and/or amend my report accordingly.

## COMPENSATION

I am billing $300 per hour for all work on this case other than testimony, plus reasonable expenses. Testimony in deposition or in court will be billed at $350 per hour.

Dated: September 3, 2010          13th

Brian T. Farrington

22

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF TEXAS

3                MARSHALL DIVISION

4                    - - -

5    PATTY BEALL, MATTHEW MAXWELL,   )
     DAVID GRAVELY, TALINA MCELHANY, )
6    KELLY HAMPTON, CASEY BROWN,     )
     JASON BONNER, KEVIN TULLOS,     )
7    ANTHONY DODD, ILENE MEYERS,     )
     TOM O'HAVER, JOY BIBLES, DON    )
8    LOCCHI and MELISSA PASTOR,      )
     Individually and on behalf of   )
9    all others similarly situated;  )
                                     )
10       Plaintiffs                  )
                                     )
11   vs.                             )  2:08-cv-422-TJW
                                     )
12   TYLER TECHNOLOGIES, INC., and   )
     EDP ENTERPRISES, INC.           )
13                                   )
             Defendants.             )
14   --------------------------------)

15

16                DEPOSITION OF

17              CHRISTOPHER HEPBURN

18               PORTLAND, MAINE

19              AUGUST 18, 2010

20

21

     ATKINSON-BAKER, INC.
22   COURT REPORTERS
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:  Cheryl C. Pieske, RMR

25   FILE NO.:     A40636E

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                    MARSHALL DIVISION

 4                        - - -

 5   PATTY BEALL, MATTHEW MAXWELL,    )

 6   DAVID GRAVELY, TALINA MCELHANY, )

 7   KELLY HAMPTON, CASEY BROWN,      )

 8   JASON BONNER, KEVIN TULLOS,      )

 9   ANTHONY DODD, ILENE MEYERS,      )

10   TOM O'HAVER, JOY BIBLES, DON     )

11   LOCCHI and MELISSA PASTOR,       )

12   Individually and on behalf of    )

13   all others similarly situated;   )

14           Plaintiff,               )

15       vs.                          ) 2:08-cv-422 TJW

16   TYLER TECHNOLOGIES, INC., and,   )

17   EDP ENTERPRISES, INC.,           )

18           Defendants.              )

19   --------------------------------

20

21           Deposition of CHRISTOPHER HEPBURN, taken on

22   behalf of Plaintiff, at Congress Street, Portland, Maine,

23   commencing at 8:32 a.m., Wednesday, August 18, 2010, before

24   Cheryl C. Pieske, RMR, Court Reporter and Notary

25   Public.
```

2

```
1                    A P P E A R A N C E S:

2     FOR PLAINTIFFS:

3     SLOAN, BAGLEY, HATCHER & PERRY LAW FIRM
      BY: LAUREEN F. BAGLEY, ESQ.
4     101 East Whaley Street
      P.O. Drawer 2909
5     Longview, Texas 75606

6     ZELBST, HOLMES & BUTLER
      BY: CHANDRA L. HOLMES RAY, ESQ.
7     P.O. Box 365
      Lawton, Oklahoma 73502-0365

8

9     FOR DEFENDANT:

10    MORGAN, LEWIS & BOCKIUS, LLP
      BY: PAULO B. McKEEBY, ESQ.
11    1717 Main Street, Suite 3200
      Dallas, Texas, 75201-7347
12
      TYLER TECHNOLOGIES, INC.
13    H. LYNN MOORE, ESQ.
      In-house Counsel
14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1    you an implementation specialist?                    08:49:15

2         A.   You're testing my memory.  That's a difficult  08:49:22

3    question to answer.  When I started, the support    08:49:26

4    specialist and implementation specialist roles were  08:49:29

5    really combined.  So I would say 2 years.           08:49:32

6         Q.   Okay.  Was that before Tyler Technologies   08:49:34

7    purchased the division you were working in or after?  08:49:38

8         A.   Before.                                    08:49:41

9         Q.   Before.  Was that also MUNIS?              08:49:41

10        A.   Yes.                                        08:49:44

11        Q.   And when you became vice-president of services  08:49:48

12   in MUNIS, was that before or after Tyler Technologies  08:49:51

13   purchased your division?                             08:49:54

14        A.   Did you say vice-president of services?    08:50:01

15        Q.   I think I did, and I may have written it down  08:50:04

16   incorrectly and I apologize.                         08:50:07

17        A.   That's okay.  I believe that was after Tyler  08:50:08

18   had acquired us.                                     08:50:11

19        Q.   Okay.  Do you recall the date when Tyler   08:50:12

20   acquired MUNIS?                                      08:50:15

21        A.   Not the specific date.  On or around 1999, in  08:50:17

22   1999.                                                08:50:22

23        Q.   Right.  And that's fine.  And when did you  08:50:22

24   become president of Schools?                         08:50:26

25        A.   January of this year.                      08:50:28
```

```
 1        Q.   Okay.  Now, I'm going to go back just a little      08:50:31

 2   bit.  You said -- to the documents that you reviewed, the    08:50:43

 3   job descriptions, the evaluations, the time sheets, and      08:50:47

 4   the notice.  Why did you review those particular             08:50:49

 5   documents?                                                   08:50:54

 6        A.   They were presented by Paulo, and I was asked      08:50:54

 7   to review them to prepare for today.                         08:51:02

 8        Q.   Okay.  Did you review any documents on your own    08:51:06

 9   to help you prepare for this deposition today?               08:51:10

10        A.   No.                                                08:51:13

11        Q.   Okay.  When you were an implementation             08:51:15

12   specialist and support specialist, how were those two       08:51:27

13   jobs combined?  What were the duties of them?               08:51:29

14        A.   In a small company, which we were, when I was      08:51:32

15   not answering phones as a support specialist, I would go     08:51:40

16   on site to clients to perform implementation services.       08:51:45

17        Q.   Okay.  And what were the implementation            08:51:52

18   services you performed?                                      08:51:54

19        A.   It would be a very long list.  I'll try to         08:51:55

20   summarize the highlights.                                    08:52:04

21        Q.   Sure.                                              08:52:05

22        A.   Analyze their -- their current business            08:52:06

23   practices, determine any changes to business practices,      08:52:11

24   configure software to adhere to those changing business      08:52:21

25   practices, review configuration with client, receive        08:52:26
```

| | | |
|---|---|---|
| 1 | client acceptance, review conversion files, load | 08:52:35 |
| 2 | conversion files, educate senior staff and user staff on | 08:52:48 |
| 3 | application, assist with go-live transition, assist with | 08:53:05 |
| 4 | post go-live support, and those are very high level.  I'm | 08:53:10 |
| 5 | not encompassing all. | 08:53:15 |
| 6 | Q.   Would you say those were the primary duties? | 08:53:17 |
| 7 | A.   The primary ones I can recall. | 08:53:19 |
| 8 | Q.   Okay.  And what did you have to do when you | 08:53:24 |
| 9 | were analyzing current business practices of a customer? | 08:53:35 |
| 10 | A.   A lot of question and answer, interviewing, | 08:53:37 |
| 11 | why -- learning why they do -- why they do what they do | 08:53:46 |
| 12 | in the order that they do things, what changes they would | 08:53:51 |
| 13 | like to make.  In summary, a lot of interviewing. | 08:53:55 |
| 14 | Q.   And what is the purpose of that interviewing? | 08:53:58 |
| 15 | I know it's to find out what they're doing, but I | 08:54:01 |
| 16 | understand the surface purpose.  But what was the purpose | 08:54:04 |
| 17 | for you as an implementation specialist? | 08:54:06 |
| 18 | A.   Primarily to see if there were any business | 08:54:12 |
| 19 | changes that the client would like to undertake. | 08:54:14 |
| 20 | Q.   Okay.  And what software module were you | 08:54:16 |
| 21 | implementing? | 08:54:22 |
| 22 | A.   MUNIS. | 08:54:23 |
| 23 | Q.   Okay.  And was it -- what particular part of | 08:54:23 |
| 24 | MUNIS?  Anything specific? | 08:54:28 |
| 25 | A.   All. | 08:54:30 |

| | | |
|---|---|---|
| 1 | Q.   All of it? | 08:54:31 |
| 2 | A.   (Nodding.) | 08:54:31 |
| 3 | Q.   Okay.  Did you have a list of questions that | 08:54:32 |
| 4 | you asked all the customers or a basic list that you went | 08:54:37 |
| 5 | from? | 08:54:42 |
| 6 | A.   No.  I would say it was very dynamic. | 08:54:42 |
| 7 | Q.   Uh-hmm.  How so? | 08:54:46 |
| 8 | A.   There was no pre-determined list of questions | 08:54:48 |
| 9 | that I was given or we had at the time. | 08:54:55 |
| 10 | Q.   What was your purpose in asking these | 08:54:57 |
| 11 | particular questions?  And I know we've talked about to | 08:55:04 |
| 12 | see if there were any business changes they wanted to | 08:55:07 |
| 13 | make, but how was that important to you if there was a | 08:55:09 |
| 14 | business change that the customer wanted to make? | 08:55:11 |
| 15 | A.   I'll provide an example.  Would that be -- | 08:55:13 |
| 16 | Q.   Sure. | 08:55:17 |
| 17 | A.   -- that be okay?  We'll take accounts payable. | 08:55:18 |
| 18 | They have a choice whether they would like to centralize | 08:55:25 |
| 19 | accounts payable functions or decentralize accounts | 08:55:30 |
| 20 | payable functions.  That one decision impacts software | 08:55:34 |
| 21 | configuration and subsequent education. | 08:55:37 |
| 22 | Q.   Okay.  And would you tell the client which one | 08:55:46 |
| 23 | they should do? | 08:55:52 |
| 24 | A.   No.  My role was to explain the differences, | 08:55:53 |
| 25 | the pros of one, cons of one, pros of other, cons of | 08:56:00 |

| | | |
|---|---|---|
| 1 | client acceptance, review conversion files, load | 08:52:35 |
| 2 | conversion files, educate senior staff and user staff on | 08:52:48 |
| 3 | application, assist with go-live transition, assist with | 08:53:05 |
| 4 | post go-live support, and those are very high level.  I'm | 08:53:10 |
| 5 | not encompassing all. | 08:53:15 |
| 6 |     Q.   Would you say those were the primary duties? | 08:53:17 |
| 7 |     A.   The primary ones I can recall. | 08:53:19 |
| 8 |     Q.   Okay.  And what did you have to do when you | 08:53:24 |
| 9 | were analyzing current business practices of a customer? | 08:53:35 |
| 10 |     A.   A lot of question and answer, interviewing, | 08:53:37 |
| 11 | why -- learning why they do -- why they do what they do | 08:53:46 |
| 12 | in the order that they do things, what changes they would | 08:53:51 |
| 13 | like to make.  In summary, a lot of interviewing. | 08:53:55 |
| 14 |     Q.   And what is the purpose of that interviewing? | 08:53:58 |
| 15 | I know it's to find out what they're doing, but I | 08:54:01 |
| 16 | understand the surface purpose.  But what was the purpose | 08:54:04 |
| 17 | for you as an implementation specialist? | 08:54:06 |
| 18 |     A.   Primarily to see if there were any business | 08:54:12 |
| 19 | changes that the client would like to undertake. | 08:54:14 |
| 20 |     Q.   Okay.  And what software module were you | 08:54:16 |
| 21 | implementing? | 08:54:22 |
| 22 |     A.   MUNIS. | 08:54:23 |
| 23 |     Q.   Okay.  And was it -- what particular part of | 08:54:23 |
| 24 | MUNIS?  Anything specific? | 08:54:28 |
| 25 |     A.   All. | 08:54:30 |

1    Q.   All of it?                                      08:54:31

2    A.   (Nodding.)                                      08:54:31

3    Q.   Okay.  Did you have a list of questions that    08:54:32

4  you asked all the customers or a basic list that you went   08:54:37

5  from?                                                   08:54:42

6    A.   No.  I would say it was very dynamic.           08:54:42

7    Q.   Uh-hmm.  How so?                                08:54:46

8    A.   There was no pre-determined list of questions  08:54:48

9  that I was given or we had at the time.                08:54:55

10   Q.   What was your purpose in asking these           08:54:57

11 particular questions?  And I know we've talked about to   08:55:04

12 see if there were any business changes they wanted to   08:55:07

13 make, but how was that important to you if there was a   08:55:09

14 business change that the customer wanted to make?      08:55:11

15   A.   I'll provide an example.  Would that be --      08:55:13

16   Q.   Sure.                                           08:55:17

17   A.   -- that be okay?  We'll take accounts payable.  08:55:18

18 They have a choice whether they would like to centralize   08:55:25

19 accounts payable functions or decentralize accounts    08:55:30

20 payable functions.  That one decision impacts software   08:55:34

21 configuration and subsequent education.                08:55:37

22   Q.   Okay.  And would you tell the client which one  08:55:46

23 they should do?                                        08:55:52

24   A.   No.  My role was to explain the differences,    08:55:53

25 the pros of one, cons of one, pros of other, cons of   08:56:00

| | | |
|---|---|---|
| 1 | other.  Ultimately, it's their decision.  My role would | 08:56:04 |
| 2 | be to offer -- | 08:56:07 |
| 3 | Q.  Options. | 08:56:10 |
| 4 | A.  -- options and the detailed analysis of those | 08:56:11 |
| 5 | options but not a recommendation. | 08:56:15 |
| 6 | Q.  And when you say the detailed analysis, you're | 08:56:17 |
| 7 | referring to the particular effects each option would | 08:56:19 |
| 8 | have in terms of how they functioned; is that correct? | 08:56:24 |
| 9 | A.  That -- correct. | 08:56:27 |
| 10 | Q.  In other words, if it's centralized, you're | 08:56:32 |
| 11 | going to go through these particular steps to do things; | 08:56:34 |
| 12 | and if it's decentralized, you're going to go through | 08:56:40 |
| 13 | these particular steps to do things.  Is that right? | 08:56:42 |
| 14 | A.  Correct.  Correct, steps and who authorizes | 08:56:45 |
| 15 | data, who enters data, at what points does data get | 08:56:52 |
| 16 | authorized, and again who has the authorization to bless | 08:56:57 |
| 17 | data.  We're talking about checks going out to vendors. | 08:57:04 |
| 18 | Q.  All right.  When you're talking about | 08:57:06 |
| 19 | authorization, do you tell the client who should be | 08:57:08 |
| 20 | authorized to have access to certain information? | 08:57:11 |
| 21 | A.  Again, no.  It wouldn't be my place to tell | 08:57:14 |
| 22 | them who should have authorization; just simply an | 08:57:19 |
| 23 | authorization point needs to be made, who do they want to | 08:57:22 |
| 24 | denote as that individual. | 08:57:26 |
| 25 | Q.  Okay.  Is there anything else about analyzing | 08:57:28 |

```
1    their current business practices that you used to do as        08:57:32

2    an implementation specialist and support specialist --         08:57:36

3    actually, we're just talking about the implementation          08:57:39

4    role --                                                        08:57:41

5         A.   Uh-hmm.                                              08:57:41

6         Q.   -- that we haven't talked about.                    08:57:42

7         MR. McKEEBY:  Go ahead, if you understand.               08:57:44

8         A.   The example I gave was one of --                    08:57:50

9    BY MS. RAY:                                                    08:58:00

10        Q.   Many?                                                08:58:00

11        A.   -- hundreds.                                         08:58:00

12        Q.   Yeah.                                                08:58:01

13        A.   But I think it provides a good illustration of      08:58:02

14   a specific question.  There's no specific answer.             08:58:06

15   There's no clear-cut you will do this.  It's presenting a     08:58:10

16   question, presenting the different options of the             08:58:17

17   question, gathering that information and then having the      08:58:19

18   connection of how that impacts the software                   08:58:25

19   configuration.                                                08:58:27

20        Q.   All right.  And I think -- if I understand you      08:58:28

21   correctly, that with the exception of the many other         08:58:30

22   examples that you could provide as to how that worked,        08:58:34

23   we've discussed everything that you would have to have       08:58:36

24   done when you analyze the current business practices of a    08:58:40

25   customer?                                                     08:58:44
```

24

```
1    something that I would consider be given to every client,        09:01:32

2    and then there's another path which is you could be              09:01:36

3    working with a client that is receiving custom software          09:01:38

4    modifications.                                                   09:01:43

5         Q.   And I'm going to get back to that in a minute.         09:01:43

6    Is there anything else that you can think of that you            09:01:48

7    would do when you were analyzing current business                09:01:51

8    practices?                                                       09:01:54

9         A.   Off the top of my head, I think that's the            09:02:00

10   major predominant items that I performed.                        09:02:02

11        Q.   Now, the next thing you said that you would do        09:02:06

12   is determine changes in their business practice.  Is that        09:02:08

13   kind of really along the lines of what we've already             09:02:13

14   discussed, or is there something different to that?              09:02:16

15        A.   I don't -- I don't believe I would determine          09:02:18

16   the changes.  My role was to ask questions to see if the         09:02:26

17   client wanted to change their business practices.                09:02:31

18        Q.   Okay.  So, once again, that's really kind of          09:02:34

19   talking about what we have already talked about in the           09:02:38

20   analyzing the current business practices, correct?  It's        09:02:41

21   not like something totally different?                            09:02:44

22        A.   It's a part of that process.                          09:02:46

23        Q.   Right.  Okay.  I just want to make sure I             09:02:48

24   understood.                                                      09:02:50

25        A.   Okay.                                                 09:02:51
```

27

```
1        Q.    There is nothing else that we haven't discussed        09:02:51

2   that goes into determining the changes in the business           09:02:53

3   practice within the confines of what we already                  09:02:56

4   discussed?                                                       09:03:04

5        A.    My hesitation is there -- there could be other        09:03:04

6   items that I'm just not recalling right now.                     09:03:16

7        Q.    Okay.                                                 09:03:18

8        A.    I don't want to imply that it's a finite or           09:03:19

9   it's a black-and-white list or it's follow checklist 1           09:03:23

10  through 10.  It's anything but follow checklist 1 through         09:03:27

11  10.                                                              09:03:30

12       Q.    If you recall something different, would you           09:03:30

13  please notify your attorney so that he could let us know?        09:03:32

14       A.    Yes, I will.                                          09:03:36

15       MR. McKEEBY:  Or if something triggers your                 09:03:37

16  recollection during the day, we can take a break --             09:03:39

17       MS. RAY:  Absolutely.                                       09:03:41

18       MR. McKEEBY:  -- and we can come back to that point.         09:03:42

19  BY MS. RAY:                                                      09:03:43

20       Q.    The next thing you talked about was configuring        09:03:43

21  software to adhere to the client's practices.  Can you           09:03:46

22  tell me what you did to configure the software to adhere         09:03:52

23  to the client's practices?                                      09:03:55

24       A.    I will use the -- I will continue with the            09:03:56

25  example of accounts payable.  If a client during the            09:04:00
```

28

| | | |
|---|---|---|
| 1 | question-and-answer session stated that they historically | 09:04:06 |
| 2 | have always run accounts payable invoice out of a central | 09:04:11 |
| 3 | accounts payable office at town or city hall and they | 09:04:17 |
| 4 | find that to be inefficient and they'd like to | 09:04:20 |
| 5 | decentralize that process, then that answer would lead me | 09:04:23 |
| 6 | down a path of having to ask who at each department would | 09:04:30 |
| 7 | be entering those invoices, set those users up in the | 09:04:37 |
| 8 | system, set the department codes up in the system so that | 09:04:40 |
| 9 | user A is in department 1, user B is in department 2; and | 09:04:45 |
| 10 | then the data that's entered at the user's would have to | 09:04:51 |
| 11 | funnel to an appropriate person within the central.  It | 09:04:56 |
| 12 | could be more than one person.  So then I would have to | 09:04:59 |
| 13 | configure work flow to say that if departments 1, 2, 3 | 09:05:02 |
| 14 | would go to one person in central accounts payable, and | 09:05:07 |
| 15 | departments 4, 5, 6 would go to another.  I would have to | 09:05:12 |
| 16 | train them and make sure they understood that when it was | 09:05:15 |
| 17 | their turn to review and approve those invoices, what | 09:05:19 |
| 18 | they did, and that training would be completely different | 09:05:23 |
| 19 | if the next client said, well, we would just as soon keep | 09:05:29 |
| 20 | it as a central accounts payable function.  Then there | 09:05:33 |
| 21 | wouldn't be a departmental need.  There wouldn't be the | 09:05:38 |
| 22 | work flow need.  But then I would need to educate the | 09:05:41 |
| 23 | departmental folks on how to enter an invoice and how to | 09:05:44 |
| 24 | approve it, et cetera.  So two different -- two different | 09:05:47 |
| 25 | implementations. | 09:05:52 |

1      Q.   What steps would you specifically have to do to          09:05:52

2   set up users?                                                     09:05:56

3      A.   There is a user ID table that says this user is          09:05:56

4   authorized to use the software, and then within that,            09:06:07

5   what are they authorized to use within the software.  So         09:06:11

6   an example, an accounts payable entry person should not          09:06:15

7   see the employee file to see what everyone's wages are,          09:06:19

8   and I would have to make sure that they didn't.                  09:06:23

9      Q.   So is it basically going into the software and           09:06:28

10  setting up or doing like data entry in the sense of,             09:06:32

11  okay, I'm going to allow access here, I'm not going to           09:06:37

12  here, I am going to enter this code into this area so            09:06:41

13  that it will automatically allow this person access?  Is         09:06:44

14  that what we're talking about?                                   09:06:47

15     A.   It's more complex than that given -- you really          09:06:48

16  are interviewing the department and the overall financial        09:06:55

17  manager to see who can do what.                                  09:07:01

18     Q.   Well, I understand that.  I'm just talking               09:07:05

19  about the actual getting it done.                                09:07:06

20     A.   Oh, after the interviews, it's filling out data          09:07:08

21  tables.                                                          09:07:13

22     Q.   Okay.  And those options are contained in the            09:07:14

23  software.  You just have to fill in what those options           09:07:17

24  are based upon what you have learned from what the person        09:07:21

25  wants to do, the client wants to do.  Is that correct?           09:07:25

```
1        A.   Correct.                                      09:07:27

2        Q.   Okay.  Anything else about what you had --    09:07:27

3   well, no, I'm sorry.  You also said you set up codes.  I 09:07:30

4   assume that's kind the same thing we're talking about is 09:07:33

5   entering the option into the software, right?  Is that   09:07:36

6   correct?                                                 09:07:40

7        A.   In the example I gave, if you are going to --  09:07:40

8   if a client were going to departmentalize or distribute  09:07:43

9   accounts payable functions, then there is a table that   09:07:47

10  needs to be filled out, a departmental table.  It defines 09:07:49

11  the department, the cost center codes that they're going  09:07:54

12  to be allocated to, and default numbering, schematics for 09:07:58

13  that department, do they have their own numbering range.  09:08:03

14  So that table would, then, need to be populated and, in a 09:08:05

15  simplistic view, turned on and integrated with other      09:08:11

16  tables.                                                   09:08:16

17       Q.   Okay.  And when you're setting up data for the 09:08:17

18  customer's work flow, once again, we're talking about     09:08:21

19  populating those areas so that their work flow will       09:08:24

20  perform within the software appropriately.  Is that       09:08:29

21  correct?                                                  09:08:32

22       A.   Work flow is a great example of -- I think it  09:08:32

23  dovetails nicely with the questions and answers because   09:08:39

24  work flow is not just the flow of data from point A to    09:08:43

25  point B to point C.  It's also notifications.  So if I    09:08:47
```

| | | |
|---|---|---|
| 1 | you did, all of your job duties as an implementor? | 09:13:39 |
| 2 | MR. MOORE:  We're talking about him personally, | 09:13:45 |
| 3 | right? | 09:13:47 |
| 4 | MS. RAY:  Uh-hmm. | 09:13:48 |
| 5 | MR. MOORE:  Okay. | 09:13:49 |
| 6 | A.   Again, if I was engaged in a tax or utility | 09:13:49 |
| 7 | implementation, it would be 100 percent of the time.  If | 09:13:55 |
| 8 | I was engaged in -- | 09:13:58 |
| 9 | Q.   Well, no.  Let me make sure I understand.  I | 09:13:59 |
| 10 | don't mean to cut you off rudely, and I apologize.  I'm | 09:14:02 |
| 11 | talking about I know that if you're doing tax, you're | 09:14:05 |
| 12 | saying that you would do that possibly 100 percent of the | 09:14:07 |
| 13 | time.  But you also had to analyze their current business | 09:14:09 |
| 14 | practices, you had to do all -- you know, so what | 09:14:12 |
| 15 | percentage of the time -- | 09:14:15 |
| 16 | A.   Oh. | 09:14:15 |
| 17 | Q.   -- in relation to everything that you did would | 09:14:17 |
| 18 | you be actually doing that function? | 09:14:18 |
| 19 | A.   10 percent but I'm making my best guess. | 09:14:20 |
| 20 | Q.   Okay.  Is there anything else about the | 09:14:30 |
| 21 | configuration process that you did that we haven't | 09:14:32 |
| 22 | discussed?  Once again, I'm not talking about different | 09:14:36 |
| 23 | examples of when I did tax or when I did accounts | 09:14:40 |
| 24 | receivable.  I'm just talking about the actual process. | 09:14:42 |
| 25 | A.   I think that the examples we've discussed of | 09:14:45 |

```
 1    primary --                                          09:14:52

 2        Q.    Okay.                                      09:14:53

 3        A.    -- provide a good example.                09:14:54

 4        Q.    The next thing you said you would do is review   09:14:55

 5    the configuration with the client.                  09:14:57

 6        A.    (Nodding.)                                 09:15:00

 7        Q.    Can you tell me what that entailed if it's  09:15:02

 8    something we haven't already discussed?             09:15:07

 9        A.    Well, after the interviews, I would build the  09:15:08

10    tables, as you've mentioned, and then I would show the  09:15:13

11    client in an example.  Take a department, if they had a  09:15:18

12    dozen departments, I would take one; and we would run   09:15:22

13    through a day in the life or a week in the life of what  09:15:27

14    they would see; and the purpose of that was to show them,  09:15:30

15    based upon their decisions and my marrying those       09:15:38

16    decisions with the application, did the intended result  09:15:43

17    or was the intended result achieved.                09:15:49

18        Q.    Kind of like showing them how it's going to  09:15:51

19    run.  A dry run, so to speak?                       09:15:54

20        A.    A dry run would be a good -- a good way to   09:15:55

21    summarize that.                                     09:15:58

22        Q.    Okay.  Anything else that you had to do with  09:15:58

23    regard to that review process?                      09:16:02

24        A.    If it went successfully, we were done.  If it  09:16:04

25    didn't, we would start all over again.              09:16:11
```

| | | |
|---|---|---|
| 1 | Q.   Made changes? | 09:16:13 |
| 2 | A.   Back to questions and answers, back to options. | 09:16:14 |
| 3 | Q.   Tweak it, so to speak? | 09:16:16 |
| 4 | A.   Iterative process.  It loops never ending | 09:16:18 |
| 5 | sometimes. | 09:16:23 |
| 6 | Q.   So you would -- you know, if they decided, no, | 09:16:23 |
| 7 | I really don't like the way that works; you know, I | 09:16:26 |
| 8 | thought I wanted that; I look at it now, I don't really | 09:16:29 |
| 9 | want that, you would go back and reconfigure it, so to | 09:16:31 |
| 10 | speak, based upon what now they feel they want.  Is that | 09:16:34 |
| 11 | correct? | 09:16:37 |
| 12 | A.   I'd first start with a lot of questions. | 09:16:37 |
| 13 | Q.   Sure. | 09:16:41 |
| 14 | A.   Go right back to the beginning.  Let's start | 09:16:42 |
| 15 | over, pros and cons.  I wouldn't do anything without the | 09:16:44 |
| 16 | client making another decision and then repeating that | 09:16:52 |
| 17 | process. | 09:16:56 |
| 18 | Q.   Okay.  Anything else with the review process, | 09:16:56 |
| 19 | or have we covered that? | 09:17:00 |
| 20 | A.   That's in general what happens. | 09:17:01 |
| 21 | Q.   Okay.  You then said that you received client | 09:17:03 |
| 22 | acceptance.  I'm presuming that means that you got their | 09:17:07 |
| 23 | final okay? | 09:17:11 |
| 24 | A.   At some point we get the green light to move | 09:17:14 |
| 25 | forward. | 09:17:16 |

37

| | | |
|---|---|---|
| 1 | isolation, you've -- you're looking for trouble.  So the | 11:40:09 |
| 2 | convert question comes up in the general analysis of how | 11:40:15 |
| 3 | we're going to define the to-be model, and it's part of | 11:40:19 |
| 4 | that iterative process.  Do I convert payroll?  Well, how | 11:40:24 |
| 5 | about we say yes on the -- no on the employee data but | 11:40:29 |
| 6 | yes on the W-2 history data.  So -- and now I have got to | 11:40:33 |
| 7 | carry those two discussions all the way through.  So when | 11:40:37 |
| 8 | I'm talking about reporting and quarterly 941 reports, | 11:40:41 |
| 9 | there is an impact all the way downstream on whether or | 11:40:44 |
| 10 | not I converted that W-2 information.  So it's -- to talk | 11:40:47 |
| 11 | about conversions in isolation is -- I'm not programmed | 11:40:51 |
| 12 | to talk about that. | 11:40:57 |
| 13 | Q.   The implementation specialist doesn't make | 11:40:58 |
| 14 | those decisions, you know, on their own, I mean, assuming | 11:41:02 |
| 15 | they make them at all.  We've talked about that many do | 11:41:08 |
| 16 | not.  But assuming that any do, it certainly would not be | 11:41:11 |
| 17 | done in isolation in the sense of I'm going to come in, | 11:41:15 |
| 18 | I'm going to analyze what you're doing, I am going to | 11:41:18 |
| 19 | decide what you need to do and how I need to get it done | 11:41:21 |
| 20 | through this new software? | 11:41:24 |
| 21 | A.    Well, that's incorrect from the standpoint that | 11:41:27 |
| 22 | at MUNIS they're not alone because you have your project | 11:41:31 |
| 23 | manager to fall back on, but in Eden and INCODE, you're | 11:41:35 |
| 24 | it.  I mean, you're the implementation consultant.  Your | 11:41:38 |
| 25 | project manager is not going to assist you in the | 11:41:41 |

```
1    convert-not convert discussion.  So you're it.  You're it      11:41:43
2    for Eden, INCODE, anyone else who uses the bull-pen            11:41:47
3    approach.  You've got to decide with that client.  You're      11:41:51
4    not in isolation because the client is making that             11:41:53
5    decision.                                                      11:41:56
6         Q.   That's what I'm talking about.  The client is        11:41:56
7    making the decision ultimately?                                11:41:57
8         MR. McKEEBY:  On convert or not convert?                  11:42:00
9         MS. RAY:  On -- on what information to convert or          11:42:03
10   not convert.                                                   11:42:04
11        A.   Well, I think -- I'm sorry.  I didn't let you        11:42:07
12   finish.                                                        11:42:09
13   BY MS. RAY:                                                    11:42:09
14        Q.   I mean, are they not?                                11:42:09
15        A.   The client would just as soon convert             11:42:10
16   everything because it means less work for them.  It's the      11:42:17
17   implementation consultant's job to give them the pros and      11:42:20
18   cons of their decisions that they choose to make, meaning      11:42:23
19   I could -- an implementation consultant could tell their       11:42:28
20   client if we convert, you will have more work to do than       11:42:31
21   if we don't convert; and then can that implementation          11:42:34
22   consultant articulate with certainty and conviction why        11:42:39
23   converting data means more work for the client when it         11:42:49
24   would clearly simplistically seem to anyone that               11:42:52
25   converting data would mean less work for a client.  And        11:42:56
```

| | | |
|---|---|---|
| 1 | it's their -- and, ultimately, the client can still | 11:43:00 |
| 2 | choose, hey, I want to go down that path, and then the | 11:43:05 |
| 3 | implementation consultant lives with that decision and | 11:43:08 |
| 4 | executes. | 11:43:10 |
| 5 | Q.   Okay. | 11:43:10 |
| 6 | MS. RAY:  Do you guys want to break now? | 11:43:12 |
| 7 | MR. McKEEBY:  Sure. | 11:43:14 |
| 8 | THE VIDEOGRAPHER:  The time is 11:43 a.m.  We're off | 11:43:15 |
| 9 | the record. | 11:43:18 |
| 10 | (Whereupon a recess was taken.) | 11:43:18 |
| 11 | THE VIDEOGRAPHER:  The time is 11:54.  We're back on | 11:54:32 |
| 12 | the record. | 11:54:34 |
| 13 | BY MS. RAY: | 11:54:36 |
| 14 | Q.   We're back after a short break.  Are you ready | 11:54:36 |
| 15 | to proceed? | 11:54:38 |
| 16 | A.   Yes. | 11:54:39 |
| 17 | Q.   Okay.  We were talking about discretion and | 11:54:39 |
| 18 | judgment.  Now, what discretion and judgment is it your | 11:54:42 |
| 19 | testimony is performed when an implementation specialist | 11:54:45 |
| 20 | is training or providing education? | 11:54:49 |
| 21 | A.   Is the question -- the "what" in there, is it | 11:54:52 |
| 22 | is there discretion and -- | 11:54:58 |
| 23 | Q.   If so, what is it? | 11:55:00 |
| 24 | A.   -- judgment during training?  Is that the | 11:55:01 |
| 25 | question? | 11:55:04 |

1      Q.   Well, let me do it this way.  What discretion          11:55:04

2  and judgment do you claim is exercised by implementation        11:55:10

3  specialists when they're performing their job function of       11:55:14

4  training?                                                       11:55:17

5      A.   Can you please explain training just so I know         11:55:17

6  what's in your mind?                                            11:55:24

7      Q.   The educational aspect that you were talking           11:55:24

8  about, educating the users on the software.                    11:55:27

9      A.   Okay.  The example -- yes, there is independent        11:55:31

10  judgment when doing training.  I would -- there are many        11:55:41

11  cases -- you asked what.  The list would be long                11:55:49

12  depending on what I'm doing.  But as an example, if I'm         11:55:53

13  leading a class of 30 people, I'm a teacher at that            11:55:57

14  point.  I have to understand who is in my class.  I could       11:56:04

15  have a recent college graduate and someone who is going        11:56:07

16  to retire in 1 to 2 years.  Are they excited about being       11:56:10

17  in the class?  I've got to determine that.  Their              11:56:15

18  knowledge, their skill level, am I going too fast, am I         11:56:17

19  going too slow, do I -- I have got to point out the            11:56:20

20  people in the class that are struggling.  I'm going to         11:56:24

21  have to work with them potentially one on one.  I'm going       11:56:27

22  to have to make an independent judgment to the client if       11:56:30

23  I'm Eden or INCODE, to my project manager if I'm MUNIS,        11:56:34

24  on did my audience learn what was being taught that day,       11:56:39

25  should I go faster or longer in certain subjects.              11:56:49

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF TEXAS

3                  MARSHALL DIVISION

4    _____

5    _____

6    PATTY BEALL, MATTHEW

7    MAXWELL, TALINA McELHANY and

8    KELLY HAMPTON, Individually

9    and on behalf of all other

10   similarly situated,

11        Plaintiffs,          2:08-cv-422   TJW

12        v.

13   TYLER TECHNOLOGIES, INC., and

14   EDP ENTERPRISES, INC.,

15        Defendants.

16   _____

17   _____

18                DEPOSITION OF

19                ILENE MEYERS

20

21   At Raleigh, North Carolina

22   Friday, July 30, 2010; 9:14 a.m.

23   Reported by: Lindsey D. Cline, CVR

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4         LAUREEN F. BAGLEY, ESQ.

 5         Sloan, Bagley, Hatcher & Perry Law Firm

 6         101 East Whaley Street

 7         Longview, Texas 75606

 8

 9    For the Defendants:

10         PAULO B. McKEEBY, ESQ.

11         Morgan, Lewis & Bockius, LLP

12         1717 Main Street, Suite 3200

13         Dallas, Texas 75201-7347

14

15

16

17

18

19

20

21

22

23
```

```
 1              T A B L E  O F  C O N T E N T S

 2                 E X A M I N A T I O N S

 3     EXAMINATION                              PAGE

 4        Direct Examination by Mr. McKeeby        6

 5        Cross Examination by Ms. Bagley         89

 6

 7              T A B L E  O F  C O N T E N T S

 8                   E X H I B I T S

 9     EXHIBITS      DESCRIPTION          MARKED/REFERENCED

10     Number 1      Expense Reports          15/23

11     Number 2      Customer Services Report  22/23,24,26

12     Number 3      Offer Letter             75/77

13     Number 4      Resume                   80/

14     Number 5      Updated Resume           82/

15     Number 6      Declaration of Ilene     84/

16                   Anne Meyers

17     Number 7      Opt In Notice            89/

18

19

20

21

22

23
```

1   Q.   Okay.  Like a project report or anything specific

2        to the project?  Anything you can recall along

3        those lines?

4   A.   You know, I don't want to be very specific because

5        I'm not recalling.

6   Q.   Okay.

7   A.   But I just know that the project manager always

8        did the analysis of what the client needs and

9        wants.  And so I know that had to have been

10       communicated to me.  And I'm not positive that

11       there was an actual form or if it actually was

12       just through e-mail saying this is exactly what

13       the client is going to be using.

14  Q.   Okay.  And when you say the analysis of what the

15       client needs and wants, you're talking something

16       more than just what module you're training on,

17       correct?

18  A.   Yes.

19  Q.   This is something more specific as to what the

20       client wants to do within the particular module as

21       to routing of data, for example?

22  A.   What they're using and what they're not.

23  Q.   Within the module?

1   A.   Yes.

2   Q.   Did you as an implementation consultant -- I'm

3        sorry -- implementation specialist at Tyler ever

4        undertake an analysis of what the client needs and

5        wants -- similar to what you described the project

6        manager typically does?

7   A.   No.  That was the project manager's duties.

8   Q.   Okay.  And so your recollection, as best you can

9        recall, is that that would have been communicated

10       to you by the project manager in some form,

11       perhaps in a document, but perhaps through an e-

12       mail or a phone conversation?

13  A.   Yes.

14  Q.   Is there a name for that analysis of what the

15       client needs and wants that was used at Tyler?

16  A.   I don't know if there was a set name, but I would

17       call it the project plan.

18  Q.   If I use the term systems analysis, is that

19       something you're familiar with as a term used at

20       Tyler?

21  A.   I think that's a common usage for most technology,

22       system analysis.  But I don't know if that's

23       particularly what they called it as a project

1        manager doing it.

2    Q.  Okay.  But just using that sort of generic

3        understanding of what a systems analysis means, is

4        that a description of what we've discussed in

5        terms of analyzing what the client wants and needs

6        with respect to the software and what it intends

7        to use and what it doesn't intend to use?

8    A.  I don't know, because I don't know what the real

9        definition of that term is.  And I hate to --

10   Q.  Okay.

11   A.  -- say anything.

12   Q.  But you're more comfortable with the phrase

13       project plan to describe that?

14   A.  Uh-huh, yes.

15   Q.  Okay.  Would it have been typical for you to be on

16       the phone with the customer prior to visiting the

17       customer site?

18   A.  It could be, possibly.

19   Q.  And what types of -- what reason would you have to

20       communicate with the client before the trip?

21   A.  I would just tell them I was to be expected in at

22       this time.  "I'm staying here.  Is there anything

23       I need to bring, or is there anything you need

```
1        more of a calendar that -- or schedule that your

2        project manager or someone else prepared that

3        would allow you to know, "Okay.  Three weeks from

4        now I'm supposed to be in the Virgin Islands," for

5        example.  Or was that something that was just

6        communicated to you more on an ad hoc --

7   A.   Yeah, I believe --

8   Q.   -- informal basis?

9   A.   I believe it was done that way because we were all

10       in different places.  I lived in Raleigh.  And if

11       we look at my last project manager, she was in

12       Louisiana.  So we really never --

13  Q.   Okay.  So that's Ms. Lowe?

14  A.   Yes.

15  Q.   Ms. Shumaker-Jackson was in Raleigh, as well?

16  A.   Yes, she was.

17  Q.   And you worked out of the Raleigh office during

18       your entire tenure with Tyler?

19  A.   Yes.

20  Q.   What -- okay.  So let's say Ms. Lowe has given you

21       a phone call or an e-mail, informed you who the

22       client was, what module you would be training on,

23       when you were to report to the client, who your
```

1      contact person was.  Would you get anything in

2      writing to review to help prepare you for the

3      implementation, other than perhaps the e-mail that

4      you've summarized that you would receive from your

5      project manager?

6   A.  The only thing I would receive is what module I

7      was teaching.  And then I would have the material

8      that was developed by MUNIS or Tyler -- whoever --

9      the training material.  I would have that training

10     material to use.

11  Q.  And what -- when you say training material, to

12     what do you refer?

13  A.  It's just a manual for each of the modules.

14  Q.  Was this something that you would have in your

15     physical possession in terms of a hard-copy book,

16     or would this be something on the system?

17  A.  It could be on the system, but I always had a

18     printout.  I always had a hard copy.

19  Q.  And did these manuals have a name?

20  A.  It was whatever the modules were.  If it was

21     accounts payable, it would say Accounts Payable,

22     MUNIS Accounts Payable.

23  Q.  And were these in separate documents or were they

```
 1        all part of the same larger document?

 2   A.   It was separate documents for each module.

 3   Q.   Were they -- how would you -- would you describe

 4        these documents as -- I think you used the term

 5        manuals.  Are they -- how long would they

 6        typically be?

 7   A.   It fluctuated.

 8   Q.   Depending on the application?

 9   A.   Yeah, depending on the application.

10   Q.   Would these be the same manuals that you mentioned

11        that you reviewed in connection with your

12        training?

13   A.   Yes.

14   Q.   So did the manuals explain how the software worked

15        or did they explain how you were supposed to train

16        others to learn the software?

17   A.   It just gave you screen shots and how the software

18        worked.

19   Q.   Okay.  Other than these manuals and the e-mail,

20        would there be anything else you would review

21        document-wise before embarking on the trip to the

22        customer site?

23   A.   I'm not recalling.
```

1    Q.    And what kinds of things would you tell your

2          project manager during these calls, just how the

3          training was going, that kind of thing?

4    A.    I would give her a -- if the training was going

5          well, was it running on time, was anything that

6          came up possibly that might need to be handled, if

7          the system was working well, if there's something

8          that maybe the system wasn't doing, if, you know,

9          she could look into it.

10   Q.    When you say "if the training was going on time,"

11         on time relative to what, a schedule, I take it?

12   A.    Just that I knew I was there for three days, three

13         billable days.  Was the three billable days going

14         to cover what I needed to cover?

15   Q.    And what would that depend on?

16   A.    It would depend on how quickly your client was

17         picking up what you were training or how well you

18         trained.

19   Q.    And when you said one of the things you would

20         report was whether or not the training was going

21         well, is that the same kind of thing in terms of

22         how -- when you say "going well," did you mean how

23         quickly the client was picking up the material?

1    A.    It's just that there was no glitches in the

2          system.  The client seems to understand what's

3          going on and the data information came -- through

4          conversation, they convert their information into

5          the system.  Everything seems to be working well.

6    Q.    And converting the data into the system, that was

7          something done by Tyler's conversion department?

8    A.    Yes, if that's the name of that.  But I don't know

9          if it's called Tyler's conversion department.  But

10         there were technology folks that did that.

11   Q.    How about this?  It wasn't -- you were not the one

12         that converted the data?

13   A.    I did not.  And they're lucky I didn't.

14   Q.    Fair enough.  What if there was a situation where

15         the customer's employees who you were training

16         were not picking up on the training such that the

17         training was not on time?  Would you discuss with

18         the project manager the need to have additional

19         training?

20   A.    Yes, I would definitely pass that type of

21         information along.

22   Q.    And then I guess it was up to the project manager

23         to work that out with the client?

```
 1   A.   And it also always depended on the contract.

 2        Whatever contract the customer had with Tyler,

 3        they were allowed so many hours of implementation

 4        -- or billable days of implementation.  So if it

 5        fell within that parameter -- otherwise there

 6        would be an additional charge to the customer.  So

 7        that all had to be worked around.  I didn't do any

 8        of that.  I just passed information along.

 9   Q.   So were you aware of what the number of hours were

10        on the contract?

11   A.   I didn't -- I never saw contracts.

12   Q.   Okay.  When you did complete a trip report, what

13        would you do with it?

14   A.   It actually went in -- I would send it to -- if I

15        recall correctly, I would do my trip report and

16        send it to my project manager via e-mail.  It was

17        a report within the system.

18   Q.   Did you have responsibilities when the customer

19        went live with Tyler's software?

20   A.   If I had implemented the full time for one client,

21        I would be there for the go-live.

22   Q.   Well, let's make sure we're on the same page about

23        what go-live means.  Tell me what your -- how
```

```
1          you're using that.

2     A.   Go-live is the -- now have actually -- are in

3          production, meaning it is an active system within

4          their business and their folks will be actually

5          using the system.  So it is actually generating

6          information.  It's actually having people put

7          input into their system.  So everything is

8          supposedly worked out prior to that for them to go

9          live.  And we would be there for support.

10    Q.   When you say we, would there be others with you?

11    A.   Generally, the project manager is there for go-

12         live.

13    Q.   But the project manager wouldn't be there when you

14         were doing the other training that you discussed?

15    A.   Generally not.  There had been times that she

16         would be there.

17    Q.   But the --

18    A.   But on a general basis, no, she was not there.

19    Q.   You would do that by yourself?

20    A.   Yes.

21    Q.   So in terms of the support that you provided

22         during the go-live process, was more -- I mean,

23         that's not something that the manual necessarily
```

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3  PATTY BEALL, MATTHEW          )
    MAXWELL, TALINA MCELHANY,     )
 4  AND KELLY HAMPTON,            )
    individually and on behalf    )
 5  of all other similarly        )
    situated,                     )
 6            Plaintiffs,         )
                                  )   No. 2:08-cv-422VS
 7                                )
                                  )
 8  TYLER TECHNOLOGIES, INC.      )
    AND EDP ENTERPRISES, INC.,    )
 9            Defendants.         )

10

11

12

13              ---------------------------------

                      ORAL DEPOSITION OF

14                   TALINA REANN MCELHANY

15                         3/29/10

                ---------------------------------

16

17              ORAL DEPOSITION OF TALINA REANN MCELHANY,

18  produced as a witness at the instance of the DEFENDANTS,

19  and duly sworn, was taken in the above-styled and

20  numbered cause on the 29th day of March, 2010, from

21  9:14 a.m. to 12:35 p.m., before TINA TERRELL BURNEY, CSR

22  in and for the State of Texas, reported by machine

23  shorthand, at the offices of SLOAN, BAGLEY, HATCHER &

24  PERRY, 101 East Whaley Street, Longview, Texas 75601,

25  pursuant to the Federal Rules of Civil Procedure.
</pre>

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3        Ms. Laureen F. Bagley
          SLOAN, BAGLEY, HATCHER & PERRY
 4        101 East Whaley Street
          Longview, Texas 75601
 5
          (903) 757-7000 (telephone)
 6        (903) 757-7574 (facsimile)

 7        Ms. Chandra Holmes Ray
          ZELBST HOLMES & BUTLER
 8        P.O. Box 365
          Lawton, Oklahoma  73502
 9
          (580) 248-4844
10

11   FOR THE DEFENDANTS:

12        Mr. Paulo B. McKeeby
          MORGAN, LEWIS & BOCKIUS LLP
13        1717 Main Street
          Suite 3200
14        Dallas, Texas 75201

15        (214) 466-4000 (telephone)
          (214) 466-4001 (facsimile)
16

17

18

19

20

21

22

23

24

25
```

1                      INDEX

2                                            PAGE

3  Appearances.................................  2

4  TALINA REANN MCELHANY

5  Examination by Mr. McKeeby...................  4

6  Signature and Changes....................... 124

7  Reporter's Certificate...................... 126

8

9                      EXHIBITS

10 NO.  DESCRIPTION                          PAGE

11 1 -  Declaration of Talina McElhany          50

12 2 -  Ms. McElhany's weekly time sheets        90

13 3 -  Job Description Form                    105

14 4 -  Performance Evaluation Form            111

15

16

17

18

19

20

21

22

23

24

25

1      Q.     And how did you come to have an understanding

2 of the EDPro software and how it worked?  Is that just

3 something you picked up on the job?

4      A.     Yes.

10:32AM 5      Q.     And your supervisor throughout the time that

6 you were a client liaison was Chandra Robins?

7      A.     Yes.

8      Q.     Was there any assistant supervisors or anything

9 like that?

10:32AM 10      A.     No.

11      Q.     So the e-mails and conversations that you would

12 have as a client liaison with the point of contact at the

13 school district would be for the purposes of

14 understanding the customer's existing software?

10:33AM 15      A.     Data.

16      Q.     Data.  And I take it this isn't necessarily

17 like a three-hour conversation that you block out.  It's

18 more something that occurs over time.  Is that more

19 accurate?

10:33AM 20      A.     There was an initial call where we would

21 gather specific information, and then there were many

22 more calls after that once we had gotten a look at the

23 data, the first run-through of data.

24      Q.     Right now I'm talking about gathering the

10:34AM 25 information from the client.  Maybe we can start with

1   this initial call.  First of all, at this point in the

2   process overall, the customer has already purchased EDPro

3   from EDP?

4        A.   Well, I don't know at what point the purchase

10:34AM 5   occurred, but they had agreed that, yes, they were going

6   to convert, and this was going to be their software.

7        Q.   Okay.  Would you agree with me that a client

8   liaison was the primary point of contact between the

9   customer and EDP during the conversion process?

10:35AM 10       A.   Yes.

11       Q.   All right.  So during this initial call, you

12   would gather information about the existing customer's

13   data?

14       A.   Yes.

10:35AM 15       Q.   And how would you know what questions to ask?

16       A.   We had a list, a checklist more or less, of

17   questions that we had to ask and answer and check off as

18   they answered them.

19       Q.   What was this list called?

10:36AM 20       A.   I don't remember.  I'm sorry.  Client liaison

21   first call checklist, something like that, but I don't

22   recall the exact name.

23       Q.   And how long was the list?

24       A.   Two pages.

10:36AM 25       Q.   So the questions that you're asking the

1    client -- or rather the point of contact at the customer,

2    at least during this initial call, were on this list?

3          A.    Yes.

4          Q.    Did you ever have to deviate from what was on

10:36AM 5    the list?

6          A.    Sometimes you had to clarify the question for

7    the customer, but we tried not to deviate from the list.

8          Q.    What were -- can you give me an example of a

9    question that was on the list?

10:37AM 10          A.    Yes.  Do you have a July 1 fiscal year or a

11    September 1 fiscal year.

12          Q.    Just for my benefit, do schools have either one

13    or the other typically?

14          A.    Yes.

10:37AM 15          Q.    And so were all of the questions -- I

16    understand that's not really a yes or no question -- but

17    were the questions -- did they require you to provide

18    information other than just Option A or Option B?  Like,

19    for example, were there questions along the lines of,

10:37AM 20    describe how grades are computed in terms of numbers or

21    letters or anything like that?

22          A.    No.

23          Q.    It was more along the lines of two different

24    options?

10:38AM 25          A.    Two or three.  If I could just clarify, this

61
Talina Reann McElhany
3/29/10

1      A.    Yes.

2      Q.    I think I have this, but your job didn't change

3   after Tyler took over, did it?

4                 MS. BAGLEY:   Object to form.

10:46AM  5      A.    No, it did not.

6      Q.    It did not change?

7      A.    My duties didn't change.  My title changed.

8      Q.    Right.  Your title changed from client liaison

9   to implementer?

10:46AM 10      A.    I believe it was implementation specialist.

11      Q.    But in terms of what you were doing on a

12   day-to-day basis, it stayed the same?

13      A.    Yes.

14      Q.    So the description of your job that I

10:46AM 15   referenced in Paragraph 4 of your declaration is accurate

16   as to while you were a client liaison at EDP and at

17   Tyler?

18      A.    Yes.

19      Q.    So how often were these departmental meetings?

10:46AM 20      A.    I don't really know.

21      Q.    Were they more than once a month?

22      A.    No.

23      Q.    Okay.  So you have this initial call.  What do

24   you do with the form that you completed?  Did you give

10:47AM 25   that to the programmer?

1      A.    Yes, and keep a copy for yourself also.

2      Q.    So what do you do next in the conversion

3  process?  Do you wait for the programmer to give you

4  information, or how do you know if you're supposed to do

10:48AM 5  something else in connection with the conversion process?

6      A.    Once you have given that to the programmer,

7  he'll run the initial conversion through the conversion

8  process.  And then he would either come and tell us it

9  completely bombed, and this is what I think is wrong, so

10:48AM 10  gather X, Y, Z information from the customer, or if they

11  had good, clean data, he might could tell you specific

12  areas that needed attention.

13            So you would go back to your customer and

14  say, I need you to do this, this and this.

10:48AM 15      Q.    And how did he communicate the status of the

16  initial conversion to you, by e-mail, orally?

17      A.    Both.  We would have conversations about it,

18  and he might send me an e-mail and say, these are the

19  things that I see wrong.  If I needed clarification, I

10:49AM 20  would just go to him, and we would talk about it.  I

21  would take notes.

22      Q.    How long would it typically take him to do the

23  initial conversion?

24      A.    I wouldn't say there was a typical time.

10:49AM 25      Q.    What would it depend on?

1    A.    Sometimes a whole day.  It could depend on the

2  data itself, the parameters that he had to set in the

3  conversion database in order to run it.  That part was

4  kind of above me, above my skill set.

10:49AM 5    Q.    What would be like an example of an area that

6  needed his attention?

7    A.    Sometimes if a customer didn't have their

8  parameters in the old software set exactly right, then

9  when the data was pulled and the conversion program

10:50AM 10  started trying to read through the data that had been

11  pulled, it might hit something, a blank -- an area that

12  had never been filled out within the parameters, and it

13  might just bomb completely.

14    Q.    So he would tell you that you needed to get a

10:50AM 15  particular type of information from the customer?

16    A.    He would say, you know they left the -- they

17  typed too many digits in their checking account number,

18  let's say, or for some reason or other there was trash

19  after the initial nine numbers in a checking account

10:50AM 20  number, and while the Unix system might not read past

21  nine digits, the EDPro system would or the conversion

22  program would, so that would be trash, so that would

23  need to be cleaned up in the old data.

24    Q.    But in that example of the checking number or

10:51AM 25  check number --

1     Q.    Were there other questions you weren't able to

2   answer that you would have to go to the conversion

3   programmer or someone else to get assistance?

4     A.    Not the conversion programmer at that point.

11:07AM 5   I mean, if they were already running, there wouldn't be

6   a conversion question.

7     Q.    It would just be more of a data question?

8     A.    Not a data question.  There could be an error

9   that I had never seen before that they were running into

11:07AM 10   that I would have to go ask, depending on which module

11   of the program it was, whether it was GL or banking or

12   HR, that would depend on which programmer I went to and

13   said, hey, I've never seen this, so what do you think.

14              And at that point the programmer might

11:08AM 15   have to take it and might have to dig through the code

16   and see what could be causing that error.

17     Q.    But this wouldn't be the conversion programmer,

18   it would be a separate employee that's a programmer?

19     A.    Well, the programmer and the conversion

11:08AM 20   programmer are one and the same, so some of the time it

21   was him, but it wouldn't necessarily have anything to do

22   with the conversion.  It was just a general software

23   error.

24     Q.    Was there a programmer with whom you worked?

11:08AM 25   A.    Yes, there were.

1    Q.    Who were they?

2    A.    Actually three, but primarily Jesse Stanley.

3    Q.    And who else?

4    A.    Richard Fritz, those were the main two.

11:08AM 5    Q.    This next sentence says:  "Additionally, my job

6   duties consisted of gathering information from customers

7   and communicating information about the customer's data

8   to the software conversion programmers."          Have

9   we talked about that or does that refer to something

11:09AM 10  different?

11    A.    No, we've talked about that.

12    Q.    Okay.  The next sentence says:  "I performed

13  this work from the EDP Enterprises, Inc.'s office using

14  the telephone and my computer, which I could network into

11:09AM 15  the customer's computer."

16          That last phrase, does that mean you could

17  access the customer's computer remotely?

18    A.    Yes.

19    Q.    Is that what that means when you say "network

11:09AM 20  into the customer's computer"?

21    A.    Yes.

22    Q.    And when would you have to do that?

23    A.    Often when we were gathering information and

24  sometimes after-hours when the customer was not

11:09AM 25  available, and we'd have a question about how something

1   was entered, we could just look at the data ourselves

2   and see some things, not all things.

3       Q.   What things could you look at, and what things

4   were you unable to look at?

11:10AM 5       A.   Well, some things you could see, but you still

6   needed clarification from the customer.

7       Q.   You needed to ask the customer additional

8   questions?

9       A.   Yes.

11:10AM 10      Q.   And these are questions about their data?

11      A.   Yes.

12      Q.   Because you had to understand the data to

13  communicate it to the conversion programmer?

14      A.   That's right.

11:10AM 15      Q.   Were there ever times where you were operating

16  the customer's system remotely while you were on the

17  telephone?

18      A.   Sometimes.

19      Q.   What would those instances involve?

11:10AM 20      A.   The gathering of information or clarifying of

21  information.  Sometimes you could tell a customer,

22  okay -- and I'm just going to use my checking account

23  number as an example.

24      Q.   Okay.

11:10AM 25      A.   You could say that the checking account

1  number, that field appears to have trash in it from what

2  we're seeing when we work through the conversion.  When

3  the programmer runs through the conversion, he says

4  there's trash in that field, and the customer could say,

11:11AM  5  okay, I'm looking at it, and I don't see any trash.  I

6  would say, okay, let me log in and see what I see.

7           Well, I've logged in, and sure enough

8  there would be trash.  Well, I would say to the

9  customer, are you on screen such and such, and she would

11:11AM 10  say, oh, no.  I mean, that could happen frequently.  You

11  could direct a customer to a particular screen in the

12  program, and they would misnavigate and not be looking

13  at what you were telling them to look at.

14      Q.    So you had to get them on the right page?

11:11AM 15      A.    Right.

16      Q.    Okay.  The next sentence says:  "During the

17  conversion process, I would verify the customer's data

18  after it was converted."

19           What did you do to verify the customer's

11:11AM 20  data after it was converted?

21      A.    I would compare -- once the conversion

22  programmer had gotten a clean enough run through the

23  conversion that he could actually populate the EDPro

24  database, then we would compare certain areas in the

11:12AM 25  Unix data to areas in the EDPro data.  I believe I

1  mentioned earlier about once you got to the point where

2  you had data in the database, you could actually run

3  error reports in EDPro, and it would tell you there was

4  missing data here and stuff like that, and then you

11:12AM 5  could go back and look at the Unix data and see why it

6  was missing.

7       Q.   So were those error reports -- you would run

8  error reports?

9       A.   It was part of the EDPro program.

11:12AM 10      Q.   Would it happen automatically, or would you

11  have to generate the report?

12       A.   You'd just click a button.

13       Q.   But you would have to do something to the

14  system to generate the error report?

11:13AM 15      A.   Yes.

16       Q.   And that would be part of your job?

17       A.   Yes.

18       Q.   Were there particular periods in the conversion

19  process in which you would have to run those error

11:13AM 20  reports, or did you just know generally when you had to

21  do them?

22       A.   You ran the error reports once you had data in

23  there, in the EDPro database, to compare it to what was

24  in the Unix data, and those are the same kind of error

11:13AM 25  reports that once the customer has the program up and

1  running, they run all the time.

2         Q.    So you're doing it kind of like a test?

3         A.    Yes.

4         Q.    But when do you determine when to run the error

11:13AM 5  report as part of this testing and verification process?

6         A.    You know once you have data in the database

7  that you can run your first set of error reports because

8  that was on -- I don't know if it was ever on a list.

9  That was just the next step.  You had to do it to see

11:14AM 10  where you were, to compare your new data to the old

11  data.

12         Q.    And what would you do with the error report

13  once it was generated?

14         A.    You had to read the error -- errors and look

11:14AM 15  at the data in the new database for each specific error

16  and then look at -- let's say if someone came in without

17  a Social Security number, then you would --

18         Q.    Like an employee you mean?

19         A.    An employee came in without a Social Security

11:14AM 20  number, then you would look back over the Unix system

21  that had a personnel program and a payroll.  In the

22  EDPro, HR is all one program.  So when the programmer

23  was running the conversion, there is a place where he

24  chooses to say pull all demographic information on

11:15AM 25  employees from either payroll or personnel.

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3    PATTY BEALL, MATTHEW           )
      MAXWELL, DAVID GRAVLEY,        )
 4    TALINA MCELHANY, KELLY         )
      HAMPTON, KEVIN TULLOS,         )
 5    CASEY BROWN, JASON BONNER,     )
      ANTHONY DODD, ILENE            )
 6    MEYERS, TOM O'HAVER, JOY       )
      BIBLES, DON LOCCHI AND         )
 7    MELISSA PASTOR,                )
      Individually and on behalf     )
 8    of all others similarly        )
      situated,                      ) CIVIL ACTION
 9                                    )
                    PLAINTIFFS,       ) NO.: 2:08-CV-422 TJW
10                                    )
      VS.                             )
11                                    )
                                      )
12    TYLER TECHNOLOGIES, INC.       )
      AND EDP ENTERPRISES, INC.,     )
13                                    )
                    DEFENDANTS.       )

14

15        ------------------------------------

16                  ORAL DEPOSITION OF

17                      TONY DODD

18                    APRIL 27, 2010

19        ------------------------------------

20

          ORAL DEPOSITION OF TONY DODD, produced as a witness
21    at the instance of the DEFENDANTS, and duly sworn, was
      taken in the above-styled and numbered cause on the 27th
22    day of April, 2010, from 9:10 a.m. to
      11:42 a.m., before Elaine Fowler, CSR in and for the
23    State of Texas, reported by machine shorthand, at the
      offices of Cathy Sosebee & Associates, 901 Mac Davis
24    Lane, Lubbock, Texas, pursuant to the Federal Rules of
      Civil Procedure and the provisions stated on the record
25    or attached hereto.
```

**Freedom Court Reporting, Inc**                                       2

```
1                    A P P E A R A N C E S

2


3    FOR THE PLAINTIFFS PATTY BEALL, MATTHEW MAXWELL, DAVID
     GRAVLEY, TALINA MCELHANY, KELLY HAMPTON, KEVIN TULLOS,
4    CASEY BROWN, JASON BONNER, ANTHONY DODD, ILENE MEYERS,
     TOM O'HAVER, JOY BIBLES, DON LOCCHI AND MELISSA PASTOR,
5    Individually and on behalf of all others similarly
     situated:

6
         MS. CHANDRA L. HOLMES RAY
7        Zelbst, Holmes & Butler
         P.O. Box 365
8        Lawton, Oklahoma 73502-0365
         (580) 248-4844

9
     FOR THE DEFENDANTS TYLER TECHNOLOGIES, INC. AND EDP
10   ENTERPRISES, INC.:

11       MR. PAULO B. MCKEEBY
         Morgan, Lewis & Bockius, L.L.P.
12       1717 Main Street
         Suite 3200
13       Dallas, Texas 75201-7347
         (214) 466-4146

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX
                                             PAGE
 2   Appearances......................................  2

 3   TONY DODD

 4        EXAMINATION BY MR. MCKEEBY:  ..................  4
          EXAMINATION BY MS. HOLMES RAY:................ 90
 5        EXAMINATION BY MR. MCKEEBY.................... 97
          EXAMINATION BY MS. HOLMES RAY................. 98
 6

 7   Reporter's Certificate........................... 102

 8                       EXHIBITS

 9   NO.   DESCRIPTION                              PAGE

10   1     Example of incentive sheets, two pages........ 11
     2     Handwritten notes titled Tyler Issues.......... 19
11   3     Customer Daily Logs........................... 27
     4     EagleRecorder Staff Training forms............ 41
12   5     9-21-2007 letter to Tony Dodd from Scott
           Helle......................................... 50
13   6     Time Sheets................................... 55
     7     Declaration of Tony Dodd...................... 61
14   8     Implementer Checklist 1.9..................... 89

15

16

17

18

19

20

21

22

23

24

25
```

1   application.

2        Q.   Okay.   I got it.   And just by way of example,

3   when you would train on balancing the till, what are you

4   doing, standing in the classroom with Power Point

5   walking someone through the different stages or looking

6   over someone's shoulder while they are playing with the

7   database and the information that goes in there or some

8   combination or something else?

9        A.   We printed up fake money and actually did

10  sample transactions.   And over the course of this

11  session we would do sample transactions and then we

12  would pretend it was the close of the day and then show

13  them how to run the daily report and balance the till.

14  And that required just walking around to the individuals

15  and showing them how to do it.

16       Q.   It would be you and these individuals who were

17  employed by the county?

18       A.   Correct.

19       Q.   Did you ever do training with a program manager

20  or anyone else at Tyler, or would that be rare?

21       A.   No.   I occasionally trained additional

22  implementation specialists.   So they would sit in on the

23  class as well so they could learn the software.

24       Q.   But in terms of anybody supervising your

25  activities during the training, that would be unusual?

```
1         A.  Right.  It never happened.  Well, the first

2    time that I did it, Nate watched.  After he said, okay,

3    he knows what he is doing, then that was at.  And he is

4    another implementation guy.

5         Q.  And that is Nate Moses?

6         A.  Correct.

7         Q.  You have produced a variety of receipts,

8    correct?

9         A.  Correct.

10        Q.  These are for gas and food and travel expenses?

11        A.  Correct.

12        Q.  I see there is a plane ticket to Chicago.  Did

13   you go there for Tyler?

14        A.  Through Chicago.  I believe I was going to

15   Lansing, Michigan.

16        Q.  Did you do an implementation up there?

17        A.  I was still in my training phase for that one.

18        Q.  And you submitted these expenses and were

19   reimbursed, correct?

20        A.  Correct.

21        Q.  Do you agree with me that these receipts don't

22   necessarily show the hours that you worked in a

23   particular day, correct?

24        A.  Correct.

25        Q.  Here is a receipt, for example, that is from
```

1    Lowe's that looks like it is office equipment that you

2    purchased.  Would you agree?

3        A.  Correct.

4        Q.  How many different implementations did you do

5    while you were at Tyler?

6        A.  I imagine they would have a record of that, but

7    I -- I would just strictly be guessing.  I don't know.

8    I probably did five or six in Texas and then I did a

9    few -- one in Michigan one in Helena, Montana.  Again, I

10   don't recall.

11       Q.  So it was around 10, in that ballpark?

12       A.  Somewhere around there would be fair to say,

13   yeah.

14       Q.  I will hand you a document and ask you to

15   identify that.

16       A.  Okay.

17       Q.  It is titled Implementation Checklist 1.9,

18   correct?

19       A.  Correct.

20       Q.  And this is one of the documents that you

21   produced today in connection with your deposition?

22       A.  I am sorry.  Can you rephrase that?

23       Q.  Yeah.  You provided this document to me through

24   your lawyer today in the deposition?

25       A.  Correct.  I don't know if it is in connection

1    to it.  It was just in my files.

2        Q.  Right.  That is all I meant.  This was in your

3    files and you provided it today to us?

4        A.  Correct.

5        Q.  Okay.  What is it?

6        A.  It looks like just a checklist for what we did

7    to go through for implementation.

8        Q.  Do you recognize the document?

9        A.  I do.  There is numerous versions of this, but

10   it is a general outline of how to do -- how to stage

11   software and whatnot.

12       Q.  So you would use that at the configuration

13   staging?

14       A.  In the staging phase of the implementation,

15   yes.

16       Q.  Did you ever use this in connection with your

17   job?

18       A.  Oh, certainly.  This, or a more modern version.

19       Q.  Is this a document that is tailored to a

20   particular project?

21       A.  No.  It just happened to be one that I printed

22   out.  I mean, they had a lot of documents similar to

23   this available on-line, on the Internet.  And as they

24   would make improvements and new revisions to the

25   software, then this document varied.  So I don't know

1    where this -- what -- this could have been done when I

2    was first hired or it could have been one of the newer

3    ones.  I don't know.  But it is representative of all of

4    them.

5        Q.  Okay.  But it wasn't necessarily tailored to a

6    particular customer project?

7        A.  No, sir.

8        Q.  Is that correct?

9        A.  That is correct.

10       Q.  And do you know what the numerical designation

11   1.0 refers to?

12       A.  The version of this checklist.

13       Q.  Okay.  How did you find out about potential

14   employment with Tyler?

15       A.  I believe it was something done through Monster

16   or Dice.

17       Q.  Were you working somewhere at the time?

18       A.  I was not.  I was -- well, self-employed.

19       Q.  Doing what?

20       A.  Doing IT work.  I do generalized IT work for

21   small businesses and physicians' offices, networking,

22   web development, a little bit of everything.

23       Q.  How are you currently employed?

24       A.  I am doing that same thing.

25       Q.  Have you done that type of work continuously

1        A.   Typically three to five.  Occasionally there

2    would be 10 or 12 just depending on the location.

3        Q.   And the size of the county?

4        A.   And the size of the county.

5        Q.   And would the people at the customer (sic) who

6    were being trained -- you were the one doing the

7    training, correct?

8        A.   Correct.

9        Q.   And how would you do the training?  Would you

10   do it based on a Power Point presentation where you are

11   giving a speech or did they all have laptops where you

12   were kind of walking them through different assets of

13   the software?

14       A.   Well, we provided handouts and we normally had

15   a training facility up with workstations for them to

16   work on.  And I more or less would walk around and I

17   would demonstrate one time and let them see and then

18   they would log in to their training workstation and

19   duplicate it.  So it was very hands-on training.

20       Q.   Was there a training schedule that --

21       A.   Yes.

22       Q.   -- you were required to adhere to?

23       A.   Yes, sir.  Well, there was a training schedule

24   provided for me to use as a guide, you know.  It varied

25   from site to site depending on if it was a small group

**Freedom Court Reporting, Inc**                    39

1    or a large group.  So I would take the number of

2    people ahead of time and then break the schedule down

3    so I could show them the various functions in the

4    software and accommodate everyone during a week.

5         Q.  Were you doing the training -- the same

6    training session for multiple people then?

7         A.  Yes.

8         Q.  Just based on their own schedules?

9         A.  Correct.

10        Q.  And did you use the guide to determine how long

11   to spend on particular aspects of the software or is

12   that something that you decided based on whatever

13   criteria?

14        A.  It was something that was kind of handed down

15   to me in what I learned from Nate about how much time

16   you spend on various things.  But, again, that -- it

17   depended on the end user.  You know, if the end user

18   gets it the first time, you don't need to have -- and

19   there is two of them in the class, we didn't necessarily

20   spend a whole hour working on it.  There was a little

21   bit of variance there.

22        Q.  Was there anything --- what were the handouts

23   that you would provide?

24        A.  They were documents provided by Tyler that were

25   instruction sheets on -- it essentially covered what we

1    were covering in the classroom.

2         Q.  Okay.  Did you determine the agenda for the

3    training in the sense of what particular topics to cover

4    with the employees?

5         A.  No.  That was pretty predetermined, you know.

6    It was provided, like I said, in the examples and then I

7    went by the example of the guy that trained me.

8         Q.  When you say examples, what do you mean?

9         A.  Shauna would send out a training template and

10   say here is what we did in such and such county, you

11   know, go by this.  And I would go by that training

12   schedule.

13        Q.  And when you say -- this is a document, the

14   training template?

15        A.  Correct.  Well, it is just a training -- a

16   schedule where we covered various topics, you know, an

17   outline of which topics to cover at which time frames.

18        Q.  How long a document was this, a couple of

19   pages.

20        A.  Maybe a couple of pages of them in here, if you

21   need to see them.

22        Q.  "In here", being in the documents that you

23   provided?

24        A.  Yes, sir.

25        Q.  Can you locate those?

1      A.  I sure can.  It is really just -- it is a

2   schedule and a sign-up sheet.  There is maybe a blank

3   one or two in here.

4      Q.  I would like one that is completed, if you can

5   locate one.

6      A.  Sometimes they would just end up in the trash

7   or in the floor afterwards.  Here is a complete, I guess

8   what you would call, a training schedule and sign-up

9   sheet.  It doesn't have signatures on it.  But basically

10  it shows Monday, Tuesday, Wednesday, Thursday and Friday

11  broken down.  And Shauna sent me that one and I, you

12  know, just modified it with the county details.

13     Q.  What does that mean, you would modify it with

14  the county details?

15     A.  Well, I would put the county name on it and

16  change the dates and times for the days that we had

17  allocated for training.

18           MR. MCKEEBY:  I will go ahead and mark this

19  as Deposition Exhibit 4 just so we have it in the

20  record.

21           (Exhibit 4 marked.)

22     Q.  (BY MR. MCKEEBY)  And that is a completed

23  document?

24     A.  Yeah.  Well, it doesn't have signatures.  We

25  would give this to the clerk and have her pass it around

1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2                MARSHALL DIVISION

3    PATTY BEALL, MATTHEW      )
     MAXWELL, TALINA McELHANY, )
4    AND KELLY HAMPTON,        )
     individually and on behalf )
5    of all other similarly    )
     situated,                 )
6        Plaintiffs,           )
                               )  No. 2:08-cv-422
7    VS                        )
                               )
8    TYLER TECHNOLOGIES, INC.  )
     AND EDP ENTERPRISES, INC.,)
9        Defendants.           )

10

11

12

                    -----------------------------------
13              ORAL DEPOSITION OF

14          LINDA ESTES CARRINGTON

15                  4/8/10

                    -----------------------------------
16

17          ORAL DEPOSITION OF LINDA ESTES CARRINGTON,

18   produced as a witness at the instance of the DEFENDANTS,

19   and duly sworn, was taken in the above-styled and

20   numbered cause on the 8th day of April, 2010, from

21   9:18 a.m. to 12:23 p.m., before TINA TERRELL BURNEY, CSR

22   in and for the State of Texas, reported by machine

23   shorthand, at the offices of MORGAN, LEWIS & BOCKIUS LLP,

24   1717 Main Street, Suite 3200, Dallas, Texas 75601,

25   pursuant to the Federal Rules of Civil Procedure.

2

1               A P P E A R A N C E S

2   FOR THE PLAINTIFFS:

3       Ms. Laureen F. Bagley
        SLOAN, BAGLEY, HATCHER & PERRY
4       101 East Whaley Street
        Longview, Texas 75601
5
        (903) 757-7000 (telephone)
6       (903) 757-7574 (facsimile)

7

8   FOR THE DEFENDANTS:

9       Mr. Paulo B. McKeeby
        MORGAN, LEWIS & BOCKIUS LLP
10      1717 Main Street
        Suite 3200
11      Dallas, Texas 75201

12      (214) 466-4000 (telephone)
        (214) 466-4001 (facsimile)
13

14  ALSO PRESENT:

15      Mr. Lynn Moore

16

17

18

19

20

21

22

23

24

25

Linda Estes Carrington - 4/8/10

3

1                    INDEX

2                            PAGE

3    Appearances...................................  2

4    LINDA ESTES CARRINGTON

5    Examination by Mr. McKeeby....................   4

6    Examination by Ms. Bagley.......................133

7    Further Examination by Mr. McKeeby..............135

8    Further Examination by Ms. Bagley...............136

9    Signature and Changes...........................140

10   Reporter's Certificate..........................142

11

12                  EXHIBITS

13   NO.  DESCRIPTION                    PAGE

14   1 -  Ms. Carrington's resume            15

15   2 -  Letter from Mr. McMain to Ms. Carrington   24
          1/6/07

16

     3 -  Ms. Carrington's time sheets       53

17
     4 -  Ms. Carrington's Performance       117
18        Review/Increase Information

19   5 -  Ms. Carrington's 2008 Performance      120
          Evaluation Form

20
     6 -  Ms. Carrington's Consent to Opt In    129

21

22

23

24

25

Linda Estes Carrington - 4/8/10

108

1        A.   And how that county wants to operate, but those

2   decisions aren't made by an implementation person.

3   They're made by someone else.

4        Q.   When you're actually doing the configuring and

5   determining those rights and roles, you're doing that

6   based on the discussion that you've had with the -- I'll

7   use it broadly -- customer, correct?

8        A.   You mean -- repeat that one more time.

9        Q.   You said there were some instances where you

10  would actually do the configuration yourself as an

11  implementation specialist.

12       A.   Uh-huh.

13       Q.   Which I understand to mean -- and you correct

14  me if I'm wrong -- but I understand to mean that you

15  would actually go into the system and determine -- and

16  program, if you will, the system such that a certain user

17  has the appropriate access rights, correct?

18       A.   Right.

19       Q.   And in those instances, you would get that

20  information through your dialogue with the customer that

21  occurred?

22       A.   The users, and through the instruction of the

23  project manager.  And big projects, not even real big

24  projects, even smaller counties, will also have an

25  equivalent to the Tyler project manager.  They'll have

Linda Estes Carrington - 4/8/10

109

1    their own Odyssey project manager, you know, who's also

2    there to make decisions.

3        Q.   But you have a dialogue with the customer as

4    well to tell them different access options?

5        A.   Uh-huh.

6        Q.   Is that right?

7        A.   Yeah.  And that's why you're showing them --

8    that's why you do a fit analysis, so that you can show

9    them the capability so they can start thinking about what

10   rights and roles they want to give to their people.

11       Q.   Do you make any recommendations based on past

12   experience as an implementation specialist?

13            MS. BAGBY:  Object to the form.

14       A.   No, you try not to.

15       Q.   Not at all?

16       A.   No.

17       Q.   Why not?

18       A.   Because every county is different, and they

19   know what they want, and they've got their own culture

20   and their own thing.

21       Q.   What if they asked you?

22       A.   You just explain to them that it's -- I'll tell

23   you how it works, but I'm not going to tell you how you

24   need to run your office.

25       Q.   That's a customer decision ultimately?

Linda Estes Carrington - 4/8/10

110

1      A.   Right, exactly.

2      Q.   When we move to the training element of the

3   implementation, at that point have these decisions with

4   respect to configuration and roles and rights already

5   been made?

6      A.   By the time you get to training?

7      Q.   Yes.

8      A.   Hopefully.  You ideally would like for it to

9   be.

10      Q.   But not in every case?

11      A.   No, plus it's fluid.

12      Q.   And you told me, I think, based on your

13   previous discussion, that the type of training that you

14   would provide as an implementation specialist would vary

15   from project to project?

16         MS. BAGBY:  Object to the form.

17      A.   You're talking about the training of the users?

18      Q.   Yes.  Was it always classroom training, for

19   example?

20      A.   Most of the time you're going to have a

21   classroom environment for the clerks for the general

22   discussions.  With the court admin, you may do

23   one-on-one.

24      Q.   Okay.  So you would do both classroom training

25   and one-on-one training as part of the training element

Linda Estes Carrington - 4/8/10

97

1    A.   Yes.  And truancy.

2    Q.   There's a truancy court?

3    A.   Yes.

4    Q.   And did you do the implementations for all of

5    those?

6    A.   Uh-huh.

7    Q.   Is that yes?

8    A.   Yes, sir.

9    Q.   I don't need the sir part, just the yes.

10   A.   I'm just not doing well with that at all.

11   Q.   That's all right.  We'll get there.

12        All right.  So you did the implementation

13   for all three of those, and how long did each of them

14   last?  First of all, probate.

15   A.   Probate lasted for almost a year.

16   Q.   And civil?

17   A.   I don't remember when we started civil.  Civil

18   took about six months.

19   Q.   And truancy?

20   A.   Truancy only took about three or four months.

21   Q.   In which one of the implementations did the

22   hardware problem exist in that you told me about, or did

23   that apply to all of them?

24   A.   Probably almost all them.  Yeah, it did apply

25   to almost all of them in varying degrees.

Linda Estes Carrington - 4/8/10

98

1    Q.  And because of that time delay, that was an

2  implementation where the training component was larger

3  than in other implementations?  Is that what you're

4  explaining?

5    A.  Yes.  I was just giving you an example.

6    Q.  Right.  And I just want to make sure I

7  understand the example.

8    A.  Yes.

9    Q.  All right.  Let's talk about conversion of

10  data.  That was one of the elements of the implementation

11  process?

12    A.  Yes, sir.

13    Q.  Is that something that the implementation

14  specialist is involved in?

15    A.  In conversion of data?

16    Q.  Yes.

17    A.  We don't -- the implementation person is not

18  really converting data as much as they are checking to

19  make sure data has been converted properly.

20    Q.  But that's part of the conversion process?

21    A.  Yes.

22    Q.  Who is doing the actual data conversion, the

23  programmer?

24    A.  Yes.  There's another whole department that's

25  in charge of conversion.

Linda Estes Carrington - 4/8/10

99

1    Q.  Right, but are those programmers?

2    A.  Developers.

3    Q.  But those are people with whom you would

4    coordinate with in the implementation process?

5    A.  Well, we don't really have to coordinate with

6    them.  I mean, we have to...

7    Q.  Well, what would you do to make sure data has

8    been converted properly by the developers?

9    A.  You -- they're going to pull reports, and

10   you're going to check the codes.

11   Q.  Is this something that's done at the client's,

12   at the courthouse?

13   A.  It can be done at the client's site, but it's

14   done more often at the office.

15   Q.  So what are you reviewing in the report to make

16   sure that the conversion has been done accurately?

17   A.  You're reviewing the data and the codes that

18   match that data.

19   Q.  And that information is conveyed to you in

20   these reports that you mentioned?

21   A.  Yes.

22   Q.  How do you know whether or not the codes match

23   the data?

24   A.  Well, that's because you've got a list.  You've

25   already -- for example, when we were talking about on

Linda Estes Carrington - 4/8/10

110

1    A.   Right, exactly.

2    Q.   When we move to the training element of the

3    implementation, at that point have these decisions with

4    respect to configuration and roles and rights already

5    been made?

6    A.   By the time you get to training?

7    Q.   Yes.

8    A.   Hopefully.  You ideally would like for it to

9    be.

10    Q.   But not in every case?

11    A.   No, plus it's fluid.

12    Q.   And you told me, I think, based on your

13    previous discussion, that the type of training that you

14    would provide as an implementation specialist would vary

15    from project to project?

16         MS. BAGBY:  Object to the form.

17    A.   You're talking about the training of the users?

18    Q.   Yes.  Was it always classroom training, for

19    example?

20    A.   Most of the time you're going to have a

21    classroom environment for the clerks for the general

22    discussions.  With the court admin, you may do

23    one-on-one.

24    Q.   Okay.  So you would do both classroom training

25    and one-on-one training as part of the training element

Linda Estes Carrington - 4/8/10

111

1  of implementation?

2      A.   Right.  And sometimes with judges if they

3  wanted training.  Not all judges wanted training.

4      Q.   But sometimes you would train judges?

5      A.   One-on-one, right, or in a group.

6      Q.   And these classroom training sessions, would

7  there be questions and dialogue from the users?

8      A.   Oh, yes.

9      Q.   And would you typically be doing these

10  trainings on your own?

11      A.   Yeah.

12      Q.   And would you have a PowerPoint or a

13  presentation, or would you just be walking through, or

14  how would you do it?

15      A.   Well, they each have a computer, and they each

16  have Odyssey on their computer, and we also had -- we had

17  training manuals with screen shots.

18      Q.   What does that mean, training manuals with

19  screen shoots?  That was part of the presentation?

20      A.   Right, that we would hand them.

21      Q.   Okay.  So these would be handouts?

22      A.   Yes.

23      Q.   So you would walk them through the process at

24  that point?

25      A.   Right.  You would go through whatever -- let's

Linda Estes Carrington - 4/8/10

112

1  say we were training on setting up hearings and

2  documenting hearing results, then you would go through

3  the whole process on that module.

4      Q.   Would you ever encounter mistakes during that

5  training process?

6      A.   You mean mistakes in the system?

7      Q.   Yes.

8      A.   Yes.

9      Q.   What would you have to do in those instances?

10      A.   You would note down that you needed -- that

11  somebody, either you or somebody, needed to go in and

12  correct it.

13      Q.   How would you know there was a mistake in the

14  system?

15      A.   Well, let's say you went in and you did the

16  drop-down box for hearing times, and you didn't have all

17  the hearing times in there.

18      Q.   And you would know that through a dialogue with

19  the people in the training session?

20      A.   Right.

21      Q.   So then you would know to go back to the --

22  who, the programmer to --

23      A.   No.  An implementation person can go in and

24  change that.

25      Q.   I see.

JOY M. BIBLES McLEOD; May 18, 2010

Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                   MARSHALL DIVISION

3    ────────────────────────────────────────────────

4    PATTY BEALL, MATTHEW MAXWELL,     )
     TALINA McELHANY and KELLY         )
     HAMPTON, individually and on      )
5    behalf of all other similarly     )
     situated,                         )   2:08-cv-422 TJW
6                                       )
             Plaintiff(s),             )
7                                       )
     vs.                                )
8                                       )
     TYLER TECHNOLOGIES, INC., and     )
9    EDP ENTERPRISES, INC.,            )
                                        )
10           Defendant(s).             )

11   ────────────────────────────────────────────────

12          DEPOSITION UPON ORAL EXAMINATION OF
                   JOY M. BIBLES McLEOD

13   ────────────────────────────────────────────────

14                    1:35 P.M.

15                  MAY 18, 2010

16          520 PIKE STREET, 12TH FLOOR

17            SEATTLE, WASHINGTON

18

19

20

21

22

23

24

25   REPORTED BY:   MARY L. GREEN, CCR 2981

JOY M. BIBLES McLEOD; May 18, 2010

Page 2

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF(S):

3         LAUREEN F. BAGLEY
          Sloan, Bagley, Hatcher & Perry
4         101 E. Whaley Street
          Longview, TX 75601
5         903.757.7000
          lbagley@textrialfirm.com
6
     FOR THE DEFENDANT(S):
7
          ELLEN L. PERLIONI
8         Morgan Lewis
          1717 Main Street, Suite 3200
9         Dallas, TX 75201
          214.466.4142
10        ellen.perlioni@morganlewis.com

11   ALSO PRESENT:  LYNN MOORE, Tyler Technologies

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOY M. BIBLES McLEOD; May 18, 2010

Page 3

```
1                         I N D E X

2

3    EXAMINATION BY:                              PAGE(S)

4

5    MS. PERLIONI                                     5

6    MS. BAGLEY                                     133

7

8

9    EXHIBITS FOR IDENTIFICATION                    PAGE

10

11   1      August 15, 2005, e-mail to Financials from    9

12          Joy Bibles

13   2      Resume                                        10

14   3      Employment Application                        11

15   4      September 13, 2005, offer letter             26

16   5      September 21, 2006, letter to Mindy          36

17          D'Andrea from Joy Michelle Bibles

18   6      October 13, 2006, letter to Joy Bibles       36

19          from Dawn Mitchell

20   7      September 21, 2006, e-mail to EDEN-All       53

21          Users from Mindy D'Andrea

22   8      October 9, 2006, e-mail to Connie Shaw and   53

23          Dawn Mitchell from Mindy D'Andrea

24   9      October 23, 2007, e-mail to TBNT from Joy    55

25          M. Bibles
```

JOY M. BIBLES McLEOD; May 18, 2010

27 (Pages 96 to 99)

| Page 96 |
|---|
| 1  If you're shadowing, that means you're going along with |
| 2  another Tyler Technologies person to watch them go |
| 3  through the implementation process? |
| 4      A. Or they're watching me because I'm training |
| 5  them. |
| 6      Q. So if it's not a situation where you're |
| 7  shadowing someone or they're shadowing you while you're |
| 8  training them, it's just you and the client team? |
| 9      A. Yes, Ma'am. |
| 10     Q. Who would be amongst that client team? |
| 11     A. It could be the treasurer. It could be the |
| 12  accounting department. Sometimes it's like persons |
| 13  from all the other groups, parks and recreation, |
| 14  construction, other people who would be involved that |
| 15  will be affected by the projects, because they might |
| 16  have to set up their own project. You might have parks |
| 17  and recreation, the library, anybody who would have |
| 18  need to use that project. |
| 19     Q. And does that differ by client as well? |
| 20     A. Yes, Ma'am. |
| 21     Q. And going into it, do you know these types of |
| 22  nuances that are client specific? |
| 23     A. At the first configuration meeting, you may |
| 24  not. |
| 25     Q. And that's a face-to-face meeting? |

| Page 97 |
|---|
| 1      A. Yes, Ma'am. |
| 2      Q. And approximately how long does your first |
| 3  configuration meeting typically last? |
| 4      A. It could be two days. It depends on how big |
| 5  the client is. |
| 6      Q. It could be two days. It could be what? |
| 7      A. It could be one day. It could be two days. I |
| 8  guess if it's a county, it could be three days. It |
| 9  depends on who comes to the meeting. |
| 10     Q. Why does it take so long to have those types |
| 11  of discussions? |
| 12     A. Because sometimes you're deciding -- it could |
| 13  be because you're configuring the client. It could be |
| 14  because only certain people can be there for the first |
| 15  meeting to get these decisions hammered out. It could |
| 16  be certain departments are going to be at the first |
| 17  meeting and then you're showing another group for the |
| 18  second meeting. It just depends. |
| 19     Q. As you work through the different variables or |
| 20  nuances for this particular client and you configure it |
| 21  in their system, you said you then give them sort of a |
| 22  task list? |
| 23     A. Yes, Ma'am. |
| 24     Q. How do you come up with that task list? |
| 25     A. The task list is already preformed by the |

| Page 98 |
|---|
| 1  packaging of these implementation packages of to dos |
| 2  and the structure of things you have. You give the |
| 3  agenda to the client. We have this list of things that |
| 4  we're supposed to do, and we present that to the |
| 5  client. We have these things that we implement from, |
| 6  tried and true implementation guides, and that's |
| 7  what -- |
| 8      Q. Like what kind of thing? Is it like a recipe |
| 9  where you say I need to tell you now that you need |
| 10  to -- |
| 11     A. Yes, Ma'am. It's pretty much a recipe. |
| 12     Q. You use no discretion in there whatsoever? |
| 13  You don't use your brain basically? |
| 14         MS. BAGLEY: Object to the form. |
| 15     A. No. We go -- if we go off the guide, we're |
| 16  supposed to contact the consulting manager or the |
| 17  project manager. |
| 18     Q. (BY MS. PERLIONI) And these agendas, they |
| 19  don't have those client nuances listed, correct? |
| 20     A. No, Ma'am, they don't. |
| 21     Q. So you have to talk to the client and find out |
| 22  what the nuances are for any particular client, |
| 23  correct? |
| 24     A. That's correct. |
| 25     Q. And then you configure based on the different |

| Page 99 |
|---|
| 1  nuances of this particular client? |
| 2      A. Yes, Ma'am. |
| 3      Q. And then when you give them their task list, |
| 4  does that have to be in any way altered based on the |
| 5  nuances that the particular client brings to the table? |
| 6      A. Well, the implementation guide allows for |
| 7  those nuances, because particularly with project |
| 8  management, the software is configured with enough |
| 9  variety or enough diversity to allow for those. |
| 10         So there's a lot of flexibility in the way |
| 11  that those modules are, particularly the module that I |
| 12  implemented, in that if it can't fit within this box |
| 13  with all these different varieties, then we contact the |
| 14  project manager and say it won't fit into the mold with |
| 15  all these variations. The client wants to do this. |
| 16  What should I do? |
| 17     Q. Just so I'm understanding, the software has so |
| 18  many variables or options that are available? |
| 19     A. Yes, Ma'am. |
| 20     Q. And then you sit down and go over that with |
| 21  the customer -- |
| 22     A. Yes, Ma'am. |
| 23     Q. -- and determine what they want to do, and |
| 24  then you configure all these different available |
| 25  options within the software? |

JOY M. BIBLES McLEOD; May 18, 2010

25 (Pages 88 to 91)

Page 88

1  had during the time that you were employed as an
2  implementation consultant?
3      A. Yes. These responsibilities look familiar.
4  Yes.
5          (Deposition Exhibit 13 was marked for
6          identification.)
7      Q. (BY MS. PERLIONI) I'm going to hand you
8  another document.
9          MS. BAGLEY: Joy, you should read over
10 that.
11         MS. PERLIONI: I've offered to give her
12 all the time to read over it, so if you want her to
13 spend more time reading over this, then we're going off
14 the record.
15         MS. BAGLEY: It's your document that
16 she's never seen before.
17         MS. PERLIONI: Then let's give her an
18 opportunity to review it, but it's not fair to say
19 you're going to count off of our 3 hours when she's
20 taking the time to read word for word. I don't think
21 that's appropriate deposition time.
22         MS. BAGLEY: There are a lot of things I
23 don't agree are appropriate in use of deposition time
24 either.
25         MS. PERLIONI: I mean, if it comes down

Page 89

1  to be an issue, we can take this to the judge, but I
2  don't think not agreeing to give her the time off the
3  record to review the document is a good or is an
4  appropriate response.
5      A. (Reviewing.)
6          MS. PERLIONI: Let the record reflect
7  that we're all sitting here while she's reviewing what
8  we've marked as Deposition Exhibit 12.
9      A. Okay.
10     Q. (BY MS. PERLIONI) After you've had a chance to
11 review Deposition Exhibit 12, is it still your
12 testimony that it accurately reflects your job duties
13 and responsibilities during the time you held the
14 position of implementation consultant with Tyler
15 Technologies?
16     A. Most of these things do.
17     Q. Is there any that are listed on here that you
18 do not -- or that were not part of your
19 responsibilities?
20     A. I didn't participate in the user conference.
21     Q. Wait. Real quick, I want to make sure we're
22 straight on the record. It looks to me like you're
23 looking on the second page of Deposition Exhibit 12
24 marked 72330.
25     A. Uh-huh.

Page 90

1      Q. Can you tell me where that is?
2      A. It's implementation consultant continued.
3  Didn't participate in the user conference.
4      Q. I see. So where it says participate in the
5  annual user conference, you didn't actually --
6      A. I didn't do that. Where it says become
7  competent in other disciplines, generic business
8  process review, project management, web application
9  deployment, crystal report writer, didn't do that.
10     Q. Anything --
11     A. Achieving certification of multiple modules,
12 didn't do that. Pursue diversity that was not
13 technical specification, those weren't things that were
14 done. Prepare appropriate training materials as new
15 products are developed, didn't have anything to do with
16 writing training documentation. (Reviewing). So far
17 that's all I see that jumped out to me.
18     Q. And you read through the entire document
19 that we've marked Deposition Exhibit 12, correct?
20     A. As fast as I can and process it with the time
21 that I had, yeah.
22     Q. We haven't tried to hurry you. We've given
23 you all the time you need.
24     A. (Reviewing.)
25         MS. PERLIONI: Let the record reflect

Page 91

1  we're again sitting here as Ms. Bibles goes back
2  through the job description marked as Deposition
3  Exhibit 12.
4      A. I didn't work with the client to develop
5  procedures, documentation, and office systems to
6  facilitate software installation. I never did that.
7      Q. (BY MS. PERLIONI) Anything else?
8      A. (Reviewing). And I didn't document client
9  requirements.
10         MS. BAGLEY: Where is that?
11         THE WITNESS: Right here.
12     A. Thoroughly identify and document client
13 requirements to a level of detail required to design
14 configure, I didn't do that.
15     Q. (BY MS. PERLIONI) Anything else on Deposition
16 Exhibit 12?
17     A. If I see something, I'll let you know as we
18 go. I don't see anything now.
19     Q. I'd like to go back to what we marked
20 Deposition Exhibit 11. It's your declaration.
21     A. Okay.
22     Q. I'm looking specifically at paragraph 3.
23 "During the time I was an implementation consultant
24 with Tyler Technologies, Inc., my job duties consisted
25 primarily of walking clients through the implementation

JOY M. BIBLES McLEOD; May 18, 2010

---

**Page 116**

1  got a problem.
2      Q. Give me some other examples of types of
3  problems that you personally were able to identify when
4  looking at the customer's data in the test program.
5      A. If we would have had subtasks that said things
6  like land use, permitting, and those ended up in phase
7  descriptions, that would have said construction 1,
8  construction 2, construction 3, and those descriptions
9  ended up in phases, I would have known we've got a
10  problem here because those are subtask descriptions in
11  phase descriptions.  That's an issue.
12      So those are the kinds of things that would
13  have jumped out.  If we would have had budgeting
14  numbers in phase descriptions, those would have been a
15  problem.
16      Q. How do you know that, though?
17      A. Well, when you see the client, you set it up
18  and you work with project accounting enough, you start
19  recognizing what phase descriptions are, and when you
20  see budget numbers show up in a phase description, you
21  know at first glance that we have a problem.
22      Q. So that's based on your prior experience?
23      A. Exactly.
24      Q. What other kind of things are you looking
25  through of the test data to look for to try to

---

**Page 117**

1  troubleshoot or see if there are any problems?
2      A. When the client imports budgets and you know
3  they've imported budgets and they were there in test
4  and they're not in production, that's a problem.
5      Q. Any other kind of things that you're looking
6  for to try to see if there are any problems with the
7  data?
8      A. The client does the validating, and then when
9  they say there's a problem, I come and confirm that
10  there's a problem, and then I would go ahead and call.
11      Q. When you say validating, you mean comparing, I
12  guess, what the Tyler software is showing and what they
13  expect it to show?
14      A. Exactly.
15      Q. Let's go back to your declaration that we
16  marked Deposition Exhibit 11.  "If there were errors in
17  the converted data, I would assist the customer with
18  developing a plan for correcting errors in their
19  existing database."
20      What does that mean?
21      A. Well, if they had errors -- well, let's say
22  the budgets were missing.  Then we would sit there and
23  I would say, okay, first of all, I'm going to call the
24  conversion team and we'll see what we can do to get
25  that taken care of.  Obviously you can't roll this out.

---

**Page 118**

1  I'm going to call the project manager.  Those are the
2  kinds of things I would do.
3      I would never go off what our plan was, call
4  the project manager, call conversion, because Tyler
5  Technologies had their own plan about what to do if
6  there was a problem, but the client also had to develop
7  a plan about what they were going to do.
8      If their Go Live date was June 1, obviously
9  they couldn't do that, so when they developed their
10  plan, it had to also include what we were going to do
11  as a company, which meant we were going to work with
12  our conversion team, talk to the consulting manager,
13  because obviously that meant another trip for me to
14  come down there once everything was cleaned up.
15      Q. So you're collaborating with the client.
16  You're collaborating with Tyler.  You're all working
17  together to come up with a plan for whatever it is
18  you've discovered when you're looking at the software?
19      A. Right.
20      Q. "I also trained clients on how to operate the
21  new software program."
22      Do you see that?  What different methods did
23  you utilize to train clients?  I mean, it could be
24  classroom training with a PowerPoint, pure lecture,
25  sitting down at computers, one-on-one with some people

---

**Page 119**

1  that are struggling.  Just give me some of the various
2  different types of training that you utilized when
3  working with clients to teach them how to operate the
4  new software program.
5      A. Well, I didn't deviate from the Tyler plan.  I
6  had to stay with that, because that's duplicatable, so
7  everything was based on that.
8      Q. What Tyler plan are you talking about?
9      A. The Tyler training plan for whatever module we
10  were implementing, because the whole idea is if
11  something happened to me, somebody else had to pick up
12  right where I left off, and people couldn't be told
13  something different or be confused by that.
14      Q. But the plan, is that like a customer
15  hand-out?  Is that something you're giving to the
16  client?
17      A. Yeah.  There's a training guide.  There's an
18  instruction manual.  Everything has to be duplicatable,
19  so whatever it was, it had to stay with that.  So if I
20  was working with a client, that was always the
21  foundation to keep that duplicatable.
22      If I was out of the picture, we couldn't
23  confuse the client so that if somebody else came in
24  that the client was saying, well, Joy was just here,
25  and that's not how she trained us.  So it always had to

---

JOY M. BIBLES McLEOD; May 18, 2010

## Page 120

1  be with that, whether it was one-on-one, whether it was
2  a group of people, whether it was city, county,
3  whatever it was.
4      There was a PowerPoint to do an overview.
5  There was always an agenda that went to the client
6  before the trip.  Then we just showed them whatever was
7  in the Tyler training, the Tyler training materials,
8  the overhead hands-on, and then usually picked somebody
9  from the class to do the driving.
10      We called it the driving so they could roam
11  around the application, which left us free to go around
12  the classroom, so if someone was struggling we could
13  help them, hold people more accountable if they were
14  going to check e-mail or be on the Internet, and then a
15  lot of questions and answers and some exercises so that
16  people could get some hands-on with that.
17      Q.  You write, "I performed my job primarily at
18  the customers' offices where I would remain until the
19  training was complete and the customer was up and
20  running on EDEN software."
21      Approximately how many times did you actually
22  go out to a customer site?
23      A.  I believe it was a minimum of three.
24      Q.  Is that per implementation or is that three
25  times total during your employment?

## Page 121

1      A.  Per implementation.
2      Q.  And do you recall how many implementations you
3  did?
4      A.  No, Ma'am, I do not.
5      Q.  I'm going to hand you a document that I marked
6  as Deposition Exhibit 13.  If you'll take a look at
7  Deposition Exhibit 13 and tell me if you recognize it.
8      A.  No.
9      Q.  If you look at it -- and I'll represent to you
10  I think this is information that was printed out of
11  Tyler Technologies' system.  If you see customer name
12  sort of in the middle of Deposition Exhibit 13, do you
13  see City of Pensacola?
14      A.  Yes, Ma'am.
15      Q.  Was that a client that you performed training
16  for?
17      A.  I think so, and Mindy shadowed me.
18      Q.  Look over at the far right where it says what
19  -- I believe the heading is supposed to be description.
20  Do you see that?
21      A.  Yes.
22      Q.  Do the entries under description mean anything
23  to you?
24      A.  (Reviewing).  Vaguely.  BQ, what was that?  I
25  can't remember what that module was.  Set-up ops go

## Page 122

1  live.  I don't know what no conv means.
2      Q.  Can you hand me Deposition Exhibit 13 back?
3      A.  (Handing).
4      Q.  I'm going to hand you something else.  This
5  one I'm marking Deposition Exhibit 14, and this may be
6  easier to read.
7      (Deposition Exhibit 14 was marked for
8      identification.)
9      MS. PERLIONI:  I'm sorry.  My pages got
10  stuck together.
11      Q.  (BY MS. PERLIONI) Take a look at Deposition
12  Exhibit 14.  See if you recognize that.
13      A.  (Reviewing).  No.
14      Q.  You might not recognize the actual print-out
15  or the format of this report.  I'm just wondering if
16  you look on it if any of the data or information that's
17  contained on Deposition Exhibit 14 looks familiar to
18  you.
19      A.  (Reviewing).  It looks like some time entry.
20      Q.  Under sold to short name on Deposition
21  Exhibit 14, do you see the first one says Highland?
22      A.  Uh-huh.
23      Q.  Who do you believe that to be?
24      A.  I don't know.
25      Q.  What about below that, Albany?

## Page 123

1      A.  Uh-huh.  Yeah.  In Oregon.
2      Q.  What is that?
3      A.  That was a client I did project accounting
4  for.
5      Q.  I thought you didn't do any project
6  accounting.
7      A.  I did do -- that's what I've been talking
8  about is project accounting.
9      Q.  I thought you didn't do the accounting module
10  at all.
11      A.  Project accounting is an auxiliary module.
12      Q.  You're right.  I'm sorry.  Tumwater.
13      A.  Another client I did project accounting for.
14      Q.  So did this appear to be if you look through
15  the different sold to, short name the clients for whom
16  you worked during the time that you were with Tyler
17  Technologies?
18      A.  Uh-huh.
19      Q.  Are there any clients that you recall working
20  with that are not reflected in Deposition Exhibit 14?
21      A.  I don't know.  I don't remember all the
22  clients I worked for.
23      Q.  Sitting here today, though, you don't?
24      A.  I don't.  They don't come to mind, no.
25      Q.  Look at what we have as 13 and 14.  It appears

1

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2              MARSHALL DIVISION

3
       PATTY BEALL, MATTHEW      )
4      MAXWELL, TALINA MCELHANY  )
       AND KELLY HAMPTON,        )
5      individually and on behalf)
       of all other similarly    )
6      situated;                 )
                                 )
7         Plaintiffs,            )
                                 )
8      vs.                       )   2:08-cv-422 TJW
                                 )
9      TYLER TECHNOLOGIES, INC.  )
       AND EDP ENTERPRISES, INC. )
10                               )
          Defendants.           )
11     ***********************************

12              ORAL DEPOSITION OF

13              RUSSELL STEELE

14              APRIL 9, 2010

15     ***********************************

16     ORAL DEPOSITION OF RUSSELL STEELE, produced as a

17     witness at the instance of the Defendants and duly

18     sworn, was taken in the above-styled and -numbered cause

19     on the 9th day of April, 2010, from 9:17 a.m. to

20     12:35 p.m., before Brenda Fleming, CSR in and for the

21     State of Texas, reported by machine shorthand at the

22     offices of Morgan, Lewis, & Bockius, LLP, 1717 Main

23     Street, Suite 3200, Dallas, Texas  75201-7347, pursuant

24     to the Federal Rules of Civil Procedure and the

25     provisions stated on the record.

Russell Steele - 4/9/10

2

1                    A P P E A R A N C E S

2    FOR THE DEFENDANTS:

3        Ms. Farin Khosravi
         MORGAN, LEWIS & BOCKIUS, LLP
4        1717 Main Street
         Suite 3200
5        Dallas, Texas  75201-7347
         (214) 466-4146 (telephone)
6        (214) 466-4001 (facsimile)

7    FOR THE PLAINTIFFS:

8        Ms. Laureen F. Bagley
         SLOAN, BAGLEY, HATCHER & PERRY
9        101 East Whaley Street
         Longview, Texas  75606
10       (903) 757-7000 (telephone)
         (903) 757-7574 (facsimile)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

# I N D E X

### PAGE

Appearances .......................................2

RUSSELL STEELE

Examination by Ms. Khosravi .....................4
Examination by Ms. Bagley .......................159
Further Examination by Ms. Khosravi ............165
Changes and Signature Page  .....................170
Reporter's Certification ........................172

## EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Consent to opt in signed by Russell Steele on 9-23-09 | 11 |
| 2 | Résumé of Rusty E. Steele | 24 |

Russell Steele - 4/9/10

92

1          THE WITNESS:  Okay.

2          MS. BAGLEY:  Almost, well, two hours.

3          (Break from 10:54 to 11:06)

4     Q.   (By Ms. Khosravi)  Rusty, I want to make sure

5   you realize that you are still under oath even though we

6   took a break.

7     A.   Yes.

8     Q.   Since we took a break, do you have any changes

9   to any of the answers that you've given previously that

10  you need to make?

11    A.   One of the things I didn't clarify on was, that

12  I can remember, in the applications that I actually did,

13  that I actually trained on -- the miscellaneous

14  applications, the court application -- those

15  applications rarely had a conversion with them.

16  Sometimes they had a conversion.

17    Q.   I have no idea what that means, Rusty.

18    A.   A conversion?

19    Q.   Uh-huh.

20    A.   You are converting from the previous software

21  that the city had to the INCODE software.  So you are

22  taking data from one software, and you are trying to

23  convert it to the fields of the INCODE software.

24    Q.   You are saying you did have input with

25  conversion of data, or you did not?

Russell Steele - 4/9/10

93

1      A.   I would verify data with the conversions.  If

2   there was a conversion, I would verify.  When I would be

3   on site, when I would go onto the city's site, I would

4   have my contact point.  And if there was a conversion

5   that was involved, then I would say, Well, here's the

6   data.  This is what we converted.  We need to look it

7   over and make sure it looks okay to you.

8      Q.   So you had -- in this situation you would have

9   converted data to the new software?

10     A.   I didn't do the conversion.

11     Q.   Yeah.  Who would have?

12     A.   I guess the developers.  The project manager

13  would actually obviously take ahold of all that and tell

14  the developer, We're doing a conversion.  And then the

15  developer does -- I don't know what they do as far as

16  the conversion.  But I would get on site on Monday, or

17  whenever it was, and any conversion that had taken

18  place, I would verify the data with the city personnel.

19     Q.   So somebody at Tyler would say, Rusty, we did a

20  conversion.  And so you knew a conversion of documents

21  had taken place?

22     A.   A conversion of data had taken place, yes.

23     Q.   Of data.  Excuse me.

24     A.   That's correct.

25     Q.   So when you got on site, you would review the

Russell Steele - 4/9/10

94

1   data to make sure it was converted correctly into

2   INCODE?

3      A.  Yes.

4      Q.  What does that process entail?

5      A.  I'll give you an example.  We had -- let's say,

6   if it was accounts receivable.  There are customers that

7   obtain or are billed for, you know, for the city mowing

8   their yard or what have you.  They owe the money to the

9   city for some reason, some service that the city

10  provided.  And now the city is trying to collect it.

11  You are trying to receive that debt.

12         If there was a conversion involved, then

13  the customer's name, the customer's mailing address, the

14  city, state, ZIP codes were in certain fields in the old

15  software.  Therefore, when they convert, they need to be

16  in the same fields in the new software.

17         And I would review that data with the

18  customer.

19     Q.  Would you do it when you were there for

20  training?

21     A.  Yes.

22     Q.  Okay.  Go on.

23     A.  Verifying conversion data would happen first

24  before you ever started doing training.  And once you

25  got to a point to where you thought the conversion was

Russell Steele - 4/9/10

51

1   we're going to take this live, so no more playing

2   around.

3            Is that how it worked?

4     A.   That's how it worked.

5     Q.   Did you have an agenda when you got there with

6   respect to training?  I'm going to train you on this

7   module first, then this, then that.  How did you --

8   that's still what I'm trying to understand.  If you come

9   to me, are you going to show me how to turn on my

10  computer, how to sign in?  How do you know what I know

11  and what you need to train me on?

12    A.   You're expected to know a certain level of

13  computers --

14    Q.   The employees?

15    A.   -- before I got out there.  The personnel of

16  the city.  That wasn't always the case.  But you were

17  expected to know that.

18            And the project managers were the ones

19  that made sure that they talked to a contact person

20  there at the city before I ever get there and said, This

21  is what he's been training on.  This is -- you know,

22  basic knowledge of the computer is what's expected.

23            I would get there, and I would tell them

24  I'm here for the court system, you know, the municipal

25  court system, to train on the municipal court system.

Russell Steele - 4/9/10

52

1     There really wasn't any kind of agenda.  We just went

2     and trained.  You know, we started off with the -- not

3     the database, but the -- we started off with entering

4     citations, which was the most common thing on a

5     day-to-day operations.  And then you moved on from

6     there, the life of a citation to the process.

7         Q.   So I'm understanding this correctly, there

8     wasn't an actual document with you where you were

9     sitting there looking at it going:  Number one, I need

10    to teach her how to enter citations.  Okay.

11          It didn't work that way?

12          MS. BAGLEY:  Object to form.

13        A.   Not that I recall.  I don't remember doing

14    anything like that.

15        Q.   Because that's my question to you.  I'm trying

16    to figure out how is it that you knew how to train them.

17    You didn't have a document that you had prepared prior

18    to your trip up there?

19        A.   Right.

20        Q.   You didn't prepare anything that prepared you

21    for the actual training?  It was all in your head?

22        A.   Yes.

23        Q.   And when you got there with the personnel,

24    again, you didn't have a document, an agenda, item

25    numbers 1 through 10, going across and checking those

Russell Steele - 4/9/10

53

1    off; or did you?

2        A.   I don't recall.

3        Q.   Now, when you were teaching them as to how to

4    enter the citations, did you have a document with you

5    that you would flip through and read in order to try to

6    train them?  Or, again, it was all your knowledge that

7    you were training them on?

8        A.   Right.  Previous experience with the software.

9    There was nothing that I had that marked everything off.

10       Q.   I understand now.

11            And what if they asked you questions, did

12   you just -- during your training was this an interactive

13   process, where if they asked you questions, you would

14   then work through it with them?

15       A.   Yes.  I would tell them what the software is

16   designed to do.  And if they asked me any legal

17   questions as of what is it supposed to be, I would refer

18   them back to their city attorney or their city finance

19   director, whoever it might be.

20       Q.   And, again, when they are asking you questions,

21   they're interrupting you.  Let's say you are showing

22   them how to enter a citation.  And they go, Oh, Rusty,

23   wait, but I don't know how, you know, X, Y, and Z will

24   play out.

25            You would then show them right then and

Russell Steele - 4/9/10

54

1    there to answer their question, or no?  Would you go

2    grab a document and turn to the page that said, If they

3    ask this, then this is the answer you give?

4        A.   No, there was no document.  It was just, we

5    would go ahead, and if they had a question about the

6    software, we would -- I would tell them, This is how you

7    do it.

8        Q.   And this was based on your knowledge having

9    worked with the software previously?

10       A.   That's correct.

11           MS. BAGLEY:  Object to the form.

12       Q.   I think I'm understanding now.

13           So that was initially when you went on

14   board with INCODE.  And you said your position was a

15   trainer?

16       A.   I'm trying to remember exactly what my title

17   was.

18       Q.   And I don't care about the title.

19   Functionality-wise, is that what you did, you trained?

20       A.   Yes.

21       Q.   Did it change in any way after that?

22       A.   The title changed.  The position -- the

23   functionality did not.

24       Q.   Okay.  So your title changed.  It became

25   something else.  Do you remember what your title became?

Russell Steele - 4/9/10

101

1    three days, three days of training, which normally you

2    would think eight hours of training, but that wasn't

3    normally what I did.  If I was there -- if I was

4    scheduled to be there all week --

5        Q.   You mean at the city's offices?

6        A.   At the city's offices.  If I was supposed to be

7    there Monday and leave on Friday, then I would normally

8    be there from 8:00 to 5:00 on site.  And if there was

9    any issues that needed, you know, that would come up,

10   say with conversion or what have you, then I would

11   e-mail the project manager with my concerns or my

12   supervisor or any other concerns, after 5:00 in my hotel

13   room.

14       Q.   What happens if you were supposed to be there

15   Monday through Friday, but let's say that Tuesday ended

16   up being a Federal holiday and the office was closed?  I

17   want to know how you spend your time then.  What

18   happened then?

19       A.   I usually try to work around those, to where I

20   didn't split it up that way.  If I did split it up -- I

21   can't remember a time when I did that.  Because I would

22   normally say, Well, you've got a holiday on Monday; I'll

23   show up on Tuesday.  Or you have a holiday within the

24   middle of the week, then what I'll do, I'll be there

25   Monday, Tuesday, and then I'll come back Thursday,

Russell Steele - 4/9/10

102

1    Friday.

2        Q.   If there were problems, such as conversion

3    issues, you wouldn't -- I thought earlier you were

4    telling me, as you're training you would then contact a

5    project manager, tell him there was a conversion

6    problem, so they could deal with that while you were

7    training?

8        A.   Correct.

9        Q.   Now I'm hearing that you weren't doing that.

10   You were doing it after hours.  Clarify that for me.

11          MS. BAGLEY:  Object to the form.

12       A.   I was doing it while I was training -- or

13   actually -- if it was a conversion, I would look at the

14   conversion with the client prior to training.  If we

15   find something during training, then I would write it

16   down.  If it was a specific major issue, then I would

17   contact a project manager immediately.  But if it was a

18   minor, real small issue, then I would wait until after

19   5:00 o'clock or when I had a break, and I would e-mail

20   the project manager with my issue.

21       Q.   So you made a decision whether or not it needed

22   to be brought to the project manager's assistance right

23   then or there or whether it could wait to be done later,

24   after you left for your hotel?

25       A.   If it didn't interrupt my training, then I

Russell Steele - 4/9/10

103

1    continued on with my training, and I contacted them

2    later.

3        Q.   But you made that decision as to when you were

4    going to contact your project manager?

5        A.   Depending on the importancy of the -- of the --

6    I mean, if we're missing names, obviously I can't train

7    without names.

8        Q.   Right.

9        A.   If I'm missing a ZIP code, I can train without

10   a ZIP Code.

11       Q.   So you made that decision --

12       A.   Right.

13       Q.   -- when you needed to call the project manager?

14       A.   It's not stopping me from training them.

15   That's right.

16       Q.   And so when you -- let's say it was one of

17   those problems that you waited until later, when you

18   left the client's site.  You would go to your hotel.

19   Walk me through how many hours you would -- how did that

20   work?  What would you do when you got to the hotel?

21       A.   If the conversion was complex, then I would

22   spend a few hours, anywhere from one to three hours,

23   reviewing the data off site so that I didn't have to,

24   you know, have them in front of me with them just seeing

25   that the problems with the conversion were there.  I

Russell Steele - 4/9/10

104

1    didn't like -- usually conversions were real -- the

2    conversions weren't pretty.  They weren't pretty at all.

3        Q.   What does that mean?  The data themselves?

4    What do you mean when you say that?

5        A.   Well, when you have a ZIP Code in the name

6    file --

7        Q.   Yeah.

8        A.   -- and that's all you have, then there's an

9    issue.

10       Q.   Okay.

11       A.   When you have the money amount completely, I

12   mean, jacked up, as far as -- and I say "jacked up."

13   I'm sorry.  That's slang.  But the decimal is missing or

14   the decimal is in the wrong place or you've gone back

15   and you've got all their history and you've put it to

16   what they owe now -- I mean, there's a lot of different

17   fields that you have to take into account with these

18   conversions.  And if it wasn't a pretty conversion, then

19   you spent more time on it with the data verification.

20   And you didn't want to have to do that in front of the

21   client because it made the software look bad, and it

22   made the company look bad.  So you continued with your

23   training the way you did it.

24       Q.   Did you make a call at that point, okay, I

25   should probably stop doing this in front of the client

# BRIAN T. FARRINGTON

**ATTORNEY AT LAW**
P.O. BOX 330088, FORT WORTH, TX  76163
TELEPHONE:  DALLAS (214) 373-0435
FORT WORTH (817) 429-8011
FAX:  (817) 423-0999
E-MAIL: BTFJD@aol.com

## BRIAN T. FARRINGTON

| | |
|---|---|
| Education: | B.A., *summa cum laude*, University of Dallas, 1973 |
| | M.A., with honors, University of Chicago, 1974 |
| | J.D., Texas Wesleyan School of Law, 1994 |
| | |
| Experience: | 1994 – Present – Principal, Law Offices of Brian T. Farrington |
| | 1993-Present - President, Harry Weisbrod Associates |
| | 1989-1993 - Vice President, Harry Weisbrod Associates |
| | 1975-1989 - U.S. Dept. of Labor, Wage and Hour Division |

Brian T. Farrington received his B.A. *summa cum laude* from the University of Dallas, and an M.A. with honors from the University of Chicago.  In 1975, he became an Investigator with the Wage and Hour Division of the U.S. Department of Labor.  In this capacity, he was responsible for enforcing a number of Federal labor laws through conducting investigations of businesses.

Mr. Farrington was an Investigator in Chicago from 1975 to 1982, with 18 months off to pursue graduate studies.  In 1981, he became a Senior Investigator.  In 1982, he transferred to Ft. Worth, where he continued as an Investigator until 1984.  During his tenure as an Investigator, Mr. Farrington conducted some 500-600 full Wage-Hour investigations, along with another 300-400 more limited enforcement actions.

Mr. Farrington has substantial management experience.  In 1984, he became Assistant District Director (this position is sometimes called " Director of Enforcement") in the Dallas District Office of Wage-Hour.  In this capacity he was directly responsible for the District Office's enforcement program, and directly supervised between 12 and 16 subordinates.   Mr. Farrington was involved in hiring, training, evaluating, and disciplining of the Investigators who reported to him.  He supervised some 5,000 investigations in the five years he held the position.

As Assistant District Director, Mr. Farrington was required to know the FLSA and the other laws enforced by the Wage-Hour Division thoroughly  He was responsible for determining in each case whether the law was properly applied by the Investigator, whether the evidence was adequate to support the Investigator's conclusions, and whether back wages had been calculated properly.  When cases could not be settled at the Investigator level, he conducted " second level" negotiations to attempt to secure from employers and their representatives agreements to comply with the law and pay back

EXHIBIT

"C"

wages.   When necessary, Mr. Farrington made the decision that litigation by the Government was appropriate, and sent the file to the Regional Solicitor of Labor with that recommendation.

In 1989, Mr. Farrington resigned from the Government to join the well-known Wage-Hour consulting firm of Harry Weisbrod Associates, where he began to assist employers with Wage-Hour, EEO, and other labor relations matters.   In 1993, Mr. Farrington became President of Harry Weisbrod Associates.   In 1994, he was licensed to practice law in the state of Texas.   His practice consists of consulting with employers to assist them in compliance, and representing them in investigations by the U.S. Department of Labor, Wage and Hour Division.   He also advises clients on compliance with state wage and hour laws, and represents them in investigations by state Departments of Labor.   Mr. Farrington also advises employers on compliance with anti-discrimination laws, and responds on behalf of clients to charges of discrimination filed with the Equal Employment Opportunity Commission and/or analogous state agencies.

Mr. Farrington is the author of numerous articles and several books.   He wrote WAGE-HOUR COMPLIANCE, which was published in 1995 by Warren, Gorham and Lamont. He also wrote the SHRM " Legal Report" on the 1996 FLSA amendments for the Society for Human Resource Management.   From 1990 until 1996, he taught a course which he designed, and for which he wrote the book-length course manual, on " Wage-Hour and EEO Compliance" for the Professional Development Institute at the University of North Texas.   This course was approved for 8 hours of Continuing Professional Education for Certified Public Accountants by the Texas Society of CPA' s, and for 6.75 hours of Continuing Legal Education by the Texas Bar Association. In 2000, he wrote another book-length course manual and designed and began teaching a course on compliance with employment regulations for the American Institute of Certified Public Accountants.

Mr. Farrington has completed another book, A WAGE-HOUR GUIDE FOR THE SELF STORAGE INDUSTRY, published in 2006.

Mr. Farrington is noted for his exceptional ability as a speaker and trainer.   He has taught sessions on the FLSA for the State Bar Associations of Texas and Arkansas, and for the Dallas Bar Association.     He has addressed groups such as the Society for Human Resource Management, the Texas Payroll Conference, attendees at ADP's "Meeting of the Minds" national conference, Ceridian Corporation's "Insights" national conference, local chapters of the Human Resources Associations, American Payroll Association, American Compensation Association, and many others.

Mr. Farrington has been used as a consulting and/or testifying expert in over fifty FLSA cases in federal and state courts across the country.